C. DABNEY O'RIORDAN (Cal. Bar No. 205158)
  oriordand@sec.gov
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
ANDREW J. HEFTY (Cal. Bar No. 220450)
  heftya@sec.gov
MARC KATZ (Cal. Bar No. 189534)
  katzm@sec.gov
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
T: (415) 705-2500
F: (415) 705-2501

ERIC M. BROOKS (Cal. Bar No. 209153)
  brookse@sec.gov
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA 02110-1424
(617) 573-8900

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>MICHAEL B. ROTHENBERG, and ROTHENBERG VENTURES LLC (f/k/a FRONTIER TECHNOLOGY VENTURE CAPITAL LLC and ROTHENBERG VENTURES MANAGEMENT COMPANY, LLC),<br><br>                Defendants. | CASE No. 18-CV-05080-JST<br><br>PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR DISGORGEMENT AND PENALTIES AGAINST DEFENDANT MICHAEL B. ROTHENBERG<br><br>DATE:  October 3, 2019<br>TIME:  2:00 P.M.<br><br>LOCATION:  Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL STATUS...................................................................................... 2

III.    STATEMENT OF FACTS ..................................................................................... 3

        A.      Rothenberg Created and Controlled RVMC and the Rothenberg Investor
                Funds, and the Funds Included Specific Limits on Investor-Paid Fees.............. 3

        B.      Rothenberg Established His Own "River" Brand Companies............................. 5

        C.      Rothenberg Misappropriated Approximately $18.8 Million. .............................. 5

        D.      Rothenberg Diverted the $18.8 Million to Himself and His Businesses. ............. 6

        E.      Rothenberg Tried to Cover Up His Misappropriation Through
                Deceptive Transactions and Documents................................................................ 7

                1.      To Mask $4 Million He Misappropriated, Rothenberg
                        Obtained a Line of Credit Under False Pretenses.................................... 7

                2.      Rothenberg Altered Accounting Records To Transform
                        Diverted Investor Funds Into Purported Investments. .............................. 8

                3.      Rothenberg Concocted "Warrant" Agreements to
                        Reclassify Diverted Funds as Investments in Warrants. ......................... 9

        F.      Rothenberg Persisted in Misappropriating Investor Money
                Even After He was Aware of the SEC Investigation......................................... 10

                1.      The Very Month He Was Informed of the SEC Investigation
                        Rothenberg Raised, and Misappropriated, $1.3 Million......................... 10

                2.      Even as He Negotiated Settlement with the SEC for Securities
                        Fraud Liability, Rothenberg Misappropriated Millions of Dollars. ....... 10

                3.      After the Court Entered the October 17, 2018 Judgment,
                        Rothenberg Funded His Lifestyle By Reselling a Warriors
                        Suite Leased with Diverted Funds. ........................................................ 11

IV.     ARGUMENT...................................................................................................... 12

        A.      The Court Should Order Disgorgement of Ill-Gotten Gains. ............................ 12

        B.      Rothenberg Should Be Ordered to Pay a Penalty of $9 Million....................... 16

V.      CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*SEC v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032
(S.D.N.Y. May 6, 2014)..................................................................... 12

*SEC v. Benson*, 657 F. Supp. 1122 (S.D.N.Y. 1987) ................................... 13

*SEC v. BIC Real Estate Dev. Corp.*, 2017 WL 1740136
(E.D. Cal. May 4, 2017)........................................................... 16, 17, 19

*SEC v. Brookstreet Sec. Corp.*, 664 Fed. Appx. 654 (9th Cir. 2016)............................ 17

*SEC v. Cavanagh,* 445 F.3d 105 (2d Cir. 2006) ................................................ 12

*SEC v. First Pacific Bancorp*, 142 F.3d 1186  (9th Cir. 1998)............................... 13, 14

*SEC v. Hedgelender LLC*, 786 F. Supp. 2d 1365 (S.D. Ohio 2011)........................... 13

*SEC v. Integrity Financial AZ, LLC*, 2012 WL 176228
(N.D. Ohio Jan 20, 2012)...................................................................... 19

*SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109 (9th Cir. 2006)......................... 13, 14

*SEC v. Kenton Capital*, 69 F. Supp. 2d 1 (D.C. Cir. 1998)........................... 16

*SEC v. Malik*, 2016 WL 670032 (S.D.N.Y. Feb. 9, 2016)........................... 19

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)........................... 12

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ...................................... 17

*SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072  (9th Cir. 2010) ...................... 13, 14, 15

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) .......................................... 12

*SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993) ............................................. 12

*SEC v. Zada*, 787 F.3d 375 (6th Cir. 2015)......................................... 19

## STATUTES AND REGULATIONS

15 U.S.C. § 80b–9(e) ......................................................... 16, 17, 19

26 U.S.C. § 6621(a)(2)........................................................... 15

17 C.F.R. § 201.1005 ............................................................ 17, 19

17 C.F.R. § 201.600(b) .......................................................... 15

*MOTION FOR DISGORGEMENT AND PENALTIES*

Pursuant to Paragraph III of the Court's Judgment as to Defendant Michael B. Rothenberg ("Judgment") (ECF No. 19) and the Stipulation to Modify Schedule Order and Order (ECF No. 48), Plaintiff Securities and Exchange Commission ("SEC or Commission") moves the Court for an award of disgorgement, prejudgment interest, and civil penalties against defendant Michael B. Rothenberg ("Rothenberg"). In particular, the Commission moves for: (1) an award of $18,776,800 in disgorgement against Rothenberg; (2) an award of $3,663,323.47 in prejudgment interest against Rothenberg; and (3) an award of $9 million in civil penalties against Rothenberg.

The Commission's motion is supported by the following Memorandum; the Declarations of Gerald Fujimoto ("Fujimoto Decl."), J.R. Eppler ("Eppler Decl."), and Eric Brooks ("Brooks Decl."), and the exhibits thereto; and the [Proposed] Order Granting Disgorgement and Penalties.

The SEC does not seek a monetary award against Defendant Rothenberg Ventures LLC, which is no longer controlled by Rothenberg.

I.       INTRODUCTION

With Judgment on liability already entered, the only issues before the Court are the appropriate amounts for disgorgement and civil penalties. The SEC seeks $18.8 million in disgorgement with prejudgment interest and a $9 million civil penalty against Defendant Michael Rothenberg.  Because the Court's monetary award hinges in part on Rothenberg's degree of scienter and the breadth of his fraud, the SEC provides a detailed recitation of the misconduct, even though liability is no longer at issue.

Rothenberg, who acted as an investment adviser, used his investment firm, Defendant Rothenberg Ventures LLC ("RVMC"), in a scheme to defraud venture capital funds he managed and their investors, in breach of his fiduciary duties to his clients, and in violation of Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2) & (4), and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8.  Rothenberg raised a net amount of approximately $45.9 million for six venture capital funds (the "Rothenberg Investor Funds" or "Funds") from at least 200 investors, falsely telling investors that the money would be used to purchase equity interests in early-stage technology companies, and that specified amounts would be used to pay management fees and administrative expenses.  But Rothenberg misappropriated money from the Funds, taking as supposed "fees" amounts that were far in excess of any amounts to which RVMC was entitled during the entire life of the Funds.  In doing so, and to cover up his misdeeds, Rothenberg engaged in numerous deceptive acts, including modifying accounting entries to make his misappropriation look like investments, entering into undisclosed transactions to paper over diverted money, and shuffling investments from one Fund to another to conceal prior diversions.

A detailed analysis by the SEC's expert forensic accountant demonstrates that Rothenberg ultimately misappropriated approximately $18.8 million that rightfully belonged to the Funds, nearly all of which was (i) transferred to Rothenberg personally (approximately $3.8 million), (ii) utilized to fund other entities under Rothenberg's control (approximately $8.8 million), and (iii) used to pay RVMC expenses over and above the management and administrative fees to which RVMC was entitled under the terms of the management agreements (approximately $5.7 million).  To rectify this fraud and to deter future misconduct, the SEC seeks from Rothenberg disgorgement of the approximately $18.8 million in

1  ill-gotten gains, plus pre-judgment interest of $3,663,323.47, and an order requiring him to pay a civil

2  penalty of $9 million.

3          The SEC first addresses below the procedural background relevant to this motion, and then sets

4  forth in a statement of facts three categories of information:  (1) foundational facts pertaining to

5  Rothenberg, his investment adviser RVMC, the Funds he managed, and Rothenberg's own business

6  ventures; (2) findings from the analysis by the SEC's retained expert relating to the $18.8 million

7  shortfall that the SEC seeks in disgorgement, including how he calculated the shortfall and Rothenberg's

8  various uses of the money he diverted; and (3) deceptive acts and other facts relevant to the $9 million

9  penalty sought by the SEC.  The SEC then provides the law and factual analysis in support of its

10  requested monetary award.

11  **II.     PROCEDURAL STATUS**

12          On August 20, 2018, Rothenberg and RVMC agreed to entry of Judgments in this case,

13  enjoining them from violations of Sections 206(1) and 206(2), and 206(4) of the Advisers Act [15

14  U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

15  Consents to Final Judgment (ECF Nos. 5, 6); Proposed Judgments (ECF Nos. 5-1, 6-1).  The Court

16  entered the Judgments on October 17, 2018.  Judgments (ECF Nos. 19, 20).  Simultaneously,

17  Rothenberg agreed, in an SEC administrative proceeding, to be barred from the securities industry,

18  which also prohibited Rothenberg from continuing to manage RVMC and the Rothenberg Investor

19  Funds.  *See* Brooks Decl. ¶ 4, Ex. 3 (SEC Rel. No. 5058, Order entered Oct. 19, 2018).  Since then, two

20  other individuals have managed RVMC and the Rothenberg Investor Funds.  Eppler Decl. ¶¶ 2, 7.

21          The Rothenberg Judgment leaves monetary relief to be decided by the Court.  Judgment (ECF

22  No. 19), ¶ III (Rothenberg "shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and

23  a civil penalty pursuant to Section 209(e)(2)(C) of the Advisers Act," and the "Court shall determine the

24  amounts of the disgorgement and civil penalty upon motion by the Commission.").  And the Judgment

25  provides that Rothenberg accepts the facts alleged in the complaint as true, and does not contest his

26  liability for the violations alleged, for the purposes of this motion and at any hearing on this motion.  *Id*.

27          Most of the underlying facts are thus not at issue for purposes of this motion.  The most

28  significant evidence outside the uncontested facts are those demonstrating the amount of investor money

Rothenberg diverted from the Rothenberg Investor Funds, and how Rothenberg directed that those monies be spent.  The SEC's retained expert, Gerald Fujimoto, conducted a detailed accounting of transactions during the relevant time period and established Rothenberg's use of funds.  Fujimoto's Expert Report, which is attached to and provides the basis for his Declaration, was timely disclosed to, and served upon, Rothenberg during discovery.

## III.   STATEMENT OF FACTS

### A.   Rothenberg Created and Controlled RVMC and the Rothenberg Investor Funds, and the Funds Included Specific Limits on Investor-Paid Fees.

Michael B. Rothenberg is a 35 year old resident of San Francisco.  *See* Compl. (ECF No. 1) ¶ 12. He formed his investment advisory company, RVMC, in 2012 while attending Harvard Business School. *Id.* ¶¶ 13, 23.  He acted as the manager, owner, and operator of RVMC, which he pitched as the venture capital "firm most uniquely positioned to find talented, Millennial founders." *Id.* ¶¶ 12, 21, 32.  When Rothenberg relinquished control of RVMC in October 2018, he placed his 95.5% ownership interest in RVMC into an irrevocable trust, the terms of which provide for the eventual return of his interest through an entity he appears to own.  Brooks Decl. ¶¶ 11-12, Exs. 9-10; Eppler Decl. ¶¶ 3, 9.

From 2012 to 2016, Rothenberg founded four main venture capital funds and two co-funds, with RVMC as the investment adviser to each.  Rothenberg formed his first Fund, Rothenberg Ventures 2013 Fund, LLC ("2013 Fund") in 2012.  Compl. ¶¶ 14, 23.  He acted as the final decision-maker for the strategy, investments, and day-to-day operations of the 2013 Fund on behalf of RVMC.  *Id.* ¶ 21.  The 2013 Fund invested primarily in equity of early stage technology companies.  *Id.* ¶ 14.  Rothenberg raised a net of $4,246,767 from investors in the 2013 Fund.  Fujimoto Decl. ¶ 7.  He set up a front-loaded fee structure for the Fund.  Compl. ¶ 37.  Each investor provided his or her share of committed capital upon investing, and at the same time, was to be charged a one-time management fee consisting of 17.75% of the investor's  invested capital; that fee was supposed to cover the management company's expenses incurred "in connection with the Fund's activities (including, without limitation, salaries, overhead and the costs and expenses incurred in connection with the organization of and the offering of Interests in the Fund)." *Id.* ¶¶ 37-38.  The "2013 Co-Fund," which provided investors with the opportunity to invest a certain amount of money in a specific portfolio company, consisted of eight legal

entities in which the 2013 Fund invested.  *See* Fujimoto Decl. ¶ 7.  Rothenberg raised a net of $2,644,215 from investors in the 2013 Co-Fund.  *Id*. ¶ 7.

In 2013, Rothenberg moved his business to San Francisco, and also formed Rothenberg Ventures 2014 Fund, LLC ("2014 Fund").  Compl. ¶¶ 15, 24.  He raised a net of $11,261,290 from investors in the 2014 Fund.  Fujimoto Decl. ¶ 7.  Like the 2013 Fund, the 2014 Fund also invested primarily in equity of early stage technology companies, and Rothenberg also made the strategy, investment, and day-to-day decisions for the Fund.  Compl. ¶¶ 15, 21.  However, Rothenberg changed the fee structure for the 2014 Fund:  He reduced the amount of front-loaded fees, with each investor paying 16% of their invested capital over the first two years of the Fund, but added 4% of their invested capital to be paid over the remaining eight years of the Fund (for a total of 20% of invested capital during the 10-year contractual lifetime of the Fund).  *Id*. ¶ 39.  Rothenberg represented in the 2014 Fund's offering memorandum that RVMC would pay all expenses incurred on behalf of the 2014 Fund, except the Fund would pay for certain expenses relating to its own investments.  *Id*. ¶ 40.  Rothenberg also formed the "2014 Co-Fund" and raised an additional net of $1,181,053 for that Fund.  *See* Fujimoto Decl. ¶ 7.

In 2014, Rothenberg formed Rothenberg Ventures 2015 Fund, LLC ("2015 Fund"), for which he raised a net of $14,026,093.  Compl. ¶¶ 16, 26; Fujimoto Decl. ¶ 7.  As with the other Funds, Rothenberg acted as the final decision-maker for the strategy, investments, and day-to-day operations of the 2015 Fund, which he told investors would be in invested in one or more early-stage companies focused on technology, such as e-commerce, mobile, digital media, social networking and software.  Compl. ¶¶ 21, 26.  Rothenberg again changed the fee structure, with less up-front fees but more fees overall:  Investors paid 13.5% of their capital contribution in fees during the first year of the Fund and 1.75% per year between the third and tenth year of the Fund, totaling 27.5% of fees over the 10-year life of the Fund.  Compl. ¶ 41.  RVMC was to use the fees to pay all expenses incurred on behalf of the 2015 Fund, except for certain specified legal, accounting, and banking fees.  *Id*. ¶ 42.

In 2015, Rothenberg formed Rothenberg Ventures 2016 Fund, LP, which together with the affiliated Cayman Islands exempted limited partnership, Rothenberg Ventures 2016 Feeder Fund, LP, comprised the "2016 Fund."  *Id*. ¶ 17.  Rothenberg raised a net of $12,497,915 from investors in the 2016 Fund.  Fujimoto Decl. ¶ 7.  The 2016 Fund did not charge front-loaded fees; instead, the Fund was

to pay annually 2.5% of each investor's committed capital to RVMC totaling 25% over the 10-year life of the Fund.  Compl. ¶ 43.  The collected fees for management and administrative expenses were to be used by RVMC to cover most expenses incurred on behalf of the Fund, with certain exceptions similar to those outlined above for the 2015 Fund.  *Id*.

Based on RVMC's records, Rothenberg also has an estimated $2.1 million of investments in the Funds.  Eppler Decl. ¶ 8, Ex. 1.

## B.     Rothenberg Established His Own "River" Brand Companies.

Separate from his RVMC advisory business, Rothenberg created his own business ventures called the "River brand" that he marketed to potential venture capital fund investors.  Compl. ¶¶ 28, 32.  The River brand included several business ventures Rothenberg founded and operated, including River Studios and the River Accelerator.  *Id*. ¶ 28.  River Studios, formed in late 2014, consisted of a number of Rothenberg's personal commercial projects, including a car racing team and a virtual reality studio.  *Id*. ¶ 29.  "River Accelerator" acted as an incubator for early-stage technology companies, whereby River Accelerator provided the startups with office space, guidance, networking connections, and at times, capital, in exchange for equity or "warrants."  *Id*. ¶ 30.  Warrants are securities that gives their holder the right, but not the obligation, to purchase equity in a company under certain conditions in the future.  *Id*., n.1.

## C.     Rothenberg Misappropriated Approximately $18.8 Million.

Rothenberg siphoned money from the Rothenberg Investor Funds far in excess of any fees authorized by the operative agreements.  Compl. ¶¶ 44-47, 65.  The SEC's expert, Gerald Fujimoto, has determined through a forensic accounting for all the Rothenberg Investor Funds the full amount Rothenberg diverted during the period 2012 through September 2018 (the month before Rothenberg resigned).  Fujimoto Decl. ¶¶ 3-5.  Fujimoto's expert analysis shows that Rothenberg ultimately misappropriated $18,776,800 of investor funds.  *Id*. ¶¶ 11, 16.

Fujimoto examined whether there was an asset shortfall across all the Rothenberg Investor Funds and, if so, the amount of that shortfall.  Fujimoto Decl. ¶¶ 3-5.  To accomplish this task, he looked at all the inflows of money that came both directly from investors and from amounts received by a Fund when one of them sold its investment in a portfolio company (referred to as "Exits").  *Id*. ¶¶ 7-8, 16. Fujimoto

subtracted from this inflow the amount that was actually invested plus the management fees that RVMC was allowed to take. *Id.* ¶¶ 8, 9, 16. Fujimoto then compared the amount of money that should have been left with the amount that was actually left. That difference is the $18,776,800. *Id.* ¶¶ 11, 16.

In particular, Fujimoto found a net inflow of approximately $58.9 million, consisting of (i) a net of approximately $45.9 million that Rothenberg raised from investors, (ii) approximately $12.5 million from Exits on investments, and (iii) approximately $495,000 of net advances from investors. *Id.* ¶¶ 7-8, 11, 16. Fujimoto then subtracted from the total inflow the above-described, permitted outflows of approximately $39.3 million, consisting of (1) approximately $30.9 million that Rothenberg invested in the portfolio companies, (2) approximately $6.7 million that RVMC was entitled to in fees, and (3) approximately $1.7 million distributed to investors. *Id.* ¶¶ 8-10, 16. Based upon these inflows and permitted outflows, there should have been approximately $19.5 million in the Rothenberg Investor Funds as of September 30, 2018, just before Rothenberg relinquished control. *Id.* ¶¶ 11, 16. Instead, only $740,866 remained, resulting in a cash shortfall of $18,776,800. *Id.*

**D.     Rothenberg Diverted the $18.8 Million to Himself and His Businesses.**

Forensic accounting expert Fujimoto also uncovered that Rothenberg funneled nearly all of the $18.8 million to himself and his businesses in three different ways: (1) Rothenberg directed a net of approximately $3,798,165 to himself, either via direct transfers from the Rothenberg Investor Funds or by using RVMC as a pass through to himself; (2) Rothenberg diverted a net of approximately $8,809,558 to his non-advisory businesses, including River Studios, River Accelerator, and others; and (3) Rothenberg used $5,699,307 in excess of the permissible investor fees for his RVMC business. Fujimoto Decl. ¶¶ 12-14, 16.

Fujimoto derived this third category total of $5,699,307 by taking (i) the total amount of $17 million that Rothenberg transferred from the Rothenberg Investor Funds to RVMC between September 2012, and September 2018, (ii) subtracting from this the $5.1 million that Rothenberg transferred from RVMC to Rothenberg's personal bank account, and (iii) adding the $564,290 that moved from the Rothenberg business entities to RVMC, resulting in a net transfer to RVMC of $12.4 million. RVMC was only entitled to $6.7 million in fees over the same period, meaning that Rothenberg transferred to RVMC an excess of $5,699,307. *Id.* ¶ 14.

**E.** **Rothenberg Tried to Cover Up His Misappropriation Through Deceptive Transactions and Documents.**

In addition to misappropriating nearly $18.8 million of investor funds, Rothenberg went to great lengths – over a period of years – to conceal his fraud, often by orchestrating elaborate deceptive transactions and creating misleading documents. These acts are relevant to the Court's penalty determination. Below are three of the many examples of Rothenberg's cover-up attempts.

**1.** **To Mask $4 Million He Misappropriated, Rothenberg Obtained a Line of Credit Under False Pretenses.**

Because Rothenberg misappropriated money from the 2015 Fund throughout 2015 (Compl. ¶¶ 35, 44, 66), as of December 20, 2015, the 2015 Fund's bank account had only $37,487; but the RVMC accounting records showed that RVMC owed the 2015 Fund $3,967,501. Fujimoto Decl. ¶¶ 40-41. In late December 2015, Rothenberg decided to fill the nearly $4 million deficit by convincing Silicon Valley Bank ("SVB") to loan RVMC $4 million.

Specifically, in late December 2015 Rothenberg secured a $4 million line of credit for RVMC from SVB. Compl. ¶ 73. But to obtain the line of credit, Rothenberg told SVB that the 2015 Fund actually owed RVMC $4.25 million in fees. *Id.* ¶ 73. Contrary to this representation, in addition to having only $37,000 cash on hand, RVMC's finance director calculated that RVMC already had taken more in fees from the 2015 Fund than RVMC would ever be entitled to earn over the entire 10-year contractual life of the Fund. *Id.* ¶ 44.

To create the appearance that the 2015 Fund had over $4 million that it owed RVMC, Rothenberg created a series of artifices. In the last few weeks of December 2015, Rothenberg raised $4,125,000 from investors for a different fund (i.e., the 2016 Fund), but he diverted the entire amount to the 2015 Fund where it was combined with $100,000 of new investment in the 2015 Fund. Fujimoto Decl. ¶ 41. As a result, as of December 28, 2015, the 2015 Fund showed in its account over $4.2 million – the same amount Rothenberg told SVB the 2015 Fund owed RVMC – yet nearly all of the money actually belonged to the 2016 Fund. *Id.*

On December 29, 2015, referencing the bank account numbers, SVB requested that Rothenberg approve the transfer of the $4.25 million from the 2015 Fund bank account to RVMC's bank

1  account.  Compl. ¶ 73.  That same day, Rothenberg approved in writing the requested transfer, and the

2  next day he acknowledged to the bank that the transfer had occurred.  *Id.*  Accordingly, after this

3  transfer, RVMC had $4.25 million in its account to act as collateral for the loan, and it appeared to SVB

4  that RVMC was entitled to that $4.25 million, as Rothenberg's had claimed.  By the end of December,

5  SVB provided RVMC the $4 million line of credit.  *Id.* ¶ 74.

6       Rothenberg immediately drew down the entire $4 million line of credit and transferred all of it

7  from RVMC to the 2015 Fund to pay-off the $3,967,501 RVMC owed the 2015 Fund.  Fujimoto Decl. ¶

8  43.  After this series of transactions, Rothenberg continued his misappropriation.  From January to April

9  2016, the 2015 Fund transferred a total of $5 million to RVMC that was spent as follows: $1.5 million to

10  Rothenberg himself; $1.25 million to Rothenberg's separate business entities; and $2.4 million for

11  RVMC operating expenses.  Fujimoto Decl. ¶ 44.

12            **2.    Rothenberg Altered Accounting Records To Transform**
            **Diverted Investor Funds Into Purported Investments.**
13

14       The second example of Rothenberg's campaign to conceal his fraud involves a scheme in 2016

15  to make it appear that he did not loot investor funds, but instead invested those funds in his River Studios

16  business.  In July 2016, the SEC notified Rothenberg of its investigation.  Compl. ¶ 80.  In August 2016,

17  following press reports about the SEC investigation, Rothenberg emailed his investors and claimed that

18  for several years Rothenberg funds had invested millions of dollars in his River Studios.  *Id.*

19       A few months later, in December 2016, Rothenberg altered RVMC's QuickBooks accounting

20  entries to make it appear as though fees paid to RVMC were actually investments in River

21  Studios.  Contrary to appearances, the QuickBooks entries of May 3, 2016, June 26, 2016, and July 1,

22  2016, originally showed that the 2015 Fund paid RVMC $2.1 million, $250,000, and $750,000,

23  respectively for "Professional Fees – management fees."  As the QuickBooks Audit Trail reveals,

24  however, these original entries were later altered on December 15, 2016, to instead state that all of these

25  transfers were made to River Studios, and that they related to portfolio investments.  Fujimoto Decl. ¶

26  35.

27       Bank records also debunk Rothenberg's "investment" claim.  The bank statements reflect that

28  all of these payments were made from the 2015 Fund bank account to an RVMC bank account.  *Id.* ¶ 36.

None of the payments went to River Studios.  None of the remarks on the bank statements indicate that these payments related to an investment in River Studios. And there are also no transfers of cash from RVMC to River Studios on the pertinent dates, demonstrating that the 2015 Fund did not in fact invest in River Studios as Rothenberg contended.  *Id.*

### 3. Rothenberg Concocted "Warrant" Agreements to Reclassify Diverted Funds as Investments in Warrants.

The third example of Rothenberg's deceptive acts is a variation of the *post hoc* River Studios "investment" scheme described above.  In this instance, Rothenberg also drafted sham "warrant" agreements to try to cover his tracks.  Between January 4, 2016, and March 2, 2016, Rothenberg transferred from the 2015 Fund to RVMC a total of $2,005,096.  Fujimoto Decl. ¶¶ 19, 24-25.  RVMC's QuickBooks accounting records originally recorded the entire $2,005,096 as payment of management and administrative fees.  *Id.*  Yet again, shortly after Rothenberg was informed of the SEC investigation, the QuickBooks were altered to instead record $1,485,550 of this amount as "Stock Warrants."  *Id.*

Rothenberg provided to the SEC what he claimed were the six agreements documenting the 2015 Fund's purchase of warrants from RVMC.  Compl. ¶ 78.  The agreements are facially deficient in three fundamental respects.  First, all six agreements are dated December 31, 2016 –  nine to twelve months after the transactions they purportedly authorize.  Fujimoto Decl. ¶ 19; Compl. ¶ 78.  Second, five of the six purported agreements are missing critical information:  They do not state (i) the number of shares that can be purchased in the portfolio companies, (ii) the exercise price of the warrants, or (iii) how the purchase price was determined.  Fujimoto Decl. ¶¶ 20-21.  In fact, the schedule Rothenberg provided, purportedly to show how he determined the purchase price, is completely blank.  *Id.* ¶ 21.  Third, Rothenberg signed the agreements on behalf of both the buyer (2015 Fund) and the seller (RVMC).  Compl. ¶ 78; Fujimoto Decl. ¶ 19.  In summary, Rothenberg signed five agreements committing the 2015 Fund to pay a specific amount to RVMC relating to warrants, but the 2015 Fund is not told how many shares it is purchasing, what the exercise price is, and why the price it is paying is a fair price.  Fujimoto Decl. ¶¶ 20-21.  Even the lone 2015 Fund warrant agreement that includes a valuation appears

1  internally inconsistent; though it shows that the 2015 Fund paid $120,000 for warrants, those warrants

2  purportedly have an aggregate value of only $4.38.  *Id.* ¶ 23.[1]

3  **F.    Rothenberg Persisted in Misappropriating Investor Money
         Even After He was Aware of the SEC Investigation.**

4

5  **1.    The Very Month He Was Informed of the SEC Investigation
         Rothenberg Raised, and Misappropriated, $1.3 Million.**

6  In July 2016, the same month Rothenberg was informed of the SEC's investigation, he solicited

7  additional money for a supposed investment in a company called Unity.  Compl. ¶¶ 48-53.  On July 15,

8  2016, one investor wired $1 million for the purpose of investing in Unity, and between July 19, 2016,

9  and August 1, 2016, other investors transferred a total of at least $300,000, for a total of approximately

10 $1.3 million earmarked for investment in Unity.  *Id.* ¶¶ 54, 56; Fujimoto Decl. ¶ 37.

11 But Rothenberg did not invest any of this money with Unity.  Between July 15 and August 15,

12 2016, Rothenberg misappropriated the entire $1.3 million.  Rothenberg diverted $465,000 to the 2016

13 Fund, and the remaining amounts to River Studios and RVMC.  Fujimoto Decl. ¶ 37; Compl. ¶¶ 55-56.

14 The one-million-dollar investor repeatedly requested that Rothenberg return the money, as did

15 other investors  Fujimoto Decl. ¶ 38; Compl. ¶¶ 59-62.  Eventually, one year later, on August 31, 2017,

16 Rothenberg returned $1 million to the investor, but not the other $300,000.  Moreover, to repay the  $1

17 million to the Unity investor, Rothenberg diverted $1 million from the liquidation of assets held by the

18 2013 and 2015 Funds.  Fujimoto Decl. ¶ 38; Compl. ¶¶ 63-64. That is, Rothenberg paid back one

19 investor by looting from others.

20 **2.    Even as He Negotiated Settlement with the SEC for Securities Fraud
         Liability, Rothenberg Misappropriated Millions of Dollars.**

21

22 In June, July, and August 2018, the SEC and Rothenberg engaged in settlement discussions that

23 led to the filing of this action as partially resolved on August 20, 2018.  Brooks Decl. ¶ 5.  In particular,

24 upon filing, Rothenberg agreed to be enjoined from further violations of the antifraud statute.  Consent to

25 Judgment (ECF No. 5), ¶ 2.  But while in those negotiations, on June 12, 2018, Rothenberg arranged for

26 the 2013 Fund to sell an interest in Robinhood Markets, Inc. ("Robinhood"), for $5.4 million, but he did

27

28 [1] Rothenberg engaged in similar deceptions using so-called "warrants" involving over $1 million
   from the 2016 Fund.  *See* Fujimoto Decl. ¶¶ 26-33.

not distribute the $5.4 million to the investors of the 2013 Fund.  Fujimoto Decl. ¶¶ 17-18.  Instead, between June and September 2018, Rothenberg transferred the proceeds from the Robinhood sale to a variety of accounts other than the 2013 Fund's account, including to Rothenberg's other business entities and RVMC.  *Id*. ¶ 18.

Eventually, on September 5, 2018, about two weeks after the filing of his Consent to Judgment, bank records do reflect a transfer of $732,000 to the 2013 Fund from "Rothenberg Group LLC."  Fujimoto Decl. ¶ 1, Ex. A at 28.  But that left a balance in the 2013 Fund account of only $732,916 – approximately $4.7 million less than the $5.4 million.  *Id*.

Right after the filing of the SEC action, Rothenberg also minimized his responsibility and deflected blame.  On August 21, 2018, just one day after this case was filed with Rothenberg's Consent to being enjoined from securities fraud, Rothenberg issued the "Rothenberg Ventures 2016 Fund – [Limited Partner] Update."  Brooks Decl. ¶ 6, Ex 4.  In describing the settlement with the SEC, the investor Update stated: "*Officially*, and as part of the agreement, we have agreed to 'neither admit nor deny' any of the allegations made in the complaint.  Instead, we will let the *actual* evidence speak for itself."  *Id*. (emphasis added).  Regarding his settlement and related agreement to be barred from the industry, the Update told investors: "This is another opportunity for me to personally take one for the team."  And the Update's hyperlink to the SEC's announcement of the action noted: "You can read more about this from the [SEC's] unique point of view here."  *Id*.

### 3.   After the Court Entered the October 17, 2018 Judgment, Rothenberg Funded His Lifestyle By Reselling a Warriors Suite Leased with Diverted Funds.

As to his recent sources of income, Rothenberg first claimed in discovery that he generally relied on payments of money that were "either loaned to [him] or owed to [him] from various sources," and then testified that he had no sources of income.  Brooks Decl. ¶¶ 3, 7, Exs. 2, 5.  However, bank records indicate that Rothenberg has been generating cash by reselling access to a Golden State Warriors suite that he leased with money he misappropriated from the Funds.

As noted above, in June 2018, Rothenberg sold $5.4 million in Robinhood stock and then immediately began misappropriating those funds.  *See supra* § III.F.2. (describing diverted proceeds from stock sales that belong to investors).  He transferred $136,000 of the $5.4 million to Golden State

1   Warriors LLC, apparently to pay for a luxury suite during Golden State Warriors games.  Fujimoto Decl.

2   ¶ 18; Compl. ¶ 71.  From October 2018, through January 2019, Rothenberg Investment Co., LLC

3   received at least $56,000 from SH Suites LLC, an online marketplace that enables people to buy and sell

4   the use of suites at various sports or entertainment venues across the United States.  Fujimoto Decl. ¶¶

5   13, 18.  In February 2019, approximately $16,500 then went from Rothenberg Investment Co. to

6   Rothenberg's personal account.  Brooks Decl. ¶ 8, Ex. 6.  Thus, Rothenberg has continued to use one of

7   his business entities to funnel the investor money to his personal account.

8        With his investors out $18.8 million due to his misappropriation, bank records reveal that in 2018

9   and early 2019, Rothenberg nevertheless gave $30,000 to the Stanford University Athletics Department

10  and spent thousands of dollars on ballet tickets.  Fujimoto Decl. ¶ 18; Brooks Decl. ¶ 9, Ex. 7.

11  **IV.   ARGUMENT**

12       **A.    The Court Should Order Disgorgement of Ill-Gotten Gains.**

13       Once the defendants' violations of the federal securities laws have been determined, the

14  district court "has broad equitable power to fashion appropriate remedies, including ordering that

15  culpable defendants disgorge their profits."  *SEC v. Razmilovic*, 738 F.3d 14, 30 (2d Cir. 2013).  "The

16  remedy consists of fact finding by a district court to determine the amount of money acquired through

17  wrongdoing – a process sometimes called 'accounting' – and an order compelling the wrongdoer to

18  pay that amount plus interest to the court."  *SEC v. Cavanagh,* 445 F.3d 105, 116 (2d Cir. 2006)

19  (footnote omitted).  The disgorgement remedy is designed to force "a defendant to give up the

20  amount by which he was unjustly enriched."  *Id.* at 117 (citation and internal quotation marks

21  omitted).  "The deterrent effect of a Commission enforcement action would be greatly undermined if

22  securities law violators were not required to disgorge illicit profits."  *SEC v. Rind*, 991 F.2d 1486,

23  1491 (9th Cir. 1993) (internal quotation marks omitted), *citing SEC v. Manor Nursing Centers, Inc.*,

24  458 F.2d 1082, 1104 (2d Cir. 1972). "Disgorgement, in other words, is judicial vindication of the

25  promise that crime does not pay."  *SEC v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *4

26  (S.D.N.Y. May 6, 2014).

27       The measurement of disgorgement should be a "reasonable approximation of profits causally

28  connected to the violation," and should include "all gains flowing from the illegal activities."  *SEC v.*

1  *JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1113-14 (9th Cir. 2006), *citing SEC v. First Pacific*

2  *Bancorp*, 142 F.3d 1186, 1192, n.6 (9th Cir. 1998).  "The SEC bears the ultimate burden of

3  persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment."

4  *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal quotation

5  marks omitted), *citing First Pacific Bancorp*, 142 F.3d at 1191.  Once the SEC demonstrates that its

6  measurement of disgorgement is a "reasonable approximation" of the defendant's profits, the burden

7  shifts to the defendant to demonstrate that the measurement is not a reasonable approximation.

8  *Platforms Wireless*, 617 F.3d at 1096.

9        Rothenberg should be ordered to disgorge the nearly $18.8 million that he misappropriated

10  from the Funds and then diverted to various, impermissible and undisclosed uses.  As a threshold

11  matter, the disgorgement remedy is particularly appropriate here, as Rothenberg sought by his

12  scheme to divert money from the Funds in order to enrich himself at the investors' expense.  As the

13  "person who control[led] the distribution of illegally obtained funds," Rothenberg should be liable for

14  the entirety of the amount siphoned from the Funds, regardless whether he currently retains any part

15  of those amounts.  *See Platforms Wireless*, 617 F.3d at 1098 ("A person who controls the distribution

16  of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she

17  retained."); *JT Wallenbrock & Assocs.*, 440 F.3d at 1116 ("The manner in which [the recipient of ill-

18  gotten funds] chose to spend the illegally obtained funds has no relevance to the disgorgement

19  calculation."); *SEC v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) (manner in which defendant

20  chooses to spend misappropriated funds – to pay off co-conspirators, give to charity, pay business

21  expenses – does not alter disgorgement liability).  That Rothenberg used some portion of the

22  misappropriated funds for RVMC's business expenses does not alter that they are subject to

23  disgorgement.  *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1087 (D.N.J. 1996) (the

24  "overwhelming weight of authority holds that securities laws violators may not offset their

25  disgorgement liability with business expenses"); *SEC v. Hedgelender LLC*, 786 F. Supp. 2d 1365,

26  1371-72 (S.D. Ohio 2011) (in procedurally similar case, in which defendants agreed not to contest

27  allegations in the complaint, court found that defendants should be liable for all profits flowing from

28  the alleged misstatements, including commissions paid to affiliates that defendants contended were

"expenses" that should be subtracted).  Without the disgorgement remedy, others might be emboldened to follow Rothenberg's path by relying on the complexity of their schemes, or after-the-fact, false excuses, or simply by quickly dissipating the assets they misappropriate.  *See First Pacific Bancorp*, 142 F.3d at 1191-92 (reiterating deterrence value of disgorgement and rejecting defendant's objection that the remedy should not be employed where he used the funds obtained from investors to pay commissions, management and legal fees).

It is also the case that the SEC's disgorgement measurement here is a "reasonable approximation" of Rothenberg's unjust enrichment flowing from his fraud.  *See Platforms Wireless*, 617 F.3d at 1096.  In particular, Rothenberg's misappropriation from the Funds falls into three general categories:  Funds Rothenberg directed to himself (totaling a net of approximately $3.8 million); to support his non-advisory business ventures, generally under the River brand (totaling approximately $8.8 million); and to defray expenditures incurred by his advisory business RVMC in excess of permissible fees (totaling approximately $5.7 million).

For each of these three categories, Rothenberg stood to gain significantly by diverting the money from the Funds to his own personal uses. While the guiding case law does not provide reason to distinguish among the various uses, the facts also do not support any practical reason to do so.  For instance, in the first category Rothenberg directly enriched himself, at the expense of his clients, by paying for his personal expenses, contrary to his representations to investors and contrary to his fiduciary duties to the Funds.  Similarly, the $8.8 million of investor money that Rothenberg used to fund his own speculative River Brand business ventures benefited him and is subject to disgorgement.  *See*, *e.g.*, *JT Wallenbrock & Assocs.*, 440 F.3d at 1114 ("Rather than put their own money at risk, the defendants benefited from the use of investor money to spend at the defendants' discretion – whether to cover operating expenses, invest in start-up companies, pay personal expenses or to pay fake returns to investors to perpetuate the fraud.").

For the same reasons, Rothenberg's use of more than $5.7 million for expenses incurred by RVMC enriched Rothenberg at the Funds' expense, in three ways.  First, Rothenberg was able to attract investments to the Funds in part by tailoring the fees that would be paid to RVMC; this fact becomes clear as Rothenberg continued to alter the fee formula over time, beginning with an up-front

rate of 17.75% for the 2013 Fund, and concluding with a back-end loaded structure for the 2016 Fund.  These changes reflect the importance of fees, and even the fee structure, to Rothenberg and investors.  Second, the differences in fees charged also signal that Rothenberg appreciated that, if RVMC's actual expenses were higher than the fees investors had agreed to pay through the Funds, Rothenberg, as the owner and manager of RVMC, would need to fund that shortfall.  By simply disregarding his promises to the Funds to limit fees charged to those contractually agreed upon, Rothenberg saved himself the substantial cost of those expenses, that is, $5.7 million.  Finally, Rothenberg, as the 95% owner of RVMC, stood to gain if the business succeeded, and the use of these excess fees helped to prop up the business.  Rothenberg (through a trust) still holds a 95.5% indirect ownership interest in RVMC.

Finally, regarding the total of $18,776,800, Rothenberg has offered no evidence to date contrary to the very thorough analysis of the SEC's expert, Fujimoto.  And the time for suggesting that any such evidence might exist has come and gone.  Order (ECF No. 48) (fact discovery closed May 1, 2019, and expert discovery closed July 3, 2019).  Accordingly, the "reasonable approximation" of Rothenberg's unjust enrichment through his fraud, totaling nearly $18.8 million, remains unchallenged, and Rothenberg should be ordered to pay it.

In keeping with the purposes of disgorgement – "to deny a wrongdoer any economic benefit from his violations," – Rothenberg should also be ordered to pay prejudgment interest.  *Platforms Wireless*, 617 F.3d at 1099.  The SEC has calculated interest on the nearly $18.8 million at the rate established for tax underpayments.  *See* 26 U.S.C. § 6621(a)(2); 17 C.F.R. § 201.600(b) (IRS underpayment rate used to calculate prejudgment interest on disgorgement ordered in SEC administrative proceedings).  This rate is both appropriately set forth in the parties' agreement to litigate the issue of disgorgement, and was found by the Ninth Circuit in *Platforms Wireless* to better reflect the benefit to the defendant from his unlawful conduct.  *See* 617 F.3d at 1099. (amount to be disgorged was effectively an "interest free loan" to the defendant, and a rate that would be charged on an unsecured loan best reflects the benefit to defendant); Judgment (ECF No. 19), ¶ III ("Prejudgment interest shall be calculated from April 1, 2015, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. §

6621(a)(2).").  Interest thus calculated on the $18,776,800, from April 1, 2015, through August 31, 2019, equals  $3,663,323.47.

**B.      Rothenberg Should Be Ordered to Pay a Penalty of $9 Million.**

The SEC seeks a $9 million civil penalty against Rothenberg based upon the totality of the circumstances of his conduct.  This substantial civil penalty is justified by Rothenberg's egregious actions:  He misappropriated $18.8 million from his investors, tried to cover his tracks through sham transactions and documents, and demonstrated no remorse.  Rothenberg's pervasive fraudulent conduct may indeed warrant the highest possible civil penalty, but the SEC believes that a $9 million penalty – less than half of his pecuniary gain and well below the maximum penalty authorized by statute – would punish him and deter such conduct.

Because Rothenberg violated the Advisers Act, he is liable for penalties under Section 209(e) of that act.  15 U.S.C. § 80b-9(e).  These civil penalties are meant to punish wrongdoers and to deter them and others from future securities law violations.  *See SEC v. BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *5 (E.D. Cal. May 4, 2017); *SEC v. Kenton Capital*, 69 F. Supp. 2d 1, 17 (D.C. Cir. 1998) (Congress intended "to achieve the dual goals of punishment of the individual violator and deterrence of future violations") (internal quotation marks and citation omitted).

The Advisers Act provides for three tiers of penalties, with the amount of any penalty "determined by the court in light of the facts and circumstances."  15 U.S.C. § 80b–9(e)(2).  First-tier penalties, the least severe, may be imposed for any violation of the Act.  *See id.* § 80b–9(e)(2)(A).  Second-tier penalties may be imposed for a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id* § 80b–9(e)(2)(B)*.*  Third-tier penalties, the most severe, may be imposed for a violation that (i) involves "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id*. § 80b–9(e)(2)(C).

The amount of the penalty imposed within each tier is discretionary.  *BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *4 (citing *SEC v. Brookstreet Sec. Corp.,* 664 Fed. Appx. 654, 656 (9th Cir. 2016)).  But the penalty must not exceed the greater of either the specific statutory amount, or

1   "the gross amount of pecuniary gain to such defendant as the result of the violation."  15 U.S.C. §
2   80b–9(e)(2)(A)-(C).

3        For a third-tier civil penalty for violations that occurred after March 5, 2013, the amount shall
4   not exceed the greater of (i) $160,000 for each violation for a natural person or (ii) the gross amount
5   of pecuniary gain to the defendant.  15 U.S.C. § 80b–9(e)(2)(C); 17 C.F.R. § 201.1005 (inflation
6   adjusted penalty amounts); *BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *4 (reciting penalty
7   amount after March 5, 2013).

8        For Rothenberg, imposition of a third-tier penalty is appropriate because both of the statutory
9   requirements are met – (i) the violations involve fraud, and (ii) they resulted in substantial losses.  15
10  U.S.C. § 80b–9(e)(2)(C).  The allegations in the complaint, which are undisputed for the purposes of
11  this remedy phase, establish that Rothenberg perpetrated an extensive fraud.  *See, e.g.*, Compl. ¶¶1-4;
12  37-71.  Rothenberg's scheme created a significant risk of substantial losses to his investors by
13  misappropriating millions of dollars of investor funds.  *Id.*; *see also* Fujimoto Decl. ¶¶ 3-5, 11, 16.

14       In evaluating the appropriateness of the total civil penalty amount, courts consider the factors
15  set forth in *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980), which include:

16       (1) The degree of scienter involved;

17       (2) The isolated or recurrent nature of the infraction;

18       (3) The defendant's recognition of the wrongful nature of his conduct;

19       (4) The likelihood, because of the defendant's professional occupation, that future violations
20           might occur; and

21       (5) The sincerity of his assurances against future violations.

22  *BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *5 (evaluating *Murphy* factors and imposing a
23  $12 million third-tier penalty equal to disgorgement amount).

24       These *Murphy* factors weigh heavily in favor of a stiff, third-tier penalty.  As to the first
25  factor, Rothenberg acted with a high degree of scienter.  Rothenberg's contemporaneous statements,
26  and efforts at concealment, establish that he diverted the investors' money knowingly.  Thus,
27  contemporaneous internal RVMC emails show that he knew that he was taking more money from the
28  Funds than RVMC was entitled to earn.  *See* Compl. ¶ 46.  In 2015, RVMC's finance director began

1   warning Rothenberg that he must cut expenses at RVMC and River Studios. *Id.* ¶ 35.  By December

2   2015, RVMC's finance director calculated that Rothenberg caused RVMC to take more in fees from

3   the 2015 Fund than RVMC would ever be able to earn in fees over the 10-year contractual life of the

4   Fund. *Id.* ¶ 44.  Rather than heeding that advice, Rothenberg continued and even accelerated his

5   scheme to defraud the Funds. *Id.* ¶ 36.  He continued to raise money for the 2015 and 2016 Funds

6   while diverting money from the 2015 Fund. *Id.* ¶¶ 44, 68.  He channeled Fund money through his

7   personal accounts, and took money from the Funds to pay his personal expenses. *Id.* ¶¶ 46, 70.  Even

8   after he became aware of the SEC's investigation, he misused Fund money to pay his own legal bills

9   and his personal credit cards. *Id.* ¶ 70.  Rothenberg also engaged in numerous deceptive acts to cover

10  up the fraud he knew he was committing, changing accounting entries and crating sham documents to

11  hide his actions. *See supra* at §§ III.E.2; III.E.3.

12      Factor two also supports imposition of a significant penalty: Rothenberg's misconduct

13  involved an array of deceptive acts spanning years.  For example, in 2015, he tried to cover up his

14  prior misappropriation from the 2015 Fund by obtaining the SVB $4 million line of credit under false

15  pretenses. *See supra* § III.E.1.  In July 2016, Rothenberg misappropriated the $1.3 million of

16  investor funds intended for Unity. *See supra* § III.F.1.  In December 2016, Rothenberg altered

17  QuickBooks entries to make it appear that misappropriated money was actually "invested" in River

18  Studios and "Stock Warrants." *See supra* §§ III.E.2; III.E.3.  And in 2018, Rothenberg diverted the

19  $5.4 million from the Robinhood sale. *See supra* § III.F.2.

20      Similarly, the third factor supports a significant penalty.  Besides resolving the liability

21  portion of this case, Rothenberg has not done anything to demonstrate that he understands the

22  wrongful nature of his misconduct.  Quite the contrary.  He learned of the SEC's investigation in July

23  2016.  Almost immediately thereafter, in July and August 2016, he raised and promptly

24  misappropriated $1.3 million intended as an investment in Unity. *See supra* § III.F.1.  In December

25  2016, he also altered the QuickBooks to falsely show that the 2015 Fund invested in River Studios

26  and "Stock Warrants" and he created sham warrant agreements. *See supra* §§ III.E.2; III.E.3.  Then

27  in 2018, during the midst of settlement negotiations with the SEC, he sold the 2013 Fund's interest in

28  Robinhood for $5.4 million and diverted that money, funneling some of it for a Warriors luxury suite

1   that he used to generate additional cash into 2019.  *See supra* §§ III.F.2; III.F.3.  His words also

2   reveal no contrition, dismissively referencing the SEC's "unique point of view" and claiming to

3   "personally take one for the team."  His actions are the opposite of *Murphy's* third factor of

4   "recognition of the wrongful nature of his conduct."  Rothenberg has demonstrated a total lack of

5   remorse and has earned a significant penalty.

6        As to the fourth and fifth factors, based on the extent of Rothenberg's misconduct and his

7   deceptive acts to camouflage the misconduct, it is unlikely that Rothenberg will forgo attempting

8   future violations.  The SEC's interactions with Rothenberg, which began with its investigation in

9   2016, have had no impact on his willingness to commit fraud, which weighs heavily in favor of a

10  serious civil penalty.

11       In light of the *Murphy* analysis, the SEC respectfully submits that a $9 million civil penalty is

12  appropriate.  This represents less than one-half of the $18.8 million that Rothenberg misappropriated.

13  "Courts frequently authorize civil penalties equal to the amount of disgorgement."  *BIC Real Estate*

14  *Dev. Corp.*, 2017 WL 1740136, at *4 (awarding a $12 million civil penalty and citing seven other

15  cases that awarded a civil penalty equal to the disgorgement figure, including  *SEC v. Zada*, 787 F.3d

16  375, 383 (6th Cir. 2015), which upheld a third-tier penalty of over $56 million).

17       In addition to being half of the amount Rothenberg misappropriated from the Funds, $9

18  million is also far lower than the maximum third-tier civil penalty.  As noted, the Court could award

19  $160,000 "for each violation."  15 U.S.C. § 80b–9(e)(2)(C)); 17 C.F.R. § 201.1005.  One method of

20  calculating the number of "violations" is the number of investors.  *SEC v. Malik*, 2016 WL 670032, at

21  *2 (S.D.N.Y. Feb. 9, 2016) (court ordered disgorgement of approximately $1 million and third-tier

22  civil penalties of $2.9 million, representing the then-maximum fine of $150,000 "for each of the 19

23  defrauded investors"); *SEC v. Integrity Financial AZ, LLC*, 2012 WL 176228, at *9 (N.D. Ohio Jan

24  20, 2012) (awarding a penalty equal to defendant's pecuniary gain of $87,000, but recognizing that

25  the court could have imposed $1.69 million based upon the statutory penalty amount multiplied by

26  the number of investors).  Here, with over 200 investors, (Compl. ¶ 1), the third-tier penalty could

27  exceed $32 million.

28

Under the totality of these facts and circumstances, Rothenberg's egregious conduct warrants a penalty of $9 million.  He orchestrated a years-long, massive fraud and posed a substantial risk of loss to investors, with $18.8 million misappropriated. Here, a penalty of this magnitude will serve to both punish and deter.  Accordingly, the SEC respectfully requests that the Court impose a penalty of $9 million, in addition to $18.8 million for disgorgement, and $3,663,323.47 in prejudgment interest.

## V.  CONCLUSION

For the reasons set forth above, the Commissions respectfully requests that the Court grant the Commission's Motion and enter the requested relief.

Dated: July 31, 2019                    Respectfully submitted,


                                        /s/  *Andrew J. Hefty*
                                        Andrew J. Hefty
                                        Marc Katz
                                        Eric M. Brooks

                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION