1  Michael B. Rothenberg
   mrothenberg@rothenberg.co
2  712 Bryant Street, Unit #6
   San Francisco, California 94107
3  Telephone:    (415) 761-1062

4  *PRO SE* DEFENDANT

5

6

RECEIVED

2019 AUG 21  P 4: 35

SUSAN Y. SOONG
CLERK, US DISTRICT COURT
NO. DIST. OF CA.

7              **UNITED STATES DISTRICT COURT**

8            **NORTHERN DISTRICT OF CALIFORNIA**

9                **SAN FRANCISCO DIVISION**

FILED
AUG 21 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

10

11

12  SECURITIES AND EXCHANGE COMMISSION,        Case No. 3:18-cv-05080-JST

13              Plaintiff,

14      vs.                                     **DEFENDANT, MICHAEL B.
                                                ROTHENBERG'S OPPOSITION TO
15                                              PLAINTIFF SECURITIES AND
                                                EXCHANGE COMMISSION'S MOTION**
16  MICHAEL B. ROTHENBERG, and                 **FOR DISGORGEMENT AND
    ROTHENBERG VENTURES LLC (f/k/a             PENALTIES**
17  ROTHENBERG VENTURES MANAGEMENT
    COMPANY LLC and FRONTIER TECHNOLOGY
18  VENTURE CAPITAL, LLC),                      DATE:  October 9, 2019
                                                TIME:  2:00 P.M.
19              Defendants.
                                                LOCATION:  Oakland Courthouse
20                                                         Courtroom 6, 2nd Floor

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................................  1

II.     PROCEDURAL STATUS.................................................................................................  2

III.    STATEMENT OF FACTS...............................................................................................  3

      A.    The Genesis of Rothenberg Ventures............................................................  3

      B.    Rothenberg Created and Managed RVMC and the Funds that Permitted and Disclosed a Variety of Expenditures Alongside Fees and Direct Investments.  4

          1.    2013 Fund. .......................................................................................  6

          2.    2014 Fund..........................................................................................  6

          3.    2015 Fund..........................................................................................  6

          4.    2016 Fund..........................................................................................  7

      C.    Rothenberg Abided by the Funds' Governing Documents to Make Indirect Investments, Charge Indemnity and Incur Other Expenditures...........  7

          1.    The Fund Documents Allow for Indirect Investments...................  7

          2.    The Fund Documents Allow for Indemnity...............................  8

          3.    The Fund Documents Allow for Other Expenditures....................  10

      D.    The River Branded Businesses Served the Interests of the Funds and Their Expenditures Did Not Constitute Personal Profit to Mr. Rothenberg. ...........  10

      E.    Mr. Rothenberg Engaged in a Series of Transactions that Were Not Concealed and Were Approved by His Counsel and Finance Team. .........................  11

          1.    Silicon Valley Bank Line of Credit. ..........................................  13

          2.    Accounting Records. ...............................................................  13

          3.    The Warrant Purchases and the River Program. ...........................  14

      F.    The Root Cause of the SEC's Investigation is Based on SVB's fraud..........  15

      G.    Mr. Rothenberg Continued to Operate and Create Value for the Funds Even after the SEC had Begun its Investigation. ............................................  17

          1.    $1.3 Million Advanced and Returned for Unity, with Interest. .........  17

          2.    Transactions in June 2016 and Thereafter...... .........................  18

IV.     ARGUMENT.................................................................................................................  19

      A.    The SEC's "Disgorgement" Demand is Legally and Factually Unfounded. ...  19

          1.    The SEC's "Disgorgement" Demand Is Actually a Thinly Disguised Demand for a Penalty that Is Not Statutorily Authorized...............  19

          2.    Any Equitable Disgorgement Must Be Limited to Money Still in Mr. Rothenberg's Possession.....................................................  22

      B.    The $9 Million Penalty Sought by the SEC is Grossly Excessive and Unsupported by Case Law. ......................................................  23

V.      CONCLUSION..............................................................................................................  25

1

## <u>TABLE OF AUTHORITIES</u>

2

## <u>CASES</u>

3    *SEC v. Illarramendi*, Civil No. 3:11cv78 (JBA) (D. Conn. Feb. 7, 2018)....................   9

4    *VonFeldt v. Stifel Fin. Corp.,* 714 A.2d 79, 84 (Del. 1998).....................................   9

5    *Ridder v. CityFed Fin. Corp.,* 47 F.3d 85, 87 (3d Cir. 1995)...................................   9

6    *Kokesh v. SEC*, 137 S.Ct. 1635 (2017)........................................................   20,21

     *Bell v. Wolfish*, 441 U.S. 520 (1979)..........................................................   21

7    *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77 (S.D.N.Y.1970)..............................   21

8    *Great-West v. Knudson*, 534 U.S. 204 (2002)....................................................   20

9    *Jackson v. Shawl*, 29 Cal. 267, 272............................................................   22

10   *SEC v. Murphy*, 626 F.2d 633 (9th Cir.: 1980)..................................................   25

11

12

## <u>STATUTES AND REGULATIONS</u>

13   Delaware Code Title 8. Corporations §145.....................................................   9

14   Section 209(e)(2)(C) of the Investment Advisers Act of 1940................................   18,24

15   Sections 206(1) of the Investment Advisers Act of 1940 ....................................   19

16   Sections 206(2) of the Investment Advisers Act of 1940.....................................   19

     Sections 206(4) of the Investment Advisers Act of 1940.....................................   19

17   15 U.S.C. §§ 80b-6(1)......................................................................   19

18   15 U.S.C. §§ 80b-6(2)......................................................................   19

19   15 U.S.C. §§ 80b-6(4) .....................................................................   19

20   17 C.F.R. § 275.206(4)-8...................................................................   19

21   15 USC 77h-1(e)............................................................................   20

22   15 USC 78u-2(e)............................................................................   20

23   15 USC 78u-3(e)............................................................................   20

24   28 U.S.C. §2462............................................................................   20

25   California Civil Code §1667................................................................   23

26

27

28

## OPPOSITION TO SEC'S MOTION FOR DISGORGEMENT AND PENALTIES

Defendant Michael B. Rothenberg ("Mr. Rothenberg") opposes the Securities and Exchange Commission's ("SEC") Motion for Disgorgement and Penalties in its entirety. In particular Mr. Rothenberg opposes any award of disgorgement or civil penalties.

Mr. Rothenberg's opposition is supported by the following Memorandum and Exhibits.

## I.   **INTRODUCTION**

As an opportunity to relieve the investors in the various Rothenberg Ventures investment funds (the "Funds") of further drama and expense from the SEC's investigation and threatened litigation, Mr. Rothenberg settled with the SEC in August 2018, without admitting or denying the allegations set forth in the SEC's complaint, and submitted to personal and subject matter jurisdiction of this court for purposes of determining the appropriate amounts of disgorgement and penalties, if any. In this submission, Mr. Rothenberg provides the Court with additional facts that give the Court broader context for the underlying events and balance out the SEC's unfair and overwrought portrayal of him.

The SEC asserts that Mr. Rothenberg misappropriated money from the Funds by "taking as **supposed** 'fees' amounts that were far in excess of any amount to which RVMC was entitled during the entire life of the Funds." (SEC Motion, p. 1, line 15) [Emphasis Added] This use of the word "supposed" suggests that Mr. Rothenberg was trying to cover up expenditures by claiming they were fees.  The SEC has been informed numerous times that Mr. Rothenberg does not take that position at all. In a letter from Mr. Rothenberg's former counsel, Marc Fagel, to the SEC staff, he explicitly states that with respect to the 2013 Fund Operating Agreement (and its incorporated Management Agreement) "the Management Agreement provides that only 'fees for certain day-to-day legal services' are borne by Rothenberg Ventures out of its management fees; in contrast, the Fund shall pay for all other Management Company expenses, including extraordinary expenses, other legal expenses, and fees and expenses with respect to "litigation and threatened litigation matters involving" the Fund. (See Exhibits A and B).

Mr. Rothenberg, starting out as an entrepreneurial twenty-eight-year-old graduate student, eventually created four Funds (with several smaller related funds), and raised for them approximately $45.9 million from sophisticated and wealthy investors.  The SEC would like to have the Court believe Mr. Rothenberg's project was a fraud from the ground up.  The governing documents for Rothenberg Ventures confirm this viewpoint to be not even remotely accurate.

OPPOSITION TO MOTION FOR DISGORGEMENT AND PENALTIES          Case No. 3:18-cv-05080-JST

1   Indeed, each of the four Funds from which this case arose exists today and continue to hold

2   securities that exceed the value of the investors' initial investments.

3          That this is so, should not be surprising given the energy, acumen and eye for talent Mr.

4   Rothenberg is known for bringing to his projects.  When structuring Rothenberg Ventures and

5   each of the Funds, Mr. Rothenberg relied on his counsel, which consisted of the most prominent

6   law firms serving the venture capital industry. The structure of the Funds, their respective

7   governing documents and solicitation materials were all designed, drafted and put into action by

8   the advice, aid and assurances of such law firms. All of the investors in the Funds were either

9   accredited or qualified institutional buyers. The investors consisted of private equity firms, funds

10  of funds, former employers, professors and classmates from Stanford and Harvard, as well as other

11  venture capitalists who recognized the raw talent and uncontainable energy of Mr. Rothenberg.

12

13  **II.      PROCEDURAL STATUS**

14         On August 20, 2018, Mr. Rothenberg settled with the SEC, without admitting or denying

15  the allegations set forth in the SEC's complaint filed on August 20, 2018, and submitted to

16  personal and subject matter jurisdiction of this court for purposes of determining the appropriate

17  amounts of penalties and disgorgement, which both Mr. Rothenberg and his counsel Mr. Fagel

18  knew and understood to be zero. The settlement was entered as a judgment by the Court on

19  October 17, 2018. Simultaneously, Mr. Rothenberg was forced to be barred from the Securities

20  industry for a period of five years, after which time he will be eligible to reapply for admission. In

21  accordance with the bar, Mr. Rothenberg was also forced to resign from his position as manager of

22  the various Rothenberg Ventures funds on October 17, 2018.

23         As part of the settlement with the SEC, any monetary relief to be awarded in this case is to

24  be determined by the Court. Although the allegations set forth in the SEC's complaint are deemed

25  to be true solely for purposes of the SEC's motion and at any hearing on the motion, the facts and

26  arguments set forth herein are provided in opposition to the SEC's characterization of the facts in

27  the SEC's motion for purposes of determining the appropriate remedies in this case, as well as to

28

2

refute and clarify the inapplicability of the factual claims and arguments advanced in the SEC's motion that are not included in its complaint.

## III.   STATEMENT OF FACTS
### A.   Genesis of Rothenberg Ventures.

Mr. Rothenberg's highest academic achievement in high school was to become U.S. Math Olympian team in 2001, by earning his position in the 2001 Math Olympiad in Washington D.C. After high school, he earned B.S. and M.S. degrees from the Stanford School of Engineering. After working several years for major U.S. management consulting and private equity firms, he attended Harvard Business School ("HBS") where he earned an M.B.A.

The genesis of Rothenberg Ventures comes directly out of Mr. Rothenberg's time as a student at HBS, where he was first introduced to the concept of launching an early stage venture capital firm with limited capital by structuring the working capital of the firm as an up-front lump sum payment typical to technology startups rather than as management fees over time like a typical large scale venture capital firm, and building an infrastructure that would enable effective asset allocation via the use of a cohort-based program providing seed investment, connections, sales mentorship, education, and other resources.  Rothenberg Ventures learned to bundle these valuable startup services together in a startup program that became well-known as the River Accelerator.  Indeed, Mr. Rothenberg succeeded in making a reality of the venture capital business model that was taught to him at HBS. In fact, he received a tremendous amount of praise from venture capital industry leaders, was ranked number one in frontier technology investing by numerous firms including Goldman Sachs, and secured investment allocations in behalf of the funds he managed in a number of high-profile venture investment opportunities, such as SpaceX, Matterport, Unity Technologies, Inc. ("Unity"), and Gusto. Unfortunately, the Unity opportunity was withdrawn after news of the SEC investigation was published.  Not only did Mr. Rothenberg receive allocations into highly sought-after startups that were already known to be successful, Mr. Rothenberg's most valuable, lasting and rare contribution to the venture ecosystem can be

3

1   attributed to the startups that did not exist until Mr. Rothenberg attracted, identified, and seeded

2   them. His unique eye for talent in his identification and conviction to invest in people ready to

3   build the world's most valuable startups manifested in Rothenberg Ventures' position as the very

4   first venture investor in an incredible constellation of now successful startups, including

5   Robinhood, Patreon, Vicarious Surgical, Dronebase, Homebase, and Andela.  Any venture

6   capitalist who seeded these companies over the course of a career would be considered successful

7   by almost any measure, and yet Mr. Rothenberg identified and invested in all of these startups in

8   less than 3 years, which is all he had from the close of his initial fund to the SEC's sudden

9   appearance in 2016. Nevertheless, Rothenberg Ventures continues to hold a highly valuable and

10  growing portfolio that attracts interest from any number of private equity investors today.

11          **B.     Rothenberg Created and Managed RVMC and the Funds that Permitted and
                     Disclosed a Variety of Expenditures Alongside Fees and Direct Investments.**

12

13          The formation documents for each of the Funds - each authored by top Silicon Valley legal

14  firms Orrick or Cooley - provided Mr. Rothenberg with the authority to make direct investments,

15  indirect investments and charge the Funds for a variety of purposes, including but not limited to

16  indemnity, "guaranteed payments," and expenditures for bringing lawsuits against third parties.

17  (See Exhibits B, C, D and E).

18          Moreover, the summary of principal terms for the 2015 Fund disclosed that assets of the

19  Fund would be allocated to what was titled the "River Accelerator Investment" and that such

20  investments would include cash and services typical of the accelerator model, described as "a

21  combination of cash directly transferred to the company, the provision and use of specialized

22  equipment, real estate, events, services provided by employees or contractors, or other

23  expenditures." (See Exhibit D). Despite that clear and accurate River Accelerator disclosure

24  written by top fund-formation counsel Cooley, the SEC's expert, Gerald T. Fujimoto, in his report

25  (the "Fujimoto Report") incorrectly, incompetently, and unfairly mischaracterizes every use of

26  capital that is consistent with it as, instead, a misappropriation of funds. (See Fujimoto Report).

27

28

4

1    In the 2016 Fund Summary of Terms again written by Cooley and provided to each

2  investor in the Fund as part of its subscription package includes the following language to describe

3  a more comprehensive agenda referred to as the "River Program" and discloses that this Fund will

4  make indirect investments via the River Program that will also be allocated for "the provision and

5  use of specialized equipment, real estate, events, services provided by employees or contractors, or

6  other expenditures." (See Exhibit E). Again, Mr. Fujimoto inexplicably ignores the intended and

7  permitted use of such expenditures in his accounting, which can only be attributed to

8  incompetence or malice, and for a man of his background it is hard to imagine it is the former.

9  The result is Mr. Fujimoto generating a report – at significant cost to the U.S. taxpayer no doubt –

10  misrepresenting the accounting across the board for the benefit of and potentially at the direction

11  of his client.  American taxpayers should be appalled if not horrified that their tax dollars are being

12  squandered and potentially misappropriated by the SEC to Deloitte in such a dishonest manner.

13  The question could be posed, what if Mr. Rothenberg had refrained from such expenditures after

14  representing to investors that they would be made? Could it be claimed that investors were

15  induced to invest by the misrepresentation that their money would be used as described in their

16  Summary of Principal Terms? The question is moot since Mr. Rothenberg and Rothenberg

17  Ventures allocated their investors' money precisely as was represented, and yet the SEC's false

18  and misleading allegations that the funds were misallocated when in fact they were allocated as

19  intended and disclosed may have potentially been far more damaging in actuality to Mr.

20  Rothenberg and Rothenberg Ventures than the pretend scenario imagined by the SEC.

21    In addition to indirect investments, each of the funds to which indemnity was charged, the

22  2013 Fund, 2014 Fund, 2015 Fund and 2016 Fund (the "Main Funds") have indemnity provisions

23  in their governing documents – authored by top legal minds from Orrick and Cooley - that provide

24  for indemnity to the manager of the general partner entity to the "fullest extent of Delaware law."

25  (See Exhibits B, C, D and E). The 2013 Fund for example specifically authorizes the use of Fund

26  assets to file lawsuits at the discretion of the general partner, which it did as permitted by funding

27  legal fees for the filing and prosecution of the lawsuit against SVB for its fraudulent activity. As

28

1   the manager of the general partner at the time, Mr. Rothenberg acted within his authority and

2   potentially his fiduciary obligation to file the lawsuit and fund it with Fund assets, regardless of

3   whether the 2013 Fund is specifically named as a plaintiff in the initial filing (See Exhibits B).

4        Mr. Fujimoto again deliberately or incompetently fails to account for such explicitly

5   permissible indemnity payments (for things such as legal defense), and instead falsely and

6   incorrectly characterizes the money uses as misappropriated. The SEC negligently or ineptly

7   asserts that the pending case filed against SVB, which is being prosecuted by the reputable firm of

8   Quinn Emanuel, is somehow frivolous or that it's even possible for it to be a misappropriation of

9   funds attributable to Rothenberg Ventures, who was authorized by each and every LP to take or

10  encumber these prepaid fees at any time.   The SEC deliberately ignores the fact that the current

11  Rothenberg Ventures managers, J.R. Eppler and Burke Robinson, have continued to support the

12  prosecution of the case on behalf of the Funds now more than a year after filing the initial suit.

13       *(1) 2013 Fund*

14       The genesis of Fund I (now named the "2013 Fund") and indeed the entire concept of

15  launching an early stage venture firm with limited resources by applying an ecosystem model with

16  an accelerator was conceived naturally and appropriately at HBS in conjunction with Mr.

17  Rothenberg's professors. Ultimately, he raised a total of $4,246,767 from investors into the 2013

18  Fund for the purpose of investing in early stage technology companies. He also launched several

19  co-funds which provided investors with the opportunity to make targeted indirect investments in

20  specific portfolio companies. A net total of $2,644,215 was initially invested in these co-funds.

21       *(2) 2014 Fund*

22       After relocating to San Francisco in 2013 as he had originally intended for Rothenberg

23  Ventures, Mr. Rothenberg formed Fund II (now named the "2014 Fund") which attracted more

24  than $11,000,000 from his investors. Just as Mr. Rothenberg had done with the launch of the 2013

25  Fund, he operated with open communication and feedback, relying heavily on the sound advice of

26  his former professors at HBS and his counsel in the formation and management of this Fund,

27

28

OPPOSITION TO MOTION FOR DISGORGEMENT AND PENALTIES          Case No. 3:18-cv-05080-JST

1    including the now unfairly maligned but effective management fee model, the plan for creating a

2    pipeline of deal flow, and the allocation of capital.

3            ***(3) 2015 Fund***

4        In 2014 Mr. Rothenberg launched the 2015 Fund, which incorporated a more

5    comprehensive structure for generating deal flow that came directly out of his discussions with

6    professors at HBS initially named "River" which consisted of an accelerator and a studio that grew

7    into separate legal entities in April of 2016, along with significant ecosystem building efforts, all

8    of which was not only properly disclosed but constituted one of the major attractors of investors

9    and startup founders alike. (See Exhibit D).

10           ***(4) 2016 Fund***

11        In 2015 Mr. Rothenberg formed Rothenberg Ventures 2016 Fund, LP, along with

12    Rothenberg Ventures 2016 Feeder Fund, LP (together, the "2016 Fund") to accommodate a

13    number of institutional investors from Europe and Asia that had gained interest in Rothenberg

14    Ventures and began clamoring for access from its presence in high profile venture deals and at a

15    very early stage. The 2016 Fund incorporated a more comprehensive and detailed version of the

16    River Accelerator and was titled the "River Program" which was again properly disclosed to all

17    investors in the 2016 Fund Principal Summary of Terms. (See Exhibit E).

18        As was contemplated between Mr. Rothenberg and his professors at HBS, Rothenberg

19    Ventures adopted its accelerator model with a high emphasis on creating and managing an

20    ecosystem of frontier technology startup founders, industry leaders, investors, and talented and

21    influential people such as artists and professional athletes, which would (and did) deliver

22    tremendous value back to the Funds. This ecosystem was named the River Program and was

23    thoroughly disclosed in the solicitation materials and governing documents for the 2015 Fund and

24    the 2016 Fund. There was nothing remotely secret about this very public and prestigious marketing

25    program, which, in addition to having been fully disclosed, was carried out in such a manner that

26    directly involved many of the investors in the Funds including on many occasions their direct

27    funding of working capital to help finance this clearly effective and lucrative strategy.

28

### C. Rothenberg Abided by the Funds' Governing Documents to Make Indirect Investments, Charge Indemnity and Incur Other Expenditures.

#### 1. The Fund Documents Allow for Indirect Investment

Indirect Investments were an integral part of both the 2015 Fund and the 2016 Fund. The SEC's exclusion of this category of authorized expenditure is misleading and unfairly characterizes the actions of Mr. Rothenberg. The Summary of Principal Terms represented to investors that indirect investments would be made as part of either the River Accelerator or the River Program. The relevant portion of the "River Accelerator Investment" section of the 2015 Fund Summary of Principal Terms states that "[t]he River Investments will be a combination of cash directly transferred to the company…" along with investments other than the direct type, that would include "the provision and use of specialized equipment, real estate, events and services provided by employees or contractors, or other expenditures." (See Exhibit D).

The relevant portion of the "River Program" section of the 2016 Fund Summary of Principal Terms also states that "[t]he River Investments will be a combination of cash directly transferred to the company…" along with investments other than the direct type, that would include "the provision and use of specialized equipment, real estate, events and services provided by employees or contractors, or other expenditures." (See Exhibit E). Thus, it is clear from these representations to investors of the 2015 Fund and 2016 Fund that their investment money would be used in part for indirect investments and not only direct investments and fees.

#### 2. The Fund Documents Allow for Indemnity Expenses

The SEC's assertion that Mr. Rothenberg "siphoned" money from the Funds in excess of fees authorized by the operative agreements simply ignores the actual terms of such operative agreements. All four of the Main Funds have provisions for the general partner's right to indemnity and each respective fund's obligation to pay it. The 2013 Fund, 2014 Fund and 2015 Fund share identical language in their indemnity provisions. As set forth in stating in the 2013 Fund Operating Agreement ("2013 Fund LPA"), section 11.4; the 2014 Fund Operating

8

1  Agreement ("2014 Fund LPA"), section 10.1; and the 2015 Fund Operating Agreement ("2015

2  Fund LPA"), section 10.1 and stating in part as follows:

> *"The Company shall defend and indemnify and Member, Manager
> or officer of the Company and may indemnify any other Person who was
> or is a party or is threatened to be made a party to any threatened,
> pending or completed action, suit or proceeding...to the fullest extent
> permitted by applicable law in effect on the date hereof and to such
> greater extent as applicable law may hereafter from time to time
> permit..."* (See Exhibit B, C and D).

8  Section 15.4a of the 2016 Main Fund Limited Partnership Agreement ("2016 Fund LPA")

9  states in part as follows:

> *"The Partnership agrees to indemnify, out of the assets of the
> Partnership...its members, each officer, director, stockholder, member,
> manager, managing director and partner of the members of the General
> Partner, the Management Company...to the fullest extent permitted by
> law and to save and hold them harmless from and in respect of all
> claims, liabilities, damages and expenses (including attorneys' fees)..."*
> (See Exhibit E).

15  Clearly, as manager of Rothenberg Ventures, the general partner entity during the time of

16  the events which gave rise to the present litigation, other legal actions against Mr. Rothenberg and

17  multiple threatened lawsuits, Mr. Rothenberg was (and continues to be) entitled to indemnity

18  from each of the four Main Funds.

19  As to the timing of his right to such payments and any claim that he may be barred from

20  indemnity if he were to be found liable for the allegations against him, Mr. Rothenberg is entitled

21  to advancement of legal fees and costs associated with his defense of any actual or threatened

22  litigation arising from his role as manager of Rothenberg Ventures until such time as a court of

23  competent jurisdiction deems him to be in violation of such provisions.

24  "There is no dispute that Delaware law...favors indemnification and the advancement of

25  attorney's fees for public policy reasons." *SEC v. Illarramendi*, Civil No. 3:11cv78 (JBA) (D.

26  Conn. Feb. 7, 2018). "We have long recognized that [Delaware Code Title 8. Corporations §145]

27  serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits, secure in

28

9

1  the knowledge that, if vindicated, the corporation will bear the expense of litigation; and (b)

2  encouraging capable women and men to serve as corporate directors and officers, secure in the

3  knowledge that the corporation will absorb the costs of defending their honesty and integrity."

4  *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998).

5       "Under Delaware law, appellants' right to receive the costs of defense in advance does not

6  depend upon the merits of the claims asserted against them, and is separate and distinct from any

7  right of indemnification they may later be able to establish." *Ridder v. CityFed Fin. Corp.*, 47 F.3d

8  85, 87 (3d Cir. 1995).  Accordingly, Mr. Rothenberg had the right to indemnification and

9  advancement of fees (and continues to have such right) for each payment to attorneys defending

10 him against the SEC's investigation, this lawsuit and any other action or threatened litigation

11 against him arising out of his role in managing the Funds.

12         **3.**     **The Fund Documents Allow for Other Expenditures**

13      Additionally, Mr. Rothenberg is authorized to pursue litigation against third parties on

14 behalf of the Funds and charge the cost of litigation to the Funds. Again, each of the 2013 Fund

15 Operating Agreement, 2014 Fund Operating Agreement and 2015 Fund Operating Agreement

16 share common language for this contractual term in section 5.4(a)(4) of each such governing

17 document which states in part that Mr. Rothenberg the authority to "…pay, extend, renew, modify,

18 adjust, subject to arbitration, prosecute, defend or compromise, upon such terms as he may deem

19 sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of

20 or against the Company…" (See Exhibits B, C and D).

21      Given Mr. Rothenberg's contractual rights, the amounts calculated by the SEC's expert as

22 having been sent to lawyers are not properly included in any disgorgement analysis. The law firm

23 of Quinn Emmanuel ("Quinn") was retained both for defense in litigation against Mr. Rothenberg

24 that arose out of his role managing the Funds, as well as for representation in a pending lawsuit

25 against SVB naming two of the Funds as plaintiffs. The pending SVB lawsuit is permitted under

26 sections of each of the LPAs and Quinn's receipt of fees from the Funds for defense of Mr.

27 Rothenberg is permitted under the indemnity provisions of each of the LPAs. Each of Kane &

28

1  Kimball, Gibson Dunn, Inhouse Co., Law Office of Robert Lott and Law Office of Eugene

2  Illovsky represented Mr. Rothenberg in his defense of this litigation, the other lawsuits brought

3  against him arising out of his role as manager of Rothenberg Ventures and threats of litigation

4  made during the course of the SEC's investigation and lawsuit. The total amount paid to such

5  attorneys according to the SEC's expert is $3.1 million, which should be excluded from any

6  disgorgement analysis in this case. (See Fujimoto Report).

7          **D.    The River Branded Businesses Served the Interests of the Funds and**
               **Their Expenditures Did Not Constitute Personal Profit to Mr.**
8              **Rothenberg.**

9          The River Accelerator was disclosed in the 2015 Fund investment materials, including the

10 specific statement that the 2015 Fund may make an investment in River Studios and/or several

11 other of the "Related Entities." (See Exhibit D). In the 2016 Fund investment materials, there is

12 an entire section dedicated to describing how the River Program, in which it is disclosed to

13 investors that Rothenberg Ventures may (and will) make indirect investments via the River

14 Program that includes an accelerator, River Studios and a plan to host numerous social events in

15 order to develop an ecosystem. (See Exhibit E). This was intended and disclosed to be an integral

16 part of the investment model for the 2015 Fund and the 2016 Fund and, indeed, benefitted the

17 Funds by attracting the various market participants in the venture capital industry that enable a

18 Fund to source deals, attract talent and follow-on investors, in addition to industry partnerships

19 that help startups progress commercially and often lead to exits (via acquisition) for a fund's

20 portfolio holdings. This is precisely the environment that was created by Rothenberg Ventures

21 and Mr. Rothenberg via the River Accelerator and the River Program.

22         The SEC's assertion that Mr. Rothenberg personally profited from the River branded

23 businesses is based entirely on its view that all of the expenditures that enabled River Studios to

24 pioneer virtual reality technology for world renowned artists, such as Bjork and Cold Play, served

25 as profit to Mr. Rothenberg as opposed to business development pursuant to the River Program

26 that was disclosed and promised to the investors in the 2015 Fund and 2016 Fund. Of course, Mr.

27 Rothenberg personally benefits from the success of all of these entities, just as any founder and

28

1   manager benefits from the success of their enterprise. In addition to the management fees, carried

2   interest, fund managers always profit from the goodwill that is gained by the general partner of a

3   successful fund. There is nothing unusual or sinister about this at all.

4          All of the expenditures of the River Program had a business purpose, including the lease

5   of a Warriors suite, the partial lease of a racecar that promoted the River brand, Founder Field

6   Day at the Giants' baseball stadium and each of the other events hosted by Rothenberg Ventures

7   or one of the River entities. The movements of money from the fund to bank accounts held in the

8   name of Rothenberg Ventures or Mr. Rothenberg personally served as reimbursements for all the

9   expenses associated with the various events held by Rothenberg Ventures and the River Program.

10  There is not a single example of Mr. Rothenberg using indirect investment monies to purchase a

11  car, pay for his personal overhead, nor is there any instance in which Mr. Rothenberg made

12  deposits in an account in order to accumulate profits for himself. Everything was spent in

13  furtherance of the River Program, for the express and singular purpose of serving the Funds.

14         Indeed, even one of Mr. Rothenberg's staunchest adversaries, his former general counsel,

15  Neil Devani, believed reports of Mr. Rothenberg's expenditures were exaggerated by the press

16  and believed Mr. Rothenberg was correct in his theory that such expenditures had true business

17  value. Mr. Devani filed a class action lawsuit against Mr. Rothenberg in August 2016 that is still

18  pending. In his deposition taken by defendants, Mr. Devani commented on the claims Mr.

19  Rothenberg was spending frivolously and excessively. The relevant portion of Mr. Devani's

20  deposition transcript states as follows:

21          Q.   On page 2 of this article, the very bottom paragraph, there's a reference to
             an apparent former employee who complains that "the firm features excessive,
22          over-the-top spending on things that make no sense and don't align with the
             supposed mission of the firm.  Examples include a full-season suite to the
23          Warriors, a race car' and renting out AT&T Park." At the time this article came
             out, did you agree with that sentiment?
24          A.   No.
             Q.   Today do you agree with that sentiment?
25          A.   No.
             Q.   Why not?
26          A.   I think that Mike had a theory for the alignment between these activities
             and the firm, and the firm's mission.
27

28

Q.  Do you agree -- well, what is your perception when you say I believe "Mike had a theory for the alignment," what was that theory, as you understand it?

A.  That these things were all aligned and there were purposes for them that were very closely tied to the firm's growth and success.

Q.  Do you personally agree with that?

A.  Yeah.

Q.  Why is it that you think that expenditures such as the race car and the AT&T Founder Field Day are closely tied to the firm's growth and success?

A.  I defaulted to Mike's judgment on these decisions, and I saw business value in them as they existed.  There was PR value, business development value, relationship-building value.  There were instances where they acted much like other normal ways that businesses spend money. (See Exhibit F, pages 174-175).

### E.   Mr. Rothenberg Engaged in a Series of Transactions that Were Not Concealed and Were Approved by His Counsel and Finance Team.

#### (1) Silicon Valley Bank Line of Credit

The SEC incorrectly argues that the SVB loan is not a legitimate exercise of Rothenberg Ventures' authority as general partner to encumber assets of the 2015 Fund.  But Mr. Rothenberg did have authority to encumber the assets of the Fund.  Section 5.4 of the 2015 Fund Amended and Restated Operating Agreement, titled "Powers of Managers and Chief Executive Officer" states that the Chief Executive Officer, who was Mr. Rothenberg at the time had the authority to "…borrow money in the name of and on behalf of the Company, and to secure any such loans by a mortgage, pledge or other encumbrance upon any assets of the Company…" (See Exhibit D).

Furthermore, the $4 million line of credit was procured by Rothenberg Ventures from SVB in December 2015 with the aid, oversight and direction of several Rothenberg Ventures team members, including its then general counsel, Geoff Rapoport, finance director Lynne McMillan and in-house counsel Neil Devani. (See Exhibit G).

#### (2) Accounting Records

Shortly after the SEC began its investigation of Rothenberg Ventures, in approximately mid-August 2016, virtually all of the Rothenberg Ventures senior management team left the firm and refused to assist in any transitioning of the accounting records or pending transactions to Mr. Rothenberg or any other person who remained at Rothenberg Ventures.  Dave Haase, head of

13

1  River Studios' accounting firm Peninsula Accounting, contacted most or all of Rothenberg

2  Ventures employees in August of 2016 apparently to apparently advise them to resign their

3  positions, and indicated that the SEC requested this obstruction of communication.

4          On August 28, 2016, Rothenberg Group COO Justin Grooms forwarded a text from Mr.

5  Haase to Mike Rothenberg that stated "…you can go ahead and let him know that I've been

6  questioned by the SEC. **They've asked me not to speak with Mike**. And they've asked me to

7  share all of his communication with them directly." [Emphasis added.]

8          Repeated requests by Mike Rothenberg, Rothenberg Ventures, and counsel to the SEC for

9  discovery for information in their possession about communications like these have been

10 uniformly rejected by the SEC. Led by Mr. Barrett Atwood, the SEC has made a mockery of this

11 Honorable court by failing to provide to Mike Rothenberg and Rothenberg Ventures any

12 documentation whatsoever of this interview with Mr. Haase or countless other communications

13 the SEC has had that undoubtedly contain exculpatory and exonerating information and evidence

14 invaluable to Mike Rothenberg and Rothenberg Ventures and essential to this Court's ability to

15 make just decisions.

16         Mr. Rothenberg had few options for managing the situation at the time and relied on

17 lawyers and outside accounting professionals to determine the state of the accounting records,

18 both for ongoing managerial purposes and for purposes of defending against the claims asserted

19 by the SEC. From this review of the accounting records, it was discovered that Mr. Haase had left

20 the Quickbooks accounting in a complete state of disarray, without even having an accounting

21 method applied by Mr. Haase. Additionally, Mr. Haase became adverse to Mr. Rothenberg in a

22 lawsuit he filed within a couple weeks of his resignation from the firm, and is now a defendant in

23 another related litigation.

24         Mr. Haase habitually recorded expenditures as compensation to Mr. Rothenberg, even

25 when Mr. Haase was given a specific description of a transaction made for business purposes. The

26 accounting records clearly required significant review and revision in order to become compliant

27 with generally accepted accounting principles ("GAAP") and to comport with transactional events

28

1  as they actually occurred. Furthermore, as much of the accounting issues raised by the SEC

2  pertain to the 2016 fiscal year, it was premature to close the books at the time Mr. Rothenberg

3  became aware of the accounting mess that had been left by Dave Haase. It should also be noted

4  that all of the original Quickbooks entries were saved as part of the firm's mandate to preserve

5  records and have been made available to the SEC.

6        With respect to the investment in River Studios, Mr. Rothenberg specifically disclosed the

7  potential of an investment into River Studios (formerly, Bend Reality LLC). The relevant portions

8  of the "Information on Related Entities" section of the 2015 Fund Summary of Principal Terms

9  state as follows:

> *Bend Reality. Mike Rothenberg manages Bend Reality LLC, a Delaware corporation, also doing business as River Studios, River Racing, River Store, and River House, formed for the purpose of enhancing the Manager's branding and positioning in the virtual reality sector primarily through the River brand, which includes a virtual reality accelerator, a production studio, a racing team, an online store, and other business ventures.*
>
> *General. Mike Rothenberg, the Manager, its members, employees, and their respective affiliates may make investments on behalf of themselves, the Prior Funds, the Co-Investment Funds, Rothenberg Ventures, Bend Reality or other funds which they currently or may in the future manage. Some of these investments could potentially be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties except to the extent the Fund invests in such investments. Additionally, in addition to the business time and attention spent on the Fund, Mike Rothenberg, the Manager, its members, employees and their respective affiliates will spend business time and attention on the business activities of the Prior Funds, the Co-Investment Funds, Rothenberg Ventures, Bend Reality, and such other investment funds as they may form. (See Exhibit D).*

20        Not only is the possibility of an investment in River Studios with money from the Fund

21  explicitly disclosed, but there is no limitation as to the amount or the timing of such investment,

22  but merely that it is determined to be "suitable for the Fund."

### (3) The Warrant Purchases, River Accelerator and the River Program

24        The River Program contemplated that Rothenberg Ventures would receive warrants from

25  the various members of its accelerator classes. These warrants were purchased by the 2015 Fund

26  and 2016 Fund as indirect investments in the River Program, and were consistent with the

27  descriptions of such investments in the Summary of Principal Terms for each of the 2015 Fund

15

and the 2016 Fund. The 2015 Fund Summary of Principal Terms describes the "River

Accelerator" in part as follows:

> *"The Fund will invest about $100,000 per company plus 9.5% of the Fund ("River Investments") through the River Accelerator to acquire an average of 5-7% (the "Average Ownership") of 25 to 30 companies, targeting a $3,000,000 to $4,000,000 valuation per company. The River Investments will be a combination of direct cash investments, the provision and use of specialized equipment, real estate, events and services provided by employees or contractors, or other expenditures. The Average Ownership will be in the form of equity or debt convertible for equity."* (See Exhibit D).

The 2016 Fund Summary of Principal Terms describes the "River Program Investment" in

part as follows:

> *"The Fund intends to invest 5.0% of the aggregate Capital Commitments plus approximately $200,000 to $400,000 on average per company (the "River Investments" through Rothenberg Ventures' River Accelerator Program to acquire an average of approximately 7%-10% (the "Average Ownership") of 25 to 40 frontier tech companies, targeting $3.0M to $6.0M valuation per company. The River Investments will be a combination of direct cash investments, the provision and use of specialized equipment, real estate, events and services provided by employees or contractors, or other expenditures. The Average Ownership will be in the form of equity or debt convertible for equity."* (See Exhibit E).

The 2015 Fund and the 2016 Fund purchased warrants via the River Accelerator and the

River Program.  Mr. Rothenberg has demonstrated that in the aggregate, the warrants have

increased in value for the funds, based on increased valuations of the underlying companies.

The descriptions of the "River Accelerator" and "River Program Investment" represented

to investors is entirely consistent with the warrant purchase transactions that the SEC deems to be

a misappropriation of funds. In fact, it would have been a departure from what was disclosed to

investors if Mr. Rothenberg did not authorize the warrant investments.

**F.      The Root Cause of the SEC's Investigation is Based on SVB's Fraud.**

The troubles at Rothenberg Ventures seem to have begun with the issuance of a line of

credit by Silicon Valley Bank ("SVB") to Rothenberg Ventures, which was procured by aid of

various Rothenberg Ventures senior executives and counsel, including its general counsel, Geoff

1  Rapaport, attorney Neil Devani, Finance Director Lynne McMillan, and others. As collateral for

2  the loan, the Rothenberg Ventures team, including Lynne McMillan and Geoff Rapaport, informed

3  SVB that the 2015 Fund would provide the collateral in an account that would need to be in the

4  name of the 2015 Fund. (See Exhibit G). The amount represented prepaid management fees and

5  not only did each and every individual LP of the 2015 Fund provide explicit permission to

6  Rothenberg Ventures to pay the lifetime management fees of the fund at any time, but the 2015

7  Fund LPs also actually funded these fees as well.  Notwithstanding Rothenberg Ventures' explicit

8  permission to take these prepaid fees at any time, Mike Rothenberg took the more conservative

9  approach to provide optionality to the 2015 Fund by instead invoking another explicitly approved

10 option the LPs empowered him as Manager with, which was his decision to encumber assets of the

11 2015 Fund per its disclosure to investors (See Exhibit D). Initially, SVB complied with this

12 requirement, demonstrating that only did they understand the intended transaction but also how it

13 was intended to be structured.  After initially correctly opening an escrow account with permission

14 from Rothenberg Ventures, Silicon Valley Bank executives Jim Gardner and Frank Amoroso later

15 insisted on creating a new collateral account, citing nomenclature issues. However, without

16 requesting or receiving permission from anyone at Rothenberg Ventures, SVB took the liberty of

17 creating a new, unauthorized account in the name of Rothenberg Ventures, fraudulently structured

18 the transaction in a different manner than had been communicated and agreed upon, and placed the

19 collateral funds in that new, unauthorized account. (See Exhibit G).  And yet repeatedly during

20 and after the transaction, SVB continued to make representations to Mike Rothenberg and

21 Rothenberg Ventures to fraudulently conceal what they had done, for example when Mikayla

22 Jayne at Silicon Valley Bank confirmed in an email to Mike Rothenberg on March 1, 2016 that the

23 escrow account was "ending 8782", which was misleading because although 8782 in fact was the

24 original account set up and intended to become the escrow account for the 2015 Fund, in reality

25 not only had SVB had opened a new and unauthorized account to move the escrow collateral into,

26 but SVB had also fraudulently, inexplicably, and without permission wired $4.25m from the

27 account ending in 8782 to the Rothenberg Ventures Management Co, while simultaneously also

28

1  fraudulently and without permission wiring $4.25m from the Rothenberg Ventures Management

2  Co account to the new account they had created.  SVB's apparent intention and result was to

3  transfer $4.25m to this new account – via the Rothenberg Ventures Management Co – on the same

4  day and at the same time so that it would not affect Rothenberg Ventures Management Co's daily

5  balance and therefore not be immediately noticed.  The result was creating the false appearance

6  that Rothenberg Ventures Management Co had taken $4.25m from the 2015 Fund on that day –

7  something the LPs had indeed authorized RVMC to do – when in fact Mike Rothenberg had given

8  no such instructions or approvals to do so.  The SEC imagined that this taking of fees was as Mike

9  Rothenberg's direction, and yet even that scenario was approved by LPs so the SEC has no valid

10  claims against Mr. Rothenberg or Rothenberg Ventures in either scenario.  The SEC has so far

11  dramatically and inexcusably failed in their obligation and duty to investigate and prosecute SVB

12  for their fraudulent activity, instead choosing to persecute and bully the victim of SVB's fraud.

13  Subsequent to this secret movement of funds out of a 2015 Fund account and into a

14  Rothenberg Ventures account, Finance Director Lynne McMillan noticed the irregularity in the

15  bank statements which gave the appearance that Rothenberg Ventures had misappropriated $4.25

16  million from the 2015 Fund. McMillan then created and evangelized a spreadsheet to show the

17  $4.25 million transfer as a misappropriation assumed to have been made by Mr. Rothenberg. By

18  July 2016, Rothenberg Ventures senior officers had turned against Mr. Rothenberg and were

19  carrying out a secret mutiny that culminated in false accusations against Mr. Rothenberg,

20  resignations from their respective positions, ceasing communication with Mr. Rothenberg, and at

21  least one Rothenberg Ventures employee claiming whistleblower protection with the SEC.

22  Rothenberg Ventures went from a vibrant early stage investment firm with access to the

23  best deals in Silicon Valley to being shunned by the industry and losing valuable opportunities on

24  the brink of closing in a matter of just a few weeks by the fraud of a "dirty bank", to quote

25  prominent former DOJ attorney and current Rothenberg Ventures' counsel.  SVB's fraud sowed

26  the seeds of mistrust and panic among the ranks of the firm and ultimately snowball into a

27  misguided regulatory inquiry of an exempt investment advisor that would inevitably result in the

28

OPPOSITION TO MOTION FOR DISGORGEMENT AND PENALTIES          Case No. 3:18-cv-05080-JST

1    SEC claiming at least some sort of technical infraction in order to procure or force a settlement.

2    Neither the SEC nor anyone else has ever claimed that Mr. Rothenberg's investors' current

3    holdings in the Funds are any less valuable today than their initial investments. In fact no one has

4    ever even disputed Mr. Rothenberg's assertions that his investors' holdings have significantly

5    appreciated in value relative to their initial investment, even net of the significant expenses and

6    opportunity costs incurred following the actions of SVB and the SEC.

7          **G.**    **Mr. Rothenberg Continued to Operate and create Value for the Funds**
                **Even after the SEC had Begun its Investigation.**

8

9                *(1) $1.3 Million Advanced and Returned for Unity, with Interest*

10           The SEC takes the events regarding Unity out of context to paint an unfair picture

11   of Mr. Rothenberg. The Rothenberg Ventures team had been negotiating with senior management

12   of Unity for several months (prior to receiving a letter from the SEC) with a view toward getting

13   an allocation in Unity's next private investment round, which was highly exclusive and only

14   accepting the most elite venture firms at the time. Eventually, Unity communicated an opening for

15   Rothenberg Ventures to join their upcoming investment round with a $14 million allocation and

16   the Rothenberg team relayed this opportunity to several investors who advanced a total of $1.3

17   million with the understanding that there was no guarantee that the investment would be

18   consummated if they could not procure the balance of the funds needed to join the round.

19           According to Crunchbase, Unity's technology is the world's most widely used real-time

20   3D development platform, the company had a pre-money valuation of $1.3 billion at the round

21   pursued by Rothenberg Ventures, and the pre-money valuation at the latest investment round was

22   $5.9 billion (representing a greater than 4.5x increase in value over a three-year period). (See

23   https://www.crunchbase.com/funding_round/unity-technologies-series-c--4a87f25b#section-

24   overview). Unfortunately, the Unity opportunity was withdrawn after news of the SEC

25   investigation was published. Due to the chaotic nature of that particular period of time and the

26   mutiny against Mr. Rothenberg that pervaded the senior management at the time, the return of

27

28

1   these advances was temporarily delayed, but of course every penny of the $1.3 million that was

2   advanced was then returned to the respective advancing parties, with some interest paid as well.

3

4                   *(2) Transactions in June 2016 and Thereafter*

5           Throughout the period of time between June and August 2018, Mr. Rothenberg was

6   continuing to manage Rothenberg Ventures.  During this time period, not only did he have the

7   authority to undertake some sales of startup equity including a fraction of holdings in Robinhood

8   holdings, he had an obligation to continue to actively manage the Funds including taking such

9   permitted actions such as directing the proceeds thereof for other transactions permitted and

10  contemplated by the 2013 Fund's operating agreement. Mr. Rothenberg acted on the advice of

11  counsel with respect to each of the transactions with the Funds during this period of time.

12          Following the SEC's expression of displeasure with the liquidation of Robinhood shares

13  and using the proceeds for obligations of the Fund without paying a dividend to investors, the SEC

14  was informed in the fall of 2018 that Rothenberg Ventures had arranged for a $10 million sale of a

15  portion of its Robinhood holdings specifically for the purpose of making a distribution to investors

16  that would have given them in excess of a 200% return on their entire initial investment, while still

17  maintaining a number of promising holdings in the 2013 Fund. This transaction was halted solely

18  because the SEC demanded that Rothenberg Ventures refrain from completing the transaction.

19  (See Exhibit A).

20          With respect to the use of 2013 Fund assets to file and prosecute the lawsuit against SVB,

21  Mr. Rothenberg had the authority to do so. Section 5.4 of the 2013 Fund LPA also gave Mr.

22  Rothenberg the authority to "…pay, extend, renew, modify, adjust, subject to arbitration,

23  prosecute, defend or compromise, upon such terms as he may deem sufficient, any obligation, suit,

24  liability, cause of action or claim, including taxes, either in favor of or against the Company…"

25  (See Exhibit B).

26          Furthermore, all of the transactions that occurred between June 2016 and the present

27  including transactions relating to any Warriors suite, ballets or donations to universities were not

28

                                      20

only transacted appropriately, but they are also outside the scope of this case, as they are not contemplated in the SEC's complaint.

## IV.   ARGUMENT
### A.   The SEC's Disgorgement Demand is Legally and Factually Unfounded.

The SEC's disgorgement request has no legal basis because the "disgorgement" it seeks is not equitable at all, but rather a legal penalty that has no statutory basis.  And to the extent the SEC were entitled to truly equitable disgorgement at all – though it hasn't asked for it – that remedy would necessarily be limited only to the recovery of any so-called ill-gotten gains it can prove are currently in Mr. Rothenberg's possession.

#### 1.   *The SEC's "Disgorgement" Demand Is Actually a Thinly Disguised Demand for a Penalty that Is Not Statutorily Authorized*

The SEC seeks to punish Mr. Rothenberg with its disgorgement request. Its motion expressly states that the purpose for seeking disgorgement in this case is "…to deter future misconduct…"  See SEC Motion, page 1, line 26. In addition, the SEC claims it does not need to establish an exact amount to be disgorged, but only a "reasonable approximation." See SEC Motion, page 12, line 27. The SEC insists disgorgement is appropriate "regardless of whether [Mr. Rothenberg] retains any portion" of the funds being sought for disgorgement. See SEC Motion, page 13, line 13.

The purported authority for the SEC's request for disgorgement is Section 209(e)(2)(C) of the Investment Advisers Act of 1940. (See SEC Motion, page 2, line 21). That statute says the SEC may seek the remedies [of x, y, z].  It does not provide disgorgement as a remedy or even mention disgorgement at all. The SEC's complaint refers to Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1), (2) & (4), and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8.  But none of these statutes authorizes the SEC to seek disgorgement as a remedy in this enforcement.

21

1    Punitive remedies – such as the so-called "disgorgement" the SEC seeks here – are legal in

2    nature and there is no statute that provides a legal remedy of disgorgement to the SEC in federal

3    court enforcement actions. Though Congress has referred to disgorgement in SEC actions on a

4    number of occasions, it has never enacted a law authorizing disgorgement as a remedy in court

5    proceedings as it has done in administrative contexts. See 15 USC 77h-1(e), 78u-2(e) and 78u-

6    3(e).  This shows that Congress knows how to provide for disgorgement, but has chosen not to

7    provide for such a remedy in court actions.

8    Furthermore, *by the SEC's own admission*, the SEC does not have a legal basis for

9    seeking disgorgement. The testimony of SEC Chairman, Jay Clayton, on December 18, 2018 in

10    response to questions of U.S. Senator John Kennedy of Louisiana before U.S. Senate Committee

11    on Banking, Housing, and Urban Affairs (the "December 18, 2018 Senate Hearing"), states in part

12    as follows:

13    Senator Kennedy: "Do you need disgorgement to do your job?"

14    Jay Clayton: "I believe that the *Kokesh* Supreme Court decision, uh, we need
some help. We need some help. Disgorgement was viewed in that case as a
penalty subject to the five-year statute of limitations.

15

16    Senator Kennedy: "And you do not have that authority?"

17    Jay Clayton: "**We do not have the authority**." [Emphasis added]

18    Senator Kennedy: "Only Congress can give you that authority?"

19    Jay Clayton: "Uh, I'm not going to be a lawyer here. Yes. (See

20    https://www.youtube.com/watch?v=T6YQixZuZtA&feature=youtu.be at 42

21    minutes, 30 seconds).

22

23    Not only does the Chairman of the SEC admit that the SEC has **no authority to seek**

24    **disgorgement**, but he expressly refrains from engaging in lawyering to admit that only Congress

25    can grant the SEC authority to seek disgorgement. In *Kokesh v. SEC*, the defendant appealed his

26    ruling in favor of disgorgement on grounds that since there is no statute of limitations specifically

27    applicable to disgorgement, the generic five-year federal statute under 28 U.S.C. §2462 was

28

OPPOSITION TO MOTION FOR DISGORGEMENT AND PENALTIES          Case No. 3:18-cv-05080-JST

1   applicable. *Kokesh v. SEC*, 137 S.Ct. 1635 (2017). The Court agreed with the defendant as to the

2   statute of limitations, but went on to point out that disgorgement is a relatively new penalty

3   derived from the "inherent equity power to grant relief ancillary to an injunction." *Id.* at 1635. The

4   Court went on to highlight the fact that a valid question remains as to "whether courts possess

5   authority to order disgorgement in SEC proceedings [and] whether courts have properly applied

6   disgorgement principles in this context." *Id.* at 1635.

7         Though the Court did not address these questions in their entirety because they were not

8   questions presented by *Kokesh*, other courts have done so. Additionally, the Court in *Kokesh* did

9   provide explanation of equitable remedies as opposed to legal penalties and concluded that

10  disgorgement is a penalty for three reasons: "First, SEC disgorgement is imposed by the courts as

11  a consequence for violating public laws, *i.e.,* a violation committed against the United States rather

12  than an aggrieved individual. Second, SEC disgorgement is imposed for punitive purposes.

13  Sanctions imposed for the purpose of deterring infractions of public laws are inherently punitive

14  because 'deterrence [is] not [a] legitimate nonpunitive governmental objectiv[e].' (the Court

15  quoting *Bell v. Wolfish,* 441 U.S. 520, 539, n. 20, 99 S.Ct. 1861, 60 L.Ed.2d 447). Finally, SEC

16  disgorgement is often not compensatory. Disgorged profits are paid to the district courts, which

17  have discretion to determine how the money will be distributed." *Kokesh* at 1635.

18        The Court went on to note that the SEC may seek disgorgement "so long as such relief is

19  remedial relief and not a penalty assessment." (quoting *SEC v. Texas Gulf Sulphur Co.,* 312

20  F.Supp. 77, 91 (S.D.N.Y.1970). Ultimately, the Court ruled that a 5-year statute of limitations was

21  applicable because "Disgorgement in the securities-enforcement context is a "penalty" within the

22  meaning of § 2462..." *Kokesh* at 1639.

23        Here, the SEC has explicitly stated that its purpose is to serve as a deterrent. On page 1 of

24  the SEC's motion, it is stated that the purpose of the SEC's request for disgorgement of $18.8

25  million plus interest is "...[t]o rectify...and to deter future misconduct..." On page 12 of the

26  SEC's motion it is stated that "[t]he deterrent effect of a Commission enforcement action would be

27  greatly undermined if securities law violators were not required to disgorge illicit profits." While

28

1   this may be true, the Supreme Court has made clear that courts have no authority to provide

2   disgorgement as a deterrent. All of the case law cited by the SEC in support of their request for

3   disgorgement is from lower courts and is outdated. Additionally, when asked, during an onstage

4   interview, whether Mr. Rothenberg had been treated to harshly by the SEC, former director of the

5   San Francisco SEC office and lead attorney of record on the complaint in this case, Gina Choi,

6   gave a response that included the statements, "…we are a civil law enforcement agency…" and

7   "…we can assess penalties…" (See https://finance.yahoo.com/video/regulating-finance-

8   cryptocurrency-jina-choi-000425838.html, at 12 minutes, 20 seconds). Given that the SEC's

9   purpose in seeking disgorgement in this case is to deter Mr. Rothenberg from future violations,

10   this court has no authority to award disgorgement in this case.

11       The Supreme Court provided further analysis of equitable remedies in *Great West v.*

12   *Knudsen,* an ERISA case in which the petitioner sought, as an equitable remedy, to impose

13   personal liability on respondents for a contractual obligation to pay money. *Great-West Life &*

14   *Annuity Ins. Co. v. Knudson,* 534 U.S. 204 (2002). Ruling against petitioners, the Court made clear

15   that the equitable remedy they sought was limited to proceeds that were still in possession of the

16   party against whom such equitable relief was sought. *Id.* at 214. Citing the Restatement of

17   Restitution, the Court stated, "…where "the property [sought to be recovered] or its proceeds have

18   been dissipated so that no product remains, [the plaintiff's] claim is only that of a general

19   creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other

20   property of the [defendant]." Restatement of Restitution, *supra, §215, Comment a,* at 867. Thus,

21   for restitution to lie in equity, the action generally must seek not to impose personal liability on the

22   defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

23   *Id.* at 214.

          **2.   *Any Equitable Disgorgement Must Be Limited to Money Still in Mr.***
24                ***Rothenberg's Possession***

25

26       Mr. Rothenberg is not in possession of any of the funds the SEC seeks to recover as

27   disgorgement. Every instance that the SEC cites as a misappropriation of funds, as detailed by Mr.

28   Fujimoto's report, involves a transaction in which such funds left Mr. Rothenberg's possession

                                                  24

and/or control and was delivered to a third party. Since Mr. Rothenberg is not in possession of any of the funds the SEC seeks to disgorge, there is no equitable relief available to the SEC as a means of recovering such funds.

As to the settlement agreement between Mr. Rothenberg and the SEC, any reference to disgorgement as an agreed upon element of the settlement are deemed to mean only a lawful application of disgorgement. The settlement agreement is a subject to California law, which provides for the unenforceability of any contract term that is unlawful. See California Civil Code §1667. If the agreement to disgorgement stated in the settlement agreement were construed to mean even unlawful applications thereof, that term would by void under California law. 'When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the ... law ... [divides] according to common reason; and having made that void that is against law, lets the rest stand. ...' " (Jackson v. Shawl, 29 Cal. 267, 272.).

If the intent were simply to charge Mr. Rothenberg with a payment of money in addition to a penalty, then the settlement agreement would not have used the specific language of disgorgement, which has a specific meaning and treatment under the law. Since the Court lacks authority to impose disgorgement on Mr. Rothenberg for the deterrent effect requested by the SEC and Mr. Rothenberg is not in possession of that which the SEC seeks to disgorge, there is no proper equitable remedy for disgorgement in this case in addition to the lack of a legal remedy of disgorgement. Therefore, the Court must refrain from ordering any payment of disgorgement in this case whatsoever.

The Consent to Judgment extends only to relief the Court has the authority to grant. That is, if the SEC sought the form of disgorgement that is equitable (that is, taking back only the ill-gotten gains the defendant still has), that would be within the scope of the consent.  But the SEC – by its own admissions – seeks a form of disgorgement that is not legally authorized and thus was not consented to by Mr. Rothenberg.

**B.**    **The $9 Million Penalty Sought by the SEC is Grossly Excessive and Unsupported by Case Law.**

25

The SEC's request for a third-tier penalty under the Investment Advisors Act is unwarranted and completely inappropriate in this case. Third tier penalties may only be imposed for violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created significant risk of substantial losses to other persons." The SEC cannot meet this test.

The SEC has failed to prove there were "substantial losses" to investors or even that any of Mr. Rothenberg's conduct "created significant risk of substantial losses" to any investors." Not only has there never been any claim that the investors' holdings in the Funds are any less valuable than their initial investments in the Funds, but there is significant evidence of great value to the Funds as a result of many of the Mr. Rothenberg's transactional decisions that the SEC deems to fraudulent or a misappropriation of funds. Most of the portfolio holdings of the Funds consist of investments in companies that were either launched in the River Accelerator or were active in the ecosystem created by the indirect investments made in the River Program. Indeed, the very same portfolio holdings were the basis for numerous accolades and high rankings from industry leaders, such as Goldman Sachs, which named Rothenberg Ventures the number one virtual reality investor and the number one frontier technology investor. In fact, **without the River Program and the transactions deemed objectionable by the SEC, much of the success of the Funds would not have been possible**.

Furthermore, the SEC seems to inappropriately apply to Mr. Rothenberg the "broker" standard of requiring that the priority of the client's interest cannot be contractually modified. However, the standard is distinctly different for advisors, such as Mr. Rothenberg, such that the freedom to contract is afforded to Mr. Rothenberg and his investors and governing with respect to their relationship. When asked about the standard of requiring brokers to put the client's interest ahead of the broker's interest and the difference in standard applied to advisors, SEC Chairman, Jay Clayton, in the December 18, 2018 Senate Hearing, stated in part as follows:

> *"Advisors are allowed to contract around the standard. It is not well-known...they are able to say 'I am going to do these things' and with informed consent, they can cut back on that standard."*

1

2    The River Studios investment, which the SEC deemed to be illegitimate, was a valuable

3    indirect investment and critical component of the River Program by virtue of its role as an in-

4    house R&D center that gave Rothenberg Ventures a direct window into the opportunity landscape

5    of the then nascent virtual reality industry. It also attracted the best and brightest virtual reality

6    professionals in the world at the time, which was a small community. Today, approximately two-

7    thirds of the former River Studios team comprises what is now called 'Arcturus', the virtual and

8    augmented reality division at the major Hollywood studio, DMG Entertainment.

9    Contrary to the SEC's suggestion, the factors set forth in *SEC v. Murphy* do not support a

10   third tier penalty in this case. See *SEC v. Murphy*, 626 F.2d 633 (9th Cir.: 1980). There is plenty of

11   evidence to suggest that Mr. Rothenberg believed everything he was doing was lawful and proper,

12   thereby negating any suggestion of scienter. For one thing his governing documents gave him

13   broad authority to make indirect investments, operate the River Program and with respect to the

14   2015 Fund, he disclosed that Rothenberg Ventures may encumber assets of the Fund as he did to

15   secure the SVB Loan. Furthermore, all of these transactions and operations were done in the open

16   with the assistance of multiple team members, many of whom were investors in the Funds

17   themselves.

18   The SEC's example of scienter to satisfy the first of the *Murphy* factors is characterized

19   inaccurately in two ways: (i) the finance director at the time, Lynne McMillan, had incorrectly

20   calculated the amount of allowable fees, and (ii) Ms. McMillan was unaware or failed to

21   acknowledge that Mr. Rothenberg had received a separate investment in excess of $2 million

22   directly into the Rothenberg Ventures management company specifically for the purpose of

23   covering expenses such as the River Program to supplement the management fees permitted by the

24   Funds.

25

26

27

28

27

**V.      CONCLUSION**

The SEC's simplistic formula of treating every expenditure in excess of direct investments and permitted management fees is simply erroneous math and ignorant of the actual agreements between Mr. Rothenberg and his investors. Given the contractual rights (and even obligations) to execute on the River Program that underlay so much of the expenditure at issue with the SEC, there is simply no basis for attributing scienter to Mr. Rothenberg. Furthermore, all of the transactions that clearly comport with his contractual rights cannot possibly be deemed included in the allegations against Mr. Rothenberg.

Additionally, it has been well established by the Supreme Court that disgorgement applied as a deterrent is not a proper equitable remedy but is punitive and, therefore, legal in nature. As the SEC seeks to punish Mr. Rothenberg with its disgorgement request and there is no legal remedy of disgorgement available to the SEC, the Court must refrain from entering an order for disgorgement of any amount. Furthermore, Mr. Rothenberg's lack of possession of any of the funds sought by the SEC render such recovery unavailable as an equitable remedy.

As to the SEC's request for a penalty of $9 million, the standards set forth in Section 209(e)(2)(C) of the Investment Advisors Act, as well as the relevant case law, render such request for a third-tier penalty improper and unlawful, particularly in light of the broad contractual rights afforded to Mr. Rothenberg by his investors, his reliance on the advice of counsel at every step of the way, and the successes achieved by his management of the Funds that are reflected in the portfolios currently held by each Fund.

DATED: August 21, 2019                 Respectfully submitted,



By _____
Michael Rothenberg

28