

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Marc J. Fagel
Direct: +1 415.393.8332
MFagel@gibsondunn.com

Client: 80471-00001

September 18, 2018

**VIA ELECTRONIC MAIL**

Andrew J. Hefty
U.S. Securities and Exchange Commission
44 Montgomery St., Suite 2800
San Francisco, CA 94104

Re:    *SEC v. Michael B. Rothenberg, et al. – Case No. 18-cv-05080 JST*

Dear Andy:

I write in response to your September 13 letter to John Potter.

As discussed on our call last week, Mr. Potter and I are happy to discuss with the Staff an appropriate treatment of funds currently held by Mr. Potter in a manner which provides protection to investors in the Rothenberg Ventures Funds.  I look forward to further discussion of these matters as previously agreed.

However, I do wish to address and correct certain assertions in your correspondence.

First, you contend that the transfer of funds to Mr. Potter's firm for legal expenses is not a "legitimate use of management fees from the 2013 Fund." However, the 2013 Fund Operating Agreement (and its incorporated Management Agreement) are quite clear that the legal services for which Mr. Potter has been compensated are not charged against the Management Company's management fees.  Rather, the Operating Agreement provides that *the Fund* shall defend and indemnify the Management Company and its members for any threatened or pending action by reason of that party's role as manager.  Additionally, the Management Agreement provides that only "fees for certain day-to-day legal [] services" are borne by the Management Company out of its management fees; in contrast, the Fund shall pay for all other Management Company expenses, including extraordinary expenses, other legal expenses, and fees and expenses with respect to "litigation and threatened litigation matters involving" the Fund.  Hence, the SEC's allegations regarding the exhaustion of management fees are wholly irrelevant to Rothenberg Ventures' and Mr. Rothenberg's right to indemnification and for reimbursement of legal expenses.

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# GIBSON DUNN

September 18, 2018
Page 2

Second, you contend that such expenses should be paid "by the insurance that was required to be maintained to cover such expenses." No such requirement exists. To the contrary, the Operating Agreement states only that the Fund may purchase and maintain insurance.

Finally, and more broadly, we disagree with the Staff's contention that "it is a breach of Mr. Rothenberg's fiduciary duties to 2013 Fund investors for those investors to bear *all* the legal fees and costs for the Quinn-represented matters." We understand Quinn's representation to involve Rothenberg Ventures' role as manager of multiple funds, including the 2013 Fund, and thus indemnification is properly borne by such Fund. While a consideration of a re-allocation of expenses may be appropriate at some later date, at this point we are faced with the reality that (a) liquidity existed within the 2013 Fund, and (b) the 2013 Fund, like the other Funds, has a legal obligation to indemnify Rothenberg Ventures and Mr. Rothenberg. The alternative option which the Staff appears to be advocating, a front-end allocation of legal fees across the Funds, would essentially require the manager to either forgo the indemnification to which it is contractually entitled, or to liquidate the holdings of the other Funds to obtain liquidity; making a determination about the proper time to undertake such transactions appears to be overstepping by the Staff.

(In any event, given the Staff's concerns about 2013 Fund investors, we note that the management company has made arrangements for a $10 million exit, which would deliver more than a 2x return to such investors; in the interests of transparency, we have reported this potential transaction to the Staff, and the management company is forbearing on any such sale at the Staff's request.)

Again, we believe that an appropriate resolution of the Staff's stated concerns can be reached, but we felt it important that these assertions did not go unaddressed.

Sincerely,

Marc J. Fagel

MJF/rcm

cc:    E. Barrett Atwood

# SECOND AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## ROTHENBERG VENTURES FUND I, LLC

## A DELAWARE LIMITED LIABILITY COMPANY

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

**SECOND AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**ROTHENBERG VENTURES FUND I, LLC**
**A DELAWARE LIMITED LIABILITY COMPANY**

This Second Amended and Restated Operating Agreement is made as of September 10, 2013, by and by and among the parties listed on the signature pages hereof, and such other Persons that may be admitted from time to time to the Company and as parties to this Agreement, with reference to the following facts:

A.     On September 4, 2012, the Certificate of Formation for the Company was filed with the Delaware Secretary of State.

B.     On September 6, 2012 certain of the Members entered into an Operating Agreement (the "Prior Agreement").

C.     On April 2, 2013 the Manager and at least a Majority Interest (each as defined in the Prior Agreement) of the Members amended and restated the Prior Agreement (the "Amended Prior Agreement"), which the Manager and at least a Majority Interest of the Members as of the date hereof,  by their signatures below, wish to amend and restate in its entirety.

D.     Pursuant to Section 12.13 of the Amended Prior Agreement, the Amended Prior Agreement or any term thereof may be amended if such amendment is approved and executed by the Board of Managers and Members holding a Majority Interest (each as defined in the Amended Prior Agreement).

E.     The Members now desires to enter into this Agreement to provide terms to govern the Company.

NOW, THEREFORE, the parties by this Agreement set forth the operating agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1
## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1     Act shall mean the Delaware Limited Liability Company Act, 6 Delaware Code, Section 18 101 et seq., as the same may be amended from time to time, and the provisions of succeeding law.

1.2     Additional Member means a Person admitted to the Company as an additional Member pursuant to Section 4.1 and shown as a Member on the books and records of the Company.

1.3     Affiliate of a Person means any director, officer, stockholder, member, partner, employer, employee or agent of such Person or any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with such Person, as applicable. The term "control," as used in the immediately preceding sentence, means with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.4     Agreement means this Second Amended and Restated Operating Agreement, as originally executed and as amended from time to time.  This Agreement shall be the "limited liability company agreement" under the Act.

1.5     Board of Managers means the single manager in the case the number of managers is one (1), or the collective group of managers in the case the number of managers is more than one (1), designated or elected by the Members pursuant to Section 5.3 hereof.

1.6     Capital Account means with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.7     Cause means gross negligence, bad faith or willful misconduct by the Management Company, in connection with the performance of its duties as a Manager under the terms of this Agreement, but only in the case that the Management Company has failed to cease the event(s) constituting Cause within fifteen (15) days of the delivery of written notice by the Members holding a Majority Interest setting forth in detail the event(s) constituting Cause.

1.8     Capital Contribution means the total amount of cash contributed to the Company by the Members.

1.9     Code means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

1.10     Company means Rothenberg Ventures Fund I, LLC, a Delaware limited liability company.

1.11     DGCL means the Delaware General Corporation Law, as amended from time to time and the provisions of succeeding law.

1.12     Distributable Amounts means the amount of cash or property which the Board of Managers deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Board of Managers deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.13     Fiscal Year means the Company's fiscal year, which shall commence on January 1st and end on December 31st of each year, or such other year as shall be required under the Code.

1.14   <u>Initial Closings</u> means those closings of the purchase and sale of Units, commencing with the closing on September 6, 2012, and including all closing of the purchase and sale of Units after September 6, 2012 until the aggregate purchase price of all Units in such closings is equal to $450,000 it being understood that any closing of the purchase and sale of Units after $450,000 of Units have been sold shall not be an Initial Closing hereunder.

1.15   <u>Interest</u> means the entire ownership interest (designated as a Profits Interest or Units in the Company) of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

1.16   <u>Majority Interest</u> means a majority of the total outstanding Units.

1.17   <u>Management Company</u> means Rothenberg Ventures Management Company, LLC, a Delaware limited liability company.

1.18   <u>Manager</u> means the manager or each of the managers designated or elected by the Members pursuant to Section 5.3 hereof or any other individuals that succeed him or her as a manager of the Company.

1.19   <u>Member</u> means each Person who is an initial signatory to this Agreement, including the Management Company, or has been admitted to the Company as a Member in accordance with this Agreement.

1.20   <u>Person</u> means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.21   <u>Profits and Losses</u> means for each Fiscal Year or other period, the taxable income or taxable loss of the Company for such period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)   any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b)   any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses, shall be subtracted from such taxable income or loss;

(c)   any income, gain, loss, or deduction required to be allocated specially to the Members under Section 6.2 shall not be taken into account in computing Profits or Losses;

(d)   in lieu of any depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, the Company shall compute such

deductions based on the book value of the Company property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3);

(e)      gain or loss resulting from a taxable disposition of Company property shall be computed by reference to the book value of the property disposed of (as adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3)), notwithstanding that the adjusted tax basis of such property differs from its book value; and

(f)      if the book value of Company assets is adjusted to equal fair market value as provided in Section 6.7, then the Profits or Losses shall include the amount of any increase or decrease in such book values attributable to such adjustment.

1.22    Profits Interest means that undivided Interest in the Company initially owned by the Management Company, including, without limitation, such Member's rights to Profits, Losses and distributions of the Company with respect to such Profits Interest.  The Profits Interest is a non-voting Interest in the Company.  Notwithstanding anything to the contrary in this Agreement, the Profits Interest may only be transferred in its entirety in accordance with this Agreement.

1.23    Profits Interest Member means the Member holding the Profits Interest.

1.24    Tax Matters Partner means the Person designated as set forth in Section 5.11.

1.25    Treasury Regulations means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.26    Unit means that undivided Interest in the Company owned by a Member, (other than the holder of the Profits Interest), including, without limitation, such Member's rights to Profits, Losses and distributions of the Company with respect to such Units.

1.27    Unpaid Capital Contribution means, as of any given date, an amount, not less than zero, equal to the Capital Contributions made by a Member with respect to its Units, as set forth on Exhibit A, minus the amount of distributions made to the Member with respect to its Units pursuant to Section 6.5(a)(i).

## ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1    Formation.  The Members have formed a Delaware limited liability company under the laws of the State of Delaware by filing the Certificate of Formation with the Delaware Secretary of State and entering into this Agreement.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name.  The name of the Company shall be Rothenberg Ventures Fund I, LLC.  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable.

2.3   Term.   The term of this Agreement commenced on the date hereof and shall continue until the tenth anniversary of the date of formation of the Company; provided that the Board of Managers shall have the option to extend such term in order to facilitate the orderly disposition of the investments held by the Company for up to two additional years in the Board of Managers' good faith discretion.   Any further extension of the term shall require the affirmative vote or written consent of Members holding a Majority Interest.

2.4   Office and Agent.   The Company shall continuously maintain an office and registered agent in the State of Delaware.   The principal office of the Company shall be located at such place as the Board of Managers may determine.   The Company may also have such offices, anywhere within and without the State of Delaware, as the Board of Managers may determine from time to time, or the business of the Company may require.   The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by the Board of Managers.

2.5   Names and Addresses of the Members and the Managers.   The names and addresses of the Members are set forth on Exhibit A.   The names and address of the Manager(s) are set forth on Exhibit B.   A Member or Manager may change its address upon notice thereof to the Company.   The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit A to this Agreement from time to time to reflect any changes to the list of Members which may have occurred from time to time in accordance with this Agreement or to reflect changes to such Members' addresses.   The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit B to this Agreement from time to time to reflect the names and address of any duly appointed or elected members of the Board of Managers.

2.6   Purpose and Business of the Company.   The Company has been formed primarily to hold equity securities in early stage companies.   Notwithstanding the foregoing, subject to the limitations set forth in this Agreement, the Company may engage in any lawful activity for which a limited liability company may be organized under the Act.

2.7   Title to Company Property.   All property owned by the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in any such property.

2.8   Failure to Observe Formalities.   A failure to observe any formalities or requirements of this Agreement, the Certificate of Formation or the Act shall not be grounds for imposing personal liability on the Members or the Managers for liabilities of the Company.

2.9   No Partnership Intended for Nontax Purposes.   The Members have formed the Company under the Act, and expressly deny any intent hereby to form a partnership under Delaware law, including a partnership under the Delaware Revised Uniform Limited Partnership Act, or a corporation under the DGCL.   Except for purposes of federal, state and local taxes, the Members shall not be partners to one another, or partners to any third party.

2.10. <u>Liability of Members and Managers to Third Parties; Reliance by Third-Party Creditors.</u>

(a)     Except as otherwise provided in the Act, no Member or Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract or otherwise, by reason of being a Member or acting as a Manager of the Company.

(b)     This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any contributions or otherwise.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

3.1     <u>Authorization and Issuance of Units.</u>

(a)     The Company shall be authorized to issue the Profits Interest and one (1) class of Units in the amount of Six Million (6,000,000) Units.

(b)     The Board of Managers, at their sole discretion, shall have the power to issue the authorized Units from time to time at the same price and on substantially the same terms and conditions without the consent of the Members or amendment of this Agreement and any additional issuances of Units shall be dilutive proportionately to all Members holding Units. Without the written consent of the Members holding a Majority Interest, the Board of Managers shall not be authorized to issue the Units after September 4, 2013. The Company shall not issue additional classes of Units or issue Units in excess of the authorized number without the affirmative vote or written consent of the Members holding a Majority Interest. In addition, the Company shall not issue any additional Profits Interest without the affirmative vote or written consent of the Members holding a Majority Interest. The Units shall be issued at $1.00 per Unit, except that:

(i)     The Units issued in the Initial Closings shall be sold at a 10% discount (i.e., $0.90 per Unit);

(ii)     With respect to Members who purchase Units in an aggregate amount of at least $200,000 by April 5, 2013, their Units shall be sold to them at a 10% discount (i.e., $0.90 per Unit);

(iii)     With respect to Members who purchase Units in an aggregate amount of at least $250,000 by May 17, 2013, their Units shall be sold to them at a 10% discount (i.e., $0.90 per Unit); and

(iv)     With respect to Members who purchase Units in an aggregate amount of at least $500,000 in the Company by September 3, 2013 or such earlier date when the

Company has received $5,000,000 in respect of the purchase of Units, their Units shall be sold to them at a 10% discount (i.e., $0.90 per Unit).

For the avoidance of doubt, the Members purchasing Units at such discount in the Initial Closings and subsequent purchases set forth in clauses (ii) through (iv) above shall be credited as making a Capital Contribution on Exhibit A equal to the $0.90 per Unit price.

(c)     The Management Company is receiving the Profits Interest in connection with the performance of services to or for the benefit of the Company. It is intended that such Interest shall be characterized for federal income tax purposes as a "profits" interest in accordance with Revenue Procedure 93-27, and the initial Capital Account of the Management Company shall be zero.

3.2     Initial Capital Contributions. Each Member has contributed such cash as set forth on Exhibit A as its initial Capital Contribution, and will hold the number of Units as set forth on Exhibit A. The Management Company is receiving the Profits Interest without cost and without the requirement to make a Capital Contribution to the Company.

3.3     Additional Capital Contributions. No Member shall be required to make additional Capital Contributions.

3.4     Capital Accounts. The Company shall establish and maintain an individual Capital Account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). In addition, the Capital Account of a Member who owns Units in different classes shall be separately computed for each separate class of Units. If a Member transfers all or a part of its Interests in accordance with this Agreement, such Member's Capital Account attributable to the transferred Interests shall carry over to the new owner of such Interests pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(l).

3.5     Schedules. The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit A to this Agreement from time to time to reflect the transfer of Interests, the issuance of additional Units or Interests to the Members or Additional Members.

3.6     Rights Regarding Capital Contributions.

(a)     No Member shall be entitled to interest on any Capital Contribution, and no Member shall have the right to withdraw or to demand the return of all or any part of its Capital Contribution, except as specifically provided in this Agreement.

(b)     Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to receive property, other than cash, except as may be specifically provided herein.

(c)     No Member shall have personal liability for the repayment of the Capital Contribution of any Member or any obligation to make loans or advances to the Company, including restoration of a deficit Capital Account as provided in Section 3.7.

3.7    Deficit Capital Accounts.  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that any Member's Capital Account has a deficit balance upon dissolution of the Company, such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

# ARTICLE 4
# MEMBERS

4.1    Procedures for Admission.  To effect the admission of a Member (including any Additional Member) to the Company, the Board of Managers shall require the Person to be so admitted to the Company to execute and deliver a counterpart signature page to this Agreement specifying the date of admission, such Person's name and address, such Person's Capital Contribution and the number and series of Units acquired thereby.  The Board of Managers shall attach such counterpart signature page as a signature page to this Agreement.

4.2    Limited Liability.  Except as required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.3    Withdrawals or Resignations.  No Member shall have the right or power to voluntarily withdraw or resign as a Member from the Company.

4.4    Competing Activities.  The Members, the Managers and their respective Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation, other ventures (including Rothenberg Ventures Fund I, LLC, RVF I Co-Investor Fund I, LLC, RVF I Co-Investor Fund II, LLC, RVF I Co-Investor Fund III, LLC, RVF I Co-Investor Fund IV, LLC and RVF I Co-Investor Fund V, LLC), existing portfolio companies or potential investments  that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any other Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  Neither the Members nor the Managers shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Members and the Managers shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company.  Each Member acknowledges that the Manager and the other Members and their respective Affiliates conduct other businesses, including businesses (i) that may compete with the Company or the portfolio companies of the Company and for the Managers' and Members' time and (ii) that the Company may invest in such portfolio companies in which the Managers or Members have already invested if the Manager determines that the Company should so invest.  Each Member hereby waives any and all rights and claims that they may otherwise have against the Managers, the other Members and their respective Affiliates as a result of any of such activities and investments.  Notwithstanding anything contained in this Section 4.4 to the contrary, this Section 4.4 is only intended to apply, and shall only apply, to the Managers and the Members in their respective capacity as such, and this Section 4.4 is not intended to, and shall not, supersede or negate (except to the extent set forth above) any

duties or agreements that may apply to Managers or Members in their capacity as officers, employees or consultants of the Company, whether or not such duties are expressly set forth in any written employment, consulting or similar agreement.

4.5     Transactions with the Company.   With the prior approval of the Board of Managers, a Member may lend money to, lease property from, contract to provide services to, or transact other business with the Company.  Subject to applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.6     Remuneration to Members.  No Member, acting in such capacity, is entitled to remuneration for acting in the Company business.

4.7     Members are not Agents.  Pursuant to Section 5.1 and the Certificate of Formation, the management of the Company is vested in the Board of Managers.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate of Formation and except as expressly required by the Act.  No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board of Managers, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.8     Voting Rights.  Except as expressly provided in this Agreement or the Certificate of Formation, Members shall have no voting, approval or consent rights.  The Units shall be voting. For purposes of determining the voting interest of a Member, a Member's voting power shall be based upon the number of Units held.  The Profits Interest shall be non-voting.

4.9     Certificate of Units or Profits Interest.  The Company will not issue certificates for Units (or Profits Interest) issued.

4.10    Meetings of and Voting by Members.

(a)     A meeting of the Members may be called at any time by the Members holding a Majority Interest.  Meetings of the Members shall be held upon four (4) days' notice by first-class mail or 48 hours' notice given personally or by telephone, telegraph, facsimile, telex, e-mail, or other similar means of communication.  Any such notice shall be addressed or delivered to each Member entitled to vote at such Member's address as it is shown upon the records of the Company.  Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the recipient.  Oral notice shall be deemed to have been given at the time it is communicated, in person or by telephone or wireless, to the recipient or to a person at the office of the recipient who the person giving the notice has reason to believe will promptly communicate it to the receiver.  Except to the extent that this Agreement expressly requires the approval of a greater number of Members, every act or decision done or made by the affirmative vote of the Members holding a Majority Interest present at a meeting is the act of the Members.

(b)     Members may participate in a meeting through use of conference telephone, electronic video screen communication, or other communications equipment, so long as all members participating in such meeting can hear one another.

(c)     Any action required or permitted to be taken by the Members may be taken without a meeting, if a consent in writing, setting forth the action so taken, is signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted. Such action by written consent shall have the same force and effect as an approval of the Members.

(d)     The provisions of this Section 4.10 govern meetings of the Members if the Members elect, in their discretion, to hold meetings. However, nothing in this Section 4.10 or in this Agreement is intended to require that meetings of the Members be held, it being the intent of the Members that meetings of the Members are not required.

## ARTICLE 5
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Management of the Company by Board of Managers. Subject to the provisions of Section 5.4 of this Agreement, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Board of Managers.

5.2     Meetings of Board of Managers. Meetings of the Board of Managers may be called by any Manager, Chief Executive Officer or the Secretary. All meetings shall be held upon at least two (2) business days notice delivered personally or by telephone, e-mail, telegraph or facsimile. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Meetings of the Board of Managers may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the Board of Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the authorized number of Managers constitutes a quorum of the Board of Managers for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present is the act of the Board of Managers. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Managers, if any action taken is approved by at least a majority of the required quorum for such meeting. Notwithstanding the foregoing, in the event that the number of Managers is one (1), then every act or decision done or made by the single Manager present at a meeting duly held is the act of the Board of Managers.

Any action required or permitted to be taken by the Board of Managers may be taken by the Board of Managers without a meeting, if all of the Managers individually or collectively consent in writing to such action. Such action by written consent shall have the same force and effect if taken at meeting of the Board of Managers.

The provisions of this Section 5.2 govern meetings of the Board of Managers if the Managers elect, in their discretion, to hold meetings. However, nothing in this Section 5.2 or in this Agreement is intended to require that meetings of Board of Managers be held, it being the intent of the Members that meetings of Managers are not required.

5.3     Election and Compensation of Managers.

(a)     Number, Term and Qualifications.  The number of Managers of the Company shall initially be fixed at one (1), which number may be increased or decreased by a resolution of the Board of Managers and the affirmative vote or written consent of Members holding a Majority Interest.  The initial Manager shall be the Management Company.  Any Manager shall serve until the earlier of (i) the removal of such Manager in accordance with this Agreement, (ii) such Manager's resignation or (iii) such Manager's death or dissolution.  A Manager may, but need not be, a Member.

(b)     Resignation. Any Manager may resign at any time by giving written notice to the Members and any other Manager. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.

(c)     Removal. Any Manager may be removed at any time, with or without Cause, by the affirmative vote or written consent of Members holding a Majority Interest; provided, however that the Management Company may only be removed for cause or as set forth in the Management Agreement.

(d)     Vacancies.  Any vacancy occurring for any reason on the Board of Managers shall be filled by the affirmative vote or written consent of the Members holding a Majority Interest.

(e)     Management Agreement. The Manager, in the name and on behalf of the Company, is authorized to enter into a Management Agreement dated as of the date of this Agreement, with Management Company, in the form attached hereto as Exhibit C (as amended from time to time, the "Management Agreement"). The Management Agreement shall not be subject to termination or cancellation by the Company other than as expressly provided in the Management Agreement and shall be subject to amendment only in the manner set forth therein. The fees and reimbursements payable to the Management Company pursuant to the Management Agreement shall not be considered a distribution of profits or a return of capital for the purpose of any provision of this Agreement, but shall be considered an expense of the Company, and shall be deducted from Profits or added to Losses in determining the Profits and Losses of the Company pursuant to Article VI hereof. Notwithstanding anything to the contrary contained in this Agreement or the Management Agreement, in no event will the Manager be required to pay any fees under the Management Agreement with respect to its Capital Contributions to the Company.

5.4     <u>Powers of Managers and Chief Executive Officer</u>.

(a)     <u>Powers of the Chief Executive Officer</u>.  Subject to the provisions of Section 5.4(b) and (c), and except as may be otherwise expressly stated in this Agreement, the Chief Executive Officer is hereby granted, under the supervision of the Board of Managers, the right, power and authority to manage the day-to-day operations of the Company and to do on behalf of the Company all things determined by the Chief Executive Officer to be necessary or desirable to carry out his duties and responsibilities, including (without limitation) the right, power and authority from time to time to do the following:

(i)     To open bank and other financial accounts, to borrow money in the name and on behalf of the Company, and to secure any such loans by a mortgage, pledge or other encumbrance upon any assets of the Company;

(ii)     To cause to be paid all amounts due and payable by the Company to any person or entity;

(iii)     To employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Company, to delegate by express action any powers of the Chief Executive Officer enumerated herein, and to pay to such persons such fees, expenses, salaries, wages and other compensation as he shall in his sole discretion determine;

(iv)     To pay, extend, renew, modify, adjust, subject to arbitration, prosecute, defend or compromise, upon such terms as he may determine and upon such evidence as he may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(v)     To pay any and all fees and to make any and all expenditures which he deems necessary or appropriate in connection with the organization of the Company, the management of the affairs of the Company and the carrying out of his obligations and responsibilities under this Agreement;

(vi)     To the extent that funds of the Company are, in the Chief Executive Officer's judgment, not immediately required for the conduct of the Company's business, temporarily to deposit the excess funds in such bank account or accounts, or invest such funds in such interest-bearing taxable or nontaxable investments, as the Chief Executive Officer shall deem appropriate;

(vii)     To acquire, prosecute, maintain, protect and defend or cause to be protected and defended all patents, patent rights, trade names, trademarks, copyrights and service marks, all applications with respect thereto and all proprietary information which may be held by the Company;

(viii)     To enter into, execute, acknowledge and deliver any and all contracts, agreements or other instruments necessary or appropriate to carry on the business of the Company as set forth herein;

(ix)   To cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Company; and

(x)   To acquire real and personal property in the name of the Company.

(b)   <u>Powers of Managers</u>.  Each Manager shall participate in the direction, management and control of the business of the Company to the best of such Manager's ability. Unless the number of Managers is one (1), in which case the single Manager shall act individually, the Managers shall in all cases act as a group and shall have no authority to act individually, unless such authority is expressly delegated to one or more Managers or a committee thereof by the Board of Managers.  The Board of Managers may appoint one (1) or more officers and, subject to this Agreement, may delegate to those officers the authority to manage the day-to-day operations of the Company.  Without limiting the generality of Section 5.1, but subject to Section 5.4(c) and to the express limitations set forth elsewhere in this Agreement, the Board of Managers shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Section 5.4(a) and in the Act.

(c)   <u>Protective Provisions of Members</u>.  Notwithstanding any other provisions of this Agreement, neither the Board of Managers nor the Chief Executive Officer shall have any authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of the Members holding a Majority Interest:

(i)   Alter, change or waive the rights, preferences or privileges of the Units or Profits Interest;

(ii)   Increase the number of authorized Units as set forth in Section 3.1(a) above; or

(iii)   Effect any amendment of the Certificate of Formation or this Agreement if such amendment adversely affects the economic rights of the Members.

(d)   <u>Creation of Committees</u>.  The Board of Managers may create committees to assist the Board of Managers and the officers in the governance of areas of importance to the Company.  Subject to the terms of this Agreement, such committees shall have such powers and perform such duties as may be prescribed by the resolutions creating such committees.

5.5   <u>Performance of Duties; Liability of Managers and Officers; Fiduciary Standard</u>.  A Manager or officer of the Company shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by such Manager or officer of the Company.  The Managers and the officers of the Company shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Members agree that the fiduciary duties of a Manager to the Company and its Members shall be those of a director to a corporation and its stockholders under the DGCL and not those of a partner to a partnership and its

partners. Any Manager or officer of the Company who performs the duties of Manager or officer of the Company, as the case may be, in compliance with this Section 5.5 shall not have any liability by reason of being or having been a Manager or officer of the Company.

5.6    <u>Devotion of Time</u>.   Managers are not obligated to devote all of their time or business efforts to the affairs of the Company. The Managers shall devote whatever time, effort, and skill as they deem appropriate for the operation of the Company.

5.7    <u>Limited Liability</u>.   No entity or person who is a Manager or officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer of the Company.

5.8    <u>Liability of Manager Limited to Manager's Assets</u>.   Under no circumstances will any Affiliate of any Manager have any personal responsibility for any liability or obligation of the Manager (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Manager will be limited to the assets of the Manager as they may exist from time to time.

5.9    <u>Officers</u>.

(a)    <u>Officers</u>.   The officers of the Company shall be appointed by the Board of Managers and shall consist of a Chief Executive Officer. The Board of Managers may appoint such other officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Managers. The salaries of all officers and agents of the Company shall be fixed by or in the manner prescribed by the Board of Managers. The officers of the Company shall hold office until their successors are chosen and qualified. Any officer may be removed at any time, with or without cause, by the Board of Managers. Any vacancy occurring in any office of the Company shall be filled by the Board of Managers.

(b)    <u>Chief Executive Officer</u>.   The Chief Executive Officer of the Company shall, subject to the control of the Board of Managers, have general supervision, direction and control of the day-to-day business and affairs of the Company. The Chief Executive Officer shall preside at all meetings of the Members, unless the Board of Managers shall have appointed another person to so preside and such person is present. The Chief Executive Officer shall perform other duties commonly incident to a chief executive officer of a Delaware corporation and shall also perform such other duties and have such other powers as set forth in Section 5.4(a) or otherwise as the Board of Managers shall designate from time to time. The initial Chief Executive Officer of the Company shall be Michael Rothenberg.

(c)    <u>Officers as Agents</u>.   The officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board of Managers not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.

5.10   <u>Tax Matters Partner</u>.  When needed the Manager shall designate a Tax Matters Partner of the Company as provided in the Treasury Regulations pursuant to Code Section 6231(a)(7), and such Tax Matters Partner shall be indemnified and reimbursed for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with its serving in that capacity.  Notwithstanding the preceding sentence, the Tax Matters Partner shall not be entitled to indemnification for such costs and expenses if such party has not acted in good faith.  The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.

# ARTICLE 6
## ALLOCATIONS OF PROFITS AND LOSSES AND DISTRIBUTIONS

6.1   <u>Allocations of Profits and Losses</u>.  Except as otherwise provided in Section 6.2, the Board of Managers shall allocate all Profits and Losses (and items thereof) of the Company to the Members so as to, as nearly as possible, increase or decrease, as the case may be, each Member's Capital Account to the extent necessary such that each Member's Capital Account is equal to the amount that such Member would receive if the Company were dissolved, its assets sold for their book value, its liabilities satisfied in accordance with their terms and all remaining amounts were distributed to the Members in accordance with Section 6.5(a) of this Agreement immediately after making such allocation.  The intent of the foregoing allocation is to comply with Treasury Regulations Section 1.704-1(b) and ensure that the Members receive allocations of Profits and Losses pursuant to this Section 6.1 in accordance with their relative interests in the Company, with the interest of each Member in the Company determined by reference to such Member's relative rights to receive distributions from the Company pursuant to Section 6.5(a).

6.2   <u>Special Allocations</u>.  Notwithstanding the allocations set forth in Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of "partnership minimum gain" (as defined in Treasury Regulations Section 1.704-2(d)), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 6.2 shall be taken into account in computing subsequent allocations of income and gain pursuant to Section 6.1 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 6.2 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to Section 6.1 if such unexpected adjustments, allocations, or distributions had not occurred.

6.3   <u>Tax Allocations</u>.  If any property is reflected in the Capital Accounts of the Members and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then the tax items with respect to such property shall (to the extent not governed by Section 704(c)), in accordance with the requirements of Treasury Regulations Section 1.704-1(b)(4)(i), be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of the applicable property and its book value in the same

manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the share of tax items under Section 704(c). The Company shall use the traditional method, as described in Treasury Regulations Section 1.704-3(b) in a manner determined by the Board of Managers. Except as otherwise provided in this Agreement, all items of Company income, gain, loss or deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses, as the case may be, for the year.

6.4     Section 754 Election. The Company shall be authorized to file an election under Section 754 of the Code to adjust the basis of property of the Company in the case of a transfer of an interest in the Company if such election under Section 754 would, in the good faith judgment of the Tax Matters Partner, be beneficial to the Company or any Member.

6.5     Distributions by the Company.

(a)     Subject to applicable law, the Board of Managers may elect from time to time to make distributions of Distributable Amounts to the Members. Any such distributions shall be made to the Members as follows:

(i)     First, to the Members pro rata in proportion to their Unpaid Capital Contributions until each Member has received aggregate distributions under this Section 6.5(a)(i) with respect to its Units equal to its Unpaid Capital Contributions (no Member shall receive distributions under this Section 6.5(a)(i) in excess of its Unpaid Capital Contribution); and

(ii)     Thereafter, twenty percent (20%) to the Profits Interest Member, and eighty percent (80%) to the Members pro rata in proportion to the number of Units held by each at the time of the distribution.

(b)     Notwithstanding the limitations set forth in Section 6.5(a), the Board of Managers shall, for each taxable year, cause the Company to distribute to each Member on a timely basis taking into consideration the due dates for estimated tax payments an amount equal to such Member's (or any Person whose tax liability is determined by reference to the income of a Member) estimated federal, state and local income tax liability (and applicable self employment taxes) resulting from the Company's income taxable to such Member for such taxable year (or applicable period), as determined by the Board of Managers (taking into consideration any information provided in writing by such Member to the Company); *provided, however*, that no such distribution shall be made to the extent that the Board of Managers determine, in their sole discretion, that funds are not reasonably available for such distribution by virtue of applicable law, contractual obligation or current or future needs of the Company. Such distribution to each Member shall be made no later than the first day of the third month following the end of the taxable year of the Company with respect to which such distribution is made. Distributions made pursuant to this Section 6.5(b) shall be applied against (and reduce on a dollar-for-dollar basis) amounts otherwise distributable to the Members pursuant to Section 6.5(a), and distributions previously made to the Members with respect to a particular year pursuant to Section 6.5(a) shall be applied against (and reduce on a dollar-for-dollar basis) amounts otherwise distributable to the Members pursuant to this Section 6.5(b) with respect to such year.

(c)     To the extent that the Company is required by law to withhold or to make tax or other payments on behalf of or with respect to any Member, the Company shall withhold such amounts from any distribution and make such payments as so required.  For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Member on behalf of whom the withholding or payment was made.  All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Units or Profit Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 6.5.

(d)     To the extent approved by the Board of Managers, a Member may be reimbursed for out-of-pocket expenses incurred by the Member in connection with the business of the Company, and a Member may be entitled to receive a "guaranteed payment" within the meaning of Section 707(c) of the Code for the performance of services to the Company by the Member for being a Manager, officer or otherwise.  The reimbursement of out-of-pocket expenses and payments of any guaranteed payments in accordance with this Section 6.5(d) shall not be treated as a distribution to the Member under Section 6.5 or under Section 9.4, and the related taxable income shall not be considered an allocation of Company income for which a tax distribution is to be made pursuant to Section 6.5(b).

6.6     <u>Book-Up of Company Assets</u>.  The book value of all Company assets may be adjusted to equal their respective gross fair market values, as determined in good faith by the Board of Managers, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of money or Company property as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), including the termination of the Company for federal income tax purposes pursuant to Section 708(b)(1)(B) of the Code.  The book-up shall be made in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE 7
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1     <u>Transfer and Assignment of Interests</u>.  Except as expressly provided in this Agreement or any other written agreement to which the Company is a party, a Member shall not transfer any part of the Member's Interest in the Company, whether now owned or later acquired, unless the Board of Managers in writing approves such transfer.  No Member may encumber or permit or suffer any encumbrance of all or any part of the Member's Interest in the Company unless such encumbrance has been approved in writing by the Board of Managers.  Such approvals may be granted or withheld in the Board of Manager's discretion.  In addition, with respect to the Profits Interest, the Profits Interest Member shall not transfer or encumber any part of the Profits Interest without the affirmative vote or written consent of Members holding a Majority Interest.  Any transfer or encumbrance of an Interest without such applicable approvals shall be void.  Notwithstanding any other provision of this Agreement to the contrary: (a) a Member who is a natural person may transfer all or any portion of his or her Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's

spouse, and the Member's immediate family; provided that the Member retains a beneficial interest in the trust and all of the voting Interest included in such Interest; and (b) a Member who is not a natural person may transfer all or any portion of its Interest to its Affiliate. A transfer of a Member's beneficial interest in such trust, or failure to retain such voting Interest, shall be deemed a transfer of an Interest. In the event that any part of the Member's Interest in the Company is transferred incident to a divorce or by operation of law, the transferee of the Interest who is not approved by the Board of Managers shall only obtain rights in the Company with respect to distributions and Profits and Losses attributable to the transferred Interests but shall have no rights as a Member under this Agreement or the Act, including no rights to vote or otherwise participate in the management of the Company. Notwithstanding the foregoing, the Interests of the transferee shall be subject to the restrictions contained in this Agreement applicable to the Interests held by a Member.

7.2   <u>Further Restrictions on Transfer of Interests</u>.  In addition to other restrictions found in this Agreement, unless otherwise approved in writing by the Board of Managers, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of its Interests: (A) without compliance with all federal and state securities laws, (B) if the Interests to be transferred, when added to the total of all other Interests transferred in the preceding twelve (12) consecutive months prior thereto, would cause the tax termination of the Company under Code Section 708(b)(1)(B), or (C) if such transfer would cause the number of holders of the Company's securities to exceed 100 or such other number as may be permitted for purposes of determining that the Company is exempt from Securities Exchange Act of 1934, as amended or the Investment Company Act of 1940, as amended, or for purposes of determining whether the Company is a "publicly traded partnership" within the meaning of Section 7704 of the Code.

7.3   <u>Transfer in Violation of Agreement</u>.  Any transfer of an Interest that is not made in accordance with the terms of this Agreement shall be null and void.

## ARTICLE 8
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1   <u>Books and Records</u>. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in a manner determined by the Board of Managers. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in Delaware all of the following:

(a)   A current list of the full name and last known business or residence address of each Member and set forth in alphabetical order, together with the Capital Contributions, Capital Account and Units (and Profits Interest) held by each Member;

(b)   A current list of the full names and addresses of each Manager;

(c)   A copy of the Certificate of Formation and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate of Formation or any amendments thereto have been executed;

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(e)     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)     Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

(g)     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

8.2     <u>Inspection of Books</u>. The Manager shall cause the Company to maintain true and proper books, records, reports, and accounts in which shall be entered all material transactions of the Company. Copies of such books, records, reports, accounts and schedules shall be located at the principal office of the Company and shall be available to any Member for inspection (and may be copied at the requesting Member's expense), upon at least two business days notice, during reasonable business hours. The Members hereby acknowledge that the Company will be in possession of confidential information the improper use or disclosure of which could have a material adverse effect upon the Company or upon one or more Members or the portfolio companies or past portfolio companies of the Company. Each Member agrees not to use, publish, disseminate, misappropriate or otherwise disclose any such confidential information, either while such Member is a Member of the Company, or thereafter, except as may be required by applicable law. Each Member will take all reasonable precautions to protect the confidential nature of such confidential information and all other documents or materials entrusted to such Member.

8.3     <u>Reports</u>.  The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency.  The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns.  The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (A) such information as is necessary to complete the Members' federal and state income tax or information returns and (B) a copy of the Company's federal, state, and local income tax or information returns for the year.

8.4     <u>Bank Accounts</u>. The Board of Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

## ARTICLE 9
## DISSOLUTION AND WINDING UP

9.1     <u>Dissolution</u>.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)     The entry of a decree of judicial dissolution;

(b)     The written consent of the Board of Managers and the Members holding a Majority Interest; or

(c)     The sale or distribution of all or substantially all of the assets of Company, as determined by the Board of Managers.

9.2     Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 9.1, the Managers shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act.

9.3     Winding Up. Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up. The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.4     Order of Payment Upon Dissolution. The assets and proceeds on liquidation shall be applied in the following order:

(a)     To creditors, including Members who are creditors, to the extent permitted by law and in accordance with their relative rights of priority, if any; and

(b)     All remaining assets and proceeds shall be distributed to the Members in accordance with Section 6.5(a).

9.5     Distributions in Kind.  The Board of Managers may make distributions (on dissolution or otherwise) to the Members in cash or distribute Company assets in kind, and the distribution of any such assets in kind shall be made on the basis of the fair market value of such asset as of the date of distribution, as determined by the Board of Managers in good faith. The Capital Accounts of the Members shall be adjusted accordingly to preserve the economic interests of the Members as the result of any distribution in kind.

9.6     Certificate of Cancellation. The Board of Managers or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a Certificate of Cancellation of the Certificate of Formation upon the completion of the winding up of the affairs of the Company.

## ARTICLE 10
## INDEMNIFICATION AND INSURANCE

10.1     Indemnification. The Company shall defend and indemnify any Member, Manager or officer of the Company and may indemnify any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that it, he or she is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, it, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent

as applicable law may hereafter from time to time permit; provided, however, that this indemnity shall not extend to conduct not undertaken in good faith nor to any recklessness, fraud, intentional wrongdoing, or gross negligence.

10.2   Insurance.   The Company may, to the extent commercially reasonable (as determined by the Board of Managers), purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

## ARTICLE 11
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managers, the other Members, and the Company as follows (reference to Units below includes the Profits Interest):

11.1   Preexisting Relationship or Experience.   By reason of his, her or its business or financial experience, or by reason of the business or financial experience of his, her or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Units and of protecting his, her or its own interests in connection with this investment.

11.2   Investment Intent.   He, she or it is acquiring the Units for investment purposes for his, her or its own account only and not with a view to, or to offer or sell for an issuer in connection with, any distribution of all or any part of the Units, or to participate or to have a direct or indirect participation in any such undertaking, or to participate or to have a participation in the direct or indirect underwriting of any such undertaking. He, she or it is not an "underwriter" as that term is defined in Section 2(a)(11) of the Securities Act of 1933, as amended (the "Securities Act"). No other Person will have any direct or indirect beneficial interest in or right to the Units.

11.3   Purpose of Entity.   If an entity, it was not organized for the specific purpose of acquiring the Units.

11.4   Economic Risk.   He, she or it is financially able to bear the economic risk of an investment in the Units, including the total loss thereof.

11.5   No Registration of Units.   He, she or it acknowledges that the Units have not been registered under the Securities Act, or qualified any applicable blue sky laws in reliance, in part, on his, her or its representations, warranties, and agreements herein.

11.6   Investment in Restricted Security.   He, she or it understands that the Units are "restricted securities" under the Securities Act in that the Units will be acquired from the Company in a transaction not involving a public offering, and that the Units may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Units must be held indefinitely.

11.7    No Obligations to Register.  He, she or it represents, warrants, and agrees that the Company and the Board of Managers are under no obligation to register or qualify the Units under the Securities Act or under any state securities law, or to assist her, him or it in complying with any exemption from registration and qualification.

11.8    No disposition in Violation of Law.  Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Units which will result in the violation by her, him or it or by the Company of the Securities Act, the DGCL, the Act, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Units unless and until he, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Board of Managers, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

11.9    Investment Risk.  He, she or it acknowledges that the Units are speculative investments which involve a substantial degree of risk of loss of an entire investment in the Company, that he, she or it understands and takes full cognizance of the risks related to the purchase of the Units, and that the Company is newly organized and has no financial or operating history.

11.10    Restrictions on Transferability.  He, she or it acknowledges that there are substantial restrictions on the transferability of the Units pursuant to this Agreement, that there is no public market for the Units and none is expected to develop, and that, accordingly, it may not be possible to liquidate his, her or its investment in the Company.

11.11    Information Reviewed.  He, she or it has received and reviewed this Agreement and the information it considers necessary or appropriate for deciding whether to purchase the Units. In connection with the purchase of the Units, he, she or it has neither (i) received any general solicitation or general advertising, including, but not limited to advertisements, articles, notices or other communications published in any newspaper, magazine, or similar media or broadcast over television or radio, nor (ii) attended any seminar or meeting whose attendees were invited by any general solicitation or general advertising. He, she or it has relied only on the information contained in this Agreement in making its investment decision.

11.12    Tax Consequences.  He, she or it acknowledges that the tax consequences of investing in the Company will depend on its particular circumstances, and neither the Company, the Managers, the Members, nor the partners, stockholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, her or its own advisers with respect to the tax consequences of this investment.

11.13    No Assurance of Tax Benefits.  He, she or it acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the

future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service

11.14   Indemnity. He, she or it shall defend, indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, stockholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him, her or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the company, each and every Manager, each and every other Member, and any officers, directors, stockholders, managers, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person in connection with such action, suit, proceeding, or the like.

### ARTICLE 12
### MISCELLANEOUS

12.1   Complete Agreement. This Agreement and the Certificate of Formation, any side letter, and any restricted unit, vesting or similar agreement, if any, entered into by any Member, constitute the complete and exclusive statement of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them. The Amended Prior Agreement is hereby amended and restated in its entirety as provided herein. No representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or Managers or have any force or effect whatsoever. To the extent that any provision of the Certificate conflict with any provision of this Agreement, the Certificate shall control.

12.2   Binding Effect.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns

12.3   Arbitration. Any unresolved controversy or claim arising out of or relating to this Agreement shall be submitted to arbitration to one arbitrator mutually agreed upon by the parties, and if no agreement can be reached as to the arbitrator, then by one arbitrator having reasonable experience in transactions of the type provided for in this Agreement and who is chosen by the American Arbitration Association (the "AAA"). The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof. Each party will bear its own costs in respect of any disputes arising under this Agreement. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action

sought in the U.S. District Court for the Northern District of California or any court of the State of California having subject matter jurisdiction.

12.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Managers and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

12.5    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Treasury Regulations, the Act, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.6    Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.7    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or its counsel.

12.8    References to this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

12.9    Exhibits.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

12.10   Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.11   Additional Documents and Acts.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.12   Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member or Manager at the address specified in Exhibit A or Exhibit B hereto.  Any party may, at any time by giving five business (5)

days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.13   <u>Amendments</u>.  All amendments to this Agreement will be in writing and approved and executed by the Board of Managers and Members holding a Majority Interest.

12.14   <u>Reliance on Authority of Person Signing Agreement</u>.  Neither the Company nor any Member will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual.

12.15   <u>No Interest in Company Property; Waiver of Action for Partition</u>.  No Member has any interest in specific property of the Company.  Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

12.16   <u>Multiple Counterparts</u>.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.17   <u>Remedies Cumulative</u>.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.18   <u>Aggregation of Units</u>.  All Units held or acquired by affiliated entities (including, without limitation, affiliated venture capital funds and members of the same family or their trusts) or persons or entities under common management or control shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

12.19   <u>Member Approval</u>.  The undersigned Members, by their signatures below, approve all amendments of the Amended Prior Agreement contained in this Agreement.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed this Second Amended and Restated Operating Agreement for Rothenberg Ventures Fund 1, LLC, a Delaware limited liability company.

**BOARD OF MANAGERS AND MANAGER:**

**Rothenberg Ventures Management Company, LLC**

By: _____

Name: _Michael Rothenberg_

Title: _Manager_

Address: _900 San Mateo Dr._
_Menlo Park, CA 94025_

Phone: _____

Fax: _____

Email: _mike @rothenbergventures.com_

# EXHIBIT A

## CAPITAL CONTRIBUTION, CAPITAL ACCOUNT BALANCE AND ADDRESSES OF MEMBERS

## EXHIBIT B

## NAMES AND ADDRESSES OF MANAGERS
## AS OF SEPTEMBER 6, 2012

Manager

Rothenberg Ventures
Management Company, LLC

Address

c/o Michael Rothenberg
900 San Mateo Drive
Menlo Park, CA 94025

# **EXHIBIT C**

MANAGEMENT AGREEMENT

# FIRST AMENDED AND RESTATED

# MANAGEMENT AGREEMENT

This First Amended and Restated Management Agreement (this "Agreement") is dated as of September 10, 2013, by and between Rothenberg Ventures Management Company, LLC, a Delaware limited liability company (the "Management Company"), and Rothenberg Ventures Fund I, LLC, a Delaware limited liability company (the "Company").

A.   On September 6, 2012, the Management Company and the Company entered into a Management Agreement (the "Prior Agreement").

B.   Pursuant to Section 6 of the Prior Agreement, the Prior Agreement or any term thereof may be amended if such amendment is approved and executed by the Board of Managers and Members holding a Majority Interest (each as defined in the Prior Agreement).

1.   *Capitalized Terms.*  Capitalized terms used without definition in this Agreement have the respective meanings specified in the Operating Agreement governing the Company (the "Company Agreement") of even date hereof.

2.   *Payment of Expenses.*

a.   The Management Company agrees to incur on behalf of the Company and to otherwise assume (and not be reimbursed for) the following expenses attributable to the management and administration of the Company:  (i) compensation and expenses of the employees of the Management Company, (ii) expenses for administrative, clerical and related support services, office space and facilities, utilities and telephones of the Management Company and (iii) normal operating expenses which relate to the management and administration of the Company itself as a going concern, including expenses with respect to the organization of the Company. Such expenses include (without limitation) any taxes which may be assessed against the Company; interest expense and financing charges for borrowed money; fees for certain day-to-day legal, auditing and accounting services provided to the Company; all expenses incurred in connection with the development, negotiation and structuring of prospective investments that are not ultimately made; expenses in connection with reporting to the Members and meetings of the Members; and costs of insurance premiums for insurance relating to the Company's activities.

b.   Except as set forth in Section 2(a) above, the Company shall pay, or reimburse the Management Company for, all other expenses of the Company (or other expenses incurred by the Management Company for or on behalf of the Company), including without limitation, expenses which are incurred in the purchase, holding, sale, exchange or other disposition of investments; commissions or brokerage fees or similar charges incurred in connection with the purchase and sale of securities (including, but not limited to, any merger or transaction fees payable to third parties); extraordinary expenses; fees for certain legal, auditing and accounting services provided to the Company; fees for investment banking, custodial and

registration services provided to the Company; and fees and expenses with respect to claims against the Company and related litigation and threatened litigation matters involving the Company.

3.   ***Management Company Duties***.  The Management Company shall perform such management services for the Company as determined by the Board of Managers. The ultimate management, policies and operations of the Company shall nevertheless be the responsibility of the Board of Managers acting pursuant to and in accordance with the Company Agreement of the Company, and all decisions relating to the Company's matters, including the selection and management of the Company's investments, shall be made by the Board of Managers acting pursuant to and in accordance with such Company Agreement.

4.   ***Fees***.  The Management Fee shall be at a rate equal to seventeen and three-fourths percent (17.75%) of the actual Capital Contributions made by the Members to the Company.   Payment of the Management Fee shall be made at the time the Capital Contributions are made by the Members.  Notwithstanding the foregoing, the Management Fee with respect to Capital Contributions allocated to Company investments in its co-investment funds shall be credited as refunded from the Manager to the Company, and paid by the Company to the Manager under the management agreement with respect to the applicable co-investment fund.

5.   ***Term***.  Commencing on the date hereof, services will be performed hereunder for the term of the Company (as set forth in the Company Agreement) plus one (1) year from termination of the Company or until such time as liquidation of the Company is completed, whichever is sooner; provided, however, that this Agreement shall also terminate upon replacement of the Manager pursuant to the terms of the Company Agreement.

6.   ***Termination; Amendment***.  This Agreement may be terminated, modified or amended only by a writing signed by each of the parties hereto and only with the written consent of the Board of Managers and the Members holding a Majority Interest.

7.   ***Governing Law***.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

8.   ***Notices***.  All notices, requests, consents, approvals and statements hereunder shall be in writing and shall be deemed to have been properly given by personal delivery or if mailed from within the United States by first-class U.S. Mail, postage prepaid, addressed in each case to such address or addresses as the addressee may have specified by written notice to the other parties.

9.   ***Entire Agreement***.  This Agreement and the exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof, and supersede any and all other written or oral agreements relating to the subject matter hereof existing between the parties hereto, including the Prior Agreement, which is of no further force or effect.  The Prior Agreement is hereby amended and superseded in its entirety and restated as provided herein.  No party hereto shall be liable or bound to any other party in any

manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first-above written.

**Rothenberg Ventures Fund I, LLC,**
a Delaware limited liability Company

By:  Rothenberg Ventures Management
Company,  LLC, its Manager

Michael Rothenberg, Manager


**Rothenberg Ventures Management Company,**
**LLC,** a Delaware limited liability company

Michael Rothenberg
Manager



FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF

ROTHENBERG VENTURES FUND II, LLC

A DELAWARE LIMITED LIABILITY COMPANY

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

# FIRST AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## ROTHENBERG VENTURES FUND II, LLC,
## A DELAWARE LIMITED LIABILITY
## COMPANY

This First Amended and Restated Operating Agreement is made as of November 1, 2013, by and by and among the parties listed on the signature pages hereof, and such other Persons that may be admitted from time to time to the Company and as parties to this Agreement, with reference to the following facts:

A     WHEREAS, on September 4, 2013, the Certificate of Limited Partnership for Rothenberg Ventures Fund II, LP, was filed with the Delaware Secretary of State.

B.     WHEREAS, on October 10, 2013 Rothenberg Ventures Fund II, LP voted to convert Rothenberg Ventures Fund II, LP to a Delaware limited liability company and did convert said limited partnership into a Delaware limited liability company named Rothenberg Ventures Fund II, LLC (the "Company").

C.     WHEREAS, on October 18, 2013 certain of the Members entered into an Operating Agreement (the "Prior Agreement"), which the Manager and at least a Majority Interest (each as defined below) of the Members as of the date hereof, by their signatures below, wish to amend and restate in its entirety.

D.     WHEREAS, pursuant to Section 12.13 of the Prior Agreement, the Prior Agreement or any term thereof may be amended if such amendment is approved and executed by the Board of Managers and Members holding a Majority Interest (each as defined in the Prior Agreement).

E.     WHEREAS, The Members desire to enter into this Agreement to provide terms to govern the Company.

NOW, THEREFORE, the parties by this Agreement set forth the operating agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1
## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1     <u>Act</u> shall mean the Delaware Limited Liability Company Act, 6 Delaware Code, Section 18-101 et seq., as the same may be amended from time to time, and the provisions of succeeding law.

1.2     <u>Additional Member</u> means a Person admitted to the Company as an additional Member pursuant to Section 4.1 and shown as a Member on the books and records of the Company.

1.3    Affiliate of a Person means (a) any director, officer, stockholder, member, partner, employer, employee or agent of such Person or any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with such Person, as applicable and (b) with respect to individuals, an immediate family member, a descendant, or a trust. The term "control," as used in the immediately preceding sentence, means with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.4    Agreement means this First Amended and Restated Operating Agreement, as originally executed and as amended from time to time. This Agreement shall be the "limited liability company agreement" under the Act.

1.5    Board of Managers means the single manager in the case the number of managers is one (1), or the collective group of managers in the case the number of managers is more than one (1), designated or elected by the Members pursuant to Section 5.3 hereof.

1.6    Capital Account means with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.7    Cause means gross negligence, bad faith or willful misconduct by the Management Company, in connection with the performance of its duties as a Manager under the terms of this Agreement, but only in the case that the Management Company has failed to cease the event(s) constituting Cause within fifteen (15) days of the delivery of written notice by the Members holding a Majority Interest setting forth in detail the event(s) constituting Cause.

1.8    Capital Contribution means the total amount of cash contributed to the Company by the Members.

1.9    Code means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

1.10    Company means Rothenberg Ventures Fund II, LLC, a Delaware limited liability company.

1.11    DGCL means the Delaware General Corporation Law, as amended from time to time and the provisions of succeeding law.

1.12    Distributable Amounts means the amount of cash or property which the Board of Managers deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Board of Managers deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.13    Fiscal Year means the Company's fiscal year, which shall commence on January 1st and end on December 31st of each year, or such other year as shall be required under the Code.

1.14    Fund I means Rothenberg Ventures Fund I, LLC, a Delaware limited liability company.

1.15    Initial Closings means those closings of the purchase and sale of Units occurring on or prior to October 18, 2013 (including Units received on conversion of Rothenberg Ventures Fund II, LP into the Company).

1.16    Interest means the entire ownership interest (designated as a Profits Interest or Units in the Company) of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

1.17    Majority Interest means a majority of the total outstanding Units.

1.18    Management Company means Rothenberg Ventures Management Company, LLC, a Delaware limited liability company.

1.19    Manager means the manager or each of the managers designated or elected by the Members pursuant to Section 5.3 hereof or any other individuals that succeed him or her as a manager of the Company.

1.20    Member means each Person who is an initial signatory to this Agreement, including the Management Company, or has been admitted to the Company as a Member in accordance with this Agreement.

1.21    Person means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.22    Profits and Losses means for each Fiscal Year or other period, the taxable income or taxable loss of the Company for such period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(l) shall be included in taxable income or loss), with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses, shall be subtracted from such taxable income or loss;

(c)    any income, gain, loss, or deduction required to be allocated specially to the Members under Section 6.2 shall not be taken into account in computing Profits or Losses;

(d)    in lieu of any depreciation, amortization and other cost recovery deductions taken

into account in computing such taxable income or loss, the Company shall compute such deductions based on the book value of the Company property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3);

(e)     gain or loss resulting from a taxable disposition of Company property shall be computed by reference to the book value of the property disposed of (as adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3)), notwithstanding that the adjusted tax basis of such property differs from its book value; and

(f)     if the book value of Company assets is adjusted to equal fair market value as provided in Section 6.6, then the Profits or Losses shall include the amount of any increase or decrease in such book values attributable to such adjustment.

1.23     Profits Interest means that undivided Interest in the Company initially owned by the Management Company, including, without limitation, such Member's rights to Profits, Losses and distributions of the Company with respect to such Profits Interest. The Profits Interest is a non-voting Interest in the Company. Notwithstanding anything to the contrary in this Agreement, the Profits Interest may only be transferred in its entirety in accordance with this Agreement.

1.24     Profits Interest Member means the Member holding the Profits Interest.

1.25     Rothenberg Party means the Manager, the Management Company, the Profits Interest Member, Michael Rothenberg or any of their respective affiliates.

1.26     Tax Matters Partner means the Person designated as set forth in Section 5.11.

1.27     Treasury Regulations means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.28     Unit means that undivided Interest in the Company owned by a Member, (other than the Profits Interest), including, without limitation, such Member's rights to Profits, Losses and distributions of the Company with respect to such Units.

1.29     Unpaid Capital Contribution shall be determined for each Member with respect to each asset of the Company and means, with respect to each Member, an amount, not less than zero, equal to the Capital Contributions made by such Member, as set forth on Exhibit A, allocated to the assets of the Company (on an asset by asset basis), minus the amount of distributions made to the Member with respect to such assets pursuant to Section 6.5(a)(1).  The Board of Managers shall determine the aggregate amount of Capital Contributions that are allocated to a particular asset of the Company.  Each Member's allocable portion of the Unpaid Capital Contributions with respect to an asset of the Company shall be determined by dividing the amount of each Member's Capital Contributions by the aggregate amount of Capital Contributions of all of the Members, regardless of when the Capital Contributions were made to the Company (i.e., the Capital Contributions of a later admitted Member will be allocated to assets owned by the Company at the time of admittance of the Member).  In addition to allocating the amount of Capital Contributions to the direct acquisition costs of the assets of the

Company, the Board of Managers shall determine the amount of expenses that shall be allocated to a particular asset of the Company, and expenses of the Company not directly related to a particular asset shall be allocated among the assets of the Company in a manner determined by the Board of Managers. For the avoidance of doubt, Capital Contributions made with respect to Rothenberg Ventures Fund II, LP shall be treated as a Capital Contribution to the Company.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1     Formation.   The Members have formed a Delaware limited liability company under the laws of the State of Delaware by filing the Certificate of Formation with the Delaware Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name.   The name of the Company shall be Rothenberg Ventures Fund II, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable.

2.3     Term.   The term of this Agreement commenced on the date hereof and shall continue until the tenth anniversary of the date of formation of the Company; provided that the Board of Managers shall have the option to extend such term in order to facilitate the orderly disposition of the investments held by the Company for up to two additional years in the Board of Managers' good faith discretion. Any further extension of the term shall require the affirmative vote or written consent of Members holding a Majority Interest.

2.4     Office and Agent.   The Company shall continuously maintain an office and registered agent in the State of Delaware. The principal office of the Company shall be located at such place as the Board of Managers may determine. The Company may also have such offices, anywhere within and without the State of Delaware, as the Board of Managers may determine from time to time, or the business of the Company may require. The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by the Board of Managers.

2.5     Names and Addresses of the Members and the Managers.   The names and addresses of the Members are set forth on Exhibit A.   The names and address of the Manager(s) are set forth on Exhibit B. A Member or Manager may change its address upon notice thereof to the Company. The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit A to this Agreement from time to time to reflect any changes to the list of Members which may have occurred from time to time in accordance with this Agreement or to reflect changes to such Members' addresses. The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit B to this Agreement from time to time to reflect the names and address of any duly appointed or elected members of the Board of Managers.

2.6     <u>Purpose and Business of the Company</u>. The Company has been formed primarily to hold equity securities in early stage companies. Notwithstanding the foregoing, subject to the limitations set forth in this Agreement, the Company may engage in any lawful activity for which a limited liability company may be organized under the Act.

2.7     <u>Title to Company Property</u>. All property owned by the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in any such property.

2.8     <u>Failure to Observe Formalities.</u> A failure to observe any formalities or requirements of this Agreement, the Certificate of Formation or the Act shall not be grounds for imposing personal liability on the Members or the Managers for liabilities of the Company.

2.9     <u>No Partnership Intended for Nontax Purposes.</u> The Members have formed the Company under the Act, and expressly deny any intent hereby to form a partnership under Delaware law, including a partnership under the Delaware Revised Uniform Limited Partnership Act, or a corporation under the DGCL.  Except for purposes of federal, state and local taxes, the Members shall not be partners to one another, or partners to any third party.

2.10    <u>Liability of Members and Managers to Third Parties; Reliance by Third-Party Creditors.</u>

(a)     Except as otherwise provided in the Act, no Member or Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract or otherwise, by reason of being a Member or acting as a Manager of the Company.

(b)     This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any contributions or otherwise.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

3.1     <u>Authorization and Issuance of Units.</u>

(a)     The Company shall be authorized to issue the Profits Interest and one (1) class of Units in the amount of sixty million (60,000,000) Units. Except as set forth in Section 3.8, the minimum Capital Contribution for each Member with respect the purchase of its Units is $200,000 subject to waiver in the Board of Manager's sole discretion.

(b)     The Board of Managers, at their sole discretion, shall have the power to issue the authorized Units from time to time at the same price and on substantially the same terms and conditions without the consent of the Members or amendment of this Agreement and any additional issuances of Units shall be dilutive proportionately to all Members holding Units.

Without the written consent of the Members holding a Majority Interest, the Board of Managers shall not be authorized to issue the Units after October 3, 2014.  The Company shall not issue additional classes of Units or issue Units in excess of the authorized number without the affirmative vote or written consent of the Members holding a Majority Interest. In addition, the Company shall not issue any additional Profits Interest without the affirmative vote or written consent of the Members holding a Majority Interest.   The Units shall be issued at $1.00 per Unit, except that:

(i) The Units issued in the Initial Closing shall be issued and sold at a 12% discount to the $1.00 per Unit price (i.e., $0.88 per Unit);

(ii) With respect to Members who purchase Units in October 2013, such Units shall be issued and sold to them at a 12% discount (i.e., $0.88 per Unit);

(iii) With respect to Members who purchase Units in November 2013, such Units shall be issued and sold to them at an 11% discount to the $1.00 per Unit price (i.e., $0.89 per Unit);

(iv) With respect to Members who purchase Units in December 2013, such Units shall be issued and sold to them at a 10% discount to the $1.00 per Unit price (i.e., $0.90 per Unit);

(v) With respect to Members who purchase Units in January 2014, such Units shall be issued and sold to them at a 9% discount to the $1.00 per Unit price (i.e., $0.91 per Unit);

(vi) With respect to Members who purchase Units in February 2014, such Units shall be issued and sold to them at an 8% discount to the $1.00 per Unit price (i.e., $0.92 per Unit);

(vii) With respect to Members who purchase Units in March 2014, such Units shall be issued and sold to them at a 7% discount to the $1.00 per Unit price (i.e., $0.93 per Unit);

(viii) With respect to Members who purchase Units in April 2014, such Units shall be issued and sold to them at a 6% discount to the $1.00 per Unit price (i.e., $0.94 per Unit);

(ix) With respect to Members who purchase Units in May 2014, such Units shall be issued and sold to them at a 5% discount to the $1.00 per Unit price (i.e., $0.95 per Unit);

(x) With respect to Members who purchase Units in June 2014, their Units shall be sold to them at a 4% discount to the $1.00 per Unit price (i.e., $0.96 per Unit);

(xi) With respect to Members who purchase Units in July 2014, their Units shall be sold to them at a 3% discount to the $1.00 per Unit price (i.e., $0.97 per Unit);

(xii) With respect to Members who purchase Units in August 2014, such Units shall be issued and sold to them at a 2% discount to the $1.00 per Unit price (i.e., $0.98 per Unit);

(xiii) With respect to Members who purchase Units in September 2014, such Units shall be issued and sold to them at a 1% discount to the $1.00 per Unit price (i.e., $0.99 per Unit); and

(xiv) With respect to Members who purchase Units in October 2014, such Units shall be

issued and sold to them at par, or a 0% discount to the $1.00 per Unit price (i.e., $1.00 per Unit).

In lieu of the discounts described above, the following Members shall be entitled to a 15% discount (without duplication) to the $1.00 per Unit price such that Units shall be issued and sold to such Members at a price of $0.85 per Unit: (x) any member of Fund I who, together with such member's respective Affiliates, makes a Capital Contribution of at least $500,000 to the Company in a Single Investment (as defined below) by December 18, 2013, with the 15% discount to be applied to all Capital Contributions by such Member and its Affiliates; (y) the first three Members (in addition to Members in the foregoing clause (x)) who, together with their respective Affiliates, make a Capital Contribution of at least $500,000 to the Company in a Single Investment, with the 15% discount to be applied to all Capital Contributions by such Member and its Affiliates; and (z) any Member who, together with its respective Affiliates, makes Capital Contributions to the Company totaling at least $3,000,000 by no later than October 3, 2014 with the discount to be applied only upon receipt of at least $3,000,000 in Capital Contributions. For the avoidance of doubt, the Members purchasing Units at a discount under this Section 3.1(b) shall be credited as making Capital Contributions equal to their actual Capital Contributions. The foregoing 15% discount shall apply, without duplication, to the Capital Contributions of qualifying Members and their respective Affiliates. For purposes hereof, "Single Investment" shall mean a single Capital Contribution or a series of Capital Contributions made within 30 days of each other by a person and such person's Affiliates.

(c)   The Management Company is receiving the Profits Interest in connection with the performance of services to or for the benefit of the Company without cost and without the requirement to make a Capital Contribution to the Company with respect to such Profits Interest. It is intended that such Interest shall be characterized for federal income tax purposes as a "profits" interest in accordance with Revenue Procedure 93-27, and the initial Capital Account of the Management Company with respect to such Interest shall be zero.

3.2   <u>Initial Capital Contributions</u>. Each Member has contributed such cash as set forth on <u>Exhibit A</u> as its initial Capital Contribution, and will hold the number of Units as set forth on <u>Exhibit A</u>. All Capital Contribution shall be paid in full on the date listed in <u>Exhibit A</u> unless otherwise agreed with the Board of Managers.

3.3   <u>Additional Capital Contributions</u>. No Member shall be required to make additional Capital Contributions.

3.4   <u>Capital Accounts</u>. The Company shall establish and maintain an individual Capital Account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). In addition, the Capital Account of a Member who owns Units in different classes shall be separately computed for each separate class of Units. If a Member transfers all or a part of its Interests in accordance with this Agreement, such Member's Capital Account attributable to the transferred Interests shall carry over to the new owner of such Interests pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(l).

3.5   <u>Schedules</u>. The Board of Managers shall be authorized, without the prior consent of the Members, to update <u>Exhibit A</u> to this Agreement from time to time to reflect the transfer of Interests, the issuance of additional Units or Interests to the Members or Additional Members.

3.6     Rights Regarding Capital Contributions.

(a)     No Member shall be entitled to interest on any Capital Contribution, and no Member shall have the right to withdraw or to demand the return of all or any part of its Capital Contribution, except as specifically provided in this Agreement.

(b)     Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to receive property, other than cash, except as may be specifically provided herein.

(c)     No Member shall have personal liability for the repayment of the Capital Contribution of any Member or any obligation to make loans or advances to the Company, including restoration of a deficit Capital Account as provided in Section 3.7.

3.7     Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that any Member's Capital Account has a deficit balance upon dissolution of the Company, such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

3.8     Capital Contribution of the Manger.  The Manager or Mike Rothenberg individually shall make a Capital Contribution, as a Member, of at least $100,000.00 in connection with the purchase of Units.

# ARTICLE 4
# MEMBERS

4.1     Procedures for Admission.  To effect the admission of a Member (including any Additional Member) to the Company, the Board of Managers shall require the Person to be so admitted to the Company to execute and deliver a counterpart signature page to this Agreement specifying the date of admission, such Person's name and address, such Person's Capital Contribution and the number and series of Units acquired thereby.  The Board of Managers shall attach such counterpart signature page as a signature page to this Agreement.

4.2     Limited Liability.  Except as required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.3     Withdrawals or Resignations.  No Member shall have the right or power to voluntarily withdraw or resign as a Member from the Company.

4.4     Competing Activities.  The Members, the Managers and their respective Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation, other ventures (including Rothenberg Ventures Fund I, LLC, RVF I Co-Investor Fund I, LLC, RVF I Co-Investor Fund II, LLC, RVF I Co-Investor Fund III, LLC, RVF I Co-Investor Fund IV, LLC, RVF I Co-Investor Fund V, LLC, RVF I Co-Investor

Fund VI, LLC, and RVF I Co-Investor Fund VII, LLC and any other co-investment funds of Rothenberg Ventures Fund I, LLC or Rothenberg Ventures Fund II, LLC), existing Portfolio Companies or potential investments that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any other Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. Neither the Members nor the Managers shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members and the Managers shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the Manager and the other Members and their respective Affiliates conduct other businesses, including businesses (i) that may compete with the Company or the Portfolio Companies of the Company and for the Managers' and Members' time and (ii) that the Company may invest in such Portfolio Companies in which the Managers or Members have already invested if the Manager determines that the Company should so invest. Each Member hereby waives any and all rights and claims that they may otherwise have against the Managers, the other Members and their respective Affiliates as a result of any of such activities and investments. Notwithstanding anything contained in this Section 4.4 to the contrary, this Section 4.4 is only intended to apply, and shall only apply, to the Managers and the Members in their respective capacity as such, and this Section 4.4 is not intended to, and shall not, supersede or negate (except to the extent set forth above) any duties or agreements that may apply to Managers or Members in their capacity as officers, employees or consultants of the Company, whether or not such duties are expressly set forth in any written employment, consulting or similar agreement.

4.5     Transactions with the Company. With the prior approval of the Board of Managers, a Member may lend money to, lease property from, contract to provide services to, or transact other business with the Company. Subject to applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.6     Remuneration to Members. No Member, acting in such capacity, is entitled to remuneration for acting in the Company business.

4.7     Members are not Agents. Pursuant to Section 5.1 and the Certificate of Formation, the management of the Company is vested in the Board of Managers. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate of Formation and except as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board of Managers, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.8     Voting Rights. Except as expressly provided in this Agreement or the Certificate of Formation, Members shall have no voting, approval or consent rights. The Units shall be voting. For purposes of determining the voting interest of a Member, a Member's voting power shall be based upon the number of Units held. The Profits Interest shall be non-voting.

4.9     Certificate of Units or Profits Interest. The Company will not issue certificates

for Units (or Profits Interest) issued.

4.10    Meetings of and Voting by Members.

(a)    A meeting of the Members may be called at any time by the Members holding a Majority Interest.  Meetings of the Members shall be held upon four (4) days' notice by first-class mail or 48 hours' notice given personally or by telephone, telegraph, facsimile, telex, e-mail, or other similar means of communication.  Any such notice shall be addressed or delivered to each Member entitled to vote at such Member's address as it is shown upon the records of the Company. Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the recipient.  Oral notice shall be deemed to have been given at the time it is communicated, in person or by telephone or wireless, to the recipient or to a person at the office of the recipient who the person giving the notice has reason to believe will promptly communicate it to the receiver.  Except to the extent that this Agreement expressly requires the approval of a greater number of Members, every act or decision done or made by the affirmative vote of the Members holding a Majority Interest present at a meeting is the act of the Members.

(b)    Members may participate in a meeting through use of conference telephone, electronic video screen communication, or other communications equipment, so long as all members participating in such meeting can hear one another.

(c)    Any action required or permitted to be taken by the Members may be taken without a meeting, if a consent in writing, setting forth the action so taken, is signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted. Such action by written consent shall have the same force and effect as an approval of the Members.

(d)    The provisions of this Section 4.10 govern meetings of the Members if the Members elect, in their discretion, to hold meetings.  However, nothing in this Section 4.10 or in this Agreement is intended to require that meetings of the Members be held, it being the intent of the Members that meetings of the Members are not required.

## ARTICLE 5
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1    Management of the Company by Board of Managers.  Subject to the provisions of Section 5.4 of this Agreement, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Board of Managers.

5.2    Meetings of Board of Managers.  Meetings of the Board of Managers may be called by any Manager, Chief Executive Officer or the Secretary.  All meetings shall be held upon at least two (2) business days notice delivered personally or by telephone, e-mail, telegraph or

facsimile. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Meetings of the Board of Managers may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the Board of Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the authorized number of Managers constitutes a quorum of the Board of Managers for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present is the act of the Board of Managers. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Managers, if any action taken is approved by at least a majority of the required quorum for such meeting. Notwithstanding the foregoing, in the event that the number of Managers is one (1), then every act or decision done or made by the single Manager present at a meeting duly held is the act of the Board of Managers.

Any action required or permitted to be taken by the Board of Managers may be taken by the Board of Managers without a meeting, if all of the Managers individually or collectively consent in writing to such action. Such action by written consent shall have the same force and effect if taken at meeting of the Board of Managers.

The provisions of this Section 5.2 govern meetings of the Board of Managers if the Managers elect, in their discretion, to hold meetings. However, nothing in this Section 5.2 or in this Agreement is intended to require that meetings of Board of Managers be held, it being the intent of the Members that meetings of Managers are not required.

    5.3    <u>Election and Compensation of Managers.</u>

    (a)    <u>Number, Term and Qualifications.</u> The number of Managers of the Company shall initially be fixed at one (1), which number may be increased or decreased by a resolution of the Board of Managers and the affirmative vote or written consent of Members holding a Majority Interest. The initial Manager shall be the Management Company. Any Manager shall serve until the earlier of (i) the removal of such Manager in accordance with this Agreement, (ii) such Manager's resignation or (iii) such Manager's death or dissolution. A Manager may, but need not be, a Member.

    (b)    <u>Resignation.</u> Any Manager may resign at any time by giving written notice to the Members and any other Manager. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.

(c)     Removal. Any Manager may be removed at any time, with or without Cause, by the affirmative vote or written consent of Members holding a Majority Interest; provided, however that the Management Company may only be removed for Cause or as set forth in the Management Agreement.

(d)     Vacancies. Any vacancy occurring for any reason on the Board of Managers shall be filled by the affirmative vote or written consent of the Members holding a Majority Interest.

(e)     Management Agreement. The Manager, in the name and on behalf of the Company, is authorized to enter into a Management Agreement dated as of the date of this Agreement, with Management Company, in the form attached hereto as Exhibit C (as amended from time to time, the "Management Agreement"). The Management Agreement shall not be subject to termination or cancellation by the Company other than as expressly provided in the Management Agreement and shall be subject to amendment only in the manner set forth therein. The fees and reimbursements payable to the Management Company pursuant to the Management Agreement shall not be considered a distribution of profits or a return of capital for the purpose of any provision of this Agreement, but shall be considered an expense of the Company, and shall be deducted from Profits or added to Losses in determining the Profits and Losses of the Company pursuant to Article VI hereof. Notwithstanding anything to the contrary contained in this Agreement or the Management Agreement, in no event will the Manager, the Management Company or Mike Rothenberg be required to pay any fees under the Management Agreement with respect to their respective Capital Contributions to the Company; provided that such persons will be permitted, in the Board of Manager's sole discretion, to pay such fee.

(f)     The Manager will disclose to all Members, semi-annually commencing promptly following the last day of the semi-annual period beginning January 1, 2015, consulting fees, deal fees, equity grants and other payments, if any, received by any Rothenberg Party from any portfolio company of the Company (or any Affiliate of any such portfolio company) during such semi-annual period. Such disclosure will include the amount of the payment and a brief description of the form of the payment. This paragraph will not apply to payments resulting from payment of management fees pursuant to the Management Agreement, payments relating to the Profits Interest or payments relating the management agreement or profit interest with respect to Fund I.

5.4     Powers of Managers and Chief Executive Officer.

(a)     Powers of the Chief Executive Officer. Subject to the provisions of Section 5.4(b) and (c), and except as may be otherwise expressly stated in this Agreement, the Chief Executive Officer is hereby granted, under the supervision of the Board of Managers, the right, power and authority to manage the day-to-day operations of the Company and to do on behalf of the Company all things determined by the Chief Executive Officer to be necessary or desirable to carry out his duties and responsibilities, including (without limitation) the right, power and authority from time to time to do the following:

(i)     To open bank and other financial accounts, to borrow money in the name and on behalf of the Company, and to secure any such loans by a mortgage, pledge or other encumbrance upon any assets of the Company;

(ii)     To cause to be paid all amounts due and payable by the Company to any person or entity;

(iii)     To employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Company, to delegate by express action any powers of the Chief Executive Officer enumerated herein, and to pay to such persons such fees, expenses, salaries, wages and other compensation as he shall in his sole discretion determine;

(iv)     To pay, extend, renew, modify, adjust, subject to arbitration, prosecute, defend or compromise, upon such terms as he may determine and upon such evidence as he may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(v)     To pay any and all fees and to make any and all expenditures which he deems necessary or appropriate in connection with the organization of the Company, the management of the affairs of the Company and the carrying out of his obligations and responsibilities under this Agreement;

(vi)     To the extent that funds of the Company are, in the Chief Executive Officer's judgment, not immediately required for the conduct of the Company's business, temporarily to deposit the excess funds in such bank account or accounts, or invest such funds in such interest-bearing taxable or nontaxable investments, as the Chief Executive Officer shall deem appropriate;

(vii)     To acquire, prosecute, maintain, protect and defend or cause to be protected and defended all patents, patent rights, trade names, trademarks, copyrights and service marks, all applications with respect thereto and all proprietary information which may be held by the Company;

(viii)     To enter into, execute, acknowledge and deliver any and all contracts, agreements or other instruments necessary or appropriate to carry on the business of the Company as set forth herein;

(ix)     To cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Company; and

(x)     To acquire real and personal property in the name of the Company.

(b)     <u>Powers of Managers.</u>  Each Manager shall participate in the direction, management and control of the business of the Company to the best of such Manager's ability. Unless the number of Managers is one (1), in which case the single Manager shall act individually, the Managers shall in all cases act as a group and shall have no authority to act individually, unless such authority is expressly delegated to one or more Managers or a committee thereof by the Board of Managers. The Board of Managers may appoint one (1) or more officers and, subject

to this Agreement, may delegate to those officers the authority to manage the day-to-day operations of the Company.  Without limiting the generality of Section 5.1, but subject to Section 5.4(c) and to the express limitations set forth elsewhere in this Agreement, the Board of Managers shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Section 5.4(a) and in the Act.

(c)     Protective Provisions of Members.  Notwithstanding any other provisions of this Agreement, neither the Board of Managers nor the Chief Executive Officer shall have any authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of the Members holding a Majority Interest:

(i)      Alter, change or waive the rights, preferences or privileges of the Units or Profits Interest;

(ii)     Increase the number of authorized Units as set forth in Section 3.1(a) above; or

(iii)    Effect any amendment of the Certificate of Formation or this Agreement if such amendment adversely affects the economic rights of the Members.

(d)     Creation of Committees.  The Board of Managers may create committees to assist the Board of Managers and the officers in the governance of areas of importance to the Company. Subject to the terms of this Agreement, such committees shall have such powers and perform such duties as may be prescribed by the resolutions creating such committees.

5.5     Performance of Duties; Liability of Managers and Officers; Fiduciary Standard. A Manager or officer of the Company shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by such Manager or officer of the Company. The Managers and the officers of the Company shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Members agree that the fiduciary duties of a Manager to the Company and its Members shall be those of a director to a corporation and its stockholders under the DGCL and not those of a partner to a partnership and its partners. Any Manager or officer of the Company who performs the duties of Manager or officer of the Company, as the case may be, in compliance with this Section 5.5 shall not have any liability by reason of being or having been a Manager or officer of the Company.

5.6     Devotion of Time.  Managers are not obligated to devote all of their time or business efforts to the affairs of the Company.  The Managers shall devote whatever time, effort, and skill as they deem appropriate for the operation of the Company.

5.7     Limited Liability.  No entity or person who is a Manager or officer of the

Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer of the Company.

5.8    Liability of Manager Limited to Manager's Assets.  Under no circumstances will any Affiliate of any Manager have any personal responsibility for any liability or obligation of the Manager (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Manager will be limited to the assets of the Manager as they may exist from time to time.

5.9    Officers.

(a)    Officers.  The officers of the Company shall be appointed by the Board of Managers and shall consist of a Chief Executive Officer. The Board of Managers may appoint such other officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Managers. The salaries of all officers and agents of the Company shall be fixed by or in the manner prescribed by the Board of Managers. The officers of the Company shall hold office until their successors are chosen and qualified. Any officer may be removed at any time, with or without cause, by the Board of Managers.  Any vacancy occurring in any office of the Company shall be filled by the Board of Managers.

(b)    Chief Executive Officer.  The Chief Executive Officer of the Company shall, subject to the control of the Board of Managers, have general supervision, direction and control of the day-to-day business and affairs of the Company.  The Chief Executive Officer shall preside at all meetings of the Members, unless the Board of Managers shall have appointed another person to so preside and such person is present.  The Chief Executive Officer shall perform other duties commonly incident to a chief executive officer of a Delaware corporation and shall also perform such other duties and have such other powers as set forth in Section 5.4(a) or otherwise as the Board of Managers shall designate from time to time.  The initial Chief Executive Officer of the Company shall be Michael Rothenberg.

(c)    Officers as Agents.  The officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board of Managers not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.

5.10   Tax Matters Partner.  When needed the Manager shall designate a Tax Matters Partner of the Company as provided in the Treasury Regulations pursuant to Code Section 6231(a)(7), and such Tax Matters Partner shall be indemnified and reimbursed for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with its serving in that capacity. Notwithstanding the preceding sentence, the Tax Matters Partner shall not be entitled to indemnification for such costs and expenses if such party has not acted in good faith.  The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the

Company funds for professional services and costs associated therewith.

## ARTICLE 6
## ALLOCATIONS OF PROFITS AND LOSSES AND DISTRIBUTIONS

6.1     Allocations of Profits and Losses.  Except as otherwise provided in Section 6.2, the Board of Managers shall allocate all Profits and Losses (and items thereof) of the Company to the Members so as to, as nearly as possible, increase or decrease, as the case may be, each Member's Capital Account to the extent necessary such that each Member's Capital Account is equal to the amount that such Member would receive if the Company were dissolved, its assets sold for their book value, its liabilities satisfied in accordance with their terms and all remaining amounts were distributed to the Members in accordance with Section 6.5(a) of this Agreement immediately after making such allocation.  The intent of the foregoing allocation is to comply with Treasury Regulations Section 1.704-1(b) and ensure that the Members receive allocations of Profits and Losses pursuant to this Section 6.1 in accordance with their relative interests in the Company, with the interest of each Member in the Company determined by reference to such Member's relative rights to receive distributions from the Company pursuant to Section 6.5(a).

6.2     Special Allocations.  Notwithstanding the allocations set forth in Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of "partnership minimum gain" (as defined in Treasury Regulations Section 1.704-2(d)), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 6.2 shall be taken into account in computing subsequent allocations of income and gain pursuant to Section 6.1 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 6.2 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to Section 6.1 if such unexpected adjustments, allocations, or distributions had not occurred.

6.3     Tax Allocations.  If any property is reflected in the Capital Accounts of the Members and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then the tax items with respect to such property shall (to the extent not governed by Section 704(c)), in accordance with the requirements of Treasury Regulations Section 1.704-1(b)(4)(i), be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of the applicable property and its book value in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the share of tax items under Section 704(c). The Company shall use the traditional method, as described in Treasury Regulations Section 1.704-3(b) in a manner determined by the Board of Managers.  Except as otherwise provided in this Agreement, all items of Company income, gain, loss or deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses, as the case may be, for the year.

6.4     Section 754 Election.  The Company shall be authorized to file an election under Section 754 of the Code to adjust the basis of property of the Company in the case of a transfer

of an interest in the Company if such election under Section 754 would, in the good faith judgment of the Tax Matters Partner, be beneficial to the Company or any Member.

6.5    Distributions by the Company.

(a)    Subject to applicable law, the Board of Managers may elect from time to time to make distributions of Distributable Amounts to the Members. In determining the amount of distributions to be made to the Members pursuant to this Section 6.5, the Board of Managers shall compute the amount of the distributions to be made on an asset by asset basis, based upon the proceeds received by the Company with respect to each asset (or its fair market value) less the selling and other expenses incurred by the Company as allocated to the asset by the Board of Managers. Expenses of the Company not directly related to a particular asset shall be allocated among the assets of the Company or the income of the Company in a manner determined by the Board of Managers. All such distributions shall be made to the Members in the following order and priority:

(1)    First, to the Members pro rata in proportion to their Unpaid Capital Contributions with respect to each such asset (or proceeds with respect thereto) being distributed (on an asset by asset basis) until each Member has received aggregate distributions under this Section 6.5(a)(1) with respect to each such asset equal to its Unpaid Capital Contributions with respect to such asset; and

(2)    Thereafter, eighty percent (80%) to the Members pro rata in proportion to the number of Units held by each at the time of the distribution and twenty percent (20%) to the Profits Interest Member ("Carried Interest Percentage").

(b)    Notwithstanding the limitations set forth in Section 6.5(a), the Board of Managers shall, for each taxable year, cause the Company to distribute to each Member on a timely basis taking into consideration the due dates for estimated tax payments an amount equal to such Member's (or any Person whose tax liability is determined by reference to the income of a Member) estimated federal, state and local income tax liability (and applicable self employment taxes) resulting from the Company's income taxable to such Member for such taxable year (or applicable period), as determined by the Board of Managers (taking into consideration any information provided in writing by such Member to the Company); provided, however, that no such distribution shall be made to the extent that the Board of Managers determine, in their sole discretion, that funds are not reasonably available for such distribution by virtue of applicable law, contractual obligation or current or future needs of the Company. Such distribution to each Member shall be made no later than the first day of the third month following the end of the taxable year of the Company with respect to which such distribution is made. Distributions made pursuant to this Section 6.5(b) shall be applied against (and reduce on a dollar-for-dollar basis) amounts otherwise distributable to the Members pursuant to Section 6.5(a) (allocated to the particular asset that caused the income as determined by the Board of Managers), and distributions previously made to the Members with respect to a particular year pursuant to Section 6.5(a) shall be applied against (and reduce on a dollar-for-dollar basis) amounts otherwise distributable to the Members pursuant to this Section 6.5(b) with respect to such year.

(c)     To the extent that the Company is required by law to withhold or to make tax or other payments on behalf of or with respect to any Member, the Company shall withhold such amounts from any distribution and make such payments as so required.  For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Member on behalf of whom the withholding or payment was made.  All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Units or Profit Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 6.5.

(d)     To the extent approved by the Board of Managers, a Member may be reimbursed for out-of-pocket expenses incurred by the Member in connection with the business of the Company, and a Member may be entitled to receive a "guaranteed payment" within the meaning of Section 707(c) of the Code for the performance of services to the Company by the Member for being a Manager, officer or otherwise.  The reimbursement of out-of-pocket expenses and payments of any guaranteed payments in accordance with this Section 6.5(d) shall not be treated as a distribution to the Member under Section 6.5 or under Section 9.4, and the related taxable income shall not be considered an allocation of Company income for which a tax distribution is to be made pursuant to Section 6.5(b).

6.6     <u>Book-Up of Company Assets.</u>  The book value of all Company assets may be adjusted to equal their respective gross fair market values, as determined in good faith by the Board of Managers, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of money or Company property as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), including the termination of the Company for federal income tax purposes pursuant to Section 708(b)(l)(B) of the Code.  The book-up shall be made in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

6.7     <u>Clawback.</u>  The Manager hereby covenants and agrees on behalf of itself and its Affiliates, that the Profits Interest Member (in its capacity as such) will not, over the entire term of the Company, receive aggregate distributions from the Fund pursuant to Sections 6.5 and Section 9.4(b) that together are in excess of 20% of the Company's net profits as provided below.  If at the time of dissolution of the Company, after giving effect to all distributions made pursuant to Sections 6.5 and Section 9.4(b) but before giving effect to this Section 6.7, the Profits Interest Member has received distributions pursuant to Section 6.5 and Section 9.4(b) that exceed twenty percent (20%) of the quotient equal to (x) the excess of (i) the amount of distributions (including the fair market value of in-kind distributions) made to the Members (other than the Profits Interest Member) pursuant to Sections 6.5 and 9.4(b), over (ii) the Capital Contributions made by such Members, divided by (y) 80% (i.e., 1 - the Carried Interest Percentage), then the Profits Interest Member shall contribute to the Company an amount equal to such excess (for distribution by the Company to the Members pursuant to Section 6.5(a) treating such contribution as an asset for purposes of Section 6.5(a)(1) that has any remaining Unpaid Capital Contributions of the Members), less the amount of taxes paid or payable by the Profits Interest Member (and/or its members) with respect to such amounts, as

reasonably determined by the Board of Managers (but increased by the amount of actual tax benefits realized by the Profits Interest Member (and/or its members) as a result of any payment pursuant to this Section 6.7 that are actually utilized by it in the same taxable year as the year in which such payment is made. The Board of Managers shall make the necessary calculations pursuant to this Section 6.7. Additionally, the Manager and the Management Company will cause the Profits Interest Member to make payments to the Company to satisfy the obligations of the Profits Interest Member set forth in this section, calculated as of October 18, 2019 (i.e., as if an "interim clawback" occurred as of that date).

6.8     Recycling. Notwithstanding Section 6.5, the Board of Managers may decide to retain the proceeds received by the Company with respect to an asset, in which case the Board of Managers shall identify on Exhibit A the assets acquired by the Company with such proceeds, and the amount of the distributions that would have otherwise been made to the Members pursuant to Section 6.5 shall be treated as the Capital Contributions of the Members with respect to such assets.

## ARTICLE 7
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1     Transfer and Assignment of Interests. Except as expressly provided in this Agreement or any other written agreement to which the Company is a party, a Member shall not transfer any part of the Member's Interest in the Company, whether now owned or later acquired, unless the Board of Managers in writing approves such transfer. No Member may encumber or permit or suffer any encumbrance of all or any part of the Member's Interest in the Company unless such encumbrance has been approved in writing by the Board of Managers. Such approvals may be granted or withheld in the Board of Manager's discretion. In addition, with respect to the Profits Interest, the Profits Interest Member shall not transfer or encumber any part of the Profits Interest without the affirmative vote or written consent of Members holding a Majority Interest. Any transfer or encumbrance of an Interest without such applicable approvals shall be void. Notwithstanding any other provision of this Agreement to the contrary: (a) a Member who is a natural person may transfer all or any portion of his or her Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's immediate family; provided that the Member retains a beneficial interest in the trust and all of the voting Interest included in such Interest; and (b) a Member who is not a natural person may transfer all or any portion of its Interest to its Affiliate. A transfer of a Member's beneficial interest in such trust, or failure to retain such voting Interest, shall be deemed a transfer of an Interest. In the event that any part of the Member's Interest in the Company is transferred incident to a divorce or by operation of law, the transferee of the Interest who is not approved by the Board of Managers shall only obtain rights in the Company with respect to distributions and Profits and Losses attributable to the transferred Interests but shall have no rights as a Member under this Agreement or the Act, including no rights to vote or otherwise participate in the management of the Company. Notwithstanding the foregoing, the Interests of the transferee shall be subject to the restrictions contained in this Agreement applicable to the Interests held by a Member.

7.2     Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, unless otherwise approved in writing by the Board of Managers, no

Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of its Interests: (A) without compliance with all federal and state securities laws, (B) if the Interests to be transferred, when added to the total of all other Interests transferred in the preceding twelve (12) consecutive months prior thereto, would cause the tax termination of the Company under Code Section 708(b)(1)(B), or (C) if such transfer would cause the number of holders of the Company's securities to exceed 100 or such other number as may be permitted for purposes of determining that the Company is exempt from Securities Exchange Act of 1934, as amended or the Investment Company Act of 1940, as amended, or for purposes of determining whether the Company is a "publicly traded partnership" within the meaning of Section 7704 of the Code.

7.3    Transfer in Violation of Agreement.  Any transfer of an Interest that is not made in accordance with the terms of this Agreement shall be null and void.

# ARTICLE 8
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1    Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in a manner determined by the Board of Managers.  The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.  The Company shall maintain at its principal office in Delaware all of the following:

(a)    A current list of the full name and last known business or residence address of each Member and set forth in alphabetical order, together with the Capital Contributions, Capital Account and Units (and Profits Interest) held by each Member;

(b)    A current list of the full names and addresses of each Manager;

(c)    A copy of the Certificate of Formation and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate of Formation or any amendments thereto have been executed;

(d)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(e)    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)    Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

(g)    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

8.2    Inspection of Books.  The Manager shall cause the Company to maintain true and proper books, records, reports, and accounts in which shall be entered all material transactions of the Company.  Copies of such books, records, reports, accounts and schedules shall be

located at the principal office of the Company and shall be available to any Member for inspection (and may be copied at the requesting Member's expense), upon at least two business days notice, during reasonable business hours.   The Members hereby acknowledge that the Company will be in possession of confidential information the improper use or disclosure of which could have a material adverse effect upon the Company or upon one or more Members or the portfolio companies or past portfolio companies of the Company. Each Member agrees not to use, publish, disseminate, misappropriate or otherwise disclose any such confidential information, either while such Member is a Member of the Company, or thereafter, except as may be required by applicable law.   Each Member will take all reasonable precautions to protect the confidential nature of such confidential information and all other documents or materials entrusted to such Member.

8.3 Reports.

(a)      The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year such information as is necessary to complete the Members' federal and state income tax or information returns.

(b)      The Company shall prepare and deliver a financial report to each Member within 180 days after the end of each Fiscal Year, or as soon as practicable thereafter (commencing after December 31, 2014) setting forth for such Fiscal Year (i) the assets and liabilities of the Company as of the end of such Fiscal Year; and (ii) such Member's closing Capital Account balance as of the end of such Fiscal Year, (commencing with the Fiscal Year beginning as of January 1, 2015).

(c)      If Capital Contributions for the Company are greater than $20,000,000.00, then commencing with the calendar year ending December 31, 2014, the books and records of account of the Company shall be audited as of the end of each Fiscal Year by an independent public accounting firm as shall be selected by the Manager; provided that such auditor will not be a Rothenberg Party.

(d)      Commencing on or about January 1, 2014, the Manager will provide semi-annual narrative updates to the Members regarding the Company and its affairs.

8.4    Bank Accounts.    The Board of Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

## ARTICLE 9
## DISSOLUTION AND WINDING UP

9.1    Dissolution. The Company shall be dissolved, its assets shall be disposed of, and

its affairs wound up on the first to occur of the following:

    (a)        The entry of a decree of judicial dissolution;

    (b)        The written consent of the Board of Managers and the Members holding a Majority Interest; or

    (c)        The sale or distribution of all or substantially all of the assets of Company, as determined by the Board of Managers; or

    (d)        the termination of this Agreement in accordance with Section 2.3.

    9.2    <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of any of the events specified in Section 9.1, the Managers shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act.

    9.3    <u>Winding Up</u>. Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up. The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

    9.4    <u>Order of Payment Upon Dissolution</u>. The assets and proceeds on liquidation shall be applied in the following order:

    (a)        To creditors, including Members who are creditors, to the extent permitted by law and in accordance with their relative rights of priority, if any; and

    (b)        All remaining assets and proceeds shall be distributed to the Members in accordance with Section 6.5(a).

    9.5    <u>Distributions in Kind</u>. The Board of Managers may make distributions (on dissolution or otherwise) to the Members in cash or distribute Company assets in kind, and the distribution of any such assets in kind shall be made on the basis of the fair market value of such asset as of the date of distribution, as determined by the Board of Managers in good faith. The Capital Accounts of the Members shall be adjusted accordingly to preserve the economic interests of the Members as the result of any distribution in kind.

    9.6    <u>Certificate of Cancellation</u>. The Board of Managers or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a Certificate of Cancellation of the Certificate of Formation upon the completion of the winding up of the affairs of the Company.

## ARTICLE 10
## INDEMNIFICATION AND INSURANCE

    10.1    <u>Indemnification</u>. The Company shall defend and indemnify any Member, Manager or officer of the Company and may indemnify any other Person who was or is a party

or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that it, he or she is or was a Member, Manager, officer, employee, independent contractors or other agent of the Company or that, being or having been such a Member, Manager, officer, employee, independent contractor or agent, it, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit; provided, however, that this indemnity shall not extend to conduct not undertaken in good faith nor to any recklessness, fraud, intentional wrongdoing, or gross negligence.

10.2   Insurance.   The Company may, to the extent commercially reasonable (as determined by the Board of Managers), purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

## ARTICLE 11
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managers, the other Members, and the Company as follows (reference to Units below includes the Profits Interest):

11.1   Preexisting Relationship or Experience.   By reason of his, her or its business or financial experience, or by reason of the business or financial experience of his, her or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Units and of protecting his, her or its own interests in connection with this investment.

11.2   Investment Intent.   He, she or it is acquiring the Units for investment purposes for his, her or its own account only and not with a view to, or to offer or sell for an issuer in connection with, any distribution of all or any part of the Units, or to participate or to have a direct or indirect participation in any such undertaking, or to participate or to have a participation in the direct or indirect underwriting of any such undertaking.   He, she or it is not an "underwriter" as that term is defined in Section 2(a)(11) of the Securities Act of 1933, as amended (the "Securities Act").   No other Person will have any direct or indirect beneficial interest in or right to the Units.

11.3   Purpose of Entity.   If an entity, it was not organized for the specific purpose of acquiring the Units.

11.4   Economic Risk.   He, she or it is financially able to bear the economic risk of an investment in the Units, including the total loss thereof.

11.5    No Registration of Units.  He, she or it acknowledges that the Units have not been registered under the Securities Act, or qualified any applicable blue sky laws in reliance, in part, on his, her or its representations, warranties, and agreements herein.

11.6    Investment in Restricted Security.  He, she or it understands that the Units are "restricted securities" under the Securities Act in that the Units will be acquired from the Company in a transaction not involving a public offering, and that the Units may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Units must be held indefinitely.

11.7    No Obligations to Register.  He, she or it represents, warrants, and agrees that the Company and the Board of Managers are under no obligation to register or qualify the Units under the Securities Act or under any state securities law, or to assist her, him or it in complying with any exemption from registration and qualification.

11.8    No disposition in Violation of Law.  Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Units which will result in the violation by her, him or it or by the Company of the Securities Act, the DGCL, the Act, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Units unless and until he, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Board of Managers, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

11.9    Investment Risk.  He, she or it acknowledges that the Units are speculative investments which involve a substantial degree of risk of loss of an entire investment in the Company, that he, she or it understands and takes full cognizance of the risks related to the purchase of the Units, and that the Company is newly organized and has no financial or operating history.

11.10   Restrictions on Transferability.  He, she or it acknowledges that there are substantial restrictions on the transferability of the Units pursuant to this Agreement, that there is no public market for the Units and none is expected to develop, and that, accordingly, it may not be possible to liquidate his, her or its investment in the Company.

11.11   Information Reviewed.  He, she or it has received and reviewed this Agreement and the information it considers necessary or appropriate for deciding whether to purchase the Units.  In connection with the purchase of the Units, he, she or it has neither (i) received any general solicitation or general advertising, including, but not limited to advertisements, articles, notices or other communications published in any newspaper, magazine, or similar media or broadcast over television or radio, nor (ii) attended any seminar or meeting whose attendees were invited by any general solicitation or general advertising. He, she or it has relied only on the information contained in this Agreement in making its investment decision.

11.12   <u>Accredited Investor; No Disqualification.</u> He, she or it represents that such Member is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. He, she or it further represents that neither such Member, nor any person or entity with whom such Member shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as <u>Exhibit D</u>).

11.13   <u>Tax Consequences.</u> He, she or it acknowledges that the tax consequences of investing in the Company will depend on its particular circumstances, and neither the Company, the Managers, the Members, nor the partners, stockholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, her or its own advisers with respect to the tax consequences of this investment.

11.14   <u>No Assurance of Tax Benefits.</u> He, she or it acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service

11.15   <u>Indemnity.</u> He, she or it shall defend, indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, stockholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him, her or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the company, each and every Manager, each and every other Member, and any officers, directors, stockholders, managers, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person in connection with such action, suit, proceeding, or the like.

## ARTICLE 12
## MISCELLANEOUS

12.1   <u>Complete Agreement.</u> This Agreement and the Certificate of Formation, any side letter, and any restricted unit, vesting or similar agreement, if any, entered into by any Member, constitute the complete and exclusive statement of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them. The Prior Agreement is hereby amended and restated in its entirety as provided herein. No representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or Managers or have any force or effect whatsoever.

To the extent that any provision of the Certificate conflict with any provision of this Agreement, the Certificate shall control.

12.2  <u>Binding Effect</u>.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.3  <u>Arbitration</u>. Any unresolved controversy or claim arising out of or relating to this Agreement shall be submitted to arbitration to one arbitrator mutually agreed upon by the parties, and if no agreement can be reached as to the arbitrator, then by one arbitrator having reasonable experience in transactions of the type provided for in this Agreement and who is chosen by the American Arbitration Association (the "AAA"). The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof. Each party will bear its own costs in respect of any disputes arising under this Agreement. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the Northern District of California or any court of the State of California having subject matter jurisdiction.

12.4  <u>Parties in Interest.</u>   Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Managers and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

12.5  <u>Pronouns; Statutory References</u>. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Treasury Regulations, the Act, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.6  <u>Headings.</u>   All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.7  <u>Interpretation.</u> In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or its counsel.

12.8  <u>References to this Agreement.</u>   Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

12.9  <u>Exhibits.</u> All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

12.10   Severability.   If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.11   Additional Documents and Acts.   Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.12   Notices.   Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A or Exhibit B hereto. Any party may, at any time by giving five business (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.13   Amendments.   All amendments to this Agreement will be in writing and approved and executed by the Board of Managers and Members holding a Majority Interest.

12.14   Reliance on Authority of Person Signing Agreement.   Neither the Company nor any Member will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual.

12.15   No Interest in Company Property; Waiver of Action for Partition.   No Member has any interest in specific property of the Company. Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

12.16   Multiple Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.17   Remedies Cumulative.   The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.18   Aggregation of Units.   All Units held or acquired by affiliated entities (including, without limitation, affiliated venture capital funds and members of the same family or their trusts) or persons or entities under common management or control shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

12.19   Member Approval.   The undersigned Members, by their signatures below, approve all amendments of the Prior Agreement contained in this Agreement.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed this Operating Agreement for Rothenberg Ventures Fund II, LLC, a Delaware limited liability company.

BOARD OF MANAGERS AND MANAGER
**Rothenberg Ventures Management Company, LLC,**
a Delaware limited liability company

_____

Mike Rothenberg, Managing Member

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed this Amended and Restated Operating Agreement for Rothenberg Ventures Fund II, LLC, a Delaware limited liability company.

**MEMBER:**

_____
(Member Name—Please print)
By:_____
Name:_____
Title:_____
Investment Amount:_____
Address:_____
_____
Phone:_____
Fax:_____
Email:_____

SPOUSAL CONSENT (IF APPLICABLE):

The undersigned is the spouse of the Member noted above and acknowledges that he/she has read the foregoing Agreement dated as of _____, 2013, and understands its provisions. The undersigned hereby expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Interests and the restrictions thereon. If the undersigned predeceases his/her spouse when his/her spouse owns any Interest in the Company, he/she hereby agrees not to devise or bequeath whatever community property interest or quasi-community property interest he/she may have in the Company in contravention of the Agreement.

Date:_____
By:_____
Name:_____