

Wire Instructions:

Name:  Rothenberg Ventures 2015 Fund

Account #: 3301053208

900 San Mateo Dr Menlo Park CA 94025

Silicon Valley Bank

ABA/Routing #: 121140399 / Swift code: SVBKUS6S

3003 Tasman Drive, Santa Clara, CA 95054



# ROTHENBERG VENTURES 2015 FUND, LLC

## SUMMARY OF PRINCIPAL TERMS

**Fund:** Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company (the "Fund").

**Purpose:** The Fund will invest primarily in equity securities, including convertible debt securities, of privately held companies. The Fund is a Delaware limited liability company and has its headquarters in San Francisco, CA.

**Manager:** The Fund's Manager is Rothenberg Ventures Management Company, LLC (the "Manager"). The Fund has entered into an agreement with the Manager for management and operating services.

**Members:** Private, high net-worth individuals (or their estate planning vehicles), institutions, and corporations that qualify as "accredited investors" within the meaning of the United States Securities Act of 1933 (the "Members").

**Fund Size:** The target size of the Fund is $20,000,000.

**Member Capital Commitment:** $500,000 to $2,000,000 target for family offices and $250,000 to $1,000,000 target for individual investors. Variances and institutional investments considered on an individual basis.

**Manager Capital Commitment:** Manager and its employees and designated partners will contribute a minimum of 10.0% of the first $10,000,000, or $1,000,000.

**Term:** The Term of the Fund will be ten years from the formation of the Fund, with the Manager having the discretion to extend the term for up to two periods of one year each, and thereafter with the consent of a majority in interest of the Members. Any extension of the term will be at the cost of the Manager and no additional Administrative or Management Expenses will be due.

**Units:**   The Units will be issued as specified in this table:

| 2015 Fund Commitment | $499,999 or less | $500,000 to $999,999 | $1,000,000 to $2,499,999 |
|---|---|---|---|
| Cumulative Commitment | $499,999 to $749,999 | $750,000 to $1,499,999 | $1,500,000 to $3,749,999 |
| Month | | | |
| November | $0.98 | $0.96 | $0.94 |
| December | $1.00 | $0.98 | $0.96 |

Additionally tiered unit pricing is available for contributions $2,500,000 and more. The first month in which a Member has signed all the required documents and wired the required funds (the initial Capital Contribution in 2015) will determine the month for the unit price, with the Manager having sole discretion to allow for a grace period of 3 business days.

The total amount of Capital Committed by the Member and all immediate family members before the end of 2015, including any unpaid fees, to this Fund or cumulatively across this Fund and Funds I and II (the Cumulative Commitment), whichever provides the lower unit price, will determine the amount contributed for the unit price.

**River Accelerator Investment:**   The Fund will invest about $100,000 per company plus 9.5% of the Fund (the "River Investments") through the River Accelerator to acquire an average of 5-7% (the "Average Ownership") of 25 to 30 companies, targeting a $3,000,000 to $4,000,000 valuation per company. The River Investments will be a combination of cash directly transferred to the company, the provision and use of specialized equipment, real estate, events, services provided by employees or contractors, or other expenditures. The Average Ownership will be in the form of equity or debt convertible for equity.

For example, a $15,000,000 fund with 25 River Investments would result in a per investment average of $157,000 spent for 5-7% of equity per company, an effective valuation of less than $4M per company.

**Distribution of Profits:**   The Manager may make annual distributions of profits to the Members. All such distributions will be made as follows: after returning to the Members their cost with respect to an investment, exclusive of Administrative Expenses, 80% will go to the Members in a pro rata proportion to the number of Units held by each at the time of the distribution and 20% ("Carried Interest") will go to the Manager. If the Fund returns a total of more than three times a Member's Cash Contribution (the Capital Contribution less Administrative Expenses) the Carried Interest will be thirty percent (30%) for every dollar returned beyond three times the Cash Contribution.

| | |
|---|---|
| **Administrative and Management Expenses:** | To manage costs related to the establishment and administration of the Fund, including but not limited to fund formation, administrative and clerical expenses, preparation and filing of tax documentation for all Members, any and all audits, and legal compliance with state and federal agencies, Members will contribute an Administrative Expense of 1% of their Capital Commitment, per year, for every year of the initial ten-year term of the Fund.

The Manager will pay all of its own operating expenses, including payroll, rent, communication costs, related support services, office space and facilities, utilities, and virtual reality equipment for the Management Company and the Fund.  To cover such expenses, Members will contribute 4% of their Capital Commitment each year for the first two years and 0% for each of the remaining eight years, combined with the percentage portion of the River Investments, as the Management Expense. |
| **Option to Pay Management Expenses of 0%:** | Any Member contributing $250,000 or more may elect to not pay any Management Expenses, in which case the Carried Interest will be 20% in the event the Fund returns between one to three times the Fund Size and split evenly (50%) for returns thereafter.  Any Members making that election shall still contribute Administrative Expenses. |
| **Specifications and Limitations on Expenses:** | The Manager is responsible for any Administrative and Management Expenses that exceed the payments made by Members as described above.  The Fund will only pay extraordinary expenses, as defined in the Management Agreement.

Payment for Administrative and Management Expenses shall be due on the first business day of the year for which they are allocated and payable in full and upfront from Members' initial Capital Contributions at the time of investment.  Members may elect to pay Management Expenses on a deferred basis beyond those due within the first twelve months of the initial Capital Contribution. |
| **Management:** | The Manager has the exclusive authority to manage and operate the Fund, with Members not being eligible to participate in the management of the Fund, to act for the Fund, or to vote on Fund matters except as specifically provided under applicable law or in the Fund's operating agreement. |
| **Allocations of Profit and Loss:** | Generally, the Manager will allocate all profits and losses (and items thereof) of the Fund to the Members so as to, as nearly as possible, increase or decrease, as the case may be, each Member's Capital Account to the extent necessary such that each Member's Capital Account is equal to the amount that such Member would receive if the Fund were dissolved, its assets sold for their book value, its liabilities satisfied in accordance with their terms, and all remaining amounts distributed to the Members in accordance with the terms regarding the Distribution of Profits, as above. |

**Liability of Members:** Except as required by law, no Member will be personally liable for any debt, obligation, or liability of the Fund, whether that liability or obligation arises in contract, tort, or otherwise.

**Tax Distributions:** The Manager will use its commercially reasonable efforts, for each taxable year, to cause the Fund to distribute to each Member, on an annual and timely basis, taking into consideration the due dates for estimated tax payments, an amount equal to such Member's (or any Person whose tax liability is determined by reference to the income of a Member) estimated federal, state and local income tax liability (and applicable self employment taxes) resulting from the Fund's income taxable to such Member for such taxable year (or applicable period), as determined by the Manager (taking into consideration any information provided in writing by such Member to the Fund).

**Clawback:** The Manager will be subject to an after-tax clawback to the extent the Manager has received Carried Interest distributions in excess of the portion of cumulative net profits of the Fund due as per the Distribution of Profits term.

**Reports and Audits:** The Fund will file all reports and documents required to be filed, by the Act or otherwise, with any governmental agency. At least annually, the Fund will compile information concerning the Fund's operations necessary for the completion of the Members' federal and state income tax returns and will undertake an audit once the fund size reaches $25,000,000.

**Fiscal Year:** Calendar year (except as otherwise required by law).

**LP Limited Recycling Right:** The proceeds of any investment in a Portfolio Company that is the subject of an acquisition or other liquidation event prior to the end of the Fund's Term may be retained by the Fund and available for re-investment in other Portfolio Companies, up to the full amount of a Member's Administrative and Management Expenses during the Term, if the Manager believes it will benefit the Members.

| | |
|---|---|
| **Information on Related Entities:** | *Funds I and II.* The Manager manages Rothenberg Ventures Fund I, LLC, a fund formed in September 2012 ("Fund I") and Rothenberg Ventures Fund II, LLC, a fund formed in September 2013 ("Fund II").<br><br>*Co-Investment Funds.* Investment allocations in Portfolio Companies received by the Fund that exceed the Fund's desired investment goals may be offered to Members selected and in amounts determined in the sole discretion of the Manager. Members contributing $250,000 or more will be automatically eligible for consideration.<br><br>*Real Estate.* Mike Rothenberg manages Rothenberg Investments Inc., a Texas corporation with real estate holdings in Texas. Mike Rothenberg also manages Rothenberg Ventures LLC, a Delaware corporation ("Rothenberg Ventures") involved in real estate transactions in California. Rothenberg Ventures intends to purchase, optimize, and rent office space to the Manager, thereby benefiting both the Manager and the Fund by allowing for expense reduction, enhanced event hosting, and the leasing of space to startups.<br><br>*Bend Reality.* Mike Rothenberg manages Bend Reality LLC, a Delaware corporation, also doing business as River Studios, River Racing, River Store, and River House, formed for the purpose of enhancing the Manager's branding and positioning in the virtual reality sector primarily through the River brand, which includes a virtual reality accelerator, a production studio, a racing team, an online store, and other business ventures.<br><br>*General.* Mike Rothenberg, the Manager, its members, employees, and their respective affiliates may make investments on behalf of themselves, the Prior Funds, the Co-Investment Funds, Rothenberg Ventures, Bend Reality or other funds which they currently or may in the future manage. Some of these investments could potentially be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties except to the extent the Fund invests in such investments. Additionally, in addition to the business time and attention spent on the Fund, Mike Rothenberg, the Manager, its members, employees and their respective affiliates will spend business time and attention on the business activities of the Prior Funds, the Co-Investment Funds, Rothenberg Ventures, Bend Reality, and such other investment funds as they may form. |
| **Amendments:** | In general, the Fund's operating agreement may be amended only with the consent of the Manager and a majority-in-interest of the Members. |

# CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

## MARCH 23, 2015

## ROTHENBERG VENTURES 2015 FUND, LLC,

### a Delaware limited liability company

# ROTHENBERG VENTURES MANAGEMENT COMPANY, LLC
### Manager

*This Confidential Private Offering Memorandum of Rothenberg Ventures 2015 Fund, LLC is dated as of March 23, 2015 (the "Memorandum"). All references herein to "the Memorandum" or "this Memorandum" shall refer to this Confidential Private Offering Memorandum.*

# ROTHENBERG VENTURES 2015 FUND, LLC,

### a Delaware limited liability company

### INVESTOR SUITABILITY STANDARDS

INVESTOR WITH SUBSTANTIAL MEANS; ILLIQUIDITY OF INVESTMENT. INVESTMENT IN ROTHENBERG VENTURES 2015 FUND, LLC (THE "*FUND*") IS SUITABLE ONLY FOR SOPHISTICATED, WELL-INFORMED INVESTORS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT AND WHO HAVE ADEQUATE MEANS OF PROVIDING FOR THEIR ANNUAL NEEDS AND CONTINGENCIES. THE INVESTOR MUST HAVE KNOWLEDGE OF FINANCE, SECURITIES AND INVESTMENTS GENERALLY, AND THE INVESTOR'S PROPOSED INVESTMENT IN THE FUND MUST NOT BE MATERIAL WHEN COMPARED TO THE INVESTOR'S TOTAL FINANCIAL CAPACITY. ALL PROSPECTIVE INVESTORS MUST BE "ACCREDITED INVESTORS," AS THAT TERM IS DEFINED UNDER RULE 501 OF REGULATION D AS PROMULGATED BY THE SECURITIES & EXCHANGE COMMISSION (THE "*SEC*") UNDER THE SECURITIES ACT OF 1933 (THE "*SECURITIES ACT*").

INVESTOR REPRESENTATIONS; MANAGER'S DISCRETION TO ACCEPT OR REJECT SUBSCRIPTIONS. BY INVESTING IN THE FUND, EACH INVESTOR REPRESENTS TO THE FUND'S MANAGER (THE "*MANAGER*") AND THE FUND THAT SUCH INVESTOR MEETS THESE STANDARDS. THE MANAGER WILL NOT ACCEPT SUBSCRIPTIONS FROM ANY PERSON OR ENTITY WHICH DOES NOT REPRESENT THAT SUCH STANDARDS ARE MET. THE MANAGER IN ITS SOLE DISCRETION MAY REJECT SUBSCRIPTIONS, IN WHOLE OR IN PART. IF THE OFFERING IS OVERSUBSCRIBED, THE MANAGER, IN ITS SOLE DISCRETION, WILL DETERMINE WHICH SUBSCRIPTIONS SHALL BE ACCEPTED.

ABILITY AND WILLINGNESS TO ACCEPT RISKS. THE ECONOMIC BENEFIT FROM AN INVESTMENT IN THE FUND DEPENDS UPON MANY FACTORS BEYOND THE CONTROL OF THE MANAGER AND ITS AFFILIATES OR THE FUND. INVESTMENTS IN PRIVATE START-UP VENTURES INVOLVE A HIGH DEGREE OF BUSINESS AND FINANCIAL RISK THAT CAN RESULT IN SUBSTANTIAL LOSSES. (SEE "CERTAIN RISK FACTORS.") ACCORDINGLY, THE SUITABILITY OF INVESTING IN THE FUND FOR ANY PARTICULAR INVESTOR WILL DEPEND UPON, AMONG OTHER THINGS, SUCH INVESTOR'S INVESTMENT OBJECTIVES AND SUCH INVESTOR'S ABILITY TO ACCEPT SPECULATIVE RISKS. INVESTMENT IN THE FUND IS NOT SUITABLE FOR INVESTORS SEEKING CURRENT INCOME.

ABILITY TO ACCEPT LIMITATIONS ON TRANSFERABILITY. INVESTORS MAY NOT BE ABLE TO LIQUIDATE THEIR INVESTMENT IN THE EVENT OF AN EMERGENCY OR FOR ANY OTHER REASON BECAUSE THERE IS NOT NOW ANY PUBLIC MARKET FOR THE INVESTMENT AND IT IS NOT ANTICIPATED THAT ONE WILL DEVELOP. IN ADDITION, INVESTORS HAVE NO RIGHT TO WITHDRAW FUNDS FROM THE

FUND. MOREOVER, THE TRANSFERABILITY OF THE INVESTMENT IS SUBJECT TO CERTAIN RESTRICTIONS IN THE FUND AGREEMENT.

MINIMUM STANDARDS ONLY. THESE SUITABILITY STANDARDS REPRESENT MINIMUM STANDARDS FOR PROSPECTIVE INVESTORS. THE SATISFACTION OF SUCH STANDARDS BY A PROSPECTIVE INVESTOR DOES NOT NECESSARILY MEAN THAT INVESTMENT IN THE FUND IS A SUITABLE INVESTMENT FOR THAT INVESTOR. EACH PROSPECTIVE INVESTOR SHOULD DETERMINE INDEPEND-ENTLY WHETHER AN INVESTMENT IN THE FUND IS SUITABLE FOR THAT INVESTOR IN LIGHT OF THE INVESTOR'S OWN PERSONAL CIRCUMSTANCES.

NO PUBLIC OFFERING. NO ACTION HAS BEEN TAKEN THAT WOULD PERMIT A PUBLIC OFFERING OF THE INTERESTS IN ANY JURISDICTION WHERE ACTION FOR THAT PURPOSE WOULD BE REQUIRED. THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940. THE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR THE SECURITIES COMMISSIONER OR REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION (INCLUDING ANY NON-U.S. JURISDICTION), NOR HAS THE SEC OR ANY REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION (INCLUDING ANY NON-U.S. JURISDICTION) PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH THE OFFER OR SOLICITATION IS REQUIRED TO BE QUALIFIED OR TO ANY PERSON TO WHOM SUCH AN OFFER OR SOLICITATION IS UNLAWFUL.

NO REGISTRATION OF INTERESTS. THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE TRANSFERRED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN EXEMPTION THEREFROM. VARIOUS STATE LAWS OR LAWS OF NON-U.S. JURISDICTIONS RELATING TO THE SALE OF SECURITIES MAY ALSO REQUIRE COMPLIANCE BEFORE ANY TRANSFER OF THE INTERESTS IS EFFECTED. NO INTEREST MAY BE TRANSFERRED WITHOUT THE WRITTEN CONSENT TO SUCH TRANSFER BY THE MANAGER, WHICH MAY REQUIRE INVESTOR(S) TO SUPPLY TO THE FUND WITH AN OPINION OF COUNSEL SATISFACTORY TO THE FUND STATING THAT A PROPOSED TRANSFER OF INTERESTS BY SUCH INVESTORS WILL NOT VIOLATE APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR REQUIRE REGISTRATION UNDER ANY SUCH LAWS.

THIS MEMORANDUM MAY INCLUDE "FORWARD-LOOKING STATEMENTS" AS THAT TERM IS USED IN SECURITIES LAWS. IN SOME CASES, YOU CAN IDENTIFY FORWARD-LOOKING STATEMENTS BY TERMINOLOGY SUCH AS "ANTICIPATES," "BELIEVES," "ESTIMATES," "SEEKS," "EXPECTS," "PLANS," "WILL," "INTENDS" AND SIMILAR EXPRESSIONS. ALTHOUGH THE MANAGER BELIEVES THAT THE EXPECTATIONS REFLECTED IN THOSE FORWARD-LOOKING STATEMENTS ARE REASONABLE, SUCH EXPECTATIONS MAY PROVE TO BE INCORRECT. FOR INFORMATION ABOUT FACTORS THAT COULD CAUSE THE FUND'S ACTUAL

RESULTS TO DIFFER FROM THE EXPECTATIONS STATED IN THE FORWARD-LOOKING STATEMENTS, SEE THE TEXT IN SECTION ENTITLED "CERTAIN RISK FACTORS." THE MANAGER URGES YOU TO CONSIDER THOSE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS CONTAINED IN THIS MEMORANDUM.  ALL SUBSEQUENT WRITTEN OR ORAL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE MANAGER OR THE FUND OR ANY PERSONS ACTING ON BEHALF OF THE MANAGER OR THE FUND ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THESE CAUTIONARY STATEMENTS.   THE FORWARD-LOOKING STATEMENTS INCLUDED IN THIS MEMORANDUM ARE MADE ONLY AS OF THE DATE OF THIS MEMORANDUM.  THE MANAGER, THE FUND AND ITS MANAGEMENT DO NOT INTEND, AND UNDERTAKE NO OBLIGATION, TO UPDATE THESE FORWARD-LOOKING STATEMENTS.

## CONFIDENTIALITY AND RESTRICTIONS ON
## USE AND DISTRIBUTION

This Memorandum is submitted in connection with an offering of interests (*"Interests"*) in the Fund and may not be reproduced or used, in whole or in part, for any other purpose. The Interest will be denominated in Units in the Fund.

This Memorandum and all matters contained herein are confidential and proprietary. Each person receiving a copy hereof, by accepting such delivery, shall be deemed to have agreed not to disclose or use any of the information contained herein except for the purpose of evaluating an investment in the Fund, and shall further agree not to distribute this Memorandum, or any reproduction of it, to any other person or entity.

Statements in this Memorandum are made as of the date hereof and do not include information relating to events occurring subsequent to its date. Unless stated otherwise herein, neither the delivery of this Memorandum at any time, nor any sale hereunder, shall under any circumstances create an implication that the information contained herein is correct as of any time subsequent to the date of this Memorandum.

Prospective investors must not construe the contents of this Memorandum as legal, tax, or investment advice. Each prospective investor should consult its own counsel, accountant, tax, business, or investment advisor as to the legal, tax, and related consequences of an investment in the Interests described by this Memorandum. Neither the Manager nor its affiliates or principals makes any representation regarding the legality of an investment in the Interests described herein under any law or regulation of any jurisdiction.

Any questions regarding this Memorandum should be addressed to the Manager.

## I.  EXECUTIVE SUMMARY

**The Fund.**  Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company (the "*Fund*"), is an early stage seed investment firm.  The purpose of the Fund is to invest in one or more "early-stage" companies (collectively, the "*Portfolio Companies*") focused on technology-enabled companies such as e-commerce, mobile, digital media, social networking and software. The Fund intends to take a small equity position (including convertible debt positions) in the Portfolio Companies with the hope that in the future (i) the Portfolio Companies will raise additional rounds of funding and continue to grow, (ii) the Portfolio Companies will be acquired, and/or (iii) the Portfolio Companies will become publicly-traded companies.

Rothenberg Ventures Management Company, LLC, a Delaware limited liability company, is the manager of the Fund.  The Manager will decide in which Portfolio Companies (if any) the Fund invests and the terms of such investment.

**Management.**  Rothenberg Ventures Management Company, LLC, is the manager of the Fund ("*Manager*" or "*RV*").  The founder of the Fund and owner of the Manager, Michael Rothenberg, will make all final decisions regarding the strategy, investments, and day-to-day operations of the Fund on behalf of the Manager (the "*Operator*").  RV current assets under management is $24.7 million.

Mike Rothenberg is a graduate of Harvard Business School and of Stanford, where he received a B.S., Management Science & Engineering.  In addition to Fund I and II, Mr. Rothenberg also operates a fund that makes real estate investments in the greater Austin, Texas area.  Prior to business school, Mr. Rothenberg worked as an Associate at Audax Private Equity for two years, where he was responsible for analysis, preliminary deal diligence, deal execution, portfolio management, and facilitating sale processes.  Before Audax, Mr. Rothenberg spent two years at Bain & Company where he consulted for Fortune 500 companies in a variety of industries including e-commerce, enterprise software, and payments.

Fran Hauser is digital media veteran, having spent 15 years in the digital media space, holding President and General Manager positions at Time Inc., AOL and Moviefone. She played an integral role in the $400mm sale of Moviefone to AOL and in building PEOPLE.com into one of the most successful women's websites.  She speaks frequently about topics such as career building, digital media and investing in/by women. She also writes regularly for publications such as Inc., Women 2.0, and Bedford Magazine, and appears on CNBC's Power Pitch. In 2014, Forty Over 40 selected Hauser as one of 40 Women to Watch Over 40, a distinction that honors women who are reinventing, disrupting and making an impact. In 2011, Hauser was named to Folio magazine's annual "Folio: 40", a list honoring magazine and media industry influencers. She was recognized in 2009 as one of Advertising Age's "Women to Watch", and was inducted into Media Industry Newsletter's (MIN) Digital Hall of Fame in 2008.

Tommy Leep is a graduate of Stanford University, where he received a B.A. in Economics and an M.A. in Sociology.  He has spent time working on products at Intuit and Meraki, and spent time working at Floodgate Capital prior to joining Rothenberg Ventures.

Brandon Farwell graduated from Stanford University with a BA in Economics and a Minor in International Relations. While at Stanford, he was Vice-President of the student-run entrepreneurial club entitled the Business Association of Stanford Entrepreneurial Students (BASES). He also holds an MBA from Harvard Business School. He focuses on early stage (seed and Series A) enterprise SaaS investments, including ZenPayRoll, Revel Systems, CodeShip, and AuditFile. Previously, he worked an Investment Professional at Draper Fisher Jurvetson. He focused on enterprise SaaS and worked on DFJ's investments in Box, Yammer, SugarCRM, Chartbeat, Insight Squared, etc. He also focused on consumer, mobile technologies like Newsle (acq Linkedin), Path, Tango, and Z2Live. His interests also include e-commerce; he worked on DFJ's investment in The Clymb.

**The Offering.** The Fund is offering initially up to $50,000,000 (the "*Offering*") of Fund interests in the Fund ("*Interests*"). The Manager expects that the investors in the Fund ("*Investors*" or "*Members*") will consist of sophisticated, high net worth individuals, corporations or institutions who are "accredited investors" as defined in Regulation D of the Securities Act of 1933, as amended (the "*Securities Act*"). The Investors will become members in the Fund and will be required to sign the Operating Agreement of the Fund (attached here as Appendix B and includes the Management Agreement between the Fund and the Manager as as Exhibit C to Appendix B), which will govern the management and affairs of the Fund and the relationship between the parties as members of the Fund. The Interests will be denominated in Units in the Fund. Capitalized terms not otherwise defined in this Memorandum shall have the meaning set forth in the Operating Agreement of the Fund.

**Fund Size.** The maximum size of the Fund is $50.0 million, with additional buffer of $10.0 million. In no event will the aggregate amount of capital invested in the Fund by the Investors exceed $50.0 million without the consent of a majority in interest of the Investors.

**Target Companies.** The Fund is intending to invest all or nearly all of the proceeds of the Offering in one or more Portfolio Companies. It is currently expected that each Portfolio Company will be located in the United States and will have zero or limited revenues at the time of investment by the Fund. Each Portfolio Company may either be a corporation or a "pass-through" entity (such as an LLC or a Fund) for U.S. federal income tax purposes.

## II.   SUMMARY OF PRINCIPAL TERMS

The following is a summary of some of the principal terms of the Fund. The following is merely a summary of the anticipated provisions of the Fund Agreement of the Fund. **Prospective investors should review the Fund Agreement of the Fund, as finally entered into, for the full, actual terms of the Fund.**

### Fund Structure

The Fund will be a Delaware limited liability company. The Fund will initially be headquartered in San Francisco, California.

## Management

The Fund will be managed by its Manager, Rothenberg Ventures Management Company, LLC, a Delaware limited liability company.

## Capital Contributions

Each Member will contribute all of its capital to the Fund on the date it becomes a member in the Fund; provided that Members contributing in excess of $500,000 to the Fund may elect to defer payment of the portion of their Management Expenses for subsequent years of the Fund through capital calls.   The Manager will use the capital (less the Management Expense and Administrative Expenses as described in the Operating and Management Agreements) to make investments in one or more Portfolio Companies.  The Manager will have the ability to seek additional capital contributions in the Fund from both new and existing Investors for a period of one year up to the maximum amount of the Offering.  The final closing of the sale of Interests is referred to herein as the "*Final Closing*."

## Distributions and Manager Carry

Subject to applicable law, the Manager may elect from time to time to make distributions of distributable amounts to the Members.  All such distributions shall be made as follows: first, to the Members, their cost with respect to the applicable investment, and second, eighty percent (80%) to the Members pro rata in proportion to the number of Units held by each at the time of the distribution and twenty percent (20%) ("*Carried Interest*") to the Manager.

In the event of the Fund returning a total of more than three (3.0) times the Fund Size, the Carried Interest will be thirty percent (30%) or fifty percent (50%), dependent on the election made by the Member.

## Limited Recycling Right and Clawback

The proceeds of any investment in a Portfolio Company that is the subject of an acquisition or other liquidation event shall be retained by the Fund and available for re-investment in other portfolio companies or payment of Management Expenses of Members who deferred Capital Contributions with respect to payment of Management Expenses.  The Manager currently expects that this right will be used only with respect to investments in Portfolio Companies that experience a liquidation event prior to the Final Closing, but may use such proceeds for new investments as well.  The Manager will be subject to an after-tax clawback to the extent the Manager has received Carried Interest distributions in excess of the percentage due of the cumulative net profits of the Fund.

## Liability of Members

Except as required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

**Transferability of Fund Interests**

The Interests will generally not be assignable without the prior written consent of the Manager, and such consent will be conditioned on the Manager's receipt (or waiver) of an opinion of counsel for the Fund that such assignment will not result in (among other things) (i) the Fund or the Manager being subjected to any additional regulatory requirements, (ii) a violation of applicable law (including securities law) or (iii) the Fund being classified as a "publicly traded Fund."

**Indemnification**

The Manager, each member of the Manager, and their employees, independent contractors, agents and affiliates will be entitled to indemnification by the Fund against any losses, costs and expenses incurred by such parties in connection with any proceeding as a result of any of the Fund's activities other than as a result of willful misconduct or gross negligence.

**Fund Term**

The term of the Fund will be 10 years from the date of the formation of the Company. The Manager in its sole discretion may extend the Fund's term for up to two periods of one year each, and thereafter with the consent of a majority in interest of the Members.

**Minimum Member Investments**

The minimum investment size for members in the Fund is $250,000 for institutions and individuals, subject to exceptions as provided in the Operating and Management Agreements (any amounts so invested, a Member's "Capital Contribution").

**Reports**

The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall prepare and deliver a financial report to each Member annually setting forth for such Fiscal Year (i) the assets and liabilities of the Company as of the end of such Fiscal Year; and (ii) such Member's closing Capital Account balance as of the end of such Fiscal Year. Once Capital Contributions for the Company are greater than $25,000,000.00, then the books and records of account of the Company shall be audited as of the end of each Fiscal Year by an independent public accounting firm as shall be selected by the Manager.

## III.   CERTAIN RISK FACTORS

While presenting the opportunity for capital gains, investment in the Fund involves a high degree of risk and is suitable only for investors who have no immediate need for liquidity of the amount invested and can withstand a loss of their entire investment in the Fund. In addition to the factors set forth elsewhere in this Memorandum, prospective investors should consider carefully the following risk factors in analyzing an investment in the Fund.

**Risk of Capital Loss; No Assurance of Profit Appreciation; Illiquidity of Portfolio Investments**

"Early-stage" private investments primarily within the technology-enabled companies such as e-commerce, mobile, digital media, social networking and software, the focus of the Fund, is an investment segment with a very high degree of investment risk. Typically, such portfolio companies have little or no operating history, unproven technology and product, untested management, and unknown future capital requirements. These companies often face intense competition from other start-up ventures and also from established and more experienced companies with much greater financial and technical resources, marketing and service capabilities, and a greater number of qualified personnel.

The inherent nature of early-stage investing dictates a significant length of time between the initial investment and realization of gains, if any. Despite historical accelerated rates of return over a short period of time, early-stage investments, if successful, typically take many years from date of investment to reach a state of maturity where liquidity is possible. Investments in the Fund's portfolio typically will be subject to restrictions on resale because they will involve unregistered securities. The Manager anticipates a long time period between the initial capitalization of the Fund and the point (if ever) when the Members begin to receive distributions.

There can be no assurance that the Fund will realize net profits or achieve returns commensurate with the risks associated with its investments, or that the Fund will not experience losses, which may be substantial, in its investments. There can be no assurance that the Members will receive distributions from the Fund in an amount equal to their investment in the Fund or all.

The Fund's investments will be in the equity securities, including convertible debt securities, of a limited number of small or start-up private companies. As a result, there generally will be limited or no marketability of the Fund's investment and such investment may decline in value while the Fund is seeking to dispose of it. Furthermore, the Fund may find it necessary to sell its investment at a discount or to sell over extended periods of time when disposing of its portfolio securities. Consequently, the Fund's investment generally will not be sold for a number of years and will remain relatively illiquid and difficult to value. The marketability and value of any such investment will depend upon many factors beyond the control of the Manager.

**Difficulty of Identifying an Attractive Investment and Competition for Investment**

There can be no assurance that the Fund will be presented with, or have the opportunity to participate in, suitable investments to deploy the Fund's committed capital. Furthermore, there can be no assurance that the Fund will in fact make an investment in any opportunity that the Manager may review.

There is increasing competition among investors for investments in the market the Fund is targeting. Many established firms and individuals have greater capital resources than the Fund. Therefore, there can be no assurance that the Fund will make an attractive investment in order to use effectively, completely or profitably the Fund's committed capital.

**Reliance on Management**

The Manager will make all final decisions regarding the strategy, investments, and day-to-day operations of the Fund. The Operator will make all such decisions on behalf of the Manager. The Members will have no right or power to take part in the management of the Fund. Only if a potential investor is willing to entrust all aspects of management to the Manager should that potential investor participate in this Offering.

The Fund's success is substantially dependent on the continued availability to the Fund of the services of the Operator. Neither the Fund nor the Manager has an employment agreement with, or "key person" life insurance policy on, the Operator. The loss of the services of the Operator could have a material adverse effect on the Fund, its ability to manage its investments, and its prospects. While the Manager may decide to expand its management team with the addition of qualified individuals, there can be no assurance that the Manager will find experienced personnel who are both available and compatible with its investment philosophy and the current Members.

Neither the Manager nor the Operator has significant experience in managing a fund and as such, its performance in this market can neither be predicted nor assured.

**Concentration of Investment**

The Fund will focus its investments in a limited number of entities. As such, this investment may be especially vulnerable to an adverse economic event or unfavorable business climate in connection with its industry.

The Fund will specifically focus investment in virtual reality through ordinary investments as well as through a proprietary accelerator program. These investments may be especially vulnerable in the event that this specific industry is subject to an adverse economic event or unfavorable business climate.

**Availability of Investment Capital**

Early-stage, private company investments often require several rounds of capital infusions before the Portfolio Company reaches maturity or may become liquid. If the Fund does not have funds available to participate in subsequent rounds of financing or if the Fund chooses not to participate in any such subsequent round of financing, that may have a significant negative impact on both the Portfolio Company and the value of the original investment. It is likely for a company to require follow-on financing in excess of the Fund's resources. Such third party sources of finance may not be available to the company on favorable terms or at all.

**No Assurance of Returns**

An investment in the Fund is a high-risk investment and there is no assurance that the Fund will be successful in producing any profits or even in returning any of the Members' capital. There can be no assurances, nor does the Fund, the Manager, or any other affiliated person or entity make any representation or warranty that the Fund will achieve any particular operating results or rates of return.

## No Market

There is currently no public market for the interests to be purchased in this Offering and the Manager does not intend for a public market to develop. Members therefore will be unable to liquidate their investment in the Fund. Even upon liquidation, Members may receive restricted securities that may not be resold without registration under, or exemption from, applicable securities laws.

In addition, the Interests have not been registered under the Securities Act and may not be transferred without registration under the Securities Act or pursuant to an exemption therefrom. Various state laws relating to the sale of securities may also require compliance before any transfer of the interests is effectuated. No interest may be transferred without the written consent to such transfer by the Manager, which may require investors to supply the Fund with an opinion of counsel satisfactory to the Fund stating that a proposed transfer of interests will not violate applicable federal and state securities laws or require registration under any such laws.

## Unspecified Investments

The amounts received from the Members pursuant to this offering will be deposited into the Fund. Members must rely on the ability of the Manager to make portfolio investments and will not have the opportunity to independently evaluate such investments in the Fund.

## Risks Associated with the Market Conditions

The Fund's business may be affected by market and economic challenges experienced by the U.S. economy as a whole or by the local economic conditions in California and the other markets in which the Fund may invest. These current conditions, or similar conditions existing in the future, may have a negative effect on the following, among other things:

- the financial condition of the Fund's investors, Portfolio Companies, lenders, partners and investors, which may expose the Fund to increased risks of default by these parties;

- the value of the Fund's Portfolio Companies, which may limit the Fund's ability to dispose of assets at attractive prices; and

- the fundamentals of the Fund's business.

## Risk Factors Relating to Portfolio Companies

Each Portfolio Company's success may be affected by challenges and risks specific to the Portfolio Company's specific industry and challenges and risks specific to the Portfolio Company itself.

**Tax Risks**

Anyone contemplating an investment in the Fund is strongly advised to seek the advice of a qualified expert on matters of federal, state, and local taxation of investments in entities like the Fund.

In judging whether to invest in the Fund, a prospective investor should consider the tax consequences thereof. These include, among others, the following possibilities: (a) that the Fund may generate taxable income (including its share of any taxable income from a Portfolio Company if it is a pass-through entity for federal income tax purposes) and resulting income tax to the Members in an amount greater than cash available for distribution, (b) that adverse changes may occur in the federal income tax laws, including increases in rates currently applicable to qualified dividends and capital gains; (c) that the Fund's and the Member's taxable income and tax liability may be adjusted as a result of audits by U.S. or other taxing authorities.

For a further discussion of certain income tax aspects of an investment in the Fund, please refer to the section titled "Tax Matters" set forth subsequently in this Memorandum.

**Risk Factors Relating to Potential Conflicts of Interest**

Certain factors may give rise to conflicts of interest between the Manager, its members, the Operator and their respective affiliates, on the one hand, and the Members, on the other hand. The following conflicts are included among such possible conflicts.

*Specific Conflicts.*

*Funds I and II.* The Manager manages Rothenberg Ventures Fund I, LLC, a fund formed in September 2012 ("Fund I") and Rothenberg Ventures Fund II, LLC, a fund formed in September 2013 ("Fund II").

*Co-Investment Funds.* Investment allocations in Portfolio Companies received by the Fund that exceed the Fund's desired investment goals may be offered to Members selected and in amounts determined in the sole discretion of the Manager. Members contributing $250,000 or more will be automatically eligible for consideration.

*Rothenberg Investments.* Mike Rothenberg manages Rothenberg Investments MG Inc., a Texas corporation with real estate holdings in Texas.

*Rothenberg Ventures LLC.* Mike Rothenberg manages Rothenberg Ventures LLC, a Delaware corporation involved in real estate transactions in California. Rothenberg Ventures LLC intends to purchase, optimize, and rent to the Manager offices, thereby benefiting both the Manager and Members by allowing for expense reduction, enhanced event hosting, and the leasing of space to startups.

*Bend Reality.* The Manager manages Bend Reality LLC, a Delaware corporation formed for the purpose of enhancing the Manager's branding and positioning in the virtual reality sector primarily through the River brand, which includes a virtual reality accelerator, a production

studio, and other business ventures.

*General*. The Members, the Manager, and their respective affiliates may make investments on behalf of themselves or other funds which they manage. Some of these investments could be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties except to the extent the Fund invests in such investments.

*Syndication of Investments*.  Recent changes to Securities Exchange Commission regulations have legalized "crowd-sourced" syndication of venture style investments on such platforms as AngelList ("Public Syndications").  While the Manager is still studying the implications of these new regulations, the Manager believes this change is potentially beneficial to investors in the Fund and therefore, subject to approval of the Company's and the portfolio company's legal and tax advisors, the Fund may participate in Public Syndications of some of its portfolio companies upon the following conditions:

> (a)  Allocations for investment into portfolio companies be allocated in the following order of priority: (1) the Fund; (2) if there is any remaining allocation, investors in the Fund that have met the minimum capital commitment or other investors in the Fund at the Manager's sole discretion; and (3) if there is any remaining allocation, co-investment opportunities in Portfolio Companies may be offered on Public Syndications ("Syndicated Investments").

> (b)  Any "Carried Interest" received by the Management Company as a result of returns on Syndicated Investments will be split 50/50 between the Management Company and the Fund to the extent advisable under applicable tax and other applicable regulations.

*General*.  The Members of the Manager and their respective affiliates may make investments on behalf of themselves or other funds which they manage.  Some of these investments could be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties except to the extent the Fund invests in such investments.

The Manager will attempt to resolve any conflicts of interest by exercising good faith and believes that it will generally be able to resolve any conflicts on an equitable basis, although it is possible that potential conflicts may not be resolved in favor of the Fund.

*Other Activities and Investments*.  The Operator has responsibilities to perform services to entities other than the Fund, including but not limited to start-up ventures, and Fund I. Thus, the Operator will not be able to devote all of his time to the Fund, and the Fund generally will receive no benefit from the services provided on behalf of others to whom the Operator has prior commitments. The Members may also have obligations to investors in other investment funds, the fulfillment of which might not be in the best interests of the Fund.  In this regard, the Members and their affiliates may make investments on behalf of themselves or other funds which they manage.  Some of these investments could be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties.

*Members' Other Activities and Investments; Co-Investments*.  The Members, the Operator, the Manager and their respective affiliates may make investments on behalf of themselves or other funds which they manage while also making investments on behalf of the Fund.  In addition, the

Operator is working on numerous ideas for start-up ventures in which he has an economic interest. Some of these investments could be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties, including the Operator. The Fund may invest in some of these investments and the start-up ventures in which the Operator individually already has a stake, but Investors in the Fund will not receive any of the benefit related to the existing Members' or the Operator's stake in these ventures. Also the Operator and, in the discretion of the Operator as Manager, certain of the Members, may co-invest with the Fund, but no economic benefit of such activity will accrue to the Members who do not co-invest with the Fund.

## IV.   TAX MATTERS

### General

The following discussion summarizes certain United States federal income tax considerations applicable to U.S. persons considering the acquisition of interests in the Fund. The discussion does not deal with all income tax considerations that may be relevant to specific investors or classes of investors in light of their particular circumstances. Furthermore, no state, local, or foreign tax considerations are addressed specifically herein. Furthermore, this summary does not describe the tax consequences of the investment to non-U.S. persons. All persons considering an investment in the Fund are urged to consult with their own tax advisors as to the specific United States federal, state, local and foreign tax consequences to them of such investment.

The discussion assumes that each Member is a United States citizen or resident individual, or a domestic corporation that is not tax-exempt. The discussion is based upon existing law as contained in United States federal statutes, regulations, administrative rulings and judicial decisions in effect the date of this memorandum. Future changes to the law may, on either a prospective or retroactive basis, give rise to materially different tax considerations. Finally, no opinions of counsel have been received and no rulings have been requested from the tax authorities as to any matter, and there can be no assurance that such authorities will not successfully assert a position contrary to one or more of the legal conclusions discussed herein.

**The discussion of tax aspects contained herein has been written to support the promotion and marketing of interests in the Fund and is not intended or written to be used, and cannot be used, by a taxpayer for the purpose of avoiding United States federal income tax penalties that may be imposed on the taxpayer. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### United States Federal Income Tax Considerations

*Company Classification.* For U.S. federal income tax purposes, the Fund will be classified as a partnership.

*Effect of Company Status.* As a partnership, the Fund will not be subject to federal income tax. Instead, each Member will be required to report on such Member's federal income tax return its allocable share of the Fund's items of income, gain, loss and deduction substantially as if the items had been recognized directly by such Member. (If a Portfolio Company is a pass-through

entity for federal income tax purposes, the Member's share of the Fund's taxable items will include the Member's indirect share of a Portfolio Company's taxable items.) A Member will be required to pay tax on its share of the Fund's net income or gain in the year recognized without regard to whether the Fund makes a corresponding cash distribution. Distributions (as opposed to allocations of taxable income or gain) received by a Member from the Fund generally will not be subject to tax (except potentially in the case of any distribution of marketable securities).

***Trade or Business Status.*** If a Portfolio Company is a pass-through entity for federal income tax purposes and is engaged in a trade or business, the Fund will be deemed to be engaged in a trade or business. If a Portfolio Company is a corporation for federal income tax purposes, the Fund generally intends to take the position for federal income tax purposes that its operations and activities constitute an investment activity rather than the active conduct of a trade or business. Unless the Fund is engaged in a trade or business, the Fund's investment expenses, including any Management and Administrative Expenses paid to the Manager, generally will be treated by Members who are individuals as "miscellaneous itemized deductions" and may not be available (or may be only partially available) to offset such Members' taxable income from the Fund or other sources.

***Passive Activity Loss Rules.*** If a Portfolio Company is a corporation for federal income tax purposes, the Fund's activities with respect thereto should not be subject to the "passive activity loss rules" of the Internal Revenue Code. In that case, individual (and certain corporate) Members' ability to reduce their income for federal income tax purposes by the Members' shares of the Fund's losses and deductions attributable to sales of Portfolio Company securities generally should not be limited by the passive activity loss rules (although such losses and deductions may be subject to other limitations, including "at-risk" limitations and restrictions on the use of miscellaneous itemized deductions and capital losses). If a Portfolio Company is a pass-through entity for federal income tax purposes, then such Members' ability to utilize the Fund's losses will be subject to the passive activity loss rules.

Unless a Portfolio Company is a pass-through entity engaged in a trade or business, a Member that is subject to the passive activity loss rules with respect to other investments generally will not be permitted to offset against the Member's share of the Fund's income and gain any losses or other deductions generated by the Member's investments in "passive activities" (until the Member's interests in such passive activities are disposed of).

***Transfer of an Interest in the Fund.*** The sale or exchange of an interest in the Fund by a Member generally will result in the recognition of capital gain or loss equal to the difference between the Member's tax basis in the interest and the amount realized on the sale or exchange, although a portion of such gain or loss may be recharacterized as ordinary income or loss to the extent attributable to the Member's share of any Fund assets described in Section 751(c) of the Internal Revenue Code, including the Fund's share of any such assets of a Portfolio Company if it is a pass-through entity for federal income tax purposes.

## State and Local Taxation

In addition to the federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local

laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Member's distributive share of the taxable income or loss of the Fund (including the Member's indirect share of any taxable income and loss of a Portfolio Company if it is a pass-through entity for state tax purposes) generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which the Member is a resident and in any states where the Fund is doing business or deemed to be doing business (including by virtue of the activities of a Portfolio Company if it is a pass-through entity for state tax purposes).

State and local taxes may be significant. Each investor is advised to consult its own tax advisor regarding state and local taxes that may be payable in connection with an investment in the Fund.

## V. REGULATORY CONSIDERATIONS

The Fund will accept subscriptions only from Investors meeting certain requirements necessary for the Fund to comply with the provisions of the Securities Act and the Investment Company Act. The Fund reserves the right to reject subscriptions, in whole or in part, in its absolute discretion.

### General Representations

A prospective investor in the Fund will be required to represent in writing, among other things, that (i) by reason of its business or financial experience, or that of its professional advisor, it is capable of evaluating the merits and risks of an investment in the Fund and of protecting its own interests in connection with such investment, (ii) it is acquiring an interest in the Fund for its own account and not with a view toward the distribution thereof, (iii) it is aware that the interests in the Fund have not been registered under the Securities Act or any state securities laws or securities laws of any other jurisdiction, and that the transfer thereof is restricted by the Securities Act, applicable state securities laws or securities laws of other jurisdictions, the Fund's Fund Agreement and the absence of a market for the interests in the Fund and (iv) it qualifies as an "accredited investor" within the meaning of Regulation D of the Securities Act.

## VI. INVESTOR QUESTIONNAIRE

This Memorandum is qualified in its entirety by reference to the governing agreements of the Fund. Copies of the Fund's governing agreements will be furnished to qualified prospective investors in the Fund. If you would like to indicate your interest in purchasing Interests in this offering, please complete the Investor Questionnaire attached hereto as Appendix A. The Fund may accept or reject indications of interest in whole or in part in its absolute discretion.

Name of Prospective Investor:_____

(Please Print)

State of Domicile or Residence:_____

Amount of Investment:  $_____

For initial investments $500,000 and over, please select "Yes" if the initial investment includes payment of all management expenses, so that Investor is not required to contribute additional capital to cover such fees in the future.  Note that "No" requires future payment of management expenses.

____ Yes, includes payment of all expenses.
____ No, I am responsible for future payments.

For initial investments $250,000 and over, please select "Yes" if you are paying management expenses in return for a higher share of returns.

____ Yes, paying expenses for a higher share of returns.
____ No, waiving expenses subject to a lower share of returns.

## ROTHENBERG VENTURES 2015 FUND, LLC

_____

## APPENDIX A - INVESTOR QUESTIONNAIRE

_____

INSTRUCTIONS:  IN ORDER TO INVEST IN **ROTHENBERG VENTURES 2015 FUND, LLC** SECURITIES, YOU MUST COMPLETE THIS INVESTOR QUESTIONNAIRE BY FILLING IN THE INFORMATION CALLED FOR, CHECKING THE APPROPRIATE BOXES, AND SIGNING AT PAGE 4.  **PLEASE RETURN THE COMPLETED QUESTIONNAIRE AS SOON AS POSSIBLE TO:**

Rothenberg Ventures 2015 Fund, LLC
1062 Folsom Street, 2nd Floor
San Francisco, CA 94103
Attention: Legal and Accounting
Email:
Fax:

# ROTHENBERG VENTURES 2015 FUND, LLC

---

## INVESTOR QUESTIONNAIRE

---

TO:   Rothenberg Ventures 2015 Fund, LLC
      1062 Folsom Street, 2nd Floor
      San Francisco, CA 94103
      Attention: Legal and Accounting
      Email:
      Fax:

Ladies and Gentlemen:

In connection with the proposed purchase of securities (the "Securities") of Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company (the "Company"), the undersigned hereby represents as follows:

**1.   Representations as to Accredited Investor Status.**   The undersigned has read the definition of "Accredited Investor" from Rule 501 of Regulation D attached hereto as Exhibit A, and certifies that either (check one):

A.   ☐   The undersigned is an "Accredited Investor" for one or more of the following reasons:

☐   (a)   The undersigned is an individual (not a partnership, corporation, etc.) whose individual Net Worth, or joint Net Worth with his or her spouse, presently exceeds $1,000,000 (excluding the value of the primary residence of such individual);[1]

☐   (b)   The undersigned is an individual (not a partnership, corporation, etc.) who had an income in excess of $200,000 in each of the two most recent years, or joint income with

---

[1] As used herein, "Net Worth" excludes indebtedness that is secured by the undersigned's primary residence, up to the current estimated fair market value of such primary residence, except that if the amount of such indebtedness currently exceeds the amount outstanding 60 days ago, other than as a result of the acquisition of the primary residence, the amount of such excess must be included as a liability in the calculation of Net Worth. Any indebtedness that is secured by the undersigned's primary residence in excess of the currently estimated fair market value of such primary residence must be included as a liability in the calculation of Net Worth.

their spouse in excess of $300,000 in each of those years (in each case including foreign income, tax exempt income and full amount of capital gains and losses but excluding any income of other family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year;

☐ (c) The undersigned is a director or executive officer of the Company which is issuing and selling the Securities;

☐ (d) The undersigned is a corporation, partnership, Massachusetts business trust, or non-profit organization within the meaning of Section 501(c)(3) of the Internal Revenue Code, in each case not formed for the specific purpose of acquiring the Securities and with total assets in excess of $5,000,000;

_____

_____

(describe entity)

☐ (e) The undersigned is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, where the purchase is directed by a "sophisticated person" as defined in Regulation 506(b)(2)(ii);

☐ (f) The undersigned is:

(1) a trust that may be amended or revoked at any time by the grantor(s), the tax benefits of investments made by the trust pass through to the grantor(s), and each grantor is an "accredited investor"; OR

(2) an irrevocable trust if each grantor is an "accredited investor" and is considered an "equity owner" because the trust has the following characteristics:

•the trust is a grantor trust for federal income tax purposes and the grantor(s) is the sole funding source; AND

•the grantor would be taxed on all income of the trust and would be taxed on the sale of trust assets; AND

-2-

•the grantor(s) is the trustee with sole investment discretion; AND

•the entire amount of the grantor's contribution plus a rate of return would be paid to the grantor prior to any other payments; AND

•the trust was established by the grantor for estate planning purposes; AND

•creditors of the grantor(s) would be able to reach the grantor's interest in the trust;

<u>If relying upon this Category (f) alone, each grantor must complete a separate copy of this Questionnaire.</u>

☐ (g)  The undersigned is an entity all the equity owners of which are "accredited investors" within one or more of the above categories.  <u>If relying upon this Category alone, each equity owner must complete a separate copy of this Questionnaire;</u>

_____

_____

(describe entity)

B.  ☐  The undersigned is <u>not</u> an "Accredited Investor" and may therefore not invest in this offering.

2.    <u>Entity Type</u>.  The undersigned is:

☐    An individual

☐    A corporation

☐    A partnership

☐    A trust

☐    Other:_____

3.    <u>Tax I.D. Number</u>.  The social security number or federal tax I.D. number of the undersigned is: _____.

4.    <u>Address</u>.  The address of the undersigned is: _____

_____

_____

The phone, fax and contact person (if an entity) are as follows:

Phone:        _____

Fax:          _____

Contact:      _____

5.    <u>Individuals</u>.  If the undersigned is an individual:

Name of Employer:_____

Position:_____

6.    <u>Institutions</u>.  If the undersigned is an institution:

Nature of business:_____

Date of inception of business: _____

7.    <u>Experience</u>.  Has the undersigned previously made speculative investments in privately-held            companies?

☐    YES      ☐    NO

-4-

8. **<u>Verification of Non-Look-Through Status (skip if an individual)</u>.**

    True    False    (1)  The undersigned was not organized or reorganized for the specific purpose of acquiring the Securities of the Company (circle one).

    True    False    (2)  The undersigned has made investments prior to the date hereof or intends to make investments in the near future, and each beneficial owner of interests in the undersigned has and will share in the same proportion to each investment (circle one).

    True    False    (3)  The undersigned's investment in the Securities of the Company will not constitute more than forty percent (40%) of the assets or committed capital of the undersigned (circle one).

    True    False    (4)  The undersigned is not a registered investment company under the 1940 Act or a company exempt from registration under Section 3(c)(1) or 3(c)(7) of the 1940 Act (circle one).

**NOTE:** If the "False" box is circled for any of (1), (2), (3) or (4) above: (i) name the partners, shareholders or other persons participating in the entity, and the percentage interest which each such person has in such entity; and (ii) each beneficial owner of the Subscriber should complete a separate copy of this Investor Questionnaire.

The foregoing information must be provided in a case where only (4) is false *only if* the undersigned is making a capital commitment of at least ten percent (10%) of the total capital commitments to the Company.

_____

_____

_____

_____

_____

_____

_____

_____

(Continue on a separate sheet of paper, if necessary)

If the answer to Question 1 is that the undersigned is an "Accredited Investor", the questionnaire is complete and please simply sign below. All potential investors who will at any time own 20% or more of the Company must also complete the supplemental questionnaire attached hereto as <u>Exhibit B</u> to assure compliance with state and federal securities laws.

The foregoing representation is true and accurate as of the date hereof and shall be true and accurate as of the date of Closing. <u>If in any respect such representation shall not be true and accurate prior to Closing, the undersigned shall give immediate notice of such fact in writing to the President of the Company.</u>

Very truly yours,

_____
(Print Name of Investor)

Dated:_____          _____
(Signature)

_____
(Print Title, if applicable)

_____
(Print Name of joint investor or other
person whose signature is required)

Dated:_____          _____
(Signature)

_____
(Print Title, if applicable)

-6-

## APPENDIX A - EXHIBIT A

**Rule 501.  Definitions and Terms Used in Regulation D.**

As used in Regulation D, the following terms have the meaning indicated:

(a)      **Accredited Investor.**  "Accredited investor" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1)      Any bank as defined in section 3(a)(2) of the Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)      Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)      Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)      Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)      Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000 (excluding the value of the primary residence of such individual);[2]

---

[2] As used herein, "Net Worth" excludes indebtedness that is secured by the undersigned's primary residence, up to the current estimated fair market value of such primary residence, except that if the amount of such indebtedness currently exceeds the amount outstanding 60 days ago, other than as a result of the acquisition of the primary residence, the amount of such excess must be included as a liability in the calculation of Net Worth. Any indebtedness that is secured by the undersigned's primary residence in excess of the currently estimated fair market value of such primary residence must be included as a liability in the calculation of Net Worth.

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8)     Any entity in which all of the equity owners are accredited investors.


[Remainder omitted]

## APPENDIX A - EXHIBIT B

## ROTHENBERG VENTURES 2015 FUND, LLC
### RULE 506(D) QUESTIONNAIRE

The purpose of this Questionnaire is to determine whether any solicitor, promoter, officer, director or beneficial owner of 20% or more of the voting equity securities of Rothenberg Ventures 2015 Fund, LLC (the "Company"), is a "bad actor" under Rule 506(d) of Regulation D promulgated by the Securities and Exchange Commission ("SEC") under the Securities Act of 1933, as amended (the "Securities Act"). The information furnished herein will be relied upon in connection with the offering and sale of securities in compliance with the Regulation D exemption. As used in this Questionnaire, "you" also refers to any entity on whose behalf you are responding.

Please complete, sign and date this Questionnaire.

Your Name: _____

Residence or Business Address: _____

Your Position(s) or Connection with the Company (check all that apply):

        ☐ Director
        ☐ Executive officer
        ☐ Other officer participating in the offering
        ☐ General partner
        ☐ Managing member
        ☐ Promoter
        ☐ Solicitor (If checked: director ☐, officer ☐, managing member ☐ or general partner ☐ of the solicitor?)
        ☐ Beneficial owner of 20% or more of the Company's voting equity securities

Telephone Number: _____

Email Address: _____

1. Have you been convicted, within ten years of the date hereof of any felony or misdemeanor (a) in connection with the purchase or sale of any security, (b) involving the making of any false filing with the SEC, or (c) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

    Yes____ No ____

2. Are you subject to any order, judgment or decree of any court of competent jurisdiction entered within five years of the date hereof that, as of the date hereof restrains or enjoins you from engaging in (a) the purchase or sale of any security, (b) involving the making of any false filing with the SEC, or (c) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

Yes___ No ___

3. Are you subject to a final order of a state securities commission (or an agency of officer of a state performing like functions), a state authority that supervises or examines banks, savings associations or credit unions, state insurance commissions (or an agency of officer of a state performing like functions), an appropriate federal banking agency, the U.S. Commodity Futures Trading Commission or the National Credit Union Administration (1) that, as of the date hereof, bars you from (a) associating with an entity regulated by such commission, authority, agency or officer, (b) engaging in the business of securities, insurance or banking or (c) engaging in savings association or credit union activities or (2) entered in the past 10 years that constitute a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative or deceptive conduct?

Yes___ No ___

4. Are you subject to SEC disciplinary orders relating to brokers, dealers, municipal securities dealers, investment advisers and investment companies and their associated persons?

Yes___ No ___

5. Have you been suspended or expelled from membership in, or suspension or bar from associating with a member of, a securities self-regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

Yes___ No ___

6. Have you filed (as a registrant or issuer), or were you named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within five years of the date hereof, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, as of the date hereof, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

Yes___ No ___

7. Are you subject to a United States Postal Service false representation order entered within five years before the date hereof, or are you, as of the date hereof, subject to a temporary

restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

Yes____ No ____

IN WITNESS WHEREOF, the undersigned has executed this Questionnaire as of the date written below and declares that it is truthful and correct.

Signature: _____

Printed Name: _____ Date_____

**Definitions:**

**Director** means any director of a corporation or any person performing similar functions with respect to any organization whether incorporated or unincorporated.

**Executive officer** means the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer. Executive officers of subsidiaries may be deemed executive officers of the issuer if they perform such policy making functions for the issuer.

**Officer** means a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization.

**Participating in the offering**, with respect to a non-executive officer means, based upon the facts, more than transitory or incidental involvement, and could include activities such as participation or involvement in due diligence activities, involvement in the preparation of disclosure documents, and communication with the issuer, prospective investors or other offering participants.

**Promoter** means any person who: (i) acting alone or together with others, directly or indirectly takes initiative in founding or organizing the business or enterprise of an issuer; or (ii) in connection with the founding or organization of the business or enterprise of an issuer, directly or indirectly receives 10% or more of any class of issuer securities or 10% or more of the proceeds from the sale of any class of issuer securities (not including securities received solely as underwriting commissions or solely in exchange for property).

**Solicitor** means any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of securities.

**Voting equity securities** are securities with respect to which the securityholders have or share the ability, either currently or on a contingent basis, to control or significantly influence the management and policies of the issuer through the exercise of a voting right, including, for example, securities that confer to securityholders the right to elect or remove the directors or equivalent controlling persons of the issuer, or to approve significant transactions such as acquisitions, dispositions or financings, would be considered voting securities for purposes of Rule 506(d). Conversely, securities that confer voting rights limited solely to approval of changes to the rights and preferences of the class would not be considered voting securities for purposes of Rule 506(d).




Dear Member,

The attached Operating Agreement for Rothenberg Ventures 2015 Fund, LLC (the
"Fund") outlines the relationships between you and the Fund and the attached
Management Agreement outlines the relationship between the Fund and Rothenberg
Ventures Management Company, LLC (the "Manager").

The Term Sheet provided at the front of these documents describes a Management
Expense paid by the Fund, 8% of your total Capital Contribution, payable as 4% per year
for the first two years of the life of the fund, and an Administrative Expense paid by the
Fund, 10% of your total Capital Contribution, payable as 1% per year across the entire
ten year life of the Fund.  The Term Sheet also provides for 9.5% of the Fund and
$100,000 per company to be dedicated to the River Accelerator, which will provide all of
its investments to the Fund, an average of 7% of each of the 25 to 30 companies in the
Accelerator during the life of the 2015 Fund, at a maximum average valuation of
$5,000,000 per company.

The Term Sheet has been constructed to clarify specifically how the aforementioned
percentages of the Fund are being used by the Manager, please note that the Operating
Agreement and Management Agreement consolidate the three provided percentages into
two percentages, which are economically equivalent.  If you have any questions, please
do not hesitate to contact us about them.

Sincerely,

Mike Rothenberg
Rothenberg Ventures

# APPENDIX B

AMENDED AND RESTATED OPERATING AGREEMENT OF

ROTHENBERG VENTURES 2015 FUND, LLC

A DELAWARE LIMITED LIABILITY COMPANY

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

**AMENDED AND RESTATED OPERATING AGREEMENT OF
ROTHENBERG VENTURES 2015 FUND, LLC,
A DELAWARE LIMITED LIABILITY COMPANY**

This Amended and Restated Operating Agreement is made as of March _____, 2015, by and by and among the parties listed on the signature pages hereof, and such other Persons that may be admitted from time to time to the Company and as parties to this Agreement, with reference to the following facts:

A    On December 10, 2014, the Certificate of Formation for Rothenberg Ventures 2015 Fund, LLC, was filed with the Delaware Secretary of State (the "Company").  On December 12, 2014 the Certificate of Formation was amended to change the name of the Company.

B.    On January 15, 2015 certain of the Members entered into an Operating Agreement (the "Prior Agreement"), which the Manager and at least a Majority Interest (each as defined below) of the Members as of the date hereof,  by their signatures below, wish to amend and restate in its entirety.

C.    Pursuant to Section 12.13 of the Prior Agreement, the Prior Agreement or any term thereof may be amended if such amendment is approved and executed by the Board of Managers and Members holding a Majority Interest (each as defined in the Prior Agreement).

D.    The Members desire to enter into this Agreement to provide terms to govern the Company.

NOW, THEREFORE, the parties by this Agreement set forth the operating agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

**ARTICLE 1
DEFINITIONS**

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1    Act shall mean the Delaware Limited Liability Company Act, 6 Delaware Code, Section 18-101 et seq., as the same may be amended from time to time, and the provisions of succeeding law.

1.2    Additional Member means a Person admitted to the Company as an additional Member pursuant to Section 4.1 and shown as a Member on the books and records of the Company.

1.3    Affiliate of a Person means (a) any director, officer, stockholder, member, partner, employer, employee or agent of such Person or any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with such Person, as applicable and (b) with respect to individuals, an immediate family member, a descendant, or a trust.  The term "control," as used in the immediately preceding sentence, means with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability

2

company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.4     Agreement means this Amended and Restated Operating Agreement, as originally executed and as amended from time to time.   This Agreement shall be the "limited liability company agreement" under the Act.

1.5     Board of Managers means the single manager in the case the number of managers is one (1), or the collective group of managers in the case the number of managers is more than one (1), designated or elected by the Members pursuant to Section 5.3 hereof.

1.6     Capital Account means with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.7     Capital Contribution means the total amount of cash contributed to the Company by the Members.

1.8     Carried Interest Percentage means (a)(i) twenty percent (20%) with respect to the portion of the Return on Investment that is less than or equal to 3.0, and (ii) thirty percent (30%) with respect to the portion of the Return on Investment that is more than 3.0 and (b) with respect to Electing Members: (i) twenty percent (20%) with respect to any portion of the Return on Investment that is less than or equal to 3.0 and (ii) fifty percent (50%) with respect to any portion of the Return on Investment that is more than 3.0.  For clarity, the increased percentages shall only apply to the actual dollars returned beyond the 3.0 Return on Investment.

1.9     Closing means the Initial Closing and any Closing occurring after the date hereof.

1.10    Cause means gross negligence, bad faith or willful misconduct by the Management Company, in connection with the performance of its duties as a Manager under the terms of this Agreement, but only in the case that the Management Company has failed to cease the event(s) constituting Cause within fifteen (15) days of the delivery of written notice by the Members holding a Majority Interest setting forth in detail the event(s) constituting Cause.

1.11    Code means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

1.12    Company means Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company.

1.13    DGCL means the Delaware General Corporation Law, as amended from time to time and the provisions of succeeding law.

1.14    Distributable Amounts means the amount of cash or property which the Board of Managers deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Board of Managers deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.15    Electing Member shall mean any Member who elects to not pay any Management Expenses whatsoever, excluding any Rothenberg Party.

1.16    Electing 500 Plus Member shall mean any Member investing at least $500,000 in the Company who elects to pay the Management Expenses over time, as described in Section 3.2(b), excluding any Rothenberg Party.

1.17    Existing Portfolio Companies shall mean any Portfolio Companies in which the Company has an existing investment prior to the referenced investment.

1.18    Fiscal Year means the Company's fiscal year, which shall commence on January 1st and end on December 31st of each year, or such other year as shall be required under the Code.

1.19    Fund I means Rothenberg Ventures Fund I, LLC, a Delaware limited liability company.

1.20    Fund II means Rothenberg Ventures Fund II, LLC, a Delaware limited liability company.

1.21    Initial Closings mean those closings of the purchase and sale of Units occurring on or prior to the date hereof.

1.22    Interest means the entire ownership interest (designated as a Profits Interest or Units in the Company) of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

1.23    Majority Interest means a majority of the total outstanding Units.

1.24    Management Company means Rothenberg Ventures Management Company, LLC, a Delaware limited liability company.

1.25    Manager means the manager or each of the managers designated or elected by the Members pursuant to Section 5.3 hereof or any other individuals that succeed him or her as a manager of the Company.

1.26    Member means each Person who is an initial signatory to this Agreement, including the Management Company, or has been admitted to the Company as a Member in accordance with this Agreement.

1.27    Person means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.28    Profits and Losses means for each Fiscal Year or other period, the taxable income or taxable loss of the Company for such period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated

4

pursuant to Code Section 703(a)(l) shall be included in taxable income or loss), with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b)     any expenditures of the Company described in Section 705(a)(2)(B) of the Code   or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses, shall be subtracted from such taxable income or loss;

(c)     any income, gain, loss, or deduction required to be allocated specially to the Members under Section 6.2 shall not be taken into account in computing Profits or Losses;

(d)     in lieu of any depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, the Company shall compute such deductions based on the book value of the Company property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3);

(e)     gain or loss resulting from a taxable disposition of Company property shall be computed by reference to the book value of the property disposed of (as adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3)), notwithstanding that the adjusted tax basis of such property differs from its book value; and

(f)     if the book value of Company assets is adjusted to equal fair market value as provided in Section 6.6, then the Profits or Losses shall include the amount of any increase or decrease in such book values attributable to such adjustment.

1.29    Profits Interest means that undivided Interest in the Company initially owned by the Management Company, including, without limitation, such Member's rights to Profits, Losses and distributions of the Company with respect to such Profits Interest.  The Profits Interest is a non-voting Interest in the Company.  Notwithstanding anything to the contrary in this Agreement, the Profits Interest may only be transferred in its entirety in accordance with this Agreement.

1.30    Profits Interest Member means the Member holding the Profits Interest.

1.31    Return on Investment means with respect to a Member: (a) the excess of (i) the amount of distributions (including the fair market value of in-kind distributions) made to the Member (other than the Profits Interest Member) pursuant to Sections 6.5 and 9.4(b), over (ii) the Capital Contributions made by such Member less Administrative Contributions of such Member (such amount, the "Base Amount") divided by (b) the Base Amount.

1.32    Rothenberg Party means the Manager, the Management Company and its employees, the Profits Interest Member, Michael Rothenberg, or any of their respective affiliates.

1.33    Tax Matters Partner means the Person designated as set forth in Section 5.11.

1.34    Treasury Regulations means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.35    Unit means that undivided Interest in the Company owned by a Member, (other than the Profits Interest), including, without limitation, such Member's rights to Profits, Losses and distributions of the Company with respect to such Units.

1.36    Unpaid Capital Contribution means, as of any given date, an amount, not less than zero, equal to the Capital Contributions made by such Member, as set forth on Exhibit A, minus the amount of distributions made to the Member with respect to such assets pursuant to Section 6.5(a)(1).

# ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1    Formation.  The Members have formed a Delaware limited liability company under the laws of the State of Delaware by filing the Certificate of Formation with the Delaware Secretary of State and entering into this Agreement.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name.  The name of the Company shall be Rothenberg Ventures 2015 Fund, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable.

2.3    Term.  The term of this Agreement commenced on the date hereof and shall continue until the tenth anniversary of the date of formation of the Company; provided that the Board of Managers shall have the option to extend such term in order to facilitate the orderly disposition of the investments held by the Company for up to two additional years in the Board of Managers' good faith discretion.  Any further extension of the term shall require the affirmative vote or written consent of Members holding a Majority Interest.

2.4    Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of Delaware.  The principal office of the Company shall be located at such place as the Board of Managers may determine.  The Company may also have such offices, anywhere within and without the State of Delaware, as the Board of Managers may determine from time to time, or the business of the Company may require.  The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by the Board of Managers.

2.5    Names and Addresses of the Members and the Managers.  The names and addresses of the Members are set forth on Exhibit A.  The names and address of the Manager(s) are set forth on Exhibit B.  A Member or Manager may change its address upon notice thereof to the Company. The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit A to this Agreement from time to time to reflect any changes to the list of Members which may have occurred from time to time in accordance with this Agreement or to reflect changes to such Members' addresses.  The Board of Managers shall be authorized, without the prior consent of

the Members, to update <u>Exhibit B</u> to this Agreement from time to time to reflect the names and address of any duly appointed or elected members of the Board of Managers.

2.6     <u>Purpose and Business of the Company.</u>  The Company has been formed primarily to hold equity securities in early stage companies.  Notwithstanding the foregoing, subject to the limitations set forth in this Agreement, the Company may engage in any lawful activity for which a limited liability company may be organized under the Act.

2.7     <u>Title to Company Property.</u>  All property owned by the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in any such property.

2.8     <u>Failure to Observe Formalities.</u>  A failure to observe any formalities or requirements of this Agreement, the Certificate of Formation or the Act shall not be grounds for imposing personal liability on the Members or the Managers for liabilities of the Company.

2.9     <u>No Partnership Intended for Nontax Purposes.</u>  The Members have formed the Company under the Act, and expressly deny any intent hereby to form a partnership under Delaware law, including a partnership under the Delaware Revised Uniform Limited Partnership Act, or a corporation under the DGCL.  Except for purposes of federal, state and local taxes, the Members shall not be partners to one another, or partners to any third party.

2.10    <u>Liability of Members and Managers to Third Parties; Reliance by Third-Party Creditors.</u>

(a)     Except as otherwise provided in the Act, no Member or Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract or otherwise, by reason of being a Member or acting as a Manager of the Company.

(b)     This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assigns.  This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.  Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any contributions or otherwise.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

3.1     <u>Authorization and Issuance of Units.</u>

(a)     The Company shall be authorized to issue the Profits Interest and one (1) class of Units in the amount of seventy-five million (75,000,000) Units.  The Minimum Capital Contribution for each Member with respect the purchase of its Units is $250,000 subject to waiver in the Board of Manager's sole discretion.

(b)     The Board of Managers, at their sole discretion, shall have the power to issue the authorized Units from time to time at the same price and on substantially the same terms and

conditions without the consent of the Members or amendment of this Agreement and any additional issuances of Units shall be dilutive proportionately to all Members holding Units. Without the written consent of the Members holding a Majority Interest, the Board of Managers shall not be authorized to issue the Units after December 31, 2015. The Company shall not issue additional classes of Units or issue Units in excess of the authorized number without the affirmative vote or written consent of the Members holding a Majority Interest. In addition, the Company shall not issue any additional Profits Interest without the affirmative vote or written consent of the Members holding a Majority Interest. The Units shall be issued at $1.00 per Unit, except that purchasers of up to and including $499,999 of Units in a Single Investment shall receive the following discounts (the "Purchase Price"):

(i) The Units issued in the month of January 2015 shall be issued and sold at a 20% discount to the $1.00 per Unit price (i.e., $0.80 per Unit);

(ii) With respect to Members who purchase Units in the month of February 2015, such Units shall be issued and sold to them at an 18% discount (i.e., $0.82 per Unit);

(iii) With respect to Members who purchase Units in the month of March 2015, such Units shall be issued and sold to them at a 16% discount (i.e., $0.84 per Unit);

(iv) With respect to Members who purchase Units in the month of April 2015, such Units shall be issued and sold to them at a 14% discount (i.e., $0.86 per Unit);

(v) With respect to Members who purchase Units in the month of May 2015, such Units shall be issued and sold to them at a 12% discount (i.e., $0.88 per Unit);

(vi) With respect to Members who purchase Units in the month of June 2015, such Units shall be issued and sold to them at an 11% discount to the $1.00 per Unit price (i.e., $0.89 per Unit);

(vii) With respect to Members who purchase Units in the month of July 2015, such Units shall be issued and sold to them at a 10% discount to the $1.00 per Unit price (i.e., $0.90 per Unit);

(viii) With respect to Members who purchase Units in the month of August 2015, such Units shall be issued and sold to them at an 8% discount to the $1.00 per Unit price (i.e., $0.92 per Unit);

(ix) With respect to Members who purchase Units in the month of September 2015, such Units shall be issued and sold to them at a 6% discount to the $1.00 per Unit price (i.e., $0.94 per Unit);

(x) With respect to Members who purchase Units in the month of October 2015, their Units shall be sold to them at a 4% discount to the $1.00 per Unit price (i.e., $0.96 per Unit);

(xi) With respect to Members who purchase Units in the month of November 2015, such Units shall be issued and sold to them at a 2% discount to the $1.00 per Unit price (i.e., $0.98 per Unit); and

(xii) With respect to Members who purchase Units in the month of December 2015, such Units shall be issued and sold to them at par, or a 0% discount to the $1.00 per Unit price (i.e., $1.00 per Unit).

In lieu of the discounts described above, purchasers of between $500,000 and $999,999 of Units in a Single Investment, or purchasers who have cumulatively contributed between $750,000 and $1,499,999 across Rothenberg Ventures Fund I, Fund II, and the 2015 Fund shall receive the following discounts:

(i) The Units issued between the months of January 2015 shall be issued and sold at a 20% discount to the $1.00 per Unit price (i.e., $0.80 per Unit);

(ii) With respect to Members who purchase Units in the month of February 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iii) With respect to Members who purchase Units in the month of March 2015, such Units shall be issued and sold to them at an 18% discount (i.e., $0.82 per Unit);

(iv) With respect to Members who purchase Units in the month of April 2015, such Units shall be issued and sold to them at a 16% discount (i.e., $0.84 per Unit);

(v) With respect to Members who purchase Units in the month of May 2015, such Units shall be issued and sold to them at a 14% discount (i.e., $0.86 per Unit);

(vi) With respect to Members who purchase Units in the month of June 2015, such Units shall be issued and sold to them at a 12% discount to the $1.00 per Unit price (i.e., $0.88 per Unit);

(vii) With respect to Members who purchase Units in the month of July 2015, such Units shall be issued and sold to them at an 11% discount to the $1.00 per Unit price (i.e., $0.89 per Unit);

(viii) With respect to Members who purchase Units in the month of August 2015, such Units shall be issued and sold to them at a 10% discount to the $1.00 per Unit price (i.e., $0.90 per Unit);

(ix) With respect to Members who purchase Units in the month of September 2015, such Units shall be issued and sold to them at an 8% discount to the $1.00 per Unit price (i.e., $0.92 per Unit);

(x) With respect to Members who purchase Units in the month of October 2015, their Units shall be sold to them at a 6% discount to the $1.00 per Unit price (i.e., $0.94 per Unit);

(xi) With respect to Members who purchase Units in the month of November 2015, such Units shall be issued and sold to them at a 4% discount to the $1.00 per Unit price (i.e., $0.96 per Unit); and

(xii) With respect to Members who purchase Units in the month of December 2015, such Units shall be issued and sold to them at par, or a 2% discount to the $1.00 per Unit price (i.e., $0.98 per Unit).

In lieu of the discounts described above, purchasers of between $1,000,000 and $2,499,999 of Units in a Single Investment, or purchasers who have cumulatively contributed between $1,500,000 and $3,749,999 across Rothenberg Ventures Fund I, Fund II, and the 2015 Fund shall receive the following discounts:

(i) The Units issued between the months of January 2015 shall be issued and sold at a 20% discount to the $1.00 per Unit price (i.e., $0.80 per Unit);

(ii) With respect to Members who purchase Units in the month of February 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iii) With respect to Members who purchase Units in the month of March 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iv) With respect to Members who purchase Units in the month of April 2015, such Units shall be issued and sold to them at an 18% discount (i.e., $0.82 per Unit);

(v) With respect to Members who purchase Units in the month of May 2015, such Units shall be issued and sold to them at a 16% discount (i.e., $0.84 per Unit);

(vi) With respect to Members who purchase Units in the month of June 2015, such Units shall be issued and sold to them at a 14% discount to the $1.00 per Unit price (i.e., $0.86 per Unit);

(vii) With respect to Members who purchase Units in the month of July 2015, such Units shall be issued and sold to them at a 12% discount to the $1.00 per Unit price (i.e., $0.88 per Unit);

(viii) With respect to Members who purchase Units in the month of August 2015, such Units shall be issued and sold to them at an 11% discount to the $1.00 per Unit price (i.e., $0.89 per Unit);

(ix) With respect to Members who purchase Units in the month of September 2015, such Units shall be issued and sold to them at a 10% discount to the $1.00 per Unit price (i.e., $0.90 per Unit);

(x) With respect to Members who purchase Units in the month of October 2015, their Units shall be sold to them at an 8% discount to the $1.00 per Unit price (i.e., $0.92 per Unit);

(xi) With respect to Members who purchase Units in the month of November 2015, such Units shall be issued and sold to them at a 6% discount to the $1.00 per Unit price (i.e., $0.94 per Unit); and

(xii) With respect to Members who purchase Units in the month of December 2015, such Units shall be issued and sold to them at par, or a 4% discount to the $1.00 per Unit price (i.e., $0.96 per Unit).

In lieu of the discounts described above, purchasers of between $2,500,000 and $4,999,999 of Units in a Single Investment, or purchasers who have cumulatively contributed between $3,750,000 and $7,499,999 across Rothenberg Ventures Fund I, Fund II, and the 2015 Fund shall receive the following discounts:

(i) The Units issued between the months of January 2015 shall be issued and sold at a 20% discount to the $1.00 per Unit price (i.e., $0.80 per Unit);

(ii) With respect to Members who purchase Units in the month of February 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iii) With respect to Members who purchase Units in the month of March 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iv) With respect to Members who purchase Units in the month of April 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(v) With respect to Members who purchase Units in the month of May 2015, such Units shall be issued and sold to them at an 18% discount (i.e., $0.82 per Unit);

(vi) With respect to Members who purchase Units in the month of June 2015, such Units shall be issued and sold to them at a 16% discount to the $1.00 per Unit price (i.e., $0.84 per Unit);

(vii) With respect to Members who purchase Units in the month of July 2015, such Units shall be issued and sold to them at a 14% discount to the $1.00 per Unit price (i.e., $0.86 per Unit);

(viii) With respect to Members who purchase Units in the month of August 2015, such Units shall be issued and sold to them at a 12% discount to the $1.00 per Unit price (i.e., $0.88 per Unit);

(ix) With respect to Members who purchase Units in the month of September 2015, such Units shall be issued and sold to them at an 11% discount to the $1.00 per Unit price (i.e., $0.89 per Unit);

(x) With respect to Members who purchase Units in the month of October 2015, their Units shall be sold to them at a 10% discount to the $1.00 per Unit price (i.e., $0.90 per Unit);

(xi) With respect to Members who purchase Units in the month of November 2015, such Units shall be issued and sold to them at a 8% discount to the $1.00 per Unit price (i.e., $0.92 per Unit); and

(xii) With respect to Members who purchase Units in the month of December 2015, such Units shall be issued and sold to them at par, or a 6% discount to the $1.00 per Unit price (i.e., $0.94 per Unit).

In lieu of the discounts described above, purchasers of $5,000,000 or more of Units in a Single Investment, or purchasers who have cumulatively contributed more than $7,500,000 across Rothenberg Ventures Fund I, Fund II, and the 2015 Fund shall receive the following discounts:

(i) The Units issued between the months of January 2015 shall be issued and sold at a 20% discount to the $1.00 per Unit price (i.e., $0.80 per Unit);

(ii) With respect to Members who purchase Units in the month of February 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iii) With respect to Members who purchase Units in the month of March 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(iv) With respect to Members who purchase Units in the month of April 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(v) With respect to Members who purchase Units in the month of May 2015, such Units shall be issued and sold to them at a 20% discount (i.e., $0.80 per Unit);

(vi) With respect to Members who purchase Units in the month of June 2015, such Units shall be issued and sold to them at an 18% discount to the $1.00 per Unit price (i.e., $0.82 per Unit);

(vii) With respect to Members who purchase Units in the month of July 2015, such Units shall be issued and sold to them at a 16% discount to the $1.00 per Unit price (i.e., $0.84 per Unit);

(viii) With respect to Members who purchase Units in the month of August 2015, such Units shall be issued and sold to them at a 14% discount to the $1.00 per Unit price (i.e., $0.86 per Unit);

(ix) With respect to Members who purchase Units in the month of September 2015, such Units shall be issued and sold to them at a 12% discount to the $1.00 per Unit price (i.e., $0.88 per Unit);

(x) With respect to Members who purchase Units in the month of October 2015, their Units shall be sold to them at an 11% discount to the $1.00 per Unit price (i.e., $0.89 per Unit);

(xi) With respect to Members who purchase Units in the month of November 2015, such Units shall be issued and sold to them at a 10% discount to the $1.00 per Unit price (i.e., $0.90 per Unit); and

(xii) With respect to Members who purchase Units in the month of December 2015, such Units shall be issued and sold to them at par, or an 8% discount to the $1.00 per Unit price (i.e., $0.92 per Unit).

In order for a Member to have made an investment in any of the time periods set forth above, the executed subscription booklet and signature page to this Agreement must be delivered to and received by the Manager, and a Capital Contribution of at least $500,000 (subject to wavier of such minimum by the Board of Managers) must have been made on or before the last day of such period, provided that the Manager may extend any period, in its sole discretion by no more than three (3) business days. For the avoidance of doubt, the Members purchasing Units at a discount under this Section 3.1(b) shall be credited as making Capital Contributions equal to their actual Capital Contributions. The foregoing discounts shall apply, without duplication, to the Capital Contributions of qualifying Members and their respective Affiliates, and to all investments of such Members and their respective Affiliates made after the date on which such persons' Capital Contributions total at least $500,000 (with the discount being equal to the rate applicable on the date on which at least $500,000 in Capital Contributions are received by the Company). For purposes

hereof: "Single Investment" shall mean a single Capital Contribution or a series of Capital Contributions made within 30 days of each other by a person and such person's Affiliates.

(c)     The Management Company is receiving the Profits Interest in connection with the performance of services to or for the benefit of the Company without cost and without the requirement to make a Capital Contribution to the Company with respect to such Profits Interest. It is intended that such Interest shall be characterized for federal income tax purposes as a "profits" interest in accordance with Revenue Procedure 93-27, and the initial Capital Account of the Management Company with respect to such Interest shall be zero.

(d)     Notwithstanding anything to the contrary in this Agreement, no Units shall be issued to any Member in respect of the portion of its Capital Contributions allocated to the payment by the Company to the Management Company of Administrative Expenses (such portion of a Member's Capital Contribution such Member's "Administrative Contributions").

3.2     Capital Contributions.

(a)     Initial Capital Contributions. Each Member has contributed such cash as set forth on Exhibit A as its initial Capital Contribution, and will hold the number of Units as set forth on Exhibit A. All Capital Contributions shall be paid in full on the date listed in Exhibit A with respect to Capital Contributions of less than $500,000 in a Single Investment unless otherwise agreed with the Board of Managers.

(b)     Capital Commitments. The Members that have made a commitment ("Capital Commitment") in the amount of at least $500,000 (the "Minimum Capital Commitment for Fee Deferral") may elect to defer a portion of their Capital Contributions that will be used to pay the Management Expenses, in an amount determined by the Board of Managers. The amount of such Capital Commitments shall be set forth on Exhibit A. Such Members shall make the additional Capital Contributions, up to the amount of their respective Capital Commitment, in cash, to the Company, payable by wire transfer or check, upon ten business (10) days' prior notice (which may be by electronic mail or facsimile) from the Board of Managers (the "Drawdown Notice") at such time (the "Drawdown Date") and in such amount (the "Drawdown Amount") and manner as shall be specified in the Drawdown Notice. Except as set forth in this Section 3.2(b), each Drawdown Notice shall be given to each Member with unpaid Capital Commitments. The Drawdown Amounts of the Members specified in any Drawdown Notice shall be proportional to the Members' respective unpaid Capital Commitments to the Company. The Company shall issue additional Units to the Members making additional Capital Contributions equal to the amount of the Capital Contributions made by the Members divided by the Purchase Price applicable to such Member. At any time prior to such date, the Manager may request all or a portion of the unpaid Capital Commitments from the Members at any time. Notwithstanding the foregoing, the Company may deduct amounts required to be paid as a Capital Contribution by recycling the proceeds of an investment as provided in Section 6.7.

(c)     Failure to Make Capital Contributions. In the event that a Member fails to make a Capital Contribution when due in accordance with Section 3.2(b) and there are not sufficient funds to make the Capital Contribution through Section 6.7, and the Board of Managers determines in its sole and absolute discretion that such Member has not taken adequate measures to make such Capital Contribution after providing written notice of such failure and providing the Member with at

least thirty (30) days to cure such failure, and such failure to make its Capital Contribution is not cured within such thirty (30) day period, then the Board of Managers shall notify such Member that it is a "Defaulting Member." If at the end of such thirty (30) day cure period the Defaulting Member has not made its required Capital Contribution, then (x) the Defaulting Member shall no longer have the right to vote on any matter presented to the Member for a vote, (y) the number of Units held by the Defaulting Member and its Affiliates shall automatically, and without any action on the part of the Defaulting Member, convert into such number of Units as would have been purchased using existing Capital Contributions of the Defaulting Member and its Affiliates had the per Unit Purchase Price been $1.50 and (z) the Manager may elect in its sole and absolute discretion to either (i) cause the Company to commence legal proceedings against the Defaulting Member to collect the due and unpaid Capital Contribution, and if such proceedings are successful, to also collect interest at a rate equal to the lesser of (1) eighteen percent (18%) per annum, compounded daily and (2) the maximum rate allowable by law, as well as the expenses of collection including, without limitation, attorneys' fees plus consequential damages, or (ii) or require that such Defaulting Member withdraw from the Company and forfeit its Member Units for no consideration and thereafter such Defaulting Member shall not be entitled to receive any distributions or return of its Capital Contributions or Capital Account balance from the Company.

3.3   Additional Capital Contributions.  Except as set forth in Section 3.2, no Member shall be required to make additional Capital Contributions.

3.4   Capital Accounts.  The Company shall establish and maintain an individual Capital Account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). In addition, the Capital Account of a Member who owns Units in different classes shall be separately computed for each separate class of Units. If a Member transfers all or a part of its Interests in accordance with this Agreement, such Member's Capital Account attributable to the transferred Interests shall carry over to the new owner of such Interests pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(l).

3.5   Schedules.  The Board of Managers shall be authorized, without the prior consent of the Members, to update Exhibit A to this Agreement from time to time to reflect the transfer of Interests, the issuance of additional Units or Interests to the Members or Additional Members.

3.6   Rights Regarding Capital Contributions.

(a)   No Member shall be entitled to interest on any Capital Contribution, and no Member shall have the right to withdraw or to demand the return of all or any part of its Capital Contribution, except as specifically provided in this Agreement.

(b)   Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to receive property, other than cash, except as may be specifically provided herein.

(c)   No Member shall have personal liability for the repayment of the Capital Contribution of any Member or any obligation to make loans or advances to the Company, including restoration of a deficit Capital Account as provided in Section 3.7.

3.7   Deficit Capital Accounts.  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that any

Member's Capital Account has a deficit balance upon dissolution of the Company, such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

3.8  Capital Contribution of the Manger. The Manager and the individual partners of the Manager shall make Capital Contributions, as Members, of at least $1,000,000.00.

## ARTICLE 4
## MEMBERS

4.1  Procedures for Admission. To effect the admission of a Member (including any Additional Member) to the Company, the Board of Managers shall require the Person to be so admitted to the Company to execute and deliver a counterpart signature page to this Agreement specifying the date of admission, such Person's name and address, such Person's Capital Contribution and the number and series of Units acquired thereby. The Board of Managers shall attach such counterpart signature page as a signature page to this Agreement. The Board of Managers at its discretion may publicize a Member's status, unless written notice is provided requesting the contrary.

4.2  Limited Liability. Except as required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.3  Withdrawals or Resignations. No Member shall have the right or power to voluntarily withdraw or resign as a Member from the Company.

4.4  Competing Activities. The Members, the Managers and their respective Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation, other ventures (including Rothenberg Ventures Fund I, LLC, RVF I Co-Investor Fund I, LLC, RVF I Co-Investor Fund II, LLC, RVF I Co-Investor Fund III, LLC, RVF I Co-Investor Fund IV, LLC, RVF I Co-Investor Fund V, LLC, RVF I Co-Investor Fund VI, LLC, RVF I Co-Investor Fund VII, LLC, Rothenberg Ventures Fund II LLC, all Rothenberg Ventures Fund II, LLC co-investment funds, and any other co-investment funds of Rothenberg Ventures Fund I, LLC, Rothenberg Ventures Fund II, LLC, the Company or Rothenberg Ventures, LLC), Rothenberg Investments MG Inc., Rothenberg Ventures LLC, Bend Reality LLC, and Existing Portfolio Companies or potential investments that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any other Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. Neither the Members nor the Managers shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members and the Managers shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the Manager and the other Members and their respective Affiliates conduct other businesses, including businesses (i) that may compete with the Company or the Portfolio Companies of the

Company and for the Managers' and Members' time and (ii) that the Company may invest in such Portfolio Companies in which the Managers or Members have already invested if the Manager determines that the Company should so invest. Each Member hereby waives any and all rights and claims that they may otherwise have against the Managers, the other Members and their respective Affiliates as a result of any of such activities and investments. Notwithstanding anything contained in this Section 4.4 to the contrary, this Section 4.4 is only intended to apply, and shall only apply, to the Managers and the Members in their respective capacity as such, and this Section 4.4 is not intended to, and shall not, supersede or negate (except to the extent set forth above) any duties or agreements that may apply to Managers or Members in their capacity as officers, employees or consultants of the Company, whether or not such duties are expressly set forth in any written employment, consulting or similar agreement.

4.5     <u>Transactions with the Company.</u>  With the prior approval of the Board of Managers, a Member may lend money to, lease property from, contract to provide services to, or transact other business with the Company.  Subject to applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.6     <u>Remuneration to Members.</u>  No Member, acting in such capacity, is entitled to remuneration for acting in the Company business.

4.7     <u>Members are not Agents.</u>  Pursuant to Section 5.1 and the Certificate of Formation, the management of the Company is vested in the Board of Managers.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate of Formation and except as expressly required by the Act.  No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board of Managers, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.8     <u>Voting Rights.</u>  Except as expressly provided in this Agreement or the Certificate of Formation, Members shall have no voting, approval or consent rights.  The Units shall be voting. For purposes of determining the voting interest of a Member, a Member's voting power shall be based upon the number of Units held.  The Profits Interest shall be non-voting.

4.9     <u>Certificate of Units or Profits Interest.</u>  The Company will not issue certificates for Units (or Profits Interest) issued.

4.10    <u>Meetings of and Voting by Members.</u>

(a)     A meeting of the Members may be called at any time by the Members holding a Majority Interest.  Meetings of the Members shall be held upon four (4) days' notice by first-class mail or 48 hours' notice given personally or by telephone, telegraph, facsimile, telex, e-mail, or other similar means of communication.  Any such notice shall be addressed or delivered to each Member entitled to vote at such Member's address as it is shown upon the records of the Company. Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the

recipient. Oral notice shall be deemed to have been given at the time it is communicated, in person or by telephone or wireless, to the recipient or to a person at the office of the recipient who the person giving the notice has reason to believe will promptly communicate it to the receiver. Except to the extent that this Agreement expressly requires the approval of a greater number of Members, every act or decision done or made by the affirmative vote of the Members holding a Majority Interest present at a meeting is the act of the Members.

(b)     Members may participate in a meeting through use of conference telephone, electronic video screen communication, or other communications equipment, so long as all members participating in such meeting can hear one another.

(c)     Any action required or permitted to be taken by the Members may be taken without a meeting, if a consent in writing, setting forth the action so taken, is signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted. Such action by written consent shall have the same force and effect as an approval of the Members.

(d)     The provisions of this Section 4.10 govern meetings of the Members if the Members elect, in their discretion, to hold meetings. However, nothing in this Section 4.10 or in this Agreement is intended to require that meetings of the Members be held, it being the intent of the Members that meetings of the Members are not required.

# ARTICLE 5
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     <u>Management of the Company by Board of Managers</u>.  Subject to the provisions of Section 5.4 of this Agreement, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Board of Managers.

5.2     <u>Meetings of Board of Managers</u>.  Meetings of the Board of Managers may be called by any Manager, Chief Executive Officer or the Secretary. All meetings shall be held upon at least two (2) business days notice delivered personally or by telephone, e-mail, telegraph or facsimile. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Meetings of the Board of Managers may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the Board of Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the authorized number of Managers constitutes a quorum of the Board of Managers for the transaction of business.   Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the Managers present

at a meeting duly held at which a quorum is present is the act of the Board of Managers. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Managers, if any action taken is approved by at least a majority of the required quorum for such meeting. Notwithstanding the foregoing, in the event that the number of Managers is one (1), then every act or decision done or made by the single Manager present at a meeting duly held is the act of the Board of Managers.

Any action required or permitted to be taken by the Board of Managers may be taken by the Board of Managers without a meeting, if all of the Managers individually or collectively consent in writing to such action. Such action by written consent shall have the same force and effect if taken at meeting of the Board of Managers.

The provisions of this Section 5.2 govern meetings of the Board of Managers if the Managers elect, in their discretion, to hold meetings. However, nothing in this Section 5.2 or in this Agreement is intended to require that meetings of Board of Managers be held, it being the intent of the Members that meetings of Managers are not required.

  5.3   Election and Compensation of Managers.

  (a)   Number, Term and Qualifications. The number of Managers of the Company shall initially be fixed at one (1), which number may be increased or decreased by a resolution of the Board of Managers and the affirmative vote or written consent of Members holding a Majority Interest. The initial Manager shall be the Management Company. Any Manager shall serve until the earlier of (i) the removal of such Manager in accordance with this Agreement, (ii) such Manager's resignation or (iii) such Manager's death or dissolution. A Manager may, but need not be, a Member.

  (b)   Resignation. Any Manager may resign at any time by giving written notice to the Members and any other Manager. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.

  (c)   Removal. Any Manager may be removed at any time, with or without Cause, by the affirmative vote or written consent of Members holding a Majority Interest; provided, however that the Management Company may only be removed for Cause or as set forth in the Management Agreement.

  (d)   Vacancies. Any vacancy occurring for any reason on the Board of Managers shall be filled by the affirmative vote or written consent of the Members holding a Majority Interest.

  (e)   Management Agreement. The Manager, in the name and on behalf of the Company, is authorized to enter into an Amended and Restated Management Agreement dated as of the date of this Agreement, with the Management Company, in the form attached hereto as Exhibit C (as amended from time to time, the "Management Agreement"). The Management Agreement shall not be subject to termination or cancellation by the Company other than as expressly provided in the Management Agreement and shall be subject to amendment only in the manner set forth therein. The fees and reimbursements payable to the Management Company pursuant to the Management Agreement shall not be considered a distribution of profits or a return of capital for the purpose of any provision of this Agreement, but shall be considered an expense of the Company, and shall be

deducted from Profits or added to Losses in determining the Profits and Losses of the Company pursuant to Article VI hereof. Notwithstanding anything to the contrary contained in this Agreement or the Management Agreement, (i) in no event will a Rothenberg Party be required to pay any fees under the Management Agreement with respect to their respective Capital Contributions to the Company; provided that such persons will be permitted, in the Board of Manager's sole discretion, to pay such fee.

(f)     The Manager will disclose to all Members, annually, commencing promptly following the last day of the semi-annual period beginning January 1, 2015, consulting fees, equity grants, or similar payments other than deal fees, if any, received by any Rothenberg Party from any portfolio company of the Company (or any Affiliate of any such portfolio company) during such period. Such disclosure will include the amount of the payment and a brief description of the form of the payment. This paragraph will not apply to payments resulting from payment of Management Expenses and Administrative Expenses pursuant to the Management Agreement, payments relating to the Profits Interest or payments relating the management agreement or profit interest with respect to Fund I.

5.4     Powers of Managers and Chief Executive Officer.

(a)     Powers of the Chief Executive Officer.  Subject to the provisions of Section 5.4(b) and (c), and except as may be otherwise expressly stated in this Agreement, the Chief Executive Officer is hereby granted, under the supervision of the Board of Managers, the right, power and authority to manage the day-to-day operations of the Company and to do on behalf of the Company all things determined by the Chief Executive Officer to be necessary or desirable to carry out his duties and responsibilities, including (without limitation) the right, power and authority from time to time to do the following:

(i)     To open bank and other financial accounts, to borrow money in the name and on behalf of the Company, and to secure any such loans by a mortgage, pledge or other encumbrance upon any assets of the Company;

(ii)     To cause to be paid all amounts due and payable by the Company to any person or entity;

(iii)     To employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Company, to delegate by express action any powers of the Chief Executive Officer enumerated herein, and to pay to such persons such fees, expenses, salaries, wages and other compensation as he shall in his sole discretion determine;

(iv)     To pay, extend, renew, modify, adjust, subject to arbitration, prosecute, defend or compromise, upon such terms as he may determine and upon such evidence as he may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(v)     To pay any and all fees and to make any and all expenditures which he deems necessary or appropriate in connection with the organization of the Company, the management of

the affairs of the Company and the carrying out of his obligations and responsibilities under this Agreement;

(vi)   To the extent that funds of the Company are, in the Chief Executive Officer's judgment, not immediately required for the conduct of the Company's business, temporarily to deposit the excess funds in such bank account or accounts, or invest such funds in such interest-bearing taxable or nontaxable investments, as the Chief Executive Officer shall deem appropriate;

(vii)   To acquire, prosecute, maintain, protect and defend or cause to be protected and defended all patents, patent rights, trade names, trademarks, copyrights and service marks, all applications with respect thereto and all proprietary information which may be held by the Company;

(viii)   To enter into, execute, acknowledge and deliver any and all contracts, agreements or other instruments necessary or appropriate to carry on the business of the Company as set forth herein;

(ix)   To cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Company; and

(x)   To acquire real and personal property in the name of the Company.

(b)   Powers of Managers.   Each Manager shall participate in the direction, management and control of the business of the Company to the best of such Manager's ability. Unless the number of Managers is one (1), in which case the single Manager shall act individually, the Managers shall in all cases act as a group and shall have no authority to act individually, unless such authority is expressly delegated to one or more Managers or a committee thereof by the Board of Managers. The Board of Managers may appoint one (1) or more officers and, subject to this Agreement, may delegate to those officers the authority to manage the day-to-day operations of the Company. Without limiting the generality of Section 5.1, but subject to Section 5.4(c) and to the express limitations set forth elsewhere in this Agreement, the Board of Managers shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Section 5.4(a) and in the Act.

(c)   Protective Provisions of Members.   Notwithstanding any other provisions of this Agreement, neither the Board of Managers nor the Chief Executive Officer shall have any authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of the Members holding a Majority Interest:

(i)   Alter, change or waive the rights, preferences or privileges of the Units or Profits Interest;

(ii)   Increase the number of authorized Units as set forth in Section 3.1(a) above; or

20

(iii)    Effect any amendment of the Certificate of Formation or this Agreement if such amendment adversely affects the economic rights of the Members.

(d)    Creation of Committees.  The Board of Managers may create committees to assist the Board of Managers and the officers in the governance of areas of importance to the Company. Subject to the terms of this Agreement, such committees shall have such powers and perform such duties as may be prescribed by the resolutions creating such committees.

5.5    Performance of Duties; Liability of Managers and Officers; Fiduciary Standard.  A Manager or officer of the Company shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by such Manager or officer of the Company.  The Managers and the officers of the Company shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Members agree that the fiduciary duties of a Manager to the Company and its Members shall be those of a director to a corporation and its stockholders under the DGCL and not those of a partner to a partnership and its partners. Any Manager or officer of the Company who performs the duties of Manager or officer of the Company, as the case may be, in compliance with this Section 5.5 shall not have any liability by reason of being or having been a Manager or officer of the Company.

5.6    Devotion of Time.  Managers are not obligated to devote all of their time or business efforts to the affairs of the Company.  The Managers shall devote whatever time, effort, and skill as they deem appropriate for the operation of the Company.

5.7    Limited Liability.  No entity or person who is a Manager or officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer of the Company.

5.8    Liability of Manager Limited to Manager's Assets.  Under no circumstances will any Affiliate of any Manager have any personal responsibility for any liability or obligation of the Manager (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Manager will be limited to the assets of the Manager as they may exist from time to time.

5.9    Officers.

(a)    Officers.  The officers of the Company shall be appointed by the Board of Managers and shall consist of a Chief Executive Officer.  The Board of Managers may appoint such other officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Managers.  The salaries of all officers and agents of the Company shall be fixed by or in the manner prescribed by the Board of Managers.  The officers of the Company shall hold office until their successors are chosen and qualified.  Any officer may be removed at any time,

with or without cause, by the Board of Managers. Any vacancy occurring in any office of the Company shall be filled by the Board of Managers.

(b)     Chief Executive Officer.  The Chief Executive Officer of the Company shall, subject to the control of the Board of Managers, have general supervision, direction and control of the day-to-day business and affairs of the Company.  The Chief Executive Officer shall preside at all meetings of the Members, unless the Board of Managers shall have appointed another person to so preside and such person is present.  The Chief Executive Officer shall perform other duties commonly incident to a chief executive officer of a Delaware corporation and shall also perform such other duties and have such other powers as set forth in Section 5.4(a) or otherwise as the Board of Managers shall designate from time to time.  The initial Chief Executive Officer of the Company shall be Michael Rothenberg.

(c)     Officers as Agents.  The officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board of Managers not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.

5.10   Tax Matters Partner.  When needed the Manager shall designate a Tax Matters Partner of the Company as provided in the Treasury Regulations pursuant to Code Section 6231(a)(7), and such Tax Matters Partner shall be indemnified and reimbursed for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with its serving in that capacity.  Notwithstanding the preceding sentence, the Tax Matters Partner shall not be entitled to indemnification for such costs and expenses if such party has not acted in good faith.  The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.

## ARTICLE 6
## ALLOCATIONS OF PROFITS AND LOSSES AND DISTRIBUTIONS

6.1     Allocations of Profits and Losses.  Except as otherwise provided in Section 6.2, the Board of Managers shall allocate all Profits and Losses (and items thereof) of the Company to the Members so as to, as nearly as possible, increase or decrease, as the case may be, each Member's Capital Account to the extent necessary such that each Member's Capital Account is equal to the amount that such Member would receive if the Company were dissolved, its assets sold for their book value, its liabilities satisfied in accordance with their terms and all remaining amounts were distributed to the Members in accordance with Section 6.5(a) of this Agreement immediately after making such allocation.  The intent of the foregoing allocation is to comply with Treasury Regulations Section 1.704-1(b) and ensure that the Members receive allocations of Profits and Losses pursuant to this Section 6.1 in accordance with their relative interests in the Company, with the interest of each Member in the Company determined by reference to such Member's relative rights to receive distributions from the Company pursuant to Section 6.5(a).

6.2     Special Allocations.  Notwithstanding the allocations set forth in Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury

22

Regulations Section 1.704-1 (b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of "partnership minimum gain" (as defined in Treasury Regulations Section 1.704-2(d)), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2 shall be taken into account in computing subsequent allocations of income and gain pursuant to Section 6.1 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 6.2 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to Section 6.1 if such unexpected adjustments, allocations, or distributions had not occurred.

6.3     Tax Allocations. If any property is reflected in the Capital Accounts of the Members and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then the tax items with respect to such property shall (to the extent not governed by Section 704(c)), in accordance with the requirements of Treasury Regulations Section 1.704-1(b)(4)(i), be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of the applicable property and its book value in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the share of tax items under Section 704(c). The Company shall use the traditional method, as described in Treasury Regulations Section 1.704-3(b) in a manner determined by the Board of Managers. Except as otherwise provided in this Agreement, all items of Company income, gain, loss or deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses, as the case may be, for the year.

6.4     Section 754 Election. The Company shall be authorized to file an election under Section 754 of the Code to adjust the basis of property of the Company in the case of a transfer of an interest in the Company if such election under Section 754 would, in the good faith judgment of the Tax Matters Partner, be beneficial to the Company or any Member.

6.5     Distributions by the Company.

(a)     Subject to applicable law, the Board of Managers may elect from time to time to make distributions of Distributable Amounts to the Members. All such distributions shall be made to the Members in the following order and priority:

(1)     First, to the Members pro rata in proportion to their Unpaid Capital Contributions until each Member has received aggregate distributions under this Section 6.5(a)(1) equal to its Unpaid Capital Contributions; and

(2)     Thereafter, pro rata to the Members as follows (i) 1 – the applicable Carried Interest Percentage (such difference, the "Member Percentage") to the Members pro rata in proportion to the number of Units held by each Member (or, if an Electing 500 Plus Member is paying Management Expenses on a deferred basis, the number of Units purchased on the date of the distribution plus the number of Units purchasable based on such Members' Capital Commitment, but subject to reduction as provided above in Section 3.2 in the event of a failure to meet a call for capital) at the time of the distribution, and (ii) the applicable Carried Interest Percentage to the Profits Interest Member.

23

(b)      Notwithstanding the limitations set forth in Section 6.5(a), the Board of Managers shall, for each taxable year, cause the Company to distribute to each Member on a timely basis taking into consideration the due dates for estimated tax payments an amount equal to such Member's (or any Person whose tax liability is determined by reference to the income of a Member) estimated federal, state and local income tax liability (and applicable self employment taxes) resulting from the Company's income taxable to such Member for such taxable year (or applicable period), as determined by the Board of Managers (taking into consideration any information provided in writing by such Member to the Company); provided, however, that no such distribution shall be made to the extent that the Board of Managers determine, in their sole discretion, that funds are not reasonably available for such distribution by virtue of applicable law, contractual obligation or current or future needs of the Company. Such distribution to each Member shall be made no later than the first day of the third month following the end of the taxable year of the Company with respect to which such distribution is made. Distributions made pursuant to this Section 6.5(b) shall be applied against (and reduce on a dollar-for-dollar basis) amounts otherwise distributable to the Members pursuant to Section 6.5(a), and distributions previously made to the Members with respect to a particular year pursuant to Section 6.5(a) shall be applied against (and reduce on a dollar-for-dollar basis) amounts otherwise distributable to the Members pursuant to this Section 6.5(b) with respect to such year.

(c)      To the extent that the Company is required by law to withhold or to make tax or other payments on behalf of or with respect to any Member, the Company shall withhold such amounts from any distribution and make such payments as so required. For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Member on behalf of whom the withholding or payment was made. All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Units or Profit Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 6.5.

(d)      To the extent approved by the Board of Managers, a Member may be reimbursed for out-of-pocket expenses incurred by the Member in connection with the business of the Company, and a Member may be entitled to receive a "guaranteed payment" within the meaning of Section 707(c) of the Code for the performance of services to the Company by the Member for being a Manager, officer or otherwise. The reimbursement of out-of-pocket expenses and payments of any guaranteed payments in accordance with this Section 6.5(d) shall not be treated as a distribution to the Member under Section 6.5 or under Section 9.4, and the related taxable income shall not be considered an allocation of Company income for which a tax distribution is to be made pursuant to Section 6.5(b).

6.6      Book-Up of Company Assets.  The book value of all Company assets may be adjusted to equal their respective gross fair market values, as determined in good faith by the Board of Managers, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of money or Company property as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), including the termination

of the Company for federal income tax purposes pursuant to Section 708(b)(l)(B) of the Code.  The book-up shall be made in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

6.7     Recycling.  Notwithstanding Section 6.5, the Board of Managers shall retain the proceeds received by the Company with respect to an asset for investment in Portfolio Companies, for payment of the Management Expenses with respect to the remaining Capital Commitment of a Member, or in respect of the remaining Capital Commitment of a Member, in which case the Board of Managers shall identify on Exhibit A the assets acquired by the Company, or Management Expenses paid by the Company, with such proceeds, and the amount of the distributions that would have otherwise been made to the Members pursuant to Section 6.5 shall be treated as the Capital Contributions of the Members with respect to such assets or Management Expenses.

## ARTICLE 7
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1     Transfer and Assignment of Interests.     Except as expressly provided in this Agreement or any other written agreement to which the Company is a party, a Member shall not transfer any part of the Member's Interest in the Company, whether now owned or later acquired, unless the Board of Managers in writing approves such transfer.  No Member may encumber or permit or suffer any encumbrance of all or any part of the Member's Interest in the Company unless such encumbrance has been approved in writing by the Board of Managers.  Such approvals may be granted or withheld in the Board of Manager's discretion.  In addition, with respect to the Profits Interest, the Profits Interest Member shall not transfer or encumber any part of the Profits Interest without the affirmative vote or written consent of Members holding a Majority Interest.  Any transfer or encumbrance of an Interest without such applicable approvals shall be void.  Notwithstanding any other provision of this Agreement to the contrary: (a) a Member who is a natural person may transfer all or any portion of his or her Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's immediate family; provided that the Member retains a beneficial interest in the trust and all of the voting Interest included in such Interest; and (b) a Member who is not a natural person may transfer all or any portion of its Interest to its Affiliate.  A transfer of a Member's beneficial interest in such trust, or failure to retain such voting Interest, shall be deemed a transfer of an Interest.  In the event that any part of the Member's Interest in the Company is transferred incident to a divorce or by operation of law, the transferee of the Interest who is not approved by the Board of Managers shall only obtain rights in the Company with respect to distributions and Profits and Losses attributable to the transferred Interests but shall have no rights as a Member under this Agreement or the Act, including no rights to vote or otherwise participate in the management of the Company.  Notwithstanding the foregoing, the Interests of the transferee shall be subject to the restrictions contained in this Agreement applicable to the Interests held by a Member.

7.2     Further Restrictions on Transfer of Interests.  In addition to other restrictions found in this Agreement, unless otherwise approved in writing by the Board of Managers, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of its Interests: (A) without compliance with all federal and state securities laws, (B) if the Interests to be transferred, when added to the total of all other Interests transferred in the preceding twelve (12) consecutive months prior thereto, would cause the tax termination of the Company under Code

Section 708(b)(1)(B), or (C) if such transfer would cause the number of holders of the Company's securities to exceed 100 or such other number as may be permitted for purposes of determining that the Company is exempt from Securities Exchange Act of 1934, as amended or the Investment Company Act of 1940, as amended, or for purposes of determining whether the Company is a "publicly traded partnership" within the meaning of Section 7704 of the Code.

     7.3   <u>Transfer in Violation of Agreement</u>. Any transfer of an Interest that is not made in accordance with the terms of this Agreement shall be null and void.

**ARTICLE 8**
**ACCOUNTING, RECORDS, REPORTING BY MEMBERS**

     8.1   <u>Books and Records</u>. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in a manner determined by the Board of Managers. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in Delaware all of the following:

     (a)   A current list of the full name and last known business or residence address of each Member and set forth in alphabetical order, together with the Capital Contributions, Capital Account and Units (and Profits Interest) held by each Member;

     (b)   A current list of the full names and addresses of each Manager;

     (c)   A copy of the Certificate of Formation and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate of Formation or any amendments thereto have been executed;

     (d)   Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

     (e)   A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

     (f)   Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

     (g)   The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

     8.2   <u>Inspection of Books</u>. The Manager shall cause the Company to maintain true and proper books, records, reports, and accounts in which shall be entered all material transactions of the Company. Copies of such books, records, reports, accounts and schedules shall be located at the principal office of the Company and shall be available to any Member for inspection (and may be copied at the requesting Member's expense), upon at least two business days notice, during reasonable business hours. The Members hereby acknowledge that the Company will be in possession of confidential information the improper use or disclosure of which could have a

26

material adverse effect upon the Company or upon one or more Members or the portfolio companies or past portfolio companies of the Company. Each Member agrees not to use, publish, disseminate, misappropriate or otherwise disclose any such confidential information, either while such Member is a Member of the Company, or thereafter, except as may be required by applicable law. Each Member will take all reasonable precautions to protect the confidential nature of such confidential information and all other documents or materials entrusted to such Member.

8.3 Reports.

(a)     The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year such information as is necessary to complete the Members' federal and state income tax or information returns.

(b)     The Company shall prepare and deliver a financial report to each Member within 180 days after the end of each Fiscal Year, or as soon as practicable thereafter (commencing after December 31, 2015) setting forth for such Fiscal Year (i) the assets and liabilities of the Company as of the end of such Fiscal Year; and (ii) such Member's closing Capital Account balance as of the end of such Fiscal Year, (commencing with the Fiscal Year beginning as of January 1, 2015).

(c)     If Capital Contributions for the Company are greater than $25,000,000.00, then commencing with the calendar year ending December 31, 2015, the books and records of account of the Company shall be audited as of the end of each Fiscal Year by an independent public accounting firm as shall be selected by the Manager; provided that such auditor will not be a Rothenberg Party.

(d)     Commencing on or about April 1, 2016, the Manager will provide annual narrative updates to the Members regarding the Company and its affairs.

8.4     Bank Accounts. The Board of Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

## ARTICLE 9
## DISSOLUTION AND WINDING UP

9.1     Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)          The entry of a decree of judicial dissolution;

(b)          The written consent of the Board of Managers and the Members holding a Majority Interest; or

(c)        The sale or distribution of all or substantially all of the assets of Company, as determined by the Board of Managers; or

(d)        the termination of this Agreement in accordance with Section 2.3.

9.2    Certificate of Dissolution.  As soon as possible following the occurrence of any of the events specified in Section 9.1, the Managers shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act.

9.3    Winding Up.  Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.4    Order of Payment Upon Dissolution.  The assets and proceeds on liquidation shall be applied in the following order:

(a)        To creditors, including Members who are creditors, to the extent permitted by law and in accordance with their relative rights of priority, if any; and

(b)        All remaining assets and proceeds shall be distributed to the Members in accordance with Section 6.5(a).

9.5    Distributions in Kind.  The Board of Managers may make distributions (on dissolution or otherwise) to the Members in cash or distribute Company assets in kind, and the distribution of any such assets in kind shall be made on the basis of the fair market value of such asset as of the date of distribution, as determined by the Board of Managers in good faith.  The Capital Accounts of the Members shall be adjusted accordingly to preserve the economic interests of the Members as the result of any distribution in kind.

9.6    Certificate of Cancellation.  The Board of Managers or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a Certificate of Cancellation of the Certificate of Formation upon the completion of the winding up of the affairs of the Company.

## ARTICLE 10
## INDEMNIFICATION AND INSURANCE

10.1    Indemnification.  The Company shall defend and indemnify any Member, Manager or officer of the Company and may indemnify any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that it, he or she is or was a Member, Manager, officer, employee, independent contractors or other agent of the Company or that, being or having been such a Member, Manager, officer, employee, independent contractor or agent, it, he or she is or was serving at the request of the Company as a manager, director, officer, employee  or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit;

28

provided, however, that this indemnity shall not extend to conduct not undertaken in good faith nor to any recklessness, fraud, intentional wrongdoing, or gross negligence.

10.2   <u>Insurance.</u>   The Company may, to the extent commercially reasonable (as determined by the Board of Managers), purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

## ARTICLE 11
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managers, the other Members, and the Company as follows (reference to Units below includes the Profits Interest):

11.1   <u>Preexisting Relationship or Experience.</u>   By reason of his, her or its business or financial experience, or by reason of the business or financial experience of his, her or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Units and of protecting his, her or its own interests in connection with this investment.

11.2   <u>Investment Intent.</u>   He, she or it is acquiring the Units for investment purposes for his, her or its own account only and not with a view to, or to offer or sell for an issuer in connection with, any distribution of all or any part of the Units, or to participate or to have a direct or indirect participation in any such undertaking, or to participate or to have a participation in the direct or indirect underwriting of any such undertaking. He, she or it is not an "underwriter" as that term is defined in Section 2(a)(11) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"). No other Person will have any direct or indirect beneficial interest in or right to the Units.

11.3   <u>Purpose of Entity.</u>   If an entity, it was not organized for the specific purpose of acquiring the Units.

11.4   <u>Economic Risk.</u>   He, she or it is financially able to bear the economic risk of an investment in the Units, including the total loss thereof.

11.5   <u>No Registration of Units.</u>   He, she or it acknowledges that the Units have not been registered under the Securities Act, or qualified any applicable blue sky laws in reliance, in part, on his, her or its representations, warranties, and agreements herein.

11.6   <u>Investment in Restricted Security.</u>   He, she or it understands that the Units are "restricted securities" under the Securities Act in that the Units will be acquired from the Company in a transaction not involving a public offering, and that the Units may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Units must be held indefinitely.

11.7   No Obligations to Register.   He, she or it represents, warrants, and agrees that the Company and the Board of Managers are under no obligation to register or qualify the Units under the Securities Act or under any state securities law, or to assist her, him or it in complying with any exemption from registration and qualification.

11.8   No disposition in Violation of Law.   Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Units which will result in the violation by her, him or it or by the Company of the Securities Act, the DGCL, the Act, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Units unless and until he, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Board of Managers, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

11.9   Investment Risk.   He, she or it acknowledges that the Units are speculative investments which involve a substantial degree of risk of loss of an entire investment in the Company, that he, she or it understands and takes full cognizance of the risks related to the purchase of the Units, and that the Company is newly organized and has no financial or operating history.

11.10   Restrictions on Transferability.   He, she or it acknowledges that there are substantial restrictions on the transferability of the Units pursuant to this Agreement, that there is no public market for the Units and none is expected to develop, and that, accordingly, it may not be possible to liquidate his, her or its investment in the Company.

11.11   Information Reviewed.   He, she or it has received and reviewed this Agreement and the information it considers necessary or appropriate for deciding whether to purchase the Units. In connection with the purchase of the Units, he, she or it has neither (i) received any general solicitation or general advertising, including, but not limited to advertisements, articles, notices or other communications published in any newspaper, magazine, or similar media or broadcast over television or radio, nor (ii) attended any seminar or meeting whose attendees were invited by any general solicitation or general advertising. He, she or it has relied only on the information contained in this Agreement in making its investment decision.

11.12   Accredited Investor; No Disqualification.   He, she or it represents that such Member is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. He, she or it further represents that neither such Member, nor any person or entity with whom such Member shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Exhibit D).

11.13   Tax Consequences.   He, she or it acknowledges that the tax consequences of investing in the Company will depend on its particular circumstances, and neither the Company, the Managers, the Members, nor the partners, stockholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely

to, and rely upon, his, her or its own advisers with respect to the tax consequences of this investment.

11.14   No Assurance of Tax Benefits.   He, she or it acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service

11.15   Indemnity.   He, she or it shall defend, indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, stockholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any   misrepresentation or misstatement of facts or omission to represent or state facts made   by him, her or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the company, each and every Manager, each and every other Member, and any officers, directors, stockholders, managers, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such  Person (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person in connection with such action, suit, proceeding,  or the like.

## ARTICLE 12
## MISCELLANEOUS

12.1   Complete Agreement.   This Agreement and the Certificate of Formation, any side letter, and any restricted unit, vesting or similar agreement, if any, entered into by any Member, constitute the complete and exclusive statement of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them. The Prior Agreement is hereby amended and restated in its entirety as provided herein. No representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or Managers or have any force or effect whatsoever.  To the extent that any provision of the Certificate conflict with any provision of this Agreement, the Certificate shall control.

12.2   Binding Effect.    Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.3   Arbitration.  Any unresolved controversy or claim arising out of or relating to this Agreement shall be submitted to arbitration to one arbitrator mutually agreed upon by the parties, and if no agreement can be reached as to the arbitrator, then by one arbitrator having reasonable experience in transactions of the type provided for in this Agreement and who is chosen by the American Arbitration Association (the "AAA").  The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered

31

in such arbitration will be binding and may be entered in any court having jurisdiction thereof. Each party will bear its own costs in respect of any disputes arising under this Agreement. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the Northern District of California or any court of the State of California having subject matter jurisdiction.

      12.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Managers and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

      12.5    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Treasury Regulations, the Act, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

      12.6    Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

      12.7    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or its counsel.

      12.8    References to this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

      12.9    Exhibits.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

      12.10    Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

      12.11    Additional Documents and Acts.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

      12.12    Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to

receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A or Exhibit B hereto. Any party may, at any time by giving five business (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.13 Amendments. All amendments to this Agreement will be in writing and approved and executed by the Board of Managers and Members holding a Majority Interest.

12.14 Reliance on Authority of Person Signing Agreement. Neither the Company nor any Member will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual.

12.15 No Interest in Company Property; Waiver of Action for Partition. No Member has any interest in specific property of the Company. Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

12.16 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.17 Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.18 Aggregation of Units. All Units held or acquired by entities that are Affiliates (including, without limitation, affiliated venture capital funds and members of the same family or their trusts) or persons or entities under common management or control shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

12.19 Member Approval. Each undersigned Member, by its signature below, adopts and approves this Agreement, and all amendments of the Prior Agreement contained in this Agreement, and the Amended and Restated Management Agreement attached hereto as Exhibit C.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed this Amended and Restated Operating Agreement for Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company.

BOARD OF MANAGERS AND MANAGER
**Rothenberg Ventures Management Company, LLC,**
a Delaware limited liability company


_____

Mike Rothenberg, Managing Member

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed this Amended and Restated Operating Agreement for Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company.

**MEMBER:**

_____
(Member Name—Please print)
By:_____
Name:_____
Title:_____
Initial Investment:_____
Capital Commitment:_____
Address:_____

_____
Phone:_____
Fax:_____
Email:_____

## SPOUSAL CONSENT (IF APPLICABLE):

The undersigned is the spouse of the Member noted above and acknowledges that he/she has read the foregoing Agreement dated as of _____ __, 2015, and understands its provisions. The undersigned hereby expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Interests and the restrictions thereon. If the undersigned predeceases his/her spouse when his/her spouse owns any Interest in the Company, he/she hereby agrees not to devise or bequeath whatever community property interest or quasi-community property interest he/she may have in the Company in contravention of the Agreement.

Date:_____
By:_____
Name:_____

## APPENDIX B - EXHIBIT A

CAPITAL CONTRIBUTION, CAPITAL COMMITMENT AND CAPITAL ACCOUNT
BALANCE AND ADDRESSES OF MEMBERS

## APPENDIX B - EXHIBIT  B

**NAMES AND ADDRESSES OF MANAGERS**
**AS OF JANUARY 15, 2015**

| Manager | Address |
|---|---|
| Rothenberg Ventures Management  Company, LLC | 1062 Folsom Street, 2nd Floor San Francisco, CA 94103 |

**APPENDIX B - EXHIBIT C**

**AMENDED AND RESTATED MANAGEMENT AGREEMENT**

This Amended and Restated Management Agreement (this "Agreement") is dated as of March __, 2015, by and between Rothenberg Ventures Management Company, LLC, a Delaware limited liability company (the "Management Company"), and Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company (the "Company").

A.     On January 15, 2015, the Management Company and the Company entered into a Management Agreement (the "Prior Agreement").

B.     Pursuant to Section 6 of the Prior Agreement, the Prior Agreement or any term thereof may be amended if such amendment is approved and executed by the Board of Managers and Members holding a Majority Interest (each as defined in the Prior Agreement).

*1.     Capitalized Terms.* Capitalized terms used without definition in this Agreement have the respective meanings specified in the Amended and Restated Operating Agreement governing the Company (as amended from time to time, the "Company Agreement" or "Operating Agreement") originally entered into as of March __, 2015.

*2.     Payment of Expenses.*

(a)     *Management Expenses.* The Management Company agrees to incur on behalf of the Company and to otherwise assume (and not be reimbursed for) the following expenses attributable to the management and administration of the Company:  (i) compensation and expenses of the employees of the Management Company, (ii) expenses for administrative, clerical and related support services, office space and facilities, utilities and telephones of the Management Company and (iii) normal operating expenses which relate to the management and administration of the Company itself as a going concern.

(b)     *Administrative Expenses.* The Management Company agrees to incur on behalf of the Company and to otherwise assume (and not be reimbursed for) the following expenses attributable to the management and administration of the Company:  expenses which are incurred in (i) the formation of the Company and drafting of the Operating Agreement and related agreements, and any offering memorandum of the Company; (ii) the purchase, holding, sale, exchange or other disposition of investments; commissions or brokerage fees or similar charges incurred in connection with the purchase and sale of securities (including, but not limited to, any merger or transaction fees payable to third parties); (iii) filing fees or taxes for maintaining the Company's legal status, (iv) interest expense and financing charges for borrowed money; (v) fees for certain day-to-day legal, auditing and accounting services provided to the Company; (vi) all expenses incurred in connection with the development, negotiation and structuring of prospective investments that are not ultimately made; (vii) expenses in connection with reporting to the Members and meetings of the Members; (viii) costs of insurance premiums for insurance relating to the Company's activities and (ix) other similar expenses.

(c)     Except as set forth in Section 2(a) or Section 2(b) above, the Company shall pay, or reimburse the Management Company for, all extraordinary expenses of the Company (or other expenses incurred by the Management Company for or on behalf of the Company) including the following: (i) fees for certain extraordinary legal, auditing and accounting services provided to the

Company; (ii) fees for investment banking, custodial and registration services provided to the Company; and (iii) fees and expenses with respect to claims against the Company and related litigation and threatened litigation matters involving the Company, and (iv) expenses for normal legal, auditing and accounting services (but excluding with respect to the organization of the Company).

**3.     Management Company Duties.** The Management Company shall perform such management services for the Company as determined by the Board of Managers. The ultimate management, policies and operations of the Company shall nevertheless be the responsibility of the Board of Managers acting pursuant to and in accordance with the Operating Agreement of the Company, and all decisions relating to the Company's matters, including the selection and management of the Company's investments, shall be made by the Board of Managers acting pursuant to and in accordance with such Operating Agreement of the Company.

**4.     Expense Calculation.**

(a)     **Management Expenses.** The Company will pay the Management Company an expense fee ("Management Expenses") on capital raised by the Company equal to 1.75% per year for ten years on the sum of each Member's Capital Contributions plus, to the extent applicable, each Member's unfunded Capital Commitment. Such expense will start to accrue for each Member as of January 1, 2015. The Management Expense will be payable from each Member's Capital Contributions by the Company to the Management Company on a yearly basis over ten years as follows: 1.75% of the sum of a Member's aggregate Capital Contribution plus, to the extent applicable, such Member's unfunded Capital Commitment, with amounts that are due within one year of the date the Member first invests to be paid to the Management Company on the date the Member first invests (such that two years worth of the Expense Fee can be paid to the Management Company from each Member's initial Capital Contribution). With respect to each Member that makes its full Capital Contribution and pays in full its Management Expenses on the date it invests in the Company or before the end of the term of this Agreement, the Company will be responsible for making the payments to the Management Company. Members eligible and electing to defer Management Expenses will be responsible for making Capital Contributions in respect of Management Expenses as outlined in the Operating Agreement.

(b)     **Administrative Expense.** The Company will pay the Management Company a fee to cover administrative expenses of the Company as described above in Section 2(b) ("Administrative Expenses") on capital raised by the Company equal to 1.00% per year for ten years on the sum of each Member's Capital Commitment plus, to the extent applicable, each Member's unfunded Capital Commitment. Such expense will be payable from each Member's initial Capital Contribution to the Company, by the Company to the Management Company in the year of a Member's initial investment in the Company.

(c)     **Acknowledgement.** The Company acknowledges and agrees that the Management Company may charge or accept commitment, break-up, directors, officers, advisory, directors and management fees from a Portfolio Company in which it invests not in excess of the amount customarily payable by companies similar to such Portfolio Companies.

5.      *Term*.  Commencing on the date hereof, services will be performed hereunder for the term of the Company (as set forth in the Company Agreement) plus one (1) year from termination of the Company or until such time as liquidation of the Company is completed, whichever is sooner; provided, however, that this Agreement shall also terminate upon replacement of the Management Company pursuant to the terms of the Company Agreement.

6.      *Termination; Amendment*.   This Agreement may be terminated, modified, assigned or amended only by a writing signed by each of the parties hereto and only with the written consent of the Board of Managers and a Majority Interest of the Members (excluding any Members who are Rothenberg Parties and their respective family members).

7.      *Removal*. The Management Company may only be removed by the affirmative vote or written consent of Members holding a Majority Interest for an act constituting Cause with respect to the Manager, the Management Company, the Profits Interest Member or Michael Rothenberg, in each case as determined by a court of competent jurisdiction, and which act resulting in material damage to the Company.

8.      *Governing Law*.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

9.      *Notices*.   All notices, requests, consents, approvals and statements hereunder shall be in writing and shall be deemed to have been properly given by personal delivery or if mailed from within the United States by first-class U.S. Mail, postage prepaid, addressed in each case to such address or addresses as the addressee may have specified by written notice to the other parties.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first-above written.

> Rothenberg Ventures 2015 Fund, LLC, a Delaware limited liability company
>
> By:  Rothenberg Ventures Management Company, LLC, its Manager
>
> _____
> Michael Rothenberg, Manager
>
>
> Rothenberg Ventures Management Company, LLC, a Delaware limited liability company
>
> _____
> Michael Rothenberg
> Manager

## APPENDIX B - <u>EXHIBIT D</u>

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

    (A) At the time of such sale, bars the person from:

        (1) Association with an entity regulated by such commission, authority, agency, or officer;

        (2) Engaging in the business of securities, insurance or banking; or

        (3) Engaging in savings association or credit union activities; or

    (B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

    (A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

    (B) Places limitations on the activities, functions or operations of such person; or

        (C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

        (A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

        (B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations

| Form **W-9** (Rev. August 2013) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | **Give Form to the requester. Do not send it to the IRS.** |
|---|---|---|

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

*Print or type*
*See Specific Instructions on page 2.*

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

☐☐☐ – ☐☐ – ☐☐☐☐

Employer identification number

☐☐ – ☐☐☐☐☐☐☐

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** | Signature of U.S. person ▶ | Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Form W-9 (Rev. 8-2013)

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust, and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS a percentage of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* on page 1.

**What is FATCA reporting?** The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name/disregarded entity name" line.

**Partnership, C Corporation, or S Corporation.** Enter the entity's name on the "Name" line and any business, trade, or "doing business as (DBA) name" on the "Business name/disregarded entity name" line.

**Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulation section 301.7701-2(c)(2)(iii). Enter the owner's name on the "Name" line. The name of the entity entered on the "Name" line should never be a disregarded entity. The name on the "Name" line must be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on the "Name" line. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on the "Business name/disregarded entity name" line. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

**Note.** Check the appropriate box for the U.S. federal tax classification of the person whose name is entered on the "Name" line (Individual/sole proprietor, Partnership, C Corporation, S Corporation, Trust/estate).

**Limited Liability Company (LLC).** If the person identified on the "Name" line is an LLC, check the "Limited liability company" box only and enter the appropriate code for the U.S. federal tax classification in the space provided. If you are an LLC that is treated as a partnership for U.S. federal tax purposes, enter "P" for partnership. If you are an LLC that has filed a Form 8832 or a Form 2553 to be taxed as a corporation, enter "C" for C corporation or "S" for S corporation, as appropriate. If you are an LLC that is disregarded as an entity separate from its owner under Regulation section 301.7701-3 (except for employment and excise tax), do not check the LLC box unless the owner of the LLC (required to be identified on the "Name" line) is another LLC that is not disregarded for U.S. federal tax purposes. If the LLC is disregarded as an entity separate from its owner, enter the appropriate tax classification of the owner identified on the "Name" line.

**Other entities.** Enter your business name as shown on required U.S. federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/disregarded entity name" line.

## Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the *Exemptions* box, any code(s) that may apply to you. See *Exempt payee code* and *Exemption from FATCA reporting code* on page 3.

**Exempt payee code.** Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following codes identify payees that are exempt from backup withholding:

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
| --- | --- |
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

Form W-9 (Rev. 8-2013)

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulation section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity [4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulation section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 1.

*Note. Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, social security number (SSN), or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:
• Protect your SSN,
• Ensure your employer is protecting your SSN, and
• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: spam@uce.gov or contact them at www.ftc.gov/idtheft or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

E



# ROTHENBERG VENTURES 2016 FUND, LP

### SUMMARY OF PRINCIPAL TERMS

*The following is a summary of the terms of the Second Amended and Restated Limited Partnership Agreement of Rothenberg Ventures 2016 Fund, LP (as the same may be amended from time to time, the "**Partnership Agreement**"). This summary does not purport to be complete and is qualified in its entirety by reference to the Partnership Agreement. Please review the legal disclaimers following this summary regarding an investment in the Fund.*

| | |
|---|---|
| **Fund:** | Rothenberg Ventures 2016 Fund, LP has been formed as a Delaware limited partnership (the "***Main Fund***"), with a Cayman Islands exempted limited partnership (the "***Feeder Fund***") as a feeder to facilitate investment by certain non-U.S. investors. Parallel Funds may be formed to accommodate specific tax, regulatory or administrative needs of certain investors or the General Partner. The Main Fund and the Feeder Fund, along with any Parallel Funds are referred to collectively as the "***Fund***." |
| **Purpose:** | The Fund will invest primarily in equity securities, including convertible debt securities, of privately held companies. |
| **General Partner; Management Company:** | The Main Fund's General Partner is Rothenberg Ventures 2016 Fund GP, LLC (the "***General Partner***"), with its headquarters located at 1062 Folsom Street, San Francisco, California 94103. The Fund's management company, an affiliate of the General Partner, is Rothenberg Ventures Management Company, LLC (the "***Management Company***"). |
| **Limited Partners:** | Private, high net worth individuals (or their estate planning vehicles), institutions, corporations or other entities that qualify as "accredited investors" within the meaning of the United States Securities Act of 1933 (the "***Limited Partners***" and collectively with the General Partner, the "Partners"). |
| **Fund Size:** | The maximum aggregate Capital Commitments of the Fund are limited to $100,000,000. |
| **Limited Partner Capital Commitment:** | $1,000,000–$10,000,000 from individuals and family offices and $5,000,000–$15,000,000 from institutions and funds-of-funds. The General Partner reserves the right to accept greater or lesser Capital Commitment amounts on an |

individual basis, in its sole discretion.

| | |
|---|---|
| **General Partner Capital Commitment:** | The General Partner and its affiliates, employees and designated partners will contribute an aggregate amount equal to the greater of (i) 5.0% of the aggregate Capital Commitments and (ii) $3,000,000. |
| **Term:** | The Term of the Fund will be eight years from the Final Closing Date, which may be extended by the General Partner for up to two additional periods of two years each, and thereafter with the consent of a Majority-in-Interest of the Limited Partners. |
| **Rights of First Refusal:** | Limited Partners with a Capital Commitment of at least $1,000,000 (for individuals and family offices) or $5,000,000 (for institutional investors and funds-of funds) (*"Anchor Limited Partners"*) will be entitled to the following benefits: |

    (1)   A right of first refusal to commit to the Rothenberg Ventures 2017 Fund, with such rights exercisable by written commitment no later than June 30, 2016, based on the expected capital commitments to the Rothenberg Ventures 2017 Fund;

    (2)   A right of first refusal on any and all available co-investment opportunities of the Fund on a pro rata basis, based on their respective Capital Commitments to the Fund, and subject to a 48-hour deadline for co-investment commitments and 5 business days for funding; and

    (3)   the right to delay wiring of up to 40.0% of the amount of their Capital Commitment until the end of February 2017.

| | |
|---|---|
| **Discretionary Distributions:** | The General Partner shall make distributions of cash or marketable securities from time to time in its discretion. Until such time as the Limited Partners have received distributions equal to 300% of their Capital Contributions as of such date (the *"Carry Hurdle"*) all such distributions will be made as follows: (i) if at the time of a proposed distribution, the aggregate fair market value of the Fund's investments plus all prior distributions is less than the aggregate Capital Contributions of the Partners, then such distribution shall be made to the Partners in proportion to their Capital Commitments; (ii) if at the time of a proposed distribution, the aggregate fair market value of the Fund's investments plus all prior distributions exceeds the aggregate Capital Contributions of the Partners, then such distribution shall be made 80% to the Partners in proportion to their Capital Commitments and 20% to the General Partner. Following the satisfaction of the Carry Hurdle, distributions shall be made 100% to the General Partner until the General Partner has received 30% of all prior distributions. Distributions thereafter shall be made 70% to the Partners in proportion to their Capital Commitments and 30% to the General Partner. |
| **Tax Distributions:** | Subject to maintenance of reasonable reserves, the General Partner will distribute cash to each Partner in an amount equal to the net taxable income allocated to such Partner as a result of the such Partner's ownership of an interest in the Fund for the current fiscal year multiplied by the highest blended federal, state and local marginal income tax rate, less all prior cash distributions |

to such Partner with respect to such fiscal year (or portion thereof); *provided, that* the General Partner will have no obligation to make the foregoing distributions if the total amount to be distributed to all Partners would be less than one million dollars ($1,000,000).

**River Program Investment:**

The Fund intends to invest 5.0% of the aggregate Capital Commitments plus approximately $200,000 to $400,000 on average per company (the "*River Investments*") through Rothenberg Ventures' River Accelerator Program to acquire an average of approximately 7%–10% (the "*Average Ownership*") of 25 to 40 frontier tech companies, targeting a $3.0M to $6.0M valuation per company. The River Investments will be a combination of direct cash investments, the provision and use of specialized equipment, real estate, events and services provided by employees or contractors, or other expenditures. The Average Ownership will be in the form of equity or debt convertible for equity.

**Expenses:**

The General Partner will pay all of its own operating expenses, including payroll, rent, communication costs, related support services, office space and facilities, utilities, and virtual reality equipment for the General Partner and the Fund. The General Partner will bear costs related to the establishment and administration of the Fund, including fund formation, legal and administrative expenses, preparation and filing of tax documentation, audits, and legal compliance.

The General Partner shall be compensated on an annual basis for services rendered to the Fund with a Management Fee equal to 2% of the aggregate Capital Commitments of the Limited Partners. In addition, the General Partner will receive an annual Administrative Fee equal to 0.5% of the aggregate Capital Commitments of the Limited Partners.

**Management:**

The General Partner (and, to the extent delegated by the General Partner, the Management Company) has the exclusive authority to manage and operate the Fund. Limited Partners will not participate in the management of the Fund, act for the Fund, or vote on Fund matters except as specifically provided under applicable law or in the Partnership Agreement.

**Allocations of Profit and Loss:**

Generally, the General Partner will allocate all profits and losses (and items thereof) of the Fund to the Partners so as to, as nearly as possible, increase or decrease, as the case may be, the balance of each Partner's capital account to the extent necessary such that each Partner's capital account is equal to the amount that such Partner would receive if the Fund were dissolved, its assets sold for their book value, its liabilities satisfied in accordance with their terms, and all remaining amounts distributed to the Partners in accordance with the terms regarding "Discretionary Distributions," described above.

**Fiscal Year:**

The Fund's fiscal year shall be the calendar year.

**Reports and Audits:**

The Fund will compile information concerning the Fund's operations necessary for the completion of the Partners' U.S. federal and state income tax returns and will undertake an audit each year starting with the Fund's first full calendar year. The Limited Partners will receive a summary of acquisitions and dispositions of investments made by the Fund during the preceding semi-annual

period, together with a valuation of the investments then held.

**Clawback:** The General Partner will be subject to an after–tax clawback to the extent the General Partner has received Carried Interest distributions in excess of the portion of cumulative net profits of the Fund due to the General Partner in accordance with the "Discretionary Distributions" terms described above. The amount of such clawback will be calculated and due to the Fund on the sixth anniversary of the Fund's Final Closing Date and annually thereafter until the final liquidation of the Fund.

**Information on Related Entities and Potential Conflicts of Interest:**

*Funds I, II, and III.* The Management Company manages Rothenberg Ventures Fund I, LLC, an investment fund formed in September 2012 ("*2013 Fund / Fund I*"), Rothenberg Ventures Fund II, LLC, an investment fund formed in September 2013 ("*2014 Fund / Fund II*"), and Rothenberg Ventures 2015 Fund, LLC ("*2015 Fund / Fund III*"), an investment fund formed in December 2014  (2013 Fund / Fund I, 2014 Fund / Fund II and 2015 Fund / Fund III, collectively, the "*Prior Funds*").

*Co-Investment Funds.* The General Partner or its affiliates manage certain co-investment vehicles investing along-side the Prior Funds. Additionally, investment allocations in portfolio companies received by the Fund that exceed the Fund's desired investment goals may be offered to Limited Partners selected and in amounts determined in the sole discretion of the General Partner (subject to "Rights of First Refusal" described above). The co-investment vehicles of the Prior Funds and any co-investment vehicles of the Fund are referred to collectively as the "Co-Investment Funds."

*Real Estate.* Mike Rothenberg manages Rothenberg Investments Inc., a Texas corporation with real estate holdings in Texas. Mike Rothenberg also manages Rothenberg Ventures LLC, a Delaware corporation ("*Rothenberg Ventures*") involved in real estate transactions in California.

*Bend Reality.* Mike Rothenberg manages Bend Reality LLC, a Delaware corporation ("*Bend Reality*"), also doing business as River Studios, River Racing, River Store, and River House, formed for the purpose of enhancing the General Partner's branding and positioning in the virtual reality sector primarily through the River brand, which includes a virtual reality accelerator, a production studio, a racing team, an online store, and other business ventures.

*General.* The Mike Rothenberg, the General Partner, its members, employees, and their respective affiliates may make investments on behalf of themselves, the Prior Funds, the Co-Investment Funds, Rothenberg Ventures, Bend Reality or other funds which they currently or may in the future manage. Some of these opportunities could potentially be suitable for the Fund; however, the Fund will derive no economic benefit from such investments made by other parties. In addition to the business time and attention spent on the Fund, Mike Rothenberg, the General Partner, its members, employees and their respective affiliates will spend business time and attention on the business activities of the Prior Funds, the Co-Investment Funds, Rothenberg Ventures, Bend Reality, and such other investment funds as they may form.

**Amendments:**     In general, the Partnership Agreement may be amended only with the consent of the General Partner and a Majority-in-Interest of the Limited Partners.

LEGAL DISCLAIMERS:

THIS CONFIDENTIAL SUMMARY OF PRINCIPAL TERMS (THIS "SUMMARY") HAS BEEN PREPARED SOLELY FOR USE BY THE PROSPECTIVE INVESTORS OF ROTHENBERG VENTURES 2016 FUND, LP, ITS PARALLEL FUNDS AND FEEDER FUNDS (COLLECTIVELY, THE "FUND"). LIMITED PARTNERSHIP INTERESTS (THE "INTERESTS") IN THE FUND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY U.S. STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION. THE INTERESTS WILL BE OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE. THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940 (THE "INVESTMENT COMPANY ACT"). CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT. THERE WILL BE NO PUBLIC MARKET FOR THE INTERESTS AND THERE IS NO OBLIGATION ON THE PART OF ANY PERSON TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT OR ANY STATE OR NON-U.S. SECURITIES LAWS.

BY ACCEPTING THIS SUMMARY, EACH RECIPIENT AGREES TO MAINTAIN ITS EXISTENCE IN STRICT CONFIDENCE. THE CONTENTS OF THIS SUMMARY ARE A TRADE SECRET, THE DISCLOSURE OF WHICH IS LIKELY TO CAUSE SUBSTANTIAL AND IRREPARABLE COMPETITIVE HARM TO THE FUND, THE FUND's GENERAL PARTNER, THE GENERAL PARTNER'S MANAGING MEMBERS AND THEIR RESPECTIVE AFFILIATES. ANY REPRODUCTION OR DISTRIBUTION OF THIS DOCUMENT, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER, IS PROHIBITED.

THIS SUMMARY HAS BEEN PREPARED IN CONNECTION WITH A PRIVATE OFFERING TO CERTAIN QUALIFIED PURCASERS OF THE INTERESTS. EACH INVESTOR WILL BE REQUIRED TO COMPLETE AND EXECUTE A SUBSCRIPTION AGREEMENT TO THE FUND AND AGREE TO BE BOUND BY THE TERMS OF THE PARTNERSHIP AGREEMENT OF THE FUND (THE "FUND AGREEMENT") BEFORE INVESTING IN THE FUND. IF ANY OF THE TERMS, CONDITIONS OR OTHER PROVISIONS OF THE FUND AGREEMENT ARE INCONSISTENT WITH OR CONTRARY TO THE DESCRIPTIONS OR TERMS CONTAINED IN THIS SUMMARY, THE FUND AGREEMENT SHALL CONTROL.

THE INTERESTS DESCRIBED IN THIS SUMMARY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE AND NON-U.S. SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. IN ADDITION, SUCH INTERESTS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN THE FUND AGREEMENT. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY STATEMENT CONCERNING THE FUND OR THE SALE OF INTERESTS DISCUSSED HEREIN OTHER THAN AS SET FORTH IN THIS SUMMARY AND OTHER DOCUMENTS SUPPLIED BY THE FUND, ITS GENERAL PARTNER OR MANAGEMENT COMPANY, AND ANY SUCH STATEMENTS, IF MADE, MUST NOT BE RELIED UPON.

IN CONSIDERING ANY INVESTMENT IN THE FUND, INVESTORS SHOULD BEAR IN MIND THAT PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS AND THERE CAN BE NO ASSURANCE THAT THE FUND WILL RETURN THE INVESTOR'S INVESTMENT. THE FUND HAS LITTLE OR NO HISTORY OF OPERATIONS AND WILL MAKE INVESTMENTS HAVING CERTAIN RISK CHARACTERISTICS.

THIS SUMMARY DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, AN INTEREST IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION. NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AGENCY OR NON-U.S. SECURITIES COMMISSION HAS APPROVED AN INVESTMENT IN THE FUND. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**ROTHENBERG VENTURES 2016 FUND, LP**

**SECOND AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT**

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE 1 | NAME, PURPOSE AND OFFICES OF PARTNERSHIP AND WITHDRAWAL OF INITIAL LIMITED PARTNER | 1 |
| 1.1 | Name | 1 |
| 1.2 | Purpose | 1 |
| 1.3 | Principal Office | 1 |
| 1.4 | Registered Agent and Office | 2 |
| ARTICLE 2 | TERM OF PARTNERSHIP | 2 |
| 2.1 | Term | 2 |
| 2.2 | Events Affecting a Member of the General Partner | 2 |
| 2.3 | Events Affecting a Limited Partner of the Partnership | 2 |
| 2.4 | Events Affecting the General Partner | 2 |
| ARTICLE 3 | NAME AND ADMISSION OF PARTNERS | 2 |
| 3.1 | Name and Address | 2 |
| 3.2 | Admission of Additional Partners | 3 |
| ARTICLE 4 | CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND NONCONTRIBUTING PARTNERS | 3 |
| 4.1 | Capital Accounts | 3 |
| 4.2 | Capital Contributions of the Limited Partners | 3 |
| 4.3 | Capital Contributions of the General Partner | 5 |
| 4.4 | Acquisition of an Additional Interest by the General Partner | 5 |
| 4.5 | Noncontributing Partners | 6 |
| ARTICLE 5 | PARTNERSHIP ALLOCATIONS | 10 |
| 5.1 | Allocation of Profit or Loss | 10 |
| 5.2 | Special Allocations | 10 |
| 5.3 | Regulatory Allocations | 10 |
| 5.4 | Income Tax Allocations | 11 |
| ARTICLE 6 | MANAGEMENT EXPENSES & ADMINISTRATIVE EXPENSES; OTHER PARTNERSHIP EXPENSES | 12 |
| 6.1 | Management Expenses and Administrative Expenses | 12 |
| 6.2 | Expenses | 13 |
| ARTICLE 7 | WITHDRAWALS BY AND DISTRIBUTIONS TO THE PARTNERS | 15 |
| 7.1 | Interest | 15 |

129797418 v2

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| 7.2 | Withdrawals by the Partners | 15 |
| 7.3 | Partners' Obligation to Repay or Restore | 15 |
| 7.4 | Tax Distributions | 15 |
| 7.5 | Discretionary Distributions and Rules Regarding Distributions | 16 |
| 7.6 | Withholding Obligations | 18 |
| ARTICLE 8 | MANAGEMENT DUTIES AND RESTRICTIONS | 19 |
| 8.1 | Management | 19 |
| 8.2 | No Control by the Limited Partners; No Withdrawal | 19 |
| 8.3 | Existing Funds; Successor Funds; Parallel Funds; River Program | 19 |
| 8.4 | Investment Opportunities; Investment Restrictions; Conflicts of Interest | 22 |
| ARTICLE 9 | INVESTMENT REPRESENTATION AND TRANSFER OF PARTNERSHIP INTERESTS | 27 |
| 9.1 | Investment Representation of the Limited Partners | 27 |
| 9.2 | Qualifications of the Limited Partners | 27 |
| 9.3 | Transfer by General Partner | 27 |
| 9.4 | Transfer by Limited Partner | 27 |
| 9.5 | Requirements for Transfer | 28 |
| 9.6 | Substitution as a Limited Partner | 28 |
| 9.7 | Expenses of Transfer | 29 |
| ARTICLE 10 | DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP; INTERIM GENERAL PARTNER GIVEBACK | 29 |
| 10.1 | Extension of Partnership Term | 29 |
| 10.2 | Early Termination of the Partnership | 29 |
| 10.3 | Winding Up Procedures | 29 |
| 10.4 | Payments in Liquidation | 30 |
| 10.5 | Return of Excess Distributions | 30 |
| 10.6 | Interim General Partner Giveback | 31 |
| ARTICLE 11 | FINANCIAL ACCOUNTING AND REPORTS | 31 |
| 11.1 | Financial Accounting; Fiscal Year | 31 |
| 11.2 | Supervision; Inspection of Books | 31 |
| 11.3 | Semi-Annual Reports | 32 |
| 11.4 | Annual Report; Financial Statements of the Partnership | 32 |

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| 11.5 | Website Based Reporting | 32 |
| 11.6 | Tax Returns | 33 |
| 11.7 | Tax Matters Partner; Partnership Representative | 33 |
| 11.8 | Partnership Funds | 34 |
| 11.9 | FATCA | 34 |
| ARTICLE 12 | VALUATION; ADVISORY COMMITTEE | 35 |
| 12.1 | Valuation | 35 |
| 12.2 | Advisory Committee | 36 |
| ARTICLE 13 | PARTNERS SUBJECT TO SPECIAL REGULATION | 37 |
| 13.1 | ERISA Partners | 37 |
| 13.2 | Governmental Plan Partners | 38 |
| 13.3 | Private Foundation Partners | 39 |
| ARTICLE 14 | CERTAIN DEFINITIONS | 39 |
| 14.1 | Accounting Period | 39 |
| 14.2 | Adjusted Asset Value | 39 |
| 14.3 | Adjusted Capital Account Balance | 40 |
| 14.4 | Affiliate | 40 |
| 14.5 | Capital Account | 40 |
| 14.6 | Capital Commitment; Committed Capital | 40 |
| 14.7 | Code | 40 |
| 14.8 | Deemed Gain or Deemed Loss | 40 |
| 14.9 | FATCA | 41 |
| 14.10 | Fund Partners; Fund Limited Partners | 41 |
| 14.11 | Individual Limited Partner | 41 |
| 14.12 | Initial Closing Date | 41 |
| 14.13 | Institutional Limited Partner | 41 |
| 14.14 | Managing Directors | 41 |
| 14.15 | Marketable; Marketable Securities; Marketability | 41 |
| 14.16 | Nonmarketable Securities | 41 |
| 14.17 | Ordinary Income | 41 |
| 14.18 | Partnership Percentage | 41 |
| 14.19 | Percentage in Interest; Majority in Interest | 41 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 14.20 | Prime Rate | 42 |
| 14.21 | Profit or Loss | 42 |
| 14.22 | Regulated Partner | 42 |
| 14.23 | Securities | 43 |
| 14.24 | Securities Act | 43 |
| 14.25 | Short-Term Securities | 43 |
| 14.26 | Treasury Regulations | 43 |
| ARTICLE 15 | OTHER PROVISIONS | 43 |
| 15.1 | Governing Law | 43 |
| 15.2 | Limitation of Liability of the Limited Partners | 43 |
| 15.3 | Exculpation | 43 |
| 15.4 | Indemnification | 44 |
| 15.5 | Arbitration | 45 |
| 15.6 | Execution of Documents | 46 |
| 15.7 | Other Instruments and Acts | 46 |
| 15.8 | Binding Agreement | 46 |
| 15.9 | Notices; Electronic Transmission of Reports | 46 |
| 15.10 | Power of Attorney | 46 |
| 15.11 | Amendment | 47 |
| 15.12 | Entire Agreement | 48 |
| 15.13 | Titles; Subtitles | 48 |
| 15.14 | Partnership Name | 48 |
| 15.15 | Confidentiality | 48 |
| 15.16 | Discretion | 50 |
| 15.17 | Partnership Legal Matters | 50 |
| EXHIBIT A: | SCHEDULE OF PARTNERS | |
| EXHIBIT B: | EXISTING ROTHENBERG FUNDS AND COMPANIES | |

## INDEX OF DEFINITIONS

| **Term** | **Paragraph** |
| --- | --- |
| Accounting Period | 14.1 |
| Act | Preamble |
| Adjusted Asset Value | 14.2 |
| Adjusted Capital Account Balance | 14.3 |
| Administrative Expenses | 6.1(b) |
| Administrator | 15.5(a) |
| Advisory Committee | 12.2 |
| Affected Parties | 15.15(a) |
| Affiliate | 14.4 |
| Agreement | Preamble |
| Alternative Vehicle | 8.4(j) |
| Anchor Limited Partner | 4.2(b) |
| Applicable Tax Rate | 7.4(a) |
| Arbitration | 15.5(a) |
| Arbitrator | 15.5(a) |
| Capital Account | 14.5 |
| Capital Commitment | 14.6 |
| Carry Hurdle | 7.5(a) |
| Claim | 15.5(a) |
| Code | 14.7 |
| Commencement Date | Preamble |
| Committed Capital | 14.6 |
| Confidential Information | 15.15(a) |
| Cooley | 15.17(a) |
| Deemed Gain | 14.8 |
| Deemed Loss | 14.8 |
| Default Notice | 4.5(b) |
| Defaulting Limited Partner | 4.5(b) |
| Delayed Contribution Amount | 4.2(b) |
| Delayed Contribution Date | 4.2(b) |
| Delayed Contribution Deposit | 4.2(b) |
| DOL Regulations | 4.2(e) |
| ECI | 8.4(e) |
| Effective Date | Preamble |
| ERISA | 9.5(a) |
| ERISA Partner | 13.1(a) |
| Existing Rothenberg Funds and Companies | 8.3(a) |
| FATCA | 14.9 |
| Feeder Fund | 8.3(e) |
| Final Closing Date | 3.2(b) |
| Fund 3 | 8.4(c)(i) |
| Fund 3 Agreement | 8.4(c)(i) |
| Fund Limited Partners | 14.10 |
| Fund Partners | 14.10 |
| General Partner | Preamble |
| Governmental Plan Partner | 13.2 |
| Indemnified Parties | 15.4(a) |
| Individual Limited Partner | 14.11 |

129797418 v2

| Term | Paragraph |
| --- | --- |
| Initial Closing Date | 14.12 |
| Interim Giveback Amount | 10.6 |
| Interim Giveback Determination Date | 10.6 |
| Interim Giveback Obligation | 10.6 |
| Institutional Limited Partner | 14.13 |
| Investment Company Act | 9.2 |
| Investment Period | 4.2(a) |
| Limited Liability | 8.4(j)(iv) |
| Limited Partners | Preamble |
| Loan | 8.4(c)(v) |
| Loss | 14.21 |
| Majority in Interest | 14.17 |
| Management Company | 8.1 |
| Management Expenses | 6.1(a)(i) |
| Management Expense Percentage | 6.1(a)(ii) |
| Managing Directors | 14.14 |
| Marketable | 14.15 |
| Marketable Securities | 14.15 |
| Marketability | 14.15 |
| Nonmarketable Securities | 14.16 |
| Non-Voting Interest | 13.4 |
| Optionees | 4.5(b)(vii) |
| Optionor | 4.5(b)(vii) |
| Ordinary Income | 14.17 |
| Parallel Funds | 8.3(c) |
| Partners | 3.1 |
| Partnership | Preamble |
| Partnership Legal Matters | 15.17(b) |
| Partnership Percentage | 14.18 |
| Partnership Representative | 11.7(b) |
| Percentage in Interest | 14.19 |
| Pooled Vehicle Partner | 15.15(e) |
| Prime Rate | 14.20 |
| Prior Agreement | Preamble |
| Private Foundation Partner | 13.3 |
| Profit | 14.19 |
| Qualified Purchaser | 8.3(d) |
| Regulated Partner | 14.22 |
| Regulatory Allocations | 5.3(a) |
| Related Entities | 8.3(a) |
| Remaining Portion | 4.5(b)(vii)(2) |
| Reporting Site | 11.5 |
| River Program | 1.2 |
| Securities | 14.23 |
| Securities Act | 14.24 |
| Short-Term Securities | 14.25 |
| Side-by-Side Fund | 8.3(d) |
| Side Letter | 15.12 |
| Subject Reports | 11.5 |
| Successor Fund | 8.3(a)(ii) |

| **Term** | **Paragraph** |
| --- | --- |
| Tax Adjusted Excess Distributions | 10.5 |
| Tax Payments | 7.6(a) |
| Termination Date | 2.1 |
| Treasury Regulations | 14.26 |
| UBTI | 8.4(d) |
| VCOC | 4.2(e) |
| VCOC Notice | 4.2(e) |

## ROTHENBERG VENTURES 2016 FUND, LP

### SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

This **SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT** (the "*Agreement*") of **ROTHENBERG VENTURES 2016 FUND, L.P.** (the "*Partnership*") is made and entered into as of the_____ day of April, 2016 (the "*Effective Date*"), by and among **ROTHENBERG VENTURES 2016 FUND GP, LLC**, a Delaware limited liability company (the "*General Partner*") and each investor who is identified as a limited partner on **EXHIBIT A** and who has been admitted to the Partnership as of the Effective Date (the "*Limited Partners*").

### WITNESSETH:

**WHEREAS**, in accordance with paragraph 15.11(a) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "*Prior Agreement*"), dated December 28, 2015 (the "*Commencement Date*"), the General Partner and a Majority in Interest of Limited Partners have as of the Effective Date consented in writing to the amendment and restatement of the Prior Agreement as set forth herein.

**NOW, THEREFORE**, pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the "*Act*"), and the Prior Agreement, the parties hereto do hereby amend and restate the Prior Agreement in its entirety as follows:

## ARTICLE 1

### NAME, PURPOSE AND OFFICES OF PARTNERSHIP AND WITHDRAWAL OF INITIAL LIMITED PARTNER

**1.1     Name.**  The name of the Partnership is **ROTHENBERG VENTURES 2016 FUND, LP**.  The affairs of the Partnership shall be conducted under the Partnership name, or such other name as the General Partner may, in its discretion, determine.

**1.2     Purpose.**  The primary purpose of the Partnership is to generate significant returns through the long-term capital appreciation of venture capital investments through direct investments in portfolio companies, and through indirect investments in portfolio companies through investment in the General Partner's and its Affiliates' River Program frontier technology accelerator (the "*River Program*").  The general purposes of the Partnership are to buy, sell, hold, and otherwise invest in Securities of every kind and nature and rights and options with respect thereto, including, without limitation, stock, notes, bonds, debentures, and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Partnership; to enter into, make, and perform all contracts and other undertakings; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.  In furtherance of the purposes of the Partnership, but subject to the provisions of this Agreement, the Partnership may engage in any activity that is lawful for a limited partnership under the Act, such activity to be deemed to fall within the objectives of the Partnership if approved by the General Partner.

**1.3     Principal Office.**  The principal office of the Partnership shall be at 1062 Folsom St, Suite 200, San Francisco, CA 94103, or such other place or places as the General Partner may from time to time designate.  The General Partner shall provide the Limited Partners with prompt written notice of any change in the location of the Partnership's principal office.

1

**1.4    Registered Agent and Office.**  The name of the registered agent for service of process of the Partnership and the address of the Partnership's registered office in the State of Delaware shall be The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801, or such other agent or office as the General Partner may from time to time designate.

## ARTICLE 2

### TERM OF PARTNERSHIP

**2.1    Term.**  The term of the Partnership commenced upon the date of the filing of the Certificate of Limited Partnership of the Partnership with the office of the Secretary of State of the State of Delaware.  The term of the Partnership shall continue until the eighth anniversary of the Partnership's Final Closing Date (such eighth anniversary being referred to as the "***Termination Date***"), unless extended pursuant to paragraph 10.1 or sooner dissolved as provided in paragraph 10.2.

**2.2    Events Affecting a Member of the General Partner.**  Except as specifically provided in paragraph 10.2, the death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, expulsion, or removal of any member of the General Partner shall not dissolve the Partnership.

**2.3    Events Affecting a Limited Partner of the Partnership.**  The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of a Limited Partner shall not dissolve the Partnership.

**2.4    Events Affecting the General Partner.**  Except as specifically provided in paragraph 10.2, the bankruptcy, expulsion, resignation, removal, liquidation, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of the General Partner shall not constitute an "event of withdrawal" of the General Partner under the Act, and upon the happening of any such event, the affairs of the Partnership shall be continued without dissolution by the General Partner or any successor entity thereto.

## ARTICLE 3

### NAME AND ADMISSION OF PARTNERS

**3.1    Name and Address.**  The name and address of the General Partner and each Limited Partner (hereinafter the General Partner and the Limited Partners shall be referred to collectively as the "***Partners***" and each individually as a "***Partner***"), the amount of such Partner's Capital Commitment to the Partnership, and such Partner's Partnership Percentage are set forth on a separate and confidential **EXHIBIT A** hereto, which shall be kept on file at the principal office of the Partnership.  The General Partner shall cause **EXHIBIT A** to be amended from time to time to reflect the admission of any new Partner, the withdrawal or substitution of any Partner, the transfer of interests among Partners, receipt by the Partnership of notice of any change of address of a Partner or the change in any Partner's Capital Commitment or Partnership Percentage, and such amendment shall not require the consent or countersignature of any Limited Partner.  An amended **EXHIBIT A** shall supersede any prior **EXHIBIT A** and become a part of this Agreement.  A copy of the most recent amended **EXHIBIT A** shall be kept on file at the principal office of the Partnership.  **EXHIBIT A** shall be available for inspection by Limited Partners at the principal office of the Partnership upon request; *provided* that if requested by a Limited Partner, the General Partner may redact the name and address of such Limited Partner from **EXHIBIT A** and withhold such information from the other Limited Partners.

2

**3.2**    **Admission of Additional Partners.**

    **(a)**     Except as provided in paragraphs 3.2(b), 4.5(b)(vii)(4) and 9.6, an additional person may be admitted as a Partner only with the consent of the General Partner and a Majority in Interest of the Limited Partners.

    **(b)**     Notwithstanding subparagraph (a) above, additional persons may be admitted as Limited Partners (or existing Limited Partners may increase their Capital Commitments) with the consent of only the General Partner on or before the date that is twelve (12) months after the first closing subsequent to the Initial Closing Date (the "***Final Closing Date***").

    **(c)**     Each additional person admitted as a Partner subsequent to the Initial Closing Date (and each existing Limited Partner that increases its Capital Commitment) shall (i) execute and deliver to the Partnership a subscription agreement or other agreement agreeing to be bound by the terms of this Agreement or otherwise take such actions as the General Partner shall deem appropriate in order for such Partner to become bound by the terms of this Agreement, (ii) subject to paragraph 4.2(b), contribute as its initial capital contribution to the Partnership that portion of its (or such) Capital Commitment which is equal to (A) for an additional person admitted as a Limited Partner (or an existing Limited Partner that increases its Capital Commitment) that is not an Anchor Limited Partner, that portion of the respective Capital Commitments contributed to date by the Partnership's previously admitted Limited Partners that are not Anchor Limited Partners (including, without limitation, amounts contributed by such Limited Partners in respect of Management Expenses and Administrative Expenses) in accordance with paragraph 4.2 and this paragraph 3.2 and (B) for an additional person admitted as a Limited Partner (or an existing Limited Partner that increases its Capital Commitment) that is an Anchor Limited Partner, that portion of the respective Capital Commitments contributed to date by the Partnership's previously admitted Anchor Limited Partners (including, without limitation, amounts contributed by such Anchor Limited Partners in respect of Management Expenses and Administrative Expenses). Notwithstanding anything to the contrary in this Agreement, the terms of this paragraph 3.2 with respect to the timing and amount of the capital contributions of a Limited Partner may be modified as agreed to in writing by the General Partner and such Limited Partner without the approval of any other Limited Partners.

    **(d)**     Limited Partners admitted to the Partnership after the Commencement Date will not be entitled to share in or be allocated any Ordinary Income, any gains from the sale of Securities or any Deemed Gain accruing on or prior to their admission date.

## ARTICLE 4

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND NONCONTRIBUTING PARTNERS

**4.1**    **Capital Accounts.** An individual Capital Account shall be maintained for each Partner.

**4.2**    **Capital Contributions of the Limited Partners.**

    **(a)**     Each Limited Partner shall contribute capital to the Partnership as requested by the General Partner upon ten (10) business days' prior written notice (which such notice shall be given by electronic mail or by a nationally recognized overnight courier, specifying next day delivery, in accordance with paragraph 15.9), in an amount up to such Limited Partner's unfunded Capital Commitment, if any. Except as set forth in paragraphs 3.2(c), 4.2(b), 4.2(c) and 4.2(e), each capital contribution shall be in accordance with Partnership Percentages; *provided, however*, that the amount of

3

capital contributions from the Limited Partners may be adjusted by the General Partner in good faith in order to account for the fact that no Management Expenses or Administrative Expenses are chargeable in respect of the General Partner's, and to the extent agreed to in writing by the General Partner and a Limited Partner, such Limited Partner's, interest in the Partnership. Notwithstanding anything in the foregoing to the contrary, unless approved by the Advisory Committee, no Limited Partner shall be required to contribute any capital following the earlier of (x) the third anniversary of the Commencement Date, or (y) the date on which at least seventy five percent (75%) of Capital Commitments of the Partnership has been invested, committed, or reserved for investment in portfolio companies or used or reserved for working capital and expenses (the "***Investment Period***"), except as may be necessary for (i) satisfying current or reasonably expected Partnership expenses, liabilities or other Partnership obligations (including, without limitation, the Management Expenses, the Administrative Expenses and any indemnification obligations), (ii) funding new investments committed to or in process prior to the end of the Investment Period, (iii) funding follow-on investments in existing portfolio companies, or (iv) fulfillment of a Partner's obligation to return distributions pursuant to paragraph 4.2(d). Further, each Limited Partner's obligation to contribute capital shall also be subject to those limitations set forth in paragraph 4.6. Each capital contribution by any Limited Partner shall be made in U.S. dollars and made in cash or by transfer of immediately-available funds.

      **(b)**     Notwithstanding anything to the contrary in this Agreement, each (i) Individual Limited Partner with a Capital Commitment of at least $1,000,000 and (ii) Institutional Limited Partner with a Capital Commitment of at least $5,000,000 (each such Limited Partner, an "***Anchor Limited Partner***"), in each case, shall have the right to delay contributing an amount equal to up to fifty percent (50%) of its initial capital contribution amount (a "***Delayed Contribution Amount***") until February 28, 2017 (the "***Delayed Contribution Date***"); *provided, however,* that each such Limited Partner shall, on the date of such Limited Partner's admission to the Partnership, pay to the partnership in cash or by transfer of immediately-available funds, as a non-refundable deposit on the Delayed Contribution Amount, an amount equal to 10% of such Limited Partner's Initial Capital Contribution (the "***Delayed Contribution Deposit***"), which amount shall offset the balance of the amount of the Delayed Contribution Amount to be contributed by such Limited Partner when such contribution is due. For all purposes of this Agreement, any Delayed Contribution Amount and Delayed Contribution Deposit shall be deemed to have been contributed by the contributing Limited Partner on the date of such Limited Partner's admission to the Partnership. Notwithstanding anything to the contrary in this Agreement, the terms of this paragraph 4.2 with respect to the timing and amount of payment of the capital contributions of a Limited Partner may be modified as agreed to in writing by the General Partner and such Limited Partner without the approval of any other Limited Partners.

      **(c)**     The General Partner may, in its sole discretion, return to the Partners all or a portion of any capital contribution intended for a proposed investment which is not consummated as anticipated *pro rata* in accordance with their respective capital contributions; *provided, however*, that such returned capital shall be added back to unfunded Capital Commitments and be subject to recall by the General Partner pursuant to this Article 4.

      **(d)**    **(i)**     If, in the discretion of the General Partner, Partnership assets are insufficient to fulfill any indemnification obligation of the Partnership pursuant to paragraph 15.4 prior to the final liquidation of the Partnership, the General Partner may require each Partner to contribute capital to the Partnership in an amount up to such Partner's unfunded Capital Commitment, if any.

           **(ii)**     If, in the discretion of the General Partner, Partnership assets remain insufficient to fulfill any liability or obligation of the Partnership (including indemnity obligations pursuant to paragraph 15.4), and following the contribution to the Partnership of the maximum amount then permitted by paragraph 4.2(d)(i), the General Partner may recall distributions previously made to the

Partners solely for the purpose of fulfilling or satisfying such an obligation or liability. Such distributions shall be recalled from the Partners in the same proportions as the expense (or loss) of the indemnity obligation giving rise to such recontribution was allocated to the Partners pursuant to Article 5. In no event shall any Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) all distributions previously received by the Partner from the Partnership or (2) twenty-five percent (25%) of such Partner's Capital Commitment. In no event will the General Partner be permitted to call capital pursuant to this paragraph 4.2(d)(ii) from a Partner after the date two (2) years after the liquidation of the Partnership.

(e)     Notwithstanding paragraph 4.2(a), with respect to the Partnership's initial request for capital contributions under this paragraph 4.2, in the event that the sum of the Capital Commitments of all ERISA Partners (as defined in paragraph 13.1(a)) equals or exceeds twenty-five percent (25%) of the Capital Commitments of all Limited Partners, then no ERISA Partner shall be required to contribute capital to the Partnership pursuant to this Agreement until such time as the General Partner shall have delivered notice (the "*VCOC Notice*") to such ERISA Partner to the effect that the Partnership's first portfolio company investment has qualified or will qualify upon its closing as a "venture capital investment" within the meaning of the U.S. Department of Labor regulations ("*DOL Regulations*") such that the Partnership will qualify as a "venture capital operating company" (a "*VCOC*") under applicable DOL Regulations. In the event that an ERISA Partner has not received the VCOC Notice prior to the date on which any capital contribution would otherwise be due under paragraph 4.2(a), the General Partner may elect to require such ERISA Partner to pay such capital contribution into an interest-bearing escrow account designated by the General Partner. The terms of any such escrow account shall be determined by the General Partner in compliance with ERISA (including the principles and conditions indicated in Dept. of Labor Adv. Op. 95-04A), to the extent applicable, and in order for the Partnership to satisfy the conditions required for it to be a VCOC upon such payment. In the event that the General Partner elects to require the use of an escrow account, then upon delivery of the VCOC Notice, all amounts in the escrow account shall be delivered to the Partnership in fulfillment of the ERISA Partner's then-outstanding obligations under paragraph 4.2(a).

**4.3     Capital Contributions of the General Partner.**  The General Partner shall contribute capital to the Partnership in an amount equal to the greater of (i) an amount equal to five percent (5%) of the aggregate Capital Commitments of all Partners and (ii) three million dollars ($3,000,000); *provided*, that the General Partner shall not be obliged to contribute any capital to the Partnership in respect of Management Expenses or Administrative Expenses. The General Partner's Capital Commitment obligation may be fulfilled by the General Partner, the Management Company, any of their respective members, senior investment personnel, or their respective family members of Affiliates, either through an interest as general partner or as Limited Partner, or through an interest in a Parallel Fund. Further, the General Partner or its Affiliates, or their respective members, may contribute additional capital to the Partnership or to one or more Parallel Funds. Each capital contribution made by the General Partner shall be made in cash, at such times and in such amounts as the General Partner may in its sole discretion determine.

**4.4     Acquisition of an Additional Interest by the General Partner.**  In the event that the General Partner acquires or holds an additional interest in the Partnership with a Capital Commitment that exceeds the amount described in paragraph 4.3, the General Partner shall have two (2) Partnership Percentages and two (2) Capital Account balances for purposes of making Partnership allocations, as if such additional excess interest were held by a separate entity which is a Limited Partner, although for all other purposes the General Partner shall have only one Capital Account.

5

**4.5    Noncontributing Partners.**

(a)    The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions to capital set forth in paragraph 4.2, and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made. If any legal proceedings relating to the failure of a Limited Partner to make such a contribution are commenced, such Limited Partner shall pay all costs and expenses incurred by the Partnership, including attorneys' fees and expenses, in connection with such proceedings.

(b)    Additionally, without in any way limiting any remedy which the Partnership may pursue pursuant to paragraph 4.5(a), should any Limited Partner fail to make any of the capital contributions required of it under this Agreement, such Limited Partner shall be in default. In the event of such default, the General Partner may, in its sole discretion, elect to enforce one or more of the provisions of this paragraph 4.5(b) in connection with such a default, to which each Limited Partner hereby expressly consents, *provided* such default shall have continued uncured for ten (10) or more days after delivery of the Default Notice described in the following sentence (after such ten (10)-day period, such Limited Partner shall be deemed a "***Defaulting Limited Partner***"). The General Partner shall deliver written notice to such Defaulting Limited Partner in the event that it determines to utilize one or more of the powers set forth in this paragraph 4.5(b) (a "***Default Notice***"). If the default shall have continued uncured for ten (10) or more days after delivery of the Default Notice, the Defaulting Limited Partner may not make any additional contributions of capital against such Defaulting Limited Partner's Capital Commitment (other than to fund Management Expenses, Administrative Expenses and other expenses of the Partnership) without the written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner.

(i)    The General Partner may waive, in whole or in part, the requirement of payment with respect to any due and unpaid capital contributions by a Defaulting Limited Partner pursuant to this Agreement and reduce such Defaulting Limited Partner's Capital Commitment accordingly.

(ii)    The General Partner may extend the time of payment for a Defaulting Limited Partner of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement.

(iii)    The General Partner may declare the entire amount of a Defaulting Limited Partner's then unfunded Capital Commitment to be immediately due and payable.

(iv)    On behalf of the Partnership, the General Partner may enforce, by appropriate legal proceedings, the Defaulting Limited Partner's obligation to make payment on the amount of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement or to pay the entire amount of such Defaulting Limited Partner's then unfunded Capital Commitment.

(v)    The General Partner may (A) deny the Defaulting Limited Partner (other than a Feeder Fund, in the event of a partial default by such Feeder Fund) the right to participate in any vote or consent of the Partners required under this Agreement or permitted under the Act, whereupon the Capital Commitment of such Defaulting Limited Partner shall not be included for purposes of calculating a Majority in Interest or other Percentage in Interest of the Limited Partners or Fund Limited Partners for purposes of this Agreement or (2)  without limitation on paragraph 4.5(c), in the case of a default in part by a Feeder Fund on account of the default by a limited partner of such Feeder Fund, shall deny such limited partner the right to participate in any vote or consent of the limited partners of such Feeder Fund

6

in any vote or consent of their respective interests in connection with a vote or consent of such Feeder Fund as a Limited Partner under this Agreement or permitted under the Act, whereupon the portion of the Capital Commitment of such Feeder Fund constituted by such defaulting shareholders of such Feeder Fund shall not be included for purposes of calculating a Majority in Interest or other Percentage in Interest of the Partners, Limited Partners, Fund Partners or Fund Limited Partners for purposes of this Agreement.

        **(vi)**    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vi), such Defaulting Limited Partner shall pay all expenses to be incurred or anticipated to be incurred by the Partnership in connection with the default and interest on the amount of the contribution to the Partnership then due at the Prime Rate plus two hundred (200) basis points per annum (or if less, the highest rate permitted by applicable law), such interest to accrue from the date the contribution to the Partnership was required to be made pursuant to this Agreement until the date the contribution is made by such Defaulting Limited Partner, unless such payment is waived by the General Partner. The accrued interest shall be paid by the Defaulting Limited Partner to the Partnership upon payment of such contribution. The accrued interest so paid shall not be treated as an additional contribution to the capital of the Partnership, but shall be deemed to be income to the Partnership; *provided, however*, that such income shall not be allocated to the Capital Account of the Defaulting Limited Partner. Until such time as the unpaid contribution and accrued interest thereon shall have been paid by the Defaulting Limited Partner, the General Partner may elect to withhold any or all distributions to be made to such Defaulting Limited Partner pursuant to Article 7 or Article 10 and recover any such unpaid contribution and accrued interest thereon by set off against any such distribution withheld.

        **(vii)**    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vii), the General Partner and the nondefaulting Limited Partners (the "*Optionees*"), shall have the right and the option, but not the obligation, to acquire the Partnership interest of the Defaulting Limited Partner (the "*Optionor*"), as follows:

        **(1)**    The General Partner shall notify the Optionees of the default within twenty (20) days of the expiration of the ten (10) day notice period commencing upon delivery of the Default Notice. Such notice shall advise each Optionee of the portion and the price of the Optionor's interest available to it. The portion available to each Optionee shall be a fraction, the numerator of which is its Capital Commitment and the denominator of which is the aggregate Capital Commitments of the Optionees. The aggregate price for the Optionor's interest shall be the lesser of fifty percent (50%) of (A) the amount of the Optionor's Capital Account calculated as of the due date of the additional contribution and adjusted to reflect the allocation of the appropriate proportion of the Partnership's unrealized gains and losses as of the due date of such defaulted contribution, and (B) the aggregate amount of the Optionor's capital contributions actually made less any distributions (valued at their fair market value on the date of distribution in accordance with paragraph 12.1) on or prior to such due date. The price for each Optionee shall be prorated according to the portion of the Optionor's interest purchased by each such Optionee. The option granted hereunder shall be exercisable at any time after the date thirty (30) days following the date of the initial notice of default from the General Partner to the Optionor by delivery to the Optionor of a notice of exercise of option together with a nonrecourse promissory note for the purchase price and a security agreement in accordance with subparagraph (5) below, which notice and documents the General Partner shall promptly forward to the Optionor.

        **(2)**    Should any Optionee not exercise its option within said thirty (30) day period provided in subparagraph (1), the General Partner shall immediately notify the other Optionees who have elected to exercise their option, which Optionees shall have the right and option ratably among them to acquire the portion of the Optionor's interest not so acquired (the "*Remaining*

7

*Portion*") within thirty (30) days of the date of the notice specified in this subparagraph (2) on the same terms as provided in subparagraph (1).

(3)    Any amount of the Remaining Portion not acquired by the Optionees pursuant to subparagraph (2) may be acquired by the General Partner within thirty (30) days of the expiration of the thirty (30) day period specified in subparagraph (2) on the same terms as set forth in subparagraph (1); *provided, however*, that the General Partner shall not be obligated to make the additional contributions otherwise due from the Optionor with respect to the Remaining Portion so acquired.

(4)    Any amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to subparagraphs (2) or (3) may, if the General Partner deems it in the best interest of the Partnership, be sold by the General Partner to any other investor, on terms not more favorable to such parties than those applicable to the Optionees' option, and upon the consent of the General Partner, any such third party purchaser may become a Limited Partner to the extent of the interest purchased hereunder.

(5)    The price due from each of the General Partner and the Optionees (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be payable by a noninterest bearing, nonrecourse promissory note (in such form as the General Partner shall designate) due upon final liquidation of the Partnership. Each such note shall be secured by the portion of the Optionor's Partnership interest so purchased by its maker pursuant to a security agreement in a form designated by the General Partner and shall be enforceable by the Optionor only against such security.

(6)    Upon exercise of any option hereunder, each Optionee (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be obligated (A) to contribute to the Partnership that portion of the additional capital then due from the Optionor equal to the percentage of the Optionor's interest purchased by such person and (B) except as otherwise provided in subparagraph (3), to pay the same percentage of any further contributions otherwise due from such Optionor on the date such contributions are otherwise due. Each person who purchases a portion of the Optionor's Partnership interest shall be deemed to have acquired such portion as of the due date of the additional capital contribution with respect to which the Optionor defaulted, and any distributions made after the due date on account of the Optionor's interest shall be distributed among such purchasers (and, unless the entire interest was purchased, the Optionor) in accordance with their ultimate respective interests in the Optionor's interest. Distributions otherwise allocable to the Optionor under the preceding sentence shall first be used to offset any defaulted contribution of the Optionor still due to the Partnership. Upon completion of any transaction hereunder, the General Partner shall cause **EXHIBIT A** to be amended to reflect all necessary changes resulting therefrom including, without limitation, admission of a purchaser as a Limited Partner, and adjustment of Capital Account balances, Capital Commitment amounts and Partnership Percentages as of the date of Optionor's default to reflect the acquisition from Optionor of the appropriate *pro rata* portion of each such item (including, if applicable, the reduction of aggregate Capital Commitments and resulting adjustment of Partnership Percentages in connection with any acquisition of any Remaining Portion by the General Partner pursuant to subparagraph (3)). The purchase and transfer of the Partnership interest of the Optionor shall occur automatically upon exercise by any Optionee or the General Partner of its option hereunder, or by any third-party purchaser pursuant to subparagraph (4), without any action by Optionor.

(7)    Notwithstanding the sale of any portion of an Optionor's interest pursuant to this paragraph 4.5(b)(vii), such Optionor shall not be released from its unfunded Capital Commitment except as actually funded by the acquirer of any such portion of Optionor's interest.

8

(8)    In the event that any amount of the Remaining Portion is not acquired by the Optionees, the General Partner and any third party purchasers pursuant to paragraphs 4.5(b)(vii)(1)-(4), then, in its sole discretion, the General Partner may apply any of the remedies described in paragraphs 4.5(a) and (b) to such unsold portion.

(viii)    The General Partner may, in its sole discretion, elect to remove such Defaulting Limited Partner from the Partnership, in which event (1) all of the Defaulting Limited Partner's Capital Account balance shall be forfeited and reallocated to the Capital Accounts of the nondefaulting Partners proportionally, based on, with respect to each such Partner, the ratio that its Partnership Percentage immediately prior to such calculation bears to the aggregate Partnership Percentages of all Partners (other than the Defaulting Limited Partner) and (2) the Defaulting Limited Partner's Partnership Percentage shall be reduced to zero.

(ix)    The General Partner may, in its sole discretion, elect to use reasonable efforts to assist such Defaulting Limited Partner transfer its entire interest in the Partnership.

(x)    Notwithstanding anything to the contrary in this Agreement, each Limited Partner (1) agrees that it will execute any instruments or perform any other acts that are or may be necessary to effectuate and carry out the transactions contemplated by this paragraph 4.5, and (2) designates and appoints the General Partner its true and lawful attorney, in its name, place and stead, to make, execute, and sign any and all instruments, documents, or certificates on behalf of any Defaulting Limited Partner in order to give effect to any remedy against such Defaulting Limited Partner (including, but not limited to, the remedies set forth in this paragraph 4.5(b)).

(xi)    The Partners agree that the General Partner's authority and discretion to enforce any remedy against a Defaulting Limited Partner (including but not limited to the remedies set forth in this paragraph 4.5(b)) supersede any fiduciary duties of the General Partner to such Defaulting Limited Partner.  The Partners further agree that the remedies set forth in this paragraph 4.5(b) are fair and reasonable in light of the difficulty in ascertaining the actual damages that would be incurred by the Partnership and the nondefaulting Partners as a result of the Defaulting Limited Partner's failure to contribute capital when due pursuant to the terms of this Agreement.

(xii)    Notwithstanding anything to the contrary in this paragraph 4.5, a Regulated Partner shall not be declared to be in default by the General Partner with respect to any due and unpaid capital contributions in the event that such Regulated Partner is entitled to withdraw from the Partnership (or the General Partner has requested such withdrawal) pursuant to Article 13 and the failure to make such due and unpaid capital contributions is the consequence of or attributable to such withdrawal.

(c)    The Limited Partners understand and agree that the provisions of this paragraph 4.5 shall be applied in part (and not in whole) with respect to a Feeder Fund in the event of a partial breach of such Feeder Fund of its obligations to contribute capital to the Partnership due to a corresponding breach by one or more (but not all) of the partners of such Feeder Fund.

9

## ARTICLE 5

### PARTNERSHIP ALLOCATIONS

**5.1    Allocation of Profit or Loss.**

(a)    Except as hereinafter provided in this Article 5 with respect to items of Loss attributable to the Management Expenses and Administrative Expenses, Profit or Loss of the Partnership for each Accounting Period shall be allocated to each Partner's Capital Account so as to effect the distribution provisions set forth in paragraphs 7.4(b) and 7.5(a) such that at the end of each Accounting Period, and after giving effect to all allocations under this Article 5, the balance in each Partner's Capital Account is equal to the amount each such Partner would be entitled to receive (or, if applicable, obligated to repay pursuant to this Agreement) if the Partnership were liquidated at the end of such Accounting Period pursuant to the terms of Article 10 (assuming that all assets of the Partnership were disposed of at their Adjusted Asset Values).

(b)    Solely in consideration of the fact that no Management Expenses or Administrative Expenses are chargeable in respect of the General Partner's, and to the extent agreed to in writing by the General Partner and a Limited Partner, such Limited Partner's, Capital Contributions to the Partnership, items of Loss attributable to the Management Expenses and Administrative Expenses for each Accounting Period shall not be allocated to the Capital Account of the General Partner or such Limited Partner.

**5.2    Special Allocations.**

(a)    To the extent the Partnership has taxable interest income or expense with respect to any promissory note between any Partner and the Partnership as holder and maker or maker and holder pursuant to Section 483, Sections 1271 through 1288, or Section 7872 of the Code, such interest income or expense shall be specially allocated to the Partner to whom such promissory note relates, and such Partner's Capital Account adjusted if appropriate.

(b)    Individual items of fees, expenses, and organizational costs (including the Management Expenses and Administrative Expenses set forth in paragraph 6.1) shall be allocated to the Partners in proportion to their respective Capital Commitments.

(c)    Subject to paragraphs 3.2(c), 3.2(d) and 3.2(e), if additional persons are admitted to the Partnership as Limited Partners subsequent to the Commencement Date (or existing Limited Partners increase their Capital Commitments), then fees, expenses, and organizational costs (including the Management Expenses and Administrative Expenses set forth in paragraph 6.1) and individual items of Ordinary Income, Profit and Loss of the Partnership that are allocated to the Partners on or after the effective date of such admission (or increase), shall be allocated first to such new Partners (or such existing Limited Partners that increased their Capital Commitments) to the extent necessary to cause such persons to be treated with respect to such items as if they had been Partners (or had such increased Capital Commitments) from the Commencement Date.

**5.3    Regulatory Allocations.**

(a)    This Agreement is intended to comply with the safe harbor provisions set forth in Treasury Regulation 1.704-1(b) and the allocations set forth in paragraph 5.3(b) (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  In the event the Regulatory Allocations result in allocations being made that are inconsistent with

the manner in which the Partners intend to divide Partnership Profit and Loss as reflected in paragraphs 5.1 and 5.2, the General Partner shall use its reasonable best efforts to adjust subsequent allocations of any items of gain, loss, income, deduction, or expense such that the net amount of the Regulatory Allocations and such subsequent special adjustments to each Partner is zero.

(b)     The allocations provided in this Article 5 shall be subject to the following exceptions:

(i)     Any loss or expense otherwise allocable to a Limited Partner which exceeds the positive balance in such Limited Partner's Capital Account shall instead be allocated first to all Partners who have positive balances in their Capital Accounts in proportion to their respective Partnership Percentages, and when all Partners' Capital Accounts have been reduced to zero, then to the General Partner; income shall first be allocated to reverse any loss or expense allocated under this paragraph 5.3(b)(i), in reverse order of such loss or expense allocations, until all such prior loss or expense allocations have been reversed.

(ii)     In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6), which causes or increases a deficit balance in such Limited Partner's Capital Account, items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible.

(iii)     For purposes of this paragraph 5.3(b), the balance in a Partner's Capital Account shall take into account the adjustments provided in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6).

**5.4     Income Tax Allocations.**

(a)     Except as otherwise provided in this paragraph or as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, a Partner's distributive share of Partnership income, gain, loss, deduction, or expense for income tax purposes shall be the same as is entered in the Partner's Capital Account pursuant to this Agreement.

(b)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction, and expense with respect to any asset contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Adjusted Asset Value.

(c)     In the event the Adjusted Asset Value of any Partnership asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss, deduction, and expense with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Adjusted Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

11

# ARTICLE 6

MANAGEMENT EXPENSES & ADMINISTRATIVE EXPENSES; OTHER PARTNERSHIP EXPENSES

6.1    **Management Expenses and Administrative Expenses.**

(a)    **Management Expenses.**

(i)    Commencing as of the Commencement Date and through the Termination Date, the General Partner shall be compensated on an annual basis for services rendered to the Partnership and expenses borne by the General Partner pursuant to paragraph 6.2(a) below by the payment in advance by the Partnership in cash to the General Partner on the first day of each calendar year of a management expense fee (the "***Management Expenses***"). No Management Expenses will be chargeable in respect of the General Partner's interest in the Partnership attributable to its Partnership Percentage.

(ii)    Subject to paragraph 10.1, the Management Expenses with respect to each Limited Partner for each annual period (prior to the adjustments described in paragraphs 6.1(a)(iii) shall be an amount equal to the aggregate Capital Contributions of such Limited Partner allocated for such period, multiplied by two percent (2.00%) (i.e., 2.00% annually) (the percentage applicable for any period referred to herein as the "***Management Expense Percentage***"). Notwithstanding the foregoing, (A) the Management Expenses for the remaining portion of the 2016 annual period and 2017 shall be due and payable on the Commencement Date, (B) additional Management Expenses shall be payable upon the date of admission of any Limited Partner (or increase in an existing Limited Partner's Capital Commitment) subsequent to the Commencement Date to reflect the increased Capital Contributions calculated as if such Partner had been admitted to the Partnership (or had such increased Capital Commitment) as of the Commencement Date, in accordance with paragraph 3.2(c) and (C) at any time on or after the Delayed Contribution Date, the General Partner may elect to declare all or any portion of the Management Expenses otherwise due within twelve (12) months following the Delayed Contribution Date to be due and payable.

(iii)    The Management Expenses otherwise payable by the Partnership to the General Partner pursuant to paragraph 6.1(a)(i) for an annual period shall be offset (in the following order of application):

(1)    First, by an amount equal to one hundred percent (100%) of the amount of any cash or other compensation paid as directors, commitment, breakup, monitoring or success fees or similar fees to the General Partner, the Management Company, the Managing Directors or any of their respective members, employees or Affiliates during the immediately preceding annual period by any portfolio company in which the Partnership holds an investment, or any portfolio company in which the Partnership expected to invest but issuance of Securities was not consummated (net of any unreimbursed expenses of the General Partner, the Management Company, the Managing Directors or any of their respective members, employees or Affiliates, and as adjusted for any similar reductions with respect to any Related Entities (if applicable) *pro rata* in proportion to the amounts invested by such entities in the portfolio company paying any such fees to prevent double counting); *provided* the General Partner may cause the Partnership to purchase at fair market value any director's options, advisory common stock or other types of securities received by the General Partner, the Management Company, the Managing Directors or any of their respective members, employees or Affiliates, from any portfolio company of the Partnership; and *provided, however,* that the Management Expenses shall not be reduced by any fees or compensation received by the General Partner, the Management Company, the Managing Directors or any of their respective members, employees or Affiliates from the River Program. In the event the offsets

12

required by this paragraph 6.1(a)(iii) for an annual period exceed the Management Expenses payable for such annual period, the amount of such excess shall be offset against the Management Expenses otherwise payable in subsequent annual periods until there has been a full reduction of Management Expenses with respect to amounts described in this paragraph 6.1(a)(iii).

(2)     Next, by the amount of any management fees or similar compensation payable to the General Partner or any of its Affiliates under the Fund 3 Agreement or any management services agreement in connection therewith in respect of the Partnership's capital commitment to Fund 3 during such annual period.

(b)     **Administrative Expenses.**

(i)     Commencing as of the Commencement Date and through the Termination Date, the General Partner (or the Management Company) shall be compensated for and expenses borne by the General Partner pursuant to paragraph 6.2(c) below by the payment in advance by the Partnership in cash to the General Partner on the first day of each calendar year of an administrative expense fee (the "*Administrative Expenses*"). No Administrative Expenses will be chargeable in respect of the General Partner's interest in the Partnership attributable to its Partnership Percentage.

(ii)     The Administrative Expenses for each annual period with respect to each Limited Partner shall be an amount equal to the aggregate Capital Contributions of such Limited Partner allocated for such period, multiplied by one-half of one percent (0.5%) (i.e., 0.5% annually), except as otherwise agreed to in writing by the General Partner and such Limited Partner. Notwithstanding the foregoing, (A) the Administrative Expenses for the remaining portion of the 2016 annual period and 2017 shall be due and payable on the Commencement Date, in accordance with paragraph 4.2(a), (B) additional Administrative Expenses shall be payable upon the date of admission of any Limited Partner (or increase in an existing Limited Partner's Capital Commitment) subsequent to the Commencement Date to reflect the increased Capital Contributions calculated as if such Partner had been admitted to the Partnership (or had such increased Capital Commitment) as of the Commencement Date, in accordance with paragraph 3.2(c) and (C) at any time on or after the Delayed Contribution Date, the General Partner may elect to declare all or any portion of the Administrative Expenses otherwise due within twelve (12) months following the Delayed Contribution Date to be due and payable.

6.2     **Expenses.**

(a)     From the Management Expenses, the General Partner shall bear all normal operating expenses incurred in connection with the management of the Partnership, the General Partner and the Management Company (as defined in paragraph 8.1), except for those expenses borne directly by the Partnership as set forth in subparagraphs (b), (c) and (d) below and elsewhere herein.  Such normal operating expenses to be borne by the General Partner (or its designee) shall include, without limitation, expenditures on account of salaries and wages of employees, consultants and agents of the Partnership (other than consultants employed with respect to investments or proposed investments), the General Partner or the Management Company, overhead and rentals payable for space used by the General Partner (or its designee) or the Partnership, virtual reality equipment of the General Partner and the Partnership, utilities, office expenses, expenses for administrative, clerical and related support services, and expenses incurred in identifying potential investment opportunities.  For the avoidance of doubt, (i) the General Partner shall bear any expenses set forth in this paragraph 6.2(a) that exceed the aggregate amount of Management Expenses and Administrative Expenses payable by the Partnership pursuant to paragraphs 6.1(a) (as reduced by paragraph 6.1(a)(iii)) and 6.1(b), respectively, and (ii) in the event that the Management Expenses and Administrative Expenses payable by the Partnership exceed the amount of

13

expenses set forth in this paragraph 6.2(a) and in paragraph 6.2(c), such excess amount shall be the sole property of the General Partner.

      **(b)**    The Partnership shall bear all costs and expenses incurred in connection with the purchase, holding, sale or proposed sale of any Partnership investment (whether or not any such purchase or sale is consummated), including, but not by way of limitation, private placement fees and finder's fees, interest on and fees and expenses arising out of all permitted borrowing made by the Partnership, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, legal fees, investment related travel expenses, expenses incurred in performing due diligence with respect to a purchase, sale or exchange of Securities (whether or not ultimately consummated), expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Partnership, including claims by or against a governmental authority, audit and accounting fees, consulting fees, banking fees relating to investments or proposed investments, taxes applicable to the Partnership on account of its operations, and any sales or other taxes, fees or government charges which may be assessed against the Partnership.  The Partnership shall also bear, the Management Expenses, the Administrative Expenses, the cost of liability and other premiums for insurance protecting the Partnership, the General Partner, its managers, and the Management Company and its managers and employees from liability to third parties that relates to the Partnership and its activities and investments, out-of-pocket costs associated with Partnership meetings or Advisory Committee matters, expenses of members of the Advisory Committee (including travel-related costs and expenses), all expenses relating to litigation and threatened litigation involving the Partnership, including indemnification expenses, premiums for insurance to protect the Partnership, the General Partner, the members of the General Partner, the Management Company, the members of the Management Company, the members of the Advisory Committee and any of their respective partners, members, stockholders, managers, managing directors, officers, directors, trustees, employees, consultants, agents or Affiliates in connection with the activities of the Partnership, and all other extraordinary expenses chargeable to the activities of the Partnership.

      **(c)**    From the Administrative Expenses, the General Partner shall bear all normal costs and expenses incurred in connection with the formation and administration of the Partnership, except for those expenses borne directly by the Partnership as set forth in subparagraphs (b) above and (d) below and elsewhere herein, or otherwise borne by the General Partner as set forth in subparagraph (a) above.  Such normal formation and administrative expenses to be borne by the General Partner (or its designee) shall include, without limitation: out-of-pocket costs incurred by or on behalf of the General Partner or its Affiliates or, with the General Partner's written consent, Limited Partners admitted as of the Commencement Date, in connection with the marketing, formation, and organization of the Partnership, the General Partner, any Feeder Fund and the Management Company including legal, accounting, travel, meeting, printing and other fees and expenses incident thereto; all expenses associated with the preparation and filing of tax returns for the Partnership, fees incurred in connection with the maintenance of bank or custodian accounts, and all expenses incurred in connection with the registration of the Partnership's Securities under applicable securities laws or regulations; expenses incurred by the General Partner in serving as the tax matters partner and the Partnership Representative (as described in paragraphs 11.7(a) and (b), respectively); all out-of-pocket expenses of preparing and distributing reports to Partners, fees and expenses relating to outsourced finance, accounting and administrative services, fees and expenses relating to specialized consulting, advisory or professional services, fees and expenses relating to regulatory compliance of the Partnership, General Partner and/or Management Company, investment related computational services and hardware needed for preparing reports or otherwise in the management of the Partnership, the General Partner and/or Management Company, meeting expenses, expenses associated with Partnership communications with Partners, including preparation and distribution of financial statements and annual or other reports to the Limited Partners; and all ordinary legal, custodial, audit, appraisal and accounting fees relating to the Partnership and its activities.  For the

14

avoidance of doubt, (i) the General Partner shall bear any expenses set forth in this paragraph 6.2(c) that exceed the aggregate amount of Management Expenses and Administrative Expenses payable by the Partnership and (ii) in the event that the Management Expenses and Administrative Expenses payable by the Partnership pursuant to paragraphs 6.1(a) (as reduced by paragraph 6.1(a)(iii)) and 6.1(b), respectively, exceed the amount of expenses set forth in this paragraph 6.2(c) and in paragraph 6.2(a), such excess amount shall be the sole property of the General Partner.

(d)     The Partnership shall bear all liquidation costs, fees, and expenses incurred by the General Partner (or its designee) in connection with the liquidation and termination of the Partnership at the end of the Partnership's term, specifically including but not limited to legal and accounting fees and expenses.

(e)     Each of the Partnership and the General Partner agree to reimburse the other as appropriate to give effect to the provisions of this paragraph 6.2 in the event that either such party pays an obligation that is properly the responsibility of the other.

## ARTICLE 7

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE PARTNERS

**7.1     Interest.**  Except as otherwise provided in this Agreement, no interest shall be paid to any Partner on account of its interest in the capital of or on account of its investment in the Partnership.

**7.2     Withdrawals by the Partners.**  No Partner may withdraw any amount from its Capital Account unless such withdrawal is made pursuant to this Article 7, Article 10 or Article 13.

**7.3     Partners' Obligation to Repay or Restore.**  Except as required by law or the terms of this Agreement, no Limited Partner shall be obligated at any time to repay or restore to the Partnership all or any part of any distribution made to it from the Partnership in accordance with the terms of this Article 7.  The General Partner hereby confirms that if a Feeder Fund withdraws all or any portion of its Capital Account balance pursuant to this paragraph 7.2, the General Partner will apply paragraph 7.2 on a "look through" principles basis, so that only the applicable constituent limited partner(s) of such Feeder Fund, and not such Feeder Fund as a whole, is treated as having withdrawn.

**7.4     Tax Distributions.**

(a)     During the term of the Partnership, within ninety (90) days following the end of each fiscal year and from time to time during each fiscal year as needed to make estimated tax payments, and subject to the maintenance of reasonable cash reserves (including in accordance with paragraphs 6.1(a)(ii) and 6.1(b)(ii)), the General Partner will distribute cash to each Partner in an amount equal to, or estimated to be equal to, the net taxable income allocated to the such Partner as a result of the such Partner's ownership of an interest in the Partnership for the current fiscal year multiplied by the highest blended federal, state and local marginal income tax rate (including, to the extent applicable, self-employment, Medicare and social security taxes) applicable to individuals resident in the State of California (the "*Applicable Tax Rate*"), less all prior cash distributions to such Partner with respect to such fiscal year (or portion thereof) pursuant to this paragraph 7.4 and paragraph 7.5(a); *provided, that* (i) the General Partner will have no obligation to make the foregoing distributions if the total amount to be distributed to all Partners would be less than one million dollars ($1,000,000) and (ii) the General Partner shall have the authority, in its sole discretion, to make good faith estimates of amounts expected to be distributable pursuant to the first sentence of this section with respect to a given calendar year and to

15

distribute such estimated amounts to the Partners as advances from time to time during such calendar year.

(b)      Subject to the maintenance of reasonable cash reserves (as determined and established at the discretion of the General Partner (including in accordance with paragraphs 6.1(a)(ii) and 6.1(b)(ii))), within ninety (90) days of the end of each fiscal year, the General Partner may distribute, in cash, to all Partners in proportion to their Partnership Percentages, an amount equal to the amount of net Ordinary Income, if any, allocated to each Partner's Capital Account during such fiscal year.

**7.5     Discretionary Distributions and Rules Regarding Distributions.**

(a)      Except as otherwise provided in paragraphs 3.2(e), 7.5(f) and 8.4(c)(v), and subject to maintaining reserves needed for reinvestment permitted under paragraph 8.4(f), for payment of Management Expenses or Administrative Expenses in accordance with paragraphs 6.1(a)(ii) and 6.1(b)(ii), respectively, or for Partnership expenses chargeable under paragraph 6.2, the General Partner may make a distribution of cash or Marketable Securities as soon as practicable after receiving such cash or Marketable Securities. Cash or Marketable Securities shall be apportioned preliminarily among the Partners in proportion to their respective Partnership Percentages as of the time of such distribution. The amount of such cash or the value of such Marketable Securities so apportioned to the General Partner shall be distributed to the General Partner. Subject to paragraphs 7.5(b) and 8.4(c)(i), the amount so apportioned to each Limited Partner shall be distributed between the General Partner and such Limited Partner as follows:

(i)      First, for so long as the Carry Hurdle has not been met, if as of the time of such distribution:

(1)      the aggregate fair market value of the Partnership's investments (including, without limitation, the value of any (x) Securities previously distributed in kind (valued as of the date of such in kind distribution) and (y) amounts previously distributed in respect of realized investments), as determined by the General Partner in accordance with Article 12, is less than or equal to the cumulative amount of all Capital Contributions made by the Partners as of the date of such distribution, to such Limited Partner until such Limited Partner has received distributions pursuant to paragraph 7.4 and this paragraph 7.5(a) in an amount equal to such Partner's aggregate Capital Contributions in respect of the portfolio company giving rise to such distribution (i.e., including contributions used for Management Expenses, Administrative Expenses, or other Partnership expenses); or

(2)      the aggregate fair market value of the Partnership's investments (including, without limitation, the value of any (x) Securities previously distributed in kind (valued as of the date of such in kind distribution) and (y) amounts previously distributed in respect of realized investments), as determined by the General Partner in accordance with Article 12, is greater than the cumulative amount of all Capital Contributions made by the Partners as of the date of such distribution, (1) eighty percent (80%) to such Limited Partner and (2) twenty percent (20%) to the General Partner until such time as the General Partner has received pursuant to this paragraph 7.5(a)(i) an amount equal to the greater of (x) twenty percent (20%) of the amount of any unrealized Profits of the Partnership and (y) twenty percent (20%) of such distribution; and

(ii)      Second, from and after such time as the Carry Hurdle has been met, 100% to the General Partner until the General Partner has received cumulative distributions equal to thirty percent of the distributions made pursuant to paragraphs 7.5(a)(i) and this paragraph 7.5(a)(ii), and

16

(iii)     Third, thereafter, (1) seventy percent (70%) to such Limited Partner and (2) thirty percent (30%) to the General Partner.

**EACH LIMITED PARTNER HEREBY ACKNOWLEDGES AND AGREES THAT PURSUANT TO PARAGRAPH 7.5(a)(i)(2) AND SUBJECT TO PARAGRAPH 8.4(c)(i), THE GENERAL PARTNER SHALL RECEIVE TWENTY PERCENT (20%) OF DISTRIBUTIONS APPORTIONED TO SUCH LIMITED PARTNER REGARDLESS OF WHETHER SUCH LIMITED PARTNER HAS RECEIVED A FULL RETURN OF ITS CAPITAL CONTRIBUTIONS, EVEN IF THE PARTNERSHIP IS PROFITABLE ON A CUMULATIVE NET BASIS AS OF THE TIME OF SUCH DISTRIBUTION, IN THE EVENT THAT THE CARRY HURDLE HAS NOT BEEN MET AND THE FAIR MARKET VALUE OF THE PARTNERSHIP'S INVESTMENTS (INCLUDING UNREALIZED PROFITS), AS DETERMINED BY THE GENERAL PARTNER IN ACCORDANCE WITH ARTICLE 12, IS GREATER THAN THE CUMULATIVE AMOUNT OF ALL CAPITAL CONTRIBUTIONS AS OF THE TIME OF SUCH DISTRIBUTION.**

For all purposes under this Agreement, the "*Carry Hurdle*" shall be determined as of the time of any distribution of cash or Marketable Securities pursuant to paragraphs 7.5(a)(i), 7.5(a)(ii) and 7.5(a)(iii), and shall be deemed to have been met to the extent that each Limited Partner has been distributed pursuant to this Article 7 an amount equal to three hundred percent (300%) of its respective capital contributions as of such time of determination.

All distributions made to the General Partner with respect to allocations or Profit or Loss that support its interest in distributions under paragraphs 7.5(a)(i)(2), 7.5(a)(ii) and 7.5(a)(iii) shall be treated as advance distributions for purposes of paragraph 7.4, and shall reduce the distributions the General Partner is otherwise entitled to under paragraph 7.4.

Notwithstanding anything to the contrary in this Agreement, the terms of this paragraph 7.5(a) with respect to a Limited Partner may be modified as agreed to in writing by the General Partner and such Limited Partner, without the approval of any other Limited Partners.

(b)     Notwithstanding paragraph 7.5(a), the General Partner may at any time waive a distribution of cash or Marketable Securities that would otherwise be made to it pursuant to paragraph 7.5(a)(i)(2), 7.5(a)(ii) or 7.5(a)(iii) and instead make such distribution one hundred percent (100%) to all Partners in accordance with their respective Partnership Percentages; *provided, however*, that the Partnership may make subsequent distributions of cash to the General Partner to the extent of any such waived distribution at such times as the General Partner shall determine.

(c)     Whenever more than one type of Marketable Securities is being distributed in kind in a single distribution or whenever more than one class of Marketable Securities of a portfolio company (or a portion of a class of such Marketable Securities having a tax basis per share or unit different from other portions of such class) are distributed in kind by the Partnership, each Partner shall receive its ratable portion of each type, class or portion of such class of Marketable Securities distributed in kind (except to the extent that a disproportionate distribution is necessary to avoid distributing fractional shares).

(d)     Marketable Securities distributed in kind pursuant to this paragraph 7.5, or Securities distributed pursuant to paragraph 10.4, shall be subject to such conditions and restrictions as the General Partner determines are legally required or appropriate. Whenever types or classes of Securities are distributed in kind, each Partner shall receive its ratable portion of each type or class of Securities distributed in kind.

17

(e)     Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Marketable Securities distributed pursuant to this paragraph 7.5, or Securities distributed pursuant to paragraph 10.4, shall be allocated to the Capital Accounts of all Partners as Profit or Loss pursuant to Article 5.

(f)     Notwithstanding anything to the contrary contained in this paragraph 7.5, no distribution shall be made to the General Partner to the extent it would create or increase a deficit in its Capital Account; *provided, however*, that the General Partner shall be entitled to receive a special distribution in an amount equal to the amount of any distribution otherwise foregone (and not already distributed) pursuant to this paragraph 7.5(f), to the extent that such special distribution would not create or increase a deficit in the General Partner's Capital Account.

(g)     All distributions of cash to be made by the Partnership, pursuant to paragraphs 7.4 or 7.5 or otherwise, shall be made in U.S. dollars.

### 7.6    Withholding Obligations.

(a)     If and to the extent the Partnership is required by law (as determined in good faith by the General Partner) to make payments ("*Tax Payments*") with respect to any Partner in amounts required to discharge any legal obligation of the Partnership or the General Partner, including any obligation pursuant to FATCA, to make payments to any governmental authority with respect to any federal, state or local tax liability of such Partner arising as a result of such Partner's interest in the Partnership, then the amount of any such Tax Payments shall be deemed to be a loan by the Partnership to such Partner, which loan shall: (i) be secured by such Partner's interest in the Partnership; (ii) bear interest at the Prime Rate; and (iii) be payable upon demand; *provided, however*, that the General Partner shall use commercially reasonable efforts to provide the Partners notice of the amount of any anticipated Tax Payments in advance of the Partnership's payment thereof and will, upon written request from any Partner, allow such requesting Partner to pay the Partnership an amount of cash equal to the amount of such Tax Payments in lieu of treating any such Tax Payment as a loan.  Each Limited Partner will, as applicable, take such actions as are required to establish to the reasonable satisfaction of the General Partner that the Limited Partner is (i) not subject to the withholding tax obligations imposed by Section 1471 of the Code and (ii) not subject to the withholding tax obligations imposed by Section 1472 of the Code.  In addition, each Limited Partner will assist the Partnership and the General Partner with any applicable information reporting or other obligation imposed on the Partnership, the General Partner, or their respective Affiliates, pursuant to FATCA.

(b)     If and to the extent the General Partner determines that the Partnership is required to make any Tax Payments with respect to any distribution to a Partner, (i) the General Partner shall use commercially reasonable efforts to provide the Partner advance notice of the amount of such anticipated Tax Payments and (ii) either (A) such Partner's proportionate share of such distribution shall be reduced by the amount of such Tax Payments (*provided, however*, that such Partner's Capital Account shall be adjusted pursuant to paragraph 14.5 for such Partner's full proportionate share of the distribution), or (B) such Partner shall pay to the Partnership prior to such distribution an amount of cash equal to such Tax Payments.  In the event a portion of a distribution in kind is retained by the Partnership pursuant to clause (A), such retained Securities may, in the discretion of the General Partner, either (i) be distributed to the Partners in accordance with the terms of this Article 7 including this paragraph 7.6(b), or (ii) be sold by the Partnership to generate the cash necessary to satisfy such Tax Payments.  If the Securities are sold, then for purposes of income tax allocations only under this Agreement, any gain or loss on such sale or exchange shall be allocated to the Partner to whom the Tax Payments relate.

18

(c)     If the Partnership is required to withhold taxes pursuant to this paragraph 7.6 with respect to any Limited Partner, the General Partner shall upon request by such Limited Partner provide any Limited Partner with such information and assistance as is reasonably necessary for such Limited Partner to obtain an exemption from or refund of such withheld amounts (so long as the provision of such information and assistance does not create an undue burden on the General Partner or otherwise interfere with the management of the Fund by the General Partner or its members).

## ARTICLE 8

### MANAGEMENT DUTIES AND RESTRICTIONS

**8.1     Management.**  The General Partner shall have the sole and exclusive right to manage, control, and conduct the affairs of the Partnership and to do any and all acts on behalf of the Partnership, including exercise of rights to elect to adjust the tax basis of Partnership assets and to revoke such elections and to make such other tax elections as the General Partner shall deem appropriate. The General Partner is hereby authorized to enter, by itself or on behalf of the Partnership, into an agreement with an Affiliate of the General Partner for the provision of certain management, administrative, operational and other services with the respect to the Partnership, including recommendations regarding the purchase and sale of investments by the Partnership, on terms to be determined and agreed to by the General Partner (the *"Management Company"*).  Whenever in this Agreement the General Partner is permitted or required to make a decision or determination in its "discretion" (or similarly), the General Partner shall be entitled to consider such interests and factors as it desires, including its own interests.

**8.2     No Control by the Limited Partners; No Withdrawal.**  No Limited Partner shall take part in the control or management of the affairs of the Partnership nor shall any Limited Partner have any authority to act for or on behalf of the Partnership or to vote on any matter relative to the Partnership and its affairs except as is specifically permitted by this Agreement.  Except as specifically set forth in this Agreement, no Limited Partner shall withdraw or be required to withdraw from the Partnership.

**8.3     Existing Funds; Successor Funds; Parallel Funds; River Program.**

(a)     **Formation of Successor Fund**: Except as otherwise approved by the Advisory Committee, Michael Rothenberg shall, so long as he remains a manager of the General Partner, devote substantially all of his business time to the affairs of the Partnership, the General Partner, the Management Company, the Partnership's portfolio companies, any Parallel Funds or co-investment vehicles, any Feeder Funds and their general partners, any Alternative Vehicles, the River Program and any other accelerators formed or operated by the General Partner, the Management Company, or their respective Affiliates, the existing investment funds, co-investment vehicles, accelerators and other entities set forth on **EXHIBIT B** hereto (collectively, the *"Existing Rothenberg Funds and Companies"*), any of the respective portfolio companies or accelerators of the foregoing, and any Successor Fund and its portfolio companies and accelerators (collectively referred to herein as the *"Related Entities"*) until the end of the Investment Period.  The foregoing shall not be construed to prevent any other member of the General Partner or Management Company employee or affiliate from undertaking and spending time on any other business or investment activity.  Furthermore, the Limited Partners acknowledge that the Managing Directors, the Management Company, its members and employees have pre-existing commitments to the Existing Rothenberg Funds and Entities.

Subject to the foregoing, the General Partner, the Managing Directors, the Management Company and their respective Affiliates, members and employees may:

(i)      Engage in or own an interest in any other business, partnership, limited liability company, limited liability partnership, corporation or other entity or association (including, without limitation, buying and selling Securities for their own accounts and the accounts of other investment vehicles, but subject in any event to the provisions of paragraph 8.4);

(ii)     Form and operate one (1) or more successor venture capital funds with the same investment strategy as the Partnership stated in paragraph 1.2 (each, a "*Successor Fund*"), subject to paragraph 8.3(e);

(iii)    Form and operate one or more Parallel Funds (as defined in paragraph 8.3(b) and one or more Feeder Funds (as defined in paragraph 8.3(c);

(iv)     Form and operate current or future investment funds that do not have the same or similar stated purposes as the Partnership as set forth in paragraph 1.2, whose investment criteria is constrained either by industry or geography and that are managed by the Management Company or its personnel or Affiliates; *provided* that subject to paragraph 8.3(b) below, (A) any investment opportunities for such a fund which meet the investment objectives of the Partnership (as determined by the General Partner in good faith) shall first be provided to the Partnership and any Parallel Funds pursuant to paragraph 8.4(a) below, and (B) to the extent that the Partnership and any Parallel Funds do not take such entire investment opportunity, the Partnership, any Parallel Funds and such fund may invest in such opportunity on a pro-rata basis based on their respective available uncalled capital for investment in such investment opportunity.

Notwithstanding anything to the contrary contained herein, each Managing Director shall be permitted to (x) continue serving as a manager, board member or observer of any company or other entity to the extent that he serves in such capacity as of the Initial Closing Date; (y) continue to manage and monitor investments made in his personal capacity, any investments made for his family office, and participate in personal or charitable activities, including, without limitation, devote time and attention to philanthropic, charitable, non-profit or educational activities.

(b)      Pursuant to paragraph 8.3(a)(iii), the General Partner, the Managing Directors, the Management Company or an Affiliate of any of the foregoing may form and serve as general partner (or in a similar management role) of one or more investment partnerships or similar entities to accommodate the tax, regulatory or other special needs of investors who otherwise would invest as Limited Partners of the Partnership (each such entity, a "*Parallel Fund*"); *provided, however*, that no Parallel Fund may admit a limited partner after the Final Closing Date (except as a result of a transfer of an interest). Each Parallel Fund shall be governed by a limited partnership agreement (or other similar constitutive document) whose terms are substantially the same as this Agreement. In the event that any Parallel Fund is formed, upon each purchase of Securities (other than short-term obligations such as money market instruments) by the Partnership, each Parallel Fund generally will simultaneously invest on the same terms as the Partnership *pro rata* in accordance with the remaining available capital of each such fund, and reflecting the reserve policies for each such fund; *provided, however*, that a Parallel Fund shall not be required to make any such investment in a Security if the General Partner receives from the issuer thereof a written notice to the effect that the issuer will not permit such Parallel Fund to invest on the same terms as the Partnership or such investment would be prohibited by the terms of the governing agreement of such Parallel Fund. Each Parallel Fund generally shall also dispose of each such Security at substantially the same time and on substantially the same terms as the Partnership; *provided, however*, that the foregoing requirement shall not apply with respect to dispositions of Securities made in connection with the liquidation of the Partnership or a Parallel Fund; *provided, further*, that a Parallel Fund shall not be required to make any such divestment of a Security if the General Partner receives from the issuer thereof a written notice to the effect that the issuer will not permit such Parallel Fund to dispose

20

of such Security on the same terms as the Partnership or such divestment would be prohibited by the terms of the governing agreement of such Parallel Fund. Each of the Limited Partners hereby consents and agrees to the foregoing activities and investments and further consents and agrees that neither the Partnership nor any of its Partners shall have any rights in or to such activities or investments, or any profits derived therefrom. Each of the limited partners hereby acknowledges and agrees that each of Rothenberg Ventures 2016 Accredited Fund, LP, a Delaware limited partnership, and Rothenberg Ventures 2016 Fund-A, LP, a Cayman Islands exempted limited partnership, is such a Parallel Fund. For the avoidance of doubt, nothing in this subparagraph (b) shall be interpreted as suggesting or resulting in the Partnership and any Parallel Funds not constituting separate partnerships as a matter of law and for the purposes of the Act.

(c)     Pursuant to paragraph 8.3(a)(iii), the General Partner, the Managing Directors, the Management Company or an Affiliate of any of the foregoing may form one or more entities, each admitted as a Limited Partner of the Partnership, formed for the purpose of accommodating certain investors desiring to participate in the Partnership or a Parallel Fund (each such entity, a "*Feeder Fund*"). The Limited Partners acknowledge and agree that Rothenberg Ventures 2016 Feeder Fund, L.P., a Cayman Islands exempted limited partnership, is such a Feeder Fund.

(d)     Notwithstanding any provision herein, in the event that the General Partner in good faith determines that the number of "*beneficial owners*" of the Partnership equals or exceeds seventy-five (75) (as defined and calculated pursuant to Section 3(c)(1) of the United States Investment Company Act of 1940, as amended), the General Partner shall have the option, at any time subsequent to such determination and exercisable by the General Partner by notice to the Limited Partners, to form a side-by-side investment partnership pursuant to the terms of paragraph 8.3(b) and this paragraph 8.3(d) (the "*Side-by-Side Fund*"). Upon the formation of the Side-by-Side Fund, the General Partner may elect that the interest in the Partnership of any Limited Partner who meets the requirements of a "*qualified purchaser*" (as defined in Section 2(a)(51) of the United States Investment Company Act of 1940, as amended) (a "*Qualified Purchaser*") be automatically converted to an interest in the Side-by-Side Fund and each Qualified Purchaser that becomes a limited partner in the Side-by-Side Fund shall automatically cease to be a Limited Partner in the Partnership. Such conversion shall occur at the time of notice by the General Partner to such Qualified Purchaser, and shall be effected by a transfer of such Qualified Purchaser's indirect interest in each of the Partnership's assets and liabilities to the Side-by-Side Fund in return for an interest in the Side-by-Side Fund followed by a distribution by the Partnership of such interest in the Side-by-Side Fund to such Qualified Purchaser in full redemption of such Qualified Purchaser's interest in the Partnership. A portion of the General Partner's interest in the Partnership shall likewise be converted to a similar interest in the Side-by-Side Fund as necessary to cause the General Partner to have a ratable percentage interest in each of the Partnership and the Side-by-Side Fund (based on aggregate capital commitments to such entities). The initial capital account balance in the Side-by-Side Fund of each Qualified Purchaser placed in the Side-by-Side Fund shall be equal to such Qualified Purchaser's Capital Account balance in the Partnership immediately before such conversion. Each Qualified Purchaser placed in the Side-by-Side Fund shall have the same duties and obligations to the Side-by-Side Fund as in the Partnership, including, without limitation, the obligation to contribute its remaining Capital Commitment to the Side-by-Side Fund instead of the Partnership. Each Qualified Purchaser hereby agrees to execute any instruments or perform any other acts that are or may be necessary to effectuate and carry out the transactions contemplated by this paragraph 8.3(d). In addition, each Qualified Purchaser hereby designates and appoints the General Partner its true and lawful attorney, in its name, place and stead to make, execute and sign any and all documents necessary or appropriate to consummate and implement the transactions contemplated by this paragraph 8.3(d), including, without limitation, the limited partnership agreement of the Side-by-Side Fund and any subscription booklet relating to the Side-by-Side Fund.

(e)     Without the consent of the Advisory Committee, neither the General Partner, the Management Company nor Michael Rothenberg may call capital with respect to a Successor Fund until the expiration of the Investment Period.

**8.4     Investment Opportunities; Investment Restrictions; Conflicts of Interest.**

(a)     Notwithstanding any other provision of this Agreement to the contrary but subject to paragraph 8.3(b), except as otherwise approved by the Advisory Committee, until the expiration of the Investment Period, the General Partner shall present all investment opportunities which meet the investment objectives of the Partnership (as determined by the General Partner in good faith) to the Partnership and any Parallel Funds in accordance with paragraph 8.3(b) prior to offering such investment opportunities to other private investors, groups, partnerships or corporations (including, without limitation, any Limited Partner, any Related entity, and the Affiliates, members and employees of the foregoing parties and Successor Funds) the right to participate in such investment opportunities; *provided* that once the Partnership and each Parallel Fund has had the opportunity to participate in such an opportunity to the extent of the participation allocated by the General Partner to the Partnership and such Parallel Fund for such opportunity, if any (as determined by the General Partner in good faith), the General Partner, whenever, in its discretion, it so determines, may offer the remaining opportunity to participate in such investment opportunity to other private investors, groups, partnerships or corporations (including, without limitation, any Limited Partner, any Related Entity, and the Affiliates, members and employees of the foregoing parties and Successor Funds), and may charge fees or carried interests with regard to the portion, if any, of any investment opportunity which the General Partner so allocates to persons other than the Partnership or any Parallel Fund, subject to the following rules regarding additional investment opportunities in Partnership portfolio companies and the first Successor Fund to the Partnership.

(i)     The General Partner shall offer to each Anchor Limited Partner a right of first refusal to participate, on a *pro rata* basis based on their respective Partnership Percentages, in each available opportunity to co-invest with the Partnership in investment opportunities of the Partnership; *provided* that such Anchor Limited Partner must (A) notify the General Partner of its commitment to participate in such co-investment within forty-eight hours of receipt of notification of the opportunity and (B) fund any amounts in respect of its participation in such co-investment within five (5) business days of receipt of notification of the opportunity; *provided, further*, that in the event that not all Anchor Investors elect to participate in such opportunity, the General Partner may offer such opportunity to any other private investors, groups, partnerships or corporations (including, without limitation, any Limited Partner, any Related Entities, and the Affiliates, members and employees of the foregoing parties and Successor Funds).

(ii)     The General Partner shall offer to each Anchor Limited Partner a right of first refusal to commit to investing in the first Successor Fund to the Partnership, on a *pro rata* basis based on (A) their respective Partnership Percentages and (B) the targeted aggregate capital commitments of such Successor Fund; *provided* that such right shall be exercisable by an Anchor Limited Partner no later than June 30, 2016.

(b)     The General Partner may cause the Partnership to purchase from the General Partner, the Managing Directors, the Management Company or any employee of the Management Company, any director's options, advisory common stock, or other types of Securities received by such persons from a portfolio company of the Partnership, at fair market value, as determined by the General Partner pursuant to Article 12.

(c)     Notwithstanding any other provision of this Agreement to the contrary, each Limited Partner hereby acknowledges and agrees that the General Partner:

(i)     Will cause the Partnership to invest in Rothenberg Ventures Fund 2015, LLC, a Delaware limited liability company ("***Fund 3***"), a Related Entity and an Affiliate of the General Partner, on a pro-rata basis with any Parallel Fund based on their respective aggregate capital commitments, an amount up to the Partnership's *pro rata* share of Ten Million Dollars ($10,000,000); *provided*, that notwithstanding anything any other provision of this Agreement to the contrary, (x) any amounts of carried interest received by the General Partner or any Affiliate thereof in respect of the Partnership's investment in Fund 3 pursuant to the Operating Agreement of Fund 3, as the same may be amended from time to time pursuant to its terms (the "***Fund 3 Agreement***") shall offset, on a dollar for dollar basis, any amount which the General Partner would otherwise be entitled to receive pursuant to paragraph 7.5(a)(i)(2), 7.5(a)(ii) or 7.5(a)(iii), and such amounts shall instead be distributed to the Limited Partners on a pro-rata basis, based on their respective Partnership Percentages and (y) any amount of management fees or similar compensation payable to the General Partner or any of its Affiliates under the Fund 3 Agreement or any management services agreement in connection therewith in respect of the Partnership's capital commitment to Fund 3 shall offset, on a dollar for dollar basis, the Management Expenses payable by the Partnership to the General Partner, in accordance with paragraph 6.1(a)(iii)(2).

(ii)     Will cause the Partnership to acquire interests in certain portfolio companies through the Partnership's investments in the River Program, an Affiliate of the General Partner and its Affiliates.

(iii)     May cause the Partnership to invest in portfolio companies of the Existing Rothenberg Funds and Companies, and portfolio companies of any accelerator managed by the Managing Directors, the Management Company, the General Partner or their respective Affiliates.

(iv)     May, in its sole discretion, effect the sale of all or substantially all of the assets of the Partnership in a single transaction or series of related transactions to one or more private investors, groups, partnerships or corporations (including, without limitation, any Limited Partner, any Related Entity, and the Affiliates, members and employees of the foregoing parties and Successor Funds), and each Limited Partner hereby waives any fiduciary duty that the General Partner owes to such Limited Partner and the Partnership with respect to any such sale.

(v)     May cause the Partnership to purchase Securities from or sell Securities to one or more Parallel Funds at cost for the purpose of allocating then existing Securities between such entities in proportion to their respective available capital.

(d)     The General Partner will use its reasonable efforts to conduct the affairs of the Partnership in a manner that is not expected to cause a tax-exempt Limited Partner (or any of its equity owners) to realize unrelated business taxable income within the meaning of Section 512 of the Code or unrelated debt-financing income under Section 514 of the Code ("***UBTI***"); *provided, that* such reasonable efforts will be deemed satisfied with respect to a Partnership investment if tax-exempt Limited Partners are given the opportunity to hold their proportionate share of the Partnership's investment in such investment through an Alternative Vehicle and are given sufficient time to establish an entity that is treated as a corporation for United States federal income tax purposes that will hold such interest. The responsibility for forming such an entity to hold such interest in an Alternative Vehicle, and any expenses, taxes or other costs specifically attributable to such entity, will be borne by the Limited Partners that hold interests in such entity. The Limited Partners acknowledge and agree that the foregoing restrictions in this paragraph 8.4(d) shall not apply to the Partnership's investments in or activities with the River

23

Program or any other accelerators of the General Partner, the Management Company and their respective Affiliates.

(e)    The General Partner will use its reasonable efforts to conduct the affairs of the Partnership in a manner that is not expected to cause a non-U.S. Limited Partner to realize any income that is "effectively connected" with the conduct of a trade or business in the U.S. ("*ECI*"); *provided, however*, that such reasonable efforts will be deemed satisfied with respect to a Partnership investment if non-U.S. Limited Partners are given the opportunity to hold their proportionate share of the Partnership's investment in such investment through an Alternative Vehicle and are given sufficient time to establish an entity that is treated as a corporation for United States federal income tax purposes that will hold such interest. The responsibility for forming such an entity to hold such interest in an Alternative Vehicle, and any expenses, taxes or other costs specifically attributable to such entity will be borne by the Limited Partners that hold interests in such entity. The Limited Partners acknowledge and agree that the foregoing restrictions in this paragraph 8.4(e) shall not apply to the Partnership's investments in or activities with the River Program or any other accelerators of the General Partner, the Management Company and their respective Affiliates.

(f)    Without the prior approval of the Advisory Committee, no more than twenty percent (20%) of the Partnership's Capital Commitments (determined on the basis of acquisition cost at the time of investment) may be invested in the Securities of, or loaned to, any one (1) portfolio company (including, for this purpose, the Affiliates of such portfolio company).

(g)    The General Partner may not incur indebtedness on behalf of the Partnership, or guaranty indebtedness of the Partnership's portfolio companies or their respective Affiliates; *provided* that notwithstanding the foregoing, the General Partner may, from time to time, cause the Partnership to guaranty indebtedness of the General Partner and/or the Management Company incurred with respect to loans to the General Partner and/or the Management Company, the aggregate principal amounts of which shall not exceed the aggregate amount of unpaid Management Expenses and Administrative Expenses payable to the General Partner and/or the Management Company with respect to the annual periods during the term of the Partnership pursuant to this Agreement; *provided, further*, that no more than one such loan shall be outstanding at any time.

(h)    Without the prior approval of the Advisory Committee, not more than ten percent (10%) of the Partnership's Capital Commitments (determined on the basis of acquisition cost at the time of investment) may be invested in publicly-traded Securities, excluding (i) private placements of Securities of public company, (ii) Securities which were not publicly traded at the time of such investment, (iii) Securities acquired in a "going private" transaction or series of transactions and (iv) short-term investments such as money market investments.

(i)    Proceeds from the sale or other disposition of investments may be reinvested to the extent that total investments of the Partnership in portfolio companies on a cumulative basis do not exceed, without the approval of the Advisory Committee, one hundred ten percent (110%) of the aggregate Capital Commitments of all Partners.

(j)    If the General Partner determines in good faith that for legal, tax, regulatory or other reasons it is in the best interests of the Partners that an investment be made through an alternative investment structure (including, without limitation, through a foreign limited partnership (or other similar vehicle) formed for the purpose of making investments outside of the United States), the General Partner shall be permitted to structure the making of all or any portion of such investment outside of the Partnership through a separate partnership or other vehicle (any such structure or vehicle, an "*Alternative Vehicle*"). Following such a determination by the General Partner, the General Partner may (i) (1) form

24

the Alternative Vehicle as a subsidiary of the Partnership, (2) invest a portion of the Partnership's capital in the Alternative Vehicle, (3) cause the Alternative Vehicle to make an investment in the portfolio company and (4) immediately thereafter, distribute interests in the Alternative Vehicle *pro rata* to all Partners in proportion to their respective Partnership Percentages; or (ii) form the Alternative Vehicle and require each Partner to make capital contributions directly to each such Alternative Vehicle to the same extent, for the same purposes and on the same terms and conditions as Partners are required to make capital contributions to the Partnership, and such capital contributions shall reduce each Limited Partner's remaining unfunded Capital Commitment obligation to the same extent as if capital were contributed directly to the Partnership. Additionally, the General Partner shall be permitted to form more than one (1) Alternative Vehicle for the making of a single investment and may require that different Partners invest in different Alternative Vehicles as the General Partner determines in good faith to be necessary for legal, tax, regulatory or other reasons; *provided, however,* that each such Alternative Vehicle shall provide for the same carried interest and fees related to management expenses and administrative expenses in respect of its investors as each other such Alternative Vehicle. The use of any Alternative Vehicle shall be subject to the following:

(i)       Equity interests in an Alternative Vehicle shall be made available solely to Limited Partners and the General Partner (or an Affiliate thereof).

(ii)      Any investment by an ERISA Partner or a Governmental Plan Partner pursuant to this paragraph 8.4(j) shall not, in the good faith judgment of the General Partner, violate ERISA or give rise to a "prohibited transaction" under section 4975 of the Code or section 406 of ERISA or violate state law or regulation applicable to a Governmental Plan Partner.

(iii)     Each Partner shall have the same economic interest in all material respects in investments made pursuant to this paragraph 8.4(j) as such Partner would have had if such investment had been made directly by the Partnership instead of through the Alternative Vehicle, and, to the extent practicable upon advice of counsel to the Partnership and considering the extent necessary to comply with legal, regulatory or tax restrictions applicable to the Alternative Vehicle or its limited partners, all other terms of such Alternative Vehicle shall be substantially identical in all material respects to those of the Partnership, to the maximum extent applicable, except to the extent that the terms of the Alternative Vehicle are required to differ from those of the Partnership in order to accomplish the purposes of such Alternative Vehicle. Where terms applicable to such Alternative Vehicle diverge from the terms of this Agreement, no such divergence shall have a material adverse effect on any Partner without such Partner's written consent; *provided, however,* that the terms applicable to an Alternative Vehicle shall not be required to include provisions comparable to paragraphs 8.4(d) and 8.4(e) of this Agreement so long as the General Partner offers each Limited Partner the opportunity to invest in such Alternative Vehicle through an entity that is treated as a corporation for United States federal income tax purposes; *provided, further,* that the terms applicable to an Alternative Vehicle shall include a provision relating to default on capital contributions that is substantially similar to paragraph 4.5 (and that provides that if a Limited Partner defaults on its capital contribution obligations to the Partnership, then it shall also be deemed to have defaulted on its capital contribution obligation to the Alternative Vehicle). Each Partner shall be provided with copies of all definitive agreements relating to any Alternative Vehicle.

(iv)      The definitive agreement of the Alternative Vehicle (and any entity into which such Alternative Vehicle makes an investment) shall provide that the liability of the Limited Partners is limited to the amount of such Limited Partner's Capital Commitment to such Alternative Vehicle ("*Limited Liability*"). Further, in the case of an Alternative Vehicle formed outside of the United States, the General Partner shall obtain advice of duly qualified local counsel to the effect that the laws of the foreign jurisdiction in which such Alternative Vehicle is formed will recognize and respect the Limited Liability of the Limited Partners.

25

(v)     The determination of allocations and distributions pursuant to Articles 5, 7 and 10 shall be calculated by treating investments made by any Alternative Vehicle established pursuant to this paragraph 8.4(j) as having been made by the Partnership.  In no event shall the sum of (i) the amount that the General Partner is required to contribute pursuant to paragraph 10.5 upon the final liquidation of the Partnership plus (ii) any amount the General Partner (or its Affiliate) is required to contribute pursuant to any analogous provision of any Alternative Vehicle's definitive agreement, be less than the amount that the General Partner would have been obligated to contribute to the Partnership pursuant to paragraph 10.5 upon the final liquidation of the Partnership had the Alternative Vehicle not been formed (and the investment(s) carried out by the Alternative Vehicle had instead been carried out by the Partnership).   Notwithstanding the foregoing, the determination of allocations and distributions pursuant to Articles 5, 7 and 10 may be calculated separately from the determination of allocations and distributions of a particular Alternative Vehicle (and vice versa) with the consent of Eighty Percent (80%) in Interest of the Limited Partners.

(vi)     In order to comply with regulatory or legal restrictions on the amount of any Alternative Vehicle that a Partner may be permitted to directly own or control, in the event that any Partner would be entitled to receive a distribution of Alternative Vehicle interests from the Partnership that would create a material likelihood of violating such a regulatory limitation, the Partnership shall accept written instructions from the Partner subject to such regulatory limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution management of such Alternative Vehicle interests upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates).   Such engagement shall be separate from and outside of the structure of the Partnership.

(vii)     In the event that (A) an Alternative Vehicle is formed to hold an investment originally made by the Partnership, and (B) the Partnership sells, exchanges or otherwise transfers such investment to such Alternative Vehicle, in order to approximate the result that would have been obtained had such investment originally been made directly by an Alternative Vehicle, the Partnership may distribute its holdings in such Alternative Vehicle *pro rata* to all Partners in proportion to their respective Partnership Percentage without regard to the provisions of Article 7.

(viii)     Each Limited Partner constitutes and appoints the General Partner its true and lawful attorney, in its name, place and stead, to execute, for and on behalf of such Limited Partner, any instrument, document or certificate that may be reasonably required in connection with the formation of an Alternative Vehicle in compliance with this paragraph 8.4(j), including, without limitation, (A) the limited partnership agreement or other definitive agreement of such Alternative Vehicle (including any amendment thereto necessary to ensure compliance with this paragraph 8.4(j)) and (B) any certificate or other filing in any jurisdiction in which such Alternative Vehicle is to be formed or shall do business to the extent necessary to qualify such Alternative Vehicle to do business in any such jurisdiction.  For the avoidance of doubt, the General Partner shall not be authorized as attorney-in-fact to vote, or execute any consent or waiver, on behalf of the undersigned in connection with any consent required under any definitive agreement of the Alternative Vehicle or any waiver of rights or obligations under such agreement.

(ix)     If a Limited Partner notifies the General Partner that it elects to invest in an Alternative Vehicle through an entity that is treated as a corporation for United States federal income tax purposes, then the General Partner shall permit such Limited Partner to so invest through such an entity.

26

(x)     The General Partner shall consolidate the financial performance of the Alternative Vehicle and its investments with that of the Partnership for purposes of preparing the periodic reports required by paragraphs 11.3 and 11.4.

(xi)    The General Partner or its Affiliate shall be the sole general partner or sole manager, as applicable, of the Alternative Vehicle.

## ARTICLE 9

### INVESTMENT REPRESENTATION AND TRANSFER OF PARTNERSHIP INTERESTS

**9.1    Investment Representation of the Limited Partners.** This Agreement is made with each of the Limited Partners in reliance upon each Limited Partner's representation to the Partnership, which by executing this Agreement each Limited Partner hereby confirms, that its interest in the Partnership is to be acquired for investment, and not with a view to the sale or distribution of any part thereof, and that it has no present intention of selling, granting participation in, or otherwise distributing the same, and each Limited Partner understands that its interest in the Partnership has not been registered under the Securities Act and that any transfer or other disposition of the interest may not be made without registration under the Securities Act or pursuant to an applicable exemption therefrom. Each Limited Partner further represents that it does not have any contract, undertaking, agreement, or arrangement with any person to sell, transfer, or grant participations to such person, or to any third person, with respect to its interest in the Partnership.

**9.2    Qualifications of the Limited Partners.** Each Limited Partner represents that it is (a) an "*accredited investor*" within the meaning of that term as defined in Regulation D promulgated under the Securities Act and (b) a Qualified Purchaser.

**9.3    Transfer by General Partner.** The General Partner shall not sell, assign, mortgage, pledge or otherwise dispose of its interest in the Partnership or in its capital assets or property without the prior written consent of Two-Thirds in Interest of the Fund Limited Partners. Admissions of new members of the General Partner or the transfer of interests in the General Partner by its members shall not be deemed to be a sale or other disposition of the General Partner's interest in the Partnership for purposes of this paragraph 9.3.

**9.4    Transfer by Limited Partner.** No Limited Partner shall sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without the prior written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner. Notwithstanding the foregoing, after delivery of the opinion of counsel hereinafter required by this Article 9 (*provided, however*, that the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel), a Limited Partner may sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without such consent (a) to any entity directly or indirectly holding eighty percent (80%) or more of the ownership interests of the Limited Partner (including profits or other economic interests) or any entity of which eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests) are held directly or indirectly by such entity, including any entity of which the Limited Partner holds, directly or indirectly, eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests), (b) pursuant to a merger, plan of reorganization, sale or pledge of, or other general encumbrance on all or substantially all of the Limited Partner's assets, (c) as may be required by any law or regulation, (d) by testamentary disposition or intestate succession, (e) to a trust, profit sharing plan or other entity controlled by, or for the benefit of, such Limited Partner or one or more of its family members or (f) during the six

27

(6) month period immediately following its admission as a Limited Partner, to an Affiliate entity that is also a Limited Partner where the sole purpose of such transfer is to adjust the relative holdings of such Affiliate and the original Limited Partner.  A change in any trustee or fiduciary of the Limited Partner shall not be considered to be a transfer, sale, assignment, mortgage, pledge or other disposition under this paragraph 9.4, provided written notice of such change is given to the General Partner within a reasonable period of time after the effective date thereof.

       **9.5**    **Requirements for Transfer.**  No transfer or other disposition of the interest of the Limited Partner shall be permitted until the General Partner shall have received an opinion of counsel satisfactory to it (or waived such opinion requirement) that the effect of such transfer or disposition would not:

       **(a)**    result in the Partnership's assets being considered, in the opinion of counsel for the Partnership, as *"plan assets"* within the meaning of the Employment Retirement Income Security Act of 1974, as amended (*"**ERISA**"*), or any regulations proposed or promulgated thereunder, or otherwise result in a requirement that the Partnership qualify as a VCOC in order to avoid holding such *"plan assets"*;

       **(b)**    result in a violation of the Securities Act or any comparable state law;

       **(c)**    require the Partnership to register as an investment company under the Investment Company Act;

       **(d)**    require the Partnership, the General Partner, or any member of the General Partner to register as an investment adviser under the Investment Advisers Act of 1940, as amended;

       **(e)**    result in a termination of the Partnership's status as a partnership for tax purposes;

       **(f)**    result in a violation of any law, rule, or regulation by the Limited Partner, the Partnership, the General Partner, or any member of the General Partner;

       **(g)**    cause the Partnership to be deemed to be a *"publicly traded partnership"* as such term is defined in Section 7704(b) of the Code; or

       **(h)**    result in a violation of this Agreement.

Such legal opinion shall be provided to the General Partner by the transferring Limited Partner or the proposed transferee.  Any costs associated with such opinion shall be borne by the transferring Limited Partner or the proposed transferee.  Upon request, the General Partner will use its good faith diligent efforts to provide any information possessed by the Partnership and reasonably requested by a transferring Limited Partner to enable it to render the foregoing opinion.  Notwithstanding any provision of this Article 9 to the contrary, the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel provided for in this paragraph 9.5.

       **9.6**    **Substitution as a Limited Partner.**  A transferee of a Limited Partner's interest pursuant to this Article 9 shall become a substituted Limited Partner only with the consent of the General Partner (which consent shall not be required in the event of a transfer pursuant to paragraph 9.4(f)) and only if such transferee (a) elects to become a substituted Limited Partner and (b) executes, acknowledges and delivers to the Partnership such other instruments as the General Partner may deem necessary or advisable to effect the admission of such transferee as a substituted Limited Partner, including, without limitation,

129797418 v2

the written acceptance and adoption by such transferee of the provisions of this Agreement. No assignment by a Limited Partner of its interest in the Partnership shall release the assignor from its liabilities to the Partnership, including but not limited to those liabilities enumerated in paragraph 4.2; *provided, however* if the assignee becomes a Limited Partner as provided in this paragraph 9.6, the assignor shall thereupon so be released (in the case of a partial assignment, to the extent of such assignment).

9.7    **Expenses of Transfer.** Any costs or expenses (including but not limited to reasonable attorneys' fees) incurred by the Partnership in connection with the transfer of a Partnership interest hereunder (including any costs associated with any opinion rendered pursuant to paragraph 9.5 above) shall be borne jointly and severally by the transferring Limited Partner and the proposed transferee.

## ARTICLE 10

### DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP; INTERIM GENERAL PARTNER GIVEBACK

10.1    **Extension of Partnership Term.** Upon the Termination Date, or such subsequent dates to which the Partnership term has previously been extended pursuant to this paragraph 10.1, the General Partner: (i) may extend the Partnership term for up to two (2) additional two (2) year periods, in the General Partner's sole discretion; and (ii) thereafter may extend the Partnership for additional one (1) year periods with the consent of a Majority in Interest of the Fund Limited Partners; *provided* that no Management Expenses shall be charged during any such extension periods and Administrative Expenses shall only be charged in the first two (2) year extension periods set forth in the foregoing clauses (i) and (ii) of this sentence. Following such extension periods, the General Partner shall use its reasonable efforts to convert the Partnership's Nonmarketable Securities into Marketable Securities or cash, and all Securities that become Marketable Securities during such period or periods shall be promptly distributed by the Partnership; *provided*, that the Advisory Committee must approve the value of any such Marketable Securities to be so distributed prior to their distribution. The General Partner shall not purchase the Securities of any new issuer in which the Partnership does not already hold an interest during such period; *provided, however*, that the General Partner may (a) purchase additional Securities of a portfolio company if it deems such a purchase to be in the best interests of the Partnership, and (b) exchange the Securities of a portfolio company for other Securities.

10.2    **Early Termination of the Partnership.**

(a)    The Partnership shall dissolve, and the affairs of the Partnership shall be wound up prior to the Termination Date (or such subsequent dates to which the Partnership term has previously been extended pursuant to paragraph 10.1) ninety (90) days after the withdrawal, bankruptcy, or dissolution of the General Partner, unless a Majority in Interest of the Fund Limited Partners elect to continue the Partnership within such ninety (90) day period.

(b)    In the event that the Partnership is dissolved pursuant to the provisions of this paragraph 10.2, a Majority in Interest of the Fund Limited Partners shall elect one or more liquidators to manage the liquidation of the Partnership in the manner described in paragraphs 10.3, 10.4 and 10.5.

10.3    **Winding Up Procedures.**

(a)    Promptly upon dissolution of the Partnership (unless the Partnership is continued in accordance with this Agreement or the provisions of the Act), the affairs of the Partnership shall be wound up and the Partnership liquidated.

(b)     Distributions during the winding up period may be made in cash or in kind or partly in cash and partly in kind. The General Partner or the liquidator shall use its best judgment as to the most advantageous time for the Partnership to sell Securities or to make distributions in kind. All cash and each Security distributed in kind after the date of dissolution of the Partnership shall be distributed ratably in accordance with the provisions of paragraph 4.2(d), if applicable, but otherwise in accordance with Article 7, unless such distribution would result in a violation of a law or regulation applicable to a Limited Partner, in which event, upon receipt by the General Partner of notice to such effect, such Limited Partner may designate a different entity to receive the distribution, or designate, subject to the approval of the General Partner (which may be withheld in the General Partner's sole discretion), an alternative distribution procedure (*provided, however*, that such alternative distribution procedure does not prejudice any of the other Partners). Each Security so distributed shall be subject to reasonable conditions and restrictions necessary or advisable, as determined in the reasonable discretion of the General Partner or the liquidator, in order to preserve the value of such Security or for legal reasons.

**10.4     Payments in Liquidation.** The assets of the Partnership shall be distributed in final liquidation of the Partnership in the following order:

(a)     to the creditors of the Partnership, including those Partners who are creditors of the Partnership, in the order of priority established by law, either by payment or by establishment of reserves; and

(b)     to the General Partner and the Limited Partners in accordance with the amounts they would receive if such assets were distributed in accordance with paragraphs 7.4(b) and 7.5(a); *provided, however*, that the General Partner shall be obligated to contribute to the Partnership an amount in cash, or Securities (previously distributed in kind from the Partnership) with a fair market value equal to the amounts the General Partner is obligated to pay back under paragraph 10.5. In addition, the Advisory Committee must approve the value of any Securities to be so distributed prior to their distribution pursuant to this paragraph 10.4.

**10.5     Return of Excess Distributions.**

(a)     Notwithstanding paragraphs 7.3 and 10.4, upon liquidation of the Partnership pursuant to this Article 10, the General Partner shall be required to pay back to the Partnership any Tax Adjusted Excess Distributions. The "***Tax Adjusted Excess Distributions***" shall mean the positive amount, if any, of (x) the *sum of* (i) the cumulative net distributions received by the General Partner over the life of the Partnership as of such time (excluding amounts received by the General Partner in respect of its Capital Commitment, and amounts returned to the Partnership by the General Partner pursuant to paragraph 4.2(d)(ii) or 10.6 prior to final liquidation of the Partnership) *plus* (ii) the cumulative amounts as of such time that offset the amounts in the immediately preceding clause (i) pursuant to clause (x) of paragraph 8.4(c)(i), *minus* (y) the cumulative distributions that would have been received by the General Partner (excluding amounts received by the General Partner in respect of its Capital Commitment) calculated as if all distributions made by the Partnership to the Partners since inception were retained by the Partnership and distributed among the Partners as of the date of the Partnership's final liquidating distribution pursuant to clause 7.5(a)(i)(2), 7.5(a)(ii), and 7.5(a)(iii)(2), as applicable; *provided, however*, that the General Partner's payment obligation pursuant to this paragraph 10.5 shall be reduced by the product of (x) such excess amount (reduced by the amount described in the immediately preceding clause (ii)) multiplied by (y) the Applicable Tax Rate as determined for the income corresponding to such distributions, assuming that the fair market value of in kind distributions were taxable in its entirety at the Applicable Tax Rate. In the event that the assets of the General Partner are insufficient to satisfy the obligation described in the preceding sentence, all carried interest recipients will on a several, but not

30

joint, basis contribute capital to the General Partner in an amount not to exceed the lesser of (a) each carried interest recipient's *pro rata* share of the General Partner's remaining obligation to the Partnership and (b) the carried interest distributions and amounts described in the immediately preceding clause (ii) actually received by such carried interest recipient from the General Partner or its Affiliate, as applicable, reduced by tax distributions to which such carried interest recipient would have been entitled with respect to such distributions assuming all such amounts distributed were taxable.

      **(b)**    [Intentionally Deleted].

    **10.6**    **Interim General Partner Giveback.**  If on the sixth anniversary of the Partnership's Final Closing Date and annually thereafter, within a reasonable period after the close of each fiscal year (each such date, the "*Interim Giveback Determination Date*"), the General Partner has received any distributions pursuant to clause 7.5(a)(i)(2), 7.5(a)(ii) or 7.5(a)(iii)(2), the General Partner shall calculate whether it would be obligated to pay back any Tax Adjusted Distributions pursuant to paragraph 10.5(a), if the Partnership had made a hypothetical distribution of its assets on the Interim Giveback Determination Date (the "*Interim Giveback Obligation*"), and the amount, if any, of such Interim Giveback Obligation as determined pursuant to this paragraph 10.6 and paragraph 10.5(a), the "*Interim Giveback Amount*").  The value of the Partnership's assets deemed to be distributed in such hypothetical liquidating distributions shall be determined by the General Partner in accordance with Article 12.  If the General Partner determines that it would have an Interim Giveback Obligation at such time, the General Partner shall make a capital contribution to the Partnership, within forty-five (45) days of the Interim Giveback Determination Date, in the amount equal to the Interim Giveback Amount.  Any contributions made to the Partnership pursuant to this paragraph 10.6 shall be distributed to the Partners pursuant to paragraph 7.5 (excluding distributions to the General Partner pursuant to 7.5(a)(i)(2), 7.5(a)(ii) or 7.5(a)(iii)(2), and such distributions shall be treated as advances of distributions to the Partners pursuant to paragraph 7.5(a).  In the event that the assets of the General Partner are insufficient to satisfy the obligation to return the Interim Giveback Amount, all carried interest recipients will on a several, but not joint, basis contribute capital to the General Partner in an amount not to exceed the lesser of (a) each carried interest recipient's *pro rata* share of the General Partner's remaining obligation to the Partnership with respect to the Interim Giveback Amount and (b) the carried interest distributions and amounts described in clause (ii) of the definition of "Tax Adjusted Excess Distributions" with respect to the Interim Giveback Amount actually received by such carried interest recipient from the General Partner or its Affiliate, as applicable, reduced by tax distributions to which such carried interest recipient would have been entitled with respect to such distributions assuming all such amounts distributed were taxable.

## ARTICLE 11

### FINANCIAL ACCOUNTING AND REPORTS

    **11.1**    **Financial Accounting; Fiscal Year.**  The books and records of the Partnership shall be kept in accordance with the provisions of this Agreement and otherwise in accordance with generally accepted accounting principles consistently applied, and shall be audited at the end of each fiscal year by an independent public accountant selected by the General Partner; *provided*, that no audit shall be required for the Partnership's first fiscal year that began on the date of the commencement of the Partnership's term and ended on December 31, 2015 (so long as such period shall be covered in the audit of the books and records of the Partnership for the fiscal year ending December 31, 2016). The Partnership's fiscal year shall be the calendar year.

    **11.2**    **Supervision; Inspection of Books.**  Proper and complete books of account of the Partnership, copies of the Partnership's federal, state and local tax returns for each fiscal year, the Schedule of Partners set forth in **EXHIBIT A**, this Agreement and the Partnership's Certificate of Limited

Partnership shall be kept under the supervision of the General Partner at the principal office of the Partnership.  Such books and records shall be open to inspection by the Limited Partners, or their accredited representatives, at not less than three (3) business days' notice, at any reasonable time during normal business hours.

**11.3    Semi-Annual Reports.**  The General Partner shall use commercially reasonable efforts to transmit to the Limited Partners within ninety (90) days after the close of each semi-annual period, a summary of acquisitions and dispositions of investments made by the Partnership during such period, together with a valuation of the investments then held; *provided*, that such valuation of any investment may be withheld by the General Partner in its sole and absolute discretion (including without limitation on a "cost" basis).

**11.4    Annual Report; Financial Statements of the Partnership.**  The General Partner shall, as soon as practicable after the close of each of the Partnership's fiscal years, transmit to the Limited Partners audited financial statements of the Partnership prepared in accordance with the terms of this Agreement and otherwise in accordance with generally accepted accounting principles, including an income statement for the year then ended and a balance sheet as of the end of such year; *provided*, that the General Partner shall use commercially reasonable efforts to transmit such audited financial statements to the Limited Partners within one hundred and fifty (150) days after the close of the Partnership's fiscal year; *provided, further* that for purposes of the audit of the Partnership's financial statements, the cost paid by the Partnership for such Securities shall be deemed to be the "value" of such Securities; and *provided, however*, that notwithstanding the foregoing, no such financial statements shall be required for the Partnership's first fiscal year that began on the date of the commencement of the Partnership's term and ended on December 31, 2015 (so long as such period shall be covered in the audit of the books and records of the Partnership for the fiscal year ending December 31, 2016).  The financial statements shall be accompanied by a report from the General Partner to the Limited Partners, which shall include a summary of acquisitions and dispositions of investments made by the Partnership during the preceding period and a valuation of each such investment; *provided*, that such valuation of any investment may be withheld by the General Partner in its sole and absolute discretion.  Each Limited Partner agrees that for all purposes hereunder, the valuation methodology set forth in this paragraph 11.4 shall substitute for a full "fair value" audit of such Securities under the Statement of Financial Accounting Standards No. 157 promulgated by the U.S. Financial Accounting Standards Board.

**11.5    Website Based Reporting.**  The General Partner shall be entitled, in its sole discretion, to transmit the reports and statements described in paragraphs 11.3 and 11.4 (the "***Subject Reports***") to one or more Limited Partners solely by means of granting such Limited Partners access to a database or other forum hosted on a website designated by the General Partner (the "***Reporting Site***"), with such parameters regarding access and availability of information for review as the General Partner deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein (including, but not limited to, establishing password protections for access to the Reporting Site and having such Subject Reports available for review for a restricted period of time (but in no event less than thirty (30) days from the date the Limited Partners are notified that such Subject Reports are posted on the Reporting Site)).  The General Partner shall provide each Limited Partner to which it will transmit Subject Reports pursuant to this paragraph 11.5 notice of the first date on which a new Subject Report will be posted on the Reporting Site for such Limited Partner's review and shall either (i) make each Subject Report printable or (ii) upon written request by a Limited Partner, deliver a mailed copy of the Subject Report to such Limited Partner. Unless the General Partner exercises its discretion pursuant to and in compliance with paragraph 15.15(c) to restrict access to certain Confidential Information that may be included in a Subject Report posted on the Reporting Site, the Subject Reports posted on the Reporting Site shall contain all of the material information included in those Subject Reports transmitted to Limited Partners other than pursuant to this paragraph 11.5 and shall be print-capable.  The Subject Reports shall

32

be posted on the Reporting Site within the same number of days after the end of the applicable period or Fiscal Year as is required pursuant to paragraphs 11.3 and 11.4.

**11.6    Tax Returns.**

(a)    The General Partner shall use commercially reasonable efforts to cause the Partnership's federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by a Limited Partner to be prepared and delivered to the Limited Partners within one hundred and twenty (120) days after the close of the Partnership's fiscal year.

(b)    Each Limited Partner hereby agrees and covenants that it shall not make an election under Section 732(d) of the Code with respect to property distributed to it by the Partnership without the prior written consent of the General Partner.  The General Partner may, but shall not be obligated to, cause the Partnership to make an election under Section 754 of the Code or an election to be treated as an "electing investment partnership" within the meaning of Section 743(e) of the Code.  If the Partnership elects to be treated as an electing investment partnership, each Limited Partner shall (i) reasonably cooperate with the Partnership to maintain such status, (ii) shall not take any action that would be reasonably inconsistent with such election, (iii) provide the General Partner with any information necessary to allow the Partnership to comply with its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and its tax reporting and other obligations as an electing investment partnership, and (iv) provide the General Partner and any such Limited Partner's transferee (if applicable), promptly upon request, with the information required under Section 6031(b) of the Code or otherwise to be furnished to the Partnership or such transferee, including such information as is reasonably necessary to enable the Partnership and such transferee to compute the amount of losses disallowed under Section 743(e) of the Code, but in no event shall such Limited Partner be required to provide such information prior to its receipt of its Schedule K-1 for such taxable year, except to the extent of information, if any, required by the Partnership to complete its Schedule K-1s.  Whether or not the Partnership makes such election, promptly upon request, each Limited Partner shall provide the General Partner with any information related to such Partner reasonably necessary to allow the Partnership to comply with (i) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (ii) any other tax reporting obligations of the Partnership.

**11.7    Tax Matters Partner; Partnership Representative.**

(a)    For fiscal years of the Partnership beginning before January 1, 2018, the General Partner shall be the Partnership's tax matters partner under the Code and under any comparable provision of state law.  The General Partner shall have the right to resign as tax matters partner by giving thirty (30) days' written notice to each Partner.  Upon such resignation a successor tax matters partner shall be selected by a Majority in Interest of the Fund Limited Partners.  The tax matters partner shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Internal Revenue Service and in connection with all subsequent administrative and judicial proceedings arising out of such audit.  If the tax matters partner is required by law or regulation to incur fees and expenses in connection with tax matters not affecting all the Partners, then the Partnership shall be entitled to reimbursement from those Partners on whose behalf such fees and expenses were incurred.  The tax matters partner shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, and shall furnish to each partner, if such Partner so requests in writing, a copy of each notice or other communication received by the tax matters partner from the Internal Revenue Service, except such notices or communications as are sent directly to such requesting Partner by the Internal Revenue Service.  The relationship of the tax matters partner to the Limited Partners is that of a fiduciary, and the tax matters partner has fiduciary obligations to perform its duties as tax matters partner in such manner as will serve the best interests of the Partnership and all of

33

the Partnership's Partners.  To the fullest extent permitted by law, but subject to the limitations and exclusions of paragraph 15.4, the Partnership agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to all (a) fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the General Partner or the Partnership that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Partnership, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise of any such claim, action, or demand. Any references to Sections of the Code set forth in this Section 11.7(a) refer to those Sections as in effect for fiscal years of the Partnership beginning before January 1, 2018.

(b)     For fiscal years of the Partnership beginning after December 31, 2017 (or if the effective date of Section 1101 of the Bipartisan Budget Act of 2015 is extended, such later extended date): (i) the General Partner shall be designated the "partnership representative" within the meaning of Section 6223(a) of the Code (the "***Partnership Representative***") and the General Partner shall be authorized to take any actions necessary under Treasury Regulations or other guidance to cause the General Partner to be designated as such; (ii) the Partnership and each Partner agree that they shall be bound by the actions taken by the Partnership Representative, as described in Section 6223(b) of the Code; (iii) the Partners consent to the election set forth in Section 6226(a) of the Code and agree to take any action, and furnish the General Partner with any information necessary, to give effect to such election if the General Partner decides to make such election; (iv) any imputed underpayment imposed on the Partnership pursuant to Section 6232 of the Code (and any related interest, penalties or other additions to tax) that the General Partner reasonably determines is attributable to one or more Partners shall be promptly paid by such Partners to the Partnership *pro rata* in proportion to their respective shares of such underpayment (*provided*, that in determining the respective shares of the Partners (including former Partners) of any such imputed underpayment, the General Partner will allocate any imputed underpayment imposed on the Partnership (and any related interest, penalties, additions to tax and audit costs) among the Partners in good faith taking into account each Partner's particular status, including, for the avoidance of doubt, a Partner's tax-exempt status) within fifteen days following the General Partner's request for payment (and any failure to pay such amount shall result in a subsequent reduction in distributions otherwise payable to such Partner plus interest on such amount calculated at the prime rate plus two percent (2%)) and/or shall constitute an event of default subject to the terms of paragraph 4.5); and (v) paragraphs 15.3 and 15.4 shall each apply to the General Partner in its capacity as Partnership Representative.  Any references to Sections of the Code set forth in this Section 11.8(b) refer to those Sections as in effect for fiscal years of the Partnership beginning after December 31, 2017.

**11.8    Partnership Funds.**  Cash held by the Partnership shall be promptly deposited into an account in a reputable bank or financial institution (as determined by the General Partner in its reasonable discretion).

**11.9    FATCA.**

(a)     Notwithstanding any other provision of this Agreement, in order to comply with FATCA, each Partner agrees to provide information and certifications, and the General Partner shall be entitled to release and/or disclose on behalf of the Partnership to any government body as required by FATCA any such information or certification so provided or information otherwise in its or its agents' or delegates' possession, regarding such Partner as the General Partner deems necessary or appropriate, including, without limitation, financial information concerning any Partner's investment in the Partnership, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Partner.  The General Partner may also authorize any third party agent to release and/or disclose such information on behalf of the Partnership.

34

(b)      In order to comply with FATCA and, if necessary, to reduce or eliminate any risk that the Partnership or its Partners are subject to withholding taxes pursuant to FATCA or incur any costs or liabilities associated with FATCA, the General Partner may cause the Partnership to undertake any of the following actions:

(i)      compulsorily redeem any or all of the interest held by a Partner either (i) where the Partner fails to provide (in a timely manner) to the Partnership, or any agent or delegate of the General Partner any information requested by the General Partner or such agent or delegate pursuant to FATCA; or (ii) where there has otherwise been non-compliance by the Partnership with FATCA whether caused, directly or indirectly, by the action or inaction of such Partner, or any related person, or otherwise;

(ii)      deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(A)      comply with any requirement to apply and collect withholding tax pursuant to FATCA;

(B)      allocate to a Partner an amount equal to any withholding tax imposed on the Partnership as a result of the Partner's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Partnership with FATCA;

(C)      ensure that any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Partnership) are recovered from the Partner(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Partner) gave rise or contributed to such costs or liabilities;

(iii)      in order to give effect to the requirements imposed upon the Partnership by FATCA, including the actions contemplated by the foregoing provisions, the General Partner may:

(A)      apply any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Partnership) to any recalcitrant Partner's Capital Account; and/or

(B)      allocate any FATCA costs, debts, expenses, obligations, liabilities or withholding tax among the Partners' capital accounts on a basis determined solely by the General Partner.

## ARTICLE 12

### VALUATION; ADVISORY COMMITTEE

**12.1    Valuation.**  Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement shall be at fair market value.  Except as may be required under applicable Treasury Regulations, no value shall be placed on the goodwill or the name of the Partnership in determining the value of the interest of any Partner or in any accounting among the Partners.

(a)      The following criteria shall be used for determining the fair market value of Securities:

(i)     If traded on one or more securities exchanges or the NASDAQ National Market System, the value shall be deemed to be the Securities' closing price on the principal of such exchanges on the valuation date.

(ii)     If actively traded over the counter (other than on the NASDAQ National Market System), the value shall be deemed to be the closing price of such Securities on the valuation date.

(iii)     If there is no active public market, the "fair market value" value shall be the value thereof as determined by the General Partner, taking into consideration the purchase price of the Securities, developments concerning the investee company subsequent to the acquisition of the Securities, the percentage of the issuer of the Securities that is owned by the Partnership, the marketability (or lack thereof) of the Securities, any financial data and projections of the investee company provided to the General Partner, and such other factor or factors as the General Partner may deem relevant.

(b)     If the General Partner in good faith determines that, because of special circumstances, the valuation methods set forth in this Article 12 do not fairly determine the value of a Security, the General Partner shall make such adjustments or use such alternative valuation method as it deems appropriate.

(c)     The General Partner shall have the power at any time to determine, for all purposes of this Agreement, the fair market value of any assets and liabilities of the Partnership, subject to paragraphs 12.1(d) and 12.1(e).

(d)     The General Partner shall submit proposed valuations of Securities to the Advisory Committee on the same schedule as the periodic reports are provided to the Limited Partners as set forth in paragraphs 11.3 and 11.4 (and which such valuations may be included in such reports). If within thirty (30) days of receipt of a proposed valuation established by the General Partner pursuant to this paragraph 12.1, the Advisory Committee notifies the General Partner of an objection to such proposed valuation, then, if the General Partner and the Advisory Committee cannot otherwise mutually agree on the valuation, the valuation of any such Securities whose valuation is disputed shall be determined as follows:

(i)     any convertible notes and simple agreements for future equity shall be assumed to convert at the most recent known capped or maximum valuation of such Securities, not including the benefit of any applicable discount calculations with respect thereto;

(ii)     any preferred equity shall be valued at the last known price paid for any other preferred equity of the same issuer; and

(iii)     any common equity shall be valued at the known price most recently paid for the common equity of such issuer or the most recent known valuation with respect to such Security conducted in accordance with Section 409A of the Code (whichever is most recent).

(e)     The Advisory Committee must approve values of Securities to be distributed in advance of their distribution pursuant to paragraphs 7.5(a), 10.1 and 10.4(b); *provided*, that in the event of a disagreement, such Securities will be valued in accordance with paragraph 12.1(d).

**12.2    Advisory Committee.** The General Partner will appoint an Advisory Committee (the "*Advisory Committee*") that shall consist of up to five (5) representatives of the Fund Limited Partners selected by the General Partner from time to time in its reasonable judgment; *provided, however*, that any Fund Limited Partner that is an Affiliate of the General Partner, the Management Company, any

Managing Director or any of their respective members, employees or Affiliates may not be appointed to be a member of the Advisory Committee; *provided, further*, that if the General Partner affirmatively removes a representative of a Fund Limited Partner from serving on the Advisory Committee, other than for conduct that the General Partner determines in its reasonable discretion, is harmful to the Partnership or any Parallel Fund or Feeder Fund, then such Fund Limited Partner shall be entitled to appoint a replacement member of the Advisory Committee who is reasonably acceptable to the General Partner. The General Partner will consider for representation on the Advisory Committee any Fund Limited Partner with a Capital Commitment of at least, or a capital commitment to any Parallel Fund or Feeder Fund of at least, ten million dollars ($10,000,000); *provided* that the General Partner shall be under no obligation by virtue of the foregoing to appoint the representative of any particular Fund Limited Partner to the Advisory Committee. The General Partner hereby confirms that it shall interpret this paragraph 12.2 on a "look through" basis where the Fund Limited Partner is a Feeder Fund so that only the applicable constituent limited partner(s) of such Feeder Fund, and not such Feeder Fund as a whole, is treated as being a Fund Limited Partner for purposes of this subparagraph 12.2.  The duties of the Advisory Committee will include: (a) consideration of any approvals sought by the General Partner pursuant to the terms of this Agreement or any governing document of a Parallel Fund or Feeder Fund; (b) review and advise the General Partner regarding matters involving conflicts of interest submitted to them by the General Partner; and (c) render such other advice and counsel as is requested by the General Partner in connection with the Partnership's investments and other Partnership matters.  However, subject to paragraph 12.1(d), the General Partner will retain ultimate responsibility for asset valuations and for making all investment decisions. The Partnership, on a *pro rata* basis with any Parallel Funds (based on their respective capital commitments) will reimburse each member of the Advisory Committee for his or her reasonable out-of-pocket expenses. All actions, consents or approvals of the Advisory Committee shall require a majority of its members serving at the time such action, consent or approval is taken, which actions, consents or approvals may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the General Partner.  If an action requires Advisory Committee's consent or approval, such consent or approval shall be deemed as obtained in compliance with this Agreement if the Advisory Committee ratifies such action after its occurrence.

## ARTICLE 13

### PARTNERS SUBJECT TO SPECIAL REGULATION

### 13.1    ERISA Partners.

(a)      Each Limited Partner that is, or whose equity interests are at least partially owned by, a "*benefit plan investor*" within the meaning of, and subject to the provisions of, ERISA (each, an "***ERISA Partner***"), hereby (i) acknowledges that it is its understanding that neither the Partnership, the General Partner, nor any of the affiliated entities of the General Partner, are "*fiduciaries*" of such Limited Partner within the meaning of ERISA by reason of the Limited Partner investing its assets in, and being a Limited Partner of, the Partnership; (ii) acknowledges that it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership; (iii) acknowledges that it is aware of the provisions of Section 404 of ERISA relating to the requirements for investment and diversification of the assets of employee benefit plans and trusts subject to ERISA; (iv) represents that it has given appropriate consideration to the facts and circumstances relevant to the investment by that ERISA Partner's plan in the Partnership and has determined that such investment is reasonably designed, as part of such portfolio, to further the purposes of such plan; (v) represents that, taking into account the other investments made with the assets of such plan, and the diversification thereof, such plan's investment in the Partnership is consistent with the requirements of Section 404 and other provisions of ERISA; (vi) acknowledges that it understands that current income will not be a primary objective of the Partnership; and (vii) represents that, taking into account the other

37

investments made with the assets of such plan, the investment of assets of such plan in the Partnership is consistent with the cash flow requirements and funding objectives of such plan.  For the avoidance of doubt, IRAs shall not be admitted to the Partnership, and therefore shall not be treated as ERISA Partners under this Agreement.

      **(b)**      Notwithstanding any provision contained herein to the contrary, each ERISA Partner may request the General Partner to effect a mandatory withdrawal of such ERISA Partner from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, at the time and in the manner hereinafter provided, if either the ERISA Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the ERISA Partner and the General Partner) to the effect that, as a result of applicable statutes, regulations, case law, administrative interpretations, or similar authority (i) the continuation of the ERISA Partner as a Limited Partner of the Partnership or the conduct of the Partnership will result, or there is a material likelihood the same will result, in a material violation of ERISA, or (ii) all or any portion of the assets of the Partnership constitute assets of the ERISA Partner and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the ERISA Partner.  In the event of the issuance of such opinion of counsel, a copy of such opinion shall be given to all the ERISA Partners, together with the written notice of the request of the ERISA Partner to withdraw or the written demand of the General Partner for withdrawal, whichever the case may be.  Thereupon, unless within ninety (90) days after receipt of such written notice and opinion the General Partner is able to eliminate the necessity for such withdrawal to the reasonable satisfaction of the ERISA Partner and the General Partner, whether by correction of the condition giving rise to the necessity of the ERISA Partner's withdrawal, or the amendment of this Agreement, or otherwise, the General Partner shall give effect to the withdrawal of such Limited Partner with respect to such Limited Partner's entire interest in the Partnership, such withdrawal to be effective upon the last day of the fiscal quarter during which such ninety (90) day period expired.

      **(c)**      The withdrawing ERISA Partner shall be entitled to receive within ninety (90) days after the date of such withdrawal an amount equal to the amount of such Partner's Capital Account as of the effective date of such withdrawal.

      **(d)**      Any distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph may, in the sole discretion of the General Partner, be made in cash, in securities, in the form of a promissory note, the terms of which shall be mutually agreed upon by the General Partner and the withdrawing ERISA Partner, or any combination thereof.

      **(e)**      Any valuation necessary for the purposes of a distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph shall be made by the General Partner in good faith pursuant to paragraph 12.1.

      **(f)**      The General Partner hereby confirms that when requiring any Limited Partner to withdraw all or any portion of its Capital Account balance pursuant to this paragraph 13.1, the General Partner will apply paragraph 13.1 on a "look through" basis, so that only the applicable constituent limited partners of any Feeder Fund, and not such Feeder Fund as a whole, is subject to such withdrawal.

    **13.2**    **Governmental Plan Partners.**  Notwithstanding any provision of this Agreement to the contrary, any Limited Partner that is either a *"governmental plan"* as defined in Title 29, Section 1002(32) of the United States Code or an employee benefit plan subject to Governmental Plan Regulations (a *"Governmental Plan Partner"*) may request the General Partner to effect a mandatory withdrawal of such Private Foundation Partner from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Governmental Plan Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Governmental Plan Partner

and the General Partner) to the effect that the Governmental Plan Partner, the Partnership, or the General Partner would be in violation, or there is a material likelihood the same would result, of any Governmental Plan Regulation, as a result of the Governmental Plan Partner continuing as a Limited Partner, and, in the case of an opinion obtained by the General Partner, that such violation would have a material adverse effect on the General Partner or the Partnership.  In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Governmental Plan Partner's interest in the Partnership shall be governed by paragraph 13.1 of the Agreement, as if the Governmental Plan Partner were an ERISA Partner.

**13.3    Private Foundation Partners.**  Notwithstanding any provision of the Agreement to the contrary, any Limited Partner that is, or whose equity interests are at least partially owned by, a "*private foundation*" as described in Section 509 of the Code (a "***Private Foundation Partner***"), may request the General Partner to effect a mandatory withdrawal of such Private Foundation Partner from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Private Foundation Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Private Foundation Partner and the General Partner) to the effect that such withdrawal is necessary in order for the Private Foundation Partner to avoid (a) excise taxes imposed by Subchapter A of Chapter 42 of the Code (other than Sections 4940 and 4942 thereof), or (b) a material breach of the fiduciary duties of its trustees under any federal or state law applicable to private foundations or any rule or regulation adopted thereunder by any agency, commission, or authority having jurisdiction.  In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Private Foundation Partner's interest in the Partnership shall be governed by paragraph 13.1, as if the Private Foundation Partner were an ERISA Partner.

## ARTICLE 14

### CERTAIN DEFINITIONS

**14.1    Accounting Period.**  An Accounting Period shall be (a) a calendar year if there are no changes in the Partners' respective interests in the Profits or Losses of the Partnership during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interests shall occur.

**14.2    Adjusted Asset Value.**  The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

**(a)**    The initial Adjusted Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset at the time of contribution, as determined by the contributing Partner and the Partnership.

**(b)**    In the discretion of the General Partner, the Adjusted Asset Values of all Partnership assets may be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the following times:  (i) upon distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership assets, unless all Partners receive simultaneous distributions of either undivided interests in the distributed property or identical Partnership assets in proportion to their interests in Partnership distributions as provided in paragraphs 7.4, 7.5 and 7.6, and (ii) the grant of an additional interest in the Partnership by any new or existing Partner.

39

(c)     The Adjusted Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the termination of the Partnership either by expiration of the Partnership's term or the occurrence of an event described in paragraph 10.2.

**14.3    Adjusted Capital Account Balance.**  The Adjusted Capital Account Balance for each Partner shall be equal to the balance in the Partner's Capital Account as of the end of the relevant Accounting Period, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amounts which the Partner is obligated to restore, including, without limitation, amounts described in paragraph 10.5, or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Section 1.704-1(b)(4)(iv)(f); and

(b)     Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

**14.4    Affiliate.**  An Affiliate of any person shall mean (a) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with the person specified or (b) such person's family members within the same line of direct consanguinity or a first degree of collateral consanguinity.

**14.5    Capital Account.**  The Capital Account of each Partner shall consist of its original capital contribution, (a) increased by any additional capital contributions, its share of income or gain that is allocated to it pursuant to this Agreement, and the amount of any Partnership liabilities that are assumed by it or that are secured by any Partnership property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of expense or loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Partnership or that are secured by any property contributed by it to the Partnership.  The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the General Partner may make such modification, *provided, however,* that it is not likely to have more than an insignificant effect on the total amounts distributable to any Partner pursuant to Article 7 and Article 10.

**14.6    Capital Commitment; Committed Capital.**  A Partner's Capital Commitment shall mean the amount that such Partner has agreed to contribute to the capital of the Partnership as set forth opposite such Partner's name on its **EXHIBIT A** hereto.  The Partnership's Committed Capital shall equal the sum of the aggregate Capital Commitments of all Partners.

**14.7    Code.**  The Code is the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

**14.8    Deemed Gain or Deemed Loss.**  The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1), over the aggregate Adjusted Asset Value of the Securities distributed.  The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair

40

market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1).

**14.9    FATCA.**  FATCA means the Foreign Account Tax Compliance provisions enacted as part of the U.S. Hiring Incentives to Restore Employment Act and codified in Sections 1471 through 1474 of the Code, all rules, regulations and other guidance issued thereunder, and all administrative and judicial interpretations thereof.

**14.10    Fund Partners; Fund Limited Partners**.  Fund Partners means, collectively, the Partners of the Partnership and the partners of any Parallel Fund.  Fund Limited Partners means, collectively, the Limited Partners of the Partnership and the limited partners of any Parallel Fund.

**14.11    Individual Limited Partner**.  Individual Limited Partner means a Limited Partner that is a natural person, an individual grantor trust of which such natural person is the grantor or settlor, any other trust or estate vehicle of a natural person, or a family office, in each case, in the reasonable determination of the General Partner.

**14.12    Initial Closing Date.**  Initial Closing Date means December 28, 2015.

**14.13    Institutional Limited Partner**.  Institutional Limited Partner means a Limited Partner that is not an Individual Limited Partner, in each case, in the reasonable determination of the General Partner.

**14.14    Managing Directors.**  Managing Directors shall refer to the managing directors of the General Partner.  The initial Managing Director is Michael Rothenberg.

**14.15    Marketable; Marketable Securities; Marketability.**   These terms shall refer to Securities that are (i) (A) traded on a national securities exchange or over the counter or (B) currently the subject of an effective Securities Act registration statement, (ii) not subject to underwriter "lockup" or other contractual restrictions and (iii) may be sold by each distributee Limited Partner without restriction under applicable securities laws of the United States or the applicable laws of the jurisdiction of the exchange on which such Securities are actively traded (other than volume limitations imposed under Securities and Exchange Commission Rule 144 or similar volume limitations imposed by another jurisdiction).  Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the General Partner, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Partnership within a reasonable time period.

**14.16    Nonmarketable Securities.**   Nonmarketable Securities are all Securities other than Marketable Securities.

**14.17    Ordinary Income.**  Ordinary Income shall be an amount computed for each Accounting Period as of the last day thereof that is equal to all income received by the Partnership during such Accounting Period from the investment of idle funds in Short-Term Securities.

**14.18    Partnership Percentage.**  The Partnership Percentage for each Partner shall be equal to the Capital Commitment of such Partner stated as a percentage of the aggregate Capital Commitments of the Partnership, and shall be set forth opposite each Partner's name on its **EXHIBIT A** hereto.

**14.19    Percentage in Interest; Majority in Interest.**  A specified fraction or percentage in interest of (a) the Partners or of the Limited Partners shall mean Partners or Limited Partners of the

Partnership whose Capital Commitments, stated as a percentage of the aggregate Capital Commitments of the Partnership, equal or exceed the required fraction or percentage in interest of all such Partners or Limited Partners and (b) the Fund Partners or the Fund Limited Partners shall mean the Partners or Limited Partners of the Partnership together with the partners or limited partners of any Parallel Fund, whose Capital Commitments to the Partnership and capital commitments to such Parallel Funds, stated as a percentage of the aggregate Capital Commitments of the Partnership and capital commitments to such Parallel Funds, equal or exceed the required fraction or percentage in interest of all such Partners or Parallel Fund partners, or Limited Partners and Parallel Fund limited partners.  A Majority in Interest shall mean more than fifty percent (50%) in interest.  Any limited partnership interest in the Partnership or any Parallel Fund or Feeder Fund owned or controlled by the General Partner or an Affiliate of the General Partner shall be deemed not to be outstanding for purposes of any determination under this Agreement of a particular percentage in interest of the Limited Partners or the Fund Limited Partners. Any vote of a Feeder Fund on a given proposal shall be allocated in proportion to the respective capital commitments of its constituent partners or limited partners based on the underlying votes of such constituent partners or limited partners as if the fund entity in which such Feeder Fund is limited partner (i.e., the Partnership any Parallel Fund) and such Feeder Fund constituted a single combined entity.

  **14.20    Prime Rate.**  The Prime Rate shall mean an interest rate equal to the floating commercial rate of interest published in the Wall Street Journal (or its successors) as its prime rate.

  **14.21    Profit or Loss.**  Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Partnership's taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

  **(a)**    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

  **(b)**    Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

  **(c)**    Gain or loss resulting from any disposition of a Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

  **(d)**    The difference between the gross fair market value of all Partnership assets and their respective Adjusted Asset Values shall be added to such taxable income or loss in the circumstances described in paragraph 14.2;

  **(e)**    Ordinary Income and items which are specially allocated pursuant to paragraphs 3.2(c), 4.5(b)(vi), 5.2, 5.3 and 5.4 shall not be taken into account in computing Profit or Loss; and

  **(f)**    The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

  **14.22    Regulated Partner.**  Regulated Partner shall refer to each ERISA Partner, Governmental Plan Partner, and Private Foundation Partner.

42

**14.23    Securities.**  Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**14.24    Securities Act.**  Securities Act shall mean the Securities Act of 1933, as amended.

**14.25    Short-Term Securities.**    Short-Term Securities shall mean commercial paper, certificates of deposit, treasury bills, and other money market investments with maturities of less than twelve (12) months.

**14.26    Treasury Regulations.**  Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

## ARTICLE 15

### OTHER PROVISIONS

**15.1    Governing Law.**  This Agreement shall be governed by and construed under the laws of the state of Delaware.

**15.2    Limitation of Liability of the Limited Partners.**  Except as required by law or by the terms of this Agreement, no Limited Partner shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Partnership in excess of its Capital Commitment to the Partnership.

**15.3    Exculpation.**

(a)    None of the General Partner (including without limitation the General Partner acting as tax matters partner, as Partnership Representative, or as liquidator), its members, each officer, director, stockholder, member, manager, managing director and partner of the members of the General Partner, the Management Company, its members, each officer, director, stockholder, member, manager, managing director and partner of the members of the Management Company, the Managing Directors, the tax matters partner, the Partnership Representative, the liquidator, the respective employees, consultants, officers, directors, managers, managing directors, partners, members, stockholders, agents and Affiliates of any of the foregoing, the members of the Advisory Committee and the Limited Partners represented by such members of the Advisory Committee shall be liable to the Partnership or any Partner for any loss suffered by the Partnership or any Partner which arises out of any investment or any other action or omission of such person if such conduct did not constitute material breach of this Agreement, gross negligence, intentional wrongdoing or recklessness; *provided, however,* that such employee, broker, or agent was selected, engaged, and retained with reasonable care.  The General Partner and such persons may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, *provided, however,* that they shall have been selected with reasonable care and the General Partner or other such persons shall have relied on their advice or opinion in good faith.

(b)    Notwithstanding anything to the contrary in this Agreement: (i) to the extent that, at law or in equity, an Indemnified Party (as defined in paragraph 15.4) has duties (including fiduciary duties) and liabilities relating thereto to the Partnership, any Partner or any other person, such Indemnified Party acting under this Agreement shall not be liable to the Partnership, and Partner or any other person for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement

43

(or for taking actions that are permitted under this Agreement); and (ii) the provisions of this Agreement, to the extent that they restrict or eliminate the duties (including fiduciary duties) and liabilities relating thereto of an Indemnified Party otherwise existing at law or in equity, are agreed by each Partner and the Partnership to replace such other duties and liabilities of such Indemnified Party.

(c)     This paragraph 15.3 is intended to apply solely for the benefit of the Limited Partners, and in no way shall be construed or interpreted as inuring to the benefit of any other person or entity, including, without limitation, creditors of the Partnership, of the General Partner or of the members of the General Partner or other third parties.

**15.4    Indemnification.**

(a)     The Partnership agrees to indemnify, out of the assets of the Partnership only (but including amounts that the Partners may be required to contribute pursuant to paragraph 4.2(d)), the General Partner (including without limitation the General Partner acting as tax matters partner, as Partnership Representative or as liquidator), its members, each officer, director, stockholder, member, manager, managing director and partner of the members of the General Partner, the Management Company, its members, each officer, director, stockholder, member, manager, managing director and partner of the members of the Management Company, the Managing Directors, the tax matter partner, the Partnership Representative, the liquidator, the respective employees, consultants, officers, directors, managers, managing directors, partners, members, stockholders, agents and Affiliates of any of the foregoing, the members of the Advisory Committee and the Limited Partners represented by such members of the Advisory Committee (each an "*Indemnified Party*" collectively the "*Indemnified Parties*") to the fullest extent permitted by law and to save and hold them harmless from and in respect of all claims, liabilities, damages and expenses (including attorneys' fees) to which they may be or become subject by reason of their activities on behalf of, or their association with, the Partnership, so long as the action giving rise to the claim is neither joined by a Majority in Interest of the Limited Partners nor involves conduct which constitutes a material breach of this Agreement, gross negligence, intentional wrongdoing or recklessness; *provided, however,* that this indemnity shall not extend to any claim or proceeding solely between or among the General Partner, Management Company, the Managing Directors, or any of their respective managers, members, partners, principals, officers, employees, Affiliates or agents.  Expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph shall be paid by the Partnership in advance of the final disposition of such claim or proceeding; *provided,* that no such advance shall be paid in the case of a claim or proceeding solely between or among the General Partner, Management Company, the Managing Directors, or any of their respective managers, members, partners, principals, officers, employees, Affiliates or agents.  In the event that an Indemnified Party is also entitled to indemnification by the General Partner or the Management Company, the Partners hereby acknowledge and agree that (i) the Partnership shall be the indemnitor of first resort (*i.e.*, the Partnership's obligations to such an Indemnified Party shall be primary and any obligation of the General Partner and/or the Management Company to advance expenses and/or to provide indemnification for the same expenses or liabilities incurred by such an Indemnified Party shall be secondary), (ii) that, to the extent such an Indemnified Party is otherwise eligible hereunder for advancement of expenses, the Partnership shall be required to advance the full amount of expenses incurred by such an Indemnified Party and shall be liable for the full amount of all fees, costs and any other items described in this paragraph without regard to any rights such an Indemnified Party may have against the General Partner or the Management Company and (iii) the Partnership hereby irrevocably waives, relinquishes and releases the General Partner and the Management Company from any and all claims against such parties for contribution, subrogation or any other recovery of any kind in respect of the foregoing provisions of this sentence.

44

(b)    The General Partner is authorized to enter into such separate agreements on behalf of the Partnership with or benefiting the Indemnified Parties on terms consistent with this paragraph 15.4 as the General Partner, in its sole discretion, considers necessary or desirable to give full and complete effect to the indemnity provisions set forth in this paragraph 15.4. A person who is not a party to this Agreement may not, in its own right or otherwise, enforce any term of this Agreement except that each of the Indemnified Parties may in its own right enforce paragraphs 15.3 and 15.4, subject to and in accordance with applicable law. Notwithstanding any other term of this Agreement, the consent of any person who is not a party to this Agreement (including, without limitation, any such Indemnified Party) is not required for any amendment to, or variation, release, rescission or termination of this Agreement.

**15.5    Arbitration.**

(a)    Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement (*"Claim"*), shall be resolved by final and binding confidential arbitration (*"Arbitration"*) before a single arbitrator (*"Arbitrator"*) selected from and administered by JAMS (the *"Administrator"*) in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. The arbitration shall be held in San Francisco, California.

(b)    Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

(c)    The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrator shall be authorized to award compensatory damages, but shall *not* be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

(d)    Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; *provided, however,* the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

(e)    By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 15.5, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

**15.6    Execution of Documents.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.

**15.7    Other Instruments and Acts.**  The Partners agree to execute any other instruments or perform any other acts that are or may be reasonably necessary to effectuate and carry on the partnership created by this Agreement.

**15.8    Binding Agreement.**  This Agreement shall be binding upon the transferees, successors, assigns, and legal representatives of the Partners.

**15.9    Notices; Electronic Transmission of Reports.**  Any notice or other communication that one Partner desires to give to another Partner shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the Partner to be notified, (b) upon confirmed transmission by electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) days after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be addressed to the other Partner at the address shown on its **EXHIBIT A** or at such other address as a Partner may designate by ten (10) days' advance written notice to the other Partners.  In addition to the provisions of paragraph 11.5, the General Partner shall be entitled to transmit to the Limited Partners by e-mail the reports required by paragraphs 11.3, 11.4, and 11.6.

**15.10    Power of Attorney.**  By signing this Agreement, each Limited Partner designates and appoints the General Partner its true and lawful attorney, in its name, place, and stead to make, execute, and (x) sign this Agreement in accordance with its terms and any amendment thereto, (y) sign and file the Certificate of Limited Partnership and any amendments thereto, and (z) sign such other instruments, documents, or certificates that may from time to time be required of the Partnership by the laws of the United States of America, the laws of the state of the Partnership's formation, or any other state in which the Partnership shall conduct its affairs in order to qualify or otherwise enable the Partnership to conduct its affairs in such jurisdictions.  Such attorney is not hereby granted any authority on behalf of the Limited Partners to amend this Agreement except that as attorney for each of the Limited Partners, the General Partner shall have the authority to amend this Agreement and the Certificate of Limited Partnership (and to execute any amendment to the Agreement or the Certificate of Limited Partnership to give effect to this Agreement on behalf of itself and as attorney in fact for each of the Limited Partners) as may be required to effect:

      **(a)**      Admission of additional Partners pursuant to Article 3;

      **(b)**      Additional capital contributions pursuant to Article 4;

      **(c)**      Transfers of Limited Partnership interests pursuant to Article 9; and

      **(d)**      Extensions of the Partnership term pursuant to Article 10.

This power of attorney and the power of attorney referenced in paragraph 4.5(b)(x) granted by each Limited Partner shall expire as to such Partner immediately after the dissolution of the Partnership or the amendment of the Partnership's **EXHIBIT A** to reflect the complete withdrawal of such Partner as a Partner of the Partnership.

129797418 v2

**15.11   Amendment.**

(a)      Except as otherwise provided by this Agreement and subject to paragraphs 15.11(b) and 15.11(c), this Agreement may be amended only with the written consent of the General Partner and a Majority in Interest of the Fund Limited Partners. Notwithstanding anything to the contrary in this Agreement other than paragraphs 15.11(c) and 15.11(d) below, the General Partner may amend this Agreement without the consent or approval of the Limited Partners or the Fund Limited Partners to reflect any change that, or set of changes that in the aggregate, the General Partner determines, with the approval of the Advisory Committee, does not adversely affect a Limited Partner.

(b)      Notwithstanding anything to the contrary in this Agreement, any consent, approval or other determination to be made by a Majority in Interest of the Fund Limited Partners under this Agreement may instead be made with the consent or approval of the Advisory Committee.

(c)      Notwithstanding paragraph 15.11(a), (i) no amendment to the provisions of Article 13 may be made without the consent of each ERISA Partner, Governmental Plan Partner and Private Foundation Partner who may be materially adversely affected by such amendment, (ii) the General Partner may amend this Agreement without the consent of the other Partners to reflect changes validly made in the membership of the Partners and the capital contributions of the Partners, and (iii) no amendment to this Agreement may modify any provision requiring the consent of more than a Majority in Interest of the Limited Partners or the Fund Limited Partners without the consent of such higher Percentage in Interest.

(d)      Notwithstanding paragraphs 15.11(a), (b) and (c), no amendment of this Agreement may modify the method of making Partnership allocations or distributions, modify the method of determining the Partnership Percentage of any Partner, reduce any Partner's Capital Account, increase any Partner's Capital Commitment to the Partnership, modify any provision of this Agreement pertaining to limitations on liability of the Limited Partners or change the restrictions contained in this paragraph 15.11(d), unless each Partner materially adversely affected thereby in a manner different than the other Partners has expressly consented in writing to such amendment.

(e)      The Partnership's or General Partner's (or its managers', members' or employees') noncompliance with any provision hereof in any single transaction or event may be waived prospectively or retroactively in writing by the same Percentage in Interest of the Limited Partners or Fund Limited Partners that would be required to amend such provision pursuant to paragraphs 15.11(a), (b) or (c). No waiver shall be deemed a waiver of any subsequent event of noncompliance except to the extent expressly provided in such waiver.

(f)      Notwithstanding anything to the contrary in this Agreement, the General Partner may, without the consent of the Limited Partners, amend this Agreement, as the General Partner determines to be advisable to address the effects (or potential effects) of legislation that has been enacted, or regulations (whether proposed, temporary or final) that have been issued, in either case that change (or, in the General Partner's good faith determination propose to change or alter) the tax consequences (in a manner that may be detrimental to the General Partner) of the terms applicable to the allocations or distributions of Profits and Losses to the General Partner to preserve the capital nature of such allocations or distributions under the law in effect as of the Commencement Date or otherwise to reduce the adverse impact of such change or proposed change on the General Partner and its direct and indirect owners, so long as any such amendment does not result in any material adverse effect on any Limited Partner or delay the timing or reduce the aggregate amount of distributions to which any Limited Partner is entitled under this Agreement.

**15.12   Entire Agreement.** This Agreement and each subscription agreement and Side Letter (as defined below) constitute the full, complete, and final agreement of the Partners and supersede all prior agreements between the Partners with respect to the Partnership. Notwithstanding the provisions of this Agreement or any subscription agreement entered into by a Limited Partner in connection with its admission to the Partnership, it is hereby acknowledged and agreed that the Partnership and the General Partner, on its own behalf or on behalf of the Partnership, a Feeder Fund or a Parallel Fund, without the approval of any Fund Limited Partners, may enter into a side letter or similar agreement to or with a limited partner of the Partnership, a Feeder Fund or a Parallel Fund (each a "*Side Letter*"), executed contemporaneously with the admission of such limited partner to the Partnership, such Feeder Fund or such Parallel Fund, which has the effect of establishing rights with respect to the Partners or the Partnership or supplementing the terms hereof or any subscription agreement in order to meet certain requirements of such Limited Partner or limited partner of such Feeder Fund or Parallel Fund. The parties hereto agree that any terms contained in a Side Letter shall govern, for purposes of this Agreement or any subscription agreement, be valid, binding and enforceable as among the Limited Partner or limited partner of such Parallel Fund or Feeder Fund that is a party thereto, the General Partner and/or the Partnership.

**15.13   Titles; Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and shall not be considered in the interpretation of this Agreement.

**15.14   Partnership Name.** The Partnership shall have the exclusive right to use the Partnership name as long as the Partnership continues. Upon termination of the Partnership, the Partnership shall assign whatever rights it may have in such name to the General Partner. No value shall be placed upon the name or the goodwill attached to it for the purpose of determining the value of any Partner's Capital Account or interest in the Partnership.

**15.15   Confidentiality.**

(a)     This Agreement and all financial statements, tax reports, portfolio valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Partnership and its investments, including, without limitation, information about the portfolio companies of the Partnership (collectively, the "*Confidential Information*"), that any Limited Partner may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) to any Limited Partner or its representatives, including Confidential Information disclosed to the members of the Advisory Committee, pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Partnership, constitute proprietary and confidential information about the Partnership, the General Partner and its Affiliates and the Partnership's portfolio companies (the "*Affected Parties*"). Each Limited Partner acknowledges and agrees that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy. Each Limited Partner further acknowledges and agrees that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses.

(b)     Each Limited Partner agrees to hold all Confidential Information in confidence, and not to disclose any Confidential Information to any third party without the prior written consent of the General Partner. Notwithstanding the preceding sentence, each Limited Partner may disclose such Confidential Information: (i) to its officers, directors, trustees, wholly-owned subsidiaries, employees and outside experts (including but not limited to its attorneys and accountants) on a "need to know" basis, so long as such persons are bound by the same duties of confidentiality to the Partnership as such Limited Partner, and so long as such Limited Partner shall remain liable for any breach of this paragraph 15.15 by such persons; (ii) to the extent that such information is required to be disclosed in connection with any

48

civil or criminal proceeding; (iii) to the extent that such information is required (as determined in good faith by the disclosing Limited Partner after consultation with counsel) to be disclosed by applicable law in connection with any governmental, administrative or regulatory proceeding or filing (including any inspection or examination or any disclosure necessary in connection with a request for information made under a state or federal freedom of information act or similar law), after reasonable prior written notice to the General Partner (except where such notice is expressly prohibited by law); (iv) to the extent that such information was received from a third party not subject to confidentiality limitations and such Limited Partner can establish that it rightfully received such information from such party other than as a result of the breach of this paragraph 15.15; (v) to the extent such information was rightfully in such Limited Partner's possession prior to the Partnership's conveyance of such information to such Limited Partner, as evidenced by the Limited Partner's prior written records; or (vi) to the extent that the information provided by the Partnership is otherwise available in the public domain in the absence of any improper or unlawful action on the part of such Partner. Any Limited Partner seeking to make disclosure in reliance on the foregoing clauses (ii) and (iii) above shall use its best efforts to claim any relevant exception under such laws or obligations which would prevent or limit public disclosure of the Confidential Information and provide the General Partner immediate notice upon the Limited Partner's receipt of a request for disclosure of any Confidential Information pursuant to such laws or obligations.

      **(c)**     Each Limited Partner also agrees that any document constituting or containing, or any other embodiment of, any Confidential Information shall be returned to the Partnership upon the General Partner's request. Notwithstanding any provision of this Agreement to the contrary, the General Partner may withhold disclosure of any Confidential Information (other than this Agreement or tax reports) to any particular Limited Partner if the General Partner reasonably determines that the disclosure of such Confidential Information to such Limited Partner may result in the general public gaining access to such Confidential Information or that such disclosure is not in the best interests of the Partnership or its investments; *provided, however,* that to the extent that any information is not delivered to a Limited Partner based on the General Partner's exercise of its discretion under this sentence, such information shall be made available for review, but not copying, during regular business hours at a location mutually determined by the General Partner and such Limited Partner. In no event shall a Limited Partner be denied access to information deliverable pursuant to paragraph 11.6 of this Agreement.

      **(d)**     With respect to each Limited Partner that is subject to any "freedom of information," "sunshine" or other law, rule or regulation that imposes upon such Limited Partner an obligation to make information available to the public, the Partnership hereby requests confidential treatment of the Confidential Information, and such Limited Partner shall use commercially reasonable efforts to take such action as necessary for such Confidential Information to be exempt from disclosure, to the maximum extent permitted under such law, rule or regulation.

      **(e)**     With respect to each Limited Partner that is a "fund of funds" or a similar pooled investment vehicle (but specifically excluding any pension, retirement or similar benefit plan) (a "***Pooled Vehicle Partner***"), the Pooled Vehicle Partner shall, subject to paragraph 15.15(d), be permitted to make disclosure to its direct equity owners (but not to any indirect or other beneficial owners), that are subject to a written confidentiality agreement or obligation that provides a degree of protection to the Partnership comparable to that provided in this paragraph 15.15, of solely the following Confidential Information: (i) the Pooled Vehicle Partner's status as a Limited Partner of the Partnership, (ii) the amount of such Pooled Vehicle Partner's Capital Commitment, (iii) the total amount of such Pooled Vehicle Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) semi-annual and annual reports summarizing the status of the Pooled Vehicle Partner's investment in the Partnership (except that any financial information regarding the Partnership and any information concerning any portfolio company in which the Partnership has invested shall not be disclosed and must be redacted), and (v) the name and address of the Partnership.

49

(f)      Each Limited Partner agrees to notify such Limited Partner's attorneys, accountants and other similar advisers about their obligations in connection with this paragraph 15.15 and will further cause such advisers to abide by the aforesaid provisions of this paragraph 15.15.

(g)      Notwithstanding the foregoing provisions of this paragraph 15.15, each Partner (and each Affiliate and Person acting on behalf of any such Partner) agrees that each Partner (and its attorneys, accountants and other similar advisers) may disclose to appropriate governmental authorities, the tax treatment and tax structure of the formation and operation of the Partnership and materials (including opinions or other tax analyses) that are provided to such Partner relating to such tax treatment and tax structure.  This authorization is not intended to permit and does not authorize the disclosure of any of the following Confidential Information or other information relating to the Partnership: (i) any information not related to the tax treatment or tax structure of the formation or operation of the Partnership, (ii) the identities of Partners or potential investors in the Partnership, (iii) the identities of any portfolio companies or potential portfolio companies of the Partnership or a Related Entity, (iv) the existence or status of any negotiations to which the Partnership or its Affiliate is a party, (v) any pricing or financial information (except to the extent such pricing or financial information is related to the tax treatment or tax structure of the formation or operation of the Partnership), or (vi) any other term or detail not relevant to the tax treatment or the tax structure of the Partnership.

**15.16   Discretion.**  Notwithstanding any other provision of this Agreement or any applicable provision of law or equity, whenever the General Partner is permitted or required pursuant to this Agreement to make a decision or act in any manner (a) in its "sole discretion," "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty (including any fiduciary duty) or obligation to give any consideration to any interest of or factors affecting the Partnership, the Limited Partners or any other Person, or (b) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards.

**15.17   Partnership Legal Matters.**  Each Partner hereby agrees and acknowledges that:

(a)      Cooley LLP ("***Cooley***") has been retained by the General Partner in connection with the formation of the Partnership and the offering of Limited Partner interests and in such capacity has provided legal services to the General Partner and the Partnership.  The General Partner expects to retain Cooley to provide legal services to the General Partner and the Partnership in connection with the management and operation of the Partnership.

(b)      Cooley is not and will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner interests, the management and operation of the Partnership, or any dispute that may arise between the Limited Partners on the one (1) hand and the General Partner and the Partnership on the other (the "***Partnership Legal Matters***").

(c)      Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d)      Each Limited Partner hereby agrees that Cooley may represent the General Partner and the Partnership in connection with any and all Partnership Legal Matters (including any dispute between the General Partner or the Partnership and one (1) or more Limited Partners) and waives any present conflict of interest with Cooley regarding Partnership Legal Matters arising by virtue of any representation or deemed representation of such Limited Partner or the Partnership on account of

50

Cooley's representation described in paragraph 15.17(a) above; *provided, however,* that the Limited Partners are not hereby agreeing to Cooley's representation of the Partnership in a derivative action on their behalf against the General Partner.

[Signature Page Follows]

51

**IN WITNESS WHEREOF,** the Partners have executed this Second Amended and Restated Limited Partnership Agreement as of the date first written above.

**GENERAL PARTNER:**

**ROTHENBERG VENTURES 2016 FUND GP, LLC**

By:   Rothenberg Ventures Management Company, LLC
Its:   Manager

By: _____

Name: _Mike Rothenberg_____

Title: _Manager_____


**LIMITED PARTNER:**

All Limited Partners now and hereafter admitted pursuant to powers of attorney now and hereafter granted to the General Partner

By: **ROTHENBERG VENTURES 2016 FUND GP, LLC,** as attorney-in-fact for the Limited Partners subscribing for interests as set forth in the books and records of the Partnership

By:   Rothenberg Ventures Management Company, LLC
Its:   Manager

By: _____

Name: _Mike Rothenberg_____

Title: _Manager_____


"THE SECURITIES EVIDENCED BY THIS PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT COVERING SUCH SECURITIES OR THE GENERAL PARTNER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE GENERAL PARTNER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE 1933 ACT."

**EXHIBIT A**

**SCHEDULE OF PARTNERS**

*MAINTAINED ON FILE AT THE PRINCIPAL OFFICE OF THE PARTNERSHIP*

Exhibit A

**EXHIBIT B**

**EXISTING ROTHENBERG FUNDS AND COMPANIES**

Rothenberg Ventures Fund I, LLC ("Fund I")
Rothenberg Ventures Fund II, LLC ("Fund II")
Rothenberg Ventures 2015 Fund, LLC ("Fund III")
Certain co-investment vehicles investing alongside Fund I, Fund II and/or Fund III
Rothenberg Ventures LLC
Bend Reality, LLC

Exhibit B