

CONFIDENTIAL

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF SAN FRANCISCO

3                        --oOo--

4     KATIE FANELLI; NEIL DEVANI,

      individually, and on behalf of

5     all others similarly situated,

6               Plaintiffs,

7                              Case

      vs.                      No. CGC-16-554609

8

      ROTHENBERG VENTURES MANAGEMENT

9     COMPANY, LLC, et al.,

10              Defendants.

      _____/

11

12

13

14               CONFIDENTIAL

15

16     VIDEOTAPED DEPOSITION OF NEIL DEVANI

17                 VOLUME I

18         WEDNESDAY, AUGUST 1, 2018

19

20

21     Reported by:

22     Anrae Wimberley

23     CSR No. 7778

24     Job No. 2978182

25     PAGES 1 - 241

                                        Page 1

CONFIDENTIAL

1  SUPERIOR COURT OF THE STATE OF CALIFORNIA
2        COUNTY OF SAN FRANCISCO
3              --oOo--
4  KATIE FANELLI; NEIL DEVANI,
   individually, and on behalf of
5  all others similarly situated,
6        Plaintiffs,
7                    Case
   vs.          No. CGC-16-554609
8
   ROTHENBERG VENTURES MANAGEMENT
9  COMPANY, LLC, et al.,
10       Defendants.
   _____/
11
12
13
14
15        CONFIDENTIAL
16
17      Transcript of video-recorded deposition
18  of NEIL DEVANI, VOLUMEI, taken at QUINN EMANUEL
19  URQUHART & SULLIVAN, LLP, 50 California Street, San
20  Francisco, California 94111, beginning at 9:18 a.m.
21  and ending at 5:39 p.m. on Wednesday, August 1,
22  2018, before Anrae Wimberley, Certified Shorthand
23  Reporter No. 7778.
24
25
                                            Page 2

1 APPEARANCES:
2 For Plaintiffs:
3     RIGHETTI GLUGOSKI, P.C.
4     BY: JOHN GLOGOSKI, ESQ.
5     456 Montgomery Street, Suite 1400
6     San Francisco, California 94104
7     (415) 983-0900
8     jglugoski@righettilaw.com
9
10 For Defendants:
11    QUINN EMANUEL URQUHART & SULLIVAN, LLP
12    BY: JEFF NARDINELLI, ESQ.
13    50 California Street, 22nd Floor
14    San Francisco, California 94111
15    (415) 875-6600
16    jeffnardinelli@quinnemanuel.com
17
18 Also Present:
19    VERITEXT LEGAL SOLUTIONS
20    SEAN GRANT, VIDEOGRAPHER
21    (415) 274-9977
22    SFDepo@veritext.com
23         --oOo--
24
25
                                            Page 3

1            I N D E X
2 EXAMINATION BY:              PAGE
3 MR. NARDINELLI             8, 139
4
5              --oOo--
6        E X H I B I T S
7
8 EXHIBIT      DESCRIPTION      PAGE
9 Exhibit 1   LinkedIn Profile; 5 pages    18
10
11 Exhibit 2   Letter dated 7/22/15 from    21
12      Rothenberg to Devani with
13      attachments; Bates DEVANI 1
14      thru 15
15
16 Exhibit 3   E-mail chain of February 2016;   91
17      2 pages
18
19 Exhibit 4   Image of logos; 1 page    98
20
21 Exhibit 5   E-mail chain of August 2016;   118
22      Bates DEVANI 20
23
24
25
                                            Page 4

1       E X H I B I T S (Cont'd)
2 EXHIBIT      DESCRIPTION      PAGE
3 Exhibit 6   Letter dated 7/21/16 from Brooks   122
4      to Devani with attachments;
5      4 pages
6
7 Exhibit 7   E-mail chain of August 2016;   129
8      Bates ROTH-FANELLI-00004757
9      thru 758
10
11 Exhibit 8   E-mail chain of August 2016;   155
12      2 pages
13
14 Exhibit 9   TechCrunch Article dated 7/31/18;   172
15      6 pages
16
17 Exhibit 10   TechCrunch Article dated 7/13/18;   190
18      7 pages
19
20 Exhibit 11   E-mail dated 2/12/16 from Devani   194
21      to Neil; Bates RVMC00038557
22
23 Exhibit 12   Convertible Promissory Note;   198
24      Bates RV 00038674 through 682
25
                                            Page 5

2 (Pages 2 - 5)

CONFIDENTIAL

1     E X H I B I T S (Cont'd)
2  EXHIBIT     DESCRIPTION         PAGE
3  Exhibit 13  E-mail chain of May 2017 with     217
4         attachments; 5 pages
5
6            --oOo--
7  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
8  PAGE  LINE
9  140   22
10  205   21
11  206   2
12  206   9
13  209   16
14           --oOo--
15
16
17
18
19
20
21
22
23
24
25

Page 6

---

1     WEDNESDAY, AUGUST 1, 2018;
2     SAN FRANCISCO, CALIFORNIA
3         9:18 A.M.
4     ---
5     THE VIDEOGRAPHER: Good morning. We're on the      09:18:24
6  record.                    09:18:27
7     The time is 9:18 a.m. and the date is       09:18:27
8  August 1st, 2018.                09:18:31
9     This begins the videotaped deposition of      09:18:33
10  Neil Devani.                  09:18:36
11     This deposition is being taken on behalf     09:18:37
12  of counsel for the defendants in the matter of Katie   09:18:40
13  Fanelli, Neil Devani, individually and on behalf of    09:18:44
14  all others similarly situated, vs. Rothenberg       09:18:48
15  Ventures Management Company LLC, et al.        09:18:50
16     This case is filed in the Superior Court     09:18:53
17  of the State of California, County of San Francisco,   09:18:55
18  Case No. CGC-16-554609.             09:18:58
19     This deposition is being held at Quinn      09:19:05
20  Emanuel in San Francisco, California.         09:19:08
21     My name is Sean Grant from the firm       09:19:10
22  Veritext. I'm the videographer. And the court     09:19:14
23  reporter is Anrae Wimberley, also from Veritext.    09:19:17
24     Please note that audio and video recording    09:19:21
25  will take place unless all parties agree to go off    09:19:24

Page 7

---

1  the record. Microphones are sensitive and may pick    09:19:27
2  up whispers, private conversations or cellular      09:19:28
3  interference.                 09:19:28
4     At this time will counsel please identify    09:19:31
5  themselves and state whom they represent.       09:19:33
6     MR. NARDINELLI: Jeff Nardinelli of Quinn    09:19:36
7  Emanuel on behalf of the defendants.         09:19:38
8     MR. GLUGOSKI: John Glugoski for plaintiffs.   09:19:40
9     THE VIDEOGRAPHER: Thank you.          09:19:42
10     Will the certified court reporter please     09:19:43
11  swear in the witness.              09:19:45
12         NEIL DEVANI,               09:19:46
13     sworn as a witness by the Certified       09:19:46
14  Shorthand Reporter, testified as follows:      09:19:46
15     THE VIDEOGRAPHER: Counsel.           09:20:03
16         EXAMINATION              09:20:03
17  BY MR. NARDINELLI:                09:20:03
18     Q.  Good morning, Mr. Devani.         09:20:03
19     As you just heard, my name is Jeff        09:20:05
20  Nardinelli, and I'm one of the attorneys       09:20:09
21  representing defendants in this case. I'm going to   09:20:11
22  be taking your deposition today.           09:20:13
23     Have you had your deposition taken before?    09:20:15
24     A.  No, I have not.             09:20:17
25     Q.  All right. Let's start, if you could, by  09:20:19

Page 8

---

1  just stating your full name for the record.      09:20:21
2     A.  Neil Devani.               09:20:23
3     Q.  So since you've never had your deposition   09:20:26
4  taken before, I'll just go over a couple of ground   09:20:28
5  rules.                    09:20:31
6     The number one guiding principle I always    09:20:31
7  think is important to remember is that the purpose   09:20:35
8  of this deposition today is to create a written    09:20:37
9  record of the under-oath conversation that you and I  09:20:41
10  will be having. So in order to make sure that     09:20:45
11  Ms. Wimberley is able to jot down accurately     09:20:48
12  everything that we say, the main two things -- three  09:20:52
13  things to remember are, No. 1, let's not talk over   09:20:56
14  each other, take one at a time, let me finish my    09:21:00
15  question, I'll let you finish your answer.      09:21:06
16     No. 2, make sure to give verbal responses.    09:21:08
17  Things like nods and shakes of the head cannot be   09:21:11
18  picked up by the court reporter.           09:21:14
19     And No. 3, just try not to speak too      09:21:15
20  quickly. I try to speak in a tone that's a little   09:21:19
21  more deliberate than I do in everyday life.      09:21:22
22     MR. NARDINELLI: And, Anrae, I'm sure you will  09:21:25
23  let me know if I go too fast.            09:21:28
24  BY MR. NARDINELLI:                09:21:32
25     Q.  The other thing to note is, it can be a   09:21:32

Page 9

3 (Pages 6 - 9)

CONFIDENTIAL

1 long day. You should feel comfortable. Any time 09:21:35
2 you want, ask me to take a break. If you want 09:21:38
3 water, need a break, want food, whatever it is, 09:21:41
4 please let me know and we can do it. And there will 09:21:44
5 be lunch coming sometime around noon, so that break 09:21:47
6 will be there. 09:21:51
7     Do you understand all of that? 09:21:52
8 A. Yes. 09:21:53
9 Q. What did you do to prepare for your 09:21:54
10 deposition today? 09:21:56
11 A. Spoke with John, got some refresher in my 09:21:57
12 mind about what all is happening. 09:22:02
13 Q. When did you speak with John? 09:22:04
14 A. Yesterday. 09:22:06
15 Q. For about how long? 09:22:06
16 A. Maybe 30 minutes, maybe a little longer. 09:22:10
17 Q. Was it an in-person meeting or on the 09:22:14
18 phone? 09:22:17
19 A. We met in person. 09:22:18
20 Q. Did you go over any documents? 09:22:19
21 A. We went over some of my records, things 09:22:20
22 that I have documented. 09:22:24
23 Q. What records were those? 09:22:25
24 A. We -- some of that I think may be 09:22:28
25 privileged. Some of that was just things that I've 09:22:33

Page 10

1 prepared in terms of e-mails, text messages, things 09:22:37
2 like that. 09:22:49
3 Q. What e-mails? 09:22:50
4 A. E-mails that I've sent, e-mails that were 09:22:52
5 sent to me. Things that are in the record. 09:22:54
6 Q. What do you mean by "in the record"? 09:22:58
7 A. Things that we've -- or that I had filed, 09:23:00
8 I guess, previously with -- I don't know who, but I 09:23:03
9 like prepared and shared with John. 09:23:10
10 Q. Are you referring to e-mails that have 09:23:12
11 been produced in this action and those e-mails would 09:23:14
12 have numbers at the bottom that say DEVANI 1, 09:23:17
13 DEVANI 32, et cetera? 09:23:22
14 A. I'm not sure what they had on them in 09:23:24
15 terms of that sort of markings. 09:23:26
16 Q. What was the subject matter of the 09:23:28
17 e-mails? 09:23:29
18 A. They were correspondences with people at 09:23:31
19 the firm, with myself, about dates and work that I 09:23:35
20 had done, things like that. 09:23:42
21 Q. Dates of the work that you had done? 09:23:44
22 A. Just dates of -- correspondence, for 09:23:47
23 example, with Mike and Mr. Mayo, Mr. Eppler -- yeah, 09:23:50
24 people like that. And dates around -- we had 09:24:05
25 discussed what my last day at the firm would be -- 09:24:10

Page 11

1     MR. GLUGOSKI:  Actually, I don't want you to 09:24:14
2 get into what we actually discussed in that meeting. 09:24:15
3     THE WITNESS:  This was just what was in the 09:24:19
4 e-mail. 09:24:20
5 BY MR. NARDINELLI: 09:24:21
6 Q. Did you mention that you also reviewed 09:24:21
7 text messages yesterday? 09:24:24
8 A. Um-hum. 09:24:25
9 Q. What text messages were those? 09:24:26
10 A. Well, I looked on my phone. Just texts 09:24:27
11 that I had with Mike. 09:24:30
12 Q. Just texts that you had with Mike, nobody 09:24:31
13 else? 09:24:33
14 A. As far as I can remember, yeah. 09:24:34
15 Q. Let's go over just some general 09:24:38
16 background. 09:24:40
17     Can you give me your educational history. 09:24:41
18 A. Yep. 09:24:44
19     How far back do you want me to go? 09:24:45
20 Q. Start with college. 09:24:47
21 A. Went to Penn State University for my 09:24:48
22 undergrad. After that I went to medical school at 09:24:53
23 Drexel University. After that I went to Stanford 09:24:57
24 for law school. 09:25:02
25 Q. What caused you to, I guess, change your 09:25:03

Page 12

1 mind from medical school to law school? 09:25:06
2 A. It wasn't what I had a passion for. 09:25:09
3 Q. When did you graduate from Stanford law? 09:25:12
4 A. 2013. 09:25:15
5 Q. Did you take the Bar exam? 09:25:16
6 A. Um-hum. 09:25:18
7 Q. Passed it? 09:25:19
8 A. Yes, that's correct. 09:25:20
9 Q. Are you currently an active member of the 09:25:21
10 California State Bar? 09:25:25
11 A. Yes, I am. 09:25:26
12 Q. When you were in law school, where did you 09:25:27
13 work during the summers? 09:25:30
14 A. I spent my first summer in Washington, 09:25:32
15 D.C., at a firm called Phillips & Cohen. And then I 09:25:34
16 spent my second summer at a firm here in the Bay 09:25:41
17 Area called Fenwick & West. 09:25:45
18 Q. So you worked for firms during the summer. 09:25:48
19     But after you graduated, did you go and 09:25:48
20 work for a law firm? 09:25:49
21 A. I did not, no. 09:25:50
22 Q. I presume you had an offer from Fenwick & 09:25:50
23 West? 09:25:50
24 A. I did, yes. 09:25:52
25 Q. And you decided to turn it down? 09:25:54

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL

1  A.  That's correct.                          09:25:54
2  Q.  Can you explain that decision.           09:25:54
3  A.  Yeah.  I decided that's not the career   09:25:57
4  path I wanted to pursue.                     09:26:00
5  Q.  You wanted to pursue a career path in the   09:26:01
6  start-up world; is that accurate?            09:26:04
7  A.  That's correct.                          09:26:06
8  Q.  And where did you go to work?            09:26:06
9  A.  I went to a start-up called Clinkle.     09:26:08
10  Q.  What was Clinkle?                        09:26:12
11  A.  Clinkle was a mobile payments company.   09:26:15
12  Q.  Have you seen the show Silicon Valley?   09:26:18
13  A.  Um-hum.                                  09:26:21
14  Q.  I was just watching it a couple of days   09:26:21
15  ago and I think there was a Clinkle reference.   09:26:25
16      Does that ring a bell?                   09:26:27
17  A.  I don't know.  I've seen the show.  I know   09:26:27
18  there was a reference.  The details I don't   09:26:30
19  remember.  Someone had texted me or sent me a   09:26:31
20  message like, hey, there's a reference.     09:26:35
21  Q.  I just saw it a couple days ago.         09:26:37
22      How long were you at Clinkle?            09:26:37
23  A.  I believe about a year and a half.       09:26:43
24  Q.  So that's from when to when?             09:26:47
25  A.  I joined after taking the Bar, so August   09:26:50

Page 14

1  of 2013.  And then I left sometime in the end of   09:26:56
2  2014.  I left, but then stayed on as a consultant.   09:27:04
3  I had a pretty large scope of work there, and so I   09:27:08
4  stayed on for some period of time, after being a   09:27:12
5  full-time employee, as a consultant.         09:27:16
6  Q.  What was your position at Clinkle when you   09:27:18
7  were a full-time employee?                   09:27:20
8  A.  What do you mean by that?                 09:27:24
9  Q.  Were you general counsel?  Were you in the   09:27:25
10  legal department?  Were you an investor?  Were you   09:27:29
11  multiple things?  Product manager?          09:27:32
12  A.  Yeah, so there were no investors.  I     09:27:34
13  worked on a variety of things.  I was on the legal   09:27:36
14  side, and I also did things on business development   09:27:40
15  and did things related to the company strategy, some   09:27:43
16  operations and finance-type functions, things like   09:27:48
17  that.                                        09:27:52
18  Q.  And how did you come to work for        09:27:52
19  Rothenberg Ventures after Clinkle?           09:27:55
20  A.  I had some friends who had worked -- one   09:27:57
21  of whom I had worked with at Clinkle who was working   09:28:02
22  at Rothenberg Ventures, and another friend who went   09:28:06
23  to undergrad -- went to Stanford with Mike.  And a   09:28:11
24  couple of other folks I think I had known at the   09:28:15
25  firm were aware of it and gave me a heads up that it   09:28:18

Page 15

1  was an interesting place and that they were looking   09:28:23
2  to expand their team and they thought it would be an   09:28:26
3  interesting place for me to work.            09:28:29
4  Q.  What were the names of those people that   09:28:31
5  you just referenced?                         09:28:33
6  A.  One is Faris Mohiuddin.  Another one is   09:28:35
7  Anarghya Vardhana.  The other ones I don't remember   09:28:38
8  off the top of my head right now.            09:28:41
9  Q.  What did you do after you received this   09:28:45
10  sort of tip or lead that there was this interesting   09:28:46
11  company that was looking to expand its team?   09:28:48
12  A.  I said that would be interesting and     09:28:49
13  somehow was, not sure how, connected with people at   09:28:53
14  the firm, eventually with Mike Rothenberg.   09:28:56
15  Q.  Was there an interview process?          09:29:01
16  A.  There was.                               09:29:03
17  Q.  How was that interview process?          09:29:04
18  A.  The details I don't recall.  I met with   09:29:08
19  people, answered questions.                  09:29:10
20  Q.  Were you applying for a particular       09:29:13
21  position?                                    09:29:15
22  A.  I don't believe there was a job listing   09:29:22
23  that I saw.  Maybe there was.  I don't remember now.   09:29:25
24  This was four years ago.                     09:29:27
25  Q.  When you were at Clinkle, you were not on   09:29:30

Page 16

1  the investing side -- well, I should state that   09:29:32
2  differently.                                 09:29:36
3      Clinkle was not an investment firm;      09:29:36
4  correct?                                     09:29:39
5  A.  Correct.                                 09:29:39
6  Q.  And Rothenberg Ventures was an investment   09:29:40
7  firm?                                        09:29:42
8  A.  That's correct.                          09:29:42
9  Q.  So was it a sort of professional goal or   09:29:43
10  interest of yours at that time to move into the   09:29:46
11  venture capital world on the investing side, whereas   09:29:49
12  previously you had been on the operating business   09:29:54
13  side?                                        09:29:56
14  A.  Not really.  I mean, it wasn't a goal per   09:29:56
15  se.  It was something that seemed interesting.  I   09:29:59
16  had expected to continue working in operating   09:30:02
17  companies for a long time and then eventually maybe   09:30:06
18  get involved on the investing side.          09:30:10
19  Q.  You had a lot of interests, I think;      09:30:12
20  medical school, law school, Clinkle, Rothenberg.   09:30:14
21      Is that kind of the fit of just how your   09:30:17
22  life has sort of gone?                       09:30:20
23  A.  I've pursued things I've found interesting   09:30:22
24  from time to time.                           09:30:25
25  Q.  At Rothenberg Ventures, you were hired for   09:30:26

Page 17

5 (Pages 14 - 17)

CONFIDENTIAL

1 the position of general counsel; is that correct?   09:30:28
2   A.  I don't believe so. I'm not entirely sure   09:30:29
3 now. I'd have to go back and look at correspondence   09:30:36
4 or what my offer letter says.   09:30:40
5   MR. NARDINELLI:  We will mark this as   09:30:44
6 Exhibit 1.   09:30:46
7   (Defendants' Exhibit 1 was marked.)   09:30:47
8 BY MR. NARDINELLI:   09:30:47
9   Q.  This is a printout of your LinkedIn   09:30:47
10 profile. If you turn to page --   09:30:52
11   MR. GLUGOSKI:  Counsel, do you have a copy?   09:31:10
12   MR. NARDINELLI:  I'm sorry, Counsel. Of   09:31:11
13 course.   09:31:13
14 BY MR. NARDINELLI:   09:31:14
15   Q.  If you turn to page 3 at the top. You've   09:31:14
16 listed a couple of positions at Rothenberg Ventures;   09:31:19
17 investor, investment team manager, and general   09:31:21
18 counsel.   09:31:26
19   Are those accurate?   09:31:27
20   A.  I guess so if they're there, yeah.   09:31:29
21   Q.  But you don't recall if you were   09:31:36
22 specifically hired for the specific position of   09:31:38
23 general counsel?   09:31:40
24   A.  I don't recall what I was specifically   09:31:41
25 hired for. I do recall that my role was supposed to   09:31:43

Page 18

1 be hybrid where I was focused on things related to   09:31:46
2 legal matters of the firm, specifically executing   09:31:49
3 investments, and then also related to diligencing   09:31:53
4 and sourcing investments. The exact titles that we   09:31:58
5 agreed on, I'm not sure.   09:32:04
6   Q.  So you don't necessarily dispute that your   09:32:09
7 official title was general counsel, you just want to   09:32:12
8 make sure that it's clear that titles weren't   09:32:14
9 necessarily super rigid at Rothenberg Ventures, you   09:32:19
10 had multiple responsibilities; is that correct?   09:32:22
11   A.  Yes. There were -- there was rigidity in   09:32:26
12 titles for certain people maybe who cared about that   09:32:30
13 or if Mike cared about it in that context or maybe   09:32:34
14 not in others. I don't want to speak to other   09:32:38
15 people's situations. I just know that when I was   09:32:40
16 joining the firm, I didn't really care what my title   09:32:45
17 was. I cared about what I would be doing and who I   09:32:49
18 would be doing it with.   09:32:49
19   Q.  You said that one of your responsibilities   09:32:51
20 that related to legal matters of the firm related to   09:32:54
21 executing investments?   09:33:00
22   A.  That's correct.   09:33:01
23   Q.  And another relating to legal matters was   09:33:01
24 diligencing and sourcing investments?   09:33:03
25   A.  That's non-legal matters.   09:33:05

Page 19

1   Q.  Got it.   09:33:07
2   Can you explain just generally what you   09:33:07
3 meant by "executing investments."   09:33:09
4   A.  So in any financing between the firm and a   09:33:11
5 start-up, or any firm and any start-up, there's some   09:33:15
6 contract. That contract needs to be written by one   09:33:20
7 party or one party's counsel and needs to be   09:33:23
8 negotiated by usually counsel for the parties. And   09:33:26
9 so that's what I mean by "executing."   09:33:30
10   Q.  And how about -- what did you mean by   09:33:32
11 "diligencing and sourcing investments"?   09:33:36
12   A.  "Sourcing" refers to the process of   09:33:39
13 finding companies to invest in or responding to   09:33:42
14 companies that are seeking investment.   09:33:45
15   And "diligencing" refers to doing research   09:33:47
16 into the market the company's operating in, doing   09:33:53
17 research into the company itself to understand who   09:34:00
18 is working there, what are they doing, what have   09:34:02
19 they created, what are their financials, how is   09:34:07
20 their performance, et cetera.   09:34:10
21   Q.  You started at Rothenberg Ventures in   09:34:11
22 October of 2014?   09:34:13
23   A.  Yes, that's correct.   09:34:17
24   Q.  And in October 2014, did you immediately   09:34:21
25 assume responsibilities on the legal side relating   09:34:25

Page 20

1 to executing investments?   09:34:29
2   A.  I don't recall.   09:34:32
3   Q.  Did you immediately assume   09:34:33
4 responsibilities relating to diligencing and   09:34:35
5 sourcing investments?   09:34:40
6   A.  I don't recall.   09:34:41
7   Q.  Do you recall the first investment that   09:34:42
8 you participated in the diligencing and sourcing of?   09:34:43
9   A.  No.   09:34:52
10   Q.  Let me show you what we'll mark as   09:35:01
11 Exhibit 2.   09:35:05
12   (Defendants' Exhibit 2 was marked.)   09:35:07
13 BY MR. NARDINELLI:   09:35:25
14   Q.  Do you recognize this document? And take   09:35:25
15 your time looking at it if you need to.   09:35:27
16   A.  This looks like the offer letter for when   09:35:32
17 I joined the firm. Although it's dated July of   09:35:34
18 2015, so it's after I joined the firm.   09:35:40
19   Q.  So you're referring to this date at the   09:35:45
20 top left that says July 22nd, 2015?   09:35:47
21   A.  Yes, that's correct.   09:35:51
22   Q.  Is this the first offer letter or contract   09:35:54
23 that you received?   09:35:56
24   I'm trying to understand.   09:35:57
25   Was there a written contract or something   09:36:01

Page 21

6 (Pages 18 - 21)

CONFIDENTIAL

1 similar to this in October 2014, if you recall?      09:36:04
2    A. I believe there was actually an agreement      09:36:09
3 before this one. Yes, there was an agreement before  09:36:11
4 this one, in 2014, when I first joined the firm. I   09:36:18
5 believe I joined actually as an independent          09:36:24
6 contractor for some period of time and then          09:36:27
7 eventually transitioned to a full-time employee, a   09:36:31
8 W-2 employee, but that was before this date. And     09:36:35
9 then this eventually became the documentation of     09:36:39
10 that process.                                        09:36:44
11    Q. I see here on the first page, at 1(c.),        09:36:45
12 "Start date: 2/1/2015."                             09:36:49
13       Is that the date that you transitioned        09:36:50
14 from being a contractor to a full-time W-2 employee?  09:36:55
15    A. I believe so, yes.                             09:36:58
16    Q. Do you know if you have a copy of the          09:37:03
17 independent contractor agreement from October 2014?  09:37:05
18    A. I don't know.                                  09:37:08
19    Q. Regardless of whether you have a copy of       09:37:09
20 that agreement, do you believe that this agreement,  09:37:11
21 Exhibit 2, superseded whatever the prior agreement   09:37:14
22 was?                                                 09:37:18
23    A. I don't know.                                  09:37:19
24    Q. As part of your legal responsibilities         09:37:22
25 when you were working for Rothenberg Ventures, were  09:37:24

Page 22

1 you responsible for compliance with wage and hour    09:37:28
2 laws?                                                09:37:34
3    A. This was never within my explicit scope of     09:37:35
4 duties as designated by Mike, no.                     09:37:39
5    Q. You say, "explicit scope of duties."           09:37:43
6       What do you mean by that?                      09:37:45
7    A. Mike would very explicitly ask me to do         09:37:48
8 certain things, for example, execute on investments   09:37:51
9 or look into certain companies, things like that.     09:37:57
10    Q. What form would those explicit              09:38:00
11 instructions take?                                   09:38:03
12    A. There were in-person meetings, phone           09:38:05
13 calls, text messages, voice memos, e-mails.          09:38:09
14    Q. So a litany of different forms of              09:38:15
15 instructions?                                        09:38:18
16    A. That's right.                                  09:38:18
17    Q. So when you say "explicit scope of             09:38:19
18 duties," you're not suggesting that there's a single  09:38:21
19 document somewhere that says, Neil Devani,           09:38:25
20 responsibilities are and several bullet points; it    09:38:29
21 was a sort of ongoing real-time set of duties?        09:38:31
22    A. That's correct.                                09:38:36
23    Q. You were never asked or you never              09:38:37
24 understood it to be one of those duties to do any     09:38:39
25 work in connection with wage and hour compliance?    09:38:42

Page 23

1    A. Oh, I definitely did work outside of those      09:38:45
2 explicit duties as well. On that topic, I did do     09:38:48
3 some work.                                           09:38:56
4    Q. What work did you do on the topic of wage       09:38:57
5 and hour compliance?                                  09:39:00
6    A. I believe that would be privileged.            09:39:01
7    Q. What time frame were you doing that work?      09:39:11
8    A. I believe all of that is privileged.           09:39:14
9    Q. This is work you're doing on behalf of the     09:39:17
10 company?                                             09:39:20
11    A. That's right.                                  09:39:20
12    Q. So you're asserting a privilege on behalf      09:39:21
13 of Rothenberg Ventures?                              09:39:24
14    A. That's correct.                                09:39:26
15    Q. You understand that I work for Rothenberg      09:39:26
16 Ventures as an attorney?                             09:39:28
17    A. That's correct.                                09:39:30
18    Q. Sir, a company's privileged information is     09:39:34
19 not privileged from itself.                          09:39:37
20    A. That's correct.                                09:39:40
21    Q. So I'm asking you, as a representative of      09:39:42
22 Rothenberg Ventures, what legal work you did on      09:39:46
23 behalf of Rothenberg Ventures.                       09:39:49
24    A. Are you waiving privilege for this             09:39:51
25 question?                                            09:39:54

Page 24

1    Q. I'm not waiving privilege for this             09:39:54
2 question. I don't know what privilege I would be     09:40:01
3 waiving.                                             09:40:05
4       I'm asking you, what is the work that you      09:40:05
5 did?                                                 09:40:08
6    A. I don't know that I can answer the             09:40:10
7 question without knowing that privilege has been      09:40:12
8 waived. And I don't know that you're qualified to     09:40:15
9 waive the privilege on behalf of the company.         09:40:17
10    MR. NARDINELLI: Speaking as a former attorney    09:40:20
11 discussing his attorney's role with the company,     09:40:24
12 there's no waiver of privilege because you're not     09:40:30
13 going outside of the company.                         09:40:33
14    MR. GLUGOSKI: Well, he's testifying, actually,    09:40:38
15 on the record. There are people that are not part     09:40:39
16 of the company -- I guess the question is -- he has   09:40:42
17 concerns about breaching the privilege. If you want   09:40:45
18 to enter into some written agreement signed by Mike   09:40:48
19 saying he can testify about matters that would         09:40:51
20 otherwise be privileged -- I don't think you           09:40:54
21 necessarily can insulate him from any potential        09:40:57
22 prosecution for divulging privileged matters.          09:41:02
23 BY MR. NARDINELLI:                                    09:41:08
24    Q. So we'll take it up later, perhaps, but        09:41:08
25 let me just make sure your position is clear for the  09:41:10

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

```
 1 record.                              09:41:15
 2      You are refusing to answer questions about   09:41:16
 3 the work you did for Rothenberg Ventures on the   09:41:20
 4 basis of privilege?                   09:41:24
 5      MR. GLUGOSKI: He's not refusing to answer the   09:41:27
 6 questions. He's saying there needs to be some   09:41:29
 7 specific protection given to him to testify on   09:41:33
 8 matters that may subject him to some type of ethical   09:41:37
 9 violations if he testifies about it, given his   09:41:42
10 position. That's all, Counsel.        09:41:47
11      I mean, that can be handled very easily by   09:41:49
12 some contract or written agreement or court order   09:41:53
13 saying that he can testify about this stuff without   09:41:56
14 suffering any type of penalty or being subject to   09:42:00
15 disciplinary action or jeopardizing his license.   09:42:04
16      MR. NARDINELLI: Fair enough. But that's a   09:42:10
17 different ground than the privilege ground. So let   09:42:11
18 me -- we're just trying to make the record clear so   09:42:14
19 we know what you're saying here.      09:42:19
20 BY MR. NARDINELLI:                    09:42:21
21   Q.  Your attorney, Mr. Glugoski, just said you   09:42:21
22 will not answer the question absent specific   09:42:25
23 protection given to you to testify on matters that   09:42:28
24 may subject you to some type of ethical violation if   09:42:31
25 you testify.                          09:42:35
```

Page 27

```
 1      So are you saying that you do not want to   09:42:36
 2 testify -- let me be more specific.   09:42:40
 3      You do not want to answer my questions   09:42:43
 4 about the wage and hour work that you did at   09:42:45
 5 Rothenberg Ventures without being protected from a   09:42:48
 6 potential ethical violation that might come from   09:42:53
 7 your response?                        09:42:57
 8   A.  I believe that's correct, based on what   09:42:58
 9 you said, yes.                        09:43:01
10   Q.  So let me just ask the question again to   09:43:02
11 make a nice, clean record.            09:43:05
12      Mr. Devani, in your role as general   09:43:07
13 counsel for Rothenberg Ventures, what work did you   09:43:11
14 do relating to wage and hour compliance?   09:43:15
15   A.  That would be privileged.       09:43:21
16   Q.  Are you saying that is privileged, or are   09:43:23
17 you saying that you don't want to answer that   09:43:25
18 because to answer that might subject you to some   09:43:28
19 type of ethical violation?            09:43:32
20      MR. GLUGOSKI: I think, Counsel, they go hand   09:43:34
21 in hand. You may not see it that way, but the point   09:43:37
22 is he is -- you're asking him questions that would   09:43:40
23 be subject to privilege by the company.   09:43:42
24      Now, what he has asked for is a waiver of   09:43:45
25 that privilege so that he can comment on it.   09:43:48
```

Page 28

```
 1 However, the question is, do you have the ability or   09:43:50
 2 the authority to waive it? And he doesn't agree   09:43:52
 3 that you do. If it's in a written contract,   09:43:58
 4 agreement by the parties, Rothenberg Ventures,   09:44:04
 5 Mr. Rothenberg and -- filed with the court, he's   09:44:06
 6 happy to answer those questions.      09:44:10
 7      MR. NARDINELLI: Now I got it.    09:44:12
 8 BY MR. NARDINELLI:                    09:44:13
 9   Q.  So what you're saying is you are concerned   09:44:13
10 that, by answering that question, you would be   09:44:16
11 breaking a privilege, and breaking that privilege   09:44:20
12 would be the ethical violation that you're concerned   09:44:23
13 about?                                09:44:26
14   A.  Yes, that's correct.          09:44:27
15   Q.  Do you understand as an attorney that to   09:44:37
16 break privilege, you have to disclose something to   09:44:39
17 somebody outside the company?         09:44:43
18   A.  I don't believe that's correct.   09:44:49
19   Q.  What do you believe is correct?   09:44:51
20   A.  There are cases where you can break   09:44:53
21 privilege by disclosing things from certain members   09:44:55
22 of the company to other employees or contractors of   09:44:59
23 the company. You are not employed by the company.   09:45:04
24 You are not an executive at the company. From my   09:45:06
25 understanding of the duty I'm bound by, I may not be   09:45:10
```

Page 29

```
 1 able to share information with you. Same thing with   09:45:15
 2 John; I may not be able to share certain information   09:45:20
 3 with John.                            09:45:24
 4   Q.  So you are concerned that you would be   09:45:25
 5 breaking privilege by answering my questions knowing   09:45:27
 6 that I'm employed by Mr. Rothenberg as his attorney   09:45:30
 7 in this wage and hour case?           09:45:33
 8   A.  Yes, that's correct.          09:45:36
 9   Q.  Have you always honored your obligation to   09:45:38
10 maintain your clients' privileged information as   09:45:41
11 privileged?                           09:45:46
12   A.  Yes, I have.                  09:45:46
13   Q.  Have you always maintained your ethical   09:45:47
14 duty to keep your clients' confidential information   09:45:51
15 confidential?                         09:45:56
16   A.  Yes.                         09:45:57
17      MR. GLUGOSKI: Counsel, just so we're clear,   09:46:11
18 I'm happy to work out some agreement that will   09:46:14
19 address your concerns, my client's concerns and get   09:46:19
20 you whatever it is that you need to get. I'm not   09:46:25
21 refusing to allow him to answer that. Just some   09:46:28
22 logistics that have to be handled.    09:46:34
23 BY MR. NARDINELLI:                    09:46:36
24   Q.  Back to your earlier testimony on your   09:46:36
25 legal responsibility relating to executing   09:46:42
```

8 (Pages 26 - 29)

CONFIDENTIAL

1 investments.                                            09:46:45
2       Were you involved in -- well, let me go          09:46:46
3 back.                                                   09:46:52
4       Were the funds structured as individual          09:46:54
5 entities separate from Rothenberg Ventures, the        09:46:57
6 entity that was the firm?                               09:47:01
7    A. I'm not sure I understand your question.          09:47:04
8    Q. I'm just trying to get just a baseline            09:47:06
9 understanding of what the entity structure is of the    09:47:09
10 firm.                                                  09:47:13
11      So if the firm makes an investment into a         09:47:13
12 company, let's say FOVE -- I know that was one of      09:47:17
13 the companies you were involved in.                    09:47:21
14   A. That's correct.                                   09:47:22
15   Q. Is that the firm as an entity that's              09:47:23
16 making the investment into FOVE? Is there a            09:47:25
17 separate entity that relates to a fund that has been   09:47:28
18 raised by the firm that makes the investment into      09:47:31
19 FOVE? Just generally speaking, how does that work?     09:47:35
20   A. So there are different entities. There is         09:47:39
21 a -- generally the way firms are constructed, you      09:47:44
22 have a management or general partnership entity that   09:47:48
23 is responsible for the management of a fund entity.    09:47:51
24 The fund entity holds capital to be invested into      09:47:54
25 companies.                                             09:47:59

Page 30

1       Does that help?                                   09:48:05
2    Q. I think. I'm just reading it.                     09:48:06
3       Were you involved in setting up any of the        09:48:11
4 fund entities that held capital to be invested in       09:48:17
5 companies?                                              09:48:23
6    A. Yes, I was.                                       09:48:23
7    Q. What entities were those?                         09:48:24
8    A. Off the top of my head, I couldn't tell           09:48:27
9 you specifically which ones. I would have to check.     09:48:30
10   Q. Was there an entity relating to the --            09:48:39
11 let's see.                                             09:48:44
12      Going back over the funds, there was a            09:48:44
13 2013 fund; correct?                                    09:48:47
14   A. The names of the funds were changed. So           09:48:50
15 there was a fund, I would say -- I don't know if       09:48:53
16 it's legally known as that, but we can call it that.   09:48:55
17 And I know what you mean, I believe, when you say      09:48:59
18 the "2013 fund."                                       09:49:01
19   Q. Okay. That's fair.                                09:49:03
20      I'm not sure I know what all the precise          09:49:03
21 legal names are, but in what we'll currently refer     09:49:07
22 to as common parlance, was there a 2013 fund?          09:49:10
23   A. That's correct.                                   09:49:15
24   Q. And a 2014 fund?                                  09:49:16
25   A. That's correct.                                   09:49:19

Page 31

1    Q. And 2015 fund?                                    09:49:19
2    A. That's correct.                                   09:49:22
3    Q. Was there a 2016 fund?                            09:49:22
4    A. I believe so, yes.                                09:49:22
5    Q. That was the one that we'll get into in a         09:49:23
6 little bit that's, I believe -- did the 2016 ever      09:49:23
7 make any investments?                                   09:49:26
8    A. I would have to check. I'm not sure.              09:49:28
9    Q. Okay. Were you involved in setting up the         09:49:30
10 2013 fund?                                             09:49:32
11   A. No, I was not.                                    09:49:33
12   Q. That predated your time there?                    09:49:34
13   A. That's correct.                                   09:49:37
14   Q. Did the 2014 fund also predate your time          09:49:38
15 there?                                                 09:49:41
16   A. It was formed and operational before I            09:49:41
17 joined.                                                09:49:45
18   Q. So you were not involved in setting up            09:49:46
19 that fund?                                             09:49:49
20   A. To the extent by "setting up" you mean the        09:49:51
21 actual formation, which refers to -- which refers to   09:49:56
22 the active creation of the fund and the signing on     09:49:58
23 of limited partners in the fund or, in this case,      09:50:08
24 members of the LLC, so it was incorporation rather     09:50:13
25 than a formation, those acts I was not involved        09:50:17

Page 32

1 with.                                                   09:50:20
2       To the extent you mean the continued              09:50:20
3 maintenance and adjustments, some of that I believe    09:50:25
4 I was.                                                  09:50:28
5    Q. And how about for the 2015 fund?                  09:50:29
6    A. That I was involved with, yes.                    09:50:33
7    Q. What was your involvement?                        09:50:35
8    A. I was involved in forming the fund.               09:50:36
9    Q. And what goes into forming the fund?              09:50:44
10 Specifically what types of documentation are           09:50:46
11 involved?                                              09:50:48
12   A. Generally, there is a limited partnership         09:50:49
13 agreement or -- in the case of a limited              09:50:53
14 partnership. In the case of a limited liability        09:50:56
15 corporation, there is an operating agreement. In       09:51:01
16 both cases, there is usually a management agreement    09:51:04
17 between the management company and the fund entity.    09:51:08
18   Q. So the fund entity would either be an LP          09:51:15
19 agreement or an operating agreement, depending on      09:51:19
20 the corporate form that the fund entity took?          09:51:21
21   A. That's correct.                                   09:51:25
22   Q. And then whether an LP agreement or an            09:51:26
23 operating agreement, that's the fund entity. And       09:51:29
24 then there's a management agreement between the        09:51:32
25 management company and the fund entity; correct?       09:51:37

Page 33

9 (Pages 30 - 33)

CONFIDENTIAL

1   A.  That's correct.                              09:51:39
2   Q.  Are there any other agreements relating to   09:51:39
3 the formation of the fund and the structure?       09:51:43
4   A.  In some cases, there might be, yes.          09:51:48
5   Q.  What might those be?                          09:51:50
6   A.  There's a whole litany of other agreements   09:51:51
7 you could have.  Different -- depends on what your  09:51:54
8 goals are.  Depends on how complex of a structure  09:51:58
9 you have.  Those are the main agreements.  In my    09:52:03
10 estimation, I would say those are the main          09:52:06
11 agreements and then other agreements are ancillary. 09:52:09
12   Q.  What are the fees involved between the        09:52:13
13 management company and the fund entity?             09:52:19
14   A.  That's very variable from fund to fund, in    09:52:23
15 some cases, even from different members of a fund to 09:52:28
16 the management company.                             09:52:33
17   Q.  Do you recall specifically for the 2014       09:52:34
18 fund?                                               09:52:37
19   A.  I do not.                                     09:52:38
20   Q.  What about for the 2015 fund?                 09:52:39
21   A.  I do not.                                     09:52:42
22   Q.  In general terms, is it always the case       09:52:43
23 that the fund entity will pay management fees to the 09:52:46
24 management company?                                 09:52:50
25   A.  Can you say the question again.               09:52:52

Page 34

1   fees over the course of its lifetime?              09:54:05
2   A.  Yes.                                           09:54:08
3   Q.  Let's go back to your employment contract,     09:54:11
4 which was Exhibit 2.                                 09:54:13
5     Do you understand this employment contract       09:54:18
6 that you signed to govern your employment at         09:54:20
7 Rothenberg Ventures Management Company LLC?          09:54:25
8   A.  What do you mean, do I understand it?          09:54:28
9   Q.  Is it your understanding that the terms        09:54:30
10 that are laid out in this agreement are the terms    09:54:36
11 that govern your, for example, legal rights to paid  09:54:38
12 time off and expense reimbursement for purposes of   09:54:45
13 this case?                                           09:54:49
14   A.  Yes.                                           09:54:49
15   Q.  Are there any other documents besides this     09:54:50
16 contract that bear on your entitlement to what you   09:54:53
17 claim to be unpaid wages and PTO, as well as what    09:54:59
18 you claim to be unpaid expenses?                     09:55:04
19   A.  I'm not sure.  There are other -- there        09:55:07
20 were e-mails, which you consider documents, text     09:55:13
21 messages, phone calls, in-person conversations that  09:55:17
22 modified this agreement or amended this agreement in 09:55:25
23 different ways.  I don't believe I have asserted     09:55:29
24 those as a basis, but they exist.                    09:55:33
25   Q.  Did you ever sign any employment contracts     09:55:40

Page 36

1   Q.  Yes.                                           09:52:54
2     In general terms, is it always the case          09:52:54
3 that the fund entity will pay management fees to the 09:52:57
4 management company?                                  09:53:00
5   A.  I don't know if you can say "in general"       09:53:02
6 and "always" in the same question like that, but     09:53:04
7 that's a common setup, is that the fund entity will  09:53:07
8 pay management fees.  In some cases, members or       09:53:12
9 investors or limited partners, whatever term you     09:53:16
10 want to use, who are investing in the fund will       09:53:20
11 directly pay management fees to the management        09:53:24
12 company separately.  That is something else I've      09:53:26
13 seen.                                                 09:53:28
14   Q.  The management company at Rothenberg            09:53:30
15 Ventures, that was Rothenberg Ventures Management     09:53:31
16 Company LLC; correct?                                 09:53:34
17   A.  I believe so, yes.                              09:53:35
18   Q.  And that's one of the defendants in this        09:53:37
19 case?                                                 09:53:38
20   A.  I believe so, yes.                              09:53:39
21   Q.  And RVMC -- I'll call that RVMC.                09:53:44
22     RVMC has earned management fees, whether          09:53:49
23 it be paid by the funds or paid directly by the       09:53:54
24 members or paid directly by the LPs?  But, again,     09:53:56
25 speaking just generally, RVMC has earned management   09:53:59

Page 35

1   subsequent to signing this contract at Exhibit 2?   09:55:43
2 And I mean with Rothenberg Ventures.                  09:55:47
3   A.  No, I did not.                                  09:55:50
4   Q.  Did you ever formally modify this               09:55:52
5 contract, so an addendum, modification, that type of 09:55:56
6 thing?                                                09:55:58
7   A.  Can you define what you mean by                 09:56:02
8 "formally."                                           09:56:04
9   Q.  Precisely, I'm not sure I can.  You             09:56:05
10 mentioned that there might be e-mails, that there     09:56:07
11 might be text messages or there might be meetings or  09:56:08
12 something like that that might have the effect of     09:56:10
13 changing or modifying this agreement.                09:56:17
14     I guess I'm -- how about I put it this            09:56:19
15 way:  Any other signed contracts that you remember    09:56:21
16 that you signed that would bear on your entitlement   09:56:26
17 to wages, PTO or expenses?                            09:56:32
18   A.  I don't believe there are any signed            09:56:35
19 contracts, no.                                        09:56:37
20   Q.  Are you familiar with the Rothenberg            09:56:39
21 Ventures employee handbook?                           09:56:41
22   A.  I'm familiar with it.                           09:56:43
23   Q.  If you could turn to Section 7, page 2,         09:57:04
24 subparagraph entitled, "Employment Relationship."     09:57:09
25 I'm going to read the final sentence from Section 7.  09:57:13

Page 37

10 (Pages 34 - 37)

CONFIDENTIAL

1   It says, "Although your job duties, title,   09:57:16
2 compensation and benefits as well as the company's   09:57:19
3 personnel policies and procedures may change from   09:57:22
4 time to time, the at-will nature of your employment   09:57:25
5 may only be changed in an express written agreement   09:57:28
6 signed by you and Mike Rothenberg."   09:57:31
7   Do you see that?   09:57:33
8   A.  I do.   09:57:34
9   Q.  Do you agree that your employment at   09:57:35
10 Rothenberg Ventures was at-will?   09:57:38
11   A.  I believe so, yes.   09:57:47
12   Q.  Do you believe that your employment at   09:57:49
13 Rothenberg Ventures remained at-will from the date   09:57:52
14 that you signed this contract until the very end of   09:57:54
15 your time there, whenever that was?   09:57:58
16   A.  I'm not sure.   09:58:01
17   Q.  What makes you unsure?   09:58:02
18   A.  The exact nature of at-will employment is   09:58:04
19 not an area that I have expertise in, the fact that   09:58:08
20 there's a written agreement and additional   09:58:12
21 agreements after that may have changed that.  It's   09:58:16
22 not an area of the law that I can comment on.   09:58:19
23   Q.  Understanding that you are not an expert   09:58:22
24 on what at-will employment means, what's your best   09:58:25
25 understanding of what at-will employment means?   09:58:28
Page 38

1   A.  Both parties are voluntarily engaged with   09:58:31
2 the right to walk away at any time without   09:58:35
3 additional obligations.   09:58:37
4   Q.  Did you understand, when you were employed   09:58:39
5 at Rothenberg Ventures, that at any point, you had   09:58:42
6 the right to voluntarily walk away without further   09:58:44
7 obligations?   09:58:47
8   A.  I did not.   09:58:48
9   Q.  You did not?   09:58:49
10   A.  I did not.   09:58:50
11   Q.  What was your understanding?   09:58:50
12   A.  Well, in the handbook, we agreed to two   09:58:51
13 weeks' notice to walk away.  This is, of course, the   09:58:54
14 employee or contractor deciding to walk away.  And   09:59:00
15 then verbally at some point, when I told Mike that I   09:59:05
16 was considering doing something else, he asked me   09:59:10
17 for at least a quarter's notice, or three months'   09:59:15
18 notice.   09:59:19
19   Q.  Did you believe that you were bound by   09:59:20
20 that -- well, let's take them one at a time because   09:59:21
21 I think you said two things.   09:59:28
22   So you said that "in the handbook, we   09:59:30
23 agreed to two weeks' notice to walk away."   09:59:34
24   Do you believe that you personally were   09:59:37
25 bound by the requirement to give two weeks' notice?   09:59:39
Page 39

1   A.  I considered myself bound by something   09:59:44
2 more than the legal agreement, more so by a   09:59:47
3 relationship and agreeing to provide that service or   09:59:50
4 availability to someone who I had worked closely   09:59:57
5 with.   10:00:01
6   Q.  What do you mean you believe you were   10:00:04
7 bound by a relationship?   10:00:05
8   A.  There are reasons to do things beyond what   10:00:08
9 you're legally allowed to do or legally required to   10:00:11
10 do.   10:00:17
11   Q.  So you believe that for some sort of moral   10:00:17
12 or ethical or just good business practice, goodwill,   10:00:20
13 something like that, you believe that you were bound   10:00:24
14 not to just give immediate resignation to Rothenberg   10:00:26
15 Ventures, but to have some transition or notice   10:00:30
16 period?   10:00:33
17   A.  That's correct.   10:00:33
18   Q.  So you wouldn't leave the firm stranded or   10:00:34
19 hanging, anything like that.   10:00:37
20   A.  Exactly.   10:00:38
21   Q.  Did you believe that that was your legal   10:00:39
22 obligation, or did you believe that that was a   10:00:40
23 personal obligation and not a legal obligation?   10:00:42
24   A.  I never considered the legal obligation of   10:00:45
25 it in detail.  I only considered the personal   10:00:48
Page 40

1 obligation.   10:00:51
2   Q.  Did you or did you not believe that you   10:00:52
3 had a legal obligation to remain at Rothenberg   10:00:55
4 Ventures Management Company after you had given   10:01:00
5 notice of resignation?   10:01:05
6   A.  I don't know that I had a belief on that.   10:01:09
7   Q.  You did not have a belief one way or the   10:01:15
8 other as to whether you had a legal obligation to   10:01:18
9 remain at Rothenberg Ventures Management Company   10:01:22
10 after you had given notice of resignation?   10:01:25
11   A.  No.   10:01:28
12   Q.  So then you do not have a belief one way   10:01:52
13 or the other as to whether the company handbook   10:01:54
14 created a legal duty binding on you to give two   10:02:01
15 weeks' notice before resigning?   10:02:06
16   A.  I felt the handbook was authoritative in   10:02:10
17 some sense.  Whether it was legally binding I did   10:02:14
18 not have certainty on one way or the other.  We   10:02:19
19 weren't required to sign a handbook.   10:02:27
20   Q.  Did you consider the handbook the official   10:02:32
21 firm policy?   10:02:37
22   A.  Yes.   10:02:37
23   Q.  By "official firm policy," what do you   10:02:39
24 understand me to mean when I use that phrase?   10:02:43
25   A.  The firm's public shared expectation of   10:02:46
Page 41

11 (Pages 38 - 41)

CONFIDENTIAL

1 how people would act, or how they should act.  10:02:49
2   Q.  So let's talk about kind of what the firm  10:02:54
3 looked like when you arrived there in 2014.  10:03:00
4   A.  Okay.  10:03:03
5   Q.  How many people were working there?  10:03:04
6   A.  I don't recall off the top of my head.  10:03:07
7   Q.  What's a rough estimate?  10:03:09
8   A.  It's difficult for me to say because there  10:03:14
9 were people who were not -- who didn't appear to be  10:03:16
10 full-time employees, but may have been.  And also  10:03:23
11 "working there" is a very vague term.  There were  10:03:27
12 employees.  There were contractors.  There were  10:03:32
13 people who were remote.  It's hard to say.  I can  10:03:35
14 say it was less than at some point in the future.  10:03:42
15 It grew.  10:03:46
16   Q.  It's hard for you to give an estimate of  10:03:47
17 how many people, quote, were working there because  10:03:51
18 there are different forms of employment, full-time  10:03:54
19 employees, contractors, people working remote; is  10:03:58
20 that correct?  10:04:01
21   A.  Yes.  And also it was four years ago.  So  10:04:02
22 if you had asked me then, I could give you a  10:04:05
23 reasonable ballpark for sure.  But at this point, it  10:04:08
24 would be difficult.  10:04:12
25   Q.  Now, that was in 2014, when you joined.  10:04:13
Page 42

1       Moving forward to roughly 2016 -- moving  10:04:16
2 forward to 2016, around the time that you left, was  10:04:18
3 employment status similarly amorphous at that time?  10:04:23
4   A.  It felt clearer at that point to me.  10:04:28
5 There were definitely still people in various roles,  10:04:31
6 but I had much more knowledge about who was working  10:04:34
7 where, in what kind of role, things like that.  10:04:37
8   Q.  So as of, let's say, July 1st, 2016, how  10:04:41
9 many people were working for Rothenberg Ventures  10:04:44
10 Management Company?  10:04:46
11   A.  Again, to give you an exact number, I  10:04:47
12 would have to check like notes or documentation.  10:04:49
13 Off the top of my head, hard to say.  I can say it  10:04:53
14 was more.  10:04:56
15   Q.  What notes and documentation would you  10:04:57
16 want to check?  10:04:59
17   A.  I would want to look at a roster or org.  10:05:00
18 chart, something like that.  10:05:06
19   Q.  Was there an org. chart?  10:05:06
20   A.  I think so, yeah.  10:05:08
21   Q.  What do you mean by "roster"?  10:05:09
22   A.  Just -- from a payroll service or any  10:05:11
23 other HR software that we use to see like what is  10:05:17
24 the list of all the people who are in the company,  10:05:20
25 one way or another.  10:05:25
Page 43

1   Q.  Do you think that by looking at a Gusto  10:05:27
2 record for, say, the pay period ending July 15th,  10:05:30
3 2016 -- would you consider that an accurate source  10:05:34
4 of who was working for Rothenberg Ventures  10:05:37
5 Management Company at that time?  10:05:39
6   MR. GLUGOSKI:  Objection; calls for  10:05:39
7 speculation.  10:05:40
8 BY MR. NARDINELLI:  10:05:43
9   Q.  You can answer.  10:05:43
10   A.  Probably, yes.  10:05:43
11   Q.  So back to 2014.  10:05:47
12   A.  I don't think it would be exhaustive.  10:05:49
13 There might be people who are not in that system,  10:05:51
14 but I would imagine everyone in that system being  10:05:55
15 paid you could consider working for the company.  10:05:58
16   Q.  Do you know that or is that your  10:06:01
17 speculation?  10:06:02
18   A.  That's speculation.  10:06:03
19   Q.  So back to when you started around  10:06:05
20 October 2014.  10:06:08
21      As best you can -- and I won't hammer this  10:06:09
22 any further.  10:06:10
23      But as best you can, notwithstanding that  10:06:10
24 this person might have been a contractor and this  10:06:12
25 person -- what's the size of the total group of  10:06:15
Page 44

1 entities or ecosystem, the size of the organization?  10:06:21
2 If there were an all-hands meeting in which  10:06:25
3 everybody that was affiliated with the company was  10:06:28
4 to appear, how many people would be at that meeting?  10:06:32
5   A.  I would guess -- I'm saying this as a  10:06:35
6 guess, it's an estimation -- probably less than 20,  10:06:38
7 maybe less than that.  10:06:41
8   Q.  Now, at this point, the 2013 fund -- and  10:06:44
9 again I'm using that colloquially as we will  10:06:48
10 throughout.  10:06:49
11   A.  Sure.  10:06:50
12   Q.  If I ever use something formally or if you  10:06:51
13 do, we'll let each other know.  10:06:54
14      What's the status of the 2013 fund at the  10:06:57
15 time that you joined in October 2014?  10:07:03
16   A.  What do you mean by "status"?  10:07:04
17   Q.  Tell me like I'm an elementary school  10:07:06
18 student.  How many companies are invested?  What's  10:07:06
19 the size of the fund?  Are you still making new  10:07:06
20 investments?  Are you still taking in money from  10:07:06
21 investors or has it closed?  Just all these basic  10:07:06
22 parameters of the fund.  10:07:06
23   A.  This is again based on my recollection, so  10:07:22
24 I wouldn't consider this entirely reliable.  10:07:25
25      I believe there was no new -- there were  10:07:28
Page 45

12 (Pages 42 - 45)

CONFIDENTIAL

**Page 46**

1  no new investors coming into the 2013 fund, that is,   10:07:31
2  no third parties investing in the fund for the fund   10:07:36
3  to invest in companies. I believe there was capital   10:07:41
4  still left to make primary investments from the 2013   10:07:44
5  fund, which is to make an investment into a company   10:07:49
6  that had not been invested in before. And I believe   10:07:52
7  there was capital, additionally, to make follow-on   10:07:56
8  investments, that is, to invest in companies the   10:07:59
9  fund had already invested in at least one time.   10:08:01
10  Q. Thank you. That's helpful. Let me break   10:08:07
11  that apart and make sure I've got it straight.   10:08:07
12  The 2013 fund, and probably similarly with   10:08:07
13  other funds, but we'll stick to the 2013 now, sort   10:08:12
14  of Step 1 is the fund gathers money from investors;   10:08:16
15  is that right?   10:08:19
16  A. That's correct.   10:08:20
17  Q. At some point, the fund closes and is no   10:08:20
18  longer accepting new funds from investors.   10:08:24
19  A. Typically, yes.   10:08:27
20  Q. Do you recall what the 2013 fund closed   10:08:28
21  with?   10:08:30
22  A. I don't off the top of my head.   10:08:32
23  Q. I think it was $5 million.   10:08:32
24  Does that sound right?   10:08:33
25  A. Yeah, generally.   10:08:36

**Page 47**

1  Q. So it closes with generally somewhere   10:08:37
2  around $5 million.   10:08:39
3  It then can use that $5 million to invest   10:08:40
4  in companies; right?   10:08:45
5  A. That's correct.   10:08:46
6  Q. And there are at least two forms of a   10:08:46
7  investments. One is a primary investment, which you   10:08:49
8  usefully defined as an investment into a company   10:08:54
9  that the fund had not previously invested into.   10:08:56
10  A. That's correct.   10:09:00
11  Q. And the second type would be a follow-on   10:09:01
12  investment, which is exactly what the name implies?   10:09:03
13  A. That's correct.   10:09:05
14  Q. Is there a third type of investment?   10:09:06
15  A. Yeah, you could consider -- this might   10:09:07
16  still seem like a primary, but folks consider it   10:09:10
17  different because it has a different name, a   10:09:14
18  secondary investment, in which case -- in primary   10:09:15
19  investment, a fund is typically providing capital to   10:09:19
20  a company. In return, the company provides equity   10:09:24
21  or similar -- something similar to the fund. Those   10:09:30
22  are considered primary investments.   10:09:33
23  There are also secondary investments   10:09:35
24  whereby you've invested in the company. And instead   10:09:38
25  of going to the company, I'm going to pay you   10:09:41

**Page 48**

1  capital and you give me the shares that you have   10:09:44
2  already gotten of the company. And we call those   10:09:46
3  secondary investments.   10:09:50
4  Q. Okay.   10:09:50
5  A. That could be another type of investment   10:09:50
6  that a fund makes.   10:09:50
7  Q. What's the mood like at the firm when you   10:09:51
8  joined in October 2014?   10:09:54
9  A. I'm not sure I can answer that.   10:09:56
10  Q. Was there a very promising and excited   10:09:58
11  feel to it?   10:10:01
12  A. I felt that it was a good place to join.   10:10:05
13  I can speak to my thoughts on the firm.   10:10:07
14  Q. Well, I appreciate that. And I understand   10:10:11
15  you're being careful not to testify as to what others   10:10:14
16  thought and stay within your personal knowledge.   10:10:17
17  But what about your personal observations   10:10:19
18  of others or your personal conversations with   10:10:22
19  others? Did the thrust of those observations and   10:10:25
20  conversations with coworkers suggest to you that   10:10:28
21  they were unhappy about the firm, looking to move   10:10:31
22  elsewhere, dissatisfied with the job; or were you   10:10:34
23  struck more by a tone of optimism, excitement and   10:10:40
24  we're building something really big and interesting   10:10:44
25  here?   10:10:48

**Page 49**

1  A. Not necessarily much of either. There   10:10:49
2  were people leaving or who had left. There were   10:10:51
3  people joining, who joined just before me or after   10:10:55
4  me. I don't think there was particularly a negative   10:10:59
5  tone of people who were leaving. They were leaving   10:11:02
6  to join other things and do other things. And then   10:11:05
7  there were people who were joining the firm, not   10:11:08
8  with the idea of some crazy optimism, but this is a   10:11:10
9  good place to work and this will be a good place to   10:11:15
10  build a career.   10:11:18
11  Q. What about the 2014 fund? Where was the   10:11:19
12  2014 fund at the time you joined in October 2014?   10:11:23
13  A. The 2014 fund, again, I believe was in a   10:11:27
14  similar status to the 2013 fund, closed in its   10:11:36
15  nascency. So I don't believe it was still accepting   10:11:42
16  new investors. Whether or not it could, I'm not   10:11:48
17  sure, but I don't think it was. And then it was   10:11:50
18  making primary investments and follow-on investments   10:11:54
19  at that time, I believe.   10:11:59
20  Q. What about the 2015 fund? At the time   10:12:02
21  that you had joined, was there a -- had it begun to   10:12:05
22  form in any way?   10:12:12
23  A. I don't think there had been anything   10:12:14
24  beyond conversations and strategizing for what it   10:12:17
25  should look like.   10:12:23

13 (Pages 46 - 49)

CONFIDENTIAL

1  Q. So there was at least the idea that there   10:12:24
2 was hopefully going to be a 2015 fund?   10:12:26
3  A. Yes.   10:12:29
4  Q. But nothing further than that?   10:12:30
5  A. There may have been something more than   10:12:32
6 that. I don't know.   10:12:34
7  Q. What about River? When you joined at   10:12:36
8 October 2014 -- did I say at October 2014?   10:12:41
9    When you joined in October 2014, what was   10:12:44
10 the status of River?   10:12:46
11  A. It did not exist.   10:12:48
12  Q. Is that the River Accelerator program? Is   10:12:49
13 that the River Studios company? Neither of them   10:12:52
14 existed?   10:12:57
15  A. I don't think any of that existed.   10:12:57
16  Q. When did you -- to your understanding,   10:13:00
17 when did River come into existence?   10:13:03
18  A. The exact date, I'm not sure, but it was   10:13:05
19 after I joined. There was a late-night meeting   10:13:08
20 where we had been discussing for weeks, I believe,   10:13:11
21 about the firm's investments and belief about   10:13:15
22 virtual reality and the virtual reality industry and   10:13:23
23 technologies.   10:13:31
24    And we had decided to create an   10:13:31
25 accelerator program for virtual reality companies,   10:13:36

Page 50

1 and we were trying to figure out a name for it. And   10:13:38
2 in this meeting, someone wrote on the white board   10:13:44
3 "Rothenberg Ventures Virtual Reality," and then   10:13:49
4 created the acronym from that, RVVR, and then, from   10:13:53
5 that, created the word "River."   10:13:58
6  Q. You were at this meeting?   10:14:02
7  A. Yes.   10:14:03
8  Q. Do you recall when it was?   10:14:04
9  A. I believe it was towards the end of 2014.   10:14:05
10 The exact date, I'm not sure.   10:14:08
11  Q. You said, "We had been discussing for   10:14:10
12 weeks about the firm's . . . belief about virtual   10:14:12
13 reality."   10:14:16
14    When you say, "We had been discussing it   10:14:17
15 for weeks," did some of those weeks predate your   10:14:20
16 start or were you there, as best you know, at the   10:14:23
17 inception of these discussions that ultimately led   10:14:28
18 to this late-night meeting?   10:14:30
19  A. No, I think some of those conversations   10:14:32
20 predated my joining the firm. Before I officially   10:14:34
21 joined, I did attend a meeting with a virtual   10:14:37
22 reality company with two employees or two people --   10:14:41
23 I don't know if they were employees or contractors,   10:14:45
24 but two people who worked at the firm and met with   10:14:45
25 the founders of a company and we demo'd their   10:14:51

Page 51

1 technology.   10:14:56
2  Q. What company was that?   10:14:56
3  A. I believe it was called Sixense.   10:14:58
4  Q. What generally did that company do?   10:15:01
5  A. They built hardware and software for   10:15:04
6 virtual reality.   10:15:09
7  Q. You said, "We had been discussing for   10:15:12
8 weeks," this sort of interest in virtual reality.   10:15:14
9    Who are "we"?   10:15:14
10  A. So there were different people on the   10:15:16
11 team. Dylan Flinn is one person. Tommy Leep is   10:15:17
12 another person. There were others. Mike was a   10:15:24
13 member of these conversations.   10:15:29
14  Q. What about with the LPs? When these   10:15:33
15 conversations are occurring about the interest in   10:15:39
16 virtual reality, do you rope in the limited partners   10:15:42
17 and say, this is something that we're interested in,   10:15:45
18 what do you think of this move that we're taking?   10:15:48
19  A. I wasn't involved in the conversations at   10:15:52
20 this point. I don't know.   10:15:54
21  Q. I'm just trying to kind of understand the   10:15:55
22 flow.   10:15:57
23    It sounds to me -- and correct me if I'm   10:15:58
24 saying this wrong, but it sounds to me like you're   10:16:01
25 describing sort of a management-driven strategy that   10:16:04

Page 52

1 says, hey, we're going to make some commitments   10:16:08
2 towards virtual reality.   10:16:12
3    Is that a fair description?   10:16:12
4  A. Yes.   10:16:14
5  Q. So what I'm trying to understand is, when   10:16:14
6 that was happening, is that a decision that's made   10:16:16
7 by the management team, or is it a decision that --   10:16:19
8 does the operating agreement, for instance, or one   10:16:23
9 of the fund agreements -- does it say you're not   10:16:25
10 allowed to make that type of decision unless you   10:16:28
11 clear it with an LP, that type of thing?   10:16:32
12  A. So in certain cases, there are certain   10:16:34
13 things you cannot do without LP approval, but   10:16:36
14 generally with venture funds, with these funds, the   10:16:40
15 GP or the manager has broad latitude to use their   10:16:44
16 best judgment in what to invest in and what   10:16:50
17 strategies to pursue. At Rothenberg Ventures, Mike   10:16:53
18 was the only manager or GP, so he made all the   10:16:57
19 decisions.   10:17:00
20  Q. You said that there are some things -- I   10:17:01
21 want to make sure I say it right.   10:17:04
22    You said there are certain things you   10:17:06
23 cannot do without LP approval.   10:17:09
24    What were those certain things?   10:17:11
25  A. That's what's contained usually in the   10:17:14

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

1 limited partnership agreement or based on Delaware  10:17:16
2 law or, in other cases, federal law.  10:17:19
3  Q. Okay. So the prohibitions on what a  10:17:22
4 general partner or a manager can do would be laid  10:17:26
5 out in the partnership agreement, the limited  10:17:31
6 partner agreement, Delaware law, the operating  10:17:35
7 agreement, those things?  10:17:38
8  A. Yes. Federal law as well.  10:17:38
9  Q. Federal law as well.  10:17:39
10  A. Whatever law might be applicable. If  10:17:39
11 you're operating in California, you may also be  10:17:42
12 subject to California law, maybe not. Depends.  10:17:44
13  Q. So what happened after this late-night  10:17:53
14 meeting where RVVR turns into River -- the acronym  10:17:57
15 turns into River? What happens next?  10:18:01
16  A. I don't know what you mean. There's a lot  10:18:05
17 of things that happened next.  10:18:08
18  Q. That was a pretty terribly formed  10:18:11
19 question, so let me try and do it again.  10:18:11
20  When you look back to this meeting, do you  10:18:12
21 see this meeting as sort of -- I hate to use the  10:18:14
22 word "official," but, in your mind, is that the  10:18:18
23 point at which the company decided we're going to do  10:18:21
24 this program and we're going to call it the River  10:18:24
25 Accelerator?  10:18:26

Page 54

1  A. No. I believe the decision was made  10:18:28
2 before that, and this was the process of finding a  10:18:31
3 name. And the formalization may have happen after  10:18:35
4 that. I don't recall the sequence of events.  10:18:45
5  Q. What do you mean by "the formalization"?  10:18:45
6  A. Well, there had to be some sort of  10:18:48
7 strategy and road map for how we would find  10:18:51
8 companies, what sort of investment terms we would  10:18:55
9 offer for them, what sort of resources we would  10:18:58
10 offer for me, how do we do any sort of PR, things  10:19:01
11 like that.  10:19:03
12  Q. Who all was involved in all of those  10:19:04
13 factors that you just laid out? Was it  10:19:06
14 company-wide?  10:19:09
15  A. Close to company-wide, almost everyone.  10:19:09
16  Q. So everyone at Rothenberg Ventures --  10:19:15
17 almost everyone or everyone at Rothenberg Ventures  10:19:18
18 was aware of the River Accelerator program and  10:19:21
19 contributed to all the things that you just  10:19:28
20 mentioned; strategy, investments, resources, things  10:19:30
21 like that?  10:19:30
22  A. Well, different people were contributing  10:19:31
23 to different things, but the general thrust of what  10:19:33
24 you're saying, yes.  10:19:36
25  Q. And that meeting, the naming meeting,  10:19:38

Page 55

1 again, that happened -- and I know you don't recall  10:19:40
2 exactly, I don't have a document I don't think on  10:19:46
3 it -- that's somewhere towards the end of 2014?  10:19:46
4  A. Yes.  10:19:49
5  Q. All right. So again just trying to stick  10:19:49
6 with this general picture, trying to paint what the  10:19:52
7 company looked like and what your experience was,  10:19:55
8 we've covered the end of 2014, which is the 2013  10:19:57
9 fund is probably closed, probably has some money  10:20:02
10 left to make investments; the 2014 fund probably is  10:20:07
11 closed, but maybe not, but is actively making  10:20:11
12 investments at that time.  10:20:14
13  Is that correct?  10:20:15
14  A. I believe, yes.  10:20:15
15  Q. So as we roll into 2015, the 2014 fund is  10:20:18
16 still fully engaged in sourcing, doing diligence,  10:20:22
17 finding portfolio companies; is that right?  10:20:26
18  A. I believe it was towards its tail end.  10:20:31
19 The exact time at which -- generally the way you  10:20:33
20 want to do things -- I don't know that we did this  10:20:35
21 at Rothenberg Ventures, maybe we did.  10:20:37
22  But generally the way you want to do  10:20:39
23 things is you want to make your last primary  10:20:39
24 investment in a fund before making your first  10:20:42
25 primary investment in the next fund. So things  10:20:46

Page 56

1 should be perfectly ordered that way.  10:20:49
2  I believe the last primary investment from  10:20:52
3 the 2014 fund -- I don't know actually. I don't  10:20:58
4 know that it happened. I believe that's what  10:21:02
5 happened.  10:21:05
6  Q. And as 2015 begins, what is the state of  10:21:13
7 the River Accelerator?  10:21:16
8  A. What do you mean, what is the state of the  10:21:22
9 Accelerator?  10:21:25
10  Q. Well, the company is still pursuing the  10:21:25
11 accelerator; right? It has not abandoned the idea?  10:21:28
12  A. That's correct.  10:21:31
13  Q. And at some point, there was a first -- I  10:21:32
14 believe you referred to them as classes; is that  10:21:34
15 right?  10:21:34
16  A. A class or a cohort, yes.  10:21:34
17  Q. Okay. So when is the first class or  10:21:37
18 cohort of River Accelerator? When is that formed?  10:21:39
19 I don't know if "formed" is the right word.  10:21:43
20  A. The exact day, I'm not sure. It was in  10:21:45
21 the beginning of 2015.  10:21:49
22  Q. Do you recall the size of that class?  10:21:51
23  A. It was somewhere between 10 and 15  10:21:53
24 companies.  10:21:56
25  Q. What was your involvement, generally  10:21:56

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 speaking, with that initial class of 10 or 15          10:21:58
2 companies?                                             10:22:01
3     A.  So I was responsible for helping find some    10:22:02
4 of the companies, helping support them.  I closed --   10:22:08
5 when I say "closed," I negotiated every investment     10:22:20
6 in that class and then helped the companies through    10:22:24
7 the class in terms of figuring out what their goals    10:22:29
8 were with the program, figuring out what resources     10:22:36
9 we could bring to support the companies, ensuring      10:22:40
10 that they were getting what they needed to grow.      10:22:42
11    Q.  You stated earlier, back at the beginning      10:22:45
12 of the deposition, that any time the fund makes an     10:22:48
13 investment into a company, there is like fund          10:22:51
14 documentation that goes along with that, a note or a   10:22:55
15 loan or something; right?                              10:22:58
16    A.  Yes.                                            10:23:00
17    Q.  When you say that you closed every             10:23:01
18 investment in that first River cohort, you're saying   10:23:03
19 that you personally negotiated those documents for     10:23:07
20 all of those -- I believe it was 13 companies?         10:23:09
21    A.  If you say it's 13, I'll go along with         10:23:13
22 that.                                                  10:23:15
23    Q.  I think it was.                                10:23:16
24    A.  Yes.                                            10:23:17
25    Q.  And you said that you helped find the         10:23:18

Page 59

1 companies.                                             10:23:21
2         What did you do to help find the              10:23:21
3 companies?                                             10:23:23
4     A.  So we contacted lots of different people      10:23:24
5 in our network, people that we had met in the          10:23:27
6 industry, told them what we were planning on doing.    10:23:31
7 Many of them were excited about the idea because       10:23:33
8 there was a perceived lack of investment in virtual    10:23:37
9 reality, according to the people who were in the       10:23:42
10 virtual reality industry, at least.                   10:23:44
11        And so we asked these folks to tell us who    10:23:45
12 they knew in terms of other people who had started     10:23:49
13 companies or were starting companies and looking for   10:23:52
14 investment, needed investment, things like that.       10:23:55
15    Q.  What do you mean when you say that you        10:23:58
16 helped "support the companies"?                        10:24:00
17    A.  Depending on the company, they have          10:24:01
18 different goals, but they might -- some companies      10:24:03
19 might be looking to make new hires, may be looking     10:24:06
20 for additional investment, may be looking for new      10:24:09
21 customers, things like that.                           10:24:11
22    Q.  Did you take a board seat on any of the      10:24:12
23 companies from the first River class?                  10:24:15
24    A.  I don't believe so, no.                      10:24:17
25    Q.  Were you excited about the first class?      10:24:18

Page 60

1 Did you think it was a good idea?  Did you think it    10:24:20
2 was a really good idea?                                10:24:22
3     A.  I thought it was a little bit too focused     10:24:25
4 on virtual reality, but I thought it was better to     10:24:29
5 do that than to be very generalist.                    10:24:32
6     Q.  Mike said something to me once outside of    10:24:35
7 the context of this litigation.  It struck me as       10:24:38
8 really smart.  I wonder if you agree with it.  And     10:24:38
9 he was talking about River.  And he said, you know,    10:24:39
10 if you make 13 investments -- he probably didn't use  10:24:41
11 the word "13," but just for today.                     10:24:46
12        He said, you know, if you make 13            10:24:46
13 investments into virtual reality companies, it's       10:24:46
14 just 13 investments into virtual reality companies,    10:24:48
15 but if you do it all at once and you call it an        10:24:54
16 accelerator, everybody notices it and everybody gets   10:24:57
17 more excited.                                          10:24:57
18        Does that make sense to you?  Do you agree   10:24:57
19 with that?                                             10:24:57
20    A.  Yes, I think that's true.                     10:24:57
21        (Discussion off the record.)                  10:24:57
22    Q.  Mike told me once that if you do 13          10:25:24
23 separate investments into VR companies, it is          10:25:27
24 perceived as 13 separate investments in VR             10:25:31
25 companies.  But if you make 13 investments in VR       10:25:34

Page 61

1 companies at one time and call it an accelerator,      10:25:38
2 people get really excited about it and more            10:25:42
3 enthusiastic.  I thought that was a very smart thing   10:25:46
4 of him to say, and I wonder if you agree with that     10:25:49
5 and share that sentiment.                              10:25:52
6     A.  I agree with that sentiment and I agree      10:25:55
7 that Mike says smart things.                           10:25:58
8     Q.  What is River Studios at this time, at the   10:26:04
9 time of the first class of the River Accelerator?      10:26:06
10    A.  I'm not sure.  I don't know that River       10:26:13
11 Studios existed at that point.  It may have.  The      10:26:18
12 exact time it came to exist I'm not entirely sure      10:26:23
13 on.                                                    10:26:26
14    Q.  There was a Founder Field Day in 2015;       10:26:27
15 correct?                                               10:26:30
16    A.  Yes.                                           10:26:31
17    Q.  Was that in May?                              10:26:32
18    A.  I believe so.  Might have been -- may have   10:26:36
19 been April.  I'm not sure.                             10:26:38
20    Q.  April or May 2015?                            10:26:40
21    A.  Somewhere around there.                       10:26:42
22    Q.  Do you recall there was a River             10:26:44
23 Accelerator demo that was part of that 2015 Founder    10:26:45
24 Field Day?                                             10:26:48
25    A.  Yes.  Yes.                                     10:26:49

16 (Pages 58 - 61)

CONFIDENTIAL

1  Q. Do you recall whether River Studios was       10:26:51
2  part of that 2015 River demo?                    10:26:54
3  A. I don't recall.                               10:27:04
4  Q. What do you remember about the beginning      10:27:06
5  of River Studios?                                10:27:08
6  A. There was a gentleman by the name of          10:27:10
7  Tipatat Chennavasin. He joined at some point     10:27:15
8  towards the end of 2014 or early 2015 as a virtual 10:27:25
9  reality expert. And his exact title, I'm not sure, 10:27:31
10 but that's what he brought and I believe why he was 10:27:39
11 hired.                                           10:27:42
12     In addition to helping the companies in      10:27:43
13 the VR accelerator in River with their technology, 10:27:48
14 with being generally plugged in to the larger    10:27:56
15 virtual reality industry, he was responsible for 10:28:01
16 creating virtual reality software as directed by 10:28:06
17 Mike. The exact scope of that, I'm not sure, for 10:28:11
18 example, whether it was supposed to be passive   10:28:17
19 content or games.                                10:28:20
20     I do know he had created his own content     10:28:22
21 already and that he was supposed to create more  10:28:25
22 content. And I believe that's the genesis of River 10:28:29
23 Studios; that is the precursor.                  10:28:33
24 Q. The hiring of Tipatat is, in your mind,       10:28:36
25 the genesis or precursor of River Studios?       10:28:40

Page 62

1  A. Yes.                                          10:28:45
2  Q. What do you mean when you say "passive        10:28:45
3  content"?                                        10:28:47
4  A. Passive content would be something where      10:28:48
5  you put on a headset and you just observe like a 10:28:49
6  movie. There's a movie you can watch on your TV, 10:28:51
7  and then there's video games you can play on your 10:28:55
8  TV. So when you think of passive, it's more like 10:29:00
9  watching a movie or a TV show.                   10:29:00
10     When you think of interactive content, it    10:29:00
11 may be a game. It may be something that's not    10:29:01
12 necessarily a game, but you're doing something,  10:29:03
13 you're not just observing or consuming.          10:29:05
14 Q. Tipatat was hired in 2015?                    10:29:09
15 A. His exact date I don't recall.                10:29:12
16 Q. Do you happen to recall if it was before      10:29:14
17 or after the 2015 Founder Field Day?             10:29:17
18 A. I would say before. I'm not 100 percent       10:29:19
19 sure, but pretty sure before.                    10:29:22
20 Q. Trying to use some guidepost to help you      10:29:25
21 figure out when the dates are, but we all understand 10:29:28
22 that it's going to be unusual for you to remember 10:29:30
23 the exact date that somebody --                  10:29:34
24 A. If there's a record, I wouldn't dispute       10:29:34
25 that because I don't know.                       10:29:38

Page 63

1  Q. There was a River II class; correct?          10:29:39
2  A. That's correct.                               10:29:41
3  Q. How many companies were involved in that?     10:29:42
4  A. Again, I think between 10 and 15.             10:29:44
5  Q. Just to jump ahead, was there also a          10:29:48
6  River III class?                                 10:29:49
7  A. There was a River III class, yes.             10:29:51
8  Q. And was the size of that also about 10 to     10:29:51
9  15?                                              10:29:54
10 A. That's correct.                               10:29:55
11 Q. The reason I ask -- and you can flip to       10:29:55
12 this if you want, but you don't need to -- on    10:29:58
13 Exhibit 1, which is your LinkedIn profile, again at 10:30:01
14 page 3, you say, "My team and I also built the   10:30:04
15 world's first frontier technology accelerator,   10:30:08
16 River. Through the River program, we invested in 44 10:30:11
17 companies across three classes."                 10:30:17
18     Do you see that?                             10:30:18
19 A. Um-hum.                                       10:30:19
20 Q. That's the three classes we've talked         10:30:20
21 about, River I, River II and River III?          10:30:22
22 A. That's correct.                               10:30:24
23 Q. And each of them, as you've testified that    10:30:25
24 you remember today, had between 10 and 15 companies? 10:30:26
25 A. That's correct.                               10:30:29

Page 64

1  Q. Do you happen to recall -- this is a          10:30:29
2  specific number, 44.                             10:30:32
3     Do you happen to recall, when you wrote       10:30:33
4  that blurb for your LinkedIn, how or if you were 10:30:35
5  able to arrive at that precise 44 number?        10:30:42
6  A. We created some sort of documentation. It     10:30:46
7  was either a slide deck or a single-page handout. 10:30:48
8  I'm not sure. I think it was a single-page       10:30:53
9  infographic that had all of the companies' logos. 10:30:56
10 It had how many companies there were, the different 10:31:00
11 sectors they were in maybe, and then some numbers 10:31:03
12 like this, the follow-on rate and things like that. 10:31:08
13     So there was a -- marketing material of       10:31:12
14 some sort along with a paragraph that we         10:31:14
15 disseminated for some purpose, and that's where I 10:31:18
16 got that information.                            10:31:21
17 Q. Understood.                                   10:31:22
18     So Tipatat joins in 2015. You're not sure    10:31:22
19 exactly when. You think probably before Founder 10:31:27
20 Field Day?                                       10:31:31
21 A. Yes.                                          10:31:31
22 Q. And you associate the hiring of Tipatat       10:31:32
23 with the beginning of River Studios; correct?    10:31:36
24 A. Correct.                                      10:31:38
25 Q. And why is it that you make that              10:31:39

Page 65

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

```
 1  connection?                           10:31:41
 2      A.  He was the first person, as far as I know,  10:31:41
 3  that Mike hired to create content.     10:31:44
 4      Q.  So I think I hear what you're saying, but  10:31:51
 5  can you spell out that logical link for me a little  10:31:54
 6  bit more.                              10:31:57
 7          I asked you why do you associate Tipatat  10:31:58
 8  with River Studios, and you say it's because that  10:32:02
 9  was the first person that I know Mike hired to  10:32:05
10  create content.                        10:32:08
11          So does that mean you associate River  10:32:09
12  Studios with content creation?         10:32:11
13      A.  That's correct.                10:32:13
14      Q.  Okay.  And what do you mean by that?  10:32:14
15      A.  I don't know how to answer your question.  10:32:17
16      Q.  Well, what type of content?    10:32:19
17      A.  Virtual reality content.       10:32:22
18      Q.  Including passive content, which, again  10:32:24
19  just generally, you put on a headset, but you don't  10:32:26
20  do anything, you just observe?  That would be part  10:32:29
21  of the content?                        10:32:31
22      A.  Yes.                          10:32:33
23      Q.  And another type of content would be, I  10:32:33
24  think you said, games, which is where you're wearing  10:32:35
25  a headset, but you're moving around, maybe you're  10:32:36
```

Page 67

```
 1  shooting cartoons --                   10:32:39
 2      A.  Yes.                          10:32:39
 3      Q.  -- something like that?  Okay.  10:32:40
 4          And how was -- the content created by  10:32:40
 5  River Studios, how did that relate to the River  10:32:45
 6  Accelerator?                           10:32:47
 7      A.  I don't know that it did relate.  I think  10:32:54
 8  it was a separate activity.            10:32:56
 9      Q.  They have the same name; right?  10:32:59
10      A.  Yes.                          10:33:01
11      Q.  Is that a coincidence?         10:33:02
12      A.  No.  River, again back to our previous  10:33:05
13  question, was "Rothenberg Ventures virtual reality."  10:33:10
14  And so what I believe Mike's goal to be, based on  10:33:13
15  our conversations and different things he directed  10:33:19
16  me to do, was to build a virtual reality brand  10:33:20
17  called River.  So the idea was to have kind of every  10:33:23
18  possible thing you could do under the River brand.  10:33:31
19      Q.  You said based on -- you said, "what I  10:33:36
20  believe Mike's goal to be, based on our  10:33:39
21  conversations . . . was to build a virtual reality  10:33:42
22  brand."                                10:33:44
23          So Mike and you had conversations about  10:33:44
24  building a virtual reality brand called River?  10:33:47
25      A.  Yes.  I believe he wanted the brand to be  10:33:51
```

Page 68

```
 1  bigger than just virtual reality as well.  10:33:54
 2      Q.  What do you believe he wanted the brand to  10:33:57
 3  be?  When you say "bigger than just virtual  10:34:00
 4  reality," what do you mean by that?    10:34:03
 5      A.  So the memory that I have and the work  10:34:04
 6  that I know was done was trademark filings related  10:34:08
 7  to the River brand and mark.  And we filed  10:34:13
 8  trademarks and sought to buy domains for things such  10:34:19
 9  as River House, for example, which was a place for  10:34:26
10  people to gather and do things related to  10:34:32
11  technology.                            10:34:36
12          The exact details I don't recall, but I  10:34:36
13  don't know that River House was necessarily related  10:34:39
14  to virtual reality.  I think it was its own general  10:34:42
15  thing.  And there were other marks and things that  10:34:45
16  we were seeking to do related to the River brand.  10:34:50
17      Q.  River Studios was virtual reality, though;  10:34:55
18  correct?                               10:34:58
19      A.  It may have been more.  I was not  10:34:58
20  intimately involved in that business.  I don't  10:35:02
21  believe it started out as a separate -- I don't  10:35:06
22  know.  It may have started as a separate business,  10:35:10
23  may not have.  Eventually became a separate  10:35:13
24  business.  And I don't know that there was only  10:35:17
25  virtual reality work there.  I know there was  10:35:19
```

Page 69

```
 1  virtual reality work, but beyond that, don't know.  10:35:21
 2      Q.  When you say "eventually became a separate  10:35:24
 3  business," what do you mean by that?   10:35:26
 4      A.  There was a separate office space.  In the  10:35:28
 5  same building, on the same floor, but a separate  10:35:30
 6  physical space.  There was separate staff.  They had  10:35:33
 7  separate meetings.  So an all-hands meeting from  10:35:38
 8  Rothenberg Ventures was different from an all-hands  10:35:42
 9  meeting for River Studios.  So that's what I mean by  10:35:46
10  that.                                  10:35:49
11      Q.  What about entities?  Was River Studios a  10:35:49
12  separate entity?                       10:35:54
13      A.  There was a separate entity.  I don't  10:35:55
14  believe it was called River Studios.  And to the  10:35:58
15  extent -- how those entities were treated or not, I  10:36:01
16  don't know.                            10:36:05
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL



Page 70

```
19    Q.  Looking at 2015 as a whole, are you aware        10:38:38
20  of any complaints during 2015 from employees about     10:38:42
21  unpaid or unreimbursed business expenses?              10:38:48
22    A.  I think that's privileged.                       10:38:54
23    Q.  For the same reasons that you explained          10:38:59
24  earlier?                                               10:39:01
25    A.  Yeah.                                            10:39:02
```

```
1     Q.  We can come back to that if we need to.          10:39:06
2         Same question.                                   10:39:09
3         Throughout 2015, are you aware of any            10:39:09
4   complaints from Rothenberg Ventures Management
5   Company employees about unpaid wages or unpaid PTO?    10:39:14  10:39:17
6     A.  What is the difference in your question?         10:39:25
7   I missed it.                                           10:39:28
8     Q.  The previous question was about awareness        10:39:28
9   of any complaints about unreimbursed business          10:39:32
10  expenses, and you said that you were concerned that    10:39:36
11  that was privileged.                                   10:39:38
12        The second question was aware of any             10:39:39
13  complaints from RVMC employees about unpaid wages or   10:39:42
14  PTO.                                                   10:39:49
15    A.  I would also consider that privileged.           10:39:50
16    MR. NARDINELLI:  Okay.  Let's take our first         10:39:52
17  break.                                                 10:39:55
18    THE VIDEOGRAPHER:  Going off the record.  The        10:39:56
19  time is 10:39 a.m.                                     10:39:57
20    (Recess taken.)                                      10:40:03
21    THE VIDEOGRAPHER:  Back on the record.  The          11:04:49
22  time is 11:04 a.m.                                     11:04:51
23  BY MR. NARDINELLI:                                     11:04:56
24    Q.  Mr. Devani, I previously asked you              11:04:56
25  whether, in your role as general counsel of            11:05:03
```

Page 72

```
1   Rothenberg Ventures, you had been responsible for      11:05:08
2   implementing any wage and hour compliance policies.    11:05:12
3         Do you recall me asking that question?           11:05:17
4     A.  I do, yes.                                        11:05:19
5     Q.  So let me ask the question again.                11:05:21
6         In your role as general counsel of               11:05:24
7   Rothenberg Ventures, were you responsible for          11:05:27
8   implementing any wage and hour compliance policies?    11:05:30
9     A.  This is the exact same question you asked        11:05:37
10  before?                                                11:05:40
11    Q.  What's your response?                            11:05:40
12    A.  The same answer I gave you before.               11:05:43
13    Q.  And what's that answer?                          11:05:45
14    A.  That that's privileged.                          11:05:46
15    Q.  And on what basis are you asserting the          11:05:47
16  privilege?                                             11:05:49
17    A.  That I am bound still under                       11:05:50
18  attorney-client privilege to the firm.                 11:05:53
19    Q.  I'm going to read to you on the record an        11:06:02
20  e-mail that I've received from Mike Rothenberg.         11:06:06
21        "To Mr. Devani, Mr. Glugoski and                 11:06:09
22  Mr. Nardinelli:  It is our understanding at            11:06:13
23  Rothenberg Ventures LLC ('RV'), formerly Rothenberg    11:06:18
24  Ventures Management Company LLC, that Mr. Neil          11:06:25
25  Devani is scheduled for a deposition with Mr. Jeff      11:06:29
```

Page 73

19 (Pages 70 - 73)

CONFIDENTIAL

1 Nardinelli of Quinn Emanuel on August 1st, 2018,    11:06:32
2 today.                                              11:06:35
3    "As the manager of RV, your former               11:06:37
4 employer, I'm writing to inform you and the court   11:06:41
5 that RV has granted a limited waiver of privilege   11:06:43
6 for the purposes of this deposition with Mr. Devani 11:06:46
7 today and, further, that our expectation is for     11:06:49
8 Mr. Devani to be forthcoming and honest in his      11:06:52
9 responses.                                          11:06:55
10   "If anyone would like to reach me, I am          11:06:56
11 available at 415-774-6468. Sincerely, Mike          11:06:59
12 Rothenberg, Manager, Rothenberg Ventures LLC."     11:07:07
13   So I have just read to you -- and I know         11:07:09
14 that your counsel, Mr. Glugoski, is sitting here and 11:07:13
15 heard that as well. I just read to you express     11:07:16
16 authorization from Michael Rothenberg of Rothenberg 11:07:20
17 Ventures Management Company LLC that you are       11:07:23
18 permitted to testify today on the questions that I'm 11:07:26
19 asking you.                                         11:07:30
20   At this point, can we proceed with this          11:07:31
21 deposition?                                         11:07:35
22   MR. GLUGOSKI: We can proceed with this           11:07:36
23 deposition, but I'm not -- he's not going to answer 11:07:37
24 things relating to the general counsel. Okay. I    11:07:40
25 don't know what that is you just read from someone 11:07:42

Page 74

1 else's computer. You can purport to whatever it is. 11:07:45
2   But I want a legal written document. I           11:07:50
3 want it reviewed by an ethics expert, submitted to  11:07:53
4 the court, confirmation that there's no attempt to  11:07:59
5 any part of Mr. Rothenberg's or RVMC to suggest that 11:08:01
6 he has breached his ethical duties. And I'm happy   11:08:07
7 to do it.                                           11:08:09
8   And if it requires him to come back and          11:08:09
9 testify at a later time, I'm okay to do it. But I'm 11:08:11
10 not going to go off an e-mail that's been read by  11:08:15
11 you that -- I don't even know if it was sent by    11:08:17
12 Mr. Rothenberg in the first place.                 11:08:20
13   MR. NARDINELLI: So you are accusing me of        11:08:21
14 falsifying an e-mail?                              11:08:23
15   MR. GLUGOSKI: I'm not accusing you of            11:08:24
16 anything. I'm saying I don't know. I don't know.   11:08:24
17 You don't know. You read it from some other        11:08:26
18 computer that was handed to you.                   11:08:28
19   Again, Jeff --                                   11:08:30
20   MR. NARDINELLI: I'll read --                     11:08:37
21   MR. GLUGOSKI: Jeff, it's not going to change     11:08:40
22 my view. You can read whatever you want.           11:08:42
23   MR. NARDINELLI: Okay. I will.                    11:08:45
24   MR. GLUGOSKI: The point is --                    11:08:45
25   MR. NARDINELLI: I'll read the same e-mail --     11:08:45

Page 75

1   MR. GLUGOSKI: The point is --                     11:08:47
2   MR. NARDINELLI: Excuse me. John, stop.            11:08:47
3   MR. GLUGOSKI: I haven't finished.                 11:08:48
4   MR. NARDINELLI: John, stop. Yes, you have.        11:08:48
5   MR. GLUGOSKI: I have not finished.                11:08:50
6   MR. NARDINELLI: Yes, you have.                    11:08:50
7   MR. GLUGOSKI: I have not finished, Counsel.       11:08:51
8   MR. NARDINELLI: Go ahead, John.                   11:08:53
9   MR. GLUGOSKI: You can read whatever you want.     11:08:54
10  MR. NARDINELLI: Thank you. I will.                11:08:56
11  MR. GLUGOSKI: What I'm saying is that we need     11:08:57
12 a specific agreement signed by the parties, a      11:08:59
13 detailed explanation of what is fair game and what 11:09:04
14 is not. Because you read something assuming it is  11:09:07
15 from Mr. Rothenberg. It says "limited." I don't    11:09:11
16 know what "limited" means. It's not defined. And   11:09:13
17 I'm not going to put my client in any jeopardy in  11:09:16
18 that regard.                                        11:09:20
19   So read the e-mail you want. It's not           11:09:21
20 changing my view. Again, I've made it clear. And   11:09:23
21 your client asked me about bringing him back. I    11:09:27
22 said, fine. If it gets resolved and we have        11:09:30
23 confirmation that he doesn't put himself in        11:09:33
24 jeopardy, he can come back and testify on that.    11:09:35
25 That's what we're doing here.                      11:09:38

Page 76

1   MR. NARDINELLI: All right. I won't read it       11:09:41
2 into the record, but I will state, so that the     11:09:42
3 record is clear, that the e-mail I read out loud   11:09:45
4 that starts with "To Mr. Devani, Mr. Glugoski and  11:09:48
5 Mr. Nardinelli" was sent to my e-mail address from 11:09:51
6 the e-mail mike@rothenbergventures.com.            11:09:54
7   And not only that, but in order to ward          11:09:58
8 off some weird challenge that you might bring about 11:10:00
9 somebody uses Mike's computer or something, we've  11:10:03
10 been talking to him about this.                    11:10:03
11   Let's go off the record. I'm going to           11:10:05
12 call Judge Karnow.                                 11:10:07
13   THE VIDEOGRAPHER: Going off the record. The     11:10:09
14 time is 11:10 a.m.                                  11:10:11
15   (Recess taken.)                                  11:10:16
16   THE VIDEOGRAPHER: Back on the record. The       11:36:34
17 time is 11:36 a.m.                                  11:36:36
18   MR. NARDINELLI: Okay. We have just taken a       11:36:38
19 break to have a telephone conversation with Judge  11:36:41
20 Karnow that was an informal conversation. It was   11:36:44
21 not transcribed. I'm not going to say anything     11:36:48
22 about what happened or did not happen at that      11:36:51
23 conversation. I just wanted to put it on the record 11:36:53
24 that it did happen. That's it.                     11:36:56
25 BY MR. NARDINELLI:                                 11:36:58

Page 77

20 (Pages 74 - 77)

CONFIDENTIAL

1    Q.  So let's get back into the questions of      11:36:58
2  you.  And forgive me for a couple of seconds while I  11:37:02
3  check my notes to see where we left off.             11:37:10
4       I believe we had left off with me asking       11:37:12
5  about whether, in 2015, there had been any           11:37:15
6  complaints that you were aware of about unpaid        11:37:20
7  expenses or about unpaid wages or PTO.               11:37:24
8       And you declined to answer, and so we're       11:37:27
9  going to move on from that.                          11:37:30
10      Let's just move on again with kind of your      11:37:32
11  painting a general picture of what your employment   11:37:35
12  situation was like and what the company was like.    11:37:38
13  And I want to move on to the beginning of 2016.      11:37:40
14      At the beginning of 2016, had Rothenberg        11:37:43
15  Ventures grown?  Did it have more employees than it  11:37:48
16  had at the beginning of 2015?                        11:37:51
17      A.  I believe so, yes.                          11:37:53
18      Q.  Can you give an approximate number of       11:37:55
19  employees at that time?                             11:37:58
20      A.  I'm not sure.                               11:38:00
21      Q.  And what about the funds?  What was the     11:38:00
22  situation -- as of January 1st, 2016, what was the   11:38:03
23  condition of the 2013 fund?                          11:38:07
24      A.  I believe it was in the same state it was   11:38:11
25  when I joined in 2013 -- or 2014.                    11:38:14

Page 78

1    Q.  Meaning it was -- so as of January 1st,      11:38:18
2  2016, the 2013 fund was closed to outside            11:38:20
3  investment?                                          11:38:24
4      A.  I believe so, yes.                          11:38:26
5      Q.  Had it completed making all of its primary  11:38:27
6  investments?                                         11:38:30
7      A.  I believe so, yes.                          11:38:31
8      Q.  Had it completed making any other           11:38:32
9  investments, whether follow-on or any other type?    11:38:34
10      A.  I don't know.                               11:38:38
11      Q.  And as of January 1st, 2016, had the 2014   11:38:39
12  fund finished collecting investments, so it had      11:38:44
13  closed its rounds?                                  11:38:47
14      A.  I'm not sure.                               11:38:51
15      Q.  And do you know whether it had finished     11:38:53
16  making its primary investments?                      11:38:56
17      A.  I believe so.                               11:38:59
18      Q.  Do you know whether it had finished making  11:39:00
19  any secondary or follow-on investments?              11:39:02
20      A.  These -- in all of these cases, these       11:39:07
21  answers I'm giving you, I'm giving you my best       11:39:10
22  belief.  I did not have authorization or control     11:39:13
23  over what the funds were actually doing in terms of  11:39:16
24  receiving investment or making investment.           11:39:19
25      So to answer your question, probably.          11:39:21

Page 79

1    Q.  Who had authorization and control over       11:39:27
2  what the funds were doing in terms of receiving      11:39:29
3  investment and making investment?                    11:39:32
4      A.  Only Mike, as far as I know.                11:39:34
5      Q.  Did Mike disclose all of the investments    11:39:40
6  that the funds made to you personally?               11:39:43
7      MR. GLUGOSKI:  Objection; calls for             11:39:46
8  speculation.                                        11:39:47
9      THE WITNESS:  As far as I know, he didn't.      11:39:49
10  BY MR. NARDINELLI:                                  11:39:51
11      Q.  Did he have an obligation to disclose to    11:39:51
12  you every investment that the funds made?            11:39:55
13      A.  As far as I know, he didn't.               11:39:59
14      Q.  As of the beginning of 2016 -- so          11:40:01
15  January 1st, 2016, was there a 2015 fund?            11:40:06
16      A.  I believe so, yes.                         11:40:09
17      Q.  When had that fund started to raise        11:40:10
18  capital?                                            11:40:12
19      A.  I believe within 2015.                     11:40:13
20      Q.  Had it finished raising capital as of      11:40:15
21  January 1st, 2016?                                  11:40:18
22      A.  I don't know.                              11:40:20
23      Q.  Had it made any investments into companies  11:40:20
24  as of January 1st, 2016?                            11:40:23
25      A.  Yes, I believe so.                         11:40:26

Page 80

1    Q.  Do you recall any of those companies?        11:40:29
2      A.  Which companies were in which fund is hard  11:40:36
3  for me to recall right now.                          11:40:38
4      Q.  But to the best of your knowledge, you      11:40:40
5  believe that, as of January 1st, 2016, the 2015 fund 11:40:42
6  had begun to invest in companies?                    11:40:45
7      A.  Yes.                                        11:40:50
8      Q.  So to briefly fast-forward, as we all       11:40:50
9  know, the fund ran into major trouble in July and    11:40:54
10  August of 2016.  And, in particular, in 2016, many   11:40:58
11  of the employees were put on unpaid leave and        11:41:04
12  resigned or were terminated.  You resigned somewhere 11:41:07
13  in that time frame.  I'm not trying to pin down any  11:41:09
14  date on you -- on that right now.                    11:41:13
15      But you're aware of just the general           11:41:15
16  turmoil, disastrous turmoil that occurred in and     11:41:18
17  around August of 2016; right?                        11:41:23
18      Do you know what I'm referring to?             11:41:26
19      A.  The general description of what you're     11:41:27
20  referring to I'm aware of, yes.                      11:41:29
21      Q.  So as of January 1st, 2016, did you have   11:41:32
22  any sense or any expectation that any of those       11:41:34
23  events of roughly August 2016 were coming?           11:41:39
24      A.  Can you explain what you mean by that.     11:41:46
25      Q.  I'm not sure I can.  I can try it again.   11:41:47

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL

**Page 82**

1     As of the end of August 2016, the firm had    11:41:56
2 barely any employees left, I believe was no longer    11:42:02
3 making any investments, I believe was no longer    11:42:06
4 attracting new capital.  As of January 1st, 2016, it    11:42:10
5 sounds like the 2015 fund was operational, it was    11:42:15
6 making investments, it was either still attracting    11:42:19
7 capital or had finished attracting capital.  So    11:42:22
8 you've got basically a vibrant operational    11:42:25
9 functioning business.  So there's a major change    11:42:29
10 that happens between January 1st of 2016 and roughly    11:42:32
11 August of 2016.    11:42:37
12     What I'm asking is, as of January 1st,    11:42:38
13 2016, did you have any premonition or any reason to    11:42:41
14 believe that the events of August '16 were in front    11:42:45
15 of you?    11:42:48
16     MR. GLUGOSKI:  Objection; assumes facts, lacks    11:42:49
17 foundation.    11:42:52
18     THE WITNESS:  I can't really recall my mental    11:42:53
19 state in January 2016.    11:42:55
20 BY MR. NARDINELLI:    11:42:58
21     Q.  When did you resign from Rothenberg    11:42:58
22 Ventures?    11:43:02
23     A.  September 1st --    11:43:05
24     Q.  Why did --    11:43:06
25     A.  -- 2016.    11:43:07

**Page 83**

1     Q.  Sorry.    11:43:09
2     Why did you resign on September 1st, 2016?    11:43:09
3     A.  I had spoken with Mike in August of 2016    11:43:14
4 and informed him of my intention to do so.    11:43:17
5     Q.  When you spoke to Mike in August of 2016    11:43:21
6 and informed him of your intention to resign, why    11:43:24
7 did you tell him in August 2016 that you intended to    11:43:27
8 resign?    11:43:31
9     A.  Part of that may be privileged.  I'll say    11:43:37
10 we had disagreements about certain things.    11:43:39
11     Q.  What disagreements about certain things    11:43:47
12 did you have?    11:43:49
13     A.  That is definitely privileged.    11:43:50
14     Q.  So your answer was "Part of that may be    11:43:52
15 privileged.  I'll say we had agreements about    11:43:54
16 certain things."    11:43:57
17     You are unable to give any further    11:43:59
18 response without claiming privilege; is that    11:44:06
19 correct?    11:44:07
20     A.  No, I can give you more insight.    11:44:08
21     Q.  Please do.    11:44:10
22     A.  I no longer wanted to pursue the path he    11:44:10
23 wanted to pursue.  We were on different philosophies    11:44:14
24 and viewpoints about what was best.    11:44:18
25     Q.  What was the path that you wanted to    11:44:21

**Page 84**

1 pursue?    11:44:25
2     A.  That would be privileged.    11:44:27
3     Q.  And what was the path that he wanted to    11:44:28
4 pursue?    11:44:30
5     A.  That would also be privileged.    11:44:31
6     Q.  All right.  So I'll ask again.    11:44:33
7     Why is it that you gave notice of    11:44:37
8 resignation in August of 2016?    11:44:39
9     A.  Because I disagreed with Mike on certain    11:44:44
10 things.    11:44:49
11     Q.  But you can't tell me what those certain    11:44:50
12 things were without, in your opinion, violating    11:44:52
13 privilege?    11:44:56
14     A.  That's correct.    11:44:57
15     Q.  And were you still acting as counsel for    11:45:01
16 Rothenberg Ventures in August of 2016?    11:45:04
17     A.  In some capacities.    11:45:09
18     Q.  What capacities were those?    11:45:12
19     A.  So I was still involved in executing    11:45:14
20 investments on behalf of the company.  I don't    11:45:18
21 believe we had been fund-raising for that month or    11:45:25
22 before, but up until that point, I had been involved    11:45:30
23 with our fund agreements to a limited extent.  And I    11:45:32
24 was responsive to Mike on legal questions he had or    11:45:38
25 various matters that he asked me to do.    11:45:44

**Page 85**

1     Q.  Do you know whether you submitted a    11:45:51
2 privilege log in response to the document request    11:45:53
3 that we issued to you in this litigation?    11:45:57
4     A.  I don't know.    11:46:00
5     Q.  So you can't tell me why you resigned from    11:46:04
6 Rothenberg Ventures; is that right?    11:46:07
7     A.  That's not right.    11:46:10
8     Q.  Why did you resign from Rothenberg    11:46:12
9 Ventures?    11:46:14
10     A.  I already answered that.    11:46:15
11     Q.  What's your answer?    11:46:16
12     A.  I disagreed with Mike on certain things.    11:46:17
13     Q.  But you won't tell me what those    11:46:20
14 disagreements were?    11:46:23
15     A.  That's correct.    11:46:24
16     MR. NARDINELLI:  John, this is what we were    11:46:25
17 talking about over the break.    11:46:26
18     MR. GLUGOSKI:  We're coming back, so you can    11:46:27
19 follow up with that question.    11:46:29
20     MR. NARDINELLI:  At some point very soon, we're    11:46:32
21 at the point where we have to shut this down.    11:46:36
22     MR. GLUGOSKI:  Do it at your own peril.    11:46:39
23     MR. NARDINELLI:  Understood.    11:46:42
24 BY MR. NARDINELLI:    11:46:45
25     Q.  All right.  So at the beginning of 2016, I    11:46:45

22 (Pages 82 - 85)

CONFIDENTIAL



Page 86

1 might have asked you this, do you recall what the   11:46:48
2 size was of Rothenberg Ventures Management Company?   11:46:50
3   A. No.   11:46:53
4   Q. What was your role at the beginning of   11:46:54
5 2016?   11:46:57
6   A. I was leading our investment team, running   11:46:58
7 our accelerator -- preparing to run it for the third   11:47:02
8 iteration. I was involved in fund-raising to a   11:47:07
9 limited extent. I was involved in other aspects of   11:47:15
10 IRD [phonetic] management to a limited extent and   11:47:20
11 involved as legal counsel.   11:47:23
12   Q. Preparing to run the accelerator for the   11:47:29
13 third iteration, that's what's known as the   11:47:32
14 River III class?   11:47:35
15   A. That's correct.   11:47:36
16   Q. When did that occur?   11:47:37
17   A. I don't recall the exact date that it   11:47:39
18 started, but it was within the beginning of 2016.   11:47:41
19   Q. You said, to a limited extent, you were   11:47:51
20 involved as legal counsel.   11:47:53
21 What was that limited extent?   11:47:55
22   A. I was responsible for primarily executing   11:47:57
23 financings.   11:48:01
24   Q. That's executing financings of companies   11:48:02
25 that the funds were investing into; correct?   11:48:05

Page 87

1   A. That's correct.   11:48:10
17   MR. NARDINELLI: We can take a break.   11:49:00
18   THE VIDEOGRAPHER: Going off the record. The   11:49:01
19 time is 11:49 a.m.   11:49:02
20   (Discussion between witness and his   11:50:36
21 counsel off the record.)   11:50:36
22   THE VIDEOGRAPHER: Back on the record. The   11:50:59
23 time is 11:51 a.m.   11:51:01
24 BY MR. NARDINELLI:   11:51:03
25   Q. Mr. Devani, let me repeat the question I   11:51:03

Page 88

1 asked before you took the opportunity to confer with   11:51:07
2 counsel.   11:51:07
15   Q. Do you know a woman named Lynne McMillan?   11:51:51
16   A. I do.   11:51:54
17   Q. Do you recall what her position was with   11:51:55
18 Rothenberg Ventures?   11:51:58
19   A. I don't recall her title.   11:52:00
20   Q. She worked for Rothenberg Ventures?   11:52:01
21   A. She did.   11:52:03
22   Q. What sort of work did she do?   11:52:04
23   A. She was more on the accounting and finance   11:52:07
24 side.   11:52:09
25   Q. When did she start working for Rothenberg   11:52:10

Page 89

1 Ventures?   11:52:12
2   A. I don't recall the exact date.   11:52:12
3   Q. Do you recall whether she started working   11:52:15
4 there in 2015?   11:52:18
5   A. I don't recall.   11:52:21
6   Q. Do you recall her resignation from   11:52:22
7 Rothenberg Ventures?   11:52:24
8   A. Yes.   11:52:25
9   Q. What do you recall about that resignation?   11:52:25
10   A. That she resigned.   11:52:28
11   Q. Did you ever speak with her about her   11:52:29
12 resignation?   11:52:31
13   A. I did.   11:52:32
14   Q. What did you speak with her about?   11:52:33
15   A. Before she resigned, she told me that she   11:52:36
16 was planning to resign.   11:52:38
17   Q. Why did she tell you that she was planning   11:52:39
18 to resign?   11:52:42
19   A. She was . . . that might also be   11:52:44
20 privileged. I'm not entirely sure.   11:52:48
21   Q. Just let me know whether you're going to   11:52:53
22 answer or not.   11:52:55
23 Why did Ms. McMillan tell you she was   11:52:55
24 planning to resign?   11:52:59
25   A. I believe that's privileged in this sense   11:53:00

CONFIDENTIAL

1 that she was considered management or an executive    11:53:01
2 at the company at the time and may have communicated    11:53:10
3 with me under an expectation of privilege. I don't    11:53:10
4 know.    11:53:10
5    Q. What was your personal relationship with    11:53:11
6 Lynne McMillan? Were you friends? Did you talk    11:53:13
7 frequently?    11:53:15
8    A. We were friendly. We didn't have much of    11:53:15
9 a relationship outside of work.    11:53:17
10    Q. Did you ever speak with Ms. McMillan after    11:53:19
11 she resigned from Rothenberg Ventures?    11:53:21
12    A. I believe so, yes.    11:53:24
13    Q. When was that?    11:53:25
14    A. I don't recall.    11:53:26
15    Q. What did you speak about?    11:53:26
16    A. We had drinks. Talked about our new job.    11:53:29
17    Q. What was her new job?    11:53:34
18    A. She was working in a similar accounting or    11:53:34
19 finance role at another fund.    11:53:37
20    Q. Do you recall what that fund was?    11:53:39
21    A. I don't know.    11:53:40
22    Q. Were you involved in any way in processing    11:53:43
23 her termination in terms of payouts or any other    11:53:49
24 sort of paperwork that goes along with a -- when I    11:53:52
25 say "termination," I mean resignation/termination in    11:53:55

Page 90

1 whatever form.    11:53:59
2       Were you involved in that processing?    11:54:00
3    A. I don't recall.    11:54:02
4    Q. When you spoke with Ms. McMillan after she    11:54:03
5 had left Rothenberg Ventures, did you ever speak    11:54:05
6 with her about Rothenberg Ventures?    11:54:08
7    A. I don't recall.    11:54:11
8    Q. Did you ever speak with her about the    11:54:11
9 reason that she had resigned from Rothenberg    11:54:14
10 Ventures?    11:54:16
11    A. I don't think so, but not entirely sure.    11:54:21
12    MR. NARDINELLI: Let me mark the next exhibit,    11:55:03
13 which I believe is Exhibit 3.    11:55:05
14    (Defendants' Exhibit 3 was marked.)    11:55:09
15 BY MR. NARDINELLI:    11:55:23
16    Q. Do you recognize this e-mail?    11:55:23
17    A. No.    11:55:43
18    Q. You see that it is -- appears to be from    11:55:43
19 Tom Leep, tom@rothenbergventures.com?    11:55:46
20    A. Um-hum.    11:55:50
21    Q. And it's to neil@rothenbergventures.com?    11:55:50
22    A. Um-hum.    11:55:53
23    Q. And the date is February 15th, 2016,    11:55:53
24 9:07 p.m.?    11:55:56
25    A. Yes, that's correct.    11:55:58

Page 91

1    Q. Do you have any reason to believe that    11:55:59
2 this is not an e-mail sent by Mr. Leep to you on    11:56:00
3 February 15, 2016?    11:56:05
4    A. I do not have any reason to believe that.    11:56:08
5    Q. If you look at the e-mail that you write,    11:56:11
6 towards the middle of the page, February 15, 2016 at    11:56:15
7 7:56 p.m.    11:56:17
8       Do you see that?    11:56:17
9    A. Yes.    11:56:20
10    Q. The first line that you write is, "Any    11:56:21
11 chance you can come to the office tomorrow?"    11:56:23
12       Do you see that?    11:56:25
13    A. Yes.    11:56:26
14    Q. Was Mr. Leep regularly in the office?    11:56:26
15    A. Define "regularly."    11:56:31
16    Q. Well, how often was he in the office?    11:56:32
17    A. It varied from week to week. At this    11:56:36
18 point in time, I believe he was in maybe one or two    11:56:39
19 days a week, maybe more, maybe less.    11:56:42
20    Q. You're asking him "Any chance you can come    11:56:45
21 to the office tomorrow?" And you're sending this on    11:56:48
22 a Monday, so "tomorrow" is a Tuesday; right?    11:56:51
23    A. I would think that's correct, yes.    11:56:53
24    Q. So it was not your expectation that    11:56:56
25 Mr. Leep would be in the office on Tuesday?    11:56:58

Page 92

1    A. I would assume so, no.    11:57:03
2    Q. You said that at this point in time, you    11:57:05
3 think he was in the office maybe one or two days a    11:57:07
4 week, maybe more, maybe less?    11:57:09
5    A. Yes.    11:57:12
6    Q. Is it correct that if somebody worked from    11:57:12
7 home, those days, under company policy, would count    11:57:15
8 as PTO days?    11:57:20
9    A. I don't think so, no. I'm not sure, but I    11:57:23
10 don't believe that's correct.    11:57:25
11    Q. Do you know whether Mr. Leep, when he was    11:57:27
12 not in the office, was working or not working?    11:57:29
13    A. I don't know.    11:57:31
14    Q. Do you have any way to know one way or the    11:57:32
15 other?    11:57:35
16    A. No.    11:57:35
17    Q. Any reason to believe one way or the    11:57:36
18 other?    11:57:38
19    A. I could make arguments one way or the    11:57:42
20 other, but I don't have a firm belief one way or the    11:57:45
21 other.    11:57:47
22    Q. As part of your regular responsibilities    11:57:48
23 at Rothenberg Ventures, did you communicate with    11:57:49
24 Mr. Leep?    11:57:51
25    A. I did.    11:57:52

Page 93

24 (Pages 90 - 93)

CONFIDENTIAL



Page 94

```
1   Q.  About what types of things?          11:57:52
2   A.  His role was similar to Lynne's.  And he   11:57:55
3   was responsible for different things on the    11:57:59
4   accounting and finance side of the business.   11:58:04
5   Q.  Would you communicate with him in person?  11:58:08
6   A.  Sometimes.                           11:58:11
7   Q.  Over the telephone?                   11:58:12
8   A.  Sometimes.                           11:58:14
9   Q.  Over e-mail?                         11:58:14
10  A.  Sometimes.                          11:58:15
11  Q.  Would you communicate with him when you   11:58:16
12  were both in the office?                  11:58:18
13  A.  Yes.                                 11:58:19
14  Q.  On days when he was not in the office, did  11:58:20
15  you communicate with him on those days also?   11:58:22
16  A.  Yes.                                 11:58:25
17  Q.  Was that a regular occurrence?        11:58:25
18  A.  Define "regular" again.              11:58:28
19  Q.  Let's say you had something that you  11:58:30
20  wanted to talk to Mr. Leep about and Mr. Leep was  11:58:35
21  not in the office that day.  Would you reach out to  11:58:38
22  him that day via phone or via e-mail, or would it  11:58:41
23  have been your practice to wait until he was back in  11:58:45
24  the office?                              11:58:47
25  A.  It depends on whether the issue was urgent  11:58:48
```

Page 94

```
1   or not.  If it was urgent, I would probably call him  11:58:51
2   or e-mail him to find time to call him; if it was    11:58:55
3   not urgent, I would wait until I saw him or maybe    11:58:56
4   e-mail him.                              11:59:00
```

Page 95

```
10  Q.  As of 2016, did you have any involvement   12:00:37
11  in River Studios?                        12:00:39
12  A.  Define "any involvement."            12:00:44
13  Q.  Any involvement at all?              12:00:45
14  A.  Yes.                                 12:00:48
15  Q.  What was that involvement?           12:00:48
16  A.  From time to time, I would provide support  12:00:51
17  to River Studios on their various endeavors.   12:00:54
18  Q.  What types of support?               12:00:58
19  A.  It might be a review of their activities,   12:00:59
20  advice on the best way to go about achieving the    12:01:06
21  business goals, connecting them with various   12:01:09
22  individuals that might be helpful to their business  12:01:13
23  goals.                                   12:01:16
```

Page 96

Page 97

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

[REDACTED]
                                        12:03:16
12   Q.   Show you what's marked as Exhibit 4.   12:03:32
13        (Defendants' Exhibit 4 was marked.)   12:03:36
14 BY MR. NARDINELLI:                            12:03:52
15   Q.   Do you recognize this image?          12:03:52
16   A.   I do not, no.                          12:03:55
17   Q.   This is not familiar to you?          12:03:57
18   A.   No.                                    12:03:58
19   Q.   I believe that this is a picture of a  12:04:00
20 chalkboard or some sort of image that was     12:04:07
21 prominently displayed at the Rothenberg Ventures   12:04:11
22 office.                                       12:04:15
23        Based on me telling you that, does that   12:04:15
24 trigger any recollection for you as to what this   12:04:18
25 image is?                                     12:04:20
                                        Page 98

1   A.   I provided support on negotiating some of   12:05:35
2 these agreements.                              12:05:41
3   Q.   What agreements did you negotiate?  I'd   12:05:42
4 like to go through all of them.  Maybe you can name   12:05:44
5 the ones first from the picture that you recognize,   12:05:47
6 and then we can ask detailed questions about each.   12:05:50
7   A.   Well, I recognize all of them.  But the   12:05:53
8 ones I had involvement in are the Black Eyed Peas,   12:05:55
9 Birchbox, Coldplay and the Sharks.  There may be   12:06:03
10 others, but those are the ones that I recall now.   12:06:08
11   Q.   What was the project involving the   12:06:15
12 San Jose Sharks?                              12:06:18
13   A.   I don't recall the exact details.  There   12:06:20
14 was some agreement to film content and create   12:06:22
15 content for them for some distribution or   12:06:28
16 promotional purpose.                          12:06:31
17   Q.   Do you recall what your involvement was   12:06:34
18 with that deal or that project?               12:06:35
19   A.   I believe I reviewed an agreement.   12:06:37
20   Q.   What type of agreement?               12:06:39
21   A.   It's a business agreement.           12:06:42
22   Q.   Like a contract for work to be performed   12:06:47
23 or services?                                  12:06:51
24   A.   Yeah, a contract for the exchange of work   12:06:52
25 and creation of content.                     12:06:56
                                        Page 100

1   A.   I'm aware of what this image represents   12:04:22
2 and I recognize almost all of the logos.  I've never   12:04:25
3 seen this exact image.  And I don't mean on paper.   12:04:29
4 I mean in real life I have not seen this chalkboard.   12:04:33
5   Q.   What does this image represent?       12:04:37
6   A.   It represents three different companies,   12:04:39
7 or business lines, at least, at the top, as well as   12:04:42
8 logos below them that relate to their activities.   12:04:47
9   Q.   What are those three different business   12:04:51
10 lines or companies?                          12:04:54
11   A.   So you have River Accelerator, so   12:04:56
12 you have companies that were invested in under the   12:04:59
13 umbrella of the Accelerator, which were invested in   12:05:03
14 by Rothenberg Ventures' funds.               12:05:06
15        And then under Rothenberg Ventures, you   12:05:09
16 have portfolio companies of Rothenberg Ventures that   12:05:11
17 it invested in.                              12:05:14
18        And under River Studios, you have      12:05:16
19 customers or partners or some entities that River   12:05:19
20 Studios has some relationship with.          12:05:23
21   Q.   Were you involved in any of the entities   12:05:25
22 or partners that River Studios had a relationship   12:05:27
23 with?                                        12:05:29
24   A.   I was.                              12:05:31
25   Q.   What was your involvement?           12:05:33
                                        Page 99

1   Q.   What about the Black Eyed Peas project;   12:06:59
2 what was that?                                12:07:04
3   A.   There were a series of agreements.  The   12:07:06
4 deal took different shapes over time.  I don't   12:07:08
5 recall the exact details.                    12:07:11
6   Q.   What was your involvement in those deals?   12:07:12
7   A.   Providing advice and support on the   12:07:16
8 structure of the terms and negotiating it.   12:07:18
9   Q.   So similar to the involvement with the   12:07:22
10 San Jose Sharks, assisting and reviewing the   12:07:24
11 documentation, implementing the deals?       12:07:27
12   A.   Yes, somewhat similar.               12:07:30
13   Q.   Was that the same type of involvement that   12:07:31
14 you had with the Coldplay and the Birchbox?   12:07:33
15   A.   In general, yes, similar.            12:07:37
16   Q.   I know I asked the question before, so I   12:08:12
17 apologize for asking it again.               12:08:14
18        Did you draft a $1 million convertible   12:08:16
19 note for investment into River Studios in 2016?   12:08:21
20   A.   I said I believe that was privileged.  I   12:08:26
21 don't recall whether or not I did.  I think I said   12:08:29
22 it was privileged.                           12:08:33
23   Q.   So whether or not you took the action of   12:08:33
24 drafting a February 2016 note is privileged, in your   12:08:35
25 view?                                        12:08:40
                                        Page 101

26 (Pages 98 - 101)

CONFIDENTIAL

1   A. I'm not sure. I'm trying to be overly   12:08:44
2   cautious.   12:08:49
3   Q. You are asserting privilege and refusing   12:08:51
4   to answer that question on those grounds?   12:08:52
5   A. That's right.   12:08:55
6   Q. At some point, did you stop serving   12:08:55
7   Rothenberg Ventures as general counsel?   12:08:58
8   A. Yes.   12:08:59
9   Q. When was that?   12:09:00
10   A. I don't recall the exact date. It was   12:09:01
11   towards the end of 2015 or early 2016.   12:09:07
12   Q. What were the circumstances surrounding   12:09:10
13   your shift out of the general counsel position?   12:09:14
14   A. What do you mean by "circumstances"?   12:09:18
15   Q. I mean circumstances.   12:09:19
16   A. Can you define that more. Like what are   12:09:21
17   you trying to -- I don't know what you're asking.   12:09:23
18   MR. NARDINELLI: Well, at least he's not   12:09:25
19   claiming privilege.   12:09:29
20   BY MR. NARDINELLI:   12:09:29
21   Q. What led to you being -- no longer acting   12:09:29
22   in the position of general counsel?   12:09:33
23   A. I met with Mike and he told me that he had   12:09:35
24   hired -- or was going to hire someone to be   12:09:39
25   full-time general counsel, and he wanted me to be   12:09:42

Page 102

1   full-time investing.   12:09:44
2   Q. And who was that new hire?   12:09:45
3   A. His name was Geoff Rehnert.   12:09:47
4   Q. Geoff -- what was his last name?   12:09:53
5   A. Rehnert. I believe Rehnert.   12:09:55
6   Q. And did Geoff Rehnert serve as general   12:09:57
7   counsel of Rothenberg Ventures?   12:09:59
8   A. I believe so, yes.   12:10:01
9   Q. Did anyone serve as general counsel after   12:10:02
10   Geoff Rehnert?   12:10:05
11   A. Not entirely sure. There was another   12:10:06
12   attorney hired. Whether he was Geoff's replacement   12:10:10
13   or had a different title -- I believe his title was   12:10:12
14   chief legal officer. And I believe he worked -- I   12:10:16
15   don't know what entity he was employed by.   12:10:19
16   Q. And who is that person?   12:10:22
17   A. His name was Martin Mayo.   12:10:23
18   Q. Do you know a person named Geoff Rapoport?   12:10:26
19   A. Sorry. Yes. Geoff Rapoport is what I   12:10:29
20   meant when I said Geoff Rehnert.   12:10:31
21   Q. What was your reaction when Mr. Rothenberg   12:10:34
22   told you that he wanted you to work full-time on the   12:10:37
23   investment team and no longer serve as general   12:10:40
24   counsel?   12:10:43
25   A. Mixed. I was interested in making that   12:10:44

Page 103

1   transition, but I was expecting to be more involved   12:10:48
2   in the conversation about that transition.   12:10:52
3   Q. Had you expressed to Mr. Rothenberg --   12:10:57
4   prior to that conversation when he told you that he   12:10:59
5   was hiring a new general counsel, had you expressed   12:11:02
6   to him that you wanted to be more involved on the   12:11:05
7   deal team?   12:11:08
8   A. Yes, but that had already happened at that   12:11:11
9   point.   12:11:13
10   Q. So let's back up.   12:11:14
11   When I say "deal team," do you understand   12:11:15
12   what that term refers to?   12:11:17
13   A. Yes.   12:11:18
14   Q. Can you put in your words what "deal team"   12:11:19
15   refers to.   12:11:21
16   A. It was the team of individuals responsible   12:11:21
17   for making investment suggestions, doing diligence,   12:11:24
18   identifying companies for potential investment,   12:11:30
19   things like that.   12:11:32
20   Q. And that was a subset of the company,   12:11:33
21   correct?   12:11:35
22   A. That's correct.   12:11:35
23   Q. That's a discrete subset of people?   12:11:36
24   A. To some degree. There were people who   12:11:40
25   were -- there was no official member list or   12:11:41

Page 104

1   anything like that. There were distribution --   12:11:44
2   e-mail distribution lists, and that could be one way   12:11:46
3   to define who was discretely on that team, but there   12:11:50
4   were folks who had mixed roles, myself being one of   12:11:53
5   them, where one part of the role was being involved   12:11:54
6   on the deal team and another part of your role was   12:11:57
7   doing something else.   12:12:01
8   Q. When had you begun to act as part of the   12:12:06
9   deal team?   12:12:10
10   A. I believe the first day I was hired, the   12:12:13
11   first day I was on the team I was involved with the   12:12:16
12   deal team.   12:12:19
13   Q. You believe that started on day one?   12:12:20
14   A. I think so, yes.   12:12:23
15   Q. At some point, were you made the team lead   12:12:23
16   of the deal team?   12:12:27
17   A. Yes.   12:12:29
18   Q. When was that?   12:12:30
19   A. I don't recall the exact date.   12:12:31
20   Q. What's the general date?   12:12:33
21   A. End of 2015, early 2016.   12:12:34
22   Q. So shortly before being removed as general   12:12:38
23   counsel?   12:12:43
24   A. Correct.   12:12:44
25   Q. Within a few months or so?   12:12:44

Page 105

27 (Pages 102 - 105)

CONFIDENTIAL

1    A.  Probably.                                  12:12:46
2    Q.  But you believe that there was a time at   12:12:47
3  which you were both deal team lead and also still  12:12:49
4  serving as general counsel?                       12:12:54
5    A.  I'm not sure.  I would -- I'm not sure.  I  12:12:55
6  don't know which one came first.                  12:12:58
7    Q.  So you think it might have been the case    12:13:02
8  that you were removed as general counsel while still  12:13:03
9  on the deal team and after that you were promoted to  12:13:05
10  lead of deal team?                               12:13:10
11    A.  There was a period within which I was a    12:13:12
12  colead of the deal team.  So I was responsible for  12:13:15
13  reporting to Mike about the deal team and HR-related  12:13:20
14  issues to the deal team, and another individual was  12:13:27
15  responsible for the day-to-day operations and work  12:13:30
16  flow, work processes of the deal team.            12:13:33
17    I'm pretty sure that happened before --        12:13:36
18  that happened first and I was still general counsel  12:13:40
19  at that point.  And then after that point -- it was  12:13:43
20  after that point where we hired a full-time general  12:13:51
21  counsel.  Whether or not I became the individual   12:13:54
22  lead of the deal team, I don't know.              12:13:57
23    Q.  Was Michael Rothenberg personally part of  12:13:59
24  the deal team?                                    12:14:02
25    A.  I believe so, yes.                         12:14:08
                                              Page 106

1    Q.  Did he execute any deals that other        12:14:09
2  members of the deal team did not perform diligence  12:14:12
3  on?                                               12:14:19
4    A.  Yes, that's correct.                        12:14:19
5    Q.  What were those?                            12:14:21
6    A.  I don't remember.                           12:14:23
7    Q.  Can you name any?                           12:14:23
8    A.  I would have to look at a list of the      12:14:25
9  deals.  I know it happened, but I can't tell you the  12:14:25
10  names.                                           12:14:27
11    Q.  How many times did that happen?            12:14:28
12    A.  I don't know the exact number.  At least   12:14:30
13  once, maybe less than ten times, maybe less than   12:14:32
14  five times.                                       12:14:37
15    Q.  You said you would have to look at a list  12:14:38
16  of deals and that might help you identify deals that  12:14:41
17  Mike executed without other input from the deal   12:14:44
18  team?                                             12:14:47
19    A.  That's correct.                            12:14:47
20    Q.  Where would such a list of deals be found?  12:14:47
21    A.  I'm sure Mike could provide it to you.     12:14:51
22    Q.  Heard of a company called Pilot Grove?     12:15:16
23    A.  It sounds familiar.                         12:15:20
24    Q.  Do you remember anything about it?         12:15:22
25    A.  No.                                         12:15:24
                                              Page 107

1    Q.  Do you know anything about Pilot Grove     12:15:25
2  investing into River Studios?                     12:15:27
3    A.  It sounds familiar, but, no, not really.   12:15:31
4    Q.  You don't know one way or the other?       12:15:34
5    A.  No.                                         12:15:35
6    Q.  Do you know a company called Dongxu,       12:15:36
7  D-o-n-g-x-u?                                      12:15:39
8    A.  No.                                         12:15:41
9    Q.  Never heard of them?                        12:15:42
10    A.  No.                                        12:15:43
11    Q.  Are you familiar with them offering a sum  12:15:43
12  of money for a stake in River Studios?            12:15:46
13    A.  No.                                        12:15:54
14    Q.  How closely did you work with Geoff       12:16:05
15  Rapoport when he came in as general counsel?      12:16:07
16    A.  I helped onboard Geoff, kind of gave him a  12:16:11
17  lay of the land.  His job was to, I think, manage  12:16:16
18  fund formation and be responsive to potential     12:16:25
19  investors or existing investors and their counsel as  12:16:33
20  it related to them investing in the fund and       12:16:35
21  eventually also manage all of the portfolio        12:16:38
22  investment activity from a legal side.            12:16:42
23    Q.  Did he have any involvement, as incoming   12:16:45
24  general counsel, in wage and hour compliance?     12:16:49
25    A.  I don't know.                              12:16:51
                                              Page 108

1    Q.  Did you have any discussions with him      12:16:52
2  about wage and hour compliance?                   12:16:53
3    A.  I believe that would be privileged.        12:16:56
4    Q.  Are you refusing to answer that question   12:16:58
5  on the grounds of privilege?                      12:17:01
6    A.  Yes.                                        12:17:03
7    Q.  Do you recall an investment into a company  12:17:07
8  called Vicarious Surgical?                        12:17:10
9    A.  Yes.                                        12:17:12
10    Q.  Were you involved in that investment?      12:17:13
11    A.  Yes.                                       12:17:15
12    Q.  How did you first become involved in that  12:17:16
13  investment?                                       12:17:20
14    A.  When they first came into the office, I    12:17:21
15  was part of the team that met with them.          12:17:24
16    Q.  What brought them into the office?         12:17:26
17    A.  They applied to an online system that we   12:17:26
18  had signed up for to solicit applications for     12:17:26
19  investment.                                       12:17:31
20    Q.  Was this a River company or a non-River   12:17:32
21  portfolio company?                                12:17:35
22    A.  It was a River portfolio company.          12:17:36
23    Q.  So there was a web portal that someone had  12:17:38
24  designed that would -- that was an application form,  12:17:42
25  essentially, for potential VR or River companies?  12:17:44
                                              Page 109

28 (Pages 106 - 109)

CONFIDENTIAL

```
1    A.  That's right.                      12:17:50
2    Q.  And Vicarious Surgical applied through   12:17:51
3  that form?                               12:17:53
4    A.  I believe so, yes.                 12:17:55
5    Q.  Was there a vetting process for companies  12:17:55
6  that fill out that form?                 12:17:55
7    A.  Yes.  We had an intern at the time who  12:17:56
8  reviewed all the applications and flagged ones that  12:17:58
9  he thought were legitimate or had some merit --  12:18:00
10 worthy of review by someone who is not an intern.  12:18:04
11   Q.  Who was that intern?               12:18:08
12   A.  His name is Firdavs.  I can't pronounce  12:18:09
13 his last name.                           12:18:10
14   Q.  And what was the concept that Vicarious  12:18:13
15 Surgical brought to you, "you" being Rothenberg  12:18:16
16 Ventures, when they were first seeking investment as  12:18:17
17 a River company?                         12:18:21
18   A.  They brought a virtual reality-empowered  12:18:22
19 surgical robot as their concept.         12:18:25
20   Q.  This is a very small surgical robot?  12:18:28
21   A.  It's smaller than most surgical robots.  12:18:32
22   Q.  I'm actually -- virtual reality-empowered  12:18:33
23 surgical robot, I don't follow that at all.  Can you  12:18:35
24 explain.                                 12:18:38
25   A.  Yes.  You, as a surgeon, would put on a  12:18:38
                                          Page 110
```

```
1  headset, and you would use your body to control the  12:18:43
2  robot, and your eyes and the headset would have  12:18:47
3  visibility.                              12:18:47
4    Q.  When did they apply to River?      12:18:48
5    A.  I don't know.                      12:18:50
6    Q.  Were they River I, River II or River III?  12:18:51
7    A.  I'm not entirely sure.  I would say  12:18:57
8  River II, I believe, but not 100 percent sure.  12:19:00
9    Q.  Would we be able to find that answer if we  12:19:03
10 looked at the promotional infographic that you  12:19:06
11 discussed earlier?                       12:19:10
12   A.  I'm sure, yes.  Or some other -- it's  12:19:11
13 available publicly for sure, one way or another.  12:19:13
14   Q.  And you were personally involved in the  12:19:14
15 deal that was ultimately struck between Rothenberg  12:19:17
16 Ventures and River Accelerator and Vicarious  12:19:20
17 Surgical; correct?                       12:19:24
18   A.  Yes.                               12:19:26
19   Q.  Did you draft up any of the paperwork for  12:19:27
20 that deal in terms of your legal capacity, or on  12:19:29
21 that deal, were you wearing purely your investor  12:19:32
22 deal team hat?                           12:19:36
23   A.  I believe -- I believe both.        12:19:39
24   Q.  So you do believe that you worked on the  12:19:43
25 documentation for that deal?             12:19:45
                                          Page 111
```

```
1    A.  Yes.                               12:19:46
2    Q.  Do you recall drafting the terms?   12:19:46
3    A.  Vaguely.  If it was a deal -- if it was an  12:19:52
4  investment into a company that the fund invested in,  12:19:57
5  that was then my scope of work and I was doing all  12:19:59
6  of those things.  That's one of those things I was  12:20:04
7  doing -- and I was doing all those things.  12:20:05
8    Q.  That's helpful.  Thank you.        12:20:08
9        What was the time frame between the time  12:20:11
10 that they first came into the office and met with  12:20:14
11 people, including you, and the time that you  12:20:16
12 executed the funding of that company?    12:20:17
13   A.  I don't recall.                    12:20:19
14   Q.  Roughly?                           12:20:20
15   A.  A few weeks to a few months, probably.  12:20:24
16   Q.  And what was the nature of the engagement  12:20:28
17 with Vicarious Surgical?                 12:20:30
18   A.  They were a member of the River portfolio  12:20:32
19 cohort, and they were involved, like other  12:20:36
20 companies, in the daily operations.      12:20:39
21   Q.  Did someone from Rothenberg Ventures  12:20:42
22 Management Company take a seat on the board of  12:20:44
23 directors of Vicarious Surgical?         12:20:47
24   A.  Yes.                               12:20:49
25   Q.  And were you that person?          12:20:49
                                          Page 112
```

```
1    A.  I was.                             12:20:51
2    Q.  And that was -- you were the first person  12:20:51
3  from Rothenberg Ventures to take that board seat?  12:20:54
4    A.  I believe so.                      12:20:57
5    Q.  And you're still on that board today?  12:20:57
6    A.  Yes -- well, no.                   12:20:59
7    Q.  When did you stop being a member of that  12:21:01
8  board?                                   12:21:05
9    A.  I don't know the exact date.  I am a board  12:21:05
10 observer.  So to the extent -- through definition of  12:21:09
11 "member of the board," depends on what that means.  12:21:11
12   Q.  So is a board observer a nonvoting board  12:21:14
13 member?                                  12:21:19
14   A.  Yes, essentially.                  12:21:19
15   Q.  Can you walk me through, I guess, the  12:21:19
16 difference between what your role was -- let me make  12:21:21
17 sure I ask this clearly.  I'm sorry.  Strike that.  12:21:24
18   A.  Can you -- I want to get some water and  12:21:27
19 visit the men's room.                    12:21:29
20   MR. NARDINELLI:  Sure.                 12:21:31
21       Let's take a break.                12:21:31
22   THE VIDEOGRAPHER:  Going off the record.  The  12:21:33
23 time is 12:21 p.m.                       12:21:34
24       (Recess taken.)                    12:21:39
25   THE VIDEOGRAPHER:  Back on the record.  The  12:48:26
                                          Page 113
```

29 (Pages 110 - 113)

CONFIDENTIAL



```
 1  time is 12:48 p.m.                      12:48:33
 2  BY MR. NARDINELLI:                      12:48:37
 3     Q.  We were just talking about Vicarious   12:48:37
 4  Surgical.                               12:48:40
 5        Tell me about how you came to join the   12:48:40
 6  board of Vicarious Surgical.           12:48:43
 7     A.  I don't recall the exact circumstances   12:48:49
 8  under which -- whether they asked for us to have a   12:48:52
 9  board seat or we offered to have a board seat or   12:48:56
10  where the requirement came that there would be a   12:48:59
11  board seat.  But it arrived, and then we had to find   12:49:02
12  someone to fill that spot.  And I had been working   12:49:08
13  closely with the company, and so Mike and I agreed   12:49:11
14  that I would do it.                     12:49:13
15     Q.  Rothenberg Ventures took a board seat with   12:49:14
16  Vicarious Surgical because of Rothenberg Ventures'   12:49:17
17  investment into Vicarious Surgical?    12:49:22
18     A.  Yes.                             12:49:24
19     Q.  And you were the representative of   12:49:25
20  Rothenberg Ventures that took that board seat?   12:49:27
21     A.  That's correct.                  12:49:29
22     Q.  Were you compensated by Vicarious Surgical   12:49:29
23  for that board seat?                    12:49:32
24     A.  I was not.                       12:49:32
25     Q.  Have you been offered any compensation or   12:49:34
                                           Page 114
```

```
 1  director to a board observer.           12:50:30
 2     Q.  Just looking again at your LinkedIn   12:50:37
 3  profile, which is at Exhibit 1, you list, "Board   12:50:40
 4  director, Vicarious Surgical, December 2015 to   12:50:44
 5  present."                               12:50:47
 6     A.  Um-hum.                          12:50:47
 7     Q.  Do you see that?                  12:50:48
 8     A.  Yes.                             12:50:49
 9     Q.  So that's how you're holding yourself out   12:50:49
10  to the LinkedIn world, is as a present serving board   12:50:52
11  director of Vicarious Surgical?        12:50:57
12     A.  That is correct.  I should probably update   12:50:59
13  that.                                   12:51:01
                                           Page 116
```

```
 1  employment by any Rothenberg Ventures portfolio   12:49:36
 2  companies?                              12:49:41
 3     A.  I have not.  I don't think so.    12:49:44
 4     Q.  You hesitated there.             12:49:47
 5     A.  Just scanning my memory.         12:49:48
 6     Q.  You took the Vicarious Surgical board seat   12:49:50
 7  on behalf of Rothenberg Ventures; correct?   12:49:56
 8     A.  That's correct.                  12:49:57
 9     Q.  And according to you, on September 1st,   12:49:59
10  2016, you stopped working for Rothenberg Ventures;   12:50:02
11  is that right?                          12:50:05
12     A.  That's right.                    12:50:05
13     Q.  Your termination, according to you, was   12:50:06
14  effective as of September 1st, 2016?   12:50:08
15     A.  Yes.                             12:50:11
16     Q.  After September 1st, 2016, did you   12:50:12
17  continue to serve on the board of Vicarious   12:50:14
18  Surgical?                               12:50:16
19     A.  At some point -- for a short period of   12:50:18
20  time, yes.                              12:50:21
21     Q.  What was that short period of time?   12:50:21
22     A.  The exact date I don't know.      12:50:23
23     Q.  And you were still on the board of   12:50:24
24  Vicarious Surgical; correct?           12:50:26
25     A.  Well, I transitioned from being a board   12:50:26
                                           Page 115
```

```
22        Showing you what we'll mark as --   12:52:57
23     MR. NARDINELLI:  Are we on Exhibit 4?   12:53:00
24     THE REPORTER:  5.                    12:53:08
25  BY MR. NARDINELLI:                      12:53:09
```

30 (Pages 114 - 117)

CONFIDENTIAL

1    Q. -- Exhibit 5.                          12:53:09
2        (Defendants' Exhibit 5 was marked.)    12:53:11
3 BY MR. NARDINELLI:                            12:53:25
4    Q. Do you see this e-mail that I've placed in  12:53:25
5 front of you as Exhibit 5?                    12:53:27
6    A. Yes.                                    12:53:30
7    Q. This is an e-mail from Mike Rothenberg to  12:53:31
8 you, Neil Devani, cc'ing Bill Broome and Martin   12:53:35
9 Mayo, and it's dated Friday, August 12, 2016.   12:53:42
10       Do you see that?                       12:53:45
11   A. Yes.                                    12:53:47
12   Q. Do you recall receiving this e-mail?    12:53:47
13   A. I don't.                                12:53:48
14   Q. Do you have any reason to believe that  12:53:49
15 this is not an e-mail that was transmitted from Mike  12:53:50
16 to you on August 12th?                       12:53:54
17   A. No.                                     12:53:54
18   Q. And you see that on August 13, you      12:53:55
19 responded to Mike Rothenberg?                12:53:57
20   A. Yes.                                    12:53:59
21   Q. Do you recall that response?           12:54:00
22   A. I don't.                                12:54:02
23   Q. Mike here says, in his August 12 e-mail,  12:54:02
24 "Neil, thank you for everything you did the past  12:54:02
25 almost two years at Rothenberg Ventures and for   12:54:06

Page 118

1 River. You are a hardworking, intelligent and loyal  12:54:09
2 friend and investors and we will miss having you  12:54:12
3 with us on a full-time basis."                12:54:16
4      I read that correctly; right?           12:54:18
5    A. Yeah.                                   12:54:19
6    Q. The next paragraph starts, "I know you  12:54:20
7 will be successful in your next steps and look   12:54:23
8 forward to your future."                     12:54:26
9      Now, you stated earlier that you resigned  12:54:29
10 on September 1st, but this e-mail seems to clearly  12:54:31
11 indicate that you had already resigned as of   12:54:34
12 August 12th.                                 12:54:37
13   MR. GLUGOSKI: Objection.                   12:54:38
14 BY MR. NARDINELLI:                           12:54:38
15   Q. Had you, in fact, resigned as of        12:54:38
16 August 12th?                                 12:54:41
17   MR. GLUGOSKI: Objection; argumentative.    12:54:43
18   THE WITNESS: You left off the next sentence,  12:54:45
19 very conveniently.                           12:54:47
20       "Even though this isn't quite goodbye yet,  12:54:48
21 please let me know if I can ever be helpful in your  12:54:52
22 journey."                                    12:54:54
23 BY MR. NARDINELLI:                           12:54:55
24   Q. What did you understand that to mean by  12:54:55
25 "Even though this isn't quite goodbye yet"?  12:54:57

Page 119

1    A. I didn't understand it to mean anything.  12:55:00
2 I knew from my conversation with Mike that I had  12:55:00
3 given notice of my intent to leave the company and,  12:55:03
4 as per our handbook and my conversation with him,  12:55:07
5 that there would be a period of transition during which  12:55:10
6 I would provide whatever support was necessary to  12:55:13
7 help the company move forward without me.     12:55:19
8    Q. So this e-mail occurred, according to you,  12:55:22
9 after you gave notice, but before your actual end  12:55:25
10 date.                                        12:55:28
11   A. That is correct.                        12:55:29
12   Q. And why did you give that notice?       12:55:29
13   A. We've already discussed that.           12:55:31
14   Q. Why did you give your notice of         12:55:33
15 resignation?                                 12:55:34
16   A. I was getting ready to leave the company  12:55:36
17 and gave notice as appropriate when you're getting  12:55:38
18 ready to leave the company.                  12:55:42
19   Q. Why were you getting ready to leave the  12:55:43
20 company?                                     12:55:46
21   A. I disagreed with certain things about --  12:55:46
22 with Mike about certain things.              12:55:48
23   Q. What were those disagreements with Mike?  12:55:50
24   A. I believe some of that is privileged. I  12:55:52
25 don't know that -- where exactly that scope ends I  12:55:55

Page 120

1 think is for Mike to decide.                 12:55:58
2    Q. I have asked you why you put in your    12:56:02
3 resignation; correct?                        12:56:05
4    A. Yes.                                    12:56:05
5    Q. And you responded, "I disagreed with     12:56:06
6 certain -- with certain things -- with Mike about  12:56:09
7 certain things"; correct?                    12:56:11
8    A. Yes.                                    12:56:12
9    Q. And I asked you to give further detail   12:56:13
10 about what you disagreed with, further detail about  12:56:16
11 why you had put in your resignation, and you refuse  12:56:19
12 to answer the question on grounds of privilege; is  12:56:23
13 that right?                                  12:56:26
14   A. That's correct.                         12:56:26
15   Q. So other than by saying, I had certain   12:56:27
16 disagreements with certain things with Mike, you are  12:56:30
17 unable to give any testimony today about why you  12:56:33
18 resigned from the company?                   12:56:36
19   A. If you can get a waiver today, I can give  12:56:37
20 you full details.                           12:56:41
21   Q. That's helpful.                         12:56:42
22       So if you did have a waiver that was to  12:56:42
23 your liking, you would be happy to testify about why  12:56:46
24 you resigned from Rothenberg Ventures?       12:56:50
25   A. That's correct.                         12:56:52

Page 121

31 (Pages 118 - 121)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL



**Page 122**

1   Q.  Okay.  Good.                    12:56:53

21   Q.  You gave your notice of resignation on   12:58:10
22  August 12th; correct?                 12:58:15
23   A.  That's correct.                  12:58:15

**Page 124**

1   Q.  Did you -- do you know a person named   12:59:22
2  Cisco Riordan?                          12:59:25
3   A.  I do.                            12:59:26
4   Q.  Do you know whether or not Cisco Riordan   12:59:27
5  had reported allegations to the SEC?     12:59:29
6   A.  I do.                            12:59:31
7   Q.  Yes or no; is that correct?        12:59:32
8   A.  I believe that's correct, yes.      12:59:35
9   Q.  It was a poorly phrased question by me.   12:59:41
10      You believe it is correct that Cisco   12:59:45
11  Riordan reported something to the SEC and that   12:59:47
12  Mr. Riordan's report triggered the SEC violation?   12:59:50
13   A.  I don't know that there's an SEC violation   12:59:54
14  and I don't know that his report triggered it, but I   12:59:56
15  know that he spoke or reported something to the SEC   12:59:59
16  at some point.                         13:00:03
17   Q.  First off, let me correct a very poorly   13:00:04
18  worded question.                       13:00:08
19      I wrote -- excuse me.              13:00:09
20      I said, Mr. Riordan's report triggered the   13:00:10
21  SEC violation.  What I mean to say was triggered the   13:00:16
22  SEC investigation.                     13:00:20
23      Do you know whether it was Mr. Riordan's   13:00:21
24  report that triggered the SEC investigation?   13:00:24
25   A.  I don't know.                    13:00:27

**Page 125**

1   Q.  Had you talked to Mr. Riordan before he   13:00:28
2  made his report to the SEC before he made the report   13:00:30
3  to the SEC?                            13:00:35
4   A.  No.                             13:00:36
5   Q.  What was Mr. Riordan's role at Rothenberg   13:00:36
6  Ventures?                              13:00:40
7   A.  He was hired as a software developer.   13:00:41
8   Q.  You say he was hired as a software   13:00:45
9  developer.                             13:00:45
10      Was that what he actually did when he   13:00:45
11  worked there?                          13:00:48
12   A.  I don't know what he actually did.   13:00:48
13   Q.  You don't know what Mr. Riordan's role was   13:00:50
14  at Rothenberg Ventures?                 13:00:53
15   A.  I know he was hired to do, or at least   13:00:55
16  what I was told he was hired to do.  I don't know   13:00:57
17  what he actually did.  There was software that was   13:01:00
18  built.  I had seen some of the software that had   13:01:03
19  been built and that we were using.  I assume it was   13:01:06
20  him that built it.  I don't know beyond that.   13:01:09
21   Q.  I'm trying to understand how someone who   13:01:12
22  was involved in an IT role at Rothenberg Ventures   13:01:14
23  would have come across information that would have   13:01:19
24  led him to believe that there was an SEC violation   13:01:22
25  going on that he wanted to report.      13:01:25

**Page 125**

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL



**Page 126**

1    Did you share any information of that    13:01:27
2  nature with Mr. Riordan?    13:01:29
3    A.  Never.    13:01:31
14    Q.  I think we talked a little bit earlier    13:02:01
15  about the resignation of Lynne McMillan; correct?    13:02:03
16    A.  Correct.    13:02:06
17    Q.  Did you talk to Ms. McMillan about why she    13:02:08
18  had resigned from Rothenberg Ventures?    13:02:10
19    A.  Not in detail.    13:02:14
20    Q.  Forget about detail.    13:02:16
21    Did you talk to Ms. McMillan at all about    13:02:19
22  the reason for her resignation from Rothenberg    13:02:22
23  Ventures?    13:02:24
24    A.  She was upset with Mike about certain    13:02:26
25  things, the details of which I don't know.  But I    13:02:31

**Page 127**

1  know that her and Mike had a tense relationship.    13:02:33
15    Q.  Around the time that you resigned from    13:04:25
16  Rothenberg Ventures, were you aware of any efforts    13:04:27
17  by Rothenberg Ventures employees to take over    13:04:30
18  control of the firm?    13:04:34
19    A.  No.    13:04:35
20    Q.  Were you aware of an omnibus agreement    13:04:36
21  that, if executed, would vest control of the firm in    13:04:40
22  the hands of other people?    13:04:45
23    A.  No.    13:04:47
24    Q.  Do you know who Brandon Farwell is?    13:04:49
25    A.  I do.    13:04:52

**Page 128**

1    Q.  How close are you with Mr. Farwell?    13:04:53
2    A.  We're friendly.    13:04:55
3    Q.  Did you talk to Mr. Farwell about your    13:04:56
4  resignation?    13:05:00
5    A.  I don't recall.  Probably, but I don't    13:05:03
6  recall.    13:05:04
7    Q.  Did you talk to him about why you had    13:05:05
8  resigned?    13:05:07
9    A.  If I talked to him, I'm sure we would have    13:05:10
10  covered that, but I don't recall.    13:05:12
11    Q.  You don't recall any conversations that    13:05:14
12  you had with Mr. Farwell about why you had resigned?    13:05:15
13    A.  I don't.    13:05:18
14    Q.  What about any conversations that you had    13:05:18
15  with Mr. Farwell about why he had resigned?    13:05:20
16    A.  He didn't resign.    13:05:23
17    Q.  I'm sorry.    13:05:25
18    Was he terminated?  What happened with his    13:05:25
19  employment?    13:05:29
20    A.  I don't know at what point he left the    13:05:30
21  firm or if he was terminated or resigned.  As far as    13:05:31
22  I know, when I resigned, he was still employed at    13:05:35
23  the firm.  I don't know if that's true or not, but    13:05:38
24  that's my belief.    13:05:41
25    Q.  Did you ever talk with Geoff Rapoport    13:05:45

**Page 129**

1  around the time that you resigned from Rothenberg    13:05:48
2  Ventures?    13:05:51
3    A.  I don't recall.  I don't believe so.    13:05:53
4    MR. NARDINELLI:  Mark this next exhibit as    13:06:05
5  Exhibit 7.    13:06:07
6    (Defendants' Exhibit 7 was marked.)    13:06:08
7  BY MR. NARDINELLI:    13:06:59
8    Q.  You see that this is an e-mail sent by Ian    13:06:59
9  Folau, F-o-l-a-u, to you on August 23rd, 2016?    13:07:03
10    A.  Um-hum.    13:07:08
11    Q.  Who is Ian Folau?    13:07:09
12    A.  Ian Folau is the founder of a company    13:07:11
13  called GitLinks.    13:07:15
14    Q.  What is GitLinks?    13:07:16
15    A.  I don't recall.    13:07:17
16    Q.  It says, "Bowtie would like" -- the    13:07:20
17  subject of the e-mail says, "Bowtie would like an    13:07:22
18  intro to Rothenberg Ventures."    13:07:26
19    What is Bowtie?    13:07:27
20    A.  I don't know.  It says here it's "a plug    13:07:29
21  and play chatbot solution for any business on any    13:07:33
22  messaging platform," so I presume that's what it is.    13:07:37
23    Q.  But you don't have a personal recollection    13:07:40
24  of Bowtie other than this e-mail?    13:07:42
25    A.  No.  I don't believe I've ever spoken with    13:07:44

33 (Pages 126 - 129)

CONFIDENTIAL

1 anyone there or met with anyone there.          13:07:47
2    Q.  If you could turn the page over.  So on     13:08:10
3 the backside, you write an e-mail dated Tuesday,   13:08:14
4 August 23rd, 2016.                               13:08:19
5       Do you see that?                           13:08:20
6    A.  Yes.                                      13:08:21
7    Q.  So you write, "Hey Ian, thanks for the    13:08:22
8 message.  I'm guessing you haven't heard, but the  13:08:25
9 firm is in a very rough spot at the moment.  I left  13:08:27
10 a few weeks ago upon confirming some troubling facts  13:08:31
11 and hearing some worse rumors."                  13:08:35
12       What were those troubling facts that you  13:08:37
13 confirmed?                                       13:08:39
14    A.  That would be privileged.                13:08:40
15    Q.  You're refusing to answer that question on  13:08:42
16 the grounds of privilege?                        13:08:43
17    A.  Yes.                                      13:08:45
18    Q.  This is an e-mail dated August 23rd, which  13:08:45
19 is directly relevant to your departure; correct?  13:08:48
20    A.  That's correct.                          13:08:52
21    Q.  You say, "I left a few weeks ago"; right?  13:08:53
22    A.  Correct.                                 13:08:55
23    Q.  How do you square saying "I left a few   13:08:57
24 weeks ago" with your earlier testimony that your  13:08:59
25 final day was September 1st?                     13:09:03

Page 130

1    A.  Ian is someone who is well outside the    13:09:05
2 firm.  And I was intending to give him the        13:09:08
3 perspective that I was not in a position to make any  13:09:10
4 sort of investment decisions or even advocate for  13:09:14
5 investment on behalf of the firm.               13:09:19
6    Q.  Why was it necessary to tell him that you  13:09:28
7 had left a few weeks ago in order to give him the  13:09:30
8 perspective that you were not in a position to make  13:09:33
9 any investment decision?                         13:09:35
10    A.  If I told him that I was in a transition  13:09:36
11 period, he might believe that I was able to provide  13:09:39
12 him or the person he wanted to introduce me to with  13:09:42
13 something that they wanted, which I couldn't.    13:09:46
14    Q.  So if you had told him, I left one day   13:09:49
15 ago, were you concerned that he would think that you  13:09:52
16 were still able to make investments on behalf of  13:09:54
17 Rothenberg?                                      13:09:57
18    A.  Potentially, yes.                        13:09:58
19    Q.  You wrote that "I left a few weeks ago    13:09:59
20 upon confirming some troubling facts and hearing  13:10:03
21 some worse rumors."                              13:10:06
22       What were those worse rumors?             13:10:07
23    A.  I think that's also potentially          13:10:09
24 privileged.                                      13:10:13
25    Q.  You're refusing to answer that question on  13:10:13

Page 131

1 the privilege ground?                            13:10:15
2    A.  Yes.                                      13:10:18
3    Q.  Is it actually the case that you told Ian  13:10:22
4 that you left a few weeks ago because you did not  13:10:24
5 want to be associated with the more recent       13:10:29
6 developments at the firm, including the SEC      13:10:32
7 investigation?                                   13:10:35
8    A.  That's not why I told him that.          13:10:37
9    MR. NARDINELLI:  Okay.  Let's take a break for  13:10:39
10 lunch.                                          13:10:43
11       I think that, John, it might be time to   13:10:44
12 take you up on your offer to continue this      13:10:46
13 deposition until a later time, which I hope is very  13:10:48
14 soon.  I appreciate your position.  I understand it,  13:10:52
15 and I think that we'll be able to get it worked out  13:10:55
16 quickly.                                        13:10:57
17 BY MR. NARDINELLI:                              13:10:57
18    Q.  But we're in this area now where I'm     13:10:57
19 asking you about e-mails that are right in the midst  13:11:00
20 of kind of the August 2016 time period.  And if  13:11:03
21 you're unable to answer questions about those, then  13:11:07
22 I think it's best we stop and come back, be able to  13:11:10
23 answer them.                                    13:11:11
24    MR. GLUGOSKI:  Well, I think you should exhaust  13:11:11
25 all the questions you can that are not of a      13:11:14

Page 132

1 privileged nature.  I'm sure there's other       13:11:18
2 questions.  I'm not going to suddenly let you start  13:11:20
3 asking about issues that would otherwise not be  13:11:24
4 subject to the privileges.                       13:11:29
5       I can think of one thing off the bat.  If  13:11:30
6 you want to ask him about any conversations he's had  13:11:34
7 about the lawsuit outside the presence of counsel,  13:11:38
8 that's certainly a question that should be asked  13:11:41
9 now, things along that line.                     13:11:45
10       So we're not going anywhere.  Ready to    13:11:47
11 answer all the ones that aren't subject to the   13:11:49
12 privilege.                                       13:11:51
13    MR. NARDINELLI:  I understand that you wanted  13:11:52
14 to say your piece there, John, but there's been  13:11:53
15 enough privilege objections for me for now.      13:11:56
16    MR. GLUGOSKI:  Just so we're clear, I'm going  13:11:59
17 to ask the court -- make it clear that you were  13:12:01
18 given an opportunity.  And what I don't want to have  13:12:04
19 happen is you prolong this thing for a third day  13:12:08
20 because you didn't ask questions you could ask   13:12:12
21 today.                                           13:12:16
22    MR. NARDINELLI:  And I said the exact same    13:12:16
23 thing to you when you were deposing Mike Rothenberg  13:12:18
24 and when you were deposing Hanna, and you took   13:12:21
25 multiple days for Mike anyway.                   13:12:26

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL

1    So let's --                          13:12:27
2    MR. GLUGOSKI: I didn't take multiple days. We    13:12:28
3 had one day of Mike testimony, and we've agreed to a    13:12:28
4 limited testimony of day two. That's just not true.    13:12:32
5 If you want to agree to a limited testimony amount    13:12:37
6 of time right now, Neil, that's fine. I'm okay with    13:12:40
7 that. What I'm not going to have is you sit and try    13:12:44
8 to do another full day and then bring him back    13:12:47
9 because you want to ask him questions that you    13:12:49
10 could've asked him right now.    13:12:51
11    MR. NARDINELLI: Well, I'm trying to ask him    13:12:51
12 questions that go to the very heart of, you know,    13:12:54
13 his resignation from the firm, which, of course, is    13:12:55
14 central to this case. I can't get past his    13:12:57
15 privilege objections. I've tried and tried and    13:13:01
16 tried. We called the court. We were unable to. I    13:13:02
17 respect your position, but enough is enough as far    13:13:04
18 as we're concerned. But we'll happily continue this    13:13:06
19 as soon as we can.    13:13:09
20    MR. GLUGOSKI: We're not -- we're going to stay    13:13:10
21 here. And you choose to use your time the way you    13:13:11
22 want to do it. You did the same thing to me. You    13:13:15
23 said, John, ask the questions you can ask now and    13:13:19
24 we'll deal with the objections later. It's what you    13:13:22
25 did to me, Counsel.    13:13:25
Page 134

1    So I think it's only fair that you ask all    13:13:26
2 the questions you can ask right now that are    13:13:29
3 not of a privileged nature. I'm happy to point out    13:13:31
4 other questions that you can ask right now if you    13:13:35
5 really want to.    13:13:38
6    MR. NARDINELLI: I'm not going to fight this    13:13:39
7 privilege fight with you all day.    13:13:41
8    Let's go off the record and take a break.    13:13:42
9    MR. GLUGOSKI: Sure.    13:13:45
10    THE VIDEOGRAPHER: Just a break?    13:13:45
11    MR. NARDINELLI: For now, right now, just a    13:13:45
12 break.    13:13:45
13    THE VIDEOGRAPHER: Going off the record. The    13:13:46
14 time is 1:13 p.m.    13:13:51
15    (Lunch recess was taken at 1:13 p.m.)
16    (Nothing omitted or deleted. See next
17    page.)
18
19
20
21
22
23
24
25
Page 135

1    AFTERNOON SESSION    2:37 P.M.
2         - - -
3    THE VIDEOGRAPHER: Back on the record. The    14:37:25
4 time is 2:37 p.m.    14:37:27
5    MR. NARDINELLI: Before we resume the    14:37:29
6 questioning, John, have you been able to get a    14:37:34
7 response from the person you reached out to    14:37:38
8 regarding the scope of the waiver?    14:37:41
9    MR. GLUGOSKI: I have not.    14:37:43
10    MR. NARDINELLI: It sounds like we're going to    14:37:45
11 have to come back and continue this deposition to    14:37:47
12 answer some of the questions over which you've    14:37:49
13 asserted privilege. I think both of us want to get    14:37:52
14 that second -- finish that deposition as soon as we    14:37:55
15 can.    14:38:00
16    Do you have a date in mind that we can do    14:38:00
17 it either this week or next week?    14:38:02
18    MR. GLUGOSKI: I have to e-mail my office and    14:38:14
19 see what the availability is. What days are you    14:38:17
20 looking at?    14:38:20
21    MR. NARDINELLI: Let me briefly check my    14:38:21
22 schedule. I think I can do any day next week.    14:38:24
23    THE WITNESS: The 6th, I'll be flying out that    14:38:34
24 evening for about 10 days.    14:38:37
25    MR. NARDINELLI: So let's get it done by the    14:38:39
Page 136

1 6th then, if we can do the 6th.    14:38:41
2    MR. GLUGOSKI: When are you back?    14:38:52
3    THE WITNESS: The 17th.    14:38:54
4    MR. GLUGOSKI: Are you available on the 17th?    14:39:02
5    MR. NARDINELLI: You're asking me?    14:39:05
6    MR. GLUGOSKI: Yeah.    14:39:07
7    MR. NARDINELLI: I've actually got a depo    14:39:15
8 scheduled that day. We don't want to wait until the    14:39:18
9 17th.    14:39:21
10    MR. GLUGOSKI: I'm just looking at my    14:39:22
11 availability. I'm not available on the 6th. Do you    14:39:23
12 want to -- assuming he's available on the 3rd, we    14:39:29
13 can kick Fanelli.    14:39:32
14    MR. NARDINELLI: Yeah, I think we can do that.    14:39:35
15    THE WITNESS: I'm not available on the 3rd.    14:39:42
16 BY MR. NARDINELLI:    14:39:46
17    Q.  What's your unavailability on the 3rd?    14:39:46
18    A.  I have a whole bunch of different    14:39:48
19 meetings.    14:39:51
20    MR. GLUGOSKI: Also this is going to require    14:39:54
21 getting the agreement in place.    14:39:56
22    MR. NARDINELLI: Which I trust we can do    14:40:00
23 quickly.    14:40:01
24    MR. GLUGOSKI: I don't know. I mean, if you    14:40:02
25 have an example -- I started working on it a little    14:40:05
Page 137

35 (Pages 134 - 137)

CONFIDENTIAL

1  bit. I mean -- so you have a depo on the 17th?   14:40:10
2  don't see it happening unless we move Fanelli --   14:40:17
3  well, he can't do it on the 3rd anyway.   14:40:20
4      MR. NARDINELLI: How about tomorrow?   14:40:24
5      MR. GLUGOSKI: I cannot do it tomorrow.   14:40:25
6      MR. NARDINELLI: How about Saturday or Sunday?   14:40:28
7      MR. GLUGOSKI: Nice try.   14:40:31
8      I can do the 20th. I can do the 21st. I   14:40:42
9  cannot do the 23rd.   14:40:54
10      MR. NARDINELLI: I think we should shoot for   14:40:56
11  the 3rd or the 6th.   14:40:57
12      MR. GLUGOSKI: I can't do the 6th. 3rd is --   14:40:59
13  we would have to move Fanelli, but that requires us   14:41:02
14  to -- but he's got meetings anyway.   14:41:05
15      MR. NARDINELLI: He's got meetings, but we've   14:41:08
16  got a deposition. And if we need to get a court   14:41:10
17  order, we can do that.   14:41:14
18      MR. GLUGOSKI: I worked around your schedule   14:41:15
19  and made the second day for your client when he was   14:41:17
20  available.   14:41:20
21      MR. NARDINELLI: We've both been working around   14:41:21
22  each other's schedules. I appreciate that. I think   14:41:23
23  we might just have to move to compel to get it on   14:41:29
24  the 3rd if you're available and I am.   14:41:34
25  BY MR. NARDINELLI:   14:41:34
Page 138

1      Q. Neil, I understand you have meetings, but   14:41:34
2  I'm sure you understand. This is a deposition.   14:41:37
3  It's important. It's a lawsuit.   14:41:37
4      MR. GLUGOSKI: You're going to move -- all   14:41:40
5  right. That's fine, but that requires us to get the   14:41:40
6  agreement in place. So you would have to -- if the   14:41:42
7  agreement is not in place, it's not going forward   14:41:46
8  anyway.   14:41:49
9      MR. NARDINELLI: I trust we can get the   14:41:50
10  agreement in place quickly.   14:41:54
11      EXAMINATION RESUMED   14:41:55
12  BY MR. NARDINELLI:   14:41:56
13      Q. Let's go back to Exhibit 7. This is the   14:41:56
14  e-mail exchange between you and Ian Folau.   14:42:00
15      So on the back of this exhibit in your   14:42:06
16  e-mail of August 23rd, you state, "I left a few   14:42:09
17  weeks ago."   14:42:12
18      Do you see that?   14:42:13
19      A. I see that.   14:42:14
20      Q. Were you being untruthful when you said,   14:42:15
21  "I left a few weeks ago"?   14:42:17
22      A. Depends on your interpretation of "I left   14:42:22
23  a few weeks ago."   14:42:24
24      Q. Well, you're the one who wrote it.   14:42:26
25      A. Right, but it's Ian's interpretation of   14:42:28
Page 139

1  what that means that would determine whether or not   14:42:32
2  I was being untruthful.   14:42:36
3      Q. What were you intending to convey when you   14:42:38
4  said, "I left a few weeks ago"?   14:42:40
5      A. I was intending to convey that I was not   14:42:42
6  in a position to provide him with what he wanted.   14:42:44
7      Q. But those were not your words. You did   14:42:47
8  not say, I am not in a position to provide you what   14:42:49
9  you want; right? You wrote, "I left a few weeks   14:42:52
10  ago."   14:42:55
11      A. That's correct, I wrote that and not, I   14:42:56
12  cannot provide you with what you want.   14:42:57
13      Q. What did you mean by "left"?   14:43:01
14      A. I meant that I was no longer in a position   14:43:04
15  to make investment decisions for the fund.   14:43:06
16      Q. Doesn't "left" mean depart the firm?   14:43:10
17      A. That's not what I meant.   14:43:10
18      Q. When you said, "I left a few weeks ago,"   14:43:12
19  you didn't actually mean that you had left a few   14:43:14
20  weeks ago?   14:43:17
21      A. No.   14:43:18
22      Q. So you were not being truthful when you   14:43:18
23  said, "I left a few weeks ago."   14:43:20
24      A. That's --   14:43:22
25      MR. GLUGOSKI: Objection; argumentative.   14:43:23
Page 140

1      Don't answer the question.   14:43:24
2      MR. NARDINELLI: Are you instructing him not to   14:43:26
3  answer?   14:43:27
4      MR. GLUGOSKI: Yeah. I'm not sure what you   14:43:28
5  mean, "you were not being truthful." He's answered   14:43:30
6  that question, Counsel. If you want to suggest he's   14:43:34
7  a liar, that's your business, that's your   14:43:37
8  interpretation.   14:43:40
9      MR. NARDINELLI: I'm asking the witness if he   14:43:41
10  was being truthful when he wrote this.   14:43:45
11      MR. GLUGOSKI: And he's answered that.   14:43:47
12      MR. NARDINELLI: I disagree he's answered that.   14:43:48
13  I'm sure you and I won't agree on that. Let me just   14:43:51
14  try one more time.   14:43:51
15  BY MR. NARDINELLI:   14:43:52
16      Q. When you wrote, "I left a few weeks ago,"   14:43:52
17  were you being truthful to Mr. Folau?   14:43:55
18      A. I believe so.   14:43:58
19      Q. Had you, in fact, resigned from Rothenberg   14:43:59
20  Ventures a few weeks ago?   14:44:01
21      A. I did not.   14:44:03
22      Q. Had you, in fact, given notice of your   14:44:04
23  resignation a few weeks ago?   14:44:07
24      A. At that point, it had been less than a few   14:44:09
25  weeks, again, depending on your definition of "a few   14:44:13
Page 141

36 (Pages 138 - 141)

CONFIDENTIAL



1 weeks."                          14:44:16

Page 142

Page 144

1 purposes of this deposition, he waives the privilege   14:47:47
2 to the extent that you need to answer any questions     14:47:50
3 that I ask you during this deposition.                  14:47:53
4       You're aware of that; right?                      14:47:55
5   A.  I'm aware of that.                                14:47:57
6   Q.  And you are, nonetheless, refusing to             14:47:58
7 answer on grounds of privilege.                         14:48:03
8   A.  Because I find that inadequate.                   14:48:03
9   Q.  And you do understand that the privilege          14:48:04
10 is held by Mr. Rothenberg and not by you.              14:48:05
11  A.  That is correct.               14:48:07
12  Q.  And you do understand that Mr. Rothenberg          14:48:08
13 has conveyed, through me, on the record, that he is    14:48:08
14 willing to waive privilege so you can answer every     14:48:11
15 question that I ask you today.           14:48:14
16      MR. GLUGOSKI:  Objection; calls for               14:48:15
17 speculation.                 14:48:16

Page 145

37 (Pages 142 - 145)

CONFIDENTIAL



**Page 146** (redacted)

**Page 148**

7  Q.  So you're aware of a legal entity called     14:51:13
8  Bend Reality LLC?     14:51:16
9    A.  That's correct.     14:51:18
10   Q.  You are aware or unaware of when that     14:51:18
11 entity formed?     14:51:21
12   A.  I can't recall when it was formed, but I     14:51:23
13 would say with a high degree of confidence it was     14:51:26
14 before 2016.     14:51:29
15   Q.  Were you involved in drawing up the     14:51:30
16 formation documents for that entity?     14:51:32
17   A.  I believe so.  I don't know that I drew     14:51:35
18 them up.  I think I may have reviewed them and     14:51:37
19 someone else drew them up.  I'm not sure.     14:51:41
20   Q.  You believe that, at the time of the     14:51:43
21 formation of Bend Reality, you had some role in     14:51:45
22 drafting or reviewing the paperwork?     14:51:49
23   A.  Yes.  I was aware of its creation and that     14:51:51
24 there was documentation of it.     14:51:54
25   Q.  Did that happen prior to Tipatat's arrival     14:51:58

**Page 147**

1 nature, you're saying things like it might have been     14:49:49
2 a subsidiary or it might have been controlled?  Is     14:49:52
3 that what you mean by you can't speak to dependent     14:49:54
4 or independent nature?     14:49:57
5    A.  I don't know what those terms necessarily     14:49:59
6 mean.  I don't think they're legally defined.  So I     14:49:59
7 don't want to speculate as to something being     14:50:02
8 dependent or independent without knowing exactly     14:50:05
9 what that means.     14:50:09
10   Q.  But you are aware that, at some point,     14:50:11
11 River Studios became a legal entity.     14:50:13
12   A.  I don't know that there was ever an entity     14:50:15
13 recognized by a state or federal government as River     14:50:18
14 Studios.     14:50:24

**Page 149**

1 at Rothenberg Ventures?     14:52:04
2    A.  That I don't recall.     14:52:05

38 (Pages 146 - 149)

CONFIDENTIAL



**Page 150**

[Text redacted]

**Page 152**

1 employee at Rothenberg Ventures, he was the general            14:56:23
2 counsel at Rothenberg Ventures.                                14:56:25
3   Q.  Gotcha.                                                  14:56:28
4       So you don't remember precisely when his                14:56:28
5 start date was, but you do remember that as of day            14:56:32
6 one, he was general counsel.                                   14:56:35
7   A.  That's correct.  He may or may not have                 14:56:36
8 been outside counsel before.  I know he worked at             14:56:39
9 Cooley.  And I know that we had an outside counsel            14:56:43
10 relationship with Cooley that Mike was the main              14:56:46
11 point of contact for.  So the fact that he created          14:56:50
12 the entity may have been while he was at Cooley on           14:56:53
13 behalf of whatever entity Mike asked him to do that         14:56:56
14 for, or it may have been as him being a full-time           14:57:02
15 employee at Rothenberg Ventures.  I don't know.             14:57:06

[Text redacted]

**Page 151**

1 Accelerator came before River Studios; correct?               14:55:16
2   A.  I think so, yes.                                         14:55:18
3   Q.  To the best of your knowledge, sitting                   14:55:21
4 here today, first there was River Accelerator and             14:55:23
5 then, at some later point, came River Studios.                14:55:27
6   A.  I believe that was the order, yes.                       14:55:30
7   Q.  And then was it some point after that that              14:55:32
8 River Studios, whose technical name was Bend                   14:55:35
9 Reality, became legally separate from the River               14:55:38
10 Accelerator?                                                  14:55:43
11  A.  I don't know.  The entity may have been                 14:55:47
12 created before the first Accelerator, it may have            14:55:50
13 been created after; I'm not sure.                             14:55:52
14  Q.  Are you aware of an entity called River                 14:55:54
15 Accelerator LLC?                                               14:55:57
16  A.  I'm not, no.                                             14:55:59
17  Q.  You don't know of an entity called River               14:56:00
18 Accelerator LLC that was formed on April 16th, 2016?  14:56:02
19  A.  No.                                                      14:56:07
20  Q.  And that entity was formed by Geoff                      14:56:07
21 Rapoport?                                                     14:56:10
22  A.  No.                                                      14:56:11
23  Q.  By April 16th, 2016, was Geoff Rapoport               14:56:12
24 the general counsel at Rothenberg Ventures?                   14:56:16
25  A.  I believe so.  If he was a full-time                    14:56:20

**Page 153**

1   Q.  So you have no reason to dispute that                   14:57:41
2 River Accelerator LLC was formed on April 16th, 2016   14:57:44
3 by Geoff Rapoport.                                            14:57:48
4   A.  I have no knowledge of that.                            14:57:52
5   Q.  Which means you have no reason to dispute               14:57:54
6 it.                                                           14:57:57
7   A.  That's your interpretation of my answer.               14:57:57
8   Q.  Do you have any reason to dispute it?                   14:58:00
9   A.  I can't think of one right now.                         14:58:03
10  Q.  So sitting here today, yes or no, do you               14:58:04
11 have any reason to dispute that River Accelerator            14:58:07
12 LLC was formed on April 16th, 2016 by Geoff                  14:58:11
13 Rapoport?                                                    14:58:16
14  A.  I can't dispute that fact because I know               14:58:23
15 nothing about it.                                            14:58:25
16  Q.  I understand you're not confirming it.                 14:58:26
17  A.  I'm not affirming the fact.                             14:58:30
18  Q.  Understood you're not affirming.                       14:58:30
19  A.  But, yes, I'm not disputing it.                        14:58:30
20  Q.  Do you have any reason to dispute that                 14:58:33
21 around the same time that River Accelerator LLC was         14:58:35
22 formed by Geoff Rapoport, River Studios LLP operated        14:58:39
23 out of the Bend Reality entity?                              14:58:47
24  A.  I've never heard of River Studios LLP.                 14:58:52

39 (Pages 150 - 153)

CONFIDENTIAL



Page 154

Page 156

23      Let's go to Exhibit 8.                 15:01:14
24      (Defendants' Exhibit 8 was marked.)    15:01:32
25  BY MR. NARDINELLI:                         15:02:14

Page 155

Page 157

40 (Pages 154 - 157)

CONFIDENTIAL



24   Q.  What would you have talked to him about?   15:04:33
25   A.  I probably would've asked him what his   15:04:35

Page 158

1  in TechCrunch?   15:05:24
2   A.  I don't think so.  I don't recall when I   15:05:27
3  got the first question.   15:05:29

Page 160

1  questions were and answered his questions for him.   15:04:36

24   Q.  Did you receive any of these questions   15:05:20
25  before the first of the articles that were published   15:05:21

Page 159

11   Q.  And you think that that was a more   15:07:04
12  effective way to answer his insistent tone than to   15:07:06
13  simply relay the same thing over e-mail?   15:07:10
14   A.  That's what I'm speculating.  I don't   15:07:13
15  recall what our conversation was.  I spoke -- when I   15:07:13
16  first said this in general about conversations I had   15:07:17
17  with LPs and what I recall about them.  And I'm   15:07:20
18  applying it to this specific situation to guess at   15:07:23
19  what our conversation was.   15:07:26
20   Q.  Did you ask him to call you so that you   15:07:33
21  could have a phone conversation that would not be   15:07:36
22  collected and stored and recorded on e-mail?   15:07:39
23   A.  That was not my intent.   15:07:42
24   Q.  Were you aware that by calling him instead   15:07:44
25  of by e-mailing him, you would be able to have a   15:07:46

Page 161

41 (Pages 158 - 161)

CONFIDENTIAL

1 conversation that was not recorded?            15:07:53
2    A.  I don't know that's what I was thinking of    15:07:54
3 now.                                          15:07:54
4    Q.  Was that part of your motivation?      15:07:54
5    A.  I don't think so.  I don't recall my   15:07:58
6 motivation at the time.                       15:08:01

[text redacted]

Page 162

8    Q.  What were you thinking about your own      15:09:21
9 career on August 22nd, August 23rd, 2016 as this bad  15:09:23
10 press is hitting and part of that is you receiving    15:09:29
11 questions from investors and maybe from others about  15:09:33
12 what's happening at the firm?                 15:09:36
13    A.  I wasn't really thinking about my career   15:09:37
14 at that time.  I was thinking about other things.    15:09:40
15    Q.  What were you thinking about?          15:09:42
16    A.  I was thinking about the fact that a lot    15:09:43
17 of people in a much more tenuous financial situation  15:09:45
18 than myself weren't being paid and might not be able  15:09:49
19 to make rent.  So I was trying to help people find    15:09:53
20 jobs, people that worked for me, essentially.  15:09:57
21       And making sure that people I had worked    15:09:59
22 with who were portfolio companies had, you know,     15:10:04
23 just knowledge of how they could reach me.  I didn't  15:10:11
24 know at what point I would be leaving the firm such   15:10:13
25 that they would not be able to contact me by e-mail.  15:10:17

1 So I wanted to make sure that folks had my contact    15:10:21
2 information.                                   15:10:25
3       When you're a portfolio company, if you  15:10:25
4 are a start-up and you've raised money from a  15:10:34
5 venture fund, often times there are expectations   15:10:38
6 from your investor, the venture fund, to provide  15:10:42
7 support to you, including additional financing.   15:10:47
8       If I was the point of contact for the   15:10:50
9 founder or management of a company, I wanted to make  15:10:57
10 sure that they knew they could reach me even though  15:11:00
11 I no longer had a contractual or fiduciary    15:11:04
12 relationship.  I just wanted to be available to   15:11:08
13 provide support to them.                      15:11:11
14    Q.  What did you do to make sure you were able  15:11:12
15 to continue to provide support to the Rothenberg   15:11:15
16 Ventures portfolio companies with whom you had some  15:11:18
17 relationship?                                 15:11:22
18    A.  I gave them my personal contact        15:11:23
19 information and said they could reach me at that  15:11:26
20 information or -- and told them I would be happy to   15:11:28
21 vouch for them with other venture investors as being  15:11:33
22 qualified companies for investment.           15:11:37
23    Q.  How many companies did you do that with?   15:11:40
24    A.  I don't recall.                       15:11:42
25    Q.  Did you reach out to them via e-mail or   15:11:44

Page 164

1 via phone call or in what form?               15:11:48
2    A.  Probably both.  I don't recall.        15:11:51
3    Q.  You have no recollection of whether you   15:11:55
4 reached out via e-mail or via phone call?     15:11:56
5    A.  Like I said, probably both, but I don't   15:12:00
6 recall.                                       15:12:02
7    Q.  Do you remember the particular companies  15:12:03
8 to whom you reached out?                      15:12:05
9    A.  I don't.  I could reconstruct a list with  15:12:09
10 a reasonable approximation, but I couldn't guarantee  15:12:13
11 that anyone on that list I actually did reach out    15:12:17
12 to.  Or there may be folks on that list that I did    15:12:22
13 not reach out to, but I think I did.          15:12:27
14    Q.  What were your e-mail addresses at      15:12:50
15 Rothenberg Ventures?                          15:12:52
16    A.  There were more than one.  I don't recall  15:12:57
17 all of them.  But neil@rothenbergventures.com was    15:12:59
18 the main one.                                 15:13:05
19    Q.  Were you on any aliases relating to legal  15:13:06
20 or attorneys?                                 15:13:11
21    A.  For a period of time, there was, I      15:13:13
22 believe, a counsel@rothenbergventures e-mail that   15:13:16
23 may have been an alias or a group distribution list.  15:13:20
24 I think there was also a legal@.  Either I was on    15:13:26
25 that list with someone else or someone else was on   15:13:30

Page 165

42 (Pages 162 - 165)

CONFIDENTIAL

1  that list. I'm not sure. I don't remember. There   15:13:32
2  was a team@ list, a dealteam@ list. There are   15:13:35
3  aliases and there are lists, and they're different.   15:13:42
4  Q. What's the difference between an alias and   15:13:46
5  a list?   15:13:49
6  A. As I'm using it, an alias is an actual   15:13:50
7  address that has an inbox. A list is what it sounds   15:13:54
8  like, a list that -- single or multiple e-mail   15:14:00
9  addresses receive e-mail if it's sent to that   15:14:04
10  address.   15:14:08
11  Q. You said earlier that around August 2016,   15:14:08
12  you were worried about people not being paid;   15:14:11
13  correct?   15:14:15
14  A. That's right.   15:14:15
15  Q. When did you start to be concerned about   15:14:16
16  that?   15:14:18
17  A. August 15th, I believe. The exact date   15:14:20
18  I'm not sure, but usually payroll was on the 15th,   15:14:24
19  plus or minus a day. I was not paid that day.   15:14:28
20  Others were not paid that day. Many people had   15:14:32
21  questions for me. I didn't have answers.   15:14:35
22  And then August 19th, there was a   15:14:37
23  e-mail -- I believe it was an e-mail that everyone   15:14:39
24  was placed on unpaid leave, effective immediately.   15:14:42
25  That triggered questions as well. I didn't know   15:14:47
Page 166

1  what was going on.   15:14:51
2  Q. You were not in the loop of whatever   15:14:53
3  decision may have -- or whatever communications   15:14:56
4  might have occurred between counsel that might have   15:15:00
5  led the companies to send an e-mail putting everyone   15:15:03
6  on unpaid leave?   15:15:05
7  A. I was not.   15:15:08
8  Q. Do you know why you were not involved in   15:15:08
9  that decision?   15:15:09
10  A. I was not operating in that capacity at   15:15:09
11  that time.   15:15:11
12  Q. At that time, were you operating in any   15:15:12
13  legal capacity, or had you completely ceased your   15:15:14
14  legal responsibilities at the firm?   15:15:18
15  A. I was still responsible from time to time   15:15:20
16  for certain legal work, primarily related to   15:15:23
17  portfolio companies and financing. And there were   15:15:27
18  other things that Mike asked me to be supportive on   15:15:30
19  in a legal capacity.   15:15:34
20  Q. So what do you recall about the   15:15:35
21  August 15th payroll? And I think you're right, it   15:15:37
22  was actually August 15th.   15:15:39
23  What do you recall about people not   15:15:41
24  getting paid on August 15th?   15:15:43
25  A. Just that they weren't paid.   15:15:45
Page 167

1  Q. Who wasn't paid?   15:15:47
2  A. People who work at the company.   15:15:50
3  Q. Do you remember who?   15:15:52
4  A. No.   15:15:53
5  Q. Was it true that everyone was not paid?   15:15:54
6  A. As far as I know. I don't know. I didn't   15:15:57
7  canvass the entire company.   15:16:01
8  Q. Who do you know did not receive pay on   15:16:04
9  August 15th that should have?   15:16:07
10  A. Other than myself, I can't recall who   15:16:11
11  else. I know there were other people, but off the   15:16:13
12  top of my head, I can't recall the exact names on   15:16:17
13  that day. There were some people paid later and   15:16:21
14  some were not.   15:16:26
15  Q. Who was paid later?   15:16:28
16  A. That I don't recall.   15:16:30
17  Q. You said that you were concerned about   15:16:31
18  people not getting paid, but that on August 15th,   15:16:33
19  you can't recall anyone other than yourself who did   15:16:37
20  not get paid.   15:16:41
21  Did your concern for others stem from the   15:16:43
22  fact that you had not gotten paid, or did it also   15:16:46
23  stem, at least in part, from knowledge you had at   15:16:49
24  that time that others had not been paid?   15:16:52
25  A. The latter.   15:16:54
Page 168

1  Q. And how did you come across the knowledge   15:16:55
2  that others had not been paid on August 15th?   15:16:57
3  A. I was still in the office and in contact   15:17:01
4  with people, so people spoke to me, maybe via   15:17:03
5  e-mail, verbally, text message. I don't know. But   15:17:10
6  I remember a sense of concern from folks as to   15:17:14
7  whether or not they were going to be paid or what   15:17:21
8  was happening.   15:17:23
9  Q. Had there been any of that type of concern   15:17:24
10  prior to the August 15th payroll?   15:17:26
11  A. There had been concern like that before.   15:17:30
12  Q. And tell me about that.   15:17:32
13  A. I don't recall the date, but there were   15:17:33
14  other times where payroll was uncertain, I believe,   15:17:36
15  or was late.   15:17:39
16  Q. What other times -- let's take both of   15:17:41
17  those.   15:17:44
18  What other times do you recall that   15:17:44
19  payroll was uncertain?   15:17:46
20  A. I don't know the exact dates.   15:17:48
21  Q. Do you recall anything at all about   15:17:51
22  payroll being uncertain?   15:17:52
23  A. I would have to check like some records or   15:17:54
24  something. I'm sure there's some documentation   15:17:57
25  around when it was, but I don't remember.   15:18:00
Page 169

43 (Pages 166 - 169)

CONFIDENTIAL

1  Q.  What type of documentation would reveal   15:18:02
2  that payroll was uncertain?  Are you referring to   15:18:05
3  e-mails or bank accounts or what?   15:18:08
4  A.  Yeah, probably e-mails or bank accounts or   15:18:10
5  payroll records showing dates, as to whether payroll   15:18:14
6  was made on a certain date or some date after that.   15:18:18
7  Or consultation with other folks might reveal that   15:18:20
8  information.  I don't know.   15:18:23
9  Q.  So what were people saying to you   15:18:25
10 following and surrounding the August 15th payroll   15:18:27
11 period?   15:18:31
12 A.  Exactly what they said I can't remember.   15:18:33
13 Q.  Who did you talk to?   15:18:36
14 A.  I can't remember.   15:18:37
15 Q.  Can you remember a single person, a single   15:18:38
16 individual that you are certain that you spoke with?   15:18:41
17 A.  Not on that day, no.   15:18:45
18 Q.  Not necessarily on that day --   15:18:47
19 A.  Around that time period, specific   15:18:50
20 conversations are hard for me to remember, again,   15:18:52
21 like two years ago.   15:18:55
22 Q.  Two years ago was a fairly significant   15:18:57
23 event; wouldn't you agree?   15:19:00
24 A.  Well, it's a significant event.  And the   15:19:02
25 fact that it was happening is pretty easy to   15:19:05

Page 170

1  remember.  That's part of this case.  But exactly   15:19:10
2  what conversations were had and with whom, I would   15:19:12
3  have to talk to those people and try to reconstruct   15:19:14
4  that information.   15:19:17
5  Q.  Following that August 15th payroll day,   15:19:18
6  what was going on day to day at the office?  Was   15:19:22
7  business carrying on as usual or not?   15:19:25
8  A.  No, it was not carrying on as usual.   15:19:29
9  Q.  In what way were things different?   15:19:31
10 A.  There were other folks who were in   15:19:34
11 transition.  I was responsible for creating a   15:19:36
12 transition plan for myself and for anyone else who   15:19:40
13 was considering parting ways with the company.  That   15:19:44
14 was definitely out of the ordinary.   15:19:51
15    Folks not being paid was out of the   15:19:55
16 ordinary.  The firm receiving the amount of press it   15:19:58
17 did was out of the ordinary.  I think -- there's   15:20:02
18 other things that were out of the ordinary -- that I   15:20:07
19 felt were out of the ordinary that I would consider   15:20:10
20 privileged.   15:20:13

█████████  ████████████████████
███████████████████████████  ████████
███████████████  ███████████████
███████████  ██████████████  ██████
███████████████████████  ████████
███████████████████████

Page 171

1  Q.  You mentioned press.  Let me show you --   15:20:28
2  MR. NARDINELLI:  Are we on Exhibit 9?   15:20:30
3  THE REPORTER:  Yes.   15:20:34
4     (Defendants' Exhibit 9 was marked.)
5  BY MR. NARDINELLI:   15:21:03
6  Q.  I trust you recognize this article.   15:21:03
7  A.  I do not.   15:21:08
8  Q.  So I will tell you it printed funny.  And   15:21:10
9  at the top there where you see, "TC News Video   15:21:14
10 Events CrunchBase," that obscures the original title   15:21:19
11 of the article.  But if you look at the very top, at   15:21:24
12 sort of the header, it says, "Several Key Rothenberg   15:21:27
13 Ventures Have Left the Firm, TechCrunch."   15:21:31
14 Q.  Is this the same one linked in the e-mail?   15:21:36
15 I believe it is.   15:21:39
16 Q.  I know we looked at a prior e-mail.  This   15:21:39
17 is probably the one.  This is the first of the   15:21:42
18 TechCrunch articles.  I'd have to double-check.   15:21:44
19 A.  The title of this one in the header is the   15:21:45
20 same as in the URL in the e-mail.   15:21:48
21 Q.  And the e-mail that you're referring to is   15:21:53
22 the e-mail from Mr. Ducoff, which is at Exhibit 8 on   15:21:56
23 August 18th?   15:22:02
24 A.  That's correct.   15:22:03
25 Q.  So do you recall this article?   15:22:03

Page 172

1  A.  The exact details, no but, yes, I know   15:22:06
2  this was an article that was written.   15:22:08
3  Q.  What was the reaction that you personally   15:22:10
4  had when this article came out?   15:22:13
5  A.  I felt that it was largely incorrect, or   15:22:19
6  partially incorrect, at least.   15:22:23
7  Q.  What was incorrect about it?   15:22:26
8  A.  I don't recall now.  I'm reading it to   15:22:29
9  see -- to refresh my memory.   15:22:31
10    (Witness reads document.)   15:23:07
11 A.  So I don't know, but I believe at the time   15:23:07
12 this came out -- and this may be true.  I can't   15:23:09
13 speak to whether or not this is actually true, but   15:23:15
14 my belief when this came out and my belief now is   15:23:19
15 that Tom Leep had not departed the firm, as it says   15:23:22
16 in the second paragraph, and that Sophie Liao had   15:23:25
17 also not departed the firm.  But perhaps she did; I   15:23:30
18 don't know.   15:23:34
19 Q.  Who was Tom Leep?   15:23:35
20 A.  Tom Leep is Tommy Leep's father.   15:23:37
21 Q.  When do you believe he departed the firm?   15:23:40
22 A.  I don't know when he did.   15:23:42
23 Q.  What causes you to believe that this   15:23:43
24 article inaccurately states that Tom Leep has   15:23:46
25 already departed?   15:23:50

Page 173

44 (Pages 170 - 173)

CONFIDENTIAL

1  A.  Because I didn't know that he had      15:23:51
2 departed.                                   15:23:53
3  Q.  So did you have a belief one way or the  15:23:53
4 other, or do you simply not know one way or the  15:23:56
5 other?                                      15:23:59
6  A.  I don't think those are mutually       15:24:00
7 exclusively.  I don't know that he had left or not,  15:24:02
8 but my belief at the time was he had not left.  And  15:24:04
9 my reason for that belief was because I wasn't aware  15:24:08
10 of his departure.  As contrast, Tommy Leep's  15:24:12
11 departure I was aware of, as was the whole firm,  15:24:17
12 because we had a going-away party for him in July of  15:24:19
13 2016.                                       15:24:23
14  Q.  Do you recall a going-away party for Katie  15:24:24
15 Fanelli?                                    15:24:28
16  A.  I do not, no.                          15:24:29
17  Q.  On July 27th?                          15:24:30
18  A.  I don't.                              15:24:32
19  Q.  On page 2 of this article, the very bottom  15:24:42
20 paragraph, there's a reference to an apparent former  15:24:46
21 employee who complains that "the firm features  15:24:51
22 'excessive, over-the-top spending on things that  15:24:54
23 make no sense and don't align with the supposed  15:24:54
24 mission of the firm.  Examples include a full-season  15:24:57
25 suite to the Warriors, a race car' and renting out  15:25:00
                                            Page 174

1 AT&T Park."                                 15:25:05
2      At the time this article came out, did you  15:25:06
3 agree with that sentiment?                  15:25:09
4  A.  No.                                   15:25:11
5  Q.  Today do you agree with that sentiment?  15:25:13
6  A.  No.                                   15:25:19
7  Q.  Why not?                              15:25:20
8  A.  I think that Mike had a theory for the  15:25:21
9 alignment between these activities and the firm, and  15:25:24
10 the firm's mission.                         15:25:29
11  Q.  Do you agree -- well, what is your     15:25:34
12 perception when you say I believe "Mike had a theory  15:25:37
13 for the alignment," what was that theory, as you  15:25:41
14 understand it?                              15:25:43
15  A.  That these things were all aligned and  15:25:44
16 there were purposes for them that were very closely  15:25:47
17 tied to the firm's growth and success.      15:25:52
18  Q.  Do you personally agree with that?     15:25:55
19  A.  Yeah.                                 15:25:59
20  Q.  Why is it that you think that expenditures  15:26:06
21 such as the race car and the AT&T Founder Field Day  15:26:09
22 are closely tied to the firm's growth and success?  15:26:15
23  A.  I defaulted to Mike's judgment on these  15:26:19
24 decisions, and I saw business value in them as they  15:26:23
25 existed.  There was PR value, business development  15:26:28
                                            Page 175

1 value, relationship-building value.  There were  15:26:31
2 instances where they acted much like other normal  15:26:36
3 ways that businesses spend money.           15:26:44
4  Q.  There's been, just generally speaking  15:26:48
5 here, press, including this article, to the effect  15:26:50
6 that the company was ill-advised to spend money on  15:26:54
7 these types of things.  It sounds like you disagree  15:26:58
8 with that.  It sounds like, as far as it goes, these  15:27:01
9 were legitimate and effective uses of funds to grow  15:27:04
10 the company, bring in clients, grow, et cetera; is  15:27:10
11 that correct?                               15:27:12
12  A.  Whether or not they were financially wise  15:27:13
13 requires both insight and perspective or opinion on  15:27:16
14 the financial management of the company, of which I  15:27:19
15 had no knowledge or role.                   15:27:21
16  Q.  Who was responsible for the financial  15:27:26
17 management of the company?                  15:27:27
18  A.  Mike and then other people who were on the  15:27:30
19 finance and accounting side of the business, I would  15:27:33
20 imagine.                                    15:27:35
21  Q.  Was Dave Hayes one of them?            15:27:36
22  A.  I believe Dave Hayes was the CFO of the  15:27:39
23 firm when I left.                           15:27:43
24  Q.  How about Katie Fanelli, was she involved  15:27:44
25 on the finance side?                        15:27:46
                                            Page 176

1  A.  I don't believe so, no.               15:27:48
2  Q.  Do you know a company called Arcturus?  15:27:49
3  A.  I do not, no.                         15:27:52
4  Q.  Do you know a company called DMG?      15:27:54
5  A.  No, I don't.                          15:27:56
6  Q.  Are you aware of the current status of  15:27:59
7 River Studios?                              15:28:02
8  A.  I am not, no.                         15:28:03
9  Q.  Are you aware that roughly 19 of the    15:28:05
10 roughly 20 initial employees of River Studios  15:28:09
11 departed at the same time for a different company?  15:28:14
12  A.  No.                                  15:28:16
13  Q.  This is the first that you've heard of  15:28:17
14 that?                                      15:28:19
15  A.  That's correct.                       15:28:21
16  Q.  Did you talk to Mike specifically about  15:28:34
17 the TechCrunch article from August 17th that was  15:28:38
18 Exhibit 9?                                  15:28:44
19  A.  I don't recall.                       15:28:46
20  Q.  Do you recall any company meetings,     15:28:51
21 company e-mails, things like that, about how to  15:28:52
22 respond to this press?                      15:28:55
23  A.  About this press specifically?         15:28:59
24  Q.  Yeah, about the first article.         15:29:03
25  A.  I don't recall.                       15:29:05
                                            Page 177

45 (Pages 174 - 177)

CONFIDENTIAL

1  Q.  When the first article came out, what did  15:29:06
2  you think was going to happen to the firm?  15:29:09
3      In other words, did you think that this  15:29:11
4  was going to be, at the end of the day, a blip on  15:29:13
5  the radar, or did you believe this was going to be a  15:29:18
6  real problem and possibly a disaster for the firm?  15:29:22
7  A.  I don't recall.  15:29:26
8  Q.  You don't know if you had an opinion or  15:29:28
9  had thought about that one way or the other?  15:29:30
10  A.  Not really.  I had already made my  15:29:32
11  decision with regard to my future with the firm.  15:29:35
12  And so I don't know that I spent a lot of time on  15:29:37
13  speculation about the firm's future beyond that.  I  15:29:41
14  was focused on providing the firm my services to be  15:29:44
15  put in the best position to maintain a relationship  15:29:48
16  with Mike and a reputation for someone who did their  15:29:52
17  job well.  15:29:56
18  Q.  Is that the transition plan that you spoke  15:29:57
19  of a little bit earlier?  15:29:59
20  A.  That's correct.  15:30:01
21  Q.  So tell me about that transition plan.  15:30:01
22      First of all, was it written down or  15:30:03
23  documented anywhere?  15:30:05
24  A.  I had created a document and it was never  15:30:07
25  completed.  15:30:09

Page 178

1  Q.  On like Google Drive?  15:30:10
2  A.  It was a Microsoft Word document.  15:30:13
3  Q.  And by "never completed" you mean?  15:30:17
4  A.  It was never completed.  15:30:18
5  Q.  What was incomplete about it?  15:30:20
6  A.  There's a finishing state for a document.  15:30:22
7  And when you have included all the content you find  15:30:23
8  necessary, you've proofread it, made sure it's  15:30:27
9  organized correctly, things like that, it never  15:30:30
10  reached that state.  15:30:32
11  Q.  Did you ever share this document with  15:30:33
12  anybody?  15:30:36
13  A.  I did not, no.  15:30:36
14  Q.  Was it originally your intent to craft  15:30:37
15  this transition plan and share it with somebody?  15:30:39
16  A.  Yes.  15:30:42
17  Q.  And why did that end up not happening?  15:30:43
18  A.  I did not feel as if -- the reason I was  15:30:46
19  creating this document was an exchange.  And I did  15:30:49
20  not feel as if the other side of the exchange was  15:30:51
21  upheld.  15:30:55
22  Q.  What was the other side of the exchange?  15:30:57
23  A.  My continued employment and payment.  15:30:59
24  Q.  Do you recall when you stopped working on  15:31:03
25  this document?  15:31:05

Page 179

1  A.  September 1st.  15:31:06
2  Q.  Did you receive the e-mail on August 19th  15:31:08
3  placing all employees on unpaid leave?  15:31:10
4  A.  I don't recall.  15:31:14
5  Q.  Are you contending that you continued to  15:31:18
6  work after the August 19th e-mail placing all  15:31:20
7  employees on unpaid leave?  15:31:26
8  A.  Yes.  15:31:28
9  Q.  And you believe you're entitled to pay for  15:31:29
10  the work that you did after all employees were  15:31:30
11  placed on unpaid leave?  15:31:34
12  A.  Yes.  15:31:36
13  Q.  Do you agree that you were an employee  15:31:36
14  that was subject to the e-mail that placed all  15:31:38
15  employees on unpaid leave?  15:31:40
16  A.  I don't.  15:31:43
17  Q.  Why is it you feel that you are immune  15:31:45
18  from the communication that placed all employees on  15:31:48
19  unpaid leave?  15:31:50
20  A.  I don't know that I received that e-mail,  15:31:52
21  number one.  Number two, I don't know if that e-mail  15:31:55
22  is an effective communication for its goal.  Number  15:31:59
23  three, I was requested by Mike to do work after  15:32:03
24  that.  And number four, there were many, many times  15:32:07
25  where I was immune from company-wide directives and  15:32:11

Page 180

1  policies at Mike's specific instruction or  15:32:14
2  communication.  15:32:20
3  Q.  So there were times where Mike would send  15:32:26
4  out a company-wide directive -- or somebody would  15:32:29
5  send out a company-wide directive, but then Mike  15:32:32
6  would come to you separately and say, Neil, that  15:32:36
7  company-wide directive does not apply to you?  15:32:39
8  A.  That's correct.  15:32:42
9  Q.  In what instances did that occur?  15:32:43
10  A.  The exact ones I don't recall.  I can  15:32:45
11  think of one where people were coming in to the  15:32:47
12  office late in the morning.  And so Mike desired  15:32:53
13  people to be in the office at a set time.  I don't  15:32:59
14  recall the time.  He sent a company-wide  15:33:03
15  communication, either by e-mail or an all-hands  15:33:08
16  meeting, and said, everybody needs to be in by this  15:33:08
17  time.  15:33:12
18      And then he said to me specifically, this  15:33:12
19  does not apply to you since I know that you work  15:33:13
20  late, either at home or you're in the office late.  15:33:16
21  So if you're up late because I asked you to do  15:33:19
22  something, don't worry about it.  15:33:22
23  Q.  Did Mike come to you after August 19th and  15:33:24
24  tell you, you are immune or excepted from this  15:33:27
25  company-wide e-mail placing everyone on unpaid  15:33:32

Page 181

46 (Pages 178 - 181)

CONFIDENTIAL

1 leave?                                                    15:33:35
2    A. I don't recall. He did ask me to do work           15:33:36
3 after that time.                                          15:33:42
4    Q. When, after that time, did he ask you to            15:33:44
5 do work?                                                  15:33:46
6    A. The exact day, I don't recall.                      15:33:47
7    Q. What did he ask you to do?                          15:33:50
8    A. He asked me to do a few things.                     15:33:53
9 Communicating with outside counsel and Martin Mayo        15:33:59
10 was one of those. I think assisting with the             15:34:03
11 transition of an employee was one of those.              15:34:11
12    Q. Of an employee?                                    15:34:14
13    A. Of an employee.                                    15:34:15
14    Q. What employee?                                     15:34:16
15    A. That's probably not privileged.                    15:34:21
16       Dylan Flinn.                                       15:34:23
17    Q. Okay. Anything else?                               15:34:26
18    A. And there were other things, I think, as           15:34:30
19 well.                                                    15:34:32
20    Q. Do you recall what those other things              15:34:32
21 were?                                                    15:34:35
22    A. Yes, but I believe they might be                   15:34:35
23 privileged.                                              15:34:38
24    Q. So you are asserting privilege.                    15:34:38
25    A. Yes.                                               15:34:40

Page 182

1    Q. So in terms of things that Mike asked you          15:34:42
2 to do -- work that Mike asked you to do for               15:34:46
3 Rothenberg Ventures Management Company after the          15:34:51
4 all-hands e-mail placing everyone on unpaid leave,        15:34:53
5 there was talk with outside counsel as well as            15:34:57
6 Martin Mayo, there was assist with the transition of      15:35:00
7 Dylan Flinn, and there were one or more other things      15:35:04
8 that you're currently not revealing because you're        15:35:07
9 asserting privilege?                                      15:35:10
10    A. That's correct.                                    15:35:11
11    Q. Did Mike ask you to do these things in             15:35:13
12 person, over e-mail, by phone, in what form?             15:35:15
13    A. I'm not sure. I think by phone. I don't            15:35:21
14 recall.                                                  15:35:26
15    Q. Do you have any documentary record of Mike         15:35:27
16 asking you to do any work for the firm following the     15:35:30
17 August 19th unpaid leave e-mail?                         15:35:33
18    A. Possibly. I'm not sure.                            15:35:38
19    Q. Did you search for any documentary records         15:35:40
20 of Mike asking you to do work for the firm following     15:35:44
21 the August 19th unpaid leave e-mail?                     15:35:48
22    A. Maybe. I don't know.                               15:35:53
23    Q. I mean, in the context of this case, did           15:35:55
24 you look for documentary evidence that you had been      15:35:57
25 asked to work in late August?                            15:36:01

Page 183

1    A. Yeah, I'm saying I don't know. This case           15:36:03
2 began thereafter, in September of 2016. The               15:36:06
3 searches I did and what exactly I searched for in         15:36:09
4 September of 2016 I don't recall.                         15:36:12
5    Q. Have you searched for documents related to         15:36:15
6 this litigation since September of 2016?                  15:36:18
7    A. I don't believe so -- no, I have.                  15:36:21
8    Q. When was that?                                     15:36:27
9    A. I searched for documents -- sometime              15:36:32
10 thereafter, there was a hearing for a Department of      15:36:37
11 Labor claim. The exact date I don't recall. There       15:36:42
12 was a search for that. That may have been in            15:36:46
13 September or may have been afterwards. I think it        15:36:50
14 was afterwards because there were two pieces of          15:36:53
15 that.                                                    15:36:55
16       Then there was also a search, I think in          15:36:56
17 relation to this case, after that, I believe when we    15:37:01
18 made the complaint or filed a complaint. And then       15:37:08
19 there was I think a search after that -- after we       15:37:12
20 received some questions or requests for information,     15:37:20
21 I did a search to find some information for those       15:37:24
22 questions.                                               15:37:30
23    Q. You said that you searched for documents         15:37:31
24 sometime thereafter because "there was a hearing for    15:37:33
25 a Department of Labor claim."                            15:37:34

Page 184

1       Do you remember who was involved in that          15:37:36
2 hearing?                                                 15:37:38
3    A. Myself, someone from the Department and           15:37:39
4 then Mr. Eppler.                                         15:37:45
5    Q. You brought a Department of Labor claim?          15:37:47
6    A. That's right.                                     15:37:49
7    Q. For what?                                         15:37:50
8    A. Unpaid wages.                                     15:37:51
9    Q. What was the result of that claim?               15:37:52
10    A. It was stayed because this -- I don't know       15:37:54
11 if "stayed" is the right word, but it was put on       15:37:57
12 pause because of this case. And then it was            15:38:01
13 dismissed because of this case.                         15:38:03
14    Q. Is that a decision that you made                15:38:05
15 deliberately, to stay or pause your labor claim so     15:38:06
16 that you could bring this case?                         15:38:10
17    A. I believe I was given the option to do one      15:38:13
18 or the other and not both. And I decided to pursue     15:38:16
19 this action.                                            15:38:19
20    Q. Given the option by whom?                       15:38:20
21    A. The Department of Labor.                         15:38:22
22    Q. So how does that come about? You submit a       15:38:24
23 claim and the Department of Labor responds to you      15:38:26
24 and says you can either follow through with this       15:38:29
25 claim or you can file a civil litigation?              15:38:31

Page 185

47 (Pages 182 - 185)

CONFIDENTIAL

1   A.  I believe Mr. Eppler objected that they       15:38:35
2 were parallel cases. And the Department said you     15:38:38
3 can pursue one path or the other.          15:38:41
4   Q.  Do you recall what you filed first, your    15:38:43
5 Department of Labor claim or this litigation?       15:38:45
6   A.  I think the Department of Labor claim.      15:38:48
7   Q.  Did you have an attorney assist you with    15:38:51
8 filing the Department of Labor claim?          15:38:53
9   A.  No.                   15:38:55
10  Q.  You filed that yourself?            15:38:55
11  A.  Yes.                  15:38:57
12  Q.  You had Mr. Glugoski assist you with      15:38:57
13 filing the complaint in this case?          15:39:04
14  A.  Yes, that's correct.              15:39:07
15  Q.  How did you come to hire Mr. Glugoski?     15:39:08
16  A.  I heard about Mr. Glugoski from Katie      15:39:11
17 Fanelli, who was filing a case with Mr. Glugoski.    15:39:16
18 And Katie Fanelli informed me that she was working  15:39:18
19 with John and I should talk to John.          15:39:26
20  Q.  And you did then talk to John?        15:39:28
21  A.  Yes, I did.                15:39:30
22  Q.  What did you guys talk about? Strike      15:39:31
23 that. Yeah, I know, I know.             15:39:33
24      As a result of you talking to John, you    15:39:35
25 decided to join Katie's class action lawsuit; is     15:39:38

Page 186

1 that right?                  15:39:42
2   A.  That's correct.               15:39:43
3   Q.  Tell me about the conversation with Katie.   15:39:44
4      When did you talk?             15:39:46
5   A.  I don't recall. Sometime probably late     15:39:48
6 2016, early 2017.                15:39:53
7   Q.  Certainly before this case was filed;     15:39:56
8 right?                    15:39:58
9   A.  Yes.                  15:39:58
10  Q.  What did you talk about?           15:40:00
11  A.  That she had a similar complaint to mine    15:40:01
12 in terms of having unpaid wages, unpaid expenses,   15:40:05
13 unpaid PTO. And I told her that I was going to     15:40:09
14 pursue this path and she should consider that. And   15:40:14
15 she told me she was pursuing another path and that I  15:40:17
16 should consider that. We evaluated the pros and    15:40:22
17 cons of either path, and I decided to join the class  15:40:24
18 action.                   15:40:28
19  Q.  What did you view as the pros and cons of   15:40:29
20 both paths?                  15:40:31
21  A.  The pro of the Department of Labor path is   15:40:32
22 that it's an administrative proceeding. It's      15:40:35
23 supposed to be faster, lightweight, counsel is not   15:40:39
24 involved. It's a more fact-finding versus zealous   15:40:44
25 advocacy-type proceeding.           . 15:40:50

Page 187

1      The cons, I didn't perceive any beyond the  15:40:53
2 fact that it was only for me and there was no one    15:41:00
3 else involved.                 15:41:03
4      On the class action side, the pros -- the   15:41:04
5 cons are all the inverse of the pros of the       15:41:07
6 Department of Labor proceeding, the pro being that   15:41:10
7 all of the other folks who may or may not have been  15:41:14
8 paid could have someone who has a little bit more    15:41:18
9 familiarity with the law be able to advocate on    15:41:22
10 their behalf and pursue their fair treatment.      15:41:26
11  Q.  Before you decided to join this class     15:41:30
12 action or before you made the decision that you were  15:41:35
13 going to pursue the litigation path, did you talk to  15:41:37
14 any other people besides Katie Fanelli?         15:41:40
15  A.  I don't recall.               15:41:45
16  Q.  You don't recall whether you talked to any  15:41:48
17 other former Rothenberg Ventures employees besides  15:41:50
18 Katie Fanelli?                 15:41:53
19  A.  I'm sure I did. I don't recall who or    15:41:53
20 what about.                  15:41:56
21  Q.  Well, you say you don't recall what about.  15:41:58
22      You would have talked to them about the   15:42:00
23 potential case; right?              15:42:03
24  A.  Possibly.                 15:42:04
25  Q.  You don't recall whether or not you talked  15:42:21

Page 188

1 to any other Rothenberg Ventures former employees    15:42:22
2 about this case before deciding that you were going   15:42:25
3 to pursue this case as opposed to your labor claim?  15:42:28
4   A.  Before I talked to Katie, I don't recall.   15:42:33
5 There was a period -- I don't know if it was before  15:42:37
6 or after I decided to join the case -- around that   15:42:41
7 time where I spoke to other people to see if other   15:42:44
8 folks had also been not paid wages.          15:42:49
9   Q.  And what did you learn from those       15:42:52
10 conversations?                 15:42:54
11  A.  That --                 15:42:55
12  MR. GLUGOSKI:  Hold on.            15:42:56
13      Object to the extent that an attorney was  15:42:57
14 involved in any of those conversations.        15:42:59
15      But you can answer if you had         15:43:03
16 conversations outside the presence of counsel.     15:43:05
17  THE WITNESS:  Okay.             15:43:08
18      I learned that there were other people who  15:43:08
19 hadn't been paid.                15:43:14
20 BY MR. NARDINELLI:               15:43:15
21  Q.  So in conversations that you had with     15:43:15
22 people not in the presence of counsel and not at the  15:43:21
23 direction of counsel, you learned that other people  15:43:23
24 were claiming that they had not been paid?       15:43:26
25  A.  That's correct.               15:43:29

Page 189

48 (Pages 186 - 189)

CONFIDENTIAL

1  Q.  And what other people was that?   15:43:29
2  A.  Dylan Flinn was one of those.  I believe   15:43:32
3  Michael Dempsey was one of those.  Brittany Lane I   15:43:35
4  believe was one of those.   15:43:42
5  Q.  Anyone else that you can recall?   15:43:49
6  A.  There were others.  Specific names I can't   15:43:51
7  recall right now.   15:43:55
8  Q.  Are you acting as an attorney on behalf of   15:44:01
9  the other class members?   15:44:04
10  A.  No.   15:44:06
11  Q.  Do you recall talking to any former   15:44:08
12  Rothenberg Ventures employees who told you that they   15:44:11
13  were not interested in joining the lawsuit for one   15:44:13
14  reason or another?   15:44:16
15  A.  No.   15:44:19
16  Q.  You don't recall or that did not happen?   15:44:22
17  A.  I don't recall.   15:44:24
18  MR. NARDINELLI:  Let's mark Exhibit 10.   15:44:32
19  (Defendants' Exhibit 10 was marked.)   15:44:34
20  BY MR. NARDINELLI:   15:44:50
21  Q.  This is a second TechCrunch article.   15:44:50
22  Again, the title is occluded by this header, but you   15:44:52
23  can see from the header at the very top of the page,   15:44:55
24  "At Rothenberg Ventures, the Rise and Fall of a   15:45:00
25  Virtual Gatsby," by TechCrunch.   15:45:04

Page 190

1  Do you recall this article?   15:45:04
2  A.  I do not.   15:45:09
3  Q.  This was posted on August 18th, 2016.   15:45:10
4  Do you see that?   15:45:13
5  A.  Where do you see that?  Oh, I see.  Yes,   15:45:13
6  "Posted August 18, 2016."   15:45:13
7  Q.  By a woman named Sarah Buhr and Connie   15:45:17
8  Loizos?   15:45:21
9  A.  That's correct.   15:45:22
10  Q.  Do you have any relationship with Sarah   15:45:22
11  Buhr?   15:45:24
12  A.  I do not.   15:45:25
13  Q.  Do you have any relationship with Connie   15:45:26
14  Loizos?   15:45:27
15  A.  I met Connie at a happy hour a few months   15:45:29
16  ago.   15:45:33
17  Q.  Have you ever spoken with Sarah Buhr in   15:45:33
18  your life?   15:45:35
19  A.  No, I have not.   15:45:36
20  Q.  Prior to a happy hour a few months ago,   15:45:36
21  did you ever speak with Connie Loizos?   15:45:40
22  A.  No.   15:45:42
23  Q.  Did you ever provide any information to   15:45:43
24  TechCrunch for any articles that they wrote about   15:45:45
25  Rothenberg Ventures?   15:45:50

Page 191

1  A.  No, I did not.   15:45:50
2  Q.  Why did you not?   15:45:53
3  A.  I should say I don't recall ever speaking   15:45:55
4  to Sarah or Connie.  I'm pretty sure I haven't.  I   15:45:56
5  never called or took a call or communication from   15:45:58
6  any of these folks with relation of articles, but I   15:46:01
7  may have met them at an event of some sort.   15:46:06
8  Q.  I believe you said you did not recognize   15:46:09
9  this article?   15:46:11
10  A.  I mean, as I read it, I can recall it, but   15:46:12
11  at first glance, I do not recognize it.   15:46:16
12  Q.  But your testimony now, now that you've   15:46:19
13  had a chance to look at the article is you do   15:46:19
14  recognize this article?   15:46:24
15  A.  Yes.   15:46:25
16  Q.  Do you recall reading this article at the   15:46:27
17  time that it was released?   15:46:28
18  A.  Vaguely, yes.   15:46:30
19  Q.  What do you recall vaguely about reading   15:46:31
20  this article at the time that it was released?   15:46:33
21  A.  It's hard for me to separate from the   15:46:35
22  other article.  These are not the only two articles;   15:46:38
23  there are other articles.   15:46:42
24  Let me read it.   15:46:43
25  (Witness reads document.)   15:46:47

Page 192

1  A.  Yeah, I recall this not being entirely   15:47:10
2  correct as well.   15:47:12
3  Q.  Do you recall what was incorrect about it?   15:47:14
4  Or sitting here today, can you explain what was   15:47:16
5  incorrect about it?   15:47:19
6  A.  I don't think the company ever had a chief   15:47:20
7  revenue officer, as listed in paragraph 1.  Maybe it   15:47:22
8  did, but not that I'm aware of.  I don't believe the   15:47:26
9  chief financial officer left in June.  I don't know   15:47:30
10  when James Taylor left.  I don't believe Fran   15:47:36
11  Hauser's title was venture partner.   15:47:42
12  That's just the first page.  I'm sure   15:47:45
13  there's more.   15:47:52
14  Q.  What was the reaction at Rothenberg   15:47:53
15  Ventures to this second article in two days from   15:47:54
16  TechCrunch?   15:47:58
17  A.  I would say the same.  I would say the   15:48:01
18  reaction to this article is the same as the reaction   15:48:18
19  to the first article, clarifying specifically that I   15:48:22
20  don't recall specific reactions to specific articles   15:48:27
21  as much as a general reaction to articles.  Which   15:48:31
22  one was first and what reaction was related to which   15:48:36
23  article I couldn't tell you.   15:48:39
24  MR. NARDINELLI:  We'll pick up on that general   15:48:41
25  reaction, but right now, let's take a break, please.   15:48:43

Page 193

49 (Pages 190 - 193)

CONFIDENTIAL

| | |
|---|---|
| 1 THE VIDEOGRAPHER: Going off the record. The 15:48:48 | 1 A. Off the top of my head, I don't. 16:23:26 |
| 2 time is 3:48 p.m. 15:48:49 | 2 Q. Do you know if you could find it? 16:23:28 |
| 3 (Recess taken.) 15:48:53 | 3 A. Possibly. 16:23:30 |
| 4 THE VIDEOGRAPHER: Back on the record. The 16:20:56 | 4 Q. How would I find it if I wanted to find 16:23:32 |
| 5 time is 4:20 p.m. 16:20:57 | 5 it? 16:23:34 |
| 6 BY MR. NARDINELLI: 16:21:01 | 6 A. You could just search e-mails, have Mike 16:23:36 |
| 7 Q. I'm handing you Exhibit 11. 16:21:01 | 7 search e-mails. 16:23:40 |
| 8 (Defendants' Exhibit 11 was marked.) 16:21:24 | 8 Q. Did Gunderson Dettmer ever write 16:23:42 |
| 9 BY MR. NARDINELLI: 16:21:25 | 9 convertible notes for investments in companies? 16:23:44 |
| 10 Q. Do you see this is an e-mail that you sent 16:21:25 | 10 A. I don't know. 16:23:48 |
| 11 to yourself on February 12th, 2016? 16:21:26 | 11 Q. Don't know one way or another? 16:23:49 |
| 12 A. Yes. 16:21:31 | 12 A. No. 16:23:51 |
| 13 Q. And there's no subject on the e-mail; 16:21:32 | 13 Q. What is a convertible note in the 16:23:52 |
| 14 correct? 16:21:34 | 14 Rothenberg Ventures investment context? 16:23:55 |
| 15 A. Yes. 16:21:34 | 15 A. I'm not sure what you mean, "the 16:23:58 |
| | 16 Rothenberg Ventures investment context." We wrote 16:24:00 |
| | 17 convertible notes. There are different types. I'm 16:24:08 |
| | 18 not sure what you mean, "in the Rothenberg Ventures 16:24:11 |
| | 19 investment context." But, generally, a convertible 16:24:14 |
| | 20 note is a loan that converts into equity based on 16:24:18 |
| | 21 some triggering event or series of triggering 16:24:23 |
| | 22 events. 16:24:26 |
| | 23 Q. You've mentioned a couple of times that 16:24:26 |
| | 24 whenever one of the funds makes an investment into a 16:24:29 |
| | 25 company, there's documentation that formalizes that 16:24:32 |
| Page 194 | Page 196 |

| | |
|---|---|
| | 1 investment and the transfer of money. 16:24:37 |
| | 2 Is a convertible note that documentation? 16:24:38 |
| 3 Q. In terms of putting together investment 16:22:19 | 3 A. It is one of the types of documentations. 16:24:42 |
| 4 paperwork, for example, a convertible note that was 16:22:23 | 4 And the convertible note can refer to a specific 16:24:47 |
| 5 going to go to a portfolio company, would you draft 16:22:27 | 5 document; it can also refer to the structure that 16:24:51 |
| 6 that note yourself or would you have outside counsel 16:22:30 | 6 the document is attempting to reflect. 16:24:53 |
| 7 draft that note and then review it? 16:22:34 | 7 Q. What's the difference between saying that 16:24:57 |
| 8 A. Typically I would draft it. 16:22:37 | 8 the note itself -- saying that the document itself 16:25:00 |
| 9 Q. Are you familiar with a firm called 16:22:38 | 9 is a convertible note versus referring to the 16:25:03 |
| 10 Gunderson Dettmer? 16:22:41 | 10 structure that the document is attempting to 16:25:07 |
| 11 A. Yes. 16:22:43 | 11 reflect? 16:25:09 |
| 12 Q. Who are they in relation to your work at 16:22:43 | 12 A. There may be more than one document 16:25:10 |
| 13 Rothenberg Ventures? 16:22:47 | 13 involved. When you say "convertible note," you may 16:25:13 |
| 14 A. They were a law firm. I believe Mike had 16:22:48 | 14 be referring to the actual legal rights that may or 16:25:15 |
| 15 worked with them before I joined and maintained some 16:22:51 | 15 may not be written on that paper in the same way, as 16:25:23 |
| 16 relationship with them outside of my knowledge or 16:22:55 | 16 an analogy, an equity investment can be signified by 16:25:27 |
| 17 scope. 16:23:00 | 17 a stock purchase agreement or shares or just a 16:25:32 |
| 18 Q. Do you recall ever working with Gunderson 16:23:04 | 18 general concept of the investment. They may have 16:25:37 |
| 19 Dettmer? 16:23:06 | 19 other things governing it outside of those 16:25:39 |
| 20 A. We had an attorney from Gunderson Dettmer 16:23:07 | 20 documents. 16:25:43 |
| 21 come in and provide office hours to portfolio 16:23:11 | 21 Q. You have drafted roughly how many 16:25:43 |
| 22 companies in one of the River programs. I think the 16:23:15 | 22 investment documents going into portfolio companies 16:25:45 |
| 23 first one, maybe also second one, maybe not, but 16:23:19 | 23 during your tenure at Rothenberg Ventures? 16:25:50 |
| 24 pretty sure the first one. 16:23:23 | 24 A. I can't say. I can guess or estimate for 16:25:55 |
| 25 Q. Do you recall that attorney's name? 16:23:24 | 25 you. At least 50, maybe -- probably less than 100. 16:25:58 |
| | Page 197 |

CONFIDENTIAL



1   Q.  So I appreciate that.  Somewhere between          16:26:08
2   50 and 100, on the order of dozens.                   16:26:10
3       Roughly, what percentage of those take the        16:26:14
4   form of a convertible note?                           16:26:17
5   A.  I would guess -- again, I'm not sure.  I          16:26:25
6   would guess more than half.                           16:26:28
7   Q.  Handing you Exhibit 12.                           16:26:32
8       (Defendants' Exhibit 12 was marked.)             16:26:35
9   BY MR. NARDINELLI:                                    16:26:59

Page 198

Page 199

Page 200

Page 201

51 (Pages 198 - 201)

CONFIDENTIAL



**Page 202**

13  Q.  And what's your reason for disputing that?  16:33:50
14  A.  That might be privileged communication.  16:33:55
15  Q.  You're refusing to divulge the reason that  16:33:59
16  you're disputing that on the grounds of privilege?  16:34:04
17  MR. GLUGOSKI:  Counsel, just so we're clear,  16:34:07
18  you keep saying he is refusing. He's not refusing.  16:34:09
19  He's already indicated he will provide the testimony  16:34:14
20  if and when there's a proper waiver in place.  16:34:18
21  That's different from refusing.  16:34:22
22  THE WITNESS:  I would like to pause and go off  16:34:23
23  the record.  16:34:25
24  BY MR. NARDINELLI:  16:34:26
25  Q.  Excuse me.  For what purpose?  16:34:26

1  A.  To consult with counsel.  16:34:28
2  Q.  Sure.  16:34:30
3  THE VIDEOGRAPHER:  Going off the record.  The  16:34:31
4  time is 4:34.  16:34:32
5  (Recess taken.)  16:34:40
6  THE VIDEOGRAPHER:  Back on the record.  The  16:43:21
7  time is 4:43 p.m.  16:43:23
8  BY MR. NARDINELLI:  16:43:27

**Page 204**

21  Q.  During the break with your counsel, you  16:45:11
22  didn't talk about the substance of your testimony,  16:45:35
23  did you?  16:45:37
24  MR. GLUGOSKI:  Objection.  16:45:38
25  Don't answer the question.  16:45:38

**Page 205**

52 (Pages 202 - 205)

CONFIDENTIAL



**Page 206**

1  BY MR. NARDINELLI:                    16:45:40
2     Q.  Did you talk about -- did you talk about    16:45:40
3  whether or not a particular answer that you would    16:45:48
4  want to be giving was privileged or not?    16:45:50
5     MR. GLUGOSKI:  Objection; attorney-client    16:45:53
6  privilege.    16:45:54
7        Don't answer the question.    16:45:54
8  BY MR. NARDINELLI:    16:45:56

**Page 208**

11       Let me also take this time to    16:48:46
12  provisionally designate the entirety of this    16:48:49
13  transcript as confidential under the protective    16:48:53
14  order.    16:48:54
15  BY MR. NARDINELLI:    16:48:56
16     Q.  Mr. Devani --    16:48:56
17     A.  Can you explain what that means?    16:48:58
18     Q.  Not at the moment, but you can talk about    16:49:00
19  it at the next break.    16:49:03
20     MR. GLUGOSKI:  I'm not sure what it means    16:49:04
21  anyway.  Are you saying he doesn't have a right to    16:49:06
22  review his own testimony because it's confidential?    16:49:09
23  BY MR. NARDINELLI:    16:49:12
24     Q.  The protective order says that you cannot    16:49:12
25  disclose confidential testimony that's been    16:49:14

**Page 209**

1  designated as confidential to essentially anybody    16:49:16
2  outside of your attorney.  And you would have to    16:49:19
3  look at the exact agreement to see it.    16:49:21
4     A.  But I can still see it.    16:49:23
5     Q.  Yes, of course you can see your own    16:49:27
6  testimony.    16:49:30

**Page 207**

53 (Pages 206 - 209)

CONFIDENTIAL

7   Q.  Did you say that you dispute that you        16:50:43
8  wrote this e-mail to yourself at Exhibit 11?       16:50:45
9   A.  I don't recall writing this e-mail.          16:50:52
10   Q.  I appreciate that.  But my question is        16:50:54
11 different.                                          16:50:56
12       My question is, do you dispute that you      16:50:56
13 wrote this e-mail to yourself at Exhibit 11?       16:50:59
14   A.  Potentially, yes.                            16:51:07
15   Q.  At the top left of the e-mail is a           16:51:11
16 picture.                                            16:51:16
17       Do you see that?                             16:51:16
18   A.  I do, yes.                                   16:51:18
19   Q.  Is that a picture of you?                    16:51:19
20   A.  It's hard to see, but I'll say, yes, for     16:51:21
21 your sake, that that's supposed to be a picture of  16:51:25
22 me.                                                 16:51:31
23   Q.  Is that a picture of you that is             16:51:31
24 associated with the e-mail address                 16:51:33
25 neil.devani@gmail.com?                             16:51:37

Page 210

1   A.  I believe so, yes.                           16:51:41
2   Q.  And you see that the e-mail is written to    16:51:42
3 "Neil"; correct?                                    16:51:46
4   A.  It says, "To Neil," yes.                      16:51:49
5   Q.  Neil refers to you?                           16:51:55
6   A.  I don't know.                                 16:51:57
7   Q.  Upon what basis do you think it's possible   16:51:58
8 that you did not write this e-mail?                 16:52:01
9   A.  I don't recall writing this e-mail.          16:52:06
10   Q.  Is your e-mail address                        16:52:11
11 neil.devani@gmail.com?                             16:52:13
12   A.  Yes, that's correct.                         16:52:16
13   Q.  Was your e-mail address as of               16:52:18
14 February 12th, 2016 neil.devani@gmail.com?          16:52:21
15   A.  Yes, it was.                                 16:52:26
16   Q.  Did you have any sort of practice or habit  16:52:27
17 of sending yourself e-mails?                        16:52:32
18   A.  I wouldn't call it a practice or habit,     16:52:33
19 but I did send myself e-mails from time to time,    16:52:36
20 yes.                                                16:52:39
21   Q.  You've testified that you do not recall    16:52:40
22 sending this specific e-mail; correct?             16:52:43
23   A.  Yes, that's correct.                         16:52:45
24   Q.  I believe you've testified to a couple of   16:52:47
25 other e-mails that we've gone over in this          16:52:50

Page 211

1  deposition that you don't recall sending that      16:52:54
2  specific e-mail, but if it was addressed to you or  16:52:56
3  addressed from you, you don't have any reason to    16:53:00
4  dispute that you sent that e-mail or received that  16:53:03
5  e-mail.                                             16:53:05
6       Do you generally remember that testimony?    16:53:05
7   A.  Generally, yes.                               16:53:08
8   Q.  Now, is your testimony the same on this      16:53:09
9  e-mail, that is, even though you say you don't      16:53:12
10 specifically recall sending this e-mail, you see    16:53:15
11 that it was sent from neil.devani@gmail.com and      16:53:18
12 therefore you believe that you did, in fact, send   16:53:23
13 it?                                                 16:53:26
14   A.  Without saying with certainty or without    16:53:28
15 certainty, I don't know that I sent this e-mail.  I  16:53:30
16 believe that, in combination with this note, I would 16:53:34
17 remember sending this e-mail.  As a result, I cannot 16:53:40
18 say I do not dispute it.                            16:53:46
19   Q.  If you didn't send this e-mail, who sent    16:53:50
20 it?                                                 16:53:53
21   A.  Your question presumes that an e-mail was   16:53:55
22 sent.                                               16:53:58
23   Q.  Sure.  We can presume that an e-mail was    16:53:59
24 sent.                                               16:54:01
25       On that presumption, if you didn't send     16:54:01

Page 212

1  this e-mail, who sent it?                           16:54:04
2   A.  I'm questioning the presumption of your      16:54:07
3  question.                                           16:54:09
4   Q.  Right.  But that's why we're presuming it.   16:54:10
5  So let's presume that this e-mail was sent.         16:54:15
6   A.  I don't know.                                 16:54:17
7   Q.  Sure.  Understand.  That's why it's a        16:54:19
8  presumption.                                        16:54:21
9       Operating on the presumption that this       16:54:21
10 e-mail was sent -- which you are disputing; correct? 16:54:23
11   A.  Go on.                                       16:54:25
12   Q.  We can make it clear.                        16:54:28
13       You are disputing that this e-mail was       16:54:29
14 actually sent?                                      16:54:31
15   A.  Correct.                                     16:54:33
16   Q.  Presuming that this was an e-mail that was  16:54:34
17 actually sent, who could have sent it, if not you?  16:54:36
18   A.  I don't know.                                16:54:40
19   Q.  Are you aware of your e-mail being hacked   16:54:40
20 at that time?                                       16:54:43
21   A.  I am not.                                    16:54:43
22   Q.  I'm not going to ask you what your e-mail   16:54:46
23 password was at this time, but was it your -- at    16:54:49
24 this time, were you using a password that was       16:54:51
25 secure?                                             16:54:54

Page 213

54 (Pages 210 - 213)

CONFIDENTIAL

**Page 214**

```
 1   A.  As far as I know, it was secure.        16:54:56
 2   Q.  Do you know of any time that your personal   16:54:57
 3  e-mail, neil.devani@gmail.com, was hacked?    16:55:01
 4   A.  I do not.                                16:55:09
 5   Q.  Can you think of any circumstance which,  16:55:11
 6  without your knowledge, an e-mail has been sent from  16:55:13
 7  the e-mail address neil.devani@gmail.com?     16:55:15
 8   A.  Can you repeat the question.             16:55:28
 9   Q.  Can you think of any time when, without   16:55:32
10  your knowledge, an e-mail has been sent from the  16:55:34
11  e-mail address neil.devani@gmail.com?         16:55:38
12   A.  I don't know.                            16:55:44
13   Q.  So the answer to "Can you think of any    16:55:48
14  time" is "no"?                                16:55:50
15   A.  Correct.                                 16:55:55
16   Q.  You are not aware --                     16:55:57
17   A.  I'm not aware of a time.                 16:55:58
18   Q.  If, then, this e-mail was actually sent -- 16:56:03
19  and I understand that you question that premise.  16:56:06
20      If this e-mail was actually sent, would   16:56:09
21  you have any reason to dispute that you had sent it?  16:56:12
22   A.  Potentially. I'm not sure.              16:56:22
23   Q.  What would be your potential reason to    16:56:27
24  dispute?                                      16:56:30
25   A.  That I don't remember sending it.        16:56:33
                                        Page 214
```

**Page 215**

```
 1   Q.  Anything else --                         16:56:35
 2   A.  And I believe that I would remember       16:56:36
 3  sending it.                                   16:56:38
 4   Q.  So the reason that you would dispute that  16:56:39
 5  you had sent this e-mail, if, in fact, it was sent,  16:56:41
 6  was because, A, you don't remember sending it; B,  16:56:44
 7  you think that you would have remembered sending it  16:56:47
 8  if you had sent it?                           16:56:51
 9   A.  That's correct.                          16:56:52
```



```
25   Q.  The agreement in Exhibit 12 says,        16:57:38
                                        Page 215
```

**Page 217**

```
                                                  59:48
 9  BY MR. NARDINELLI:                            17:00:30
10   Q.  Let me know when you're done with your   17:00:30
11  phone, Mr. Devani, and when you've had a chance to  17:00:33
12  review the documents.                         17:00:36
13   MR. GLUGOSKI:  Counsel, has this been produced?  17:00:45
14  It doesn't have a Bates stamp.                17:00:47
15   MR. NARDINELLI:  This has not. It's an e-mail  17:00:50
16  to Mr. Devani.                               17:00:51
17   MR. GLUGOSKI:  I guess the question is, what --  17:00:52
18  part of the discovery was documents related to his  17:00:53
19  employment, so I'm not sure why this wasn't    17:00:58
20  produced.                                     17:01:02
21   MR. NARDINELLI:  We can take that up later.  17:01:03
22   MR. GLUGOSKI:  We have quite a few issues to  17:01:05
23  take up. I'm not sure I'm prepared to have him  17:01:07
24  testify about a document that has not been produced  17:01:11
25  without giving him an opportunity to review it and  17:01:13
                                        Page 217
```

55 (Pages 214 - 217)

CONFIDENTIAL



1  for me to have an opportunity to discuss it.                17:01:15
2      MR. NARDINELLI:  He has an opportunity to         17:01:18
3  review it right now.  As you recall, at prior           17:01:19
4  depositions, you put in unproduced documents,       17:01:24
5  especially ones that had been seen by the witness.    17:01:26
6  This is an e-mail that was written by him and          17:01:30
7  received by him.                          17:01:33
8  BY MR. NARDINELLI:                        17:01:35
9      Q.  But, please, Mr. Devani, take the time        17:01:35
10  that you need to go over this.                  17:01:39

Page 218

Page 221

56 (Pages 218 - 221)

CONFIDENTIAL



17:07:07

Page 222

Page 224

:09:21

Page 223

Page 225

57 (Pages 222 - 225)

CONFIDENTIAL



24   Q.   So what are they describing to you?        17:11:22
25   A.   I'm not sure.                              17:11:24
Page 226

23   Q.   So tell me what you are able to discern        17:13:53
24   from Section 1(a).  I appreciate and understand that  17:13:55
25   you've told me some of things that are uncertain,     17:13:58
Page 228

Page 227

Page 229

58 (Pages 226 - 229)

CONFIDENTIAL

23 mean.                                          17:16:51
24    Q.  What do you mean?                       17:16:51
25    A.  I mean, I don't know, in general, what  17:16:53

Page 230

---

4    MR. NARDINELLI:  I'm okay for a break if you   17:18:26
5 guys are.                                         17:18:28
6    THE VIDEOGRAPHER:  Going off the record.  The  17:18:30
7 time is 5:18 p.m.                                  17:18:33
8       (Recess taken.)                             17:24:55
9    THE VIDEOGRAPHER:  Back on the record.  The    17:30:54
10 time is 5:31 p.m.                                 17:30:56
11 BY MR. NARDINELLI:                                17:30:59
12    Q.  Mr. Devani, are you aware that Cisco       17:30:59
13 Riordan, while still employed at Rothenberg       17:31:04
14 Ventures, searched and downloaded e-mails sent from  17:31:08
15 various accounts that were not his, including Mike   17:31:13
16 Rothenberg's e-mail account and including the e-mail  17:31:17
17 accounts of one or more attorneys at Rothenberg   17:31:20
18 Ventures?                                         17:31:23
19    A.  I'm aware, yes.                            17:31:24
20    Q.  When did you become aware of that?        17:31:25
21    A.  I don't recall the date.                   17:31:28
22    Q.  And what is your general awareness of      17:31:29
23 that?                                             17:31:31
24    A.  Well, he gave an interview with some       17:31:32
25 publication and spoke in great detail about his   17:31:36

Page 232

---

Page 231

---

1 actions.  And I believe Mike also gave me some heads  17:31:40
2 up and information about that.  Yeah.             17:31:47
3    Q.  So are the two sources of your knowledge   17:31:52
4 of Cisco's downloading the article that you read in  17:31:55
5 which Cisco gave an interview and also            17:31:59
6 communications with Mike?                         17:32:02
7    A.  Those are two sources, yes.                17:32:04
8    Q.  Are there any other sources besides that?   17:32:05
9    A.  Yes.                                        17:32:07
10    Q.  And what are those sources?               17:32:08
11    A.  There is a person named Margo Jennings     17:32:09
12 that Cisco told -- well, as far as I know.  She told  17:32:14
13 me that Cisco told her.  And then Cisco also told me  17:32:19
14 himself.                                          17:32:25
15    Q.  Did you have any further discussions with   17:32:26
16 Cisco when he told you about the downloads?       17:32:27
17    A.  I did not.                                 17:32:30
18    Q.  When did he tell you about the downloads?   17:32:31
19    A.  I don't recall.                            17:32:34
20    Q.  Was it before or after the TechCrunch      17:32:34
21 articles came out?                                17:32:37
22    A.  I don't recall.                            17:32:39
23    Q.  Was your first knowledge of the SEC        17:32:40
24 investigation the report of the SEC investigation in  17:32:43
25 the TechCrunch article -- in one of the TechCrunch  17:32:48

Page 233

59 (Pages 230 - 233)

CONFIDENTIAL



1 articles?                                      17:32:52
2    A.  I don't believe so. I'm not 100 percent    17:32:54
3 sure, but I don't believe so, no.               17:32:56
4    Q.  What's your best recollection of the first   17:32:58
5 time that you learned about the SEC investigation?   17:32:59
6    A.  Mike -- I believe Mike told me at a happy    17:33:05
7 hour of some sort, at a wine bar.               17:33:09
8    Q.  Do you recall whether that was before or    17:33:14
9 after you gave your notice of resignation on     17:33:16
10 August 12th?                                    17:33:19
11    A.  I believe it was before.                 17:33:21

25    Q.  Okay. And I do have follow-up questions    17:34:00
                                              Page 234

1 on this, but I'm going to wrap this up very quickly.   17:34:03
2       For the record, you testified a little bit   17:34:07
3 earlier -- or it might have been John speaking, I   17:34:09
4 don't want to misrepresent the record -- but to   17:34:12
5 having separate counsel relating to the SEC     17:34:15
6 investigation.                                  17:34:18
7       Can you just identify who that counsel is   17:34:19
8 for the record.                                 17:34:21
9    A.  I cannot, no.                            17:34:22
10    Q.  On what ground are you refusing to       17:34:24
11 identify that counsel?                          17:34:26
12    A.  I don't remember that person's name, to be   17:34:27
13 honest.                                         17:34:29
14    Q.  Do you recall the firm?                  17:34:30
15    A.  Off the top of my head, no.             17:34:32
16    Q.  How would you get in touch with this     17:34:34
17 person if you needed to?                        17:34:36
18    A.  I have their contact information on a    17:34:37
19 business card at home. And I have met with them   17:34:41
20 once. And I have their e-mail -- I have an e-mail   17:34:45
21 correspondence with them.                       17:34:48
22    Q.  Do you consider this person to currently   17:34:49
23 actively represent you with respect to the SEC   17:34:52
24 investigation?                                  17:34:55
25    A.  Yes. I would say yes. I'm not entirely   17:35:01
                                              Page 235

1 sure about the -- at what point representation     17:35:04
2 begins, but I met with this person. We've discussed   17:35:12
3 engagement. He gave me assurances that my        17:35:16
4 conversations with him and communications were   17:35:20
5 privileged. We discussed --                      17:35:22
6       MR. GLUGOSKI:  You're starting to talk about   17:35:23
7 what you discussed, so be careful there.         17:35:26
8 BY MR. NARDINELLI:                              17:35:28
9    Q.  Have you paid any money to this person for   17:35:28
10 services -- for legal services rendered?        17:35:32
11    A.  I have not yet paid.                     17:35:35
12    Q.  But it is your contention -- is it a him   17:35:37
13 or her?                                         17:35:39
14    A.  It's a him.                             17:35:40
15    Q.  It is your contention that he is your    17:35:42
16 counsel such that you are uncomfortable or unwilling   17:35:44
17 to answer questions that you believe might relate to   17:35:46
18 the SEC without consulting him?                 17:35:49
19    A.  That's correct.                         17:35:52
20    Q.  Is it your intention to consult him after   17:35:52
21 this deposition?                                17:35:54
22    A.  It is.                                  17:35:55
23    Q.  Are you aware of an April 2016 investment   17:35:57
24 by the 2015 Fund into River Studios?            17:36:04
25    A.  I am not.                              17:36:09
                                              Page 236

1    Q.  You have no knowledge one way or the other   17:36:11
2 of whether the 2015 Fund invested in River Studios   17:36:15
3 in April 2016?                                  17:36:19
4    A.  I believe that is privileged.            17:36:31
5    Q.  So just to be clear, you're not answering   17:36:34
6 that question because of the privilege that you're   17:36:36
7 asserting?                                      17:36:40
8    A.  Yeah.                                   17:36:41

25    Q.  Apologies if I asked this before.        17:37:58
                                              Page 237

60 (Pages 234 - 237)

CONFIDENTIAL

▌▌▌▌▌▌▌▌▌▌▌▌▌▌ ▌▌▌

▌▌▌▌▌▌▌▌▌▌

4   Q.  You're not answering because you're          17:38:10

5  claiming privilege?                              17:38:12

6   A.  Yeah.                                       17:38:12

7   MR. NARDINELLI:  Okay.  Thank you.              17:38:13

8       As we've discussed, we will keep this      17:38:14

9  deposition open and we will resume, but that is all   17:38:17

10  of the questions that we will be covering today.  17:38:20

11      Let me say on the record thank you so much  17:38:23

12  for hanging in as long as you did.               17:38:26

13      And same to you as well.                    17:38:27

14   THE REPORTER:  I just want to make sure, is    17:38:29

15  this transcript marked confidential?  Do I need an  17:38:29

16  agreement?                                       17:38:29

17   MR. GLUGOSKI:  I think he can mark it.  I can   17:38:41

18  contest it.                                       17:38:43

19   MR. NARDINELLI:  Under the protective order, I  17:38:44

20  think paragraph 4(c) -- but under the protective  17:38:45

21  order, I'm invoking my right to designate the    17:38:48

22  entirety of this transcript as confidential.      17:38:52

23   THE REPORTER:  Thank you.                       17:38:55

24   THE VIDEOGRAPHER:  This concludes today's       17:38:55

25  videotaped deposition of Neil Devani.  We're off the  17:38:56

Page 238

---

1  record at 5:39 p.m.                               17:38:59

2       (Whereupon, the proceedings were adjourned  17:39:24

3       at 5:39 p.m.)                               17:39:24

4           ---oOo---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 239

---

1       I declare under penalty of perjury

2  under the laws that the foregoing is

3  true and correct.

4

5       Executed on _____, 20___,

6  at _____, _____.

7

8

9

10

11       _____

12       WITNESS SIGNATURE

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 240

---

1       CERTIFICATE OF DEPOSITION OFFICER

2   I, ANRAE WIMBERLEY, CSR NO. 7778, duly

3  authorized to administer oaths pursuant to Section

4  8211 of the California Code of Civil Procedure,

5  hereby certify that the witness in the foregoing

6  deposition was by me sworn to testify to the truth,

7  the whole truth and nothing but the truth in the

8  within-entitled cause; that said deposition was

9  taken at the time and place therein stated; that the

10  testimony of said witness was reported by me and was

11  thereafter transcribed by me or under my direction

12  by means of computer-aided transcription; that the

13  foregoing is a full, complete and true record of

14  said testimony; and that the witness was given an

15  opportunity to read and correct said deposition and

16  to subscribe same.

17   I further certify that I am not of counsel or

18  attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said caption.

22   IN WITNESS WHEREOF, I have hereunto subscribed

   by my hand this 15th day of August, 2018.

23

24

25       _Anrae Wimberley_
         ANRAE WIMBERLEY

Page 241

61 (Pages 238 - 241)

CONFIDENTIAL

**[& - 2016]**

| **&** |
| --- |
| **&** 2:19 3:11 13:15 13:17,22 |

| **0** |
| --- |
| **00004757** 5:8 |
| **00038674** 5:24 |

| **1** |
| --- |

**1** 1:18,25 2:21 4:9
4:13,19 7:1 9:13
11:12 18:6,7
22:11 46:14 64:13
88:6,11 101:18
116:3 193:7
194:25 199:8,12
199:17,19,23,24
201:17 202:7,10
205:6,7,11 207:19
216:22 224:3,3,16
226:11,14 228:1
228:11,24 229:8
237:22
**10** 5:17 57:23 58:1
64:4,8,24 136:24
190:18,19 201:13
201:13,19 202:24
203:2 205:3,8,13
205:14 228:2
**100** 63:18 111:8
197:25 198:2
234:2
**10:39** 72:19
**10th** 228:7
**11** 5:20 194:7,8
199:2,5,9,10,18
200:6,24 201:1,25
204:10,11,22
205:2,11 206:10
210:8,13
**118** 4:21

**11:04** 72:22
**11:10** 77:14
**11:36** 77:17
**11:49** 87:19
**11:51** 87:23
**12** 5:23 118:9,23
198:7,8 199:3,19
200:3,9 201:2,18
201:23 202:1,9,18
203:2,5 204:10,14
204:25 205:7,16
206:12,17,20,21
209:17,24 215:25
237:22
**122** 5:3
**129** 5:7
**12:21** 113:23
**12:48** 114:1
**12th** 118:16
119:12,16 122:22
123:13,16 194:11
203:9 206:11,14
206:18 207:17
211:14 234:10,14
**13** 6:3 58:20,21
60:10,11,12,14,22
60:24,25 118:18
217:7,8 221:15,22
**139** 4:3
**140** 6:9
**1400** 3:5
**14th** 218:13 220:4
221:15,22 222:13
223:5 225:11
**15** 4:14 57:23 58:1
64:4,9,24 92:3,6
**155** 5:11
**15th** 44:2 91:23
166:17,18 167:21
167:22,24 168:9
168:18 169:2,10

170:10 171:5
220:17,23,25
221:14 223:7
241:22
**16** 6:13 82:14
**16-554609** 1:7 2:7
7:18
**16617** 241:24
**16th** 151:18,23
152:17,23 153:2
153:12 154:1,4
**172** 5:14
**17th** 137:3,4,9
138:1 177:17
**18** 4:9 191:6
**18th** 156:9 172:23
191:3
**19** 177:9
**190** 5:17
**194** 5:20
**198** 5:23
**19th** 166:22 180:2
180:6 181:23
183:17,21
**1:13** 135:14,15
**1m** 194:18
**1st** 7:8 43:8 74:1
78:22 79:1,11
80:15,21,24 81:5
81:21 82:4,10,12
82:23 83:2 115:9
115:14,16 119:10
130:25 180:1

| **2** |
| --- |

**2** 4:11,17 5:12
6:11 9:16 21:11
21:12 22:8,14,21
36:4 37:1,23
174:19 200:3,9
201:2 202:17
204:14,15 231:23

**2/1/2015** 22:12
**2/12/16** 5:20
**20** 4:22 45:6
177:10 240:5
**2013** 13:4 15:1
31:13,18,22 32:10
45:8,14 46:1,4,12
46:13,20 49:14
56:8 78:23,25
79:2
**2014** 15:2 20:22,24
22:1,4,17 31:24
32:14 34:17 42:3
42:25 44:11,20
45:15 48:8 49:11
49:12,12,13 50:8,8
50:9 51:9 56:3,8
56:10,15 57:3
62:8 78:25 79:11
**2015** 21:18,20 32:1
33:5 34:20 49:20
50:2 56:15 57:6
57:21 61:14,20,23
62:2,8 63:14,17
65:18 71:19,20
72:3 78:5,16
80:15,19 81:5
82:5 89:4 102:11
105:21 116:4
127:8,13 210:4
216:1,3,11,22
224:5,9 236:24
237:2,13,23
**2016** 4:16,21 5:7
5:11 32:3,6 43:1,2
43:8 44:3 78:13
78:14,22 79:2,11
80:14,15,21,24
81:5,10,10,17,21
81:23 82:1,4,10,11
82:13,19,25 83:2,3

CONFIDENTIAL

**[2016 - accelerator]**

83:5,7 84:8,16
85:25 86:5,18
88:7,12 91:23
92:3,6 96:10
97:18,22 98:5,7
101:19,24 102:11
105:21 115:10,14
115:16 118:9
122:3,13 123:24
127:8,12 129:9
130:4 132:20
146:4,9,23 147:18
148:14 151:18,23
152:17,23 153:2
153:12 154:1,4
155:2 156:10
163:9 166:11
174:13 184:2,4,6
187:6 191:3,6
194:11 195:1
203:9 206:11,14
206:18,21 211:14
218:13 220:4,17
220:23,25 221:16
236:23 237:3,11
237:11
**2017** 6:3 187:6
**2018** 1:18 2:22 7:1
 7:8 74:1 241:22
**205** 6:10
**206** 6:11,12
**209** 6:13
**20th** 138:8
**21** 4:11 6:10
**217** 6:3
**21st** 122:3,13
 123:24 138:8
**22** 6:9
**22nd** 3:13 21:20
 163:9

**23rd** 129:9 130:4
 130:18 138:9
 139:16 163:9
**241** 1:25
**274-9977** 3:21
**27th** 174:17
**2978182** 1:24
**29th** 224:5,9
**2:37** 136:1,4
**2nd** 195:1

### 3

**3** 4:16 9:19 18:15
 64:14 91:13,14
 201:12 204:16
 205:20 220:16,16
 220:20
**30** 10:16
**31** 231:24
**32** 11:13
**3:48** 194:2
**3rd** 137:12,15,17
 138:3,11,12,24

### 4

**4** 4:19 5:5 98:12
 98:13 117:23
 224:6 226:15,19
 227:11,13,15,18
 227:20,23,23,25
 229:12,16 230:6
 238:20
**4.25** 226:13,19
 227:13,17 230:13
**4.9** 231:25 232:2
**415** 3:7,15,21
**415-774-6468**
 74:11
**44** 64:16 65:2,5
**456** 3:5
**4:20** 194:5

**4:34** 204:4
**4:43** 204:7

### 5

**5** 4:9,21 6:4 46:23
 47:2,3 117:24
 118:1,2,5 200:4,7
 200:14,18,25
 201:3 202:14,19
 202:20 205:12
**50** 2:19 3:13
 197:25 198:2
**5:18** 232:7
**5:31** 232:10
**5:39** 2:21 239:1,3

### 6

**6** 5:3,15 122:9,10
**682** 5:24
**6th** 136:23 137:1,1
 137:11 138:11,12

### 7

**7** 5:7,18 37:23,25
 129:5,6 139:13
**7/13/18** 5:17
**7/21/16** 5:3
**7/22/15** 4:11
**7/31/18** 5:14
**758** 5:9
**7778** 1:23 2:23
 241:2
**7:56** 92:7 221:1

### 8

**8** 4:3 5:11 155:23
 155:24 172:22
**8.25** 224:17 225:4
 226:18 227:13,17
 229:18 230:11,21
**8211** 241:4
**875-6600** 3:15

### 9

**9** 5:14 6:12 172:2
 172:4 177:18
**91** 4:16
**94104** 3:6
**94111** 2:20 3:14
**98** 4:19
**983-0900** 3:7
**9:07** 91:24
**9:18** 2:20 7:3,7

### a

**a.m.** 2:20 7:3,7
 72:19,22 77:14,17
 87:19,23
**abandoned** 57:11
**ability** 28:1
**able** 9:11 29:1,2
 65:5 111:9 131:11
 131:16 132:15,22
 136:6 161:25
 163:18,25 164:14
 188:9 228:23
 229:7
**absent** 26:22
**abstracted** 149:23
**accelerator** 50:12
 50:25 54:25 55:18
 57:7,9,11,18 60:16
 61:1,9,23 62:13
 64:15 67:6 86:7
 86:12 99:11,13
 111:16 144:7,15
 146:18 149:4,12
 149:14,20 150:6,8
 150:10,14 151:1,4
 151:10,12,15,18
 152:18,23 153:2
 153:11,21 154:1,6
 154:7,10,19,23

Page 2

CONFIDENTIAL

**[accepting - annual]**

accepting  46:18
  49:15
account  226:12,16
  226:18 227:5,6,13
  227:15,22 229:1
  230:12 232:16
accounting  88:23
  90:18 94:4 176:19
accounts  170:3,4
  232:15,17
accrue  200:12
  201:2 202:19
accrued  204:16
accrues  200:19
  201:1 202:15
  205:13
accurate  14:6
  18:19 44:3
accurately  9:11
  206:16
accusing  75:13,15
achieving  96:20
acquire  145:24
acronym  51:4
  54:14
act  42:1,1 105:8
acted  176:2
acting  84:15
  102:21 190:8
action  11:11 26:15
  101:23 185:19
  186:25 187:18
  188:4,12
actions  95:20,23
  231:8,17 233:1
active  13:9 32:22
actively  56:11
  235:23
activities  96:19
  99:8 155:17 175:9

activity  67:8
  108:22
acts  32:25
actual  32:21 120:9
  166:6 197:14
addendum  37:5
addition  62:12
additional  38:20
  39:3 59:20 164:7
additionally  46:7
address  29:19
  77:5 166:7,10
  207:7,11 210:24
  211:10,13 214:7
  214:11 219:19
  220:5
addressed  122:14
  122:15,19 212:2,3
addresses  165:14
  166:9
adjourned  239:2
adjustments  33:3
administer  241:3
administered
  154:21
administrative
  187:22
admit  219:8
advice  96:20 101:7
advised  176:6
advocacy  187:25
advocate  131:4
  188:9
affect  234:12
affiliated  45:3
affirming  153:17
  153:18
afternoon  136:1
ago  14:15,21 16:24
  42:21 130:10,21
  130:24 131:7,15

131:19 132:4
  139:17,21,23
  140:4,10,18,20,23
  141:16,20,23
  142:4,7,13,24
  143:1,4,4,9,25
  158:8 162:15
  170:21,22 191:16
  191:20
agree  7:25 28:2
  38:9 60:8,18 61:4
  61:6,6 134:5
  141:13 170:23
  175:3,5,11,18
  180:13 202:3,6,9
  202:13,17,23
  203:1 219:23
  224:23
agreed  19:5 39:12
  39:23 114:13
  134:3
agreeing  40:3
agreement  22:2,3
  22:17,20,20,21
  25:18 26:12 28:4
  29:18 33:13,15,16
  33:19,19,22,23,24
  36:10,22,22 37:13
  38:5,20 40:2 53:8
  54:1,5,6,7 71:10
  71:12 76:12
  100:14,19,20,21
  116:20 127:20
  137:21 139:6,7,10
  197:17 202:5,18
  203:1,5,8 204:25
  205:6 206:17,20
  207:25 209:3
  215:25 217:1
  238:16

agreements  34:2,6
  34:9,11,11 38:21
  53:9 83:15 84:23
  87:12 88:3 100:2
  100:3 101:3
ahead  64:5 76:8
  198:25
aided  241:12
al  1:9 2:9 7:15
alarmed  229:24
alias  165:23 166:4
  166:6
aliases  165:19
  166:3
align  174:23
aligned  175:15
alignment  175:9
  175:13
allegations  124:5
allow  29:21
  219:16
allowed  40:9
  53:10 87:15
ambiguity  162:12
amended  36:22
amorphous  43:3
  149:23
amount  134:5
  171:16 200:13
  201:19 226:15,17
  227:12,15,21
  230:20
analogy  197:16
anarghya  16:7
ancillary  34:11
anniversary
  204:19
annual  200:7,18
  200:25 202:14
  205:13

CONFIDENTIAL

**[annum - attempt]**

**annum** 200:4,14
  201:3 202:19,20
**anrae** 1:22 2:22
  7:23 9:22 241:2
  241:25
**answer** 6:7 9:15
  25:6 26:2,5,22
  27:3,17,18 28:6
  29:21 44:9 48:9
  66:15 73:12,13
  74:23 78:8 79:25
  83:14 85:11 88:10
  89:22 96:2,4,5,9
  98:9 102:4 109:4
  111:9 121:12
  123:9 130:15
  131:25 132:21,23
  133:11 136:12
  141:1,3 144:3
  145:2,7,14 153:7
  157:8 160:7,8,9,22
  161:12 189:15
  200:22 205:25
  206:3,7 207:9
  209:19 214:13
  236:17 237:9
**answered** 16:19
  85:10 141:5,11,12
  159:1
**answering** 28:10
  29:5 207:24 226:8
  237:5 238:4
**answers** 79:21
  160:20 161:2,7,9
  166:21
**anybody** 179:12
  209:1 231:12,17
**anymore** 116:18
**anyway** 133:25
  138:3,14 139:8
  208:21 219:13

**apart** 46:11
  146:17 223:15
**apologies** 237:25
**apologize** 101:17
**apparent** 174:20
**appear** 42:9 45:4
**appearances** 3:1
**appears** 91:18
  207:16
**applicable** 54:10
**application** 109:24
**applications**
  109:18 110:8
**applied** 109:17
  110:2
**apply** 111:4 181:7
  181:19
**applying** 16:20
  161:18
**appreciate** 48:14
  132:14 138:22
  198:1 210:10
  228:24
**appropriate**
  120:17 208:4
  217:4
**approval** 53:13,23
**approved** 217:4
**approximate**
  78:18
**approximation**
  165:10
**april** 61:19,20
  151:18,23 152:17
  152:23 153:2,12
  154:1,4 155:2
  236:23 237:3,11
**arcturus** 177:2
**area** 13:17 38:19
  38:22 132:18

**argumentative**
  119:17 140:25
**arguments** 93:19
**arose** 228:22
**arrival** 148:25
**arrive** 65:5
**arrived** 42:3
  114:11
**article** 5:14,17
  156:20 172:6,11
  172:25 173:2,4,24
  174:19 175:2
  176:5 177:17,24
  178:1 190:21
  191:1 192:9,13,14
  192:16,20,22
  193:15,18,19,23
  233:4,25
**articles** 159:25
  172:18 191:24
  192:6,22,23
  193:20,21 233:21
  234:1
**asked** 23:23 27:24
  39:16 42:22 59:11
  66:7 72:24 73:9
  76:21 84:25 86:1
  87:9 88:1 95:12
  101:16 114:8
  121:2,9 133:8
  134:10 144:2
  152:13 158:25
  160:5 167:18
  181:21 182:8
  183:1,2,25 206:15
  207:13 219:12
  237:25
**asking** 24:21 25:4
  27:22 73:3 74:19
  78:4 82:12 92:20
  95:10,17,24,25

96:6,7 97:5,9,18
  101:17 102:17
  132:19 133:3
  137:5 141:9
  147:21 149:9,10
  183:16,20 207:15
  209:11 221:5
  237:10,12
**aspects** 86:9
  228:20
**asserted** 36:23
  136:13
**asserting** 24:12
  73:15 87:7 95:20
  102:3 182:24
  183:9 226:9 237:7
**assist** 183:6 186:7
  186:12
**assisting** 101:10
  182:10
**associate** 65:22
  66:7,11
**associated** 132:5
  210:24
**assume** 20:25 21:3
  93:1 125:19
  228:15,16
**assumes** 82:16
**assuming** 76:14
  137:12 145:19
  200:21
**assurances** 236:3
**at&t** 175:1,21
**attached** 122:3
**attachment**
  223:22 231:24
**attachments** 4:13
  5:4 6:4 218:15,24
  225:11 231:10,14
**attempt** 75:4

CONFIDENTIAL

**[attempting - believe]**

**attempting** 197:6
197:10 207:2
**attend** 51:21
**attending** 117:5
**attention** 221:11
**attorney** 24:16
25:10 26:21 28:15
29:6 73:18 103:12
186:7 189:13
190:8 195:20
206:5 209:2
241:18
**attorney's** 25:11
195:25
**attorneys** 8:20
165:20 232:17
**attracting** 82:4,6,7
**atypical** 158:20
230:17,18,19
231:1
**audio** 7:24
**audit** 95:6,11,12
95:14,18,25 96:7
221:2,5,9,13 222:7
222:17 225:15,18
**auditing** 223:8
**august** 1:18 2:21
4:21 5:7,11 7:1,8
14:25 74:1 81:10
81:17,23 82:1,11
82:14 83:3,5,7
84:8,16 98:5,6
118:9,16,18,23
119:12,16 122:22
123:13,16 129:9
130:4,18 132:20
139:16 156:9
163:9,9 166:11,17
166:22 167:21,22
167:24 168:9,18
169:2,10 170:10

171:5 172:23
177:17 180:2,6
181:23 183:17,21
183:25 191:3,6
234:10,14 241:22
**authoritative**
41:16
**authority** 28:2
**authorization**
74:16 79:22 80:1
**authorized** 241:3
**availability** 40:4
136:19 137:11
**available** 74:11
111:13 137:4,11
137:12,15 138:20
138:24 164:12
**aware** 15:25 55:18
71:19 72:3,12
78:6 81:15,20
99:1 122:25
123:12,15,17
126:5,8,11 127:16
127:20 142:19,21
142:21 143:17,19
143:20,21 145:4,5
145:24 147:10
148:7,10,23
151:14 161:24
174:9,11 177:6,9
193:8 213:19
214:16,17 232:12
232:19,20 236:23
237:10,13,16
238:1
**awareness** 72:8
215:14,17,20
232:22

**b**

**b** 4:6 5:1 6:1
199:19 204:15
215:6
**back** 12:19 18:3
29:24 30:3 31:12
36:3 44:11,19
54:20 58:11 67:12
72:1,21 75:8
76:21,24 77:16
78:1 85:18 87:22
94:23 104:10
113:25 123:3
132:22 134:8
136:3,11 137:2
139:13,15 158:4
194:4 200:6 204:6
232:9
**background** 12:16
**backside** 130:3
**bad** 163:9
**balance** 226:12
228:3 229:10
230:12
**ballpark** 42:23
**bank** 127:4,7,11
170:3,4 224:18,24
225:4
**bar** 13:5,10 14:25
234:7
**barely** 82:2
**based** 27:8 45:23
54:1 67:14,19,20
98:23 144:22
160:18 196:20
**baseline** 30:8
**basic** 45:21 160:20
**basically** 82:8
**basis** 26:4 36:24
73:15 87:7 119:3
200:14 201:4

202:19,20 211:7
**bat** 133:5
**bates** 4:13,22 5:8
5:21,24 198:13,14
217:14
**bay** 13:16
**bear** 36:16 37:16
**bearing** 227:6
229:3
**bears** 229:1
**began** 184:2
**beginning** 2:20
57:21 58:11 62:4
65:23 78:13,14,16
80:14 85:25 86:4
86:18 127:8
**begins** 7:9 57:6
236:2
**begun** 49:21 81:6
105:8
**behalf** 1:4 2:4 7:11
7:13 8:7 24:9,12
24:23 25:9 84:20
115:7 131:5,16
152:13 188:10
190:8
**belief** 41:6,7,12
50:21 51:12 79:22
93:20 128:24
173:14,14 174:3,8
174:9
**believe** 14:23
16:22 18:2 22:2,5
22:15,20 24:6,8
27:8 28:18,19
31:17 32:4,6 33:3
35:17,20 36:23
37:18 38:11,12
39:19,24 40:6,11
40:13,21,22 41:2
45:25 46:3,6

Page 5

CONFIDENTIAL

**[believe - business]**

49:13,15,19 50:20
51:9 52:3 55:1
56:14,18 57:2,4,14
58:20 59:24 61:18
62:10,22 67:14,20
67:25 68:2,21
69:14,25 78:4,17
78:24 79:4,7,17
80:16,19,25 81:5
82:2,3,14 84:21
87:6 89:25 90:12
91:13 92:1,4,18
93:10,17 95:16,19
96:3 97:20,21
98:19 100:19
101:20 103:5,8,13
103:14 105:10,13
106:2,25 109:3
110:4 111:8,23,23
111:24 113:4
116:17 117:20
118:14 120:24
122:5 124:8,10
125:24 129:3,25
131:11 141:18
146:20,23 147:15
147:18,19,24
148:17,20 149:5,5
150:25 151:6,25
155:10 156:5
162:24 163:1
165:22 166:17,23
169:14 172:15
173:11,21,23
175:12 176:22
177:1 178:5 180:9
182:22 184:7,17
185:17 186:1
190:2,4 192:8
193:8,10 195:14
200:20 207:20

208:6 209:25
211:1,24 212:12
212:16 215:2,12
222:22,24 223:9
223:11 225:22,24
226:7 228:13
233:1 234:2,3,6,11
236:17 237:4,15
238:3
**believed** 97:10
**bell** 14:16
**bend** 69:17,20,21
71:6 148:6,8,21
149:3 151:8
152:19 153:23
154:3,5,15 155:2
194:18,25 199:12
199:18,20 202:7
202:10 205:12
207:20 210:5
215:18,22 216:6
216:16,17,23
231:23 232:2
**benefits** 38:2
**best** 38:24 44:21
44:23 51:16 53:16
79:21 81:4 83:24
96:20 132:22
151:3 155:1 157:2
159:9,11 160:22
178:15 234:4
**better** 60:4 123:4
228:21
**beyond** 40:8 49:24
69:1 125:20
145:25 178:13
188:1
**big** 48:24
**bigger** 68:1,3
**bill** 118:8

**binding** 41:14,17
**birchbox** 100:9
101:14
**bit** 32:6 60:3 66:6
126:14 138:1
178:19 188:8
220:15 235:2
**black** 100:8 101:1
**blended** 150:15
**blip** 178:4
**block** 207:23
**blurb** 65:4
**board** 51:2 59:22
112:22 113:3,5,8,9
113:11,12,12
114:6,9,9,11,15,20
114:23 115:6,17
115:23,25 116:1,3
116:10,15,18
117:5,8,8,13,14,18
117:19
**body** 111:1
**books** 224:6
227:24 229:13
230:6
**borrow** 230:11
**borrowed** 224:17
225:4 226:16,17
227:12,14,21
**borrowing** 229:17
**bottom** 11:12
174:19
**bound** 28:25 39:19
39:25 40:1,7,13
73:17 163:4
**bowtie** 129:16,17
129:19,24
**brand** 67:16,18,22
67:24,25 68:2,7,16
150:12

**brandon** 127:24
156:12 157:13,17
**breached** 75:6
**breaching** 25:17
**break** 10:2,3,5
28:16,20 46:10
72:17 77:19 85:17
87:17 113:21
132:9 135:8,10,12
193:25 205:21
206:9 208:19
232:4
**breaking** 28:11,11
29:5
**briefly** 81:8
136:21
**bring** 58:9 77:8
134:8 176:10
185:16
**bringing** 76:21
**brings** 206:23
**brittany** 190:3
**broad** 53:15
**brooks** 5:3
**broome** 118:8
**brought** 62:10
109:16 110:15,18
185:5 219:6
**buhr** 191:7,11,17
**build** 49:10 67:16
67:21
**building** 48:24
67:24 69:5 176:1
**built** 52:5 64:14
125:18,19,20
**bullet** 23:20
**bunch** 137:18
**business** 15:14
17:12 40:12 68:20
68:22,24 69:3
71:21 72:9 82:9

CONFIDENTIAL

**[business - clarifying]**

94:4 96:21,22
99:7,9 100:21
129:21 141:7
149:15 155:5,17
155:19 171:7
175:24,25 176:19
216:20,23 235:19
**businesses** 176:3
**buy** 68:8

**c**

**c** 22:11 156:2
205:7 238:20
**calendar** 204:19
**california** 1:1 2:1
2:19,20 3:6,13,14
7:2,17,20 13:10
54:11,12 241:4
**call** 31:16 35:21
48:2 54:24 60:15
61:1 77:12 95:1,2
123:16 157:24
158:1,12,19
160:21 161:20
165:1,4 192:5
211:18 221:11
222:1,3 225:15,18
**called** 13:15,17
14:9 52:3 67:17
67:24 69:14,17
107:22 108:6
109:8 129:13
134:16 148:1,3,4,7
151:14,17 154:6
155:2 158:21
161:6 177:2,4
192:5 195:9
**calling** 161:24
**calls** 23:13 36:21
44:6 80:7 145:16
**canafax** 117:16,17

**canvass** 168:7
**cap** 201:13,18
202:24 203:2
205:13
**capacities** 84:17
84:18
**capacity** 111:20
167:10,13,19
**capital** 17:11
30:24 31:4 46:3,7
47:19 48:1 80:18
80:20 82:4,7,7
**caption** 241:19,21
**car** 174:25 175:21
**card** 235:19
**care** 19:16
**cared** 19:12,13,17
**career** 14:3,5
49:10 163:9,13
**careful** 48:15
236:7
**carrying** 171:7,8
**cartoons** 67:1
**case** 1:7 2:7 7:16
7:18 8:21 29:7
32:23 33:13,14
34:22 35:2,19
36:13 47:18 106:7
117:6 132:3
134:14 171:1
183:23 184:1,17
185:12,13,16
186:13,17 187:7
188:23 189:2,3,6
**cases** 28:20 33:16
34:4,15 35:8
53:12 54:2 79:20
186:2
**cash** 224:6 227:23
229:12,16 230:6

**cause** 241:8,20
**caused** 12:25
**causes** 173:23
**caution** 123:5
**cautious** 102:2
**caveat** 218:25
**cc'd** 157:13
**cc'ing** 118:8
**ceased** 167:13
**cellular** 8:2
**central** 134:14
**ceo** 150:1,3
**certain** 19:12 23:8
23:9 28:21 29:2
53:12,12,22,24
83:10,11,16 84:9
84:11 85:12
120:21,22 121:6,6
121:7,15,16
126:24 167:16
170:6,16 230:3
**certainly** 133:8
187:7 209:9
**certainty** 41:18
145:21,22,25
212:14,15
**certificate** 241:1
**certified** 2:22 8:10
8:13
**certify** 241:5,17
**cetera** 11:13 20:20
176:10
**cfo** 176:22
**cgc** 1:7 2:7 7:18
**chain** 4:16,21 5:7
5:11 6:3 220:20
231:18
**chalkboard** 98:20
99:4
**challenge** 77:8

**chance** 92:11,20
192:13 217:11
**change** 12:25 38:3
75:21 82:9
**changed** 31:14
38:5,21 117:8
**changing** 37:13
76:20
**chart** 43:18,19
**chatbot** 129:21
**check** 31:9 32:8
43:12,16 78:3
136:21 169:23
172:18
**chennavasin** 62:7
**chief** 103:14 193:6
193:9
**choose** 134:21
**circulating** 126:5
126:8,11
**circumstance**
214:5
**circumstances**
102:12,14,15
114:7
**cisco** 124:2,4,10
232:12 233:5,12
233:13,13,16
**cisco's** 233:4
**civil** 185:25 241:4
**claim** 36:17,18
184:11,25 185:5,9
185:15,23,25
186:5,6,8 189:3
234:24
**claiming** 83:18
102:19 189:24
234:22 238:5
**clarifying** 144:20
193:19

CONFIDENTIAL

**[class - company]**

**class** 57:16,17,22
58:1,6,7 59:23,25
61:9 64:1,6,7
86:14 186:25
187:17 188:4,11
190:9
**classes** 57:14
64:17,20
**clean** 27:11
**clear** 19:8 25:25
26:18 29:17 53:11
76:20 77:3 95:24
123:13 133:16,17
143:10 144:24
149:17,19 162:11
203:17 213:12
224:21 237:5
**clearer** 43:4
**clearly** 113:17
119:10 145:23
**client** 73:18 76:17
76:21 138:19
206:5 207:11
219:11,13
**client's** 29:19
**clients** 29:10,14
176:10
**clinkle** 14:9,10,11
14:15,22 15:6,19
15:21 16:25 17:3
17:20
**close** 55:15 128:1
160:20 205:18
**closed** 45:21 46:20
56:9,11 58:4,5,17
79:2,13
**closely** 40:4
108:14 114:13
175:16,22 205:18
**closes** 46:17 47:1

**code** 241:4
**cohen** 13:15
**cohort** 57:16,18
58:18 112:19
**coincidence** 67:11
223:4
**coldplay** 100:9
101:14
**colead** 106:12
**collateral** 226:12
226:16,18 227:5,6
227:12,15,21
229:1 230:12,20
231:3
**collected** 161:22
**collecting** 79:12
**college** 12:20
**colloquially** 45:9
**combination**
212:16 234:18
**come** 15:18 27:6
50:17 72:1 75:8
76:24 92:11,20
98:1,6 116:19
123:3 125:23
132:22 136:11
169:1 181:6,23
185:22 186:15
195:21
**comfortable** 10:1
**coming** 10:5 46:1
81:23 85:18
181:11
**comment** 27:25
38:22
**commission** 122:4
**commitments** 53:1
**common** 31:22
35:7
**communicate**
93:23 94:5,11,15

**communicated**
90:2 145:23
**communicating**
158:1 182:9
224:13 231:12
**communication**
180:18,22 181:2
181:15 192:5
203:14
**communications**
95:22 167:3
171:25 223:10
233:6 236:4
**companies** 17:17
20:13,14 23:9
30:13,25 31:5
45:18 46:3,8 47:4
50:25 55:8 56:17
57:24 58:2,4,6,9
58:20 59:1,3,13,13
59:16,18,23 60:13
60:14,23,25 61:1
62:12 64:3,17,24
65:9,10 80:23
81:1,2,6 86:24
97:3 99:6,10,12,16
104:18 109:25
110:5 112:20
115:2 150:22
154:18 163:22
164:16,22,23
165:7 167:5,17
195:22 196:9
197:22 220:13
221:24 222:7,15
223:24 225:15,18
**company** 1:9 2:9
7:15 14:11 15:15
16:11 20:17 24:10
25:9,11,13,16
27:23 28:17,22,23

28:23,24 30:12
33:17,25 34:13,16
34:24 35:4,12,14
35:16 36:7 41:4,9
41:13 43:10,24
44:5,15 45:3 46:5
47:8,20,20,24,25
48:2 50:13 51:22
51:25 52:2,4
54:23 55:14,15
56:7 57:10 58:13
59:17 69:23 70:3
70:13,14 72:5
73:24 74:17 78:12
84:20 86:2 90:2
93:7 96:24 97:19
97:23 98:2 104:20
107:22 108:6
109:7,20,21,22
110:17 112:4,12
112:22 114:13
117:5 120:3,7,16
120:18,20 121:18
126:5 129:12
146:19 150:17,22
154:12,14,22
164:3,9 168:2,7
171:13 176:6,10
176:14,17 177:2,4
177:11,20,21
180:25 181:4,5,7
181:14,25 183:3
193:6 195:5
196:25 199:19
216:6,13,15 224:3
224:7,17 225:3
227:24 228:3,19
228:20 229:10,13
229:17 230:7,11
231:2,25 237:18

Page 8

CONFIDENTIAL

**[company's - conversations]**

| | | | |
|---|---|---|---|
| **company's** 20:16 24:18 38:2 228:17 230:1 | 168:17 **concerns** 25:17 29:19,19 | **considered** 40:1 40:24,25 47:22 90:1 | **contract** 20:6,6 21:22,25 26:12 28:3 36:3,5,16 |
| **compared** 215:15 | **concludes** 238:24 | **considering** 39:16 | 37:1,5 38:14 |
| **comparison** 204:10 | **conclusion** 229:15 | 171:13 | 100:22,24 |
| **compel** 138:23 | **condition** 78:23 223:16 | **constraint** 237:10 | **contractor** 22:6,14 22:17 39:14 44:24 |
| **compensated** 114:22 | **confer** 88:1 207:10 | **constructed** 30:21 116:21 | **contractors** 28:22 42:12,19 51:23 |
| **compensation** 38:2 114:25 | **confidence** 148:13 **confident** 209:12 | **consult** 204:1 236:20 | **contracts** 36:25 37:15,19 |
| **complains** 174:21 | **confidential** 1:14 2:15 29:14,15 | **consultant** 15:2,5 **consultation** 170:7 | **contractual** 164:11 |
| **complaint** 184:18 184:18 186:13 187:11 | 208:13,22,25 209:1 238:15,22 **confirm** 142:20 | **consulting** 236:18 **consuming** 63:13 | **contrast** 174:10 **contributed** 55:19 **contributing** |
| **complaints** 71:20 72:4,9,13 78:6 | **confirmation** 75:4 76:23 | **cont'd** 5:1 6:1 **contact** 152:11 | 55:22 **control** 79:22 80:1 |
| **complete** 116:25 117:9 241:13 | **confirmed** 130:13 142:5,13,17,22,25 | 163:25 164:1,8,18 169:3 235:18 | 111:1 127:18,21 150:4,18 |
| **completed** 79:5,8 116:23 178:25 179:3,4 | 143:3,7,8,12 **confirming** 130:10 131:20 142:3 | **contacted** 59:4 **contained** 53:25 **contemplate** 149:4 | **controlled** 147:2 226:16 227:12,21 **controls** 226:12 |
| **completely** 167:13 223:10 | 153:16 162:15 **connected** 16:13 | **contending** 180:5 **content** 62:19,20 | **conveniently** 119:19 |
| **complex** 34:8 | 222:19 | 62:22 63:3,4,10 | **conversation** 9:9 |
| **compliance** 23:1 23:25 24:5 27:14 73:2,8 108:24 109:2 | **connecting** 96:21 **connection** 23:25 66:1 **connie** 191:7,13,15 | 66:3,10,12,16,17 66:18,21,23 67:4 100:14,15,25 179:7 | 77:19,20,23 104:2 104:4 120:2,4 158:4 161:15,19 161:21 162:1 |
| **compounding** 200:14 201:4 202:20 | 191:21 192:4 **cons** 187:17,19 188:1,5 | **contention** 236:12 236:15 **contest** 238:18 | 187:3 **conversations** 8:2 36:21 48:18,20 |
| **computer** 75:1,18 77:9 241:12 | **consequences** 145:19 | **context** 19:13 60:7 183:23 196:14,16 | 49:24 51:19 52:13 52:15,19 67:15,21 |
| **concept** 110:14,19 197:18 | **consider** 36:20 41:20 44:3,15 | 196:19 **continue** 17:16 | 67:23 128:11,14 133:6 161:16 |
| **concern** 168:21 169:6,9,11 | 45:24 47:15,16 72:15 171:19,23 | 115:17 132:12 134:18 136:11 | 170:20 171:2,24 189:10,14,16,21 |
| **concerned** 28:9,12 29:4 72:10 131:15 134:18 166:15 | 187:14,16 219:5 235:22 | 164:15 **continued** 33:2 154:4 179:23 180:5 | 236:4 |

CONFIDENTIAL

**[conversion - date]**

**conversion** 205:20
**convert** 201:13
205:19
**convertible** 5:23
88:6,11 101:18
194:25 195:4
196:9,13,17,19
197:2,4,9,13 198:4
202:10 207:19
216:10
**converts** 196:20
**convey** 140:3,5
143:17
**conveyed** 145:13
**cooley** 71:18 152:9
152:10,12
**copy** 18:11 22:16
22:19
**corporate** 33:20
146:15
**corporation** 33:15
**correct** 13:8 14:1
14:7 17:4,5,8 18:1
19:10,22 20:23
21:21 23:22 24:14
24:17,20 27:8
28:14,18,19 29:8
30:14 31:13,23,25
32:2,13 33:21,25
34:1 35:16 40:17
42:20 46:16 47:5
47:10,13 52:23
56:13 57:12 61:15
64:1,2,10,22,25
65:23,24 66:13
68:18 83:19 84:14
85:15 86:15,25
87:1 91:25 92:23
93:6,10 97:5,25
104:21,22 105:24
107:4,19 111:17

114:21 115:7,8,24
116:12 120:11
121:3,7,14,25
122:20,22,23
124:7,8,10,17
126:15,16 130:19
130:20,22 140:11
142:14,15 144:5
145:11 148:9
151:1 152:7 155:3
155:4 156:11,14
156:16,22 157:13
158:10,11 162:16
166:13 172:24
176:11 177:15
178:20 181:8
183:10 186:14
187:2 189:25
191:9 193:2
194:14 199:6,11
200:4,7,8 202:7,11
202:12 204:20
205:16 211:3,12
211:22,23 213:10
213:15 214:15
215:9 216:18
220:21 221:24
222:7 225:16
231:22 236:19
240:3 241:15
**correctly** 119:4
179:9
**correspondence**
11:22 18:3 122:6
235:21
**correspondences**
11:18
**could've** 134:10
**counsel** 7:12 8:4
8:15 15:9 18:1,11
18:12,18,23 19:7

20:7,8 26:10
27:13,20 29:17
71:15,16 72:25
73:6 74:14,24
76:7 84:15 86:11
86:20 87:21 88:2
102:7,13,22,25
103:7,9,24 104:5
105:23 106:4,8,18
106:21 108:15,19
108:24 133:7
134:25 141:6
151:24 152:2,6,8,9
165:22 167:4
182:9 183:5
187:23 189:16,22
189:23 195:6
198:12 203:17
204:1 205:21
206:22 207:4,6,10
208:5 209:8,10,20
217:13 225:1
235:5,7,11 236:16
241:17
**count** 93:7
**county** 1:2 2:2
7:17
**couple** 9:4 14:14
14:21 15:24 18:16
78:2 196:23
211:24
**course** 18:13 36:1
39:13 134:13
209:5 219:22
**court** 1:1 2:1 7:16
7:22 8:10 9:18
26:12 28:5 74:4
75:4 133:17
134:16 138:16
**covered** 56:8
123:2 128:10

**covering** 238:10
**coworkers** 48:20
**craft** 179:14
**crazy** 49:8
**create** 9:8 50:24
62:21 66:3,10
70:18,23 71:1
100:14
**created** 20:19
41:14 51:4,5
62:20 65:6 67:4
69:21 70:1 151:12
151:13 152:11
178:24
**creating** 62:16
171:11 179:19
230:3
**creation** 32:22
66:12 100:25
148:23
**crunchbase**
172:10
**csr** 1:23 241:2
**culture** 157:2
**current** 144:22
177:6
**currently** 13:9
31:21 116:16
183:8 235:22
**customers** 59:21
99:19
**cut** 157:6 161:1
219:18

| d |
|---|

**d** 4:1 108:7 156:2
**d.c.** 13:15
**daily** 112:20
**date** 7:7 21:19
22:8,12,13 38:13
50:18 51:10 63:15
63:23 81:14 86:17

CONFIDENTIAL

**[date - desired]**

89:2 91:23 102:10
105:19,20 113:9
115:22 120:10
122:12 123:14
136:16 143:16
152:5 156:9
166:17 169:13
170:6,6 184:11
200:13 203:9
206:10 220:3
221:12 232:21
**dated**  4:11 5:3,14
5:17,20 21:17
118:9 130:3,18
218:13 220:16,23
**dates**  11:19,21,22
11:24 63:21
169:20 170:5
**dave**  176:21,22
**day**  10:1 11:25
57:20 61:14,24
63:17 65:20 94:21
94:22 95:6 105:10
105:11,13 106:15
106:15 130:25
131:14 133:19
134:3,4,8 135:7
136:22 137:8
138:19 152:5
157:6 166:19,19
166:20 168:13
170:17,18 171:5,6
171:6 175:21
178:4 182:6
206:13 221:1
222:5,16,17
223:15 225:15
241:22
**days**  14:14,21
92:19 93:3,7,8
94:14,15 133:25

134:2 136:19,24
193:15
**deal**  100:18 101:4
104:7,11,14 105:6
105:9,12,16 106:3
106:9,10,12,13,14
106:16,22,24
107:2,17 111:15
111:20,21,22,25
112:3 134:24
209:9
**deals**  101:6,11
107:1,9,16,16,20
207:5 208:5
**dealteam**  166:2
**december**  116:4
224:5,9
**decide**  121:1
**decided**  13:25
14:3 50:24 54:23
185:18 186:25
187:17 188:11
189:6
**deciding**  39:14
189:2
**decision**  14:2 53:6
53:7,10 55:1
131:9 167:3,9
178:11 185:14
188:12 234:12,13
**decisions**  53:19
131:4 140:15
149:25 150:3,3
175:24
**deck**  65:7
**declare**  240:1
**declined**  78:8
**decompress**  157:1
**defaulted**  175:23
**defendants**  1:10
2:10 3:10 7:12 8:7

8:21 18:7 21:12
35:18 91:14 98:13
118:2 122:10
129:6 155:24
172:4 190:19
194:8 198:8 217:8
**define**  37:7 92:15
94:18 96:12
102:16 105:3
**defined**  47:8 76:16
147:6 199:19
201:17 205:7
217:3
**definitely**  24:1
43:5 83:13 171:14
**definition**  113:10
141:25
**definitively**
231:16
**degree**  104:24
148:13
**delaware**  54:1,6
**deleted**  135:16
**deliberate**  9:21
**deliberately**
185:15
**demand**  204:18
**demanding**  161:2
**demo**  61:23 62:2
**demo'd**  51:25
**dempsey**  190:3
**deny**  222:9,11
**depart**  140:16
**departed**  173:15
173:17,21,25
174:2 177:11
**department**  15:10
184:10,25 185:3,5
185:21,23 186:2,5
186:6,8 187:21
188:6

**departure**  130:19
174:10,11
**departures**  156:15
**dependent**  146:21
146:25 147:3,8,16
**depending**  33:19
59:17 141:25
**depends**  34:7,8
54:12 94:25
113:11 139:22
152:21
**depo**  137:7 138:1
**deposing**  133:23
133:24
**deposition**  1:16
2:17 7:9,11,19
8:22,23 9:3,8
10:10 58:12 73:25
74:6,21,23 132:13
136:11,14 138:16
139:2 145:1,3
212:1 236:21
238:9,25 241:1,6,8
241:15,19
**depositions**  218:4
**describe**  198:20
201:6
**described**  97:2
204:21,24 228:11
**describes**  202:6,23
**describing**  52:25
201:23,25 226:24
**description**  4:8
5:2 6:2 53:3 81:19
**designate**  208:12
238:21
**designated**  23:4
209:1
**designed**  109:24
**desired**  181:12

CONFIDENTIAL

**[desks - documentations]**

desks  150:23
detail  40:25 121:9
  121:10 126:19,20
  232:25
detailed  76:13
  100:6
details  14:18
  16:18 68:12 97:15
  100:13 101:5
  117:4 121:20
  126:25 173:1
  230:1
determine  140:1
dettmer  195:10,19
  195:20 196:8
devani  1:4,16 2:4
  2:18 4:12,13,22
  5:4,20 7:10,13
  8:12,18 9:2 11:12
  11:13 23:19 27:12
  72:24 73:21,25
  74:6,8 77:4 87:25
  118:8 198:24
  204:9 207:4,13,23
  208:16 209:16
  217:11,16 218:9
  219:4 220:3
  232:12 238:25
developer  125:7,9
development
  15:14 175:25
developments
  132:6
difference  72:6
  113:16 166:4
  197:7 226:15,19
  227:11,14,20
different  23:14
  26:17 30:20 34:7
  34:15 36:23 42:18
  47:17,17 52:10

55:22,23 59:4,18
  65:10 67:15 69:8
  83:23 94:3 97:6,8
  97:13 99:6,9
  101:4 103:13
  137:18 147:21
  149:6 166:3 171:9
  177:11 196:17
  203:21 210:11
differently  17:2
difficult  42:8,24
diligence  56:16
  104:17 107:2
diligencing  19:3
  19:24 20:11,15
  21:4,8
direct  161:8
directed  62:16
  67:15
direction  189:23
  241:11
directive  181:4,5,7
directives  180:25
directly  35:11,23
  35:24 130:19
director  116:1,4
  116:11 117:8,13
directors  112:23
disagree  141:12
  176:7 201:22,24
disagreed  84:9
  85:12 120:21
  121:5,10
disagreement
  219:25
disagreements
  83:10,11 85:14
  120:23 121:16
disaster  178:6
disastrous  81:16

discern  228:23
  229:7
disciplinary  26:15
disclose  28:16
  80:5,11 162:18,23
  162:25 208:25
disclosing  28:21
disconnected
  223:10
discount  201:14
  205:3,7,14
discovery  217:18
  219:2,20
discrete  104:23
discretely  105:3
discuss  87:16
  218:1
discussed  11:25
  12:2 111:11
  120:13 236:2,5,7
  238:8
discussing  25:11
  50:20 51:11,14
  52:7 127:10
  206:10 220:11
  223:16 237:20
discussion  60:21
  87:20 215:14,16
  215:19
discussions  51:17
  109:1 233:15
dismissed  185:13
displayed  98:21
dispute  19:6 63:24
  152:16,20,22
  153:1,5,8,11,14,20
  153:25 154:8,9
  203:10 206:16,19
  210:7,12 212:4,18
  214:21,24 215:4
  219:24 223:2

226:22
disputing  153:19
  203:13,16 213:10
  213:13 225:12
dissatisfaction
  228:18
dissatisfied  48:22
disseminated
  65:15
distribution
  100:15 105:1,2
  165:23
divulge  203:15
divulging  25:22
  144:16
dmg  177:4
document  21:14
  23:19 56:2 75:2
  85:2 173:10
  178:24 179:2,6,11
  179:19,25 192:25
  197:5,6,8,10,12
  198:11,12,21,22
  206:13,20 207:7
  207:15,25 208:4,7
  217:24 218:15,19
  219:9 223:23
  225:8,11,23
  226:11 228:1,11
documentary
  183:15,19,24
documentation
  22:9 33:10 43:12
  43:15 58:14 65:6
  101:11 111:25
  148:24 169:24
  170:1 196:25
  197:2
documentations
  197:3

CONFIDENTIAL

**[documented - employees]**

**documented** 10:22
150:20 178:23
**documents** 10:20
36:15,20 58:19
148:16 184:5,9,23
197:20,22 207:2
217:12,18 218:4
218:17 219:1,3,12
219:15,17 227:2
**doing** 19:17,18
20:15,16,18 24:7,9
39:16 56:16 59:6
63:12 76:25 79:23
80:2 104:17 105:7
112:5,7,7 155:5
207:1 216:19,23
**dollars** 201:19
**domains** 68:8
**dongxu** 108:6
**dose** 219:1,12
**double** 172:18
**downloaded**
232:14
**downloading**
233:4
**downloads** 233:16
233:18
**dozens** 198:2
**draft** 87:12 88:3,6
101:18 111:19
195:1,5,7,8
**drafted** 88:11
197:21
**drafting** 101:24
112:2 148:22
208:3 209:17
210:3
**draw** 71:10,14
**drawing** 148:15
**drawn** 149:3

**drew** 71:14 148:17
148:19
**drexel** 12:23
**drinks** 90:16
**drive** 179:1 234:13
**driven** 52:25
**ducoff** 156:2,5,19
157:5,12 158:9,21
159:15 160:14
172:22
**ducoff's** 160:18
**due** 204:17
**duly** 146:14 241:2
**duties** 23:4,5,18
23:21,24 24:2
38:1 75:6
**duty** 28:25 29:14
41:14
**dylan** 52:11
182:16 183:7
190:2

**e**

**e** 4:1,6,16,21 5:1,7
5:11,20 6:1,3 11:1
11:3,4,4,10,11,17
12:4 23:13 36:20
37:10 73:20 75:10
75:14,25 76:19
77:3,5,6 91:16
92:2,5 94:9,22
95:2,4 105:2
118:4,7,12,15,23
119:10 120:8
122:2 129:8,17,24
130:3,18 132:19
136:18 139:14,16
142:19 143:6,13
143:15,25 144:25
145:20,25 156:1,9
156:17 157:12,15
158:2,4 161:13,22

161:25 162:19
163:25 164:25
165:4,14,22 166:8
166:9,23,23 167:5
169:5 170:3,4
172:14,16,20,21
172:22 177:21
180:2,6,14,20,21
181:15,25 183:4
183:12,17,21
194:10,13,16,19
194:21,24 196:6,7
199:5,17 200:18
200:20,21,24
201:11,22,24
202:4,6,14,23
203:10 204:22
207:15 210:8,9,13
210:15,24 211:2,8
211:9,10,13,17,19
211:22,25 212:2,4
212:5,9,10,15,17
212:19,21,23
213:1,5,10,13,16
213:19,22 214:3,6
214:7,10,11,18,20
215:5 216:8,9
217:15 218:6,12
218:12,23,24
220:3,5,9,16,17,20
220:25 221:14,19
221:21,22 222:6
222:13,15,19
223:15,19 225:10
225:12 231:9,13
231:18 232:14,16
232:16 235:20,20
**earlier** 29:24
58:11 71:24 97:2
111:11 119:9
126:14 130:24

146:3 166:11
178:19 220:15
225:24 235:3
237:22
**early** 62:8 102:11
105:21 187:6
**earned** 35:22,25
**easily** 26:11
**easy** 170:25
**ecosystem** 45:1
**educational** 12:17
**effect** 37:12 176:5
**effected** 217:2,3
**effective** 115:14
161:12 166:24
176:9 180:22
200:12
**efforts** 127:16
**either** 33:18 49:1
65:7 70:12 82:6
117:12 136:17
150:16 165:24
181:15,20 185:24
187:17 241:18
**elementary** 45:17
**else's** 75:1
**emanuel** 2:18 3:11
7:20 8:7 74:1
**employed** 28:23
29:6 39:4 103:15
128:22 232:13
**employee** 15:5,7
22:7,8,14 37:21
39:14 152:1,15
174:21 180:13
182:11,12,13,14
225:2
**employees** 28:22
42:10,12,19 51:22
51:23 71:20 72:5
72:13 78:15,19

Page 13

CONFIDENTIAL

**[employees - exhibit]**

81:11 82:2 127:17
150:5,8,8,9 154:22
177:10 180:3,7,10
180:15,18 188:17
189:1 190:12
**employer** 74:4
**employment** 36:3
36:5,6,25 37:24
38:4,9,12,18,24,25
42:18 43:3 78:11
115:1 128:19
179:23 217:19
219:4
**empowered**
110:18,22
**endeavors** 96:17
**ended** 160:20
**ends** 120:25
**engaged** 39:1
56:16
**engagement**
112:16 236:3
**ensuring** 58:9
**enter** 25:18
**enthusiastic** 61:3
**entire** 168:7
200:10
**entirely** 18:2
45:24 61:12 71:17
89:20 91:11
103:11 111:7
149:17,19 193:1
235:25
**entirety** 208:12
238:22
**entities** 30:5,20
31:4,7 45:1 69:11
69:15 95:7,11,13
95:15,18 96:1,8
99:19,21 146:19
149:8,9,16 154:15

154:17 155:18,19
221:2,6,9 222:18
223:6,8,17
**entitled** 37:24
180:9 241:8
**entitlement** 36:16
37:16
**entity** 30:6,9,15,17
30:22,23,24 31:10
33:17,18,20,23,25
34:13,23 35:3,7
69:12,13,17 70:10
70:11 71:1 103:15
146:5,10,12,13,14
146:15,21 147:11
147:12,16,20,25
148:1,3,4,7,11,16
149:8 150:12,17
151:11,14,17,20
152:12,13,19
153:23 154:3,5,6
154:11,11,19
155:2 216:17,19
229:4
**eppler** 11:23 185:4
186:1
**equal** 201:3,19
**equally** 223:20
225:24,25 226:2
**equals** 199:24
**equation** 227:19
**equity** 47:20
196:20 197:16
**err** 123:4
**especially** 218:5
**esq** 3:4,12
**essentially** 109:25
113:14 163:20
209:1
**estimate** 42:7,16
197:24

**estimation** 34:10
45:6
**et** 1:9 2:9 7:15
11:13 20:20
176:10
**ethical** 26:8,24
27:6,19 28:12
29:13 40:12 75:6
**ethics** 75:3
**evaluated** 187:16
**evening** 136:24
**event** 170:23,24
192:7 196:21
**events** 55:4 81:23
82:14 172:10
196:22
**eventually** 16:14
17:17 22:7,9
68:23 69:2 108:21
**everybody** 45:3
60:16,16 181:16
**everyday** 9:21
**evidence** 183:24
**exact** 19:4 38:18
43:11 50:18 51:10
56:19 57:20 61:12
62:9,17 63:15,23
68:12 73:9 86:17
89:2 97:15 99:3
100:13 101:5
102:10 105:19
107:12 113:9
114:7 115:22
133:22 150:19
166:17 168:12
169:20 173:1
181:10 182:6
184:11 209:3
**exactly** 40:20
47:12 56:2 65:19
120:25 144:19

147:8 170:12
171:1 184:3 227:9
227:14
**exam** 13:5
**examination** 4:2
8:16 139:11
**example** 11:23
23:8 36:11 62:18
68:9 137:25 195:4
229:1
**examples** 174:24
**excel** 218:16,20,21
**excepted** 181:24
**excessive** 174:22
**exchange** 100:24
122:4 139:14
179:19,20,22
**excited** 48:10 59:7
59:25 60:17 61:2
**excitement** 48:23
**exclusively** 174:7
**excuse** 76:2
124:19 127:12
201:23 203:25
**execute** 23:8 107:1
**executed** 107:17
112:12 127:21
240:5
**executing** 19:2,21
20:3,9 21:1 29:25
84:19 86:22,24
87:2,13 88:4
**executive** 28:24
90:1
**exhaust** 132:24
**exhaustive** 44:12
**exhibit** 4:8,9,11,16
4:19,21 5:2,3,7,11
5:14,17,20,23 6:2
6:3 18:6,7 21:11
21:12 22:21 36:4

Page 14

CONFIDENTIAL

**[exhibit - finance]**

37:1 64:13 91:12
91:13,14 98:12,13
116:3 117:23
118:1,2,5 122:9,10
129:4,5,6 139:13
139:15 155:23,24
172:2,4,22 177:18
190:18,19 194:7,8
198:7,8 199:2,3,5
199:9,10,18,19
200:3,6,9,24 201:1
201:2,18,23,25
202:1,9,18 203:2,5
204:10,10,11,14
204:22,25 205:2,7
205:11,16,16
206:10,12,17,20
208:7 209:17,24
210:2,8,13 215:25
217:6,7,8 218:18
220:16,16,20
221:15,22 237:22
**exist** 36:24 50:11
61:12
**existed** 50:14,15
61:11 175:25
**existence** 50:17
**existing** 108:19
**expand** 16:2,11
**expect** 123:6
**expectation** 41:25
74:7 81:22 90:3
92:24
**expectations**
164:5
**expected** 17:16
160:18
**expecting** 104:1
**expenditures**
175:20

**expense** 36:12
**expenses** 36:18
37:17 71:21 72:10
78:7 187:12
**experience** 56:7
**expert** 38:23 62:9
75:3
**expertise** 38:19
**explain** 14:2 20:2
81:24 110:24
193:4 208:17
**explained** 71:23
**explanation** 76:13
**explicit** 23:3,5,10
23:17 24:2
**explicitly** 23:7
**express** 38:5 74:15
**expressed** 104:3,5
**extent** 32:20 33:2
69:15 84:23 86:9
86:10,19,21 96:2
113:10 145:2
150:1 189:13
208:2 209:8
226:21
**eyed** 100:8 101:1
**eyes** 111:2

**f**

**f** 129:9 156:2,2
**fact** 38:19 119:15
141:19,22 142:22
152:11 153:14,17
163:16 168:22
170:25 187:24
188:2 212:12
215:5 238:1
**factors** 55:13
**facts** 82:16 130:10
130:12 131:20
142:3,5,13,17,19
142:23,25 143:3,7

143:8,12,14,20,22
143:23,24 144:1,2
144:6,9,10,13
162:8,15,19,23
163:4
**fair** 26:16 31:19
53:3 76:13 135:1
188:10
**fairly** 170:22
**fall** 190:24
**falsifying** 75:14
**familiar** 37:20,22
98:17 107:23
108:3,11 195:9
**familiarity** 188:9
**familiarize** 198:10
**family** 156:24
**fanelli** 1:4 2:4 5:8
7:13 137:13 138:2
138:13 174:15
176:24 186:17,18
188:14,18
**far** 12:14,19 66:2
80:4,9,13 117:2
128:21 134:17
148:2,4 168:6
176:8 214:1 217:1
233:12
**faris** 16:6
**farwell** 127:24
128:1,3,12,15
156:13,23
**fast** 9:23 81:8
**faster** 158:4
187:23
**father** 173:20
**favor** 229:3
**features** 174:21
**february** 4:16
88:7,12 91:23
92:3,6 97:18,22

101:24 194:11
195:1 203:9
206:11,14,18,21
207:17 211:14
218:13 220:4,17
220:23,25 221:14
221:15,22 222:13
223:5,7 225:11
228:2,7
**federal** 54:2,8,9
147:13
**feel** 10:1 48:11
123:4 163:3,5
179:18,20 180:17
**fees** 34:12,23 35:3
35:8,11,22 36:1
230:9
**felt** 41:16 43:4
48:12 171:19
173:5
**fenwick** 13:17,22
**fiduciary** 164:11
**field** 61:14,24
63:17 65:20
175:21
**fight** 135:6,7
**figure** 51:1 63:21
**figuring** 58:7,8
**file** 185:25
**filed** 7:16 11:7
28:5 68:7 184:18
186:4,10 187:7
**filing** 186:8,13,17
**filings** 68:6
**fill** 110:6 114:12
**film** 100:14
**final** 37:25 130:25
**finance** 15:16
88:23 90:19 94:4
176:19,25

Page 15

CONFIDENTIAL

**[finances - frame]**

| | | | |
|---|---|---|---|
| **finances** 223:24 228:18 | 127:21 128:21,23 130:9 131:2,5 | **five** 107:14 159:10 159:11 | **formalization** 55:3 55:5 |
| **financial** 163:17 176:14,16 193:9 220:12 221:23 222:14 223:6,16 228:19 | 132:6 134:13 140:16 156:6 159:5,22,22,23 160:5,6,8,14 163:12,24 167:14 171:16 172:13 | **flagged** 110:8 **flinn** 52:11 182:16 183:7 190:2 **flip** 64:11 **floor** 3:13 69:5 150:23 | **formalizes** 196:25 **formally** 37:4,8 45:12 95:6 219:10 221:2 222:17 **formation** 32:21 32:25 34:3 71:3 |
| **financially** 176:12 **financials** 20:19 **financing** 20:4 87:3,13 88:4,7,12 164:7 167:17 | 173:15,17,21 174:11,21,24 175:9 176:23 178:2,6,11,14 183:16,20 195:9 195:14 235:14 | **flow** 52:22 106:16 **flying** 136:23 **focused** 19:1 60:3 178:14 231:5 **folau** 129:9,11,12 | 108:18 148:16,21 154:11 **formed** 32:16 54:18 57:18,19 146:15 148:11,12 151:18,20 152:23 |
| **financings** 86:23 86:24 **find** 55:7 58:3,25 59:2 95:2 111:9 114:11 145:8 163:19 179:7 184:21 196:2,4,4 | **firm's** 41:25 50:21 51:12 175:10,17 175:22 178:13 **firms** 13:18 30:21 **first** 13:14 21:7,22 22:4,11 56:24 | 139:14 141:17 142:16 143:11,17 162:9,10,14,18 **folks** 15:24 47:16 59:11 105:4 156:25 160:8,17 164:1 165:12 | 153:2,12,22 154:6 **former** 25:10 74:3 174:20 188:17 189:1 190:11 **formerly** 73:23 **forming** 33:8,9 |
| **finding** 20:13 55:2 56:17 187:24 **fine** 76:22 134:6 139:5 | 57:13,17 58:18 59:23,25 61:9 64:15 66:2,9 72:16 75:12 92:10 | 169:6 170:7 171:10,15 188:7 189:8 192:6 **follow** 46:7 47:11 | **forms** 23:14 42:18 47:6 **forth** 158:5 219:6 **forthcoming** 74:8 |
| **finish** 9:14,15 136:14 **finished** 76:3,5,7 79:12,15,18 80:20 82:7 | 100:5 105:10,11 106:6,18 109:12 109:14 110:16 112:10 113:2 124:17 149:14 | 49:18 65:12 79:9 79:19 85:19 110:23 185:24 218:18 234:25 **following** 170:10 | **forward** 43:1,2 81:8 119:8 120:7 139:7 160:11 219:22 **found** 17:23 |
| **finishing** 179:6 **firdavs** 110:12 **firm** 7:21 11:19,25 | 151:4,12 159:25 160:3 161:16 172:17 177:13,24 | 171:5 183:16,20 **follows** 8:14 **food** 10:3 | 107:20 **foundation** 82:17 **founder** 61:14,23 |
| 13:15,16,20 15:25 16:14 17:3,7 19:2 19:16,20 20:4,5 21:17,18 22:4 30:6,10,11,15,18 40:18 41:21,23 42:2 48:7,13,21 49:7 51:20,24 73:18 82:1 93:20 123:18,20 127:18 | 178:1,22 186:4 192:11 193:12,19 193:22 194:16 195:23,24 202:8 206:24 218:18 221:21 223:22 233:23 234:4 **fit** 17:21 157:2 | **foregoing** 240:2 241:5,13,19 **forget** 126:20 **forgive** 78:2 **form** 23:10 33:20 49:22 91:1 109:24 110:3,6 165:1 183:12 198:4 | 63:17 65:19 129:12 164:9 175:21 **founders** 51:25 **four** 16:24 42:21 158:18 180:24 **fove** 30:12,16,19 **frame** 24:7 81:13 112:9 159:3,7 |

CONFIDENTIAL

**[frame - glugoski]**

237:12
**fran** 193:10
**francisco** 1:2 2:2
2:20 3:6,14 7:2,17
7:20
**fraud** 126:6
**frequently** 90:7
**friday** 118:9
**friend** 15:22 119:2
**friendly** 90:8
128:2
**friends** 15:20 90:6
**front** 82:14 118:5
198:23 221:14
**frontier** 64:15
**full** 9:1 15:5,7 22:7
22:14 42:10,18
102:25 103:1,22
106:20 119:3
121:20 134:8
151:25 152:14
155:16,19 174:24
241:13
**fully** 56:16
**functioning** 82:9
**functions** 15:16
**fund** 30:17,23,24
31:4,13,15,18,22
31:24 32:1,3,10,14
32:19,22,23 33:5,8
33:9,17,18,20,23
33:25 34:3,13,14
34:14,15,18,20,23
35:3,7,10 45:8,14
45:19,22 46:1,2,2
46:5,9,12,14,17,20
47:9,19,21 48:6
49:11,12,13,14,20
50:2 53:9 56:9,10
56:15,24,25 57:3
58:12,13 78:23

79:2,12 80:15,17
81:2,5,9 82:5
84:21,23 86:8
90:19,20 108:18
108:20 112:4
140:15 146:19
150:9,11,24
154:12,13 164:5,6
210:4 216:1,3,12
216:23 236:24
237:2,13,17,17,17
237:23 238:2
**funder** 216:4
**funding** 112:12
**funds** 30:4 31:12
31:14 35:23 46:13
46:18 53:14,14
78:21 79:23 80:2
80:6,12 86:25
97:20 99:14 126:9
154:13,14,21
176:9 196:24
216:6
**funny** 172:8
**further** 39:6 44:22
50:4 74:7 83:17
121:9,10 144:16
160:15 207:24
233:15 241:17
**future** 42:14 119:8
178:11,13
**fuzzy** 230:2

**g**

**g** 108:7
**game** 63:11,12
76:13
**games** 62:19 63:7
66:24 70:18,19,20
70:23
**gather** 68:10

**gathers** 46:14
**gatsby** 190:25
**general** 12:15 15:9
18:1,17,23 19:7
27:12 30:22 34:22
35:2,5 54:4 55:23
56:6 68:14 72:25
73:6 74:24 78:11
81:15,19 101:15
102:7,13,22,25
103:6,9,23 104:5
105:20,22 106:4,8
106:18,20 108:15
108:24 143:15
151:24 152:1,6
161:16 193:21,24
197:18 225:1
230:25 231:6
232:22
**generalist** 60:5
**generally** 20:2
30:19,21 33:12
35:25 46:25 47:1
52:4 53:14 56:19
56:22 57:25 62:14
66:19 176:4
196:19 212:6,7
**genesis** 62:22,25
**gentleman** 62:6
70:15
**geoff** 103:3,4,6,10
103:18,19,20
108:14,16 128:25
151:20,23 152:24
153:3,12,22
**geoff's** 103:12
**getting** 58:10
120:16,17,19
137:21 162:12
167:24 168:18

**gitlinks** 129:13,14
**give** 9:16 12:17
39:25 40:14 41:14
42:16,22 43:11
48:1 78:18 83:17
83:20 96:2,5,5
120:12,14 121:9
121:17,19 122:24
131:2,7 157:23,25
158:12 222:1,3
**given** 26:7,9,23
41:4,10 120:3
133:18 141:22
185:17,20 218:22
241:14
**giving** 79:21,21
206:4 217:25
227:18
**glance** 192:11
**glogoski** 3:4
**glugoski** 3:3 8:8,8
12:1 18:11 25:14
26:5,21 27:20
29:17 44:6 73:21
74:14,22 75:15,21
75:24 76:1,3,5,7,9
76:11 77:4 80:7
82:16 85:18,22
119:13,17 123:3
132:24 133:16
134:2,20 135:9
136:9,18 137:2,4,6
137:10,20,24
138:5,7,12,18
139:4 140:25
141:4,11 145:16
186:12,15,16,17
189:12 198:12,18
203:17 205:24
206:5,22 208:1,20
209:7,18 217:13

CONFIDENTIAL

[glugoski - hat]

217:17,22 218:25
236:6 238:17
**gmail.com** 210:25
211:11,14 212:11
214:3,7,11
**go** 7:25 9:4,23
10:20 12:15,19
13:19 14:8 18:3
27:20 30:2 36:3
58:21 75:10 76:8
77:11 87:15 96:20
100:4 134:12
135:8 139:13
144:16 155:23
157:1 195:5
198:25 200:2,6
201:11,17 203:22
207:2 208:1
213:11 218:10
219:21 224:2
**goal** 17:9,14 67:14
67:20 180:22
**goals** 34:8 58:7
59:18 96:21,23
**goes** 33:9 58:14
90:24 176:8
**going** 8:21 25:13
31:12 37:25 47:25
47:25 50:2 53:1
54:23,24 63:22
70:18 72:18 73:19
74:23 75:10,21
76:17 77:11,13,21
78:9 87:18 89:21
102:24 113:22
123:3 125:25
133:2,10,16 134:7
134:20 135:6,13
136:10 137:20
139:4,7 144:3,3
157:7 167:1 169:7

171:6 174:12,14
178:2,4,5 187:13
188:13 189:2
194:1 195:5
197:22 198:14
204:3 207:6,23
208:2 209:7,9,13
209:19 213:22
219:16,18,24
221:13 222:6
231:23 232:6
235:1
**good** 7:5 8:18
40:12 48:12 49:9
49:9 60:1,2 122:1
157:2
**goodbye** 119:20
119:25
**goodwill** 40:12
**google** 179:1
**gotcha** 152:3
**gotten** 48:2 168:22
**govern** 36:6,11
**governing** 197:19
**government**
147:13
**gp** 53:15,18
**graduate** 13:3
**graduated** 13:19
**grant** 3:20 7:21
**granted** 74:5
**great** 219:21
232:25
**grew** 42:15
**ground** 9:4 26:17
26:17 132:1
235:10
**grounds** 88:13
98:10 102:4 109:5
121:12 123:10
130:16 144:4

145:7 203:16
**group** 44:25
165:23
**grove** 107:22
108:1
**grow** 58:10 176:9
176:10
**grown** 78:15
**growth** 175:17,22
**guarantee** 165:10
**guess** 11:8 12:25
18:20 25:16 37:14
45:5,6 113:15
159:9,11 161:4,18
197:24 198:5,6
217:17 219:14
224:25
**guessing** 130:8
**guidepost** 63:20
**guiding** 9:6
**gunderson** 195:10
195:18,20 196:8
**gusto** 44:1
**guys** 186:22 232:5

**h**

**h** 4:6 5:1 6:1
199:23
**habit** 211:16,18
**hacked** 213:19
214:3
**half** 14:23 198:6
230:13
**hammer** 44:21
**hand** 27:20,21
209:16 241:22
**handbook** 37:21
39:12,22 41:13,16
41:19,20 120:4
**handed** 75:18
**handing** 194:7
198:7

**handled** 26:11
29:22
**handout** 65:7
**hands** 45:2 69:7,8
127:22 181:15
183:4
**hanging** 40:19
238:12
**hanna** 133:24
**happen** 55:3 63:16
65:1,3 77:22,24
107:11 133:19
148:25 178:2
190:16
**happened** 54:13
54:17 56:1 57:4,5
77:22 104:8
106:17,18 107:9
117:19 128:18
146:22 147:17
**happening** 10:12
53:6 138:2 159:4
159:21 160:5
163:12 169:8
170:25 179:17
**happens** 54:15
82:10
**happily** 134:18
**happy** 28:6 29:18
75:6 121:23 135:3
164:20 191:15,20
207:10 234:6
**hard** 42:13,16
43:13 81:2 143:15
170:20 192:21
210:20
**hardware** 52:5
**hardworking**
119:1
**hat** 111:22

Page 18

CONFIDENTIAL

**[hate - information]**

hate  54:21
hauser's  193:11
hayes  176:21,22
head  9:17 16:8
  31:8 42:6 43:13
  46:22 168:12
  196:1 221:10
  235:15
header  172:12,19
  190:22,23
heads  15:25 233:1
headset  63:5 66:19
  66:25 111:1,2
hear  66:4
heard  8:19 74:15
  107:22 108:9
  130:8 142:8
  153:24 177:13
  186:16
hearing  130:11
  131:20 162:16
  184:10,24 185:2
  219:1
heart  134:12
heightened  215:15
held  7:19 31:4
  145:10
hello  220:18
help  31:1 59:2
  63:20 107:16
  120:7 163:19
helped  58:6,25
  59:16 108:16
  195:1
helpful  46:10
  96:22 112:8
  119:21 121:21
helping  58:3,4
  62:12
hereunto  241:22

hesitated  115:4
hey  14:20 53:1
  130:7
high  148:13
  198:14 215:17,20
hire  102:24 103:2
  186:15
hired  17:25 18:22
  18:25 62:11 63:14
  66:3,9 102:24
  103:12 105:10
  106:20 125:7,8,15
  125:16
hires  59:19
hiring  62:24 65:22
  104:5
history  12:17
hitting  163:10
hold  189:12
holder  204:18
  216:1
holding  116:9
holds  30:24
home  93:7 181:20
  235:19
honest  74:8 157:7
  161:2 235:13
honored  29:9
hope  132:13
hopefully  50:2
hour  23:1,25 24:5
  27:4,14 29:7 73:2
  73:8 108:24 109:2
  191:15,20 234:7
hours  195:21
house  68:9,13
hr  43:23 106:13
  157:1
hum  12:8 13:6
  14:13 64:19 91:20
  91:22 116:6

129:10 156:3
  205:5
hybrid  19:1

**i**

ian  129:8,11,12
  130:7 131:1 132:3
  139:14
ian's  139:25
idea  49:8 50:1
  57:11 59:7 60:1,2
  67:17 199:14
identify  8:4
  107:16 235:7,11
identifying  104:18
ii  64:1,21 111:6,8
iii  64:6,7,21 86:14
  111:6 226:11
image  4:19 98:15
  98:20,25 99:1,3,5
imagine  44:14
  158:23 176:20
  227:9 229:14
  230:8
immediate  40:14
immediately  20:24
  21:3 166:24
immune  180:17,25
  181:24
impact  234:15
implementing
  73:2,8 101:11
implies  47:12
important  9:7
  139:3
inaccurately
  173:24
inadequate  145:8
inbox  166:7
inception  51:17
include  174:24

included  179:7
including  66:18
  112:11 132:6
  164:7 176:5
  231:10,14 232:15
  232:16
incoming  108:23
incomplete  96:3,4
  179:5
incorporation
  32:24
incorrect  173:5,6
  173:7 193:3,5
independent  22:5
  22:17 146:4,9,11
  146:13,14,21,25
  147:4,8,16
independently
  117:14
indicate  119:11
indicated  203:19
indicates  198:23
  206:12 216:21
individual  30:4
  69:23 70:3 106:14
  106:21 170:16
individually  1:4
  2:4 7:13
individuals  96:22
  104:16
industry  50:22
  59:6,10 62:15
infographic  65:9
  111:10
inform  74:4
informal  77:20
information  24:18
  29:1,2,10,14 65:16
  125:23 126:1
  164:2,19,20 170:8
  171:4 184:20,21

CONFIDENTIAL

**[information - issuing]**

191:23 233:2
234:18,19,21,23
235:18
**informed** 83:4,6
186:18 206:11
**initial** 58:1 177:10
**input** 107:17
**insight** 83:20
155:17,20 176:13
**insistent** 161:12
**instance** 53:8
207:1
**instances** 176:2
181:9
**instruct** 207:23
209:19
**instructed** 6:7
**instructing** 141:2
207:9
**instruction** 181:1
**instructions** 23:11
23:15
**insulate** 25:21
**intelligent** 119:1
**intend** 157:25
**intended** 83:7
157:23
**intending** 131:2
140:3,5 143:10
**intent** 120:3
161:23 179:14
201:9 202:4
**intention** 83:4,6
236:20
**interactive** 63:10
**interest** 17:10 52:8
52:15 200:7,10,12
200:18,25 201:2
202:14,18 204:17
205:12 227:7,7
229:1,2,3 230:9

**interested** 52:17
103:25 190:13
225:3,5 241:20
**interesting** 16:1,3
16:10,12 17:15,23
48:24
**interests** 17:19
**interference** 8:3
**intern** 110:7,10,11
**interpretation**
139:22,25 141:8
153:7
**interview** 16:15,17
232:24 233:5
**intimate** 117:4
227:2
**intimately** 68:20
**intro** 129:18
**introduce** 131:12
**inverse** 188:5
**invest** 20:13 46:3,8
47:3 53:16 81:6
**invested** 30:24
31:4 45:18 46:6,9
47:9,24 64:16
99:12,13,17 112:4
237:2 238:2
**investee** 216:5
**investigation**
123:1,17,21,23
124:22,24 132:7
206:25 207:5,8
208:6,8 209:21
233:24,24 234:5
235:6,24
**investing** 17:1,11
17:18 35:10 46:2
86:25 103:1 108:2
108:20
**investment** 17:3,6
18:17 20:14 21:7

30:11,16,18 46:5
47:7,8,12,14,18,19
48:5 55:8 56:24
56:25 57:2 58:5
58:13,18 59:8,14
59:14,20 79:3,24
79:24 80:3,3,12
86:6 101:19
103:23 104:17,18
108:22 109:7,10
109:13,19 110:16
112:4 114:17
116:24 117:1,10
126:9 131:4,5,9
140:15 164:22
195:3 196:14,16
196:19,24 197:1
197:16,18,22
199:23 200:3
210:4 215:18,22
216:14,15,22
236:23 237:11,13
**investments** 19:3
19:4,21,24 20:3,11
21:1,5 23:8 30:1
32:7 45:20 46:4,8
47:7,22,23 48:3
49:18,18 50:21
55:20 56:10,12
60:10,13,14,23,24
60:25 79:6,9,12,16
79:19 80:5,23
82:3,6 84:20
131:16 150:10
154:18 196:9
237:16,20
**investor** 15:10
18:17 111:21
156:5 164:6 216:4
216:9,11

**investors** 15:12
35:9 45:21 46:1
46:14,18 49:16
108:19,19 119:2
163:11 164:21
**invoking** 238:21
**involved** 17:18
30:2,13 31:3 32:9
32:18,25 33:6,8,11
34:12 52:19 55:12
64:3 68:20 84:19
84:22 86:8,9,11,20
87:9 90:22 91:2
99:21 104:1,6
105:5,11 109:10
109:12 111:14
112:19 125:22
148:15 167:8
176:24 185:1
187:24 188:3
189:14 197:13
209:20
**involvement** 33:7
57:25 87:5 96:10
96:12,13,15 99:25
100:8,17 101:6,9
101:13 108:23
208:3
**involving** 100:11
126:6
**ird** 86:10
**issue** 94:25 206:23
207:3 209:9 219:5
219:11
**issued** 85:3
**issues** 106:14
133:3 207:7
209:11 217:22
219:20
**issuing** 116:22

Page 20

CONFIDENTIAL

**[item - known]**

item 224:3,16
iteration 86:8,13
iv 226:14

**j**

james 193:10
january 78:22
  79:1,11 80:15,21
  80:24 81:5,21
  82:4,10,12,19
  231:24
jeff 3:12 8:6,19
  73:25 75:19,21
jeffnardinelli 3:16
jennings 233:11
jeopardizing
  26:15
jeopardy 76:17,24
jglugoski 3:8
job 1:24 16:22
  38:1 48:22 90:16
  90:17 108:17
  178:17 228:17
jobs 163:20
john 3:4 8:8 10:11
  10:13 11:9 29:2,3
  76:2,4,8 85:16
  87:14 132:11
  133:14 134:23
  136:6 145:18
  186:19,19,20,24
  235:3
join 48:12 49:6
  114:5 186:25
  187:17 188:11
  189:6
joined 14:25 21:17
  21:18 22:4,5
  32:17 42:25 45:15
  48:8 49:3,12,21
  50:7,9,19 51:21
  62:7 78:25 195:15

joining 19:16 49:3
  49:7 51:20 190:13
joins 65:18
joint 69:22 70:2,16
  70:23 71:5,6
jose 100:12 101:10
jot 9:11
journey 119:22
judge 77:12,19
judgment 53:16
  175:23
july 21:17,20 43:8
  44:2 81:9 122:3
  122:13 123:24
  174:12,17
jump 64:5
june 193:9
justify 230:21
justin 69:24 70:15
  70:24

**k**

karnow 77:12,20
katie 1:4 2:4 7:12
  174:14 176:24
  186:16,18 187:3
  188:14,18 189:4
katie's 186:25
keep 29:14 203:18
  238:8
key 172:12
kick 137:13
kind 17:21 42:2
  43:7 52:21 67:17
  78:10 108:16
  132:20
knew 59:12 120:2
  164:10
know 9:23 10:4
  11:8 14:17,17
  19:15 22:16,18,23
  25:2,6,8 26:19

30:12 31:15,17,20
35:5 41:6 44:16
45:13 50:6 51:16
51:23 52:20 54:16
56:1,20 57:3,4,19
60:9,12 61:10
62:20 63:25 66:2
66:9,15 67:7 68:6
68:13,22,24,25
69:1,16,20 70:21
70:22 74:13,25
75:11,16,16,17
76:16 79:10,15,18
80:4,9,13,22 81:9
81:18 85:1,4
88:15 89:21 90:4
90:21 93:11,13,14
97:18,22 98:1,6
101:16 102:17
103:15,18 106:6
106:22 107:9,12
108:1,4,6,25 111:5
113:9 115:22
117:2,4 119:6,21
120:25 123:23
124:1,4,13,14,15
124:23,25 125:12
125:13,15,16,20
126:25 127:1,2,5,6
127:9,24 128:20
128:22,23 129:20
134:12 137:24
142:18 146:6,11
146:12 147:5,12
148:2,5,17 149:24
150:2,18,24
151:11,17 152:8,9
152:15 153:14
154:10,16,24
158:5,6,13 162:2
162:12 163:6,22

163:24 166:25
167:8 168:6,6,8,11
169:5,20 170:8
172:16 173:1,11
173:18,22 174:1,4
174:7 177:2,4
178:8,12 180:20
180:21 181:19
183:22 184:1
185:10 186:23,23
189:5 193:9
194:21,24 196:2
196:10,11 198:20
202:2,4 205:17
206:25 211:6
212:15 213:6,18
214:1,2,12 217:1
217:10 219:14,14
221:20 222:21
225:3,5 227:5,9,16
227:17,19 228:8,9
228:22 229:2,3,5
229:21,25 230:14
230:15,16,19,25
232:1,3 233:12
237:17,24
knowing 25:7 29:5
  147:8
knowledge 43:6
  48:16 81:4 95:22
  97:6,7,7,12,13
  144:1 151:3
  152:25 153:4
  163:23 168:23
  169:1 176:15
  195:16 214:6,10
  228:10 233:3,23
  237:1
known 15:24
  31:16 86:13
  152:19 154:2

Page 21

CONFIDENTIAL

**[l - llc]**

| **l** |
| --- |

l 129:9
labor 184:11,25
  185:5,15,21,23
  186:5,6,8 187:21
  188:6 189:3
lack 59:8
lacks 82:16
laid 36:10 54:4
  55:13
land 108:17
lane 190:3
large 15:3
largely 173:5
larger 62:14
late 50:19 51:18
  54:13 169:15
  181:12,20,20,21
  183:25 187:5
latitude 53:15
law 12:24 13:1,3
  13:12,20 17:20
  38:22 54:2,2,6,8,9
  54:10,12 188:9
  195:14
laws 23:2 240:2
lawsuit 133:7
  139:3 186:25
  190:13
lay 108:17
lead 16:10 105:15
  106:3,10,22
leading 86:6
learn 189:9 234:19
learned 189:18,23
  234:5
learning 224:12
lease 150:16
leased 150:17
leave 40:18 81:11
  120:3,16,18,19

166:24 167:6
  180:3,7,11,15,19
  182:1 183:4,17,21
leaving 49:2,5,5
  159:22,23 160:6,6
  160:7,8,14 161:8
  163:24
led 51:17 102:21
  125:24 167:5
  225:14,17
leep 52:11 91:19
  92:2,14,25 93:11
  93:24 94:20,20
  127:10 173:15,19
  173:20,24 218:13
  220:4,11,21
  221:12,22 222:13
  222:16 223:5,7
  231:9,14
leep's 173:20
  174:10 218:14
left 15:1,2 21:20
  43:2 46:4 49:2
  56:10 78:3,4 82:2
  91:5 119:18
  128:20 130:9,21
  130:23 131:7,14
  131:19 132:4
  139:16,21,22
  140:4,9,13,16,18
  140:19,23 141:16
  142:2 156:25
  162:14 172:13
  174:7,8 176:23
  193:9,10 210:15
legal 3:19 15:10,13
  19:2,20,23,25
  20:25 22:24 24:22
  29:25 31:21 36:11
  40:2,21,23,24 41:3
  41:8,14 70:9,9,10

75:2 84:24 86:11
  86:20 103:14
  108:22 111:20
  146:20 147:11,16
  147:19,25 148:1,2
  148:4,7 149:9,16
  150:11 154:3,19
  165:19,24 167:13
  167:14,16,19
  197:14 216:17
  236:10
legally 31:16 40:9
  40:9 41:17 147:6
  151:9
legitimate 110:9
  176:9
letter 4:11 5:3
  18:4 21:16,22
  122:12,14,16,17
  122:18
letters 122:2
level 145:22
  215:15,17,20
  218:12
liability 33:14
liao 173:16
liar 141:7
license 26:15
life 9:21 17:22
  99:4 191:18
lifetime 36:1
light 171:21
lightweight
  187:23
liking 121:23
limit 194:18
  199:13,14
limited 32:23
  33:12,13,14 35:9
  52:16 54:1,5 74:5
  76:15,16 84:23

86:9,10,19,21
  134:4,5 156:7
line 6:8 92:10
  133:9 144:19,21
  156:15 160:10
  194:16 201:9,10
  201:11,21 202:8
  202:13 204:11
  224:16
lines 99:7,10
link 66:5 156:20
linked 172:14
linkedin 4:9 18:9
  64:13 65:4 116:2
  116:10 219:7
list 43:24 104:25
  107:8,15,20 116:3
  165:9,11,12,23,25
  166:1,2,2,5,7,8
listed 18:16 193:7
  204:11 205:20
  216:19
listing 16:22
lists 105:2 166:3
litany 23:14 34:6
litigation 60:7
  85:3 184:6 185:25
  186:5 188:13
  198:17,19,21
little 9:20 10:16
  32:6 60:3 66:5
  126:14 137:25
  178:19 188:8
  220:15 235:2
llc 1:9 2:9 7:15
  32:24 35:16 36:7
  70:11 71:8,10,12
  73:23,24 74:12,17
  146:16 148:6,8
  151:15,18 152:23
  153:2,12,21 154:7

Page 22

CONFIDENTIAL

**[llc - mark]**

154:15 199:20
210:5,5 216:1,3,7
216:12,16,17,23
216:23
**llp**  2:19 3:11
153:22,24
**loan**  58:15 127:3,6
127:11 196:20
230:8,21 231:1
**log**  85:2
**logical**  66:5
**logistics**  29:22
**logos**  4:19 65:9
99:2,8
**loizos**  191:8,14,21
**long**  10:1,15 14:22
17:17 143:4
198:11 238:12
**longer**  10:16 46:18
82:2,3 83:22
102:21 103:23
140:14 164:11
**look**  18:3 23:9
43:17 49:25 54:20
92:5 107:8,15
119:7 172:11
183:24 192:13
199:18 209:3
**looked**  12:10 42:3
56:7 111:10
172:16 237:21
**looking**  16:1,11
21:15 44:1 48:21
59:13,19,19,20
71:19 116:2
136:20 137:10
157:8 204:9
**looks**  21:16 97:1
157:5 223:23
**loop**  167:2 209:10

**lot**  17:19 54:16
160:17 163:16
178:12
**lots**  59:4 160:19
223:19
**loud**  77:3
**low**  227:9
**loyal**  119:1
**lp**  33:18,22 53:11
53:13,23
**lps**  35:24 52:14
157:8 159:3,6
160:4 161:17
162:7,22
**lunch**  10:5 132:10
135:15
**lynne**  88:15 90:6
126:15 228:2,4
229:9
**lynne's**  94:2 228:9

**m**

**mail**  4:16,21 5:7
5:11,20 6:3 12:4
73:20 75:10,14,25
76:19 77:3,5,6
91:16 92:2,5 94:9
94:22 95:2,4
105:2 118:4,7,12
118:15,23 119:10
120:8 122:2 129:8
129:17,24 130:3
130:18 136:18
139:14,16 142:19
143:6,13,15,25
144:25 145:20,25
156:1,9,17 157:12
157:15 158:2
161:13,22 162:19
163:25 164:25
165:4,14,22 166:8
166:9,23,23 167:5

169:5 172:14,16
172:20,21,22
180:2,6,14,20,21
181:15,25 183:4
183:12,17,21
194:10,13,16,19
194:21,24 199:5
199:17 200:18,20
200:21,24 201:11
201:22,24 202:4,6
202:14,23 203:10
204:22 207:15
210:8,9,13,15,24
211:2,8,9,10,13,22
212:2,4,5,9,10,15
212:17,19,21,23
213:1,5,10,13,16
213:19,22 214:3,6
214:7,10,11,18,20
215:5 216:8,9
217:15 218:6,12
218:12,23,24
220:3,5,9,16,17,20
220:25 221:14,21
221:22 222:6,13
222:15 225:10,12
231:9,13,18
232:16,16 235:20
235:20
**mailing**  161:25
**mails**  11:1,3,4,4,10
11:11,17 23:13
36:20 37:10
132:19 158:4
170:3,4 177:21
196:6,7 211:17,19
211:25 221:19
222:19 223:15,19
232:14
**main**  9:12 34:9,10
152:10 165:18

**maintain**  29:10
178:15
**maintained**  29:13
195:15
**maintenance**  33:3
**major**  81:9 82:9
**making**  30:16
45:19 49:18 56:11
56:24 79:5,8,16,18
79:24 80:3 82:3,6
103:25 104:17
163:21
**man**  69:24
**manage**  108:17,21
**managed**  237:18
**management**  1:8
2:8 7:15 30:22,23
33:16,17,24,25
34:13,16,23,24
35:3,4,8,11,11,14
35:15,22,25 36:7
41:4,9 43:10 44:5
52:25 53:7 69:23
70:3,13,14 72:4
73:24 74:17 86:2
86:10 90:1 112:22
146:18 150:17,22
154:12,13,22
164:9 176:14,17
183:3 224:3,6,17
225:3 227:24
228:3 229:10,13
229:17 230:6,9,11
231:2 237:18
**manager**  15:11
18:17 53:15,18
54:4 74:3,12
**map**  55:7
**margo**  233:11
**mark**  18:5 21:10
68:7 91:12 117:22

Page 23

CONFIDENTIAL

**[mark - million]**

| | | | |
|---|---|---|---|
| 122:9 129:4 | 90:25 97:14 99:3 | **members** 28:21 | 60:22 61:7 62:17 |
| 190:18 238:17 | 99:4 102:14,15 | 32:24 34:15 35:8 | 66:3,9 67:23 |
| **marked** 18:7 | 116:14 119:24 | 35:24 107:2 190:9 | 69:22 70:2,12,14 |
| 21:12 91:14 98:12 | 120:1 124:21 | **memory** 68:5 | 70:24 73:20 74:11 |
| 98:13 118:2 | 137:24 138:1 | 115:5 173:9 | 77:6 80:4,5 83:3,5 |
| 122:10 129:6 | 140:13,16,19 | **memos** 23:13 | 84:9,24 85:12 |
| 155:24 172:4 | 141:5 146:12,14 | **men's** 113:19 | 95:6,10,12,14,17 |
| 190:19 194:8 | 147:3,6 152:21 | **mental** 82:18 | 95:24 96:6 102:23 |
| 198:8 217:8 | 179:3 183:23 | 230:3 | 106:13 107:17,21 |
| 238:15 | 192:10 196:15,18 | **mention** 12:6 | 114:13 118:7,15 |
| **market** 20:16 | 201:5 216:2 | 162:10 | 118:19,23 120:2 |
| **marketing** 65:13 | 226:22 230:18,23 | **mentioned** 37:10 | 120:22,23 121:1,6 |
| **markings** 11:15 | 230:24,25 234:17 | 55:20 162:9 172:1 | 121:16 126:24 |
| **marks** 68:15 | **meaning** 79:1 | 196:23 219:6 | 127:1,3 133:23,25 |
| **martin** 103:17 | 226:17 | **merit** 110:9 | 134:3 144:20 |
| 118:8 182:9 183:6 | **means** 38:24,25 | **message** 14:20 | 145:25 149:25 |
| **master** 150:16 | 76:16 113:11 | 130:8 169:5 | 152:10,13 160:12 |
| **match** 200:17 | 140:1 147:9 153:5 | **messages** 11:1 | 160:16,24 161:9 |
| 201:1,5 | 154:10 199:14,20 | 12:7,9 23:13 | 167:18 171:24,25 |
| **material** 65:13 | 201:18 208:17,20 | 36:21 37:11 | 175:8,12 176:18 |
| 234:15,20 | 216:1 227:10,25 | **messaging** 129:22 | 177:16 178:16 |
| **matter** 7:12 11:16 | 229:6 241:12 | **met** 10:19 16:18 | 180:23 181:3,5,12 |
| **matters** 19:2,20,23 | **meant** 20:3 103:20 | 51:24 59:5 102:23 | 181:23 183:1,2,11 |
| 19:25 25:19,22 | 140:14,17 143:25 | 109:15 112:10 | 183:15,20 195:14 |
| 26:8,23 84:25 | 202:5 | 130:1 191:15 | 196:6 221:2,5,8,13 |
| **maturity** 204:15 | **medical** 12:22 | 192:7 235:19 | 222:17 224:4 |
| **mayo** 11:23 | 13:1 17:20 | 236:2 | 231:24 232:1,15 |
| 103:17 118:9 | **meeting** 10:17 | **metadata** 198:22 | 233:1,6 234:6,6 |
| 182:9 183:6 | 12:2 45:2,4 50:19 | 198:25 203:7,11 | **mike's** 67:14,20 |
| **mcmillan** 88:15 | 51:2,6,18,21 54:14 | 206:12,16 | 77:9 95:20,23 |
| 89:23 90:6,10 | 54:20,21 55:25,25 | **michael** 74:16 | 145:20 175:23 |
| 91:4 126:15,17,21 | 69:7,9 181:16 | 106:23 190:3 | 181:1 |
| **mean** 11:6 15:8 | **meetings** 23:12 | **microphones** 8:1 | **million** 46:23 47:2 |
| 17:14 20:9,10 | 37:11 69:7 117:5 | **microsoft** 179:2 | 47:3 88:6,11 |
| 23:6 26:11 31:17 | 137:19 138:14,15 | **middle** 92:6 | 101:18 194:25 |
| 32:20 33:2 36:8 | 139:1 177:20 | **midst** 132:19 | 199:8,12,17,24 |
| 37:2,7 40:6 41:24 | **member** 13:9 | **mike** 11:23 12:11 | 201:13,19 202:7 |
| 43:21 45:16 54:16 | 52:13 104:25 | 12:12 15:23 16:14 | 202:10,24 203:2 |
| 55:5 57:8 59:15 | 112:18 113:7,11 | 19:13 23:4,7 | 205:11,13 207:19 |
| 63:2 66:11,14 | 113:13 | 25:18 38:6 39:15 | 216:22 224:6,17 |
| 68:4 69:3,9 81:24 | | 52:12 53:17 60:6 | 225:4 226:13,15 |

Page 24

CONFIDENTIAL

**[million - neil.devani]**

226:18,19,19
227:11 229:12,16
229:18 230:6,11
230:13,21 231:25
232:2 237:22
**mind** 10:12 13:1
54:22 62:24
136:16 226:4
**mine** 187:11
**minimal** 227:8
229:5,5
**minus** 166:19
227:13,17
**minutes** 10:16
158:18
**mismanagement**
126:9
**misrepresent**
235:4
**missed** 72:7
**mission** 174:24
175:10
**mixed** 103:25
105:4
**mobile** 14:11
**modification** 37:5
**modified** 36:22
198:24 203:8
206:13,17,20
207:20
**modify** 37:4
**modifying** 37:13
**mohiuddin** 16:6
**moment** 130:9
208:18
**monday** 92:22
**money** 45:20
46:14 56:9 108:12
164:4 176:3,6
197:1 217:4 236:9

**montgomery** 3:5
**month** 84:21
**months** 39:17
105:25 112:15
191:15,20
**mood** 48:7 160:19
**moral** 40:11
**moravetz** 69:24
**morning** 7:5 8:18
181:12
**motivation** 162:4
162:6
**move** 17:10 48:21
52:18 78:9,10,13
120:7 138:2,13,23
139:4
**moved** 217:4
**movie** 63:6,6,9
**moving** 43:1,1
66:25
**multiple** 15:11
19:10 133:25
134:2 149:8 166:8
**mutually** 174:6

**n**

**n** 4:1 108:7
**name** 7:21 8:19
9:1 47:12,17 51:1
55:3 62:6 67:9
69:24,25 100:4
103:3,4,17 107:7
110:12,13 151:8
155:6,9 195:25
216:18 235:12
**named** 70:15
88:15 103:18
124:1 156:2 191:7
233:11 241:19,20
**names** 16:4 31:14
31:21 107:10
159:14 168:12

190:6
**naming** 55:25
**nardinelli** 3:12 4:3
8:6,6,17,20 9:22
9:24 12:5 18:5,8
18:12,14 21:13
25:10,23 26:16,20
28:7,8 29:23 44:8
72:16,23 73:22
74:1 75:13,20,23
75:25 76:2,4,6,8
76:10 77:1,5,18,25
80:10 82:20 85:16
85:20,23,24 87:17
87:24 91:12,15
98:14 102:18,20
113:20 114:2
117:23,25 118:3
119:14,23 122:9
122:11 123:8
129:4,7 132:9,17
133:13,22 134:11
135:6,11 136:5,10
136:21,25 137:5,7
137:14,16,22
138:4,6,10,15,21
138:25 139:9,12
141:2,9,12,15
146:2 155:25
172:2,5 189:20
190:18,20 193:24
194:6,9 198:9,16
198:20 199:1
203:24 204:8
206:1,8 207:13,18
207:22 208:9,15
208:23 209:12,15
209:22 217:6,9,15
217:21 218:2,8
219:21 220:2
232:4,11 236:8

238:7,19
**nascency** 49:15
**nature** 38:4,18
112:16 126:2
133:1 135:3
146:21 147:1,4,16
**necessarily** 19:6,9
25:21 49:1 63:12
68:13 147:5
170:18 231:3
**necessary** 120:6
131:6 179:8
**need** 10:3 21:15
29:20 64:12 72:1
76:11 97:8 138:16
145:2,22 198:10
218:10 238:15
**needed** 58:10
59:14 160:24
163:3 235:17
**needs** 20:6,7 26:6
181:16
**negative** 49:4
**negotiate** 70:25
100:3
**negotiated** 20:8
58:5,19
**negotiating** 100:1
101:8
**neil** 1:4,16 2:4,18
5:21 7:10,13 8:12
9:2 23:19 73:24
91:21 118:8,24
134:6 139:1
165:17 181:6
211:3,4,5 220:6
238:25
**neil.devani** 210:25
211:11,14 212:11
214:3,7,11

CONFIDENTIAL

[neither - operating]

**neither** 50:13
**network** 59:5
**never** 9:3 23:3,23
  23:23 40:24 99:2
  108:9 122:17,18
  126:3 149:17
  153:24 178:24
  179:3,4,9 192:5
  219:2,11
**new** 45:19,25 46:1
  46:18 49:16 59:19
  59:20 82:4 90:16
  90:17 103:2 104:5
  154:6 206:23
**news** 172:9
**nice** 27:11 138:7
**nick** 117:16,17
  156:2,5,24 157:17
  157:18,19,22
**night** 50:19 51:18
  54:13
**nods** 9:17
**non** 19:25 109:20
  200:14 201:4
  202:20
**nonvoting** 113:12
**noon** 10:5
**normal** 176:2
**note** 5:23 7:24
  9:25 58:14 88:7
  88:11 101:19,24
  194:18,25 195:4,6
  195:7 196:13,20
  197:2,4,8,9,13
  198:4 199:8,12,18
  201:18,25 202:7
  202:10 204:17
  205:12 207:19
  209:24 210:3
  212:16 216:3,10
  216:13,21 237:21

237:23
**notes** 43:12,15
  78:3 196:9,17
**notice** 39:13,17,18
  39:23,25 40:15
  41:5,10,15 84:7
  120:3,9,12,14,17
  122:21,24 123:16
  141:22 234:9,13
**notices** 60:16
**notwithstanding**
  44:23
**nuance** 87:11
**number** 9:6 43:11
  65:2,5 78:18
  107:12 157:21,22
  158:10,17,18
  180:21,21,22,24
  198:13 224:2
**numbers** 11:12
  65:11 198:14
  227:20

**o**

**o** 108:7 129:9
  156:2
**oath** 9:9
**oaths** 241:3
**object** 189:13
**objected** 186:1
**objection** 44:6
  80:7 82:16 119:13
  119:17 140:25
  145:16 205:24
  206:5 209:18
**objections** 133:15
  134:15,24
**obligation** 29:9
  40:22,23,23,24
  41:1,3,8 80:11
**obligations** 39:3,7

**obscures** 172:10
**observations**
  48:17,19
**observe** 63:5
  66:20
**observer** 113:10
  113:12 116:1,14
  117:8,13,14,19
**observing** 63:13
**obtained** 127:3,7
  127:11
**occluded** 190:22
**occupied** 116:15
**occur** 86:16 181:9
**occurred** 81:16
  120:8 167:4
  229:11
**occurrence** 94:17
**occurring** 52:15
**october** 20:22,24
  22:1,17 44:20
  45:15 48:8 49:12
  50:8,8,9
**offer** 13:22 18:4
  21:16,22 55:9,10
  132:12
**offered** 114:9,25
**offering** 108:11
  203:4
**office** 69:4 92:11
  92:14,16,21,25
  93:3,12 94:12,14
  94:21,24 98:22
  109:14,16 112:10
  136:18 150:13,14
  169:3 171:6
  181:12,13,20
  195:21
**officer** 103:14
  193:7,9 241:1

**official** 19:7 41:20
  41:23 54:22
  104:25 160:10
**officially** 51:20
**oh** 24:1 191:5
**okay** 31:19 32:9
  42:4 48:4 54:3
  57:17 66:14 67:3
  72:16 74:24 75:9
  75:23 77:18 96:3
  117:21 122:1
  132:9 134:6
  144:15 182:17
  189:17 198:25
  208:9 219:21
  232:4 234:25
  238:7
**omitted** 135:16
**omnibus** 127:20
**onboard** 108:16
**once** 60:6,15,22
  107:13 235:20
**ones** 16:7 31:9
  100:5,8,10 110:8
  133:11 181:10
  218:5
**ongoing** 23:21
  206:25
**online** 109:17
**ooo** 1:3 2:3 3:23
  4:5 6:6,14 239:4
**open** 238:9
**operated** 153:22
**operating** 17:12
  17:16 20:16 33:15
  33:19,23 53:8
  54:6,11 152:18
  167:10,12 213:9
  220:12 221:24
  222:15 223:24

CONFIDENTIAL

**[operation - people]**

operation 200:3
operational 32:16
  82:5,8
operations 15:16
  106:15 112:20
  230:2
opinion 84:12
  176:13 178:8
opportunity 88:1
  133:18 217:25
  218:1,2 228:21
  241:15
opposed 87:10
  158:1 189:3
optimism 48:23
  49:8
option 116:21
  185:17,20 201:12
  205:19
order 9:10 26:12
  77:7 131:7 138:17
  151:6 198:2
  208:14,24 238:19
  238:21
ordered 57:1
ordinary 171:14
  171:16,17,18,19
  171:22
org 43:17,19
organization 45:1
organized 179:9
original 172:10
originally 69:21
  70:1 179:14
orrick 71:18
outcome 241:20
outside 24:1 25:13
  28:17 60:6 71:15
  71:16 79:2 90:9
  131:1 133:7 152:8
  152:9 182:9 183:5

189:16 195:6,16
197:19 209:2
overly 102:1
owned 70:12,14

**p**

p.c. 3:3
p.m. 2:21 91:24
  92:7 113:23 114:1
  135:14,15 136:1,4
  194:2,5 204:7
  221:1 232:7,10
  239:1,3
page 4:2,8,19 5:2
  6:2,8 18:10,15
  22:11 37:23 64:14
  65:7,8 92:6 130:2
  135:17 174:19
  190:23 193:12
  200:2 204:14
  205:6 218:19
pages 1:25 4:9,17
  5:5,12,15,18 6:4
  198:11 218:19,20
paid 35:23,23,24
  36:11 44:15
  163:18 166:12,19
  166:20 167:24,25
  168:1,5,13,15,18
  168:20,22,24
  169:2,7 171:15
  188:8 189:8,19,24
  236:9,11
paint 56:6
painting 78:11
paper 99:3 197:15
papers 149:3
paperwork 90:24
  111:19 148:22
  195:4
paragraph 65:14
  119:6 173:16

174:20 193:7
238:20
parallel 186:2
parameters 45:22
  207:11
park 175:1
parlance 31:22
part 22:24 25:15
  61:23 62:2 66:20
  70:12 75:5 83:9
  83:14 93:22 105:5
  105:6,8 106:23
  109:15 122:25
  162:4 163:10
  168:23 171:1
  201:8 208:7
  217:18 228:15
partially 173:6
participated 21:8
particular 16:20
  81:10 165:7 206:3
  206:23 207:1,3,7
  208:4,6 219:8
particularly 49:4
parties 7:25 20:8
  28:4 39:1 46:2
  76:12 217:4
  241:18
parting 171:13
partner 54:4,6
  156:7 193:11
partners 32:23
  35:9 52:16 99:19
  99:22
partnership 30:22
  33:12,14 54:1,5
  70:8 71:4,5
  146:16
party 20:7 174:12
  174:14

party's 20:7
pass 116:19
passed 13:7
passion 13:2
passive 62:18 63:2
  63:4,8 66:18
password 213:23
  213:24
path 14:4,5 83:22
  83:25 84:3 186:3
  187:14,15,17,21
  188:13
paths 187:20
pause 185:12,15
  203:22 227:18
pay 34:23 35:3,8
  35:11 44:2 47:25
  168:8 180:9
payable 204:18
  227:7,8
payment 179:23
payments 14:11
payouts 90:23
payroll 43:22
  166:18 167:21
  169:10,14,19,22
  170:2,5,5,10 171:5
peas 100:8 101:1
penalty 26:14
  240:1
penn 12:21
people 11:18,24
  16:4,13,19 19:12
  25:15 42:1,5,9,13
  42:17,19 43:5,9,24
  44:13 45:4 49:2,3
  49:5,7 51:22,24
  52:10 55:22 59:4
  59:5,9,12 61:2
  68:10 104:23,24
  112:11 127:22

CONFIDENTIAL

[people - potentially]

159:22 160:6
163:17,19,20,21
166:12,20 167:23
168:2,11,13,18
169:4,4 170:9
171:3 176:18
181:11,13 188:14
189:7,18,22,23
190:1
**people's**  19:15
**perceive**  188:1
**perceived**  59:8
60:24
**percent**  63:18
111:8 200:4,7,14
200:18,25 201:3
201:13 202:14,19
202:20 205:3,8,12
205:14 234:2
**percentage**  198:3
**perception**  175:12
**perfectly**  57:1
**perform**  107:2
**performance**
20:20
**performed**  100:22
**peril**  85:22
**period**  15:4 22:6
40:16 44:2 97:9
106:11 115:19,21
120:5 131:11
132:20 165:21
170:11,19 189:5
**perjury**  240:1
**permitted**  74:18
**person**  10:17,19
23:12 36:21 44:24
44:25 52:11,12
66:2,9 94:5
103:16,18 112:25
113:2 124:1

131:12 136:7
156:2 170:15
183:12 233:11
235:17,22 236:2,9
**person's**  235:12
**personal**  40:23,25
48:16,17,18 90:5
129:23 164:18
214:2 228:21
**personally**  39:24
58:19 80:6 106:23
111:14 173:3
175:18
**personnel**  38:3
**perspective**  131:3
131:8 176:13
**phillips**  13:15
**philosophies**  83:23
**phone**  10:18 12:10
23:12 36:21 94:22
157:24,25 158:9
158:17,18 160:21
161:21 165:1,4
183:12,13 217:11
**phonetic**  86:10
**phrase**  41:24
200:25
**phrased**  124:9
**physical**  69:6
150:21
**pick**  8:1 193:24
**picked**  9:18
**picture**  56:6 78:11
98:19 100:5
210:16,19,21,23
**piece**  133:14
**pieces**  184:14
**pilot**  107:22 108:1
**pin**  81:13 123:14
**place**  7:25 16:1,3
48:12 49:9,9 68:9

75:12 137:21
139:6,7,10 203:20
241:9
**placed**  118:4
166:24 180:11,14
180:18 221:14
**placing**  180:3,6
181:25 183:4
**plaintiffs**  1:6 2:6
3:2 8:8
**plan**  171:12
178:18,21 179:15
**planning**  59:6
89:16,17,24
**platform**  129:22
**play**  63:7 129:21
**please**  7:24 8:4,10
10:4 83:21 119:21
157:7 193:25
218:9 222:1
**plug**  129:20
**plugged**  62:14
**plus**  166:19
201:13
**point**  27:21 39:5
39:15 42:14,23
43:4 45:8 46:17
52:20 54:23 57:13
61:11 62:7 74:20
75:24 76:1 84:22
85:20,21 92:18
93:2 98:3,4 102:6
104:9 105:15
106:19,19,20
115:19 124:16
128:20 135:3
141:24 143:8,9
146:4,9 147:10,25
151:5,7 152:11
160:23 163:24
164:8 215:24

229:25 230:4
231:3 236:1
**points**  23:20
229:14
**policies**  38:3 73:2
73:8 181:1
**policy**  41:21,23
93:7
**poorly**  124:9,17
**portal**  109:23
**portfolio**  56:17
96:24 97:19,23
98:2 99:16 108:21
109:21,22 112:18
115:1 150:22
163:22 164:3,16
167:17 195:5,21
197:22
**position**  15:6
16:21 18:1,22
25:25 26:10 88:17
102:13,22 131:3,8
132:14 134:17
140:6,8,14 144:18
178:15 207:22
209:13 231:6
**positions**  18:16
**possible**  67:18
211:7
**possibly**  178:6
183:18 188:24
196:3
**posted**  191:3,6
**potential**  25:21
27:6 104:18
108:18 109:25
126:12 188:23
208:3 214:23
**potentially**  131:18
131:23 152:20
207:1 210:14

CONFIDENTIAL

[potentially - pros]

214:22
pr  55:10 175:25
practice  40:12
94:23 211:16,18
precise  31:20 65:5
precisely  37:9
152:4 229:5
precursor  62:23
62:25
predate  32:14
51:15
predated  32:12
51:20
premise  214:19
premonition  82:13
prepare  10:9
prepared  11:1,9
217:23
preparing  86:7,12
presence  133:7
189:16,22
present  3:18 116:5
116:10 207:6
press  163:10
171:16 172:1
176:5 177:22,23
presume  13:22
129:22 212:23
213:5
presumes  212:21
presuming  213:4
213:16
presumption
212:25 213:2,8,9
pretty  15:3 54:18
63:19 106:17
145:23 146:23
147:18 170:25
192:4 195:24
prevent  207:23

previous  67:12
72:8 231:4
previously  11:8
17:12 47:9 72:24
primarily  86:22
167:16
primary  46:4 47:7
47:16,18,22 49:18
56:23,25 57:2
79:5,16
principal  204:16
principle  9:6
200:13
printed  172:8
printout  18:9
printouts  218:23
prior  22:21 104:4
123:12,15,23
148:25 152:17
154:1 155:1
169:10 172:16
191:20 209:23
218:3
private  8:2
privilege  24:12,24
25:1,2,7,9,12,17
26:4,17 27:23,25
28:11,11,16,21
29:5 73:16,18
74:5 83:18 84:13
85:2 87:8,16
88:13 90:3 98:10
102:3,19 109:5
121:12 123:2,10
130:16 132:1
133:12,15 134:15
135:7 136:13
144:4 145:1,7,9,14
163:4 182:24
183:9 203:16
206:6 215:12

226:9 234:22,24
237:6 238:5
privileged  10:25
24:6,8,18,19 25:20
25:22 27:15,16
29:10,11 71:22
72:11,15 73:14
83:9,13,15 84:2,5
87:6 88:9 89:20
89:25 95:16,19,21
95:23 97:16 98:8
101:20,22,24
109:3 120:24
123:4,7 130:14
131:24 133:11
135:3 142:11
144:11,13,17,22
171:20,23 182:15
182:23 203:14
206:4 215:21
226:7 236:5 237:4
237:15 238:3
privileges  133:4
pro  187:21 188:6
probably  44:10
45:6 46:12 56:9,9
56:10 60:10 65:19
71:13 79:25 95:1
106:1 112:15
116:12 128:5
142:18 157:23
158:3,21,25 165:2
165:5 170:4
172:17 182:15
187:5 197:25
problem  178:6
procedure  241:4
procedures  38:3
proceed  74:20,22
proceeding  187:22
187:25 188:6

proceedings  239:2
process  16:15,17
20:12 22:10 55:2
110:5
processes  106:16
processing  90:22
91:2
produce  230:5
produced  11:11
198:13,15,16,22
217:13,20,24
219:18 224:5
229:12,16
product  15:11
professional  17:9
profile  4:9 18:10
64:13 116:3
program  50:12,25
54:24 55:18 58:8
64:16
programs  195:22
progress  160:23
prohibitions  54:3
project  100:11,18
101:1
prolong  133:19
prominently  98:21
promising  48:10
promissory  5:23
194:25 201:18,25
202:10 209:24
210:3 216:10,21
237:21,22
promoted  106:9
promotional
100:16 111:10
pronounce  110:12
proofread  179:8
proper  203:20
pros  187:16,19
188:4,5

CONFIDENTIAL

[prosecution - reality]

prosecution 25:22
protected 27:5
protection 26:7,23
protective 208:13
208:24 238:19,20
provide 40:3
96:16 107:21
120:6 131:11
140:6,8,12 164:6
164:13,15 191:23
195:21 203:19
provided 100:1
231:25
provides 47:20
156:20
providing 47:19
101:7 178:14
232:1
provisionally
208:12
pto 36:17 37:17
72:5,14 78:7 93:8
187:13
public 41:25
143:18
publication
232:25
publicly 111:13
published 159:25
purchase 197:17
purely 111:21
purport 75:1
purports 216:25
purpose 9:7 65:15
70:16,22 100:16
149:6 203:25
purposes 36:12
74:6 145:1 175:16
pursuant 241:3
pursue 14:4,5
53:17 83:22,23

84:1,4 185:18
186:3 187:14
188:10,13 189:3
pursued 17:23
pursuing 57:10
187:15
put 37:14 63:5
66:19 76:17,23
77:23 81:11
104:14 110:25
121:2,11 178:15
185:11 218:4
234:13
putting 167:5
195:3

**q**

qualified 25:8
164:22
quarter's 39:17
question 9:15
24:25 25:2,7,16
26:22 27:10 28:1
28:10 30:7 34:25
35:6 54:19 66:15
67:13 72:2,6,8,12
73:3,5,9 79:25
85:19 87:25 88:10
97:4 98:9 101:16
102:4 109:4
121:12 124:9,18
130:15 131:25
133:8 141:1,6
145:15 160:3
200:22,22 205:25
206:7 208:1,1,10
208:10 210:10,12
212:21 213:3
214:8,19 217:17
219:15 223:3
231:4 237:6

questioning 136:6
213:2
questions 6:7
16:19 26:2,6 27:3
27:22 28:6 29:5
74:18 78:1 84:24
100:6 132:21,25
133:2,20 134:9,12
134:23 135:2,4
136:12 145:2
159:1,1,2,4,19,24
160:11,16,17,19
160:21 163:11
166:21,25 184:20
184:22 207:24
234:25 236:17
238:10
quick 161:2
quickly 9:20
132:16 137:23
139:10 235:1
quinn 2:18 3:11
7:19 8:6 74:1
quinnemanuel.c...
3:16
quite 119:20,25
209:12 217:22
quote 42:17

**r**

race 174:25
175:21
radar 178:5
raise 80:17 219:9
raised 30:18 164:4
raising 80:20
84:21 86:8
ran 81:9
rapidly 160:23
rapoport 103:18
103:19 108:15
128:25 151:21,23

152:24 153:3,13
153:22
rate 65:12 200:13
201:3 205:7 227:8
229:2,4
reach 74:10 94:21
163:23 164:10,19
164:25 165:11,13
reached 136:7
165:4,8 179:10
reaction 103:21
173:3 193:14,18
193:18,21,22,25
reactions 193:20
read 37:25 73:19
74:13,15,25 75:10
75:17,20,22,25
76:9,14,19 77:1,3
119:4 192:10,24
194:17 200:10
205:18 233:4
241:15
reading 31:2
144:24 173:8
192:16,19 227:4
reads 173:10
192:25
ready 120:16,18
120:19 133:10
real 23:21 99:4
178:6
reality 50:22,22
50:25 51:3,13,22
52:6,8,16 53:2
59:9,10 60:4,13,14
62:9,15,16 66:17
67:13,16,21,24
68:1,4,14,17,25
69:1,18,20,21
70:19 71:6 110:18
110:22 148:6,8,21

Page 30

CONFIDENTIAL

**[reality - regard]**

| | | | |
|---|---|---|---|
| 149:3 151:9 | 89:6,9 90:14,20 | 235:14 | 238:11 239:1 |
| 152:19 153:23 | 91:3,7 95:10 | **receive** 159:24 | 241:13 |
| 154:3,5,15 155:3 | 100:10,13,17 | 160:20,21 166:9 | **recorded** 2:17 |
| 194:18 195:1 | 101:5,21 102:10 | 168:8 180:2 | 161:22 162:1 |
| 199:12,18,20 | 105:19 109:7 | **received** 16:9 | **recording** 7:24 |
| 202:7,11 205:12 | 112:2,13 114:7 | 21:23 73:20 122:2 | **records** 10:21,23 |
| 207:20 210:5 | 118:12,21 122:6 | 180:20 184:20 | 169:23 170:5 |
| 215:18,22 216:6 | 122:16 126:7,10 | 212:4 218:7 | 183:19 |
| 216:16,17,23 | 126:13 127:10,14 | **receiving** 79:24 | **refer** 31:21 197:4 |
| 231:23 232:2 | 128:5,6,10,11 | 80:2 118:12 122:6 | 197:5 |
| **realize** 160:24 | 129:3,15 148:12 | 122:16 163:10 | **reference** 14:15,18 |
| **really** 17:14 19:16 | 149:2,7 155:14 | 171:16 216:6,14 | 14:20 174:20 |
| 48:24 60:2,8 61:2 | 156:17 158:7,14 | 216:15 | 224:4 |
| 82:18 108:3 135:5 | 158:15 159:8 | **recess** 72:20 77:15 | **referenced** 16:5 |
| 149:13 163:6,13 | 160:2 161:15,17 | 113:24 135:15 | **referred** 57:14 |
| 178:10 | 162:5 164:24 | 194:3 204:5 232:8 | 149:11 |
| **reason** 64:11 | 165:2,6,16 167:20 | **recognize** 21:14 | **referring** 11:10 |
| 82:13 91:9 92:1,4 | 167:23 168:10,12 | 91:16 98:15 99:2 | 21:19 81:18,20 |
| 93:17 118:14 | 168:16,19 169:13 | 100:5,7 172:6 | 143:6 170:2 |
| 126:22 152:16,22 | 169:18,21 172:25 | 192:8,11,14 | 172:21 194:21 |
| 153:1,5,8,11,20,25 | 173:8 174:14 | **recognized** 147:13 | 197:9,14 219:1 |
| 174:9 179:18 | 177:19,20,25 | **recollection** 45:23 | **refers** 20:12,15 |
| 190:14 203:10,13 | 178:7 179:24 | 98:24 129:23 | 32:21,21 104:12 |
| 203:15 206:15,19 | 180:4 181:10,14 | 165:3 210:1,3 | 104:15 194:24 |
| 212:3 214:21,23 | 182:2,6,20 183:14 | 224:10,12 225:7 | 211:5 |
| 215:4 222:22,24 | 184:4,11 186:4 | 230:1 234:4 | **reflect** 197:6,11 |
| 228:13 | 187:5 188:15,16 | **reconstruct** 165:9 | 202:5 |
| **reasonable** 42:23 | 188:19,21,25 | 171:3 | **reflected** 205:15 |
| 165:10 | 189:4 190:5,7,11 | **record** 7:6 8:1 9:1 | 206:16 |
| **reasons** 40:8 71:23 | 190:16,17 191:1 | 9:9 11:5,6 25:15 | **refresh** 173:9 |
| **recall** 16:18 18:21 | 192:3,10,16,19 | 26:1,18 27:11 | **refresher** 10:11 |
| 18:24,25 21:2,6,7 | 193:1,3,20 194:19 | 44:2 60:21 63:24 | **refuse** 121:11 |
| 22:1 34:17 42:6 | 195:18,25 198:14 | 72:18,21 73:19 | **refusing** 26:2,5 |
| 46:20 51:8 55:4 | 203:4 210:9 211:9 | 77:2,3,11,13,16,23 | 29:21 88:10 98:9 |
| 56:1 57:22 61:22 | 211:21 212:1,10 | 87:15,18,21,22 | 102:3 109:4 123:9 |
| 62:1,3 63:15,16 | 218:3 221:5,8 | 113:22,25 135:8 | 130:15 131:25 |
| 65:1,3 68:12 | 222:4,10 224:8 | 135:13 136:3 | 145:6 203:15,18 |
| 69:17 70:5,6,6 | 225:13,17,20 | 145:13 183:15 | 203:18,21 235:10 |
| 71:11 73:3 81:1,3 | 228:4,6 231:8,12 | 194:1,4 203:23 | **regard** 76:18 |
| 82:18 86:1,17 | 231:15,20 232:21 | 204:3,6 219:25 | 178:11 |
| 88:17,19 89:2,3,5 | 233:19,22 234:8 | 232:6,9 235:2,4,8 | |

Page 31

CONFIDENTIAL

**[regarding - responses]**

**regarding** 136:8
207:12
**regardless** 22:19
237:12
**register** 219:25
**regular** 93:22
94:17,18
**regularly** 92:14,15
**rehnert** 103:3,5,5
103:6,10,20
**reimbursement**
36:12
**relate** 67:5,7 97:6
99:8 144:6 207:8
236:17 237:21
**related** 15:15 19:1
19:3,20,20 68:6,10
68:13,16 106:13
108:20 144:13
149:25 154:16
167:16 184:5
193:22 217:18
219:4 221:19
223:12,13,17,18
223:20,21 225:23
226:1 228:10,17
229:15,17
**relates** 30:17
215:12,23
**relating** 19:23
20:25 21:4 27:14
29:25 31:10 34:2
74:24 87:12 88:3
88:7,12 165:19
207:12 210:3
235:5
**relation** 184:17
192:6 195:12
**relationship** 37:24
40:3,7 71:1 90:5,9
99:20,22 127:1

144:6,14 149:17
149:20,22,24
150:19 152:10
154:23 164:12,17
176:1 178:15
191:10,13 195:16
**relay** 161:13
**released** 192:17,20
**relevant** 130:19
223:2
**reliable** 45:24
**remain** 41:3,9
**remained** 38:13
**remember** 9:7,13
12:14 14:19 16:7
16:23 37:15 62:4
63:22 64:24 107:6
107:24 144:24
149:10 152:4,5
155:8 159:14,17
165:7 166:1 168:3
169:6,25 170:12
170:14,15,20
171:1 185:1 212:6
212:17 214:25
215:2,6 220:9,11
230:4 235:12
**remembered**
215:7,10
**remote** 42:13,19
**remove** 237:9
**removed** 105:22
106:8
**rendered** 236:10
**rent** 163:19
**renting** 174:25
**repay** 201:12
205:19
**repeat** 87:25 214:8
**rephrase** 200:23

**replacement**
103:12
**report** 124:12,14
124:20,24 125:2,2
125:25 233:24
**reported** 1:21
124:5,11,15
241:10
**reporter** 2:23 7:23
8:10,14 9:18
117:24 172:3
238:14,23
**reporting** 106:13
**represent** 8:5 99:5
218:17 235:23
**representation**
236:1
**representative**
24:21 114:19
117:12
**representing** 8:21
**represents** 99:1,6
**reputation** 178:16
**request** 85:2
**requested** 180:23
219:2,3,10,17
**requests** 184:20
**require** 137:20
**required** 40:9
41:19 230:20
**requirement**
39:25 114:10
**requires** 75:8
138:13 139:5
176:13
**research** 20:15,17
**resign** 82:21 83:2
83:6,8 85:8 89:16
89:18,24 128:16
**resignation** 40:14
41:5,10 84:8 89:6

89:9,12 90:25
120:15 121:3,11
122:21,24 123:12
123:16 126:15,22
128:4 134:13
141:23 228:9
234:9,14
**resigned** 81:12,12
85:5 89:10,15
90:11 91:9 119:9
119:11,15 121:18
121:24 126:18
127:15 128:8,12
128:15,21,22
129:1 141:19
228:4
**resigning** 41:15
**resolved** 76:22
**resources** 55:9,20
58:8
**respect** 134:17
207:14 219:11
235:23
**respond** 157:17
158:17 160:4
177:22
**responded** 118:19
121:5 157:15
**responding** 20:13
**responds** 156:23
157:5 158:9
185:23
**response** 27:7
73:11 83:18 85:2
95:17,25 96:7
118:21 136:7
157:20 161:6
231:9,13,18
**responses** 9:16
74:9

CONFIDENTIAL

[responsibilities - rothenberg]

**responsibilities**
19:10,19 20:25
21:4 22:24 23:20
93:22 167:14
**responsibility**
29:25
**responsible** 23:1
30:23 58:3 62:15
73:1,7 86:22 87:2
87:10 94:3 104:16
106:12,15 167:15
171:11 176:16
**responsive** 84:24
108:18
**rest** 160:11
**restructuring**
160:9,15 161:8
**result** 185:9
186:24 212:17
231:13
**resume** 136:5
238:9
**resumed** 139:11
**retired** 156:25
**return** 47:20
**reveal** 170:1,7
**revealing** 183:8
**revenue** 193:7
**review** 96:19
110:10 195:7
208:22 209:7
217:12,25 218:3
**reviewed** 12:6
75:3 100:19 110:8
148:18
**reviewing** 101:10
148:22
**righetti** 3:3
**righettilaw.com**
3:8

**right** 8:25 16:8
23:16 24:11 39:2
39:6 46:15,24
47:4 53:21 56:5
56:17 57:11,15,19
58:15 67:9 77:1
81:3,14,17 84:6
85:6,7,25 92:22
97:24 102:5 110:1
115:11,12 119:4
121:13 122:4
130:21 132:19
134:6,10 135:2,4
135:11 139:5,25
140:9 144:4 145:4
147:21 153:9
157:15 158:22
161:3,10 166:14
167:21 185:6,11
187:1,8 188:23
190:7 193:25
199:7 202:15,21
204:22 208:21
213:4 218:3
219:24 227:4
238:21
**rights** 36:11
197:14
**rigid** 19:9
**rigidity** 19:11
**ring** 14:16
**riordan** 124:2,4,11
125:1 126:2
232:13
**riordan's** 124:12
124:20,23 125:5
125:13
**rise** 190:24
**river** 50:7,10,12
50:13,17 51:5
54:14,15,24 55:18

57:7,18 58:18
59:23 60:9 61:8,9
61:10,22 62:1,2,5
62:13,22,25 64:1,6
64:7,16,16,21,21
64:21 65:23 66:8
66:11 67:5,5,12,17
67:18,24 68:7,9,13
68:16,17 69:9,11
69:14 86:14 87:3
87:13 88:4,8,12
96:11,17 97:19,23
98:1 99:11,18,19
99:22 101:19
108:2,12 109:20
109:20,22,25
110:17 111:4,6,6,6
111:8,16 112:18
119:1 144:7,8,14
144:15 146:4,9,17
146:17 147:11,13
147:24 148:1,3
149:7,8,11,11,12
149:20,21 150:6
150:14,14,25
151:1,4,5,8,9,14
151:17 152:17,18
152:23 153:2,11
153:21,22,24
154:1,2,2,4,5,7,10
154:19,23,24
155:5,9,10,13
177:7,10 195:22
216:18,20,24
236:24 237:2,14
237:19,23 238:2
**road** 55:7
**robot** 110:19,20
110:23 111:2
**robots** 110:21

**role** 18:25 25:11
27:12 43:7 72:25
73:6 86:4 90:19
94:2 105:5,6
113:16 125:5,13
125:22 148:21
176:15
**roles** 43:5 105:4
**roll** 56:15
**room** 113:19
**rope** 52:16
**roster** 43:17,21
**roth** 5:8
**rothenberg** 1:8
2:8 4:12 7:14
15:19,22 16:14
17:6,20,25 18:16
19:9 20:21 22:25
24:13,15,22,23
26:3 27:5,13 28:4
28:5 29:6 30:5
35:14,15 36:7
37:2,20 38:6,10,13
39:5 40:14 41:3,9
43:9 44:4 51:3
53:17 55:16,17
56:21 67:13 69:8
69:22 70:2 72:4
73:1,7,20,23,23
74:12,12,16,16
75:12 76:15 78:14
82:21 84:16 85:6
85:8 86:2 88:18
88:20,25 89:7
90:11 91:5,6,9
93:23 97:20 98:21
99:14,15,16 102:7
103:7,21 104:3
106:23 110:15
111:15 112:21
113:3 114:15,16

Page 33

CONFIDENTIAL

[rothenberg - see]

114:20 115:1,7,10
116:15,17,22,23
116:25 117:9,17
118:7,19,25
121:24 125:5,14
125:22 126:18,22
127:16,17 129:1
129:18 131:17
133:23 141:19
144:7,14,25
145:10,12 146:18
149:1 151:24
152:1,2,15 154:20
154:22 164:15
165:15 172:12
183:3 188:17
189:1 190:12,24
191:25 193:14
195:13 196:14,16
196:18 197:23
210:4 216:1,3,11
216:22 223:16
225:2 232:13,17
237:18
**rothenberg's** 75:5
117:12 232:16
**rothenbergventu...**
165:22
**rothenbergventu...**
91:19,21 165:17
**rothenbergventu...**
77:6 220:6
**rough** 42:7 130:9
**roughly** 43:1
81:23 82:10
112:14 177:9,10
197:21 198:3
**rounds** 79:13
**route** 157:1
**rules** 9:5 144:22

**rumors** 126:4,8,11
130:11 131:21,22
142:8,10 143:20
162:8,16,20,25
163:4
**run** 86:7,12
**running** 86:6
**rv** 5:24 73:23 74:3
74:5
**rvmc** 35:21,21,22
35:25 72:13 75:5
**rvmc00038557**
5:21
**rvvr** 51:4 54:14
**résumé** 219:7

**s**

**s** 4:6 5:1 6:1
**sake** 210:21
**san** 1:2 2:2,19 3:6
3:14 7:2,17,20
100:12 101:10
**sarah** 191:7,10,17
192:4
**saturday** 138:6
**save** 220:1
**saw** 14:21 16:23
95:3 175:24
**saying** 25:19 26:6
26:13,19 27:1,16
27:17 28:9 45:5
52:24 55:24 58:18
66:4 75:16 76:11
121:15 130:23
147:1 170:9 184:1
197:7,8 203:18
208:21 212:14
229:9 231:16,19
231:20
**says** 18:4 21:20
23:19 38:1 53:1
61:7 76:15 95:5

118:23 129:16,17
129:20 156:19,23
157:6 172:12
173:15 185:24
199:8,12,17,19,23
200:3,6 201:2,12
202:8,14,16,18,22
204:15 208:24
211:4 215:25
216:8,11 221:25
222:8 224:21
226:11,14 227:20
228:1 231:24
**scanning** 115:5
**scenario** 230:17
**schedule** 136:22
138:18
**scheduled** 73:25
137:8
**schedules** 138:22
**school** 12:22,24
13:1,1,12 17:20,20
45:17
**scope** 15:3 23:3,5
23:17 62:17 112:5
120:25 136:8
195:17
**scratch** 155:22
**se** 17:15
**sean** 3:20 7:21
**search** 183:19
184:12,16,19,21
196:6,7
**searched** 184:3,5,9
184:23 232:14
**searches** 184:3
**season** 174:24
**seat** 59:22 112:22
113:3 114:9,9,11
114:15,20,23
115:6 116:15,18

116:22 117:18
**sec** 122:7,19 123:1
123:17,21 124:5
124:11,12,13,15
124:21,22,24
125:2,3,24 126:12
132:6 206:25
207:5,8,12,14
208:5 209:9,21
233:23,24 234:5
235:5,23 236:18
**second** 13:16
47:11 72:12
136:14 138:19
149:15 173:16
190:21 193:15
195:23 200:2,10
202:13
**secondary** 47:18
47:23 48:3 79:19
**seconds** 78:2
**section** 37:23,25
200:11 202:17
204:15,15,16
205:20 228:11,24
229:8 231:23
241:3
**sectors** 65:11
**secure** 213:25
214:1
**securities** 122:3
**security** 230:8
**see** 22:11 27:21
31:11 38:7 43:23
54:21 64:18 71:12
78:3 91:18 92:8
92:12 95:8 116:7
118:4,10,18 129:8
130:5 135:16
136:19 138:2
139:18,19 156:1

Page 34

CONFIDENTIAL

**[see - situated]**

156:21 157:3,4,10
172:9 173:9 189:7
190:23 191:4,5,5
194:10 199:17,21
199:25 200:15
201:15,20,21
204:11,13,14
205:4,9 209:3,4,5
210:17,20 211:2
212:10 218:11,14
220:7,8 221:3,17
221:18 222:2
223:25 224:1,19
226:20,21 227:13
229:4
**seeking** 20:14
68:16 110:16
**seen** 14:12,17
35:13 99:3,4
122:17,18 125:18
207:20 209:23
218:5 229:23
**send** 167:5 181:3,5
211:19 212:12,19
212:25
**sending** 92:21
211:17,22 212:1
212:10,17 214:25
215:3,6,7,11
**sense** 41:17 60:18
70:9,10,10 81:22
89:25 143:15
169:6 174:23
222:2
**sensitive** 8:1
**sent** 11:4,5 14:19
75:11 77:5 92:2
129:8 166:9
181:14 194:10
212:4,11,15,19,22
212:24 213:1,5,10

213:14,17,17
214:6,10,18,20,21
215:5,5,8,11
232:14
**sentence** 37:25
95:5 119:18
200:10
**sentences** 201:8
226:21
**sentiment** 61:5,6
175:3,5
**separate** 30:5,17
60:23,24 67:8
68:21,22,23 69:2,4
69:5,6,7,12,13
146:17,20 147:15
149:16 150:7,11
150:21 151:9
192:21 201:8
210:1 227:25
235:5
**separately** 35:12
181:6
**september** 82:23
83:2 115:9,14,16
119:10 130:25
180:1 184:2,4,6,13
**sequence** 55:4
**series** 101:3
154:13,14 196:21
219:17
**seriously** 161:2
**serve** 103:6,9,23
115:17
**service** 40:3 43:22
**services** 100:23
178:14 236:10,10
**serving** 102:6
106:4 116:10
**session** 136:1

**set** 23:21 181:13
207:10
**setting** 31:3 32:9
32:18,20
**setup** 35:7
**sfdepo** 3:22
**shakes** 9:17
**shapes** 101:4
**share** 29:1,2 61:5
126:1 179:11,15
234:21
**shared** 11:9 41:25
150:13
**shares** 48:1 197:17
**sharks** 100:9,12
101:10
**shed** 171:21
**sheet** 218:16,20
228:3 229:10
**sheets** 218:21
**shift** 102:13
**shoot** 138:10
**shooting** 67:1
**short** 115:19,21
157:7 161:1
**shorthand** 2:22
8:14
**shortly** 105:22
**show** 14:12,17
21:10 63:9 98:12
172:1
**showing** 117:22
170:5
**shut** 85:21
**side** 15:14 17:1,11
17:13,18 20:25
70:15 88:24 94:4
108:22 123:5
176:19,25 179:20
179:22 188:4
199:3,3

**sidebar** 87:14
**sign** 36:25 41:19
**signature** 218:14
240:12 241:24
**signed** 25:18 36:6
37:15,16,18 38:6
38:14 76:12
109:18 217:1,3
**significance**
227:22
**significant** 170:22
170:24
**signified** 197:16
**signifies** 217:2
**signify** 217:5
**signing** 32:22 37:1
**silicon** 14:12 127:4
127:7,11 224:18
224:23 225:4
**similar** 22:1 47:21
47:21 49:14 90:18
94:2 101:9,12,15
187:11
**similarly** 1:5 2:5
7:14 43:3 46:12
**simple** 200:7,18,25
202:14 205:12
**simply** 154:2
160:13 161:13
174:4 225:1
**sincerely** 74:11
**single** 23:18 65:7,8
149:7 166:8
170:15,15
**sir** 24:18
**sit** 134:7
**sitting** 74:14
143:21 151:3
153:10 193:4
**situated** 1:5 2:5
7:14

Page 35

CONFIDENTIAL

**[situation - strategizing]**

**situation** 78:12,22 161:18 163:17
**situations** 19:15 231:2
**sixense** 52:3
**size** 44:25 45:1,19 57:22 64:8 86:2
**slide** 65:7
**small** 110:20
**smaller** 110:21
**smart** 60:8 61:3,7
**software** 43:23 52:5 62:16 125:7 125:8,17,18 157:1
**solicit** 109:18
**solution** 129:21
**solutions** 3:19
**somebody** 28:17 63:23 77:9 93:6 158:17 179:15 181:4 226:3
**somewhat** 101:12 117:11 149:23
**soon** 85:20 132:14 134:19 136:14
**sophie** 173:16
**sorry** 18:12 83:1 103:19 113:17 128:17 154:13
**sort** 11:15 16:10 17:9,22 23:21 40:11 46:13 52:8 52:25 54:21 55:6 55:8,9,10 65:6,14 88:22 90:24 98:20 131:4 172:12 192:7 211:16 231:1 234:7
**sorts** 159:2
**sought** 68:8

**sound** 46:24
**sounds** 52:23,24 82:5 107:23 108:3 136:10 166:7 176:7,8
**source** 44:3
**sources** 233:3,7,8 233:10
**sourcing** 19:4,24 20:11,12 21:5,8 56:16
**space** 69:4,6 150:13,14,24
**spaces** 150:21
**speak** 9:19,20 10:13 19:14 48:13 89:11,14 90:10,15 91:5,8 143:13,24 144:1 146:22 147:3,17 158:3 159:6 160:24 173:13 191:21 231:17
**speaking** 25:10 30:19 35:25 58:1 143:14 176:4 192:3 235:3
**specific** 18:22 26:7 26:22 27:2 65:2 76:12 143:16,24 161:18 170:19 181:1 190:6 193:20,20 197:4 210:2 211:22 212:2 226:3,6 230:22 231:3
**specifically** 18:22 18:24 19:2 31:9 33:10 34:17 155:8 177:16,23 181:18 193:19 207:4

212:10 219:3
**specify** 97:8 216:9 216:10
**speculate** 147:7
**speculating** 161:14
**speculation** 44:7 44:17,18 80:8 145:17 178:13
**spell** 66:5
**spend** 176:3,6
**spending** 174:22
**spent** 13:14,16 178:12
**split** 149:8
**spoke** 10:11 70:24 70:24 83:5 91:4 124:15 161:15 162:22 169:4 170:16 178:18 189:7 232:25
**spoken** 83:3 129:25 191:17
**spot** 114:12 130:9
**square** 130:23
**staff** 69:6
**stake** 108:12
**stamp** 198:13,14 217:14
**stanford** 12:23 13:3 15:23
**start** 8:25 12:20 14:6,9 20:5,5 22:12 51:16 88:25 133:2 152:5 164:4 166:15
**started** 20:21 44:19 59:12 68:21 68:22 80:17 86:18 89:3 105:13 137:25

**starting** 59:13 236:6
**starts** 77:4 119:6
**state** 1:1 2:1 7:17 8:5 12:21 13:10 17:1 57:6,8 77:2 78:24 82:19 139:16 147:13 179:6,10 230:3
**stated** 58:11 119:9 230:9 241:9
**statement** 231:5
**statements** 219:23 220:12 221:23 222:14 223:6
**states** 173:24
**stating** 9:1 144:12 203:7
**status** 43:3 45:14 45:16 49:14 50:10 117:7 177:6
**stay** 48:16 134:20 185:15
**stayed** 15:2,4 185:10,11
**stem** 168:21,23
**step** 46:14
**steps** 119:7 145:24
**stick** 46:13 56:5
**stock** 197:17
**stop** 76:2,4 102:6 113:7 132:22
**stopped** 115:10 179:24
**stored** 161:22
**straight** 46:11 157:8
**stranded** 40:18
**strategies** 53:17
**strategizing** 49:24

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

**[strategy - talk]**

**strategy** 15:15
52:25 55:7,20
**street** 2:19 3:5,13
**strike** 113:17
186:22 230:10
**struck** 48:23 60:7
111:15
**structure** 30:9
34:3,8 101:8
197:5,10
**structured** 30:4
**structures** 227:3
**structuring** 71:3
**student** 45:18
**studio** 149:14
150:10,21
**studios** 50:13 61:8
61:11 62:1,5,23,25
65:23 66:8,12
67:5 68:17 69:9
69:11,14 87:3,13
88:4,8,13 96:11,17
97:19,23 98:2
99:18,20,22
101:19 108:2,12
144:8,15 146:4,9
146:17 147:11,14
147:24 148:2,3
149:11,21 150:6
150:15 151:1,5,8
152:17 153:22,24
154:2,4,24 155:10
177:7,10 216:20
216:24 236:24
237:2,14,19,23
238:2
**stuff** 26:13
**subheaded** 229:15
**subject** 11:16 26:8
26:14,24 27:18,23
54:12 129:17

133:4,11 156:15
180:14 194:13
204:16 220:17
**subleased** 150:18
**subleases** 150:19
**submit** 185:22
**submitted** 75:3
85:1
**subparagraph**
37:24
**subscribe** 241:16
**subscribed** 241:22
**subsequent** 37:1
**subset** 104:20,23
**subsidiary** 147:2
**substance** 205:22
**success** 175:17,22
**successful** 119:7
**succinct** 218:22
**suddenly** 133:2
**suffering** 26:14
**suggest** 48:20 75:5
141:6 229:19,22
**suggesting** 23:18
**suggestions**
104:17
**suite** 3:5 174:25
**sullivan** 2:19 3:11
**sum** 108:11
**summer** 13:14,16
13:18
**summers** 13:13
**sunday** 138:6
**super** 19:9
**superior** 1:1 2:1
7:16
**superseded** 22:21
**support** 58:4,9
59:16 96:16,18
97:3 100:1 101:7
120:6 164:7,13,15

**supportive** 167:18
**supposed** 18:25
62:18,21 70:11
174:23 187:23
210:21
**sure** 9:10,16,22
11:14 16:13 18:2
19:5,8 25:25 30:7
31:20 32:8 36:19
37:9 38:16 42:23
45:11 46:11 48:9
49:17 50:18 51:10
53:21 57:20 61:10
61:12,19 62:9,17
63:19,19 65:8,18
71:17 78:20 79:14
81:25 89:20 91:11
93:9 97:11 102:1
103:11 106:5,5,17
107:21 111:7,8,12
111:13 113:17,20
117:3,13 128:9
133:1 135:9 139:2
141:4,13 144:19
146:23,24 147:18
148:3,19 149:16
151:13 155:11,15
155:16 162:11
163:21 164:1,10
164:14 166:1,18
169:24 179:8
183:13,18 188:19
192:4 193:12
195:24 196:15,18
198:5 204:2
205:19 208:20
209:12,14 212:23
213:7 214:22
216:4 217:19,23
223:13 226:22,25
227:6,22,23 234:3

236:1 238:14
**surgeon** 110:25
**surgical** 109:8
110:2,15,19,20,21
110:23 111:17
112:17,23 114:4,6
114:16,17,22
115:6,18,24 116:4
116:11,21 117:1
117:18
**surrounding**
102:12 170:10
**svb** 224:4,9,22,23
226:12 227:7,8
229:18 231:1
**swear** 8:11
**sworn** 8:13 241:6
**system** 44:13,14
109:17

**t**

**t** 4:6 5:1 6:1
**tail** 56:18
**take** 7:25 10:2
13:5 21:14 23:11
25:24 39:20 59:22
72:16 87:17
112:22 113:3,21
127:17 132:9,12
134:2 135:8
169:16 193:25
198:3,10 208:9,11
209:13 217:21,23
218:9 231:17
**taken** 2:18 7:11
8:23 9:4 72:20
77:15,18 113:24
135:15 194:3
204:5 232:8 241:9
**talk** 9:13,14 42:2
90:6 94:20 126:17
126:21 128:3,7,25

CONFIDENTIAL

**[talk - think]**

170:13 171:3
177:16 183:5
186:19,20,22
187:4,10 188:13
205:22 206:2,2
208:18 236:6
**talked** 64:20 90:16
125:1 126:14
128:9 158:24
188:16,22,25
189:4 220:15
**talking** 60:9 77:10
85:17 114:3
186:24 190:11
221:23 222:14
223:5,7
**taylor** 193:10
**tc** 172:9
**team** 16:2,11
18:17 52:11 53:7
64:14 86:6 103:23
104:7,11,14,16
105:3,6,9,11,12,15
105:16 106:3,9,10
106:12,13,14,16
106:22,24 107:2
107:18 109:15
111:22 166:2
**techcrunch** 5:14
5:17 156:20 160:1
172:13,18 177:17
190:21,25 191:24
193:16 233:20,25
233:25
**technical** 151:8
**technically** 150:23
**technologies** 50:23
**technology** 52:1
62:13 64:15 68:11
**telephone** 77:19
94:7

**tell** 31:8 45:17
59:11 83:7 84:11
85:5,13 89:17,23
97:11 107:9 114:5
123:20 131:6
142:16 160:22
162:7 169:12
172:8 178:21
181:24 187:3
193:23 218:11
222:16 228:23
233:18
**telling** 98:23
221:12
**ten** 107:13 159:10
159:12
**tend** 215:20
**tense** 127:1
**tenuous** 144:21
163:17
**tenure** 197:23
**term** 35:9 42:11
104:12 143:23
199:19 201:1,12
201:17 204:12,21
204:24 205:2,7,13
**terminated** 81:12
128:18,21
**termination** 90:23
90:25,25 115:13
123:14
**terminology** 216:5
**terms** 11:1,15
34:22 35:2 36:9
36:10 55:8 58:7
59:12 79:23 80:2
90:23 97:2,9
101:8 111:20
112:2 146:25
147:5 183:1
187:12 195:3

201:6 205:15
**terribly** 54:18
**testified** 8:14
64:23 211:21,24
235:2
**testifies** 26:9
**testify** 25:19 26:7
26:13,23,25 27:2
48:15 74:18 75:9
76:24 121:23
146:3 217:24
241:6
**testifying** 25:14
**testimony** 29:24
121:17 130:24
134:3,4,5 192:12
203:19 205:22
206:24 208:22,25
209:6 212:6,8
241:10,14
**text** 11:1 12:7,9
23:13 36:20 37:11
169:5
**texted** 14:19
**texts** 12:10,12
**thank** 8:9 46:10
76:10 112:8
118:24 238:7,11
238:23
**thanks** 130:7
156:24
**theory** 175:8,12
175:13
**thing** 9:25 29:1
37:6 53:11 61:3
67:18 68:15 133:5
133:19,23 134:22
150:2 161:13
215:13
**things** 9:12,13,17
10:21,25 11:1,5,7

11:20 15:11,13,14
15:15,16 17:23
19:1 23:8,9 28:21
39:21 40:8 43:7
49:6,6 53:13,20,22
53:24 54:7,17
55:10,19,20,23
56:20,23,25 59:14
59:21 61:7 65:12
67:15 68:8,10,15
74:24 83:10,11,16
84:10,12 85:12
94:1,3 97:2,5
104:19 112:6,6,7
120:21,22 121:6,7
121:16 126:25
133:9 145:19
147:1 159:23
163:14 167:18
171:9,18,21
174:22 175:15
176:7 177:21
179:9 182:8,18,20
183:1,7,11 197:19
228:25
**think** 9:7 10:24
14:15 15:24 17:19
25:20 27:20 31:2
39:21 43:20 44:1
44:12 46:23 49:4
49:17,23 50:15
51:19 52:18 56:2
58:23 60:1,1,20
63:8,10 64:4 65:8
65:19 66:4,24
67:7 68:14 71:22
87:11 88:9 91:11
92:23 93:3,9 96:9
97:15 101:21
105:14 106:7
108:17 115:3

CONFIDENTIAL

**[think - trademarks]**

116:20 117:11
121:1 126:14
131:15,23 132:11
132:15,22,24
133:5 135:1
136:13,22 137:14
138:10,22 144:16
144:21 145:18
147:6 148:18
149:13 150:7,8,24
151:2 153:9 160:2
161:11 162:5,12
163:6 165:13,24
167:21 171:17
174:6 175:8,20
178:2,3 181:11
182:10,18 183:13
184:13,16,19
186:6 193:6
195:22 208:4
211:7 214:5,9,13
215:7,10,23
218:25 223:1,4,12
223:14,17 238:17
238:20
**thinking** 143:22
162:2 163:8,13,14
163:15,16
**third** 46:2 47:14
86:7,13 133:19
201:11 204:11
**thought** 16:2
48:16 60:3,4 61:3
110:9 161:1 178:9
**thoughts** 48:13
**thread** 156:17
158:2 231:9,13
**three** 9:12 39:17
64:17,20 99:6,9
180:23 204:12,19
204:21,24 205:13

218:20,21 220:12
221:23 222:14
**thrust** 48:19 55:23
**tied** 175:17,22
**time** 7:7 8:4 9:14
10:1 15:4,5,7
17:10,17,24,24
21:15 22:6,7,14
23:21 24:7 32:12
32:14 36:12 38:4
38:4,15 39:2,20
42:10,18 43:2,3
44:5 45:15 46:9
49:12,19,20 56:12
56:19 58:12 61:1
61:8,9,12 72:19,22
75:9 77:14,17
78:19 81:13 87:19
87:23 90:2 92:18
93:2 95:2 96:16
96:16,25 97:1,9,17
97:17 101:4
102:25 103:1,22
106:2,20 110:7
112:9,9,11 113:23
114:1 115:20,21
116:23 119:3
127:15 129:1
132:11,13,20
134:6,21 135:14
136:4 141:14
148:20 149:7,10
151:25 152:14
153:21 154:25
159:3,7 162:6
163:14 165:21
167:11,12,15,15
168:24 170:19
173:11 174:8
175:2 177:11
178:12 181:13,14

181:17 182:3,4
189:7 192:17,20
194:2,5 198:10
204:4,7,18 208:11
211:19,19 213:20
213:23,24 214:2,9
214:14,17 218:9
219:9 229:23
232:7,10 234:5
237:9,12 241:9
**times** 107:11,13,14
164:5 169:14,16
169:18 180:24
181:3 196:23
**tip** 16:10
**tipatat** 62:7,24
63:14 65:18,22
66:7
**tipatat's** 148:25
**title** 19:7,16 38:1
62:9 88:19 103:13
103:13 172:10,19
190:22 193:11
223:23
**titled** 150:2
**titles** 19:4,8,12
**today** 8:22 9:8
10:10 60:11 64:24
74:2,7,18 113:5
121:17,19 133:21
143:21 145:15
151:4 153:10
175:5 193:4
209:23 238:10
**today's** 238:24
**told** 39:15 59:6
60:22 89:15
102:23 103:22
104:4 125:16
131:10,14 132:3,8
160:10 164:20

187:13,15 190:12
228:25 233:12,12
233:13,13,16
234:6
**tom** 91:19,19
127:10 156:25
173:15,19,20,24
218:13,14 220:4
220:11,21 221:12
221:22 222:1,3,5
222:13,16 223:5,7
225:10 229:9,11
231:9,14
**tommy** 52:11
156:25 173:20
174:10
**tomorrow** 92:11
92:21,22 95:5
138:4,5 221:1
222:6,16
**tone** 9:20 48:23
49:5 160:18,25
161:12
**top** 16:8 18:15
21:20 31:8 42:6
43:13 46:22 99:7
156:1 168:12
172:9,11 174:22
190:23 196:1
210:15 218:12
220:3 221:10
235:15
**topic** 24:2,4
215:14,16,19
**topics** 215:15
**total** 44:25 199:23
**touch** 207:3
235:16
**trademark** 68:6
**trademarks** 68:8

Page 39

CONFIDENTIAL

**[transaction - unpaid]**

**transaction**  70:25
  71:2 224:4,5,8,11
  224:13,14 229:11
  229:12,16 230:5
**transactions**
  228:10 230:2
**transcribed**  77:21
  241:11
**transcript**  2:17
  208:13 238:15,22
**transcription**
  241:12
**transfer**  197:1
**transition**  40:15
  104:1,2 120:5
  131:10 171:11,12
  178:18,21 179:15
  182:11 183:6
**transitioned**  22:7
  22:13 115:25
**transmitted**
  118:15
**treated**  69:15
**treatment**  188:10
**tried**  70:25 134:15
  134:15,16
**trigger**  98:24
**triggered**  124:12
  124:14,20,21,24
  166:25
**triggering**  196:21
  196:21
**trouble**  81:9
**troubling**  130:10
  130:12 131:20
  142:3,5,13,17,23
  142:25 143:3,7,8
  143:12,23 162:8
  162:15
**true**  60:20 97:21
  128:23 134:4

142:4,6,7,9,12
  145:20,22 168:5
  173:12,13 240:3
  241:13
**trust**  137:22 139:9
  172:6
**truth**  241:6,7,7
**truthful**  140:22
  141:5,10,17
**try**  9:19,20 54:19
  81:25 134:7 138:7
  141:14 171:3
**trying**  21:24 26:18
  30:8 51:1 52:21
  53:5 56:5,6 63:20
  81:13 102:1,17
  123:13 125:21
  134:11 143:16
  147:23 163:19
**tuesday**  92:22,25
  130:3
**turmoil**  81:16,16
**turn**  13:25 18:10
  18:15 37:23 130:2
  223:22
**turns**  54:14,15
**tv**  63:6,8,9
**two**  9:12 39:12,21
  39:23,25 41:14
  47:6 51:22,22,24
  70:7 92:18 93:3
  118:25 134:4
  143:25 149:18
  158:7 170:21,22
  180:21 184:14
  192:22 193:15
  218:14 221:19
  222:19 223:9,15
  233:3,7
**type**  15:16 26:8,14
  26:24 27:19 37:5

47:11,14 48:5
  53:10,11 66:16,23
  70:19 79:9 100:20
  101:13 126:12
  146:15 169:9
  170:1 187:25
  230:5
**types**  33:10 94:1
  96:18 97:2 159:19
  176:7 196:17
  197:3
**typical**  158:16
  230:16,18,19
  231:1
**typically**  46:19
  47:19 195:8

**u**

**u**  108:7 129:9
  156:2
**ultimately**  51:17
  111:15
**um**  12:8 13:6
  14:13 64:19 91:20
  91:22 116:6
  129:10 156:3
  205:5
**umbrella**  99:13
**unable**  83:17
  121:17 132:21
  134:16
**unavailability**
  137:17
**unaware**  148:10
**uncertain**  169:14
  169:19,22 170:2
  228:25
**uncertainty**
  227:18 231:6,7
**uncomfortable**
  236:16

**undergrad**  12:22
  15:23
**underneath**
  218:14
**understand**  10:7
  20:17 21:24 24:15
  28:15 30:7 36:5,8
  39:4 41:24 48:14
  52:21 53:5 63:21
  104:11 117:6
  119:24 120:1
  125:21 132:14
  133:13 139:1,2
  145:9,12 153:16
  175:14 206:24
  213:7 214:19
  222:12 228:24
  229:6
**understanding**
  28:25 30:9 36:9
  38:23,25 39:11
  50:16 73:22 117:7
  146:8 155:1
**understands**
  229:11
**understood**  23:24
  65:17 85:23
  153:18 161:5
  208:9
**unhappy**  48:21
**university**  12:21
  12:23
**unpaid**  36:17,18
  71:21 72:5,5,13
  78:6,7 81:11
  166:24 167:6
  180:3,7,11,15,19
  181:25 183:4,17
  183:21 185:8
  187:12,12,13
  200:13 204:17

CONFIDENTIAL

**[unprivileged - vs]**

**unprivileged** 215:13
**unproduced** 218:4
**unreimbursed** 71:21 72:9
**unrelated** 226:1
**unsure** 38:17 227:1
**untruthful** 139:20 140:2
**unusual** 63:22 230:10
**unwilling** 236:16
**update** 116:12
**upheld** 179:21
**upset** 126:24 127:2
**urgent** 94:25 95:1 95:3
**url** 172:20
**urquhart** 2:19 3:11
**use** 35:10 41:24 43:23 45:12 47:3 53:15 54:21 60:10 63:20 71:4 111:1 134:21 160:10 216:5
**usefully** 47:8
**uses** 77:9 176:9
**usual** 171:7,8
**usually** 20:8 33:16 53:25 166:18

**v**

**vacant** 116:16
**vacation** 156:24 157:6 161:1
**vague** 42:11
**vaguely** 112:3 192:18,19

**valley** 14:12 127:4 127:7,11 224:18 224:24 225:4
**value** 175:24,25 176:1,1
**vardhana** 16:7
**variable** 34:14
**varied** 92:17
**variety** 15:13
**various** 43:5 84:25 96:17,21 158:4 232:15
**venture** 17:11 53:14 69:22 70:2 70:17,23 71:5,7 150:9,11,24 164:5 164:6,21 193:11
**ventures** 1:8 2:8 7:15 15:19,22 17:6,25 18:16 19:9 20:21 22:25 24:13,16,22,23 26:3 27:5,13 28:4 30:5 35:15,15 36:7 37:2,21 38:10,13 39:5 40:15 41:4,9 43:9 44:4 51:3 53:17 55:16,17 56:21 67:13 69:8 72:4 73:1,7,23,24 74:12 74:17 78:15 82:22 84:16 85:6,9 86:2 88:18,20 89:1,7 90:11 91:5,6,10 93:23 97:20 98:21 99:14,15,16 102:7 103:7 110:16 111:16 112:21 113:3 114:15,16 114:20 115:1,7,10

116:15,17,22,23
116:25 117:9,18
118:25 121:24
125:6,14,22
126:18,23 127:16
127:17 129:2,18
141:20 144:7,14
146:18 149:1
151:24 152:1,2,15
154:21,22 164:16
165:15 172:13
183:3 188:17
189:1 190:12,24
191:25 193:15
195:13 196:14,16
196:18 197:23
210:4 216:1,3,11
216:22 225:2
232:14,18 237:18
**verbal** 9:16
**verbally** 39:15 169:5
**veritext** 3:19 7:22 7:23
**veritext.com** 3:22
**versus** 97:7 187:24 197:9
**vest** 127:21
**vetting** 110:5
**vibrant** 82:8
**vicarious** 109:8 110:2,14 111:16 112:17,23 114:3,6 114:16,17,22 115:6,17,24 116:4 116:11,21 117:1 117:18
**video** 2:17 7:24 63:7 172:9
**videographer** 3:20 7:5,22 8:9,15

72:18,21 77:13,16
87:18,22 113:22
113:25 135:10,13
136:3 194:1,4
204:3,6 232:6,9
238:24
**videotaped** 1:16 7:9 238:25
**view** 75:22 76:20 101:25 187:19
**viewed** 203:8
**viewing** 203:4 225:7
**viewpoints** 83:24
**violating** 84:12
**violation** 26:24 27:6,19 28:12 124:12,13,21 125:24 126:12
**violations** 26:9
**virtual** 50:22,22 50:25 51:3,12,21 52:6,8,16 53:2 59:8,10 60:4,13,14 62:8,15,16 66:17 67:13,16,21,24 68:1,3,14,17,25 69:1 70:19 110:18 110:22 190:25
**visibility** 111:3
**visit** 113:19
**voice** 23:13
**volume** 1:17
**volumei** 2:18
**voluntarily** 39:1,6
**vouch** 164:21
**vr** 60:23,24,25 62:13 109:25
**vs** 1:7 2:7 7:14

Page 41

CONFIDENTIAL

**[w - worked]**

| w |
|---|
| **w**  22:8,14 |
| **wage**  23:1,25 24:4 |
| 27:4,14 29:7 73:2 |
| 73:8 108:24 109:2 |
| **wages**  36:17 37:17 |
| 72:5,13 78:7 |
| 185:8 187:12 |
| 189:8 |
| **wait**  94:23 95:3 |
| 137:8 |
| **waive**  25:9 28:2 |
| 145:14 |
| **waived**  25:8 |
| **waiver**  25:12 |
| 27:24 74:5 121:19 |
| 121:22 136:8 |
| 203:20 |
| **waives**  145:1 |
| **waiving**  24:24 |
| 25:1,3 |
| **walk**  39:2,6,13,14 |
| 39:23 113:15 |
| **want**  10:2,2,3 12:1 |
| 12:19 19:7,14 |
| 25:17 27:1,3,17 |
| 35:10 43:16,17 |
| 53:21 56:20,22,23 |
| 64:12 75:2,3,22 |
| 76:9,19 78:13 |
| 113:18 132:5 |
| 133:6,18 134:5,9 |
| 134:22 135:5 |
| 136:13 137:8,12 |
| 140:9,12 141:6 |
| 147:7 199:2 206:4 |
| 221:11 224:2 |
| 235:4 238:14 |
| **wanted**  14:4,5 |
| 67:25 68:2 77:23 |
| 83:22,23,25 84:3 |

94:20 102:25
103:22 104:6
125:25 131:12,13
133:13 140:6
142:20 156:25
158:3 163:5 164:1
164:9,12 196:4
221:8
**ward**  77:7
**warriors**  174:25
**washington**  13:14
**watch**  63:6
**watching**  14:14
63:9
**water**  10:3 113:18
**way**  27:21 30:21
37:15 41:7,12,18
43:25 49:22 56:19
56:22 57:1 90:22
93:14,14,17,19,20
96:20 97:3 105:2
108:4 111:13
116:20 117:3
134:21 144:22
149:4 154:20
161:12 171:9
174:3,4 178:9
196:11 197:15
223:11 224:14
228:14 231:20
234:13 237:1
241:20
**ways**  36:23 70:9
171:13 176:3
**we've**  11:7 56:8
64:20 77:9 120:13
134:3 138:15,21
211:25 236:2
238:8
**wearing**  66:24
111:21

**web**  109:23
**wednesday**  1:18
2:21 7:1
**week**  92:17,17,19
93:4 136:17,17,22
156:24
**weeks**  39:13,23,25
41:15 50:20 51:12
51:15,15 52:8
112:15 130:10,21
130:24 131:7,19
132:4 139:17,21
139:23 140:4,9,18
140:20,23 141:16
141:20,23,25
142:1,4,7,12,24
143:1,4,9 162:15
**weird**  77:8
**went**  10:21 12:21
12:22,23 14:9
15:22,23 228:2
229:9
**west**  13:17,23
**whereof**  241:22
**whispers**  8:2
**white**  51:2
**wide**  55:14,15
180:25 181:4,5,7
181:14,25
**willing**  145:14
**wimberley**  1:22
2:22 7:23 9:11
241:2,25
**wine**  234:7
**wire**  126:6
**wise**  176:12
**wish**  157:2
**witness**  6:7 8:11
8:13 12:3 80:9
82:18 87:20
119:18 123:2,6

136:23 137:3,15
141:9 145:18
173:10 189:17
192:25 198:25
203:22 218:5
240:12 241:5,10
241:14,22
**woman**  88:15
191:7
**wonder**  60:8 61:4
**word**  51:5 54:22
57:19 60:11 71:4
179:2 185:11
**worded**  124:18
**words**  104:14
140:7 178:3 201:7
**work**  11:19,21
13:13,20 14:8
15:3,18 16:3
23:25 24:1,3,4,7,9
24:15,22 25:4
26:3 27:4,13
29:18 30:19 49:9
68:5,25 69:1
88:22 90:9 100:22
100:24 103:22
106:15,16 108:14
112:5 167:16
168:2 180:6,10,23
181:19 182:2,5
183:2,16,20,25
195:12 209:13,14
209:20
**workbook**  218:21
**worked**  13:18
15:13,20,21 40:4
51:24 70:25 71:18
88:20 93:6 103:14
111:24 125:11
132:15 138:18
150:5 152:8

CONFIDENTIAL

**[worked - zeitgeist]**

| | |
|---|---|
| 163:20,21 195:15 | 139:24 140:9,11 |
| **working**   15:21 | 141:10,16 142:2 |
| 17:16 20:18 22:25 | 143:25 157:12,21 |
| 42:5,11,17,19 43:6 | 191:24 196:16 |
| 43:9 44:4,15 71:1 | 199:6 200:17,20 |
| 88:25 89:3 90:18 | 200:21 210:8,13 |
| 93:12,12 114:12 | 222:9 |
| 115:10 137:25 | |
| 138:21 179:24 | **x** |
| 186:18 195:18 | **x**   4:1,6 5:1 6:1 |
| **world**   14:6 17:11 | 108:7 |
| 116:10 | |
| **world's**   64:15 | **y** |
| **worried**   166:12 | **yeah**   11:23 12:14 |
| **worry**   181:22 | 14:3 15:12 18:20 |
| **worse**   130:11 | 43:20 46:25 47:15 |
| 131:21,22 142:8 | 71:25 100:24 |
| 142:10 162:8,16 | 119:5 137:6,14 |
| **worthy**   110:10 | 141:4 145:18 |
| **would've**   158:25 | 159:13 170:4 |
| **wrap**   235:1 | 175:19 177:24 |
| **write**   92:5,10 | 184:1 186:23 |
| 130:3,7 157:20 | 193:1 199:4 233:2 |
| 196:8 211:8 | 237:8 238:6 |
| 221:12 222:5 | **year**   14:23 204:19 |
| **writes**   222:1 | 204:21,24 221:15 |
| **writing**   74:4 210:9 | **years**   16:24 42:21 |
| 211:9 222:10 | 118:25 143:25 |
| **written**   9:8 20:6 | 158:8 170:21,22 |
| 21:25 25:18 26:12 | 201:12 204:12 |
| 28:3 38:5,20 75:2 | 205:13 |
| 144:23 146:1 | **yep**   12:18 |
| 156:12 173:2 | **yesterday**   10:14 |
| 178:22 197:15 | 12:7 |
| 207:16 211:2 | |
| 218:6 | **z** |
| **wrong**   52:24 | **zealous**   187:24 |
| **wrongdoing** | **zeitgeist**   143:18 |
| 229:20,22 | |
| **wrote**   51:2 65:3 | |
| 124:19 131:19 | |

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



**LYNNE (RV) REQUESTS TO OPEN 2015 FUND ESCROW ACCOUNT**

On Dec 23, 2015, at 2:10 PM, Jim Gardner <JGardner@svb.com> wrote:

Hi Lynne,

Nice speaking with you earlier, and I hope you're gearing up for Christmas!  The account is in the works, and we will link this account to the existing profile for Rothenberg Ventures Management Comp, with an account modifier (nickname) of "2015 Fund Escrow Account".

Thanks!

Jim Gardner
Client Service Advisor, Private Equity Services
jgardner@svb.com  / Peselectsupport@svb.com
T 480 557 4923

Hello,

Can you please assist in immediately creating a new account for the entity Rothenberg Ventures 2015 Fund, LLC, with the same features and signers as all of the other Rothenberg Ventures accounts.  Please advise what other information you may need. I know you already have the W9 for the entity, so I'm not aware of other documents you may need. Don't hesitate to give me a call to discuss more.

Sincerely,

Lynne McMillan

...................................................................................................................

From: lynne@rothenbergventures.com [mailto:lynne@rothenbergventures.com]
Sent: Wednesday, December 23, 2015 3:13 PM
To: Jim Gardner
Cc: Venture Client Service; Ashil Ram; Tom Leep
Subject: Re: New Account for Rothenberg Ventures 2015 Fund

Fantastic, thanks very much Jim. Merry Christmas to the SVB team.

...................................................................................................................

## JIM (SVB) CONFIRMS 2015 FUND ESCROW ACCOUNT IS OPEN (x8782)

From: Jim Gardner <JGardner@svb.com>
Date: December 23, 2015 at 4:03:35 PM PST
To: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>
Cc: Venture Client Service <venturecs@svb.com>, Ashil Ram
<ARam@svb.com>, Tom Leep <tom@rothenbergventures.com>
Subject: RE: New Account for Rothenberg Ventures 2015 Fund

Hi Lynne,

The sub account for Rothenberg Ventures 2015 Fund has been opened.  Please
allow 1-2 business for the account to show up online, but the account is available
immediately to receive incoming wires/deposits.  I will send a secure email
shortly that includes the account number, as well as the incoming wire
instructions.

Thanks!

................................................................................................

From: <lynne@rothenbergventures.com>
Date: Wed, Dec 23, 2015 at 4:44 PM
Subject: Fwd: New Account for Rothenberg Ventures 2015 Fund
To: Mike Rothenberg <mike@rothenbergventures.com>

FYI - escrow account is set up for 2015 fund.

................................................................................................

From: Jim Gardner <JGardner@svb.com>
Date: Thu, Dec 24, 2015 at 10:27 AM
Subject: RE: New Account for Rothenberg Ventures 2015 Fund
To: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>,
"mike@rothenbergventures.com" <mike@rothenbergventures.com>
Cc: Venture Client Service <venturecs@svb.com>, Ashil Ram
<ARam@svb.com>, Tom Leep <tom@rothenbergventures.com>

Hi Team,

I just had a couple follow-up items on the account that we set up yesterday.

Mike – Lorie Goulart had mentioned that you inquired about setting up a sub

account.  Is this in addition to the one we set up yesterday?  We're happy to set up another sub account if that's the case, but just want to make sure we're on the same page.

Also – I'm sorry I didn't catch this sooner, but the word "Escrow" is one of the words we can't have on an account modifier, as it does imply fiduciary responsibility.  Are we ok to update the account modifier to "2015 Fund Sub Account".  Please let me know if this works for you, or if there's something else we could change it to.

Thanks again, and I hope you're enjoying a little break as well!

.......................................................................................................

From: Mike Rothenberg <mike@rothenbergventures.com>
Date: Thu, Dec 24, 2015 at 10:52 AM
Subject: Re: New Account for Rothenberg Ventures 2015 Fund
To: Jim Gardner <JGardner@svb.com>
Cc: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>,
Venture Client Service <venturecs@svb.com>, Ashil Ram <ARam@svb.com>,
Tom Leep <tom@rothenbergventures.com>

Thanks Jim - it's the same account, so no need for another one, and yes let's name it as you suggest.  We'd like to set up a LoC against cash that is funded there.  Thank you!

.......................................................................................................

From: Jim Gardner <JGardner@svb.com>
Date: Thu, Dec 24, 2015 at 11:01 AM
Subject: RE: New Account for Rothenberg Ventures 2015 Fund
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>,
Venture Client Service <venturecs@svb.com>, Ashil Ram <ARam@svb.com>,
Tom Leep <tom@rothenbergventures.com>

Mike,

Good to hear, and we will update the account modifier.

With regards to the LoC, happy to help get this set up for you.  What is the timeframe that you're going to need it by?

Thanks,

..................................................................................................................

From: Judy Lee <julee@svb.com>
Date: Thu, Dec 24, 2015 at 11:03 AM
Subject: RE: SVB LoC secured by cash
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: Jeremiah Nevin <JNevin@svb.com>

Hi Mike,

In order to move forward, the account will need to be opened and funded.  We
will then cash secure a line of credit based on the amount funded in the
account.  Is there a set dollar amount that we are looking at? If we are looking at
a moving dollar amount, we would need to further discuss internally as to how
this will be structured…but it may take a bit longer to implement from an
operational standpoint.  The interest rate would be WSJ prime flat.

Let us know if there are any questions.

Thanks,
Judy

..................................................................................................................

From: Mike Rothenberg <mike@rothenbergventures.com>
Date: Thu, Dec 24, 2015 at 11:06 AM
Subject: Re: SVB LoC secured by cash
To: Judy Lee <julee@svb.com>
Cc: Jeremiah Nevin <JNevin@svb.com>, Jim Gardner <JGardner@svb.com>

Judy - that sounds good.  We should be funding it Monday and will need to draw
from it by 12/30 b/c we want to establish it in this calendar year.

+ Jim

..................................................................................................................

## JUDY (SVB) CONFIRMS 2015 FUND ESCROW ACCOUNT (x8782) IS THE COLLATERAL ACCOUNT

From: Judy Lee
Sent: Thursday, December 24, 2015 11:54 AM
To: 'Mike Rothenberg'
Cc: Jeremiah Nevin; Jim Gardner
Subject: RE: SVB LoC secured by cash

Hi Mike,

Ok, we will look into the possibility of having a moving dollar amount (cash secured) with a 95% borrowing base. The collateral account will be Rothenberg Ventures 2015 Fund, LLC – 33001438782?

Also, what would be the purpose of the funding (i.e. portfolio investments)? And would you be able to provide some color as to why the LPs are paying the management fees early?

Thanks,
Judy

......................................................................................................

From: Judy Lee <julee@svb.com>
Date: Thu, Dec 24, 2015 at 2:05 PM
Subject: RE: SVB LoC secured by cash
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: Jeremiah Nevin <JNevin@svb.com>, Frank Amoroso <famoroso@svb.com>

Hi Mike,

Thanks for taking the time to get on the phone today.  As discussed, we will work internally to see what we can do from here.

In the meantime, please send a copy of the signed operating agreement as well as confirm the purpose of the loan (management co opex? Portfolio investment for the fund?).

Regards,
Judy

...................................................................................

From: Mike Rothenberg <mike@rothenbergventures.com>
Date: Thu, Dec 24, 2015 at 3:12 PM
Subject: Re: SVB LoC secured by cash
To: Judy Lee <julee@svb.com>
Cc: Jeremiah Nevin <JNevin@svb.com>, Frank Amoroso <famoroso@svb.com>

Hi Judy - the operating agreement is attached.

The members have pre-paid somewhere between $1.7-5m of expenses, which
we have in cash and will fund the recently opened account.  The management
company would like to access a LoC for opex secured by these funds that are
ultimately owed to the management company.

Thanks!
Mike

...................................................................................

From: Judy Lee <julee@svb.com>
Date: Mon, Dec 28, 2015 at 8:26 PM
Subject: RE: SVB LoC secured by cash
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: Frank Amoroso <famoroso@svb.com>

Mike,

We can change the maturity to 5.03 years from date of documentation. Also,
please confirm the account # you would like us to debit the good faith deposit
from tomorrow morning.

Thank you,

Judy

...................................................................................

## MIKE (RV) CONFIRMS 2015 FUND ESCROW ACCOUNT (x8782) NOW HAS $4.25M

From: Mike Rothenberg [mike@rothenbergventures.com]
Sent: Monday, December 28, 2015 10:36 PM PST

To: Judy Lee
Cc: Frank Amoroso; Lynne Mcmillan
Subject: Re: SVB LoC secured by cash

Perfect.  Lynne will send account # and we're ready to sign docs and draw.  The
$4.25m is funded.

......................................................................................................................

From: Frank Amoroso <famoroso@svb.com>
Date: Tue, Dec 29, 2015 at 4:13 AM
Subject: RE: SVB LoC secured by cash
To: Mike Rothenberg <mike@rothenbergventures.com>, Judy Lee <julee@svb.com>
Cc: Lynne Mcmillan <lynne@rothenbergventures.com>, Jim Marshall
<JMarshall@svb.com>, Mark Lau <mlau@svb.com>

Mike,

I appreciate that you are prepared to execute and fund. However, there are still a
number of steps that need to be completed before we are ready to execute documents
and fund. To ensure we are all on the same page, before that can happen...

1) Judy will need to complete our loan approval process.

2) We need our attorney to complete their diligence and prepare documentation on an
expedited basis.

3) I need to figure out how to fund this loan before the loan is formally "booked" onto our
system as "the pattern is full," if you will, in terms of the bank's year-end processing
queue. The deadline for our internal QA & loan processing group to process and fund
new loans for year-end has already passed, so, we are in uncharted territory / working
on an exception / special dispensation basis at this point.

The entire supply-chain outlined above is operating under duress due to year-end
volume, staffing levels and imminent deadlines. Hence why I originally characterized our
chances of success as a "possibility" versus a "probability" when we spoke on 12/24.
For perspective, the typical time to close a similar loan would be three weeks (during a
non quarter / year-end).

All of this being said, we continue to work toward your stated goals, but reason,
accountability and prudence dictate that I clarify the above for you as it pertains to
funding by 12/30.

The Good Faith deposit is intended to cover the fees & costs of SVB's counsel. The
borrower is required to cover these costs, regardless of the closing date.

I would also like to confirm your understanding that the cash collateral pledged as security for the facility will be in a restricted account. The borrower will not have access to the cash / account until all obligations are paid in full.

Best,
Frank Amoroso

...........................................................................................................

## LYNNE (RV) APPROVES $10K GOOD FAITH DEPOSIT TO BE PAID FROM MGMT CO ACCOUNT (x8931)

From: <lynne@rothenbergventures.com>
Date: Tue, Dec 29, 2015 at 9:06 AM
Subject: Re: SVB LoC secured by cash
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: Frank Amoroso <famoroso@svb.com>, Judy Lee <julee@svb.com>, Jim Marshall <JMarshall@svb.com>, Mark Lau <mlau@svb.com>

Judy -

Please withdraw the good faith deposit from the Rothenberg Ventures Management Company account (Account #: 3300898931).

Thank you,
Lynne

...........................................................................................................

## JIM (SVB) REQUESTS 2 TRANSFERS BEFORE RESCINDING 1 REQUEST 11 MINS LATER:
   1) WANTS TO TRANSFER THE $4.25m FROM 2015 FUND ESCROW ACCOUNT (x8782) TO A NEW CMMA ACCOUNT (x8797)
   2) WANTS TO TRANSFER A GOOD FAITH DEPOSIT, BUT GETS THE # WRONG AND RESCINDS THIS REQUEST 11 MINS LATER

From: Jim Gardner <JGardner@svb.com>
Date: Tue, Dec 29, 2015 at 10:50 AM
Subject: RE: New Account for Rothenberg Ventures 2015 Fund
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>, Venture Client Service <venturecs@svb.com>, Tom Leep <tom@rothenbergventures.com>, Judy Lee <julee@svb.com>, Jeremiah Nevin

<JNevin@svb.com>, Lorie Goulart <lgoulart@svb.com>

Hi Mike,

We're working to get the LOC setup.  We will need your approval for a couple things in regards to the CMMA (Collateral Money Market Account).

We need to transfer the good faith deposit of $4,250,000.00 from the account ending in -8782 to the account ending in -8931.

Once that is complete we will be transferring the same $4,250,000.00 to the new CMMA that we are setting up.

Email approval is sufficient to make the transfers on your behalf.

Thanks!

...................................................................................................................

**JIM (SVB) CLARIFIES THAT THE GOOD FAITH DEPOSIT HAS ALREADY BEEN APPROVED, LEAVING ONLY ONE REQUEST OUTSTANDING:**
  **1) WANTS TO TRANSFER THE $4.25m FROM 2015 FUND ESCROW ACCOUNT (x8782) TO A NEW CMMA ACCOUNT (x8797)**

From: Jim Gardner <JGardner@svb.com>
Date: Tue, Dec 29, 2015 at 11:01 AM
Subject: RE: New Account for Rothenberg Ventures 2015 Fund
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>, Venture Client Service <venturecs@svb.com>, Tom Leep <tom@rothenbergventures.com>, Judy Lee <julee@svb.com>, Jeremiah Nevin <JNevin@svb.com>, Lorie Goulart <lgoulart@svb.com>

Mike,

Just to clarify, the $4.25 MM is solely for the CMMA.  And we already have the approval for the Good Faith Deposit of $10,000.00 which also be debited.

We will process the CMMA transfers with your approval,

Thanks!

...................................................................................................................

**MIKE (RV) APPROVES MOVING $4.25m FROM 2015 FUND ESCROW ACCOUNT (x8782) TO A NEW CMMA ACCOUNT (x8797) (SINCE JIM SAID "WE NEED TO")**

From: Mike Rothenberg <mike@rothenbergventures.com>
Date: Tue, Dec 29, 2015 at 12:43 PM
Subject: Re: New Account for Rothenberg Ventures 2015 Fund
To: Jim Gardner <JGardner@svb.com>
Cc: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>,
Venture Client Service <venturecs@svb.com>, Tom Leep
<tom@rothenbergventures.com>, Judy Lee <julee@svb.com>, Jeremiah Nevin
<JNevin@svb.com>, Lorie Goulart <lgoulart@svb.com>

Approved to move $4.25m as you outline below.  Thank you.

...............................................................................................................

**JIM (SVB) SAYS THE CMMA HAS BEEN CREATED AND THE TRANSFERS COMPLETE (which includes the $10k escrow paid).  JIM DOES NOT ASK FOR APPROVAL FOR THE MGMT CO TO TAKE THE FUNDS, OR TO TITLE THE CMMA (x8797) IN THE MGMT CO'S NAME.  NOR DOES HE DISCLOSE.**

From: Jim Gardner <JGardner@svb.com>
Date: Wed, Dec 30, 2015 at 11:25 AM
Subject: RE: New Account for Rothenberg Ventures 2015 Fund
To: Mike Rothenberg <mike@rothenbergventures.com>
Cc: "lynne@rothenbergventures.com" <lynne@rothenbergventures.com>,
Venture Client Service <venturecs@svb.com>, Tom Leep
<tom@rothenbergventures.com>, Judy Lee <julee@svb.com>, Jeremiah Nevin
<JNevin@svb.com>, Lorie Goulart <lgoulart@svb.com>

Hi Mike,

I just wanted to send a quick update.  The CMMA has been created, and all
transfers completed.  This account has also been added to the existing online
banking profile so you will see this when you logon.

In speaking with Judy, it looks like they do need a copy of the W9 for
ROTHENBERG VENTURES MANAGEMENT COMPANY, LLC  (Tax ID 46-
0933520).  Lynne or Tom – perhaps this is something you have on file?

Thanks in advance!

**MIKE (RV), NOT KNOWING WHAT CRIME JIM HAD JUST COMMITTED, IS HAPPY.**

From: mikerothenberg@gmail.com [mailto:mikerothenberg@gmail.com] On Behalf Of Mike Rothenberg
Sent: Wednesday, December 30, 2015 10:11 PM
To: Judy Lee; Jeremiah Nevin; Frank Amoroso
Cc: Lynne McMillan; Jim Marshall
Subject: Re: Rothenberg Ventures / SVB LoC (Secured by cash)

Judy, Frank, and Jeremiah - this was above and beyond incredible work.  Thank you for making this happen!

If there are other folks on your team (managers, etc) that I can express how impressed I am to, please do let me know.

Happy New Year!
Mike

From: Frank Amoroso <famoroso@svb.com>
Date: Thu, Dec 31, 2015 at 8:11 AM
Subject: RE: Rothenberg Ventures / SVB LoC (Secured by cash)
To: Mike Rothenberg <mike@rothenbergventures.com>, Judy Lee <julee@svb.com>, Jeremiah Nevin <JNevin@svb.com>
Cc: Lynne McMillan <lynne@rothenbergventures.com>, Jim Marshall <JMarshall@svb.com>, Mark Lau <mlau@svb.com>

Mike,

When you speak if us... Speak well.

;-)

Thanks! I'm delighted that we were able to get it done and I couldn't be more proud of my team.

Given the urgency, we weren't able to be as thoughtful as I would have liked regarding discussion points for reserve requirements and I think there are some provisions in the loan doc that weren't necessarily required due to the cash

security, etc. So it goes given the constraints we were operating under. Ends up that cash security is a pretty rare bird in our private partnership banking practice.

I'll look forward to connecting with you in 2016 and debriefing then.

Happy new year,
Frank

..................................................................................................

From: Judy Lee <julee@svb.com>
Date: Thu, Dec 31, 2015 at 8:23 AM
Subject: RE: Rothenberg Ventures / SVB LoC (Secured by cash)
To: Mike Rothenberg <mike@rothenbergventures.com>

You're welcome, Mike.  Glad we were able to get this done before the end of the year.

Happy New Year!
Judy