C. DABNEY O'RIORDAN (Cal. Bar No. 205158)
  oriordand@sec.gov
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
ANDREW J. HEFTY (Cal. Bar No. 220450)
  heftya@sec.gov
MARC KATZ (Cal. Bar No. 189534)
  katzm@sec.gov
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
T: (415) 705-2500
F: (415) 705-2501

ERIC M. BROOKS (Cal. Bar No. 209153)
  brookse@sec.gov
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA 02110-1424
(617) 573-8900

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>MICHAEL B. ROTHENBERG, and ROTHENBERG VENTURES LLC (f/k/a FRONTIER TECHNOLOGY VENTURE CAPITAL LLC and ROTHENBERG VENTURES MANAGEMENT COMPANY, LLC),<br><br>    Defendants. | CASE NO. 18-CV-05080-JST<br><br>PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF MOTION FOR DISGORGEMENT AND PENALTIES AGAINST DEFENDANT MICHAEL B. ROTHENBERG<br><br>DATE:  October 9, 2019<br>TIME:  2:00 P.M.<br><br>PLACE:    Courtroom 6, 2d Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     Rothenberg's Challenges To Disgorgement Fail................................................. 2

        A.      Rothenberg Has Failed to Show that the SEC's $18.8 Million
                Disgorgement Amount is Not a Reasonable Approximation of Unjust
                Enrichment............................................................................................. 2

                1.      The SEC's Disgorgement Figure Credits All "Indirect
                        Investments."............................................................................ 2

                2.      Rothenberg Cannot Reduce the Disgorgement Amount
                        Based on "Investments" in River Studios When There
                        Were No Such Investments. ...................................................... 3

                3.      The Disgorgement Figure Should Not be Discounted
                        for Attorneys' Fees. ................................................................. 4

        B.      Disgorgement Is an Appropriate Equitable Remedy.. ........................... 4

                1.      Ninth Circuit Precedent Supports Disgorgement as
                        Equitable Relief. ...................................................................... 5

                2.      *Kokesh* Does Not Preclude Disgorgement from Defendant. ................... 7

                3.      Disgorgement is Not Limited to Money Still in
                        Rothenberg's Possession ......................................................... 8

III.    Defendant's Opposition Reinforces the Appropriateness of a $9 Million
        Civil Penalty. ...................................................................................................... 9

        A.      Rothenberg Already Conceded the Deceptive Acts Cited by
                the SEC, and His Arguments Do Not Withstand Scrutiny. .................. 9

        B.      Rothenberg's Contentions About Silicon Valley Bank Fail.............. 10

        C.      Rothenberg's Response to His Deceptive Acts Regarding the
                Purported River Studios "Investment" and Sham Warrant
                Agreements Fails.. ................................................................................ 11

        D.      Rothenberg Offers Unsupported Factual Assertions to Contest
                Conceded Facts Regarding His Misappropriation From
                Investors in Unity. ............................................................................... 13

        E.      Rothenberg's Arguments Enhance The Case for a $9 Million
                Civil Penalty. ....................................................................................... 13

IV.     CONCLUSION.................................................................................................. 14

1

2 **TABLE OF AUTHORITIES**

3 <u>**CASES**</u>

4 *Eagleston v. Guido*, 41 F.3d 865 (2d Cir. 1994) ............................................................ 7

5 *FTC v. Bronson Partners LLC*, 654 F.3d 359 (2d Cir. 2011).......................................... 9

6 *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ......................... 9

7 *Hateley v. SEC,* 8 F.3d 653, 656 (9th Cir. 1993) ........................................................... 5

8
9 *In re Sherman,* 491 F.2d 948 (9th Cir. 2007)................................................................. 9

10 *Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ........................................................................ 7

11 *Maslenjak v. United States*, 137 S. Ct. 1918 (2017) ..................................................... 6

12 *SEC v. Banner Fund Intern.*, 211 F.3d 602 (D.C. Cir. 2000) ........................................ 9

13 *SEC v. BIC Real Estate Dev. Corp.*, 2017 WL 1740136 (E.D. Cal. May 4, 2017) ..................... 14

14 *SEC v. Cavanagh,* 445 F.3d 105 (2d Cir. 2006) ............................................................ 9

15 *SEC v. de Maison*, 2019 WL 4127328 (2d Cir. Aug. 30, 2019) .................................... 7

16 *SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998)....................................... 5

17 *SEC v. Gemstar-TV Guide Int'l Inc.*, 401 F.3d 1031 (9th Cir. 2005) ........................... 6

18 *SEC v. Int'l Swiss Investments Corp.*, 895 F.2d 1272 (9th Cir. 1990).......................... 5

19
*SEC v. Jammin Java Corp.*, No. 2:15-cv-08921, 2017 WL 4286180
20   (C.D. Cal. Sept. 14, 2017)......................................................................................... 5

21 *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109 (9th Cir. 2006)................................. 5

22 *SEC v. Liu*, --- Fed. Appx. ---, 2018 WL 5308171 (9th Cir. Oct. 25, 2018)................... 7

23 *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072 (9th Cir. 2010) ............................. 2, 5, 8

24 *SEC v. Wencke*, 783 F.2d 829 (9th Cir. 1986) ............................................................. 5

25 *SEC v. World Capital Market, Inc.*, 864 F.3d 996 (9th Cir. 2017)................................. 5

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATUTES AND REGULATIONS

Sarbanes-Oxley Act of 2002, Pub. L. 107-204, §§ 308 and 803 ................................................... 6

11 U.S.C. § 523(a)(19) ............................................................................................................. 6

15 U.S.C. § 78t-1(b)(2) ........................................................................................................... 6

15 U.S.C. § 78u(d)(4)............................................................................................................... 6

15 U.S.C. § 78u(d)(5)............................................................................................................... 6

15 U.S.C. § 78u-3(c)(3) ........................................................................................................... 6

15 U.S.C. § 78u-6 .................................................................................................................... 6

15 U.S.C. § 80b-9(d) ............................................................................................................... 6

15 U.S.C. § 7246 ..................................................................................................................... 6

28 U.S.C. § 2462 ..................................................................................................................... 6

## I.    INTRODUCTION

With judgment on liability established, and the foundational facts agreed to by the parties, the SEC's motion addresses the measure of disgorgement and the magnitude of the penalty warranted by defendant Michael Rothenberg's already-conceded misappropriation and fraudulent scheme. The SEC established, through a forensic accounting, that Defendant misappropriated $18.8 million, and the burden shifted to Rothenberg to show why that measure is not a "reasonable approximation" of his profits. But he fails to carry his burden.

Rothenberg makes three unfounded factual arguments to attempt to reduce the disgorgement amount. First, he asserts that the SEC does not account for "indirect investments" in his "River Accelerator" companies. But the SEC did include approximately $8.3 million of the Funds' money that went to these companies, and accounting records show that there were no "indirect investments." Second, Rothenberg claims he made investments in River Studios that are ignored by the SEC, but both the Complaint and the additional evidence show that this claim was an after-the-fact fabrication to cover up his misappropriation. Third, Rothenberg contends that the disgorgement figure should be discounted for certain legal fees, but he does not provide any evidence to show that the fees were authorized by any of the specific provisions he cites.

Rothenberg's contentions that governing law prohibits an order of disgorgement here are similarly flawed. Disgorgement as an appropriate equitable remedy in SEC enforcement actions remains the law in the Ninth Circuit. And Defendant's claim that he no longer has the money misappropriated does not change the calculus. Full disgorgement of the $18.8 million he misappropriated, with interest, is authorized by the operative case law and warranted here.

Defendant's opposition papers actually provide the Court with additional bases for imposing a $9 million civil penalty by advancing positions that compound his misconduct. For example, Rothenberg claims "no substantial harm" to investors, but that is contradicted by the fact that he failed to invest the nearly $19 million of misappropriated funds, depriving investors of the expected benefit of their bargain. He also blames an array of others for his situation and actions, demonstrating his failure both to recognize the wrongful nature of his conduct or to offer any assurance against

1  future violations, two of the pertinent factors in assessing a civil penalty under Ninth Circuit

2  precedent.

3        As a result, the SEC requests that the Court order Rothenberg to pay disgorgement of

4  $18,776,800, plus pre-judgment interest of $3,663,323.47, and a civil penalty of $9 million.

5  **II.    Rothenberg's Challenges to Disgorgement Fail.**

6        **A.  Rothenberg Has Failed to Show that the SEC's $18.8 Million Disgorgement Amount is
          Not a Reasonable Approximation of the Unjust Enrichment.**

7

8        The SEC's $18.8 million disgorgement calculation is explained in detail and supported through a

9  forensic accounting and related evidence. Pl. Mot. (ECF No. 83) at 5-6; Fujimoto Decl. (ECF No. 84) ¶¶

10  3-8, 11-16.  Now the burden shifts to Defendant to prove otherwise. *SEC v. Platforms Wireless Intern.*

11  *Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010).  His three attempts to do so fail.

12        **1.   The SEC's Disgorgement Figure Credits All "Indirect Investments."**

13        Defendant contends that the SEC's disgorgement analysis does not account for permissible

14  "indirect investments" in his River Accelerator businesses. Opp. (ECF No. 90) at 4-5, 8, 11-12, 16. Not

15  so. The SEC's proposed disgorgement figure is based on a detailed analysis that includes investments in

16  the River Accelerator companies. Without offering numerical values or evidentiary support, Rothenberg

17  asserts that the SEC has improperly excluded authorized, "indirect investment" expenditures. *Id*. at 8. He

18  cites two provisions from the 2015 Fund and 2016 Fund (Opp. at 16) stating that the Funds intend to

19  make two types of investments through the River Accelerator program: (1) direct investments in

20  companies that are part of the River Accelerator program; plus (2) investments of "the provision and use

21  of specialized equipment, real estate, events and services provided by employees or contractors, or other

22  expenditures." He calls the latter "indirect investments." *Id*. at 16.

23        The SEC's disgorgement figure reflects all such River Accelerator investments for which there is

24  evidentiary support. Specifically, the SEC's disgorgement calculation credits Rothenberg for *all*

25  investments in Portfolio Companies, including those that were part of the River Accelerator, which total

26  approximately $8.3 million. Fujimoto Decl. ¶ 5, 16; Supplemental Fujimoto Decl. in Support of SEC

27  Motion ("Supp. Fujimoto Decl.") ¶ 3. However, the accounting records reflect that there were *no*

28  "indirect investments" in "the provision and use of specialized equipment, real estate, events and

services provided by employees or contractors, or other expenditures." *Id.* ¶¶ 4-6. Mr. Fujimoto searched the 2015 and 2016 Fund QuickBooks accounting records for anything labeled "indirect investments" (or any related items) and anything that would substantively reflect the types of "indirect investment" categories set forth in the two paragraphs Rothenberg cites in his Opposition. *Id.* ¶¶ 5-6. If there had been any such investments, the accounting records should so indicate. Instead, they reflect $0 for any amounts that are listed or could be construed as "indirect investments." *Id.*

The SEC considered whether Defendant's "indirect investment" hypothesis was meant to rebut two line items in Mr. Fujimoto's misappropriation calculation, one showing $5.3 million transferred to "River Accelerator, LLC," and one showing $3.7 transferred to "Rothenberg Ventures Events LLC." Fujimoto Decl. ¶ 1, Ex. A at 25. If so, it also fails. The bank records show that (1) all of this money was transferred in June 2018; (2) none of the money went to investments in Portfolio Companies; and (3) none of the money went to costs or expenditures including "the provision and use of specialized equipment, real estate, events and services provided by employees or contractors, or other expenditures" that could have been classified as an "indirect investment" into the Portfolio Companies.  Supp. Fujimoto Decl. ¶ 7.

### 2. Rothenberg Cannot Reduce the Disgorgement Amount Based on "Investments" in River Studios When There Were No Such Investments.

Rothenberg also argues that the $18.8 million disgorgement figure should be reduced because he was permitted to make investments in River Studios. He states that he "specifically disclosed the potential of an investment in River Studios." Opp. at 15. This misses the point. Rothenberg diverted money to pay River Studios' expenses, but none of his misappropriation constituted an "investment" by the Funds. Indeed, Rothenberg conceded these facts for purposes of this motion. The SEC's Complaint, which is deemed true for purposes of this motion, states that Rothenberg misappropriated money to finance River Studios, contrary to his current argument that the misappropriation was instead an "investment" by the Funds. Compl. (ECF No. 1) ¶¶ 33, 65-68, 36 ("Rothenberg misused the money taken from his clients to fund his personal business ventures (primarily by sinking millions into River Studios)…").

Also, the provision Rothenberg relies on for his argument, a section of the Summary of Principal

1    Terms to the 2015 Fund Offering Memorandum titled "Information on Related Entities," does not grant

2    him unbridled authority to invest Fund money in River Studios; nor does it confirm that he made such

3    investments. Opp. at 15 (citing Ex. D. (ECF No. 90-2) at 7 of 151). It is merely a description for conflict-

4    of-interest purposes, acknowledging that Rothenberg may make investments on behalf of his many

5    entities, including River Studios, and other funds that he may manage, and that some of these

6    investments "could potentially be suitable for the [2015] Fund; however, the [2015] Fund will derive no

7    economic benefit from such investments . . . *except to the extent the [2015] Fund invests in such*

8    *investments*." *Id*. (emphasis added). Most notably, Defendant provides no facts to show that any Fund

9    actually *did* invest in River Studios. Quite the contrary. The SEC outlined at length that Rothenberg's

10   claim that he invested in River Studios was an after-the-fact device he used to hide his earlier

11   misappropriation. Pl. Mot. at 8-9; Fujimoto Decl. ¶¶ 35-36; Compl. ¶ 80.

12                  **3.   The Disgorgement Figure Should Not be Discounted for Attorneys' Fees.**

13          Defendant claims that $3.1 million that he used to pay attorneys should be "excluded from any

14   disgorgement analysis in this case." Opp. at 11. He cites two bases for his argument. First, he claims that

15   express provisions mandate that the Funds indemnify him for attorneys' fees incurred in his defense of

16   "the SEC's investigation, this lawsuit, and any other action or threatened litigation against him arising

17   out of his role in managing the Funds." *Id*. at 8-10. Second, he argues that the Fund agreements authorize

18   him "to pursue litigation against third parties on behalf of the Funds and charge the cost of litigation to

19   the Funds." *Id*. at 10. However, there is no evidence to substantiate what, if any, portion of these fees

20   were incurred for legal services relating to either indemnification or pursuit of ligation on behalf of the

21   Funds. Without such evidence, Rothenberg's argument fails. For example, Rothenberg argues that some

22   unspecified amount of money went to lawyer fees for permissible affirmative litigation, including a case

23   against Silicon Valley Bank. Opp. at 5-6, 10-11. But there is no evidence that the 2013 Fund, from

24   which he raided the assets to pay for his lawsuit against the bank, was a plaintiff in the case, or stands to

25   benefit therefrom. Opp. Ex. B (ECF No. 90-1) (at pages 7 and 17 of 70) (2013 Fund Operating

26   Agreement only authorized prosecution of suits "in favor of . . . the [2013 Fund].").

27                  **B.  Disgorgement Is an Appropriate Equitable Remedy.**

28          Rothenberg also offers three legal arguments to suggest that the Court should not order him to

disgorge the approximately $18.8 million that he unlawfully diverted from the Funds. First, he argues that disgorgement is not authorized by a specific statute. Opp. at 21-22. Second, he argues that the Supreme Court's decision in *Kokesh v. SEC* prohibits an order of disgorgement against him. And third, he argues that because he transferred the money he diverted to third-parties and "is not in possession of any of the funds," any amount of disgorgement would be inappropriate. Each of these arguments is contrary to law.

**1.   Ninth Circuit Precedent Supports Disgorgement as Equitable Relief.**

The SEC brought this case to enforce the securities laws, under the statute granting it the right to pursue injunctive actions in federal courts for violations of the Investment Advisers Act of 1940. *See* 15 U.S.C. § 80b-9(d). In cases brought by the SEC under the securities laws, the federal courts may grant "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Controlling circuit precedent holds that this authority includes the power to require disgorgement of ill-gotten gains obtained through violations of the federal securities laws. *See SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) ("[A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws.") (quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)).

The Ninth Circuit has long held that federal courts have broad equitable powers to issue a wide variety of equitable and ancillary relief, including "disgorgement of the gains obtained from securities law violations." *SEC v. World Capital Market, Inc.*, 864 F.3d 996, 1003 (9th Cir. 2017); *accord In re Sherman*, 491 F.2d 948, 959 (9th Cir. 2007); *SEC v. Int'l Swiss Investments Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986). Ninth Circuit precedent further defines the purpose for which disgorgement may be imposed and how it should be measured. *See, e.g., Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993) (explaining that disgorgement is a means "to remedy … unjust enrichment," not "a *fine* levied against petitioners as *punishment* for their conduct," and reducing the disgorgement ordered); *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114-16 (9th Cir. 2006) (discussing circumstances when expenses may be deducted from disgorgement obligation).

Moreover, Rothenberg's argument that Congress "has chosen not to provide for such a

1   remedy in court actions" (Opp. at 22), cannot be reconciled with numerous statutes that expressly

2   refer to "disgorgement" in "judicial actions." For instance, in the same legislation that expressly

3   authorized courts to award "equitable relief" in SEC actions, Congress provided, among other things,

4   that (1) "disgorgement payment[s]" resulting from any "court … order in SEC enforcement actions"

5   shall not be dischargeable in bankruptcy; and (2) civil penalties could be added to "disgorgement

6   fund[s]" to be distributed to investors. *See* Sarbanes-Oxley Act of 2002, Pub. L. 107-204, § 308,

7   codified at 15 U.S.C. § 7246, and § 803, codified at 11 U.S.C. § 523(a)(19). Similarly, in *SEC v.*

8   *Gemstar-TV Guide Int'l Inc.*, 401 F.3d 1031, 1035 (9th Cir. 2005) (*en banc*), the Ninth Circuit

9   observed that preservation of funds for potential disgorgement and for other remedies was a driving

10  factor behind the enactment of the statute, Section 1103 of the Sarbanes–Oxley Act, 15 U.S.C. § 78u–

11  3(c)(3), under which public issuers of securities may be ordered to place extraordinary payments to

12  executives in escrow during a pending SEC investigation. "Congress' purpose in enacting Section

13  1103's escrow measure could not be clearer. . . . By the time the authorities have been alerted to the

14  fraud, it's too late; the assets of the company have already disappeared, rendering the traditional

15  remedies used by the Commission to rectify such wrongs – disgorgement, civil penalties, restitution,

16  etc. – difficult, if not impossible, to pursue." *Id*. at 1035; *see also* 15 U.S.C. § 78t-1(b)(2) (referring to

17  amounts that a defendant in an SEC case "may be required to *disgorge, pursuant to a court order*")

18  (emphasis added); 15 U.S.C. § 78u(d)(4) (describing use of funds "disgorged as a result of an action

19  brought by the Commission in Federal Court"); 15 U.S.C. § 78u-6 (measuring payments to

20  whistleblowers by amounts of any "disgorgement" ordered to be paid in a "judicial" action brought

21  by the SEC). Defendant's argument would render these statutes meaningless and superfluous, in

22  violation of a court's obligation "to make sense rather than nonsense out of the corpus juris."

23  *Maslenjak v. United States*, 137 S. Ct. 1918, 1926 (2017).

24      Finally, Rothenberg misquotes the current SEC Chairman, Jay Clayton, to claim that the SEC

25  has admitted that it lacks the authority to obtain disgorgement after *Kokesh*. Opp. at  22. What the

26  SEC Chairman actually relayed during Congressional testimony regarded the limitations on

27  disgorgement of ill-gotten gains that are subject to the five-year statute of limitations:

28

"I believe that the *Kokesh* Supreme Court decision – we need some help. **We need some help because what it did was it said basically Ponzi schemes and other types of frauds like that that go on beyond five years, we're not able to reach back and get the money back for people who were victim of those schemes**. Disgorgement was viewed in that case as a penalty subject to the five-year statute of limitations." . . . "We do not have the authority **in those types of cases**."

C-Span.org, December 11, 2018 testimony of Jay Clayton before the Senate Banking Committee (Oversight of the Securities and Exchange Commission) (minutes 43-44) (bolded text omitted by Rothenberg). In any event, the opinions of a public official as to the state of the law are not evidentiary "admissions." *See Eagleston v. Guido*, 41 F.3d 865, 873-74 (2d Cir. 1994) (such statements are inadmissible opinions regarding the law).

### 2.   *Kokesh* Does Not Preclude Disgorgement from Defendant.

Rothenberg argues that the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017), in which disgorgement was held to be a penalty "within the meaning" of the statute of limitations in 28 U.S.C. § 2462, also suggests that disgorgement is a penalty for all purposes in this case, and thus cannot be awarded pursuant to this Court's equitable authority. *See* Opp. at 22-23. But the Supreme Court in *Kokesh* expressly stated:  "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings." 137 S. Ct. at 1642, n.3. While Defendant acknowledges that *Kokesh* "did not address these questions in their entirety" (Opp. at 23), he claims that other courts have done so, but he fails to identify any decisions that supports his position.

In fact, post-*Kokesh*, courts have held that the well-established precedent recognizing courts' authority to award disgorgement continues to be valid and binding. *See e.g, SEC v. Liu*, --- Fed. Appx. ---, 2018 WL 5308171 at *3 (9th Cir. Oct. 25, 2018) (not for publication) (rejecting challenge to disgorgement order, finding that the Court's express refusal in *Kokesh* to reach the issue was not "clearly irreconcilable" with longstanding Ninth Circuit precedent); *SEC v. de Maison*, 2019 WL 4127328, at *1 (2d Cir. Aug. 30, 2019) (unpublished) ("[W]e cannot agree with de Maison that the Supreme Court in *Kokesh* implicitly did what it *explicitly* said it was not doing.") (emphasis in original); *SEC v. Jammin Java Corp.*, No. 2:15-cv-08921, 2017 WL 4286180, at *2-4 (C.D. Cal. Sept. 14, 2017) (holding that "*Kokesh* is best seen as a decision clarifying the statutory scope of §

1  2462, rather than one redefining the essential attributes of disgorgement," and ordering

2  disgorgement), *aff'd*, 773 Fed. Appx. 354 (9th Cir. May 8, 2019).

3      Rothenberg also misstates the SEC's position on disgorgement, contending that the SEC

4  seeks this remedy only as a deterrent. Opp. at 21, 23 (partial quotation of the SEC motion). To the

5  contrary, it is the SEC's position that disgorgement ordered in this case would mark an important step

6  in rectifying Defendant's fraud. If disgorgement is granted by this Court, the SEC would expect to

7  ask the Court to permit a distribution to harmed investors of significant funds collected.

8              **3.  Disgorgement is Not Limited to Money Still in Rothenberg's Possession.**

9      Defendant claims that he is "not in possession of the funds the SEC seeks to recover as

10  disgorgement" because "[e]very instance that the SEC cites as misappropriation of the funds, as

11  detailed in Mr. Fujimoto's report, involves a transaction in which such funds left Mr. Rothenberg's

12  possession and/or control and was delivered to a third party." Opp. at 24-25. He asserts that because

13  he "is not in possession of any of the funds the SEC seeks to disgorge, there is no equitable relief

14  available to the SEC as a means of recover such funds." Opp. at 25. Defendant similarly argues that

15  his Consent to Judgment, which provides that "Defendant agrees that the Court shall order

16  disgorgement of ill-gotten gains" (Consent (ECF No. 5) ¶ 5), limits disgorgements to "the form of

17  disgorgement that is equitable (that is, taking back only the ill-gotten gains the defendant still has)."

18  Opp. at 25. Defendant's argument is contrary to established Ninth Circuit law.

19      As a matter of law in the Ninth Circuit, disgorgement is not limited to amounts still in a

20  defendant's possession. *SEC v. World Capital Market*, *Inc*., 854 F.3d at 1007 (2017) ("[O]ngoing

21  possession of the funds is not required for disgorgement") *citing Platforms Wireless*, 617 F.3d at

22  1098 ("A person who controls the distribution of illegally obtained funds is liable for the funds he or

23  she dissipated as well as the funds he or she retained") *and JT Wallenbrock & Assocs.*, 440 F.3d at

24  1116 ("The manner in which [the recipient of ill-gotten funds] chose to spend the illegally obtained

25  funds has no relevance to the disgorgement calculation")). As courts have observed, Defendant's

26  argument would bring about an absurd, and inequitable, result. "Under [Defendant's] approach, for

27  example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while

28  husbanding his other assets, would be immune from an order of disgorgement. [Defendant's] would

1  be a monstrous doctrine for it would perpetuate rather than correct an inequity." *SEC v. Banner Fund*

2  *Intern.*, 211 F.3d 602, 617 (D.C. Cir. 2000). Defendant's citation to *Great-West Life & Annuity Ins.*

3  *Co. v. Knudson*, 534 U.S. 204 (2002), does not aid his argument. In *Great-West Life*, the Court

4  addressed the difference – longstanding in American jurisprudence – between "restitution at law" and

5  "restitution in equity" to determine whether the remedy sought in that case was contemplated by the

6  relevant statute (ERISA). *Id.* at 214-18. In contrast, disgorgement that forces a defendant to return his

7  ill-gotten gains is traceable to the ancient remedy of accounting (*see SEC v. Cavanagh*, 445 F.3d 105,

8  119-20 (2d Cir. 2006)), which *Great-West* acknowledged does not require tracing. *Great-West Life*,

9  534 U.S. at 715, n.2. Contrary to Defendant's premise (*see* Opp. at 24), disgorgement does not

10  require tracing, and does not seek to impose a lien or constructive trust on specified property. *See*

11  *FTC v. Bronson Partners LLC*, 654 F.3d 359, 373-75 (2d Cir. 2011) (explaining longstanding

12  distinction between "disgorgement" remedy and remedies available to a private litigant, and the

13  consequences of court decisions finding no tracing requirement).

14        Finally, Defendant's assertion that the misappropriated funds "left Mr. Rothenberg's

15  possession" is not only legally irrelevant, but factually misleading. The SEC has already proved that

16  Rothenberg funneled the vast bulk of the $18.8 million to *his own businesses* – plus $3.8 million to

17  himself.  Fujimoto Decl. ¶¶ 4, 12-14, 16. And Rothenberg admits that he benefits from money

18  flowing to his businesses. Opp. at 11 ("Of course, Mr. Rothenberg personally benefits from the

19  success of all these entities, just as any founder . . . benefits from the success of their enterprise.").

20  **III.**    **Defendant's Opposition Reinforces the Appropriateness of a $9 Million Civil Penalty.**

21        **A. Rothenberg Already Conceded the Deceptive Acts Cited by the SEC, and His**

22           **Arguments Do Not Withstand Scrutiny.**

23        In support of the $9 million civil penalty request, the SEC described in detail three specific

24  examples of the deceptive schemes Rothenberg employed to try to cover up his misappropriation: (1)

25  the $4 million-dollar line of credit obtained under false pretenses; (2) the altered accounting records

26  that changed "fees" to "investments"; and (3) the sham agreements that re-characterized diverted

27  funds as investments in "warrants." Pl. Mot. at 7-10. These instances illustrate Defendant's repeated,

28  brazen fraud and reveal his scienter. Rothenberg now challenges the factual basis for each of these,

1   but his efforts fail because he already conceded these facts and his arguments to the contrary don't

2   hold up.

3       **B.  Rothenberg's Contentions About Silicon Valley Bank Fail.**

4           In response to the SEC's demonstration of the fraudulent scheme related to the Silicon Valley

5   Bank (SVB) line of credit, Rothenberg now claims not only that he "had the authority" to borrow

6   money and that the loan was done with "the aid, oversight and direction" of other employees (Opp. at

7   13) but also that the bank (which lent him the money he sought) actually defrauded him, through the

8   "secret movement of funds," and is responsible for his downfall. *Id.* at 16-19 (Rothenberg's company

9   went from a "vibrant firm with access to the best deals in Silicon Valley to being shunned by the

10  industry" by "the fraud of a 'dirty bank'"); *Id.* at 18 ("SVB's fraud sowed the seeds of mistrust and

11  panic"). His accusations and excuses wither under scrutiny.

12          Rothenberg has already conceded for this motion his deceptive acts regarding SVB: As the

13  Complaint states, his "deceptive acts included, among others, (i) improperly using cash from the 2015

14  Fund so RVMC could secure a line of credit from a bank, and then using the proceeds from the line

15  of credit to mask the 2015 Fund's 'overpayment' of fees." Compl. ¶ 72. The Complaint further

16  details that in December 2015, RVMC's finance director calculated that RVMC already had taken

17  more in fees from the 2015 Fund than RVMC would ever be entitled to earn over the entire 10-year

18  contractual life of the Fund; Rothenberg misrepresented to SVB that RVMC was entitled to $4.25

19  million in the 2015 Fund; Rothenberg approved the transfer of $4.25 million from the 2015 Fund's

20  bank account to RVMC's bank account; after receiving the line of credit, RVMC immediately drew

21  down the entire $4 million line of credit and transferred the proceeds to the 2015 Fund's bank

22  account; and Rothenberg's actions, timed to the 2015 Fund's fiscal year-end, created the illusion that

23  Rothenberg was returning excess fees that RVMC had taken during 2015. *Id.* ¶¶ 44, 72-74.

24          Moreover, in his Opposition, Rothenberg does not contradict, nor explain, the series of

25  specific deceptive steps that he took in December 2015:

26      • Rothenberg does not dispute that on December 20, 2015, the 2015 Fund's bank
          account had only $37,487; but the RVMC accounting records showed that RVMC
27        owed the 2015 Fund $3,967,50 (Pl. Mot at 7; Fujimoto Decl. ¶¶ 40-41).

28

- Rothenberg does not dispute that he told SVB that the 2015 actually owed RVMC $4.25 million in fees (Pl. Mot. at 7; Compl. ¶ 40).

- Rothenberg does not dispute that he raised over $4 million from investors in the *2016 Fund* but diverted it to the 2015 Fund (Pl. Mot at 7; Fujimoto Decl. ¶ 7).

- Rothenberg does not dispute that he immediately drew down the entire $4 million line of credit and transferred all of it from RVMC to the 2015 Fund to pay-off the $3,967,501 RVMC owed the 2015 Fund (Pl. Mot. at 8; Fujimoto Decl. ¶ 43).

- And Rothenberg does not dispute that From January to April 2016, the 2015 Fund transferred a total of $5 million to RVMC that was spent as follows: $1.5 million to Rothenberg himself; $1.25 million to Rothenberg's separate business entities; and $2.4 million for RVMC operating expenses (Pl. Mot. at 8; Fujimoto Decl. ¶ 44).

Instead, Rothenberg floats an incomprehensible conspiracy, accusing the bank of opening "a new and unauthorized account," and "fraudulently, inexplicably and without permission wir[ing] $4.25M" to Rothenberg's business. Opp. at 17. Rothenberg attempts further to deflect blame, arguing that his employees "were carrying out a secret mutiny that resulted in false accusations against Mr. Rothenberg." *Id*. at 18. There is no basis to credit Rothenberg's description of the SVB loan, as it does not even rebut the critical facts demonstrated by the SEC, let alone those he has already agreed are established for the purposes of this motion.

### C. Rothenberg's Responses Regarding the Purported River Studios "Investment" and Sham Warrant Agreements Fail.

Defendant also challenges the factual bases for the SEC's second and third examples of his deceptive campaign to conceal his misappropriation. As its second example, the SEC provided evidence that Rothenberg tried to mask his misappropriation of investor funds by creating the appearance that he invested those funds in his River Studios business. Pl. Mot. at 8. Specifically, six months after the original accounting entries were made showing $3 million in "fees," – and after Rothenberg learned of the SEC's investigation – the accounting records were altered to suggest that the money taken was for River Studios and related to portfolio investments. *Id*. at 8; Fujimoto Decl. ¶ 35.

Again, Rothenberg does not dispute:

- That the QuickBooks were changed 6 months after the originally entries; and

- That the bank records also prove that this $3 million was not invested in River Studio, as he claimed after the SEC launched his investigation. Pl. Mot. at 8-9; Fujimoto Decl. ¶ 36.

1   Instead, Defendant blames his former employees for the state of his accounting records, contending that

2   one accounting professional "habitually recorded expenditures as compensation to Mr. Rothenberg."

3   Opp. at 14-15. Rothenberg also argues that he was permitted to invest in River Studios. *Id*. at 15. These

4   arguments miss the point: After he misappropriated money, and when on the verge of being caught,

5   Defendant covered his tracks by altering QuickBooks entries to make it look like he invested in River

6   Studios, when he did not. Rothenberg also cannot avoid that he conceded for this motion the factual

7   basis for this deceptive conduct set forth in the Complaint. In particular, "Rothenberg's representation

8   that the Rothenberg Funds had invested $5 million in River Studios over two years was false as it was

9   contrary to Defendants' past conduct, including (i) RVMC's contemporaneous accounting records . . . ."

10  Compl. ¶ 80.

11          As to the third and most brazen example of his deceptive acts – his creation of sham

12  "Warrant" agreements – Rothenberg's silence is telling. After transferring millions of dollars from

13  the 2015 Fund to RVMC in early 2016, and recording the money as payment of management and

14  administrative fees, the QuickBooks were later altered to instead record $1,485,550 of this amount as

15  "Stock Warrants." Fujimoto Decl. ¶¶ 19, 24-25. Rothenberg again blames a former employee for the

16  state of the accounting records. But that argument ignores the fact that these supposed "Warrant"

17  agreements provided by Rothenberg had abundant indicia of being fraudulent, *post hoc* creations:

18  •   All six agreements were dated the same day, December 31, 2016 – nine to twelve
19      months after the transactions they purportedly authorize (Fujimoto Decl. ¶ 19; Compl. ¶
        78).

20  •   Five of the six are missing essential, basic information; they do not state (i) the number
21      of shares that can be purchased in the Portfolio Companies, (ii) the exercise price of the
        warrants, or (iii) how the purchase price was determined (Fujimoto Decl. ¶¶ 20-21).

22  •   The schedule Rothenberg provided, purportedly to show how he determined the purchase
23      price, is completely blank (*Id*. ¶ 21).

24  •   And even the lone 2015 Fund warrant agreement that does includes a valuation shows
        that the 2015 Fund paid $120,000 for warrants with value of only $4.38 (*Id*. ¶ 23).

25          Here too, the Complaint also outlines Rothenberg's deceptive conduct: Rothenberg "used

26  these self-dealing transactions to mask the overpayment of fees," including "[Warrant] agreements

27  [that] are incomplete and reference valuation schedules that are not included and do not appear to

28

exist." Compl. ¶¶ 75-78. This unrebutted example of Rothenberg's scienter is strong support for the

requested penalty.

### D. Rothenberg Offers Unsupported Factual Assertions to Contest Conceded Facts Regarding His Misappropriation From Investors in Unity.

In addition to challenging the SEC's examples of his deceptive conduct, Rothenberg also takes

issue with one of the examples of his more recent schemes, the $1.3 million misappropriated from Unity

investors in the summer of 2016. Again, these facts were conceded for purposes of this motion. *See*

Compl. ¶¶ 48-56; 63-64 (describing how Rothenberg misappropriated $1.3 million and returned $1

million a year later using other misappropriated money). Without evidence, Rothenberg now argues that

he paid back all of the money "with some interest," and he dismissively refers to returning the money *a*

*year later* as a "temporar[y] delay[]." Opp. at 20. He also neglects to mention that he used other

misappropriated money to make the payment. *See* Compl. ¶¶ 63-64; Fujimoto Decl. ¶ 38.

### E. Rothenberg's Arguments Enhance The Case for a $9 Million Civil Penalty.

Rothenberg throws the term "grossly excessive" at the SEC's penalty request, but his

arguments boomerang. Defendant offers no more than sleight-of-hand to suggest that the SEC has not

demonstrated "substantial losses" or a "significant risk of substantial losses" to any investors. Opp. at

26. He asserts that that the SEC has not claimed that "investors' current holdings in the Funds are any

less valuable today *than their initial investments." Id*. at 19 (emphasis added). By his rationale, if an

investor provided $1 million, and the advisor stole $500,000, the investor would not face either a

"substantial loss" or a "significant risk" of such a loss unless or until the Court could determine the

performance of the remaining $500,000 investment. But according to Rothenberg, "investors'

holdings [based on the money he *did* invest] have significantly appreciated in value relative to their

initial investments." Opp. at 19; *see also id*. at 4 ("Any venture capitalist who seeded these

companies over the course of a career would be  considered successful by almost any measure, and

yet Mr. Rothenberg identified and invested in all of these startups in less than 3 years . . . .").  If

Rothenberg stands by his ability to make valuable investments, he must concede that had the $18.8

million not been misappropriated – and the investors had the benefit of the money actually being in

the intended Funds – they would be better off now based on investments that could have been made

1  with the misappropriated money. In any event, investors are harmed when they are robbed of the

2  principal or returns that they sought to invest.

3  Rothenberg also attacks the recommended penalty by claiming that he was allowed to do what

4  he did. *Id*. at 26-27. The SEC has proved that this simply is not so. Lastly, Rothenberg questions the

5  SEC's evidence of scienter, contending that "[t]here is plenty of evidence to suggest that Mr.

6  Rothenberg believed everything he was doing was lawful and proper." Opp. at 27. To the contrary,

7  the case is replete with examples of his scienter, including altered accounting records and fake

8  "Warrant" documents.

9  The SEC has explained why a $9 million penalty is fully warranted. Pl. Mot. at 17-19. And

10  Rothenberg's own words provide powerful support for a $9 million penalty. His brief is larded with

11  deflection of blame – blame for a bank that loaned him $4 million, blame for employees and their

12  "secret munity," and blame for the SEC. But acceptance of responsibility is nowhere to be found.

13  Courts examine the defendant's recognition of the wrongful nature of his conduct, and the sincerity

14  of his assurances against future violations. *See SEC v. BIC Real Estate Dev. Corp*., 2017 WL

15  1740136, at *5 (E.D. Cal. May 4, 2017) (evaluating *Murphy* factors and imposing a $12 million third-

16  tier penalty equal to disgorgement amount). Here there can be no doubt about these two factors.

17  Taken in combination with Rothenberg's scienter and the $18.8 million he misappropriated, these

18  factors demonstrate that a $9 million civil penalty is appropriate and just.

19  **IV.    CONCLUSION**

20  For the reasons set forth above, the Commissions respectfully requests that the Court grant the

21  Commission's motion and enter the requested relief.

22  Dated: September 4, 2019                    Respectfully submitted,

23

24                                              /s/  *Andrew J. Hefty*
                                                Andrew J. Hefty
25                                              Marc D. Katz
                                                Eric M. Brooks
26
                                                Attorneys for Plaintiff
27                                              SECURITIES AND EXCHANGE COMMISSION

28